**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724<br>HON. CYNTHIA M. RUFE |
| 1199SEIU NATIONAL BENEFIT FUND; 1199SEIU GREATER NEW YORK BENEFIT FUND; 1199SEIU NATIONAL BENEFIT FUND FOR HOME CARE WORKERS; 1199SEIU LICENSED PRACTICAL NURSES WELFARE FUND;<br><br>AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN;<br><br>LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY D/B/A BLUE CROSS AND BLUE SHIELD OF LOUISIANA AND HMO LOUISIANA, INC.;<br><br>SELF-INSURED SCHOOLS OF CALIFORNIA; and<br><br>SERGEANTS BENEVOLENT ASSOCIATION HEALTH AND WELFARE FUND, on behalf of themselves and all others similarly situated,<br><br><div align="center">Plaintiffs,</div><br>v.<br><br>ACTAVIS HOLDCO U.S., INC.;<br>ACTAVIS ELIZABETH LLC;<br>ACTAVIS PHARMA, INC.;<br>AKORN INC.;<br>AKORN SALES, INC.;<br>ALVOGEN INC.;<br>AMNEAL PHARMACEUTICALS, INC.;<br>AMNEAL PHARMACEUTICALS, LLC;<br>APOTEX CORP.;<br>ASCEND LABORATORIES, LLC;<br>AUROBINDO PHARMA USA, INC.;<br>BARR PHARMACEUTICALS, LLC;<br>BAUSCH HEALTH AMERICAS, INC.;<br>BAUSCH HEALTH US LLC;<br>BRECKENRIDGE PHARMACEUTICALS, INC.; | CIVIL ACTION NO.<br><br><br>JURY TRIAL DEMANDED<br><br><br><br><br><div align="center"><u>END-PAYER</u><br><u>CLASS ACTION COMPLAINT</u></div> |

CAMBER PHARMACEUTICALS INC.;
CITRON PHARMA LLC;
DAVA PHARMACEUTICALS, LLC;
DR. REDDY'S LABORATORIES, INC.;
EPIC PHARMA LLC;
FOUGERA PHARMACEUTICALS INC.;
GENERICS BIDCO I, LLC;
GLENMARK PHARMACEUTICALS, INC.;
GREENSTONE, LLC;
G&W LABORATORIES, INC.;
HERITAGE PHARMACEUTICALS, INC.;
HIKMA LABS, INC.;
HIKMA PHARMACEUTICALS USA, INC.;
HI-TECH PHARMACAL CO., INC.;
IMPAX LABORATORIES, LLC;
JUBILANT CADISTA PHARMACEUTICALS, INC.;
LANNETT COMPANY, INC.;
LUPIN PHARMACEUTICALS, INC.;
MALLINCKRODT INC.;
MAYNE PHARMA INC.;
MORTON GROVE PHARMACEUTICALS, INC.;
MUTUAL PHARMACEUTICAL COMPANY, INC.;
MYLAN INC.;
MYLAN PHARMACEUTICALS, INC.;
OCEANSIDE PHARMACEUTICALS, INC.;
PAR PHARMACEUTICAL, INC.;
PERRIGO NEW YORK, INC.;
PFIZER, INC.;
PLIVA, INC.;
SANDOZ, INC.;
SUN PHARMACEUTICAL INDUSTRIES, INC.;
TARO PHARMACEUTICALS USA, INC.;
TELIGENT INC.;
TEVA PHARMACEUTICALS USA, INC.;
TORRENT PHARMA INC.;
UPSHER-SMITH LABORATORIES, LLC;
VERSAPHARM, INC.;
WEST-WARD COLUMBUS, INC.;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

WEST-WARD PHARMACEUTICALS INC.;

WOCKHARDT USA LLC; and,

ZYDUS PHARMACEUTICALS (USA), INC.

       Defendants.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## TABLE OF CONTENTS

I.     **NATURE OF THE ACTION**......................................................................................... 1

II.    **JURISDICTION AND VENUE**............................................................................. 15

III.   **PLAINTIFFS**.......................................................................................................... 16

IV.  **DEFENDANTS**....................................................................................................... 20

     A.     Actavis Defendants........................................................................................20

     B.     Akorn Defendants.........................................................................................21

     C.     Alvogen..........................................................................................................22

     D.    Amneal Defendants.......................................................................................22

     E.     Apotex............................................................................................................23

     F.     Ascend............................................................................................................23

     G.    Aurobindo.....................................................................................................23

     H.    Bausch Defendants........................................................................................23

     I.      Breckenridge.................................................................................................24

     J.     Cadista...........................................................................................................24

     K.    Camber...........................................................................................................24

     L.     Citron.............................................................................................................25

     M.    Dr. Reddy's...................................................................................................25

     N.    Epic................................................................................................................25

     O.    Glenmark.......................................................................................................25

     P.     Greenstone Defendants.................................................................................26

     Q.    G&W.............................................................................................................26

     R.     Heritage.........................................................................................................26

     S.     Impax.............................................................................................................27

     T.     Lannett...........................................................................................................27

     U.    Lupin.............................................................................................................27

     V.     Mallinckrodt..................................................................................................28

     W.    Mayne............................................................................................................28

     X.     Mylan Defendants.........................................................................................28

     Y.     Par Defendants..............................................................................................29

     Z.     Perrigo...........................................................................................................29

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| AA. | Sandoz Defendants | 30 |
| BB. | Sun Defendants | 30 |
| CC. | Taro | 31 |
| DD. | Teligent | 32 |
| EE. | Teva Defendants | 32 |
| FF. | Torrent | 32 |
| GG. | Upsher-Smith | 33 |
| HH. | West-Ward Defendants | 33 |
| II. | Wockhardt Defendants | 34 |
| JJ. | Zydus | 34 |

| V. | CO-CONSPIRATORS | 35 |
| A. | Rising | 35 |
| B. | Unknown Co-Conspirators | 35 |

| VI. | DEFENDANTS' OVERARCHING CONSPIRACY | 35 |
| A. | Defendants Are Competitors or Potential Competitors for All Drugs at Issue. | 37 |
| B. | The Principles of "Playing Fair" and "Fair Share" Governed Defendants' Interactions. | 38 |
| C. | Defendants' Conspiracy Spanned Multiple Drugs and Manufacturers | 41 |
| | 1. Example 1: Nisha Patel and Teva's Systematic Price-Fixing | 42 |
| | 2. Example 2: Price-Fixing of Multiple Drugs All at Once | 44 |
| | 3. Example 3: Collusion on Drugs that Manufacturers Did Not Sell | 46 |
| D. | Frequent Meetings and Contacts among Industry Personnel Facilitated Defendants' Conspiracy | 47 |
| E. | Defendants Frequently Communicated Directly and Privately As Part of the Overarching Conspiracy | 48 |

| VII. | DEFENDANTS CONSPIRED TO FIX PRICES, ALLOCATE MARKETS AND/OR RIG BIDS FOR THE DRUGS AT ISSUE | 52 |
| | 1. Perphenazine | 54 |
| | 2. Pentoxifylline | 56 |
| | 3. Hydroxyurea | 59 |
| | 4. Piroxicam | 61 |
| | 5. Permethrin | 63 |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

6.     Triamcinolone Acetonide.................................................................... 67

7.     Potassium Chloride ........................................................................... 71

8.     Betamethasone Dipropionate ............................................................. 74

9.     Betamethasone Dipropionate Augmented ........................................... 74

10.    Betamethasone Dipropionate Clotrimazole ........................................ 74

11.    Betamethasone Valerate ................................................................... 74

12.    Hydrocortisone Valerate ................................................................... 74

13.    Nitrofurantoin ................................................................................. 87

14.    Nortriptyline HCL............................................................................. 89

15.    Methylprednisolone .......................................................................... 91

16.    Amiloride HCL/HCTZ......................................................................... 94

17.    Amphetamine Salts [Adderall] .......................................................... 97

18.    Dextroamphetamine Sulfate............................................................ 100

19.    Metronidazole ………………………………………………………………106

20.    Chlorpromazine HCL....................................................................... 110

21.    Flurbiprofen .................................................................................. 112

22.    Clonidine-TTS Patch ...................................................................... 114

23.    Oxybutynin Chloride ...................................................................... 116

24.    Triamterene HCTZ.......................................................................... 118

25.    Ranitidine HCL ............................................................................... 121

26.    Amantadine HCL ............................................................................ 125

27.    Fluocinolone Acetonide .................................................................. 127

28.    Irbesartan..................................................................................... 133

29.    Isosorbide Dinitrate....................................................................... 134

30.    Clindamycin Phosphate .................................................................. 137

31.    Labetalol HCL ................................................................................ 144

32.    Lamivudine/Zidovudine .................................................................. 146

33.    Lidocaine HCL................................................................................ 148

34.    Ethinyl Estradiol and Levonorgestrel .............................................. 151

35.    Etodolac ....................................................................................... 152

36.    Tamoxifen Citrate .......................................................................... 160

37.    Cimetidine .................................................................................... 162

38.    Cyproheptadine HCL ...................................................................... 164

39.    Oxaprozin...................................................................................... 167

40.    Tolterodine ................................................................................... 171

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

41.    Buspirone HCL ................................................................................................ 172

42.    Estradiol ........................................................................................................... 173

43.    Ethosuximide .................................................................................................... 175

44.    Loperamide HCL .............................................................................................. 177

45.    Nadolol .............................................................................................................. 179

46.    Halobetasol Propionate ................................................................................... 183

47.    Ketoprofen ........................................................................................................ 188

48.    Methotrexate Sodium ....................................................................................... 189

49.    Valsartan HCTZ ............................................................................................... 192

50.    Diclofenac Potassium ...................................................................................... 193

51.    Ketorolac Tromethamine ................................................................................. 196

52.    Prazosin HCL ................................................................................................... 198

53.    Methylphenidate ............................................................................................... 201

54.    Spironolactone HCTZ ...................................................................................... 205

55.    Bromocriptine Mesylate ................................................................................... 207

56.    Budesonide ....................................................................................................... 209

57.    Fenofibrate ....................................................................................................... 211

58.    Medroxyprogesterone ...................................................................................... 213

59.    Alclometasone Dipropionate ........................................................................... 214

60.    Carbamazepine ................................................................................................ 217

61.    Cefdinir ............................................................................................................. 223

62.    Cefprozil ........................................................................................................... 223

63.    Cholestyramine ................................................................................................ 224

64.    Ciclopirox ......................................................................................................... 228

65.    Drospirenone and Ethinyl Estradiol ............................................................... 230

66.    Tizanidine HCL ................................................................................................ 231

67.    Adapalene ......................................................................................................... 233

68.    Captopril ........................................................................................................... 234

69.    Diltiazem HCL .................................................................................................. 238

70.    Doxazosin Mesylate ......................................................................................... 241

71.    Fluconazole ...................................................................................................... 244

72.    Moexipril HCL .................................................................................................. 248

73.    Moexipril HCL HCTZ ....................................................................................... 248

74.    Nabumetone ..................................................................................................... 250

75.    Prednisone ........................................................................................................ 251

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

76.    Tolmetin Sodium ..................................................................................... 254

77.    Disopyramide Phosphate ......................................................................... 255

78.    Isoniazid ................................................................................................... 256

79.    Enalapril Maleate ..................................................................................... 257

80.    Haloperidol ............................................................................................... 261

81.    Prednisolone Acetate ............................................................................... 265

82.    Temozolomide .......................................................................................... 267

83.    Trifluoperazine HCL ................................................................................ 268

84.    Clemastine Fumarate ............................................................................... 271

85.    Oxycodone/Acetaminophen ..................................................................... 271

86.    Cephalexin ................................................................................................ 274

87.    Estradiol and Norethindrone Acetate (Mimvey) ..................................... 276

88.    Hydroxyzine Pamoate .............................................................................. 277

89.    Tobramycin ............................................................................................... 278

90.    Azithromycin ............................................................................................ 279

91.    Balsalazide Disodium ............................................................................... 280

92.    Butorphanol Tartrate ................................................................................ 282

93.    Cefuroxime Axetil .................................................................................... 284

94.    Clarithromycin ......................................................................................... 287

95.    Timolol Maleate ....................................................................................... 288

96.    Capecitabine ............................................................................................. 290

97.    Norethindrone/Ethinyl Estradiol (Balziva) ............................................. 291

98.    Penicillin V Potassium ............................................................................. 292

99.    Pilocarpine HCL ....................................................................................... 293

100.   Dexmethylphenidate HCL ........................................................................ 295

101.   Ketoconazole ............................................................................................ 297

102.   Paricalcitol ................................................................................................ 301

103.   Atenolol Chlorthalidone ........................................................................... 303

104.   Diphenoxylate Atropine ........................................................................... 305

105.   Estazolam .................................................................................................. 308

106.   Niacin ........................................................................................................ 309

107.   Phenytoin Sodium .................................................................................... 311

108.   Bumetanide ............................................................................................... 314

109.   Dicloxacillin Sodium ............................................................................... 315

110.   Diflunisal................................................................................................... 315

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

111.  Fluvastatin Sodium ............................................................... 316
112.  Topiramate ............................................................................. 317
113.  Allopurinol ............................................................................ 318
114.  Clotrimazole .......................................................................... 322
115.  Desogestrel and Ethinyl Estradiol ........................................ 325
116.  Prochlorperazine ................................................................... 326
117.  Fluoxetine HCL ..................................................................... 326
118.  Methadone HCL ..................................................................... 328
119.  Omega-3-Acid Ethyl Esters .................................................. 330
120.  Warfarin Sodium ................................................................... 332
121.  Ciprofloxacin HCL ................................................................ 335
122.  Desmopressin Acetate ........................................................... 337
123.  Entecavir ............................................................................... 338
124.  Flutamide .............................................................................. 339
125.  Glimepiride ........................................................................... 339
126.  Griseofulvin .......................................................................... 340
127.  Norethindrone Acetate .......................................................... 341
128.  Raloxifene HCL ..................................................................... 342
129.  Amoxicillin/Clavulanate ....................................................... 344
130.  Bethanechol Chloride ............................................................ 345
131.  Gabapentin ............................................................................ 346
132.  Celecoxib .............................................................................. 347
133.  Cabergoline ........................................................................... 348
134.  Naproxen Sodium .................................................................. 349
135.  Metformin ER (F) [Fortamet] ............................................... 351

VIII.  INTERSTATE AND INTRASTATE TRADE AND COMMERCE ...................... 352

IX.  BACKGROUND OF THE GENERIC DRUG INDUSTRY ....................... 353
    A.  Generic Drugs Are Commodity Products ........................... 353
    B.  Pricing in the U.S. Prescription Drug Industry. .................. 356

X.  FACTORS INCREASING THE SUSCEPTIBILITY TO COLLUSION OF THE
    DRUGS AT ISSUE .................................................................. 359
    1.  Industry Concentration ......................................................... 359

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

2.      Barriers to Entry..................................................................... 359

3.      Demand Inelasticity ............................................................... 360

4.      Lack of Substitutes................................................................ 360

5.      Standardized Product with High Degree of Interchangeability ......... 361

6.      Inter-Competitor Contacts and Communications .............................. 361

**XI.     THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS .. 370**

**A.      The Statutes of Limitations Did Not Begin to Run Because Plaintiffs
          Did Not and Could Not Discover Defendants' Unlawful Conspiracy. ..........370**

**B.      Fraudulent Concealment Tolled the Statutes of Limitations........................373**

1.      Active Concealment of the Conspiracy. ................................ 374

2.      Plaintiffs Exercised Reasonable Diligence. ........................... 378

**XII.    CONTINUING VIOLATIONS.............................................................. 379**

**XIII.   DEFENDANTS' ANTITRUST VIOLATIONS ....................................... 379**

**XIV.    CLASS ACTION ALLEGATIONS ..................................................... 381**

**XV.     CAUSES OF ACTION ....................................................................... 385**

**FIRST COUNT:  VIOLATION OF SECTIONS 1 AND 3 OF THE SHERMAN
ACT (ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS) .........385**

**SECOND COUNT:  VIOLATION OF STATE ANTITRUST STATUTES (ON
BEHALF OF PLAINTIFFS AND THE DAMAGES CLASS)................................. 387**

**THIRD COUNT:  VIOLATION OF STATE CONSUMER PROTECTION
STATUTES (ON BEHALF OF PLAINTIFFS AND THE DAMAGES CLASS)... 408**

**FOURTH COUNT:  UNJUST ENRICHMENT (ON BEHALF OF PLAINTIFFS
AND THE DAMAGES CLASS).................................................................... 441**

**XVI.    PRAYER FOR RELIEF.................................................................... 466**

**XVII.   JURY DEMAND.............................................................................. 467**

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

# I.   <u>NATURE OF THE ACTION</u>

1.     This suit brings claims on behalf of End-Payer Purchasers ("End-Payers" or "Plaintiffs" or "EPPs") of generic pharmaceutical drugs to secure injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise, and/or stabilize the prices of 135 generic pharmaceutical drugs beginning at least as early as July 2009. Together, these drugs are referred to herein as "Drugs at Issue."

2.     Defendants participated in an overarching conspiracy, the purpose of which was to raise prices and minimize competition in the generic drug industry for numerous generic drugs. This overarching conspiracy encompassed an agreement among all Defendants that covered all Drugs at Issue, and included subsidiary agreements among certain Defendants relating to individual Drugs at Issue.

3.     The Drugs at Issue discussed in this complaint are listed alphabetically in Table 1. The Drugs at Issue include: (a) forty drugs that are new to the MDL (highlighted in gray in Table 1); (b) all of the drugs sued upon by the State Attorneys General in their May 19, 2019 Complaint,[1] except for those drugs on which the EPPs already have filed suit. *See infra* n.1 (listing pending EPP complaints); and (c) Metronidazole (a drug on which other private plaintiffs already have filed suit). Note: As to the Drugs at Issue identified in the States' Complaint, EPPs have in some instances added Defendants and/or formulations, and/or varied the relevant time period as specified below.

---

[1] *See State of Connecticut v. Teva Pharmaceuticals USA, Inc., et al.,* No. 19-cv-710 (D. Conn.), filed 5/10/2019 ("5/10/2019 State AG Complaint" or "States' Complaint").

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Table 1: Drugs at Issue**

|  | **Drug** | **Start Date** | **Formulations** | **Defendants** |
|---|---|---|---|---|
| 1. | Adapalene | 5/2013 | Gel | Teva, Taro, Glenmark |
| 2. | Alclometasone Dipropionate | 4/2013 | Cream Ointment | Sandoz, Taro, Glenmark |
| 3. | Allopurinol | 5/2014 | Tablets (100, 300 mg) | Actavis, Par, Mylan, Dr. Reddy's |
| 4. | Amantadine HCL | 12/2011 | Capsules | Sandoz, Upsher-Smith, Lannett |
| 5. | Amiloride HCL/HCTZ | 5/2011 | Tablets | Teva, Mylan |
| 6. | Amoxicillin/Clavulanate | 10/2014 | Chewable Tablets | Teva, Sandoz |
| 7. | Amphetamine Salts ("MAS") [Adderall] | 6/2011 | ER capsules ("MAS-XR") IR tablets ("MAS-IR") | ER: Teva , Actavis, Impax IR: Teva, Impax, Sandoz, Aurobindo, Mallinckrodt |
| 8. | Atenolol Chlorthalidone | 3/2014 | Tablets (100-25, 50-25 mg) | Actavis, Mylan |
| 9. | Azithromycin | 11/2013 | Oral Suspension (100, 200 mg/5 ml) | Teva, Greenstone |
| 10. | Balsalazide Disodium | 11/2013 | Capsules | West-Ward, Apotex |
| 11. | Betamethasone Dipropionate | 10/2010 | Ointment Cream Lotion | Actavis, Taro, Sandoz, Perrigo |
| 12. | Betamethasone Dipropionate Augmented | 10/2010 | Lotion | Taro, Sandoz |
| 13. | Betamethasone Dipropionate Clotrimazole | 10/2010 | Cream Lotion | Actavis, Taro, Sandoz |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| 14. | Betamethasone Valerate | 10/2010 | Ointment<br>Cream | Actavis, Taro, Sandoz |
|---|---|---|---|---|
| 15. | Bethanechol Chloride | 10/2014 | Tablets | Teva, Amneal, Upsher-Smith |
| 16. | Bromocriptine Mesylate | 2/2013 | Tablets | Mylan, Sandoz, Perrigo |
| 17. | Budesonide | 2/2013 | Inhalation<br>DR Capsules | Inhalation: Teva, Actavis, Sandoz<br>DR Capsules: Teva, Mylan, Par |
| 18. | Bumetanide | 4/2014 | Tablets | Teva, Sandoz |
| 19. | Buspirone HCL | 7/2012 | Tablets | Teva, Mylan, Actavis |
| 20. | Butorphanol Tartrate | 12/2013 | Nasal Spray | Mylan, West-Ward, Apotex |
| 21. | Cabergoline | 12/2014 | Tablets | Teva, Greenstone, Par |
| 22. | Capecitabine | 1/2014 | Tablets | Teva, Mylan |
| 23. | Captopril | 5/2013 | Tablets (12.5, 25, 50, 100 mg) | Mylan, West-Ward, Wockhardt |
| 24. | Carbamazepine | 4/2013 | Chewable Tablets (100 mg)<br>Tablets (200 mg)<br>ER tablets (200, 400 mg) | Chewable: Teva, Taro, Torrent<br>Tabs: Apotex, Teva, Taro, Torrent<br>ER Tabs: Sandoz, Taro |
| 25. | Cefdinir | 4/2013 | Capsules<br>Oral Suspension | Teva, Sandoz, Lupin |
| 26. | Cefprozil | 4/2013 | Tablets | Teva, Sandoz, Lupin |
| 27. | Cefuroxime Axetil | 12/2013 | Tablets (250, 500 mg) | Lupin, Aurobindo, Citron |
| 28. | Celecoxib | 11/2014 | Capsules | Teva, Actavis |
| 29. | Cephalexin | 10/2013 | Oral Suspension | Lupin, Teva |
| 30. | Chlorpromazine HCL | 7/2011 | Tablets | Sandoz, Upsher-Smith |
| 31. | Cholestyramine | 4/2013 | Powder<br>Solid | Sandoz, Par, Upsher-Smith |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| 32. | Ciclopirox | 4/2013 | 8% Dermatological liquid | G&W, Perrigo, Akorn |
|---|---|---|---|---|
| 33. | Cimetidine | 6/2012 | Tablets | Teva, Mylan |
| 34. | Ciprofloxacin HCL | 8/2014 | Tablets | Teva, Actavis, Dr. Reddy's |
| 35. | Clarithromycin | 12/2013 | ER Tablets | Actavis, Teva |
| 36. | Clemastine Fumarate | 8/2013 | Tablets | Teva, Sandoz |
| 37. | Clindamycin Phosphate | 4/2012 | Gel<br>Lotion<br>Solution<br>Vaginal Cream | Sandoz, Greenstone, Perrigo, Taro, Actavis |
| 38. | Clonidine TTS | 9/2011 | Patch | Teva, Mylan, Actavis |
| 39. | Clotrimazole | 5/2014 | Solution | Teva, Taro |
| 40. | Cyproheptadine HCL | 6/2012 | Tablets | Teva, Breckenridge, Impax |
| 41. | Desmopressin Acetate | 8/2014 | Tablets | Teva, Actavis |
| 42. | Desogestrel and Ethinyl Estradiol [Kariva] | 5/2014 | Tablets | Teva, Glenmark, Actavis |
| 43. | Dexmethylphenidate HCL [Focalin] | 2/2014 | ER Capsules (5, 15, 20, 40 mg) | Teva, Sandoz, Par |
| 44. | Dextroamphetamine Sulfate ER ("Dex Sulfate XR") | 6/2011 | Tablets<br><br>Capsules | Tablets: Teva, Mallinckrodt, Aurobindo<br><br>Capsules: Teva, Mallinckrodt, Impax, Actavis |
| 45. | Diclofenac Potassium | 10/2012 | Tablets | Teva, Mylan, Sandoz |
| 46. | Dicloxacillin Sodium | 4/2014 | Capsules | Teva, Sandoz |
| 47. | Diflunisal | 4/2014 | Tablets | Teva, Rising |
| 48. | Diltiazem HCL | 5/2013 | Tablets (30, 60, 90, 120 mg) | Teva, Mylan |
| 49. | Diphenoxylate Atropine | 3/2014 | Tablets | Mylan, Greenstone |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| 50. | Disopyramide Phosphate | 6/2013 | Capsules | Teva, Actavis |
|---|---|---|---|---|
| 51. | Doxazosin Mesylate | 5/2013 | Tablets (1, 2, 4, 8 mg) | Teva, Mylan, Apotex, Par, Greenstone |
| 52. | Drospirenone and Ethinyl Estradiol | 4/2013 | Tablets | Teva, Lupin, Actavis |
| 53. | Enalapril Maleate | 7/2013 | Tablets (2.5, 5, 10, 20 mg) | Teva, Mylan, Taro, Wockhardt, Bausch |
| 54. | Entecavir | 8/2014 | Tablets | Teva, Par |
| 55. | Estazolam | 3/2014 | Tablets | Teva, Actavis |
| 56. | Estradiol | 7/2012 | Tablets (0.5, 1, 2 mg) | Teva, Mylan, Actavis |
| 57. | Estradiol and Norethindrone Acetate [Mimvey] | 10/2013 | Tablets | Teva, Breckenridge |
| 58. | Ethinyl Estradiol and Levonorgestrel [Portia and Jolessa] | 5/2012 | Tablets | Teva, Sandoz |
| 59. | Ethosuximide | 7/2012 | Capsules<br>Oral Solution | Teva, Akorn/Versapharm |
| 60. | Etodolac | 5/2012 | Capsules  (200, 300 mg)<br>Tablets (400, 500 mg)<br>ER Tablets (400, 500, 600 mg) | Caps: Apotex, Taro<br>Tabs: Teva, Sandoz, Taro, Apotex<br>ER Tabs: Teva, Taro, Zydus |
| 61. | Fenofibrate | 3/2013 | Tablets (48 and 145 mg) | Teva, Mylan, Lupin, Zydus, Perrigo |
| 62. | Fluconazole | 5/2013 | Tablets (50, 100, 150, 200 mg) | Teva, Glenmark, Greenstone, Citron, Dr. Reddy's |
| 63. | Fluocinolone Acetonide | 1/2012 | Cream<br>Ointment<br>Solution | Cream & Ointment: Sandoz, G&W, Teligent<br>Solution: Sandoz, Taro, Teligent |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| 64. | Fluoxetine HCL | 6/2014 | Tablets | Teva, Mylan, Par |
|---|---|---|---|---|
| 65. | Flurbiprofen | 7/2011 | Tablets | Teva, Mylan |
| 66. | Flutamide | 8/2014 | Capsules | Teva, Actavis, Par |
| 67. | Fluvastatin Sodium | 4/2014 | Capsules | Teva, Mylan |
| 68. | Gabapentin | 10/2014 | Tablets (600 and 800 mg) | Teva, Glenmark, Aurobindo |
| 69. | Glimepiride | 8/2014 | Tablets | Teva, Dr. Reddy's |
| 70. | Griseofulvin | 9/2014 | Suspension | Teva, Actavis |
| 71. | Halobetasol Proprionate | 8/2012 | Cream<br>Ointment | Perrigo, G&W, Sandoz, Taro |
| 72. | Haloperidol | 7/2013 | Tablets (0.5, 1, 2, 5, 10, 20 mg) | Sandoz, Mylan, Zydus |
| 73. | Hydrocortisone Valerate | 10/2010 | Cream | Taro, Perrigo, G&W |
| 74. | Hydroxyurea | 3/2010 | Capsules | Teva, Par |
| 75. | Hydroxyzine Pamoate | 10/2013 | Capsules | Teva, Sandoz, Actavis, Rising |
| 76. | Irbesartan | 3/2012 | Tablets | Teva, Lupin |
| 77. | Isoniazid | 6/2013 | Tablets | Teva, Sandoz |
| 78. | Isosorbide Dinitrate | 3/2012 | Tablets (5, 10, 20, 30 mg) | Sandoz, Par, West-Ward |
| 79. | Ketoconazole | 2/2014 | Cream<br>Tablets | Cream: Teva, Sandoz, Taro, G&W<br><br>Tablets: Teva, Mylan, Taro |
| 80. | Ketoprofen | 9/2012 | Capsules | Teva, Mylan |
| 81. | Ketorolac Tromethamine | 10/2012 | Tablets | Teva, Mylan |
| 82. | Labetalol HCL | 4/2012 | Tablets (100, 200, 300 mg) | Teva, Sandoz, Par, Actavis, Alvogen |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| 83. | Lamivudine/ Zidovudine | 4/2012 | Tablets | Teva, Lupin, Aurobindo, Camber |
|---|---|---|---|---|
| 84. | Lidocaine HCL | 4/2012 | 5% Ointment | Sandoz, Taro, Akorn |
| 85. | Loperamide HCL | 7/2012 | Capsules | Teva, Mylan |
| 86. | Medroxyprogesterone | 3/2013 | Tablets | Teva, Greenstone |
| 87. | Metformin ER (F) | 6/2015 | Tablets (500, 1000 mg) | Actavis, Lupin |
| 88. | Methadone HCL | 6/2014 | Tablets (5 & 10 mg) | West-Ward, Mallinckrodt |
| 89. | Methotrexate Sodium | 9/2012 | Tablets | Teva, Mylan, Par, West-Ward |
| 90. | Methylphenidate | 1/2013 | Tablets (5, 10, 20 mg) | Sandoz, Actavis, Sun, Mallinckrodt, Impax, Par |
| 91. | Methylprednisolone | 2/2011 | Tablets (4 mg) | Sandoz, Par, Breckenridge, Greenstone, Cadista |
| 92. | Metronidazole | 6/2011 | Cream<br>Jelly<br>Lotion<br>Vaginal Cream | Teva, Sandoz, G&W, Taro, Impax, Bausch |
| 93. | Moexipril HCL | 5/2013 | Tablets | Teva, Glenmark |
| 94. | Moexipril HCL HCTZ | 5/2013 | Tablets | Teva, Glenmark |
| 95. | Nabumetone | 5/2013 | Tablets | Teva, Sandoz, Glenmark, Actavis |
| 96. | Nadolol | 7/2012 | Tablets (20, 40, 80 mg) | Teva, Mylan, Sandoz, Greenstone |
| 97. | Naproxen Sodium | 1/2015 | Tablets (275, 550 mg) | Amneal, Glenmark |
| 98. | Niacin | 3/2014 | ER Tablets | Teva, Lupin, Zydus |
| 99. | Nitrofurantoin | 12/2010 | Macrocrystal Capsules | Teva, Mylan, Alvogen |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| 100. | Norethindrone Acetate | 9/2014 | Tablets | Teva, Amneal, Glenmark |
|---|---|---|---|---|
| 101. | Norethindrone / Ethinyl Estradiol (Balziva) | 1/2014 | Tablets | Teva, Lupin |
| 102. | Nortriptyline Hydrochloride | 1/2011 | Capsules | Teva, Taro, Actavis |
| 103. | Omega-3-Acid Ethyl Esters | 6/2014 | Capsules | Teva, Par, Apotex |
| 104. | Oxaprozin | 6/2012 | Tablets (600 mg) | Teva, Dr. Reddy's, Greenstone, Sandoz |
| 105. | Oxybutynin Chloride | 10/2011 | Tablets | Teva, Upsher-Smith, Par |
| 106. | Oxycodone/ Acetaminophen | 8/2013 | Tablets (5/7.5/10-325 mg) | Actavis, Mallinckrodt, Alvogen, Aurobindo, Par, Amneal |
| 107. | Paricalcitol | 2/2014 | Capsules | Teva, Dr. Reddy's, Zydus |
| 108. | Penicillin V Potassium | 1/2014 | Tablets | Teva, Sandoz, Aurobindo, Greenstone |
| 109. | Pentoxifylline | 8/2009 | Tablets | Teva, Mylan, Apotex, Bausch |
| 110. | Permethrin | 5/2010 | Cream | Actavis, Perrigo, Mylan |
| 111. | Perphenazine | 7/2009 | Tablets | Sandoz, Par |
| 112. | Phenytoin Sodium | 3/2014 | Capsules | Mylan, Taro, Amneal, Sun |
| 113. | Pilocarpine HCL | 1/2014 | Tablets | Actavis, Lannett, Impax |
| 114. | Piroxicam | 4/2010 | Capsules (10, 20 mg) | Teva, Mylan, Greenstone |
| 115. | Potassium Chloride | 7/2010 | Tablets (8, 10, 20 mEq) | Actavis, Sandoz, Zydus, Mylan, Upsher-Smith |
| 116. | Prazosin HCL | 10/2012 | Capsules (1, 2, 5 mg) | Teva, Mylan |
| 117. | Prednisolone Acetate | 7/2013 | Ophthalmic Suspension | Sandoz, Greenstone |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| 118. | Prednisone | 5/2013 | Tablets (1, 2.5, 5, 10, 20 mg) | Actavis, West-Ward, Par, Cadista |
|---|---|---|---|---|
| 119. | Prochlorperazine | 5/2014 | Tablets | Teva, Mylan, Sandoz, Cadista |
| 120. | Raloxifene HCL | 9/2014 | Tablets | Teva, Camber |
| 121. | Ranitidine HCL | 11/2011 | Capsules (150 & 300 mg) Tablets (150 mg) | Capsules: Dr. Reddy's, Sandoz Tablets: Teva, Sandoz, Glenmark, Amneal |
| 122. | Spironolactone HCTZ | 1/2013 | Tablets | Mylan, Sun, Greenstone |
| 123. | Tamoxifen Citrate | 5/2012 | Tablets (10, 20 mg) | Teva, Mylan, Actavis |
| 124. | Temozolomide | 7/2013 | Capsules | Teva, Sandoz |
| 125. | Timolol Maleate | 12/2013 | Opthalmic Gel | Sandoz, Bausch |
| 126. | Tizanidine HCL | 4/2013 | Tablets (2 & 4 mg) | Sandoz, Mylan, Dr. Reddy's, Sun, Apotex |
| 127. | Tobramycin | 10/2013 | Eye drop | Teva, Sandoz |
| 128. | Tolmetin Sodium | 5/2013 | Capsules | Teva, Mylan |
| 129. | Tolterodine | 6/2012 | Regular Tablets ER Tablets | Teva, Mylan, Greenstone |
| 130. | Topiramate | 4/2014 | Sprinkle Capsules | Teva, Actavis, Zydus |
| 131. | Triamcinolone Acetonide | 6/2010 | Cream Ointment | Cream: Sandoz, Perrigo, Par, Taro, Ascend Ointment: Sandoz, Perrigo, Taro |
| 132. | Triamterene HCTZ | 10/2011 | Tablets (37.5-25, 75-50 mg) Capsules (37.5-25 mg) | Tablets: Actavis, Mylan, Sandoz, Apotex Capsules: Mylan, Sandoz, Lannett |
| 133. | Trifluoperazine HCL | 7/2013 | Tablets (1, 2, 5, 10 mg) | Sandoz, Mylan, Upsher-Smith |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| 134. | Valsartan HCTZ | 9/2012 | Tablets | Sandoz, Mylan |
|---|---|---|---|---|
| 135. | Warfarin Sodium | 6/2014 | Tablets<br>(1, 2, 2.5, 3, 4, 5, 6, 7.5, 10 mg) | Teva, Taro, Zydus, Amneal |

4.      In addition to the Drugs at Issue identified in this complaint, End-Payers have filed complaints alleging conspiratorial conduct relating to 30 other drugs involving nearly all of these Defendants.[2] These existing cases are related to and are part of the same conspiracy alleged here. Accordingly, all Defendants in the existing EPP complaints have been named as Defendants here, even if they did not market or sell a Drug at Issue in this complaint.

5.      Defendants' conspiratorial conduct was widespread and criminal in nature. It has had a tremendous impact on the marketplace, and on End-Payers in particular, who have been forced to pay higher prices for essential drugs. Defendants knew that End-Payers needed their products, and they used this to their advantage. For example, as memorialized in internal Teva documents, Defendants knew that they could raise certain drug prices to extraordinary levels ██████████████████████████████ In other words, people's lives were in jeopardy, and Defendants used this to maximize the profits of their conspiracy.

_____

[2] The EPP complaints for other drugs implicated in this MDL include: Albuterol (Case 2:16-AL-27242-CMR, Doc. 109); Amitriptyline (Case 2:16-AM-27242-CMR, Doc. 101); Baclofen (Case 2:16-BC-27242-CMR, Doc. 107); Benazepril (Case 2:16-BZ-27242-CMR, Doc. 89); Clobetasol (Case 2:16-CB-27242-CMR, Doc. 168); Clomipramine (Case 2:16-CM-27242-CMR, Doc. 134); Desonide (Case 2:16-DS-27242-CMR, Doc. 160); Digoxin (Case 2:16-DG-27242-CMR, Doc. 173); Divalproex (Case 2:16-DV-27242-CMR, Doc. 124); Econazole (Case 2:16-EC-27242-CMR, Doc. 146); Fluocinonide (Case 2:16-FL-27242-CMR, Doc. 142); Levothyroxine (Case 2:16-LV-27242-CMR, Doc. 110); Lidocaine-Prilocaine (Case 2:16-LD-27242-CMR, Doc. 113); Pravastatin (Case 2:16-PV-27242-CMR, Doc. 153); Propranolol (Case 2:16-PP-27242-CMR, Doc. 132); Ursodiol (Case 2:16-UR-27242-CMR, Doc. 113); Multi-Drug (Case 18-CV-02401, Doc. 154) (involving Acetazolamide, Doxycycline Hyclate, Doxycycline Monohydrate, Fosinopril-Hydrochlorothiazide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline, Verapamil and Zoledronic Acid). The factual allegations in the foregoing EPP complaints are incorporated herein by reference, although the legal claims asserted therein remain separate.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

6.      In a competitive marketplace, each generic drug manufacturer should price its drugs competitively relative to other manufacturers. Accordingly, if any one company decided to raise prices, it would do so at the risk of losing customers and sales to its rivals with more competitive prices. But, beginning at least as early as July 2009, the generic pharmaceutical market has not been characterized by such competition.

7.      Defendants engaged in pervasive conspiratorial conduct designed to impose and maintain inflated prices and to avoid competition with one another. Throughout the conspiracy, Defendants communicated with each other to reach agreements on market share and pricing. The volume and frequency of inter-Defendant communication that occurred in furtherance of the conspiracy is mind-boggling. Plaintiffs are aware of numerous direct and private telephone communications between generic manufacturers, and discovery will likely uncover even more.

8.      The purpose of Defendants' unlawful "Fair Share" agreement was to fix, maintain and stabilize prices—either for a particular generic drug or any number of generic drugs. In this way, each entrant would benefit from coordination as a whole, even if a manufacturer did not seek a market allocation for a particular drug. Defendants implemented the "Fair Share" agreement by refusing to bid for a particular customer or by providing a pretextual bid that they knew would not be successful. Defendants also frequently ceded customers to co-conspirators rather than compete on price.

9.      Defendants also agreed to raise prices for certain Drugs at Issue. Defendants were able to raise, maintain or slow the decline of prices that would have been lower absent their conspiratorial agreements.

10.      The generic drug pricing described in this Complaint cannot be explained by changes in supply, the costs of production, or demand, or any other competitive market feature.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Instead, the price levels were the result of an illegal agreement among Defendants to fix the prices of the Drugs at Issue and not the result of free and fair market competition.

11.     The generic pharmaceutical industry has a number of features that make it highly susceptible to collusion. The markets for the Drugs at Issue were controlled by Defendants, and are subject to high barriers to entry, including substantial manufacturing costs and regulatory requirements. Each generic drug described in this Complaint is a commodity product, for which reasonable substitutes are not available and demand is highly inelastic. Federal regulations require generic products to contain the same type and amount of active pharmaceutical ingredient and to be therapeutically equivalent to one another. Interchangeability facilitates collusion, as cartel members can easily monitor and detect deviations from a price-fixing or market allocation agreement.

12.     Because purchasers choose whose generic pharmaceutical product to buy based primarily on price, and unilateral price increases generally result in loss of market share, it would have been economically irrational for any one Defendant to raise its prices without assurance that its competitors either would also increase prices or at least not compete on pricing.

13.     Moreover, due to the regulated nature of the industry, generic pharmaceutical manufacturers are typically able to determine in advance which manufacturers are coming in and out of the market for a particular generic drug. Armed with that knowledge, Defendants were able to reach a common understanding that each competitor would be entitled to a "Fair Share," meaning that each Defendant would be entitled to a percentage of the market for each generic drug that it manufactures.

14.     Defendants' attendance at trade association meetings, conferences, and workshops provided ample opportunities to agree on generic drug prices and allocate markets and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

customers. As alleged in greater detail below, the sheer volume of industry meetings provided the perfect opportunity for Defendants to implement and maintain their conspiracy, and evidence uncovered in the pending governmental investigations confirms that Defendants availed themselves of this opportunity. Defendants implemented their conspiracy through numerous meetings and communications between and among their representatives, including at industry events such as the Generic Pharmaceutical Association ("GPhA") (now the Association for Accessible Medicines), the National Association of Chain Drug Stores ("NACDS"), the Healthcare Distribution Management Association ("HDMA") (now the Healthcare Distribution Alliance) ("HDA"), Efficient Collaborative Retail Marketing ("ECRM"), and Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP").

15.     Indeed, such routine meetings facilitated the Defendants' ability to reach agreements on their "Fair Shares" of the market for any given drug.

16.     Extreme and unprecedented price increases in the generic drug industry have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

17.     The Office of the Attorney General for the State of Connecticut ("Connecticut AG") has been leading a multi-state attorney general investigation of the generic drug industry and has identified "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States….[and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[3]

18.     An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior

---

[3] Connecticut AG, Press Release (Dec. 15, 2016), http://portal.ct.gov/AG/Press-Releases/2016-Press-Releases.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

executives at Defendant Heritage relating to the sale of Glyburide and Doxycycline Hyclate. In addition, Defendant Heritage and co-conspirator Rising Pharmaceuticals, Inc. have entered into delayed prosecution agreements with DOJ, essentially admitting that they reached anticompetitive agreements with competitors relating to certain generic drugs.

19.     In addition to the non-prosecution agreements and guilty pleas, numerous other Defendants named here have received criminal subpoenas in connection with the DOJ investigation, including: Actavis Holdco U.S., Inc.; Aurobindo Pharma USA, Inc.; Citron Pharma LLC; Dr. Reddy's Laboratories, Inc.; Impax Laboratories, Inc.; Lannett Company, Inc.; Lupin Pharmaceuticals, Inc.; Mallinckrodt plc; Mayne Pharma Inc.; Mylan Pharmaceuticals, Inc.; Par Pharmaceutical, Inc.; Perrigo New York, Inc.; Pfizer, Inc.; Sandoz, Inc.; Sun Pharmaceutical Industries, Inc.; Taro Pharmaceuticals USA, Inc.; Teva Pharmaceuticals USA, Inc.; West-Ward Pharmaceuticals Corp.; and Zydus Pharmaceuticals USA, Inc.

20.     Further, at least two Defendants have been raided by federal authorities in connection with the investigation.  Perrigo disclosed that its offices were raided in 2017, and Mylan's Pennsylvania headquarters were raided by the FBI in the fall of 2016.[4]

21.     Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws set forth below. Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Drugs at Issue manufactured by any Defendant, other than for resale, from at least July 2009 to the present

---

[4] David McLaughlin & Drew Armstrong, *Generic-Drug Companies to Face First Charges in U.S. Probe*, BLOOMBERG (Apr. 24, 2018), https://www.bloomberg.com/news/articles/2018-04-24/generic-drug-companies-said-to-face-first-charges-in-u-s-probe.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

("Class Period"), and (b) a damages class of persons and entities in the states and territories identified herein who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Drugs at Issue manufactured by any Defendant, other than for resale, from at least July 2009 to the present.

22.     The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Plaintiffs' counsel. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of themselves and the classes they seek to represent, Plaintiffs allege as follows:

## II.     <u>JURISDICTION AND VENUE</u>

23.     Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

24.     This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

25.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1332(d) and 1367.

26.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C §§ 1391(b), (c), and (d); and § 1407 and MDL Order dated April 6, 2017 (ECF No. 291),

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here. According to DOJ guidelines, an "investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[5]

27.    This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold generic drugs throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably have expected to be sued in this District. In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

## III.    PLAINTIFFS

28.    Plaintiffs 1199SEIU National Benefit Fund, 1199SEIU Greater New York Benefit Fund, 1199SEIU National Benefit Fund for Home Care Workers, and 1199SEIU Licensed Practical Nurses Welfare Fund are jointly administered health and welfare funds (collectively,

---

[5] DOJ, Antitrust Division Manual at III-83.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

"1199SEIU Benefit Funds"). The 1199SEIU Benefit Funds are among the largest labor-management funds in the nation, providing comprehensive health benefits to hundreds of thousands of working and retired healthcare industry workers and their families. They provide health and welfare benefits to 400,000 members, retirees, and their families, who reside in numerous locations in the United States. During the Class Period, the 1199SEIU Benefit Funds indirectly purchased and paid, not for resale, for some or all of the purchase price for numerous Drugs at Issue manufactured by the Defendants. Plaintiffs made such payments and/or reimbursements in numerous jurisdictions, thereby suffering injury to its business and property. During the Class Period, the 1199SEIU Benefit Funds paid and reimbursed more for these products than they would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, the 1199SEIU Benefit Funds were injured in their business or property by reason of the violations of law alleged herein. The 1199SEIU Benefit Funds intend to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

29.     Plaintiff American Federation of State, County and Municipal Employees District Council 37 Health & Security Plan ("DC 37") is a health and welfare benefit plan headquartered in New York, New York. District Council 37 (the "Union") is New York City's largest public employee union. The Union includes 51 local unions, representing public sector employees serving in thousands of job titles from Accountants to Zoo Keepers. Members covered by DC 37's benefit plan work in almost every agency in New York City, including but not limited to the City's police and fire departments, hospitals, schools, libraries, social service centers, water treatment facilities, and city colleges. DC 37 provides supplemental health benefits, including a

17

prescription drug benefit, to approximately 313,000 individuals, including both active members and their families and 50,000 retirees, who reside in numerous locations in the United States. During the Class Period, DC 37 indirectly purchased and paid, other than for resale, for some or all of the purchase price for numerous Drugs at Issue manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in numerous jurisdictions, thereby suffering injury to its business and property.  During the Class Period, DC 37 paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, DC 37 was injured in its business or property by reason of the violations of law alleged herein. DC 37 intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

30.     Plaintiff Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana and HMO Louisiana, Inc. is a not-for-profit mutual insurance organized and existing under the laws of the state of Louisiana. HMO Louisiana, Inc. ("HMOLA") is a domestic health maintenance organization licensed to conduct business in the state of Louisiana and is a wholly owned subsidiary of Louisiana Health Service & Indemnity Company (collectively, "BCBS-LA"). BCBS-LA provides health insurance coverage to over one million members who reside in numerous locations in the United States and also provides third party administrative ("TPA") services for self-funded employee health plans. During the Class Period, BCBS-LA indirectly purchased and paid, not for resale, for some or all of the purchase price for numerous Drugs at Issue manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in numerous jurisdictions, thereby suffering injury to its business and property.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

During the Class Period, BCBS-LA paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, BCBS-LA was injured in its business or property by violations of law alleged herein. BCBS-LA intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

31.      Plaintiff Self-Insured Schools of California ("SISC") is a Joint Powers Authority under California law that serves the interests of California public schools. It is headquartered in Bakersfield, California. It provides pharmacy benefits to approximately 260,000 members who reside in numerous locations in the United States. During the Class Period, SISC indirectly purchased and paid, other than for resale, for some or all of the purchase price for numerous Drugs at Issue manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in numerous jurisdictions, thereby suffering injury to its business and property. During the Class Period, SISC paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, SISC was injured in its business or property by reason of the violations of law alleged herein. SISC intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

32.      Sergeants Benevolent Association Health and Welfare Fund ("SBA Fund") is a citizen of the State of New York, and has its principal place of business at 35 Worth Street, New York, New York. SBA Fund is an independent labor organization operating under Internal Revenue Code section 501(c)(5), and is sponsored and administered by a Board of Trustees. As

such, SBA Fund is a legal entity entitled to bring suit in its own name. SBA Fund is an "employee welfare benefit plan" and an "employee benefit plan" with membership of approximately 4,700 active and 7,600 retired sergeants of the New York City Police Department. It provides comprehensive health care benefits, including prescription drug benefits, to participants and their dependents. During the Class Period, SBA Fund indirectly purchased and paid, other than for resale, for some or all of the purchase price for numerous Drugs at Issue manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in numerous jurisdictions, thereby suffering injury to its business and property. During the Class Period, SBA Fund paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products. As a result of the alleged conspiracy, SBA Fund was injured in its business or property by reason of the violations of law alleged herein. SBA Fund intends to continue paying and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

## IV.   DEFENDANTS

### A.   Actavis Defendants

33.   Defendant Actavis Holdco U.S., Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. In August 2016, Teva Pharmaceuticals USA, Inc. acquired the Actavis Generics business of Allergan plc, including Actavis, Inc. Upon the acquisition, Actavis, Inc.—the acquired Allergan plc generics operating company (formerly known as Watson Pharmaceuticals)—was renamed Allergan Finance, LLC, which in turn assigned all of the assets and liabilities of the former Allergan plc generic business to the newly formed Actavis Holdco, including subsidiaries Actavis Pharma, Inc. and Actavis Elizabeth LLC (a research, development and manufacturing entity for Actavis generic

operations), among others. Actavis Holdco is a wholly-owned subsidiary of Teva Pharmaceuticals USA, Inc., which is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. Teva Pharmaceuticals USA, Inc. is a wholly-owned subsidiary of Teva Pharmaceuticals Industries Ltd., an Israeli entity.

34.     Defendant Actavis Pharma, Inc. ("Actavis Pharma") is Delaware corporation with its principal place of business in Parsippany, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc. It manufactures, markets, and/or distributes generic drugs. Actavis Pharma is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

35.     Actavis Elizabeth LLC ("Actavis Elizabeth") is a Delaware company with its principal place of business in Elizabeth, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco and is a research, development and manufacturing entity for Actavis generic operations.

36.     Unless addressed individually, Actavis Holdco, Actavis Pharma and Actavis Elizabeth are collectively referred to herein as "Actavis." During the Class Period, Actavis marketed and sold generic pharmaceuticals in this District and throughout the United States.

**B.     Akorn Defendants**

37.     Defendant Akorn Inc. is a Louisiana corporation with its principal place of business in Lake Forest, Illinois. It is the parent company of Hi-Tech Pharmacal Co., Inc. and Akorn Sales, Inc.

38.     Defendant Akorn Sales, Inc. is a Delaware corporation. It is a wholly-owned subsidiary of Akorn Inc. It is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

39.     Defendant Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") is a Delaware corporation with its principal place of business in Amityville, New York. It is a wholly-owned subsidiary of Akorn, Inc. Akorn Inc. acquired and integrated Hi-Tech into its operations in April 2014.

40.     Defendant Versapharm, Inc. is a Georgia corporation with its principal place of business in Marietta, GA. It is a wholly-owned subsidiary of Akorn, Inc. Versapharm was acquired by Akorn, Inc. in August 2014.

41.     Unless addressed individually, Akorn Inc., Akorn Sales, Inc., Hi-Tech and Versapharm are collectively referred to herein as "Akorn." During the Class Period, Akorn marketed and sold generic pharmaceuticals in this District and throughout the United States.

## C.     Alvogen

42.     Defendant Alvogen Inc. is a Delaware corporation with its principal place of business in Pine Brook, New Jersey. It is a privately held company that was founded in 2009 by a former CEO of Defendant Actavis. During the Class Period, Alvogen marketed and sold generic pharmaceuticals in this District and throughout the United States.

## D.     Amneal Defendants

43.     Defendant Amneal Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business in Bridgewater, New Jersey. It is the parent company of Defendant Amneal Pharmaceuticals LLC.

44.     Defendant Amneal Pharmaceuticals, LLC is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey. Amneal Pharmaceuticals LLC is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

45.     Unless addressed individually, Amneal Pharmaceuticals, Inc. and Amneal Pharmaceuticals, LLC are collectively referred to as "Amneal." During the Class Period, Amneal

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

marketed and sold generic pharmaceuticals in this District and throughout the United States.

### E.    Apotex

46.     Defendant Apotex Corp. ("Apotex") is a Delaware corporation with its principal place of business in Weston, Florida. During the Class Period, Apotex marketed and sold generic pharmaceuticals in this District and throughout the United States.

### F.    Ascend

47.     Defendant Ascend Laboratories, LLC ("Ascend") is a New Jersey company with its principal place of business in Parsippany, New Jersey. It is a wholly-owned subsidiary of Alkem Labs, an Indian pharmaceutical company. During the Class Period, Ascend marketed and sold generic pharmaceuticals in this District and throughout the United States.

### G.    Aurobindo

48.     Defendant Aurobindo Pharma USA, Inc. ("Aurobindo") is a Delaware corporation with its principal place of business in Dayton, New Jersey. Aurobindo is a subsidiary of Aurobindo Pharma Limited, a corporation based in Hyderabad, India. During the Class Period, Aurobindo marketed and sold generic pharmaceuticals in this District and throughout the United States.

### H.    Bausch Defendants

49.     Defendant Bausch Health Americas, Inc. (formerly Valeant Pharmaceuticals International, Inc.) is a Delaware corporation with its US headquarters located in Bridgewater, New Jersey.

50.     Bausch Health US, LLC (formerly Valeant Pharmaceuticals North America LLC) is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey. Bausch Health US is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

51.     Defendant Oceanside Pharmaceuticals, Inc. ("Oceanside") is a wholly-owned subsidiary of Bausch Health Americas, Inc. It is a Delaware corporation with its principal place of business in Bridgewater, New Jersey.

52.     Unless addressed individually, Bausch Health Americas, Bausch Health USA, Oceanside and Valeant are collectively referred to herein as "Bausch." During the Class Period, Bausch marketed and sold generic pharmaceuticals in this District and throughout the United States.

**I.      Breckenridge**

53.     Defendant Breckenridge Pharmaceuticals, Inc. ("Breckenridge") is a Delaware corporation with its headquarters in Boca Raton, Florida. During the Class Period, Breckenridge marketed and sold generic pharmaceuticals in this District and throughout the United States.

**J.      Cadista**

54.     Defendant Jubilant Cadista Pharmaceuticals Inc. ("Cadista") is a Delaware corporation with its principal place of business in Salisbury, Maryland. It is a wholly-owned subsidiary of Jubilant Life Sciences Company, an Indian pharmaceutical company. Cadista is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. During the Class Period, Cadista marketed and sold generic pharmaceuticals in this District and throughout the United States.

**K.      Camber**

55.     Defendant Camber Pharmaceuticals, Inc. ("Camber") is a Delaware corporation with its principal place of business in Piscataway, New Jersey. Camber is a wholly-owned subsidiary of Hetero Drugs, an Indian pharmaceutical company. During the Class Period, Camber marketed and sold generic pharmaceuticals in this District and throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### L.      Citron

56.      Citron Pharma, LLC ("Citron") is a New Jersey limited liability company with its principal place of business in East Brunswick, New Jersey. The operating assets of Citron were acquired in December 2016 by co-conspirator Rising Pharmaceuticals Inc., which is a subsidiary of Aceto Corp. During the Class Period, Citron marketed and sold generic pharmaceuticals in this District and throughout the United States.

### M.      Dr. Reddy's

57.      Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's") is a New Jersey corporation with its principal place of business in Princeton, New Jersey.  It is a wholly-owned subsidiary of Dr. Reddy's Laboratories Ltd., which is an Indian company with its principal place of business in Hyderabad, Telangana, India. Dr. Reddy's is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.  During the Class Period, Dr. Reddy's marketed and sold generic pharmaceuticals in this District and throughout the United States.

### N.      Epic

58.      Defendant Epic Pharma, LLC ("Epic") is a Delaware limited liability company with its principal place of business in Laurelton, New York. During the Class Period, Epic marketed and sold generic pharmaceuticals in this District and throughout the United States.

### O.      Glenmark

59.      Defendant Glenmark Pharmaceuticals, Inc., USA ("Glenmark") is a Delaware corporation with its principal place of business in Mahwah, New Jersey.  It is a wholly-owned subsidiary of Glenmark Pharmaceuticals Ltd., headquartered in Mumbai, India. During the Class Period, Glenmark marketed and sold generic pharmaceuticals in this District and throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**P.    Greenstone Defendants**

60.    Defendant Pfizer, Inc. ("Pfizer") is a Delaware corporation that is headquartered in New York, New York. Pfizer is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. Pfizer is the parent company of Defendant Greenstone LLC.

61.    Defendant Greenstone LLC ("Greenstone") is a Delaware limited liability company with its principal place of business in Peapack, New Jersey. It is a wholly-owned subsidiary of Pfizer. Greenstone operates out of Pfizer's Peapack, New Jersey campus. A majority of Greenstone's employees—including its President—also are employees of Pfizer's Essential Health Division. Greenstone employees use Pfizer for financial analysis, human resources and employee benefit purposes, making the two companies essentially indistinguishable.

62.    Unless addressed individually, Greenstone and Pfizer are collectively referred to herein as "Greenstone." During the Class Period, Greenstone marketed and sold generic pharmaceuticals in this District and throughout the United States.

**Q.    G&W**

63.    Defendant G&W Laboratories, Inc. ("G&W") is a New Jersey corporation with its principal place of business in South Plainfield, New Jersey. During the Class Period, G&W marketed and sold generic pharmaceuticals in this District and throughout the United States.

**R.    Heritage**

64.    Defendant Heritage Pharmaceuticals, Inc. ("Heritage") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. It is the exclusive United States commercial operation for Emcure Pharmaceuticals Ltd., an Indian company headquartered in

Pune, India. During the Class Period, Heritage marketed and sold generic pharmaceuticals in this District and throughout the United States.

### S.    Impax

65.    Defendant Impax Laboratories, LLC ("Impax") is a Delaware limited liability company that is the successor entity of Impax Laboratories, Inc. As of May 2018, Impax merged with Amneal and became a wholly-owned subsidiary of Defendant Amneal Pharmaceutical, LLC. During the relevant period, Impax's generics division was called Global Pharmaceuticals ("Global"). Impax is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. During the Class Period, Impax marketed and sold generic pharmaceuticals in this District and throughout the United States.

### T.    Lannett

66.    Defendant Lannett Company, Inc. ("Lannett") is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. Lannett is registered with the Pennsylvania Department of State as a foreign corporation.  During the Class Period, Lannett marketed and sold generic pharmaceuticals in this District and throughout the United States.

### U.    Lupin

67.    Defendant Lupin Pharmaceuticals, Inc. ("Lupin") is a Delaware corporation with its principal place of business in Baltimore, Maryland. It is a wholly-owned subsidiary of Lupin Ltd., an Indian company with its principal place of business in Mumbai, India. Lupin is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. During the Class Period, Lupin marketed and sold generic pharmaceuticals in this District and throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### V.    Mallinckrodt

68.    Defendant Mallinckrodt Inc. is a Delaware corporation with its principal place of business in Webster Groves, Missouri. As a result of a tax inversion acquisition, as of 2013 it is a wholly-owned subsidiary of Mallinckrodt plc, which is based in the United Kingdom. Mallinckrodt is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. During the Class Period, Mallinckrodt marketed and sold generic pharmaceuticals in this District and throughout the United States.

### W.    Mayne

69.    Defendant Mayne Pharma Inc. is a Delaware corporation with its principal place of business in Raleigh, North Carolina. Mayne is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. In 2012, Mayne acquired Metrics, Inc. and its division, Midlothian Laboratories, and has also operated under the name Midlothian since that time. In 2013, Mayne acquired Libertas Pharma. Unless addressed individually, Metrics, Inc., Midlothian Laboratories, Libertas Pharma and Mayne Pharma Inc. are collectively referred to herein as "Mayne." During the Class Period, Mayne marketed and sold generic pharmaceuticals in this District and throughout the United States.

### X.    Mylan Defendants

70.    Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

71.    Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia. It is a subsidiary of Mylan Inc. Mylan Pharmaceuticals, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

72.     Mylan Inc. and Mylan Pharmaceuticals, Inc. are wholly-owned subsidiaries of Mylan N.V., a Dutch pharmaceutical company. Unless addressed individually, Mylan Inc. and Mylan Pharmaceuticals, Inc. are collectively referred to herein as "Mylan." During the Class Period, Mylan marketed and sold generic pharmaceuticals in this District and throughout the United States.

**Y.     Par Defendants**

73.     Defendant Par Pharmaceutical, Inc. ("PPI") is a New York corporation with its principal place of business in Chestnut Ridge, New York. PPI is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

74.      Defendant Generics Bidco I, LLC ("Generics Bidco") is a Delaware company with its principal place of business in Huntsville, Alabama. Generics Bidco formerly conducted business as Qualitest Pharmaceuticals ("Qualitest").

75.     Defendant DAVA Pharmaceuticals, LLC ("DAVA") is a Delaware company with its principal place of business in Fort Lee, New Jersey.

76.     PPI, Generics Bidco and DAVA are wholly-owned subsidiaries of Endo International plc ("Endo"), an Irish corporation with its principal place of business located in Dublin, Ireland and its U.S. headquarters located in Malvern, Pennsylvania. PPI, Generics Bidco and DAVA collectively do business as Par Pharmaceutical. Unless addressed individually, Endo, PPI, Generics Bidco, DAVA and Qualitest are collectively referred to herein as "Par." During the Class Period, Par marketed and sold generic pharmaceuticals in this District and throughout the United States.

**Z.     Perrigo**

77.     Defendant Perrigo New York, Inc. ("Perrigo") is a Delaware corporation with its executive offices in Allegan, Michigan and its primary business location in Bronx, NY. It is a

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

subsidiary of Perrigo Company plc, an Irish company with its principal place of business in Dublin, Ireland. Perrigo is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. During the Class Period, Perrigo marketed and sold generic pharmaceuticals in this District and throughout the United States.

### AA.    Sandoz Defendants

78.    Defendant Sandoz, Inc. is a Colorado corporation with its principal place of business in Princeton, New Jersey. Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland. Sandoz is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

79.    Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York. Foguera is a wholly-owned subsidiary of Defendant Sandoz, Inc. In 2012, Sandoz acquired and integrated Fougera into its US-based generic pharmaceutical business.

80.    Unless addressed individually, Fougera and Sandoz Inc. are collectively referred to herein as "Sandoz." During the Class Period, Sandoz marketed and sold generic pharmaceuticals in this District and throughout the United States.

### BB.    Sun Defendants

81.    Defendant Sun Pharmaceutical Industries, Inc. ("SPII") is a Michigan corporation with its principal place of business in Cranbury, New Jersey. SPII is a wholly-owned subsidiary of Sun Pharmaceutical Industries Ltd. ("Sun Pharma"), an Indian corporation, which also owns a majority stake in Taro Pharmaceutical Industries, Ltd., and Taro's U.S. subsidiary, Taro Pharmaceutical USA, Inc. Beginning in 1997, Sun Pharma began a series of investments in Caraco Pharmaceutical Laboratories Ltd. ("Caraco") and in 2013 acquired 100% of Caraco and merged it into SPII to become Sun Pharma's US operations for generic pharmaceutical products.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

In late 2012, SPII acquired URL Pharma, Inc. ("URL") and its subsidiary, Mutual Pharmaceutical Company, Inc. ("Mutual"), both of which have their principal place of business in Philadelphia, PA. Until at least June 2016, URL and Mutual operated a pharmaceutical manufacturing facility in Philadelphia. URL was registered with the Pennsylvania Department of State as a foreign corporation and maintained a registered agent in Pennsylvania during the Class Period until April 28, 2015, at which time it was merged with Mutual.

82.     Defendant Mutual is a Delaware corporation with its principal place of business located in Philadelphia, PA. It is a wholly-owned subsidiary of SPII. Since April 29, 2015 (the day after Mutual and URL merged), Mutual has been registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. Many of the pharmaceutical products sold and distributed throughout the United States during the Class Period by SPII, URL and Mutual were marked with the trade name "MUTUAL" on the pill or capsule.

83.     Unless addressed individually, SPII, URL, Mutual and Caraco are collectively referred to herein as "Sun." During the Class Period, Sun marketed and sold generic pharmaceuticals in this District and throughout the United States.

**CC.     Taro**

84.     Defendant Taro Pharmaceuticals USA, Inc. ("Taro") is a New York corporation with its principal place of business in Hawthorne, New York. Taro is a wholly-owned subsidiary of Taro Pharmaceutical Industries, Ltd., an Israeli entity, which in turn is majority owned by Sun Pharma. During the Class Period, Taro marketed and sold generic pharmaceuticals in this District and throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### DD.    Teligent

85.     Defendant Teligent, Inc. ("Teligent") is a Delaware corporation with its principal place of business in Buena, New Jersey. Teligent is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. Teligent was known as IGI Laboratories, Inc. until 2015. During the Class Period, Teligent sold generic pharmaceuticals in this District and throughout the United States.

### EE.    Teva Defendants

86.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. It is a subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli entity. Teva USA is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

87.     Defendant Barr Pharmaceuticals, LLC ("Barr") is a Delaware company with its principal place of business in North Wales, Pennsylvania. Barr is a wholly-owned subsidiary of Teva USA, which acquired Barr (then called Barr Pharmaceuticals, Inc.) in 2008.

88.     Defendant PLIVA, Inc. is a New Jersey corporation with its principal place of business in East Hanover, New Jersey. PLIVA is a wholly-owned subsidiary of Teva USA, which acquired the PLIVA assets as part of the Barr acquisition.

89.     Unless addressed individually, Teva USA, Barr and PLIVA are collectively referred to herein as "Teva." During the Class Period, Teva sold generic pharmaceuticals in this District and throughout the United States.

### FF.    Torrent

90.     Defendant Torrent Pharma Inc. ("Torrent") is a Delaware corporation with its principal place of business in Basking Ridge, New Jersey. Torrent is registered with the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. It is a wholly-owned subsidiary of Torrent Pharmaceuticals Ltd., an Indian pharmaceutical company. During the Class Period, Torrent sold generic pharmaceuticals in this District and throughout the United States.

### GG.   Upsher-Smith

91.     Defendant Upsher-Smith Laboratories, LLC ("Upsher-Smith") is a Minnesota limited liability company with its principal place of business in Maple Grove, Minnesota. It is wholly owned by Sawai Pharmaceutical Co., Ltd. ("Sawai"), a large publicly traded generic pharmaceutical company in Japan. Sawai acquired Upsher-Smith Laboratories, Inc. in June 2017. During the Class Period, Upsher-Smith sold generic pharmaceuticals to customers in this District and throughout the United States.

### HH.   West-Ward Defendants

92.     Defendant West-Ward Pharmaceuticals Inc. is a Delaware corporation with its principal place of business in Eatontown, New Jersey.

93.     Defendant West-Ward Columbus, Inc. is a Delaware corporation with its principal place of business in Eatontown, New Jersey.

94.     Defendant Hikma Pharmaceuticals USA Inc. is a Delaware corporation with its principal place of business in Eatontown, New Jersey.

95.     Defendant Hikma Labs Inc. (formerly Roxane Laboratories, Inc.) is a Nevada corporation with its principal place of business in Eatontown, New Jersey.

96.     Defendants West-Ward Pharmaceuticals, West-Ward Columbus, Hikma Pharmaceuticals USA and Hikma Labs are subsidiariaries of Hikma Pharmaceuticals PLC ("Hikma"), a London-based global pharmaceutical company. Unless addressed individually, these Hikma subsidiaries are collectively referred to herein as "West-Ward." During the Class

Period, West-Ward marketed and sold generic pharmaceuticals in this District and throughout the United States.

## II.    Wockhardt Defendants

97.    Defendant Wockhardt USA LLC is a Delaware corporation with its principal place of business in Parsippany, New Jersey. It is a wholly-owned subsidiary of Morton Grove Pharmaceuticals, Inc.

98.    Defendant Morton Grove Pharmaceuticals, Inc. ("Morton Grove") is a Delaware corporation with its principal place of business in Morton Grove, Illinois. It is a wholly-owned subsidiary of Wockhardt Ltd., a pharmaceutical and biotechnology company headquartered in Mumbai, India.  Morton Grove is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

99.    Unless addressed individually, Wockhardt and Morton Grove Pharmaceuticals, Inc. are collectively referred to herein as "Wockhardt." During the Class Period, Wockhardt marketed and sold generic pharmaceuticals in this District and throughout the United States.

## JJ.    Zydus

100.    Defendant Zydus Pharmaceuticals (USA), Inc. ("Zydus") is a New Jersey corporation with its principal place of business in Pennington, New Jersey. It is a subsidiary of Cadila HealthCare, an Indian company headquartered in Mumbai. Zydus is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.  During the Class Period, Zydus marketed and sold generic pharmaceuticals in this District and throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## V.   CO-CONSPIRATORS

### A.   Rising

101.   Rising Pharmaceuticals Inc. ("Rising") is a Delaware corporation with its principal place of business in East Brunswick, New Jersey. Rising is a wholly-owned subsidiary of Aceto Corp., which, along with Rising, filed for bankruptcy in 2019. On December 3, 2019, the Department of Justice announced that Rising entered into a deferred prosecution agreement relating to a felony price-fixing charge and that Rising has agreed to cooperate with the ongoing DOJ investigation into generic pharmaceutical price fixing.

### B.   Unknown Co-Conspirators

102.   Various other persons, firms, corporations, and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein. Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

## VI.   DEFENDANTS' OVERARCHING CONSPIRACY

103.   Defendants have participated in a long-running conspiracy to allocate market shares and to fix, raise and/or stabilize the prices of the Drugs at Issue.

104.   As detailed below, Defendants facilitated their conspiracy through personal connections formed through frequent movement within the industry, through frequent in-person meetings at various happy hours, dinners, lunches, golf outings, trade shows, and industry conferences, and through frequent direct communications in person, via chat and email, and on the telephone (both voice and text).

105.   Inter-defendant communications were commonplace in the industry and date as far back as 2006. Starting in at least July 2009, if not before, Defendants implemented anti-

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

competitive agreements to increase the prices and allocate the markets of at least the Drugs at Issue, and possibly many more.

106.    The foundational agreement between all Defendants was premised on the understanding that they are current or future competitors with each other across numerous generic drugs. All of these Defendants market and sell multiple products. The effectiveness of an agreement on any one drug would be limited and unstable without a broader agreement that encompassed other drugs as well. For example, an agreement between two Defendants to raise prices or to allocate market share on one drug would not likely hold where those same two Defendants engaged in vigorous price competition on another drug, or where a third manufacturer not party to that agreement entered the market with an intent to compete on price. Therefore, Defendants understood that in order to be effective, their agreement needed to extend to multiple manufacturers and drugs.

107.    In furtherance of that objective, Defendants developed the concept of "Fair Share," in which each market participant (within and across multiple drugs) was able to obtain an allocated share of market sales without resorting to free and fair price competition. Because Defendants are repeat players who routinely enter new markets but face the same competitors, their basic agreement—to eschew price competition and seek only a "Fair Share" of the market—became the "rules of the road" that governed their overarching conspiracy. As described more fully below, Defendants' decisions whether and if so when to enter a market, how to price their drugs, and which customers to target were made in accordance with their unlawful "Fair Share" agreement.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

108.    From this broad agreement among all Defendants to market and sell the Drugs at Issue under a "Fair Share" understanding, sprang subsidiary agreements among the manufacturing Defendants relating to each of the Drugs at Issue.

109.    The higher prices and overcharges for Drugs at Issue that resulted from Defendants' anticompetitive conduct are directly traceable through the pharmaceutical distribution chain to End-Payers.

110.    The drug-specific agreements involve only those Defendants that marketed and sold the relevant Drug at Issue during the Class Period. But each Defendant, including the Defendants who did not manufacture the particular drug involved in each drug-specific agreement, was a party to the broader, overarching conspiracy to abide by the "Fair Share" agreement covering all Drugs at Issue. The purpose and effect of these agreements was to lessen competition in the markets for each of the Drugs at Issue.

111.    Both the "Fair Share" agreement and the drug-specific agreements created a web of relationships and understandings among and between all Defendants that had the purpose and effect of lessening competition among Defendants for all the Drugs at Issue.

## A.    Defendants Are Competitors or Potential Competitors for All Drugs at Issue.

112.    All Defendants are competitors or potential competitors with each other for every Drug at Issue. As described below, far more Defendants had the right (*i.e.*, regulatory approval) to sell the Drugs at Issue than actually did so during the Class Period. And all Defendants could have obtained approval or otherwise acquired marketing rights (by, *e.g.*, licensing) to sell the Drugs at Issue, had they chosen to do so.

113.     Although the process for obtaining approval to sell a generic drug can be long, Defendants were able to obtain and did obtain numerous ANDAs covering the Drugs at Issue. The core function of Defendants' businesses is to market and sell generic pharmaceuticals and,

accordingly, Defendants are highly adept at obtaining access to the markets for generic pharmaceuticals, including the Drugs at Issue.

114.    Defendants gain access to generic pharmaceutical markets through at least three methods, all of which were employed by Defendants during the relevant time frame. *First*, Defendants can go through the ANDA process to obtain approval from the FDA to sell a specific drug. *Second*, Defendants can obtain existing ANDAs by purchasing them from companies that have ANDAs, or by acquiring the company that owns them. *Third*, Defendants can license the use of an ANDA held by someone else.

115.    The ANDAs owned or licensed by Defendants for Drugs at Issue demonstrate the extent to which these Defendants can and do access the markets for generic drugs and highlight that Defendants have the resources and ability to access the market for any Drug at Issue.[6]

**B.    The Principles of "Playing Fair" and "Fair Share" Governed Defendants' Interactions.**

116.    In a competitive generic drug market, new market entrants typically price their product below the prevailing market price in order to gain market share.[7] As a result, each subsequent entry into a generic market tends to decrease the market prices as manufacturers compete for market share. As discussed in detail below, this did not happen for the Drugs at Issue because Defendants used their "fair play" and "Fair Share" agreement to coordinate market share and pricing.

---

[6] The FDA Orange Book (available at https://www.fda.gov/drugs/drug-approvals-and-databases/approved-drug-products-therapeutic-equivalence-evaluations-orange-book) lists current and discontinued ANDAs for all Drugs at Issue. "Discontinued" ANDAs can be re-activated with relative ease. *See* Kurt R. Karst, "Waking From a Drug Coma: How to Bring a Drug Out of Discontinued Status – It's As Easy As 1, 2, 3 . . . 4, and 5," *available at* http://www.fdalawblog.net/2015/09/waking-from-a-drug-coma-how-to-bring-a-drug-out-of-discontinued-status-its-as-easy-as-1-2-3-4-and-5/.

[7] U.S. Government Accountability Office Report: Generic Drugs Under Medicare ("GAO Report") at 23, (August 2016), *available at* https://www.gao.gov/assets/680/679022.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

117.    Because application for entry into a generic market is a public process, Defendants know which manufacturers have approval to manufacture a generic drug and approximately when they will enter the market. This creates an incentive and opportunity to coordinate pricing and allocate the market among competitors in order to maintain pricing levels and maximize profit.

118.    The practice of contacting competitors to determine their market intentions— whether through in-person meetings, telephone communications, or other interactions—is a long-standing and common industry practice.

119.    Defendants understood and engaged in the practice of contacting their competitors when they were preparing to enter a particular generic market so that they could reach agreements on pricing and allocate the market according to their Fair Share agreement. Reaching out to competitors was part of the "tool kit" used in the ordinary course of business.

120.    Fair Shares were allocated to Defendants within a particular drug market based upon the number of competitors in the market and the timing of their entry into the market. This system aimed to allocate to each Defendant a Fair Share of the market without depressing prices. As detailed below, through this overarching conspiracy, Defendants often were able to raise prices or enter the market at elevated prices.

121.    Another common feature of Defendants' Fair Share agreement was to coordinate and implement price increases by incumbent manufacturers immediately before a new manufacturer entered the market. When new manufacturers entered a market, the existing manufacturers would bring them into the Fair Share agreement by ceding market share to them. By raising prices, and then having the new manufacturer enter the market at the higher prices,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

all manufacturers were able to maintain—and sometimes even increase—dollar sales, even as their unit sales decreased as market share was ceded to the new entrant.

122.    The Fair Share agreement was so ingrained that some Defendant account managers and sales teams viewed contacting their counterparts at other companies—even to discuss market allocation and/or price increases—as part of the normal course of business. Indeed, Defendants trained their employees on Fair Share principles and in some instances paid bonuses based on the ability to obtain "market intel." For example, a September 2013 Taro Pricing Department Training presentation instructed: ██████████████████████ ██████████████████████████████████ The training presentation explained that when Taro launched a new product, ███████████████████████ ███████████████████████████ Taro's training was not limited to specific drugs, but rather, was broadly aimed at inculcating Taro personnel on how to adhere to the Fair Share agreement in their daily business dealings.

123.    Defendants understood the "rules of the road" and that they needed to "play nice in the sandbox." This understanding meant that Defendants did not compete with each other on price and did not take advantage of another Defendant's price increase by providing a lower bid to "steal" the customer.

124.    "Playing nice in the sandbox" was not just a slogan—it was a key to keeping prices high. As an Associate Director of Generic Rx Marketing at Dr. Reddy's explained with respect to price increases, ███████████████████████ Similarly, in a Sandoz July 2013 Commercial Operations presentation, the company recognized that being "responsible" and abiding by the Fair Share agreement translated into higher profits: ███████

125.    The Fair Share agreement was utilized repeatedly during the Class Period. Defendants routinely and readily agreed to follow or not to compete on price increases for a number of generic drugs. Additionally, when customers requested new bids in response to price increases instituted from other Defendants, the Defendant-competitors spoke to each other and devised strategies for responding without undermining pricing. Consequently, consistent with their understanding of Fair Share, Defendants sometimes refused to bid or provided a cover bid that allowed a competitor's price increase to succeed.

126.    The Fair Share practice injured Plaintiffs and the Class. Plaintiffs paid more for the Drugs at Issue than they otherwise would have paid absent Defendants' anticompetitive "Fair Share" and drug-specific agreements.

**C.    Defendants' Conspiracy Spanned Multiple Drugs and Manufacturers**

127.    The concept of Fair Share was not limited to a specific drug. Rather, the concept of Fair Share extended across (at least) the Drugs at Issue. Defendants that "played fair" and maintained a Fair Share would benefit from the overarching conspiracy as a whole, even if Defendants would occasionally "lose out" on one specific drug. For example, customers for one generic drug were sometimes traded for customers for a different generic drug so that Fair Shares could be allocated across the larger market. In other instances, competitors would support a price increase for one drug with the understanding that their competitors would support a price increase for a different drug. Defendants who undercut other Defendants' prices were seen as "not playing fair" and "punishing" a competitor, which was contrary to the Fair Share agreement.

128.    Although many of the allegations in this Complaint highlight the drug-specific conduct and price-fixing agreements between manufacturers of certain drugs, it is clear that

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants also reached a broader Fair Share agreement that spanned the Drugs at Issue. A few specific examples—elaborated in detail in the States' Complaint—highlight the overarching nature of Defendants' Fair Share agreement.

**1.      Example 1: Nisha Patel and Teva's Systematic Price Fixing**

129.      In April 2013, Defendant Teva hired Nisha Patel as its Director of Strategic Customer Marketing. As the States' Complaint makes plain, Patel's "strategy" primarily focused on a widespread effort to implement collusive price increases on numerous drugs manufacturerd by numerous manufacturers. Before joining Teva, Patel worked at a large drug wholesaler, working her way up to Director of Global Generic Sourcing. During her time at the wholesaler, Patel developed and maintained relationships with many sales and marketing executives at Teva's competitors. Teva hired Patel for the express purpose of strengthening Teva's relationships with other manufacturers in order to maintain prices and to implement price increases.

130.      On May 1, 2013, Patel began creating a spreadsheet with a list of "Price Increase Candidates." In a separate tab of the spreadsheet, she rated Teva's "Quality of Competition" by assigning companies into several categories, including "Strong Leader/Follower," "Lag Follower," "Borderline," and "Stallers."

131.      As she was creating the list, Patel was talking to competitors to determine their willingness to increase prices and adjusted the ratings accordingly. For example, in one of her first conversations with another manufacturer after joining Teva, Patel learned that Sandoz would follow Teva's price increases and would not poach Teva's customers after Teva price increases. Sandoz was thus rated as one of Teva's highest "quality" competitors. Patel and Teva based many anticompetitive decisions on this understanding with Sandoz over the next several years.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

132.    By May 6, 2013, Patel created an initial rating of fifty-six (56) different manufacturers in the generic drug market by their "quality." Patel defined "quality" by her assessment of whether a manufacturer would agree to lead or follow price increases. The rating system was a scale from +3 for the "highest quality" manufacturer to a -3 ranking for the "lowest quality" manufacturer.

133.    Patel used her rating system, in conjunction with other market factors, to identify drugs that were candidates for price increases. The best candidates (aside from a drug where Teva was the sole supplier) were drugs where there was only one other "high quality" manufacturer in the market. Drug markets with several "low quality" competitors were less desirable candidates for price increases.

134.    Patel's systematic approach to collusive pricing was understood and authorized by her supervisors and executives at Teva, including Maureen Cavanaugh (Senior Vice President of Sales and Marketing) and David Rekenthaler (Vice President of Sales).

135.    Approximately one year after her initial set of "competitor" ratings, on May 9, 2014, Patel updated her ratings of the various manufacturers. The updates took into account Teva's work over the prior year to expand and solidify agreements with numerous manufacturers, including many Defendants here. Some manufacturers had a high-quality rating throughout the entire relevant time period, while other competitors' ratings increased after successfully colluding with Teva on one or more drugs.

136.    The breadth of Patel's list—56 manufacturers—and Teva's systematic effort to maintain and strengthen the Fair Share agreement across all of them, even those with "low" quality rankings, underscores the overarching and multi-drug aspect of Defendants' conspiracy.

137.    For example, Apotex was one of the "lowest" rated manufacturers in May 2013. A year later, Apotex's rating was adjusted to +2. Apotex made this jump in large part due to Patel's relationship with B.H., National Sales Director at Apotex, and the successful coordination between Apotex and Teva in 2013 on Pravastatin and Doxazosin Mesylate price increases.

138.    Notably, Apotex's low rating in 2013 does not indicate that it was not colluding with Teva—or other manufacturers—during that period. Quite the contrary. For example, Apotex's B.H., National Sales Director, communicated with more than just Nisha Patel; she also communicated with M.B., a Director of National Accounts at Actavis, at least as early as May 2011 and numerous times thereafter. Apotex's B.H. also communicated with M.D., a Vice President of Sales at Cadista, at least as early as February 2012, and with C.M., a Director of National Accounts at Aurobindo, at least as early as May 2013.

139.    Other Apotex employees also communicated with generic manufacturers notwithstanding its "low quality" rating by Patel in 2013. For example, at least as early as 2010, J.V., Apotex's Vice President of Retail Sales, communicated with (at least) D.D., the Senior National Account Manager at Defendant Impax. Almost as soon as Apotex hired J.H., a new Senior Vice President and General Manager, in April 2013, Teva's Rekenthaler began to communicate directly with him by phone, and did so throughout 2013 (and thereafter). That same Apotex SVP also communicated by phone with individuals at (at least) Defendants Actavis, Aurobindo and Par during 2013, and additional Defendants in 2014.

## 2.    Example 2: Price Fixing of Multiple Drugs All at Once

140.    Defendants' businesses—and their anticompetitive agreements with each other—were not siloed by drug. Rather, all Defendants market and sell multiple generic drugs, many of which also are marketed and sold by various other manufacturers. Defendants thus are repeat players that compete on any number of drugs and can expect to compete on additional drugs as

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

their portfolios expand. Accordingly, Defendants' agreements to fix, raise or stabilize the prices of Drugs at Issue often were coordinated across groups or portfolios of overlapping drugs.

141.    For example, Teva orchestrated and implemented price increases (effective July 31, 2012) for at least seven drugs all at once: Buspirone HCL, Estradiol, Labetalol HCL, Loperamide, Nadolol, Nitrofurantoin and Tamoxifen Citrate. Teva's Rekenthaler and Kevin Green (Director of National Accounts) communicated with the other manufacturers of those drugs (which included Mylan, Sandoz, Actavis and Alvogen). Rekenthaler communicated by phone with A.S., the Vice President of Sales at Actavis, twice on July 11, 2012. Green spoke to P.K., Director of National Accounts at Sandoz, on July 29 and July 31, 2012 and to Jim Nesta (Vice President of National Accounts at Mylan) on July 23, 24, 25, 26, 30, and 31, 2012. Nesta (Mylan) spoke with B.H., Executive Vice President of Sales at Alvogen, on a number of occasions in April, May, June and July 2012. Teva's Green also spoke to the Alvogen EVP in April 2012.

142.    Similarly, Teva and Glenmark coordinated pricing on at least six drugs all at once in the spring of 2013. On May 2, 2013, Patel spoke to P.D., an Executive Vice President at Glenmark, several times. Those two manufacturers worked out pricing agreements on Adapalene, Nabumetone, Pravastatin, Ranitidine, Moexipril and Moexipril HCTZ. Other Defendants, including Amneal, Apotex, Lupin, Sandoz, Taro and Zydus manufactured at least one of these drugs. During the week preceding and the week following Patel's discussions with the Glenmark EVP, contacts between and among all of the manufacturers also took place. For example, Teva's Rekenthaler communicated by phone with S.R., Vice President of Sales at Amneal, and with J.H., SVP and General Manager at Apotex. Teva's Green communicated with multiple sales personnel at Zydus and with David Berthold, the Vice President of Sales at Lupin.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

M.B., Vice President of Sales at Glenmark, spoke with Ara Aprahamian (Vice President of Sales at Taro) as well as additional contacts at Taro. This series of communications and agreements is an example of Defendants' broader, coordinated anticompetitive conduct, which involved overlapping webs of communications in furtherance not only of the drug-specific price-fixing agreements that they reached, but also of the Fair Share agreement that spanned multiple drugs.

<u>3.</u>      <u>Example 3: Collusion on Drugs that Manufacturers Did Not Sell</u>

143.      All Defendants market and sell numerous drugs and are in the business of adding new drugs to their product offerings. This means that they regularly enter new drug markets. It also means that new competitors sometimes enter the markets that they already occupy. Thus, during the relevant period, each Defendant was a potential competitor of every other Defendant. Accordingly, each Defendant had an interest in the conduct and pricing of their co-conspirators relating to drugs that they did not (at least at that juncture) market or sell. Monitoring co-conspirator conduct served at least two purposes. <u>First</u>, it provided each Defendant with information about whether and the extent to which co-conspirators were abiding by their anticompetitive agreements. The rating system for 56 manufacturers compiled by Teva's Nisha Patel is another manifestation of the same interest. <u>Second</u>, by monitoring co-conspirator conduct, each Defendant was able to ascertain when and where supracompetitive prices were in place and likely to hold, which provided an incentive and opportunity for them to enter that market. Without some confidence that the Fair Share agreement would hold across drugs, it was less likely that each Defendant would abide by it for any single drug.

144.      The States' Complaint demonstrates that Defendants' interest in drugs beyond those that each of them sold was not merely theoretical. For example, after Teva and Mylan coordinated a number of price increases in the summer of 2013, Sandoz sought to obtain a "comprehensive list of items" subject to those price increases, even as to drugs that Sandoz did

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

not sell. P.K., a Director of National Accounts at Sandoz, reached out to Rekenthaler at Teva to obtain a copy of the Teva price increase list, including drugs that Sandoz did not sell. During the same period, D.L., another Director of National Accounts at Sandoz, reached out to Nesta at Mylan, and asked him to identify all of Mylan's price increases. Nesta complied, and provided the Sandoz Director with a list that included at least one drug—Haloperidol—on which Mylan had not yet raised its price.

### D.   Frequent Meetings and Contacts among Industry Personnel Facilitated Defendants' Conspiracy

145.   Executives and managers at Defendants, as well as sales and marketing personnel and National Account Managers ("NAMs") in particular, had numerous opportunities to meet and communicate both in professional and social settings. Although Defendants compete for the same customers, their employees have developed close relationships. These relationships, and the many opportunities to meet and communicate, facilitated Defendants' ability to reach anticompetitive agreements.

146.   Moreover, many of the personnel employed by Defendants have worked at multiple companies—including other Defendants—during their careers. These employees maintained contact with people at their prior employers. In turn, this facilitated the ease with which conspiratorial agreements could be reached. Among Defendants, this familiarity spawned collusion.

147.   Defendants' geographic proximity to each other—at least 41 different generic drug manufacturers are concentrated between the New York City and Philadelphia metropolitan areas—facilitated Defendants' frequent in-person meetings at "industry dinners" and other social events. These events provided Defendants with additional opportunities to collude.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

148.     Defendants also had almost constant opportunities to conspire and interact with each other at trade shows and customer conferences and such contacts were commonplace and encouraged by industry executives. *See* Exhibit A (Trade Association Contacts).

149.     But trade shows were not the only place where Defendant personnel communicated with one another. Defendants also had their own events and activities that presented numerous opportunities for sharing competitive information.

150.     For instance, certain sales representatives, including those employed by Defendants, regularly met for what was referred to as "Girls Night Out" ("GNO") or "Women in the Industry" meetings or dinners which were used as a place to meet with competitors and discuss competitively sensitive information.

**E.     Defendants Frequently Communicated Directly and Privately As Part of the Overarching Conspiracy.**

151.     In addition to their regular meetings in person, Defendants used text messages, phone calls, and messages passed through third-party services such as LinkedIn to facilitate their conspiratorial communications.

152.     For example, every Defendant named in this Complaint communicated directly by telephone with multiple other Defendants. The following table shows some (and almost certainly not all, given the preliminary stage of discovery in this litigation) of the private and direct inter-Defendant communications between sales, marketing and executive personnel at Defendants.

**Table 2: Widespread Inter-Defendant Communications**

| Defendant | Direct Phone Communication between July 2009 and March 2016 |
|-----------|------------------------------------------------------------|
| Actavis | Akorn, Alvogen, Amneal, Apotex, Ascend, Aurobindo, Bausch, Breckenridge, Cadista, Camber, Citron, Dr. Reddy's, Epic, Glenmark, Greenstone, G&W, Heritage, Impax, Lannett, Mallinckrodt, Mayne, Mylan, Par, Perrigo, Rising, Sandoz, Sun, Taro, Teligent, Teva, Torrent, Upsher-Smith, West-Ward, Wockhardt, Zydus |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| | |
|---|---|
| Akorn | Actavis, Amneal, Apotex, Aurobindo, Bausch, Camber, Epic, Glenmark, Greenstone, Impax, Lannett, Mallinckrodt, Mayne, Par, Perrigo, Sandoz, Taro, Teva, West-Ward, Wockhardt |
| Alvogen | Actavis, Apotex, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Epic, G&W, Heritage, Impax, Lannett, Mylan, Par, Teva, Upsher-Smith, Wockhardt, Zydus |
| Amneal | Actavis, Akorn, Ascend, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Glenmark, G&W, Heritage, Impax, Lannett, Mylan, Par, Perrigo, Taro, Teva, Torrent, Upsher-Smith, West-Ward, Zydus |
| Apotex | Actavis, Akorn, Alvogen, Ascend, Aurobindo, Cadista, Citron, Dr. Reddy's, Glenmark, Greenstone, Heritage, Impax, Lupin, Mallinckrodt, Par, Perrigo, Rising, Sandoz, Taro, Teva, Upsher-Smith, Zydus |
| Ascend | Actavis, Amneal, Apotex, Aurobindo, Breckenridge, Camber, Citron, Dr. Reddy's, Epic, Glenmark, Heritage, Lannett, Par, Sun, Taro, Teva, West-Ward |
| Aurobindo | Actavis, Akorn, Alvogen, Amneal, Apotex, Ascend, Breckenridge, Cadista, Camber, Citron, Dr. Reddy's, Glenmark, Greenstone, G&W, Heritage, Lannett, Lupin, Mallinckrodt, Mayne, Mylan, Par, Perrigo, Rising, Sun, Taro, Teligent, Teva, Torrent, Upsher-Smith, West-Ward, Wockhardt, Zydus |
| Bausch | Actavis, Akorn, Breckenridge, Citron, G&W, Heritage, Lannett, Perrigo, Zydus |
| Breckenridge | Actavis, Alvogen, Amneal, Ascend, Aurobindo, Bausch, Cadista, Camber, Citron, Glenmark, Greenstone, G&W, Heritage, Impax, Lannett, Lupin, Par, Perrigo, Sandoz, Sun, Taro, Teligent, Teva, Upsher-Smith, Wockhardt |
| Cadista | Actavis, Apotex, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark, G&W, Heritage, Impax, Lannett, Mylan, Par, Perrigo, Sun, Teva, West-Ward, Wockhardt, Upsher-Smith, Zydus |
| Camber | Actavis, Akorn, Ascend, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Glenmark, G&W, Impax, Lannet, Mayne, Par, Sun, Teva, Upsher-Smith, Wockhardt, Zydus |
| Citron | Actavis, Alvogen, Amneal, Apotex, Ascend, Aurobindo, Bausch, Breckenridge, Camber, Dr. Reddy's, Glenmark, Greenstone, G&W, Heritage, Impax, Lannett, Lupin, Par, Perrigo, Sandoz, Sun, Taro, Teva, Torrent, Upsher-Smith, Zydus |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| | |
|---|---|
| Dr. Reddy's | Actavis, Alvogen, Amneal, Apotex, Ascend, Aurobindo, Cadista, Camber, Citron, Glenmark, Greenstone, G&W, Heritage, Impax, Lannett, Lupin, Mallinckrodt, Mayne, Mylan, Par, Perrigo, Rising, Sandoz, Sun, Taro, Teva, Upsher-Smith, West-Ward, Wockhardt, Zydus |
| Epic | Actavis, Akorn, Alvogen, Ascend, Lannett, Perrigo, Sun, Torrent, West-Ward |
| Glenmark | Actavis, Akorn, Amneal, Apotex, Ascend, Aurobindo, Breckenridge, Cadista, Camber, Citron, Dr. Reddy's, Greenstone, G&W, Heritage, Impax, Lannett, Lupin, Mallinckrodt, Par Perrigo, Sandoz, Sun, Taro, Teva, Torrent, West-Ward, Wockhardt, Zydus |
| Greenstone | Actavis, Akorn, Apotex, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Glenmark, G&W, Heritage, Impax, Lannett, Lupin, Mylan, Par, Perrigo, Sandoz, Teva, Zydus |
| G&W | Actavis, Alvogen, Amneal, Aurobindo, Bausch, Breckenridge, Cadista, Camber, Citron, Dr. Reddy's, Glenmark, Greenstone, Heritage, Impax, Lannett, Lupin, Mallinckrodt, Mylan, Par, Perrigo, Sandoz, Sun, Taro, Teligent, Teva, Torrent, Upsher-Smith, Wockhardt, Zydus |
| Heritage | Actavis, Alvogen, Amneal, Apotex, Ascend, Aurobindo, Bausch, Breckenridge, Cadista, Citron, Dr. Reddy's, Glenmark, Greenstone, G&W, Lannett, Lupin, Mallinckrodt, Mayne, Mylan, Par, Sandoz, Sun, Teligent, Taro, Teva, Torrent, Upsher-Smith, West-Ward, Wockhardt |
| Impax | Actavis, Akorn, Alvogen, Amneal, Apotex, Breckenridge, Cadista, Camber, Citron, Dr. Reddy's, Glenmark, Greenstone, G&W, Lannett, Lupin, Mylan, Par, Perrigo, Sandoz, Sun, Taro, Teligent, Upsher-Smith, Wockhardt, Zydus |
| Lannett | Actavis, Alvogen, Amneal, Ascend, Aurobindo, Bausch, Breckenridge, Cadista, Camber, Citron, Dr. Reddy's, Epic, Glenmark, Greenstone, G&W, Heritage, Impax, Lupin, Mallinckrodt, Mayne, Mylan, Par, Perrigo, Sandoz, Sun, Taro, Teligent, Teva, Upsher-Smith, West-Ward, Wockhardt, Zydus |
| Lupin | Actavis, Akorn, Apotex, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Glenmark, G&W, Heritage, Impax, Lannett, Mallinckrodt, Mylan, Par, Sun, Teva, Wockhardt, Zydus |
| Mallinckrodt | Actavis, Akorn, Apotex, Aurobindo, Dr. Reddy's, Glenmark, G&W, Heritage, Lannett, Lupin, Perrigo, Sandoz, Taro, Upsher-Smith, West-Ward, Wockhardt |
| Mayne | Actavis, Akorn, Aurobindo, Camber, Dr. Reddy's, Heritage, Lannett, Mylan, Perrigo, Sun, Taro, Teva, Upsher-Smith |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| | |
|---|---|
| Mylan | Actavis, Alvogen, Amneal, Aurobindo, Cadista, Dr. Reddy's, Greenstone, G&W, Heritage, Impax, Lannett, Lupin, Mayne, Par, Perrigo, Sandoz, Taro, Teva, Upsher-Smith, West-Ward, Zydus |
| Par | Actavis, Akorn, Alvogen, Amneal, Apotex, Ascend, Aurobindo, Breckenridge, Cadista, Camber, Citron, Dr. Reddy's, Glenmark, Greenstone, G&W, Heritage, Impax, Lannett, Mylan, Perrigo, Sandoz, Sun, Taro, Teligent, Teva, Torrent, Upsher-Smith, West-Ward, Wockhardt, Zydus |
| Perrigo | Actavis, Akorn, Amneal, Apotex, Aurobindo, Bausch, Breckenridge, Cadista, Citron, Dr. Reddy's, Epic, Glenmark, Greenstone, G&W, Heritage, Impax, Lannett, Mallinckrodt, Mayne, Mylan, Par, Sandoz, Sun, Taro, Teligent, Upsher-Smith, West-Ward, Wockhardt, Zydus |
| Rising[8] | Actavis, Apotex, Aurobindo, Dr. Reddy's, Sandoz, Taro, Teva, Upsher-Smith, West-Ward, Zydus |
| Sandoz | Actavis, Akorn, Apotex, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Glenmark, Greenstone, G&W, Heritage, Impax, Lannett, Mallinckrodt, Mylan, Par, Perrigo, Rising, Taro, Teva, Upsher-Smith, West-Ward, Wockhardt, Zydus |
| Sun | Actavis, Ascend, Aurobindo, Breckenridge, Cadista, Camber, Citron, Dr. Reddy's, Epic, Glenmark, G&W, Heritage, Impax, Lannett, Lupin, Mayne, Par, Perrigo, Taro, Teva, Upsher-Smith, West-Ward, Zydus |
| Taro | Actavis, Akorn, Amneal, Apotex, Ascend, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Glenmark, G&W, Heritage, Impax, Lannett, Mallinckrodt, Mayne, Mylan, Par, Perrigo, Rising, Sandoz, Sun, Teligent, Teva, West-Ward, Wockhardt |
| Teligent | Actavis, Aurobindo, Breckenridge, G&W, Heritage, Impax, Lannett, Par, Perrigo, Taro, Teva, West-Ward |
| Teva | Actavis, Akorn, Alvogen, Amneal, Apotex, Ascend, Aurobindo, Breckenridge, Cadista, Camber, Citron, Dr. Reddy's, Glenmark, Greenstone, G&W, Heritage, Lannett, Lupin, Mayne, Mylan, Par, Rising, Sandoz, Sun, Taro, Teligent, Torrent, Upsher-Smith, West-Ward, Wockhardt, Zydus |
| Torrent | Actavis, Amneal, Aurobindo, Citron, Epic, Glenmark, G&W, Heritage, Par, Teva |
| Upsher-Smith | Actavis, Alvogen, Amneal, Apotex, Aurobindo, Breckenridge, Cadista, Camber, Citron, Dr. Reddy's, G&W, Heritage, Impax, Lannett, Mallinckrodt, Mayne, Mylan, Par, Perrigo, Rising, Sandoz, Sun, Teva, Wockhardt |

[8] Rising, although not named as a Defendant in this complaint, was a co-conspirator in the alleged conspiracy and therefore is included here.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| West-Ward | Actavis, Akorn, Amneal, Ascend, Aurobindo, Cadista, Dr. Reddy's, Epic, Glenmark, Heritage, Lannett, Mallinckrodt, Mylan, Par, Perrigo, Rising, Sandoz, Sun, Taro, Teligent, Teva, Wockhardt |
| Wockhardt | Actavis, Akorn, Alvogen, Aurobindo, Breckenridge, Cadista, Camber, Dr. Reddy's, Glenmark, G&W, Heritage, Impax, Lannett, Lupin, Mallinckrodt, Par, Perrigo, Sandoz, Taro, Teva, Upsher-Smith, West-Ward, Zydus |
| Zydus | Actavis, Alvogen, Amneal, Apotex, Aurobindo, Bausch, Cadista, Camber, Citron, Dr. Reddy's, Glenmark, Greenstone, G&W, Lannett, Lupin, Mylan, Par, Perrigo, Rising, Sandoz, Sun, Teva, Wockhardt |

153.    The above catalog of inter-defendant phone contacts is by no means complete. It is clear, however, even from the incomplete information available to date, that direct communications between Defendants were commonplace during the conspiracy period.

## VII.    DEFENDANTS CONSPIRED TO FIX PRICES, ALLOCATE MARKETS AND/OR RIG BIDS FOR THE DRUGS AT ISSUE

154.    From at least as early as July 2009 until the present, Defendants agreed to raise the prices of and allocate the markets for the Drugs at Issue.

155.    No shortages or other market features can explain Defendants' price increases for the Drugs at Issue.

156.    The elevated prices of Drugs at Issue that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and the Class and caused them to pay more than they would have paid in a free and fair market.

157.    Each Defendant entered into the Fair Share agreement, which encompassed all Drugs at Issue.

158.    Each Defendant also entered into drug-specific price-fixing agreements as to those Drugs at Issue which it sold. The drug-specific agreements between certain Defendants with respect to each of the individual Drugs at Issue was part of all Defendants' overarching

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

conspiracy to unreasonably restrain trade and to fix, raise or stabilize the prices of all Drugs at Issue.

159.    Throughout the relevant period, each Defendant attended trade association and other events along with other Defendants. *See, e.g.*, Exhibit A (Trade Association Contacts). These trade events provided opportunities for Defendants to reach agreement on price fixing and Fair Share for Drugs at Issue.

160.    Defendants' conduct clearly cuts across multiple drugs and inculpates all Defendants. Allegations relating to each of the Drugs at Issue are included below.[9]

161.    Two types of price charts are included in the allegations relating to Defendants' conduct: (1) charts of list prices, also known as WAC (wholesale acquisition cost) prices; and (2) charts of IQVIA NSP (National Sales Perspectives) prices. Defendants' anticompetitive agreements often are evidenced in one or both of these types of prices. For example, in some instances, Defendants coordinated increases in their list (WAC) prices, and communications among them occurred around the times of list (WAC) price announcements. In other instances, Defendants agreed to raise prices—and did raise prices—without ever announcing a list (WAC) price increase. In other words, Defendants increased the prices that they charged their customers, but did not update the list (WAC) prices for those products. The prices actually paid by Defendants' customers are reflected in the NSP prices.

---

[9] The narration of each Drug at Issue as an individual set of events does not mean and is not intended to suggest that the events and actions relating to individual Drugs at Issue are unrelated. As described in the preceding section, the opposite was true: Defendants' anticompetitive efforts were systematic, widespread and not limited to individual drugs.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

162.    The allegations below include the conduct of numerous individuals employed by Defendants. Individuals named as Defendants in the States' complaint are identified by name. All other individuals are identified only by their intitials.

### 1.    Perphenazine

163.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Perphenazine tablets beginning at least as early as July 2009.

164.    Perphenazine, also known by the brand name Trilafon, is an anti-psychotic medication.

165.    During the relevant time frame, Defendants Par and Sandoz were the primary manufacturers of Perphenazine.

166.    The market for Perhpenazine was mature and at all relevant times had multiple manufacturers.

167.    In 2007 and 2008, Par and Sandoz sold Perphenazine tablets for less than 

168.    When Par experienced supply disruptions and temporarily left the market, Sandoz more than doubled its prices for Perphenazine tablets.

169.    When Par re-entered the market in the summer of 2009, rather than resume its formerly low pricing to compete with Sandoz to win back customers, it joined the market at Sandoz's elevated prices. This was consistent with the Fair Share agreement between Sandoz, Par and all Defendants.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

170.    Over the ensuing years, Par and Sandoz continued to dominate the market for Perphenazine. Notably, Par and Sandoz prices for Perphenazine have never returned to the lower levels of 2008.

171.    Even when Par or Sandoz wanted to increase their market share of Perphenazine, they eschewed price competition and instead adhered to their Fair Share agreement.   For example, ███████████████████████████████████████████████████████████ ██████████████████████████. Par nonetheless maintained its prices well above competitive levels and endeavored to gain share without resorting to free and fair price competition.

172.    The price chart below shows the close coordination of pricing between Par and Sandoz for 8 mg Perhpenazine tablets (which also is true of the other dosages of tablets sold by Par and Sandoz): ████████████████████



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

173.    Throughout this period, Sandoz and Par met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Perphenazine and of their Fair Share agreement.

174.    For example, as Sandoz prepared to announce a list (WAC) price increase on Perphenazine, it spoke to Par both before and after the increase. On March 26, 2013, K.O, Par's Vice President of National Accounts, spoke with M.V., the Associate Director of Pricing at Sandoz for 25 minutes. Less than 10 days later, Sandoz announced its price increase.  Par increased its price at approximately the same time.

### 2.    Pentoxifylline

175.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Pentoxifylline tablets beginning at least as early as August 2009.

176.    Pentoxifylline, also known by the brand names Pentopak, Pentoxil, and TRENtal, is a medication used to reduce leg pain caused by poor blood circulation.

177.    During the relevant time frame, Defendants Teva, Mylan, Apotex and Bausch Health/Oceanside were the primary manufacturers of Pentoxifylline.

178.    The market for Pentoxifylline was mature and at all relevant times had multiple manufacturers.

179.    In 2008 and 2009, Teva, Mylan and Apotex NSP unit prices for Pentoxifylline tablets were ▮▮▮▮▮▮▮▮▮. Beginning at least as early as August 2009, these Defendants agreed to impose significant price increases.

180.    When Apotex exited the market in late 2009, Mylan and Teva took the opportunity to raise prices significantly. ▮▮▮▮▮▮▮▮▮▮. Consistent with their

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Fair Share agreement, Teva and Mylan achieved nearly an equal split of dollar sales during 2010 and most of 2011.

181.   In October 2011, Apotex re-joined the market. Instead of competing for customers by lowering prices, as would be expected in a competitive generic market, the addition of another manufacturer had the opposite effect; all three manufactures *increased* prices. By early 2012, Pentoxifylline effective prices had ████████ over 2008 levels and remain elevated today.

182.   The pattern repeated in October 2014, when Bausch/Oceanside entered the market.  Rather than offer lower prices to win customers, Bausch/Oceanside matched the market pricing of Teva, Mylan and Apotex.

183.   The following chart of Pentoxifylline NSP prices shows the coordinated increase by Teva and Mylan in late 2009, which was joined by Apotex when it re-entered the market in 2011. ████████████



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

184.     Throughout this period, Teva, Mylan, Apotex and Bausch/Oceanside met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Pentoxifylline and of their Fair Share agreement.

185.     For example, during 2010 and 2011, when Teva and Mylan imposed price increases and split the market for Pentoxifylline, the contacts between the two manufacturers were extensive. For example, Teva's David Reckenthaler was communicating by phone with Mylan employees at least as early as April 2010. Rekenthaler communicated with J.K., the Vice President Executive Director of Sales, in April and May 2010. Rekenthaler also communicated frequently with Mylan's Jim Nesta from 2012 until Rekenthaler departed Teva in the spring of 2015.

186.     Rekenthaler was not the only Teva employee to cultivate relationships with Mylan. R.C., a Teva Vice President of Sales, was, until he left Teva to become the CEO of Aurobindo, in contact with B.P., Mylan's Senior Vice President of National Accounts, as well as Nesta.

187.     Similarly, in 2014 when Teva wanted to increase its prices for Pentoxifylline, it reached out to coordinate with Mylan and Apotex in the days and weeks leading up to the increase. For example, Teva's Rekenthaler spoke to J.H., a Senior Vice President and General Manager at Apotex, on March 20 for four (4) minutes and March 25, 2013 for two (2) minutes. Then, on the day that Teva imposed price increases, April 4, 2014, Rekenthaler spoke to Nesta of Mylan for six (6) minutes. A week after Teva increased its price – on April 11, 2014 – Rekenthaler followed-up with the SVP at Apotex and the two spoke again for five (5) minutes. During these calls, Rekenthaler gathered Apotex's pricing plans and conveyed them to his Teva colleague, Nisha Patel.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 3.     Hydroxyurea

188.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Hydroxyurea beginning at least as early as March 2010.

189.    Hydroxyurea, also known by the brand names Droxia and Hydrea, is a medication used to treat sickle cell anemia and cancer of the white blood cells (chronic myeloid leukemia).

190.    During the relevant time frame, Defendants Teva and Par were the primary manufacturers of Hydroxyurea.

191.    The market for Hydroxyurea was mature and at all relevant times had multiple manufacturers.

192.    After a period of relatively low and stable prices for Hydroxyurea capsules in 2008 and 2009, Teva and Par agreed to implement large price increases. In the spring of 2010, Teva and Par began to implement nearly simultaneous and identical price increases. By summer, Par and Teva Hydroxyurea effective prices were approximately ▮▮▮ higher and remained elevated for years thereafter.

193.    In late 2011, Teva experienced a supply disruption and briefly exited the market. When it re-entered the market approximately 3 months later, rather than offer lower prices to win back market share, Teva matched the elevated prices to which it had previously raised prices in parallel with Par.

194.    The following chart of Hydroxyurea NSP prices shows the coordinated increase by Teva and Par in the spring of 2010, and the later increase by Teva in 2014. ▮▮▮▮ ▮▮▮▮



195.    Throughout this period, Teva and Par met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Hydroxyurea and of their Fair Share agreement.

196.    For example, between March and June 2010 (when Par and Teva imposed their first coordinated price increases) Teva's Rekenthaler spoke with G.B., Par's Vice President of National Accounts via telephone on at least 5 occasions.

197.    In 2014, Teva (again) raised its Hydroxyurea prices. This created a risk that Teva would lose customers and market share to Par. However, Defendants' Fair Share agreement allowed Teva to implement a significant price increase without a commensurate loss in sales. Before increasing prices in 2014, Teva again communicated directly with Par. Teva's Rekenthaler again reached out to the VP of National Accounts at Par. They spoke at least three times between August 24 and August 28, 2014 in furtherance of the Hydroxyurea price-fixing agreement and the Fair Share agreement.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 4.      Piroxicam

198.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Piroxicam capsules beginning at least as early as April 2010.

199.    Piroxicam, also known by the brand name Feldene, is a nonsteroidal anti-inflammatory drug (NSAID).  Piroxicam is used to treat rheumatoid arthritis, osteoarthritis, and juvenile rheumatoid arthritis.

200.    During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Piroxicam. Defendant Greenstone joined the Piroxicam market and the Piroxicam conspiracy in 2014.

201.    The market for Piroxicam capsules was mature and at all relevant times had multiple manufacturers.

202.    Piroxicam capsule prices were relatively low and stable for years, but in the spring of 2010 prices skyrocketed and have remained elevated above competitive levels ever since. Teva and Mylan announced identical list (WAC) prices that were more than 30 times higher than the former list prices. NSP prices ███████████████████████████. When Greenstone later joined the market, it matched those inflated WAC prices and its NSP prices ████████████████████.

203.     The list (WAC) price chart and the NSP price chart below show the extraordinary price increases that were imposed in the spring of 2010, and that Greenstone matched Teva and Mylan's high prices when it joined the market in 2014. (Note: 10 mg and 20 mg Piroxicam capsules exhibited a similar pricing pattern. Charts for only the 20 mg dosage are included here. Also note: During the period between March and July 2010, Nostrum Pharmaceuticals marketed

Piroxicam using Mylan's ANDAs; Nostrum sales and Mylan sales are shown as a single line of sales in the NSP chart below.) ████████████





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

204.    Throughout this period, Teva, Mylan and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Piroxicam and of their Fair Share agreement.

205.    For example, in the period immediately preceding Teva's announcement of list (WAC) price increases on May 12, 2010, Teva's Rekenthaler communicated directly with Mylan via telephone. He spoke with J.K., Mylan's Vice President and Executive Director of Sales shortly before the increase, on April 27, 2010, and then again right after the increase, on May 14, 2010.

206.    When Teva and Mylan learned that Greenstone would be entering the Piroxicam market in the spring of 2014, they quickly moved to bring Greenstone into their Piroxicam price-fixing agreement and the broader Fair Share agreement. First, on March 3, 2014, Teva's Rekenthaler and Nesta connected by phone for nearly 10 minutes. Then, over the ensuing days, Teva's Patel reached out to Greenstone. On March 5, 6, 12 and 17, 2014—within days of Greenstone's entrance to the market—Teva's Nisha Patel had multiple phone conversations with Jill Nailor and R.H., the Director of National Accounts at Greenstone (who had worked at AmerisourceBergen during the same period as Patel), during which Teva and Greenstone reached agreement that Teva would cede a Fair Share of the Piroxicam market to Greenstone.

### 5.    Permethrin

207.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Permethrin cream beginning at least as early as May 2010.

208.    Permethrin, also known by the brand name Acticin, among others, is used to treat scabies.

209.    During the relevant time frame, Defendants Actavis, Perrigo and Mylan were the primary manufacturers of Permethrin cream.

210.    The market for Permethrin cream was mature and at all relevant times had multiple manufacturers.

211.    In the early summer of 2010, effective prices for Permethrin cream sold by Perrigo and Actavis were low and stable at less than ███████ per unit. In the summer of 2010, however, Perrigo and Actavis agreed to implement significant price increases and by the summer of 2013 when Mylan entered the market, prices were more than ████████ than in 2009 and early 2010.

212.    In the summer of 2010, Actavis and Perrigo approximately ████████ their NSP prices. This large increase appears small on the chart below because their subsequent coordinated price increases were even more extreme.

213.    In the summer of 2011, Actavis and Perrigo approximately ████████ the already inflated Permethrin cream NSP prices. The also announced large and identical list (WAC) price increases in close succession.

214.    Then, in the summer of 2013, shortly before Mylan entered the market, Actavis and Perrigo imposed additional price increases, which were again very similar in timing and size. When Mylan entered the market in the late summer of 2013, rather than offer lower prices to gain market share (as would be expected in a competitive market), Mylan entered at prices ██████ ██████████████████████ and announced identical list (WAC) prices, which was consistent with their price-fixing agreement on Permethrin and their Fair Share agreement.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

215.    The NSP price chart and the list (WAC) price chart below show the large and parallel price increases by Actavis and Perrigo, and the subsequent market entry by Mylan at those inflated prices. ██████████████



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



216.    Throughout this period, Actavis, Perrigo and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Permethrin and of their Fair Share agreement.

217.    For example, on May 27, 2010—right around the time that Actavis and Perrigo first raised NSP prices—M.D., Actavis's Director of National Accounts spoke by phone with T.P., Perrigo's Director of National Accounts for nearly 10 minutes.

218.    The two spoke again the following summer. In late July 2011, Actavis announced a list (WAC) price increase. Shortly thereafter, the Perrigo Director of National Accounts and the Actavis Director of National Accounts spoke for three minutes on August 3. Two days later, Perrigo announced an identical list (WAC) price. That day, the Perrigo Director called the Actavis Director and appears to have left a message. A few days later, on August 8, they finally connected and spoke for nearly 9 minutes.

66

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

219.    The pattern repeated in 2013. This time, Perrigo led the list (WAC) price increase on March 13, 2013. The next day, the Actavis and Perrigo Directors spoke for more than 10 minutes. They spoke again for nearly 25 minutes on April 12. On April 25, Actavis announced list (WAC) prices identical to those of Perrigo.

220.    Before Mylan entered the market in late 2013, Mylan's Jim Nesta and Perrigo's T.P. (Director of National Accounts) communicated. On August 27, the two executives exchanged messages but finally connected on the 28th and spoke for 10 minutes. They spoke again on November 15. Perrigo's Director of National Accounts kept Actavis in the loop. He again spoke to M.D., Director of National Accounts at Actavis on August 21, 23 and September 11, 2013.

## 6.    Triamcinolone Acetonide

221.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Triamcinolone Acetonide cream and ointment beginning at least as early as June 2010.

222.    Triamcinolone Acetonide, also known by the brand name Cinolar, is a topical corticosteroid used to treat inflammation caused by conditions such as allergic reactions, eczema, and psoriasis.

223.    During the relevant time frame, Defendants Sandoz, Perrigo, Taro, Par, and Ascend were the primary manufacturers of Triamcinolone Acetonide cream and Sandoz, Perrigo and Taro were the primary manufacturers of Triamcinolone Acetonide ointment.

224.    The markets for Triamcinolone Acetonide cream and ointment were mature and at all relevant times had multiple manufacturers.

225.    All dosages and formulations of Triamcinolone Acetonide cream and ointment were subject to Defendants' conspiracy.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

226.     Between June and December 2010, Triamcinolone Acetonide prices significantly increased and remain at supracompetitive levels even today.

227.     In the cream market, Sandoz, Perrigo and Par approximately ███ their prices in the second half of 2010 to bring them in line with those of Taro. In early 2011, Taro then proceeded to more than ███ its prices. Although Taro's prices were much higher than Sandoz, Perrigo and Par, it was nonetheless able to maintain a relatively stable share of the market, consistent with their Fair Share agreement. As Taro noted in an internal document in 2012, ███ ████████████████

228.     In the ointment market, after years of relatively low and stable pricing, Sandoz and Perrigo imposed significant price increases between June and September 2010.  Their prices more than ███ and remained at supracompetetive levels thereafter. When Taro re-launched its ointment in June 2011, rather than offer lower prices to win customers, it entered the market at even higher prices than Sandoz and Perrigo, thus entering without disturbing the already high prices.

229.     The following NSP price charts for Triamcinolone Acetonide cream and ointment show the parallel and inflated pricing by Sandoz, Perrigo, Taro, Par and Ascend. ████ ██████





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

230.    Throughout this period, Sandoz, Perrigo, Taro, Par and Ascend met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Triamcinolone Acetonide and of their Fair Share agreement.

231.    For example, in the summer of 2010, Sandoz and Perrigo raised prices for Triamcinolone Acetonide cream significantly to match those of Taro. Par, which also increased its prices, did not raise them to the same level as the others. A series of communications between Par and Taro followed, after which Par raised its prices to the same level as the others.  On August 3 and 6, 2010, K.O., a Vice President of National Accounts at Par, received two calls from the Taro offices. Then, on October 11, 2010, the same Par VP had a brief call with D.S., Assistant Vice President of National Accounts at Taro. The Par VP received another call from Taro's offices on December 10, and had calls with D.S. (the Taro AVP of National Accounts) on January 24, 25 and February 22, 2011, and also received a text message on March 18 from the Taro executive. On April 5, 2011, the Par VP received yet another call from the Taro offices. Shortly thereafter, Par's cream prices steeply increased to the same heights as Taro, Sandoz and Perrigo. When Taro raised its cream prices even higher in June 2011, the Taro and Par executives spoke again for approximately 6 minutes on June 28, 2011.

232.    In the midst of his communications with the Par VP, the Taro AVP also was keeping in touch with Perrigo, and had phone calls with A.F., a National Account Director at Perrigo, on January 24 and February 10, 2011.

233.    During this period, the same AVP at Taro also was communicating with Sandoz. As Taro was entering the ointment market in June 2011, D.S. (Taro AVP) received a call from D.L., a Director of National Accounts at Sandoz. They spoke for approximately 3 minutes. Taro

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

entered the ointment market at prices even higher than the already inflated prices imposed by Sandoz and Perrigo. The two spoke again on July 6, 2011.

234.    In May 2012, Ascend entered the cream market. Less than a week before, on April 26, G.W., Ascend's Vice President of National Accounts, spoke twice on the phone with G.B., Vice President of National Accounts at Par. When Ascend did enter the market days later, it did so at the inflated prices that Par, Perrigo, Sandoz and Taro already had imposed. Shortly after Ascend entered the market, its VP of National Accounts spoke to D.S., the AVP at Taro (on July 11, 19 and 20). The Taro AVP also was in touch with his contacts at Par (July 12) and Sandoz (June 11, 15 and August 17).

### 7.    Potassium Chloride

235.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Potassium Chloride tablets (8 mEq, 10 mEq, 20 mEq) beginning at least as early as July 2010.

236.    Potassium Chloride tablets, also known by the brand name K-Dur, among others, is a medication used to prevent and to treat low potassium, which is important for the heart, muscles, and nerves.

237.    During the relevant time frame, Defendants Upsher-Smith, Sandoz, Actavis, Zydus and Mylan were the primary manufacturers of Potassium Chloride 8 MEQ, 10 MEQ and 20 MEQ tablets.

238.    The market for Potassium Chloride tablets was mature and at all relevant times had multiple manufacturers.

239.    For years, the prices of Potassium Chloride tablets were relatively low and stable. Upsher-Smith, Sandoz and Actavis were the dominant suppliers in the market in the early years. Upsher-Smith manufactured tablets and marketed and sold them under the brand name Klor-

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Con. Upsher-Smith also supplied tablets to Sandoz, which in turn marketed and sold them under a Sandoz label.

240.    In the summer of 2010, Upsher-Smith, Sandoz and Actavis imposed nearly simultaneous and very large price increases. In the space of approximately 6 weeks, all three manufacturers tripled their list (WAC) prices. █████████████████████████.

241.    In June 2011, Zydus entered the market. Rather than offer better prices to win market share, Zydus tracked the high prices of Upsher-Smith, Sandoz and Actavis.

242.    As of July 1, 2014, Upsher-Smith ceased to market and sell Klor-Con under the Upsher-Smith label, but instead licensed the Klor-Con name to Sandoz. Thus, after July 1, 2014, Sandoz sold Klor-Con Potassium Chloride tablets under the Sandoz label, though the tablets continued to be manufactured by Upsher-Smith.

243.    In the second half of 2014, Mylan entered the market for Potassium Chloride tablets. Like Zydus before it, Mylan entered at high prices that tracked the other manufacturers already in the market.

244.    The WAC price chart below shows the large, parallel and sustained price increases for Potassium Chloride tablets. Note: The pricing patterns for 8 MEQ, 10 MEQ and 20 MEQ dosages were very similar. Only the chart for the 10 MEQ dosage is included here. ██████
██████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

245.    Throughout this period, Upsher-Smith, Sandoz, Actavis, Zydus and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Potassium Chloride tablets and of their Fair Share agreement.

246.    For example, during the summer of 2010, D.Z, the Senior National Account Manager at Upsher-Smith, and K.K., a Senior National Account Executive at Sandoz, communicated a number of times by telephone both before and after the August list (WAC) price increases by Sandoz and Upsher-Smith.

247.    During the summer of 2011, before Zydus entered the Potassium Chloride ER market, it first communicated with the incumbent suppliers. K.R., Zydus's Assistant Vice President of National Accounts, communicated frequently that summer by phone, including voice and text messages, with D.L., a Director of National Accounts at Sandoz.

248.    In the fall of 2014 when Mylan was entering the Potassium Chloride ER market, Mylan's Jim Nesta spoke to Marc Falkin at Actavis twice on September 23, 2014. They also had been communicating over the summer leading up to Mylan's entry. When Mylan finally joined the market it did so at elevated prices consistent with the Fair Share and price-fixing agreement.

**8.    Betamethasone Dipropionate**

**9.    Betamethasone Dipropionate Augmented**

**10.    Betamethasone Dipropionate Clotrimazole**

**11.    Betamethasone Valerate**

**12.    Hydrocortisone Valerate**

249.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Betamethasone Dipropionate cream, ointment and lotion, Betamethasone Valerate cream and ointment,

Betamethasone Dipropionate Clotrimazole cream and lotion, Betamethasone Dipropionate Augmented lotion and Hydrocortisone Valerate cream and at least as early as October 2010.

250.    These five drugs treat related conditions, are sold by the same manufacturers, and involve related anticompetitive conduct. Accordingly, all five drugs are discussed together.

251.    Betamethasone Dipropionate, also known by the brand names Alphatrex, Del-Beta, and Diprosone, is a medication used to help relieve redness, itching, swelling or other discomforts caused by certain skin conditions.

252.    Betamethasone Dipropionate Augmented, also known by the brand name Diprolene, is a corticosteroid used to treat itching, redness, and swelling caused by certain skin conditions.

253.    Betamethasone Dipropionate Clotrimazole, also known by the brand name Lotrisone, is a medication used to treat fungal infections.

254.    Betamethasone Valerate, also known by the brand name Betamethacot, among others, is a medication used to help relieve redness, itching, swelling or other discomforts caused by certain skin conditions.

255.    Hydrocortisone Valerate, also known by the brand name Westcort, is a corticosteroid used to help relieve redness, itching, swelling, or other discomfort caused by skin conditions.

256.    During the relevant time frame, the primary manufacturers of these products were as follows:

| Betamethasone Dipropionate | Cream | Actavis, Sandoz, Taro |
| | Ointment | Actavis, Sandoz |
| | Lotion | Sandoz, Perrigo |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Betamethasone Dipropionate Augmented | Lotion | Sandoz, Taro |
|---|---|---|
| Betamethasone Dipropionate Clotrimazole | Cream | Actavis, Sandoz, Taro |
| | Lotion | Sandoz, Taro |
| Betamethasone Valerate | Cream | Actavis, Sandoz, Taro |
| | Ointment | Actavis, Sandoz |
| Hydrocortisone Valerate | Cream | Taro, Perrigo, G&W |

257.    The markets for the above products were mature and at all relevant times had multiple manufacturers.

258.    The Defendant manufacturers imposed extraordinary price increases across all formulations of these drugs. Defendants increased the prices of some formulations by more than 20 times. Indeed, ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████. As the various charts below highlight, the price increases by Defendants were close in time and amount.

259.    Throughout, Defendants were hyper-conscientious about monitoring and adhering to Fair Shares and maintaining high prices. For example, an internal analysis by Sandoz in November 2013 ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████. The analysis noted that ██████████████████████████████ Another Sandoz internal analysis admonished employees ██████████████████████████████████ In line with the Fair

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Share agreement (and as memorialized in an internal Sandoz document), rather than compete for new business, ████████████████████████████████████████

260.    The following charts present NSP prices (*i.e.*, prices paid by Defendants' customers) and list prices (*i.e.*, WAC) for the cream formulations of Betamethasone Dipropionate, Betamethasone Valerate, Betamethasone Dipropionate Clotrimazole and Hydrocortisone Valerate. The charts highlight the parallel pricing by Actavis, Sandoz and Taro. The charts also show that when G&W entered the Hydrocortisone Valerate market, rather than offer lower prices to win customers, they offered prices equal or higher to the incumbent manufacturers. ████████████████████████



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



261.   The following charts present NSP prices and list prices for ointment formulations of Betamethasone Dipropionate and Betamethasone Valerate and highlight the parallel pricing by Actavis and Sandoz. ████████████████████



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



262.    The following charts present NSP and list prices for the lotion formulations of Betamethasone Dipropionate, Betamethasone Dipropionate Clotrimazole and Betamethasone Diproprionate Augmented and highlight the parallel pricing by Sandoz and Perrigo and by Sandoz and Taro.



83
PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





263.    Throughout this period, Actavis, Sandoz, Taro, Perrigo and G&W met at trade conferences and communicated directly with each other in furtherance of their price-fixing

agreements on Betamethasone Dipropionate, Betamethasone Valerate, Betamethasone Dipropionate Clotrimazole, Hydrocortisone Valerate and their Fair Share agreement.

264.    For example, on January 4, 2011, Perrigo implemented a large list (WAC) price increase on Betamethasone Dipropionate lotion. On January 7, T.P., Director of National Accounts at Perrigo spoke to A.T., a National Account Executive at Sandoz. On January 11, Sandoz imposed its own list (WAC) price increase.

265.    Similarly, D.L., Director of National Accounts at Sandoz and D.S., AVP of National Accounts at Taro, communicated a number of times during the relevant period as Sandoz and Taro coordinated pricing. In April 2011, when both companies raised prices on Betamethasone Dipropionate Clotrimazole lotion, the two spoke by phone. In October 2012, when Sandoz announced another price increase on lotion, the two spoke again. In February 2013, when Taro raised its lotion prices to follow Sandoz, the two spoke yet again.

266.    During the same period that D.L (Sandoz) and D.S. (Taro) were communicating, M.B., Taro VP of Marketing, and M.P., Actavis VP of Sales and Marketing, also were communicating; the two men communicated by phone every month from February 2011 through May 2012.

267.    In March 2013, when Taro and Perrigo began to raise prices to customers for Hydrocortisone Valerate cream, the two companies were communicating. D.S., the AVP of National Accounts at Taro, and A.F., Perrigo National Account Director, communicated by phone on March 13, 2013.

268.    When G&W was preparing to enter the Hydrocortisone Valerate cream market in early 2015, T.P, Director of National Accounts at Perrigo, spoke a number of times to E.V., a VP

of Sales at Marketing at G&W, between January and March 2015. When G&W entered the market, it matched the prices of Perrigo and Taro.

### **13.** **Nitrofurantoin**

269.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Nitrofurantoin Macrocrystal capsules beginning at least as early as December 2010.

270.    Nitrofurantoin Macrocrystal, also known by the brand name Macrodantin, is a medication used to treat urinary tract infections.

271.    During the relevant time frame, Defendants Teva, Mylan, and Alvogen were the primary manufacturers of Nitrofurantoin Macrocrystal capsules.

272.    The market for Nitrofurantoin was mature and at all relevant times had multiple manufacturers.

273.    For years, the prices of Nitrofurantoin Macrocrystal capsules were relatively low and stable. Teva, Mylan and Sandoz were the dominant manufacturers, but in late 2009, Sandoz effectively exited the market. Even then, prices did not rise.

274.    In December 2010, however, Mylan began to raise prices. It announced a large list (WAC) price increase, ███████████████████. Even with higher prices, Mylan did not lose market share to Teva, and as the new year began, Teva █████████████████ ██████

275.    As summer 2011 approached, a new manufacturer, Alvogen, was planning to enter the market. In anticipation of Alvogen's entry, Teva began to raise its NSP prices more aggressively. And when Alvogen finally entered, it announced list (WAC) prices close to Mylan's already high prices, and its NSP prices were high as well. Mylan responded by raising its list (WAC) prices again, even higher than Alvogen's. Instead of driving prices down,

Alvogen's entry into the market had the perverse effect of causing all manufacturers to raise prices, which was exactly what the Fair Share agreement was supposed to do.

276.    Alvogen quickly gained market share, even with higher prices than Teva.  Teva, for its part, continued to steadily raise prices. In July 2012, Teva announced a list (WAC) price increase that made its prices the highest in the market. Before implementing this large price increase, Teva coordinated with Mylan and Alvogen to ensure that Fair Share's would be maintained.

277.   The NSP price chart below shows the large price increases imposed on Nitrofurantoin by Mylan and Teva, which were then matched by Alvogen when it entered the market.  Note: The pricing patterns for Nitrofurantoin Macrocrystaline 50 mg and 100 mg capsules were very similar. Charts for only the 100 mg dosage are included here.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

278.    Throughout the relevant period, Mylan, Teva and Alvogen met at trade conferences and communicated directly in with each other in furtherance of their price-fixing agreement on Nitrofurantoin and of the Fair Share agreement.

279.    For example, in the weeks before Teva raised its list (WAC) prices in 2012 to bring them more in line with Mylan's list prices, Teva's Green spoke to Nesta of Mylan on July 23, July 24 (2 calls); July 25; July 26; July 30 (2 calls); and July 31, 2012 (5 calls).

280.    After some of the calls between Green and Nesta on July 31, 2012, Nesta called B.H., the Executive Vice President of Commercial Sales at Alvogen.

281.    Teva, Mylan and Alvogen continued to coordinate and communicate in order to maintain Fair Shares. For example, on October 10, 2012, a distributor customer approached Teva requesting a lower price for Nitrofurantoin Macrocrystal. This prompted Teva's Green to reach out to both Nesta at Mylan and again to B.H. at Alvogen. Nesta separately spoke to the same contact at Alvogen. After coordinating with Mylan and Alvogen and re-confirming their price-fixing agreement on Nitrofurantoin Macrocrystal capsules, Teva did not lower its price.

### **14.    Nortriptyline HCL**

282.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Nortriptyline Hydrochloride capsules beginning at least as early as January 2011.

283.    Nortriptyline HCL, also known by the brand name Pamelor, is a medication used to treat depression.

284.    During the relevant time frame, Defendants Teva, Taro, and Actavis were the primary manufacturers of Nortriptyline HCL.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

285.   The market for Nortriptyline HCL was mature and at all relevant times had multiple manufacturers.

286.   For years, the prices for Nortriptyline HCL capsules were low and relatively stable. In the spring and summer of 2011, however, Teva and Actavis reached an agreement to impose significant price increases on all doses of Nortriptyline HCL capsules. Both manufacturers approximately ███████ their prices. In late 2013, when Taro was preparing to enter the market, Teva and Actavis brought it into their price-fixing agreement and Taro entered the market at elevated prices.

287.   The chart below shows the coordinated price increase by Actavis and Teva, as well as the market entry by Taro at elevated prices. ████████████████



288.   Throughout this period, Actavis, Teva and Taro met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Nortriptaline HCL and their Fair Share agreement.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

289.    For example, in late 2013, Teva, Actavis and Taro carefully orchestrated Taro's entry into the Nortryptaline HCL market. In order to accommodate Taro's entry without disrupting prices, David Rekenthaler of Teva and Marc Falkin of Actavis spoke by phone on November 10, 14, 15 and 18. Falkin also exchanged text messages with Maureen Cavanaugh of Teva on November 17 and 18. Also during November, Ara Aprahamian of Taro spoke by telephone with Teva's Patel and Actavis's M.D. to hammer out their agreement.  Teva and Actavis both agreed to cede customers to Taro, and Taro was careful not to pursue more than its "fair share" from Teva or Actavis. Thereafter, Aprahamian (Taro), Falkin (Actavis) and Reckenthaler and Patel (Teva) continued to coordinate the pricing of Nortriptyline HCL, with numerous direct communications between them in 2014 and 2015.

### **15.    Methylprednisolone**

290.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Methylpredinosolone 4 mg tablets beginning at least as early as February 2011.

291.    Methylprednisolone, also known by the brand name Solu-Medrol, is an adrenocortical steroid used to treat arthritis, lupus, psoriasis, and ulcerative colitis.

292.    During the relevant time frame, Defendants Sandoz, Par, Greenstone, Breckenridge and Cadista were the primary manufacturers of Methylprednisolone.

293.    The market for Methylprednisolone 4 mg tablets was mature and at all relevant times had multiple manufacturers.

294.    For years, the prices of Methylprednisolone were relatively low and stable, but that changed abruptly in early 2011. When some manufacturers had supply disruptions, all manufacturers used it as pretext to increase prices; prices shot up from approximately ███ to

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

more than ████. Although the supply disruption—which in any event did not impact all manufacturers—was resolved in few months, prices never returned to the prior, lower levels.

295.    Sandoz and Cadista announced identical list (WAC) prices in close succession, and when Greenstone entered the market in the fall of 2011, it matched the list prices of Sandoz and Cadista. Although Par and Breckenridge did not announce identical list prices, they followed ████████████████████████████.

296.    Defendants's Fair Share agreement and agreement to fix the prices of Methylprednisolone enabled them to maintain elevated prices. In a 2012 internal analysis, Sandoz lamented that ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████ That, of course, is how a competitive market is supposed to work. Notably, it did not happen with Methylprednisolone because of Defendants' adherence to their Fair Share agreement.

297.    For example, in late 2012, when Breckenridge and Greenstone were re-entering the market, R.T. and Armando Kellum of Sandoz were careful not to disrupt other manufacturers' Fair Shares. ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████ Kellum was concerned that ██████████████████████ ██████

298.    In September 2013, ████████████████████████████████████ ████████████████████████. Kellum quickly followed up ██████████████████ ████████████████████████████████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

███████████████████████████ Kellum admonished, consistent with the Fair Share agreement between Sandoz and Cadista (and the other Defendants), ██

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████

299.     The  following  chart  highlights  the  extraordinary  price  increases  for Methylprednisolone  and  prices  have  remained  above  former  levels  through  the  present.

███████████



300.     Throughout this period, Sandoz, Par, Greenstone, Breckenridge and Cadista met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Methylprednisolone and their Fair Share agreement.

301.     For example, as Breckenridge was entering the Methylprednisolone market in September 2011, D.N., the Director of Sales at Breckenridge, exchanged text messages with

93

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

G.B., Par's Vice President of National Accounts, both before (August 14) and after (November 14) Breckenridge's entry.

302.     Similarly, as Greenstone entered the market and ramped up from the spring to the fall of 2012, R.H., a Director of National Accounts at Greenstone, communicated by phone with M.S., Breckenridge Vice President of Sales, in February and again in November.

303.     In March 2013, during the Period (as described above) when Sandoz was considering whether to pursue business ███████ (a Cadista customer), Sandoz, Par and Cadista were in contact. On March 21, 2013, K.O., Par's Vice President of National Accounts, spoke to M.D., Vice President of Sales at Cadista. A few days later, on March 26, 2013, the same Par VP spoke to M.V., the Associate Director of Pricing at Sandoz. Open lines of communication ensured that each manufacturer maintained a Fair Share.

**16.     Amiloride HCL/HCTZ**

304.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Amiloride HCL/HCTZ beginning at least as early as May 2011.

305.     Amiloride HCL/HCTZ, also known by the brand name Moduretic 5-50, is a medication used to treat high blood pressure.

306.     During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Amiloride HCL/HCTZ.

307.     The market for Amiloride HCL/HCTZ tablets was mature and at all relevant times had multiple manufacturers.

308.     For years, the prices of Amiloride HCL/HCTZ were relatively low and stable. Abruptly, between May and October 2011, Teva and Mylan approximately ███████ their

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

prices, and continued to raise prices thereafter. Teva and Mylan prices at the end of 2018 are more than ███████ higher than before the companies began their coordinated increases.

309.    The following charts present NSP prices and list prices for Amiloride HCL/HCTZ and highlight the parallel pricing by Mylan and Teva. ████████████████



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



310.    Throughout this period, Teva and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Amiloride and their Fair Share agreement.

311.    Teva's Rekenthaler communicated consistently with Mylan at least as early as April 2010, and continued thereafter with Mylan's J.K. (VP and Executive Director of Sales), B.P. (Senior VP of Sales)  and Nesta over the following months and years.

312.    In the spring and summer of 2013, Teva wanted to raise its Amiloride prices again. Accordingly, Teva's Kevin Green and Jim Nesta spoke numerous times via telephone to coordinate and agree to the price increase. They spoke at least on May 7, 8, 9, 10 and July 10, 11, 23 and August 1, 2, 6, 8 in 2013.

313.    In 2014, Teva was eager to impose yet another price increase, and again coordinated with Mylan to do so. This time, Teva's Rekenthaler communicated with Mylan's Nesta. They spoke by phone at least on May 9, 20 and 27, 2014

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

314.    Teva and Mylan's price increase in parallel throughout the period of communications between Nesta (Mylan) and Rekenthaler (Teva).

### 17.    Amphetamine Salts (Adderall)

315.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Amphetamine Salts tablets (5, 10, 20 and 30 mg dosages) and capsules (5, 10, 15, 20, 25 and 30 mg dosages) beginning at least as early as June 2011.

316.    Amphetamine Salts, also known by the brand name Adderall, is a medication used to treat attention deficit hyperactivity disorder (ADHD). The drug is comprised of a combination of dextroamphetamine salts and levoamphetamine salts and is sometimes referred to as "Mixed Amphetamine Salts" or "MAS" or simply "amphetamine/dextroamphetamine." The drug is available in two formulations: Extended Release ("XR") capsules and Immediate Release ("IR") tablets.  Both formulations were part of Defendants' Fair Share agreement.

317.    During the relevant time frame, Defendants Teva, Sandoz and Impax[10] were the primary manufacturers of generic Adderall IR tablets. Defendants Aurobindo and Mallinckrodt joined the generic Adderall IR tablet market and conspiracy in 2014.

318.    During the relevant time frame, Defendants Teva, Impax and Actavis were the primary manufacturers of Adderall XR capsules.

319.    The NSP price chart for IR tablets below highlights the large and sustained price increases for generic Adderall tablets (MAS-IR) by Teva, Sandoz and Impax and the high price at which Aurobindo and Mallinckrodt later joined the market. Note: Generic Adderall IR tablets

---

[10] The relevant entity at the time of the MAS-IR price increase (summer 2011) was Corepharma, which was acquired by Impax in October 2014.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

come in 5, 10, 20 and 30 mg dosages, all of which exhibited highly similar pricing patterns. The chart for only the 20 mg dosage is included here.



320.    Throughout this period, Teva, Sandoz, Mallinckrodt, Impax, Actavis and Aurobindo met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on generic Adderall and of the Fair Share agreement.

321.    For example, Teva began marketing generic Amphetamine/Dextroamphetamine Extended Release ("MAS-XR") after the expiration of brand manufacturer Shire's patent on Adderall XR. In April 2012, a large customer contacted Teva to request a price reduction because a new competitor had expressed an interest in "all or some" of its MAS-XR business. When Teva learned the new competitor was Actavis, which was expecting approval for the drug soon, Teva deferred its decision in pricing until Actavis entered the market.

322.    Actavis obtained FDA approval to manufacture various formulations of MAS-XR on June 22, 2012.  Teva and Actavis immediately began coordinating regarding market share.

98

That evening, Rekenthaler instructed Teva employees to find out Actavis's plans, including shipping details and inventory levels. The next morning, T.S., a National Account Manager at Teva, confirmed that she had spoken to a contact at Actavis. She conveyed to Rekenthaler what she had learned: "Spoke to [Actavis]. Going after approx 15 share. 1 wholesaler (either McKesson or Cardinal) as backup and possibly Econdisc. NOT Walgreens and CVS."

323.    Defendants also communicated and coordinated shares in the MAS-IR market. For example, Teva announced its list (WAC) price increase on August 17 and Sandoz followed on August 24, 2011. Teva's Kevin Green spoke to P.K., Sandoz Director of National Accounts, on August 3, 9, 16, 17 and 18.

324.    Just as in the MAS-XR capsule market, when new entrants joined the MAS-IR tablet market, Defendants again coordinated to ensure Fair Shares. For example, on January 24, 2914, as Mallinckrodt was preparing to enter the MAS-IR market, K.K., the National Account Director at Mallinckrodt (who was a former National Account Executive at Sandoz) called C.B., a former colleague and National Account Executive at Sandoz. The two spoke for approximately 25 minutes. They spoke again for approximately 19 minutes on February 10. Mallinckrodt entered the market at high prices the next week.

325.    Similarly, in March 2014, Aurobindo was making plans to enter the MAS-IR market. On March 11 and 12, T.G., a Director of National Accounts at Aurobindo, spoke to C.B., a National Accounts Manager at Sandoz. The next week, on March 18, Teva's Rekenthaler and R.C., the CEO of Aurobindo, had a thirty (30) minute telephone conversation. That same day, Teva's Manager of Corporate Accounts shared with her colleagues that Aurobindo was targeting a 10% share. A few days later, Teva's Patel spoke with M.V., the Associate Director of Pricing at Sandoz on March 21.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

326.    Teva, Sandoz, Impax, Aurobindo and Mallinckrodt continued to communicate and to monitor Fair Shares in the MAS-IR market and acted accordingly. For example, in 2014, Teva declined to bid on one of Impax's major customers because ██████████████████ ██████████████████████████████ Yet again, in March 2016, Teva passed on a large customer because ████████████████████████████████████ ████████

### **18.    Dextroamphetamine Sulfate**

327.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Dextroamphetamine Sulfate Extended Release (also referred to as "Dex Sulfate XR") tablets (5 and 10 mg) and capsules (5, 10 and 15 mg) beginning at least as early as June 2011.

328.    Dex Sulfate XR, also known by the brand name Dexedrine, among others, is a medication used to treat attention deficit hyperactivity disorder (ADHD).

329.    During the relevant time frame, Defendants Teva, Impax, Mallinckrodt and Actavis were the primary manufacturers of Dextroamphetamine Sulfate ER capsules.

330.    Teva, Mallinckrodt and Aurobindo were the primary manufacturers of Dextroamphetamine Sulfate tablets.

331.    For years, Teva was effectively the sole supplier of Dextroamphetamine Sulfate capsules and tablets. Mallinckrodt, which had been a supplier of both products, exited both markets in late 2008. Without competitive pressure to keep prices low, Teva slowly and steadily raised prices. Eventually, however, both the capsule market and the tablet market attracted additional manufacturers. Typically, this would have driven prices lower; the addition of suppliers tends to spur price competition which drives down prices. Here, however, because of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' Fair Share agreement, the addition of suppliers to the market caused the prices of Dextroamphetamine Sulfate capsules and tablets to skyrocket.

332.    In the ER capsule market, Impax was the first to enter in the fall of 2011. In anticipation of Impax's entry, Teva announced a large list (WAC) price increase in August 2011. Teva immediately raised the prices it charged customers, ███████████████████. When Impax entered the market, rather than offer lower prices to win customers, it matched Teva's market prices. Impax did not announce list (WAC) prices until much later, but when it did so, they were even higher than Teva's.

333.    Similarly, when Mallinckrodt re-entered the ER capsule market in the summer of 2012, it did so at the high prices that Teva and Impax already had coordinated. Even before it began shipping product, Mallinckrodt announced list (WAC) prices in April 2012 that matched Teva's, and which were more than five times higher than Mallinckrodt's former prices for Dextroamphetamine Sulfate ER capsules.

334.    Not long after Mallinckrodt entered the ER capsule market, it also re-launched its Dextroamphetamine Sulfate tablet products. The same pattern as the capsule market followed. In anticipation of Mallinckrodt's entry, Teva drastically increased its prices. At the end of July 2012, Teva increased its list (WAC) prices on tablets by more than 800%. Within weeks, Mallinckrodt matched the price increase. As it had done with capsules, rather than offer lower prices to win customers, Mallinckrodt coordinated with Teva to impose higher prices.

335.    In 2014, Actavis joined the ER capsule market and Aurobindo joined the tablet market. Like Mallinckrodt and Impax before them, they eschewed price competition and instead announced identical list (WAC) prices as Teva and Mallinckrodt. Adding yet another supplier to

the capsule and tablet markets did not drive prices back down to a competitive level. Instead, the Fair Share agreement kept prices high.

336.    Throughout this period, Defendants monitored their Fair Share agreement, and made sure to cede share where necessary to keep prices high. For example, in January 2013, Teva was confronted with a request for pricing from a large customer that had been approached by Mallinckrodt. This prompted Teva to assess Fair Shares of the tablet market. Teva's David Rekenthaler pointed out that Teva was expecting to cede share to Mallinckrodt: ██████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Teva's Director of Marketing responded, ████████████████████████████████████

████████████████████ Ultimately, however, Teva's Senior Director of Sales signed off, ████████████ By ceding customers, Teva ensured that each manufacturer obtained a Fair Share of the market, and all manufacturers ensured that prices for Dextroamphetamine Sulfate remained high.

337.    Similarly, in February 2014, Teva again recognized the need to walk away from business in order to maintain Fair Shares and higher prices. In an internal analysis describing the Dextroamphetamine Sulfate market, Teva noted: ████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████ The underlying premise of the Fair Share agreement—less sales but higher prices—continued to work throughout the period. That same month, Teva confirmed in an internal document ████████████████████████████████████████████████████

████████████████████████████████████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

338. The NSP price charts and list (WAC) price charts below highlight the large and sustained price increases for Dextroamphetamine Sulfate capsules and tablets. Note: Dextroamphetamine Sulfate capsules and tablets come in a number of dosages, which all exhibit highly similar pricing patterns. Charts for only a single dosage of tablets and capsules are included here.





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



339. Throughout this period, Teva, Mallinckrodt, Impax, Actavis and Aurobindo met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Dextroamphetamine Sulfate and of the Fair Share agreement.

340. For example, representatives from Teva and Impax attended the NACDS 2011 Pharmacy & Technology Meeting in Boston on August 27 to 30, 2011, shortly before Impax entered the Dextroamphetamine Sulfate ER capsule market in September 2011 at the inflated prices that Teva had recently imposed.

341. Similarly, representatives of Mallinckrodt and Teva attended the HDMA 2012 Business and Leadership Conference in San Antonio on June 13, 2012, not long before Teva announced list (WAC) price increases on Dextroamphetamine Sulfate tablets in July that Mallinckrodt quickly followed.

342. Defendants also communicated directly with each other by phone to coordinate pricing. For example, in January and February 2014—when Aurobindo was entering the market

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

for Dextroamphetamine Sulfate tablets, Teva's Rekenthaler spoke to R.C., the CEO of Aurobindo multiple times.

343.    Teva's Rekenthaler also coordinated with Actavis when it entered the Dextroamphetamine Sulfate capsule market later that year. On June 19, 2014, as Actavis was entering the market, Rekenthaler spoke twice with Falkin of Actavis, and they discussed Actavis's market share goal of "20-25%." Actavis entered the market not long after, and as contemplated by the Fair Share agreement between them, Teva conceded a large Dextroamphetamine Sulfate customer to Actavis. That same week (on June 13, 20, 23 and 26), Falkin (Actavis) communicated by phone with T.E., Impax Senior Director of Sales Operations.

### **19.    Metronidazole**

344.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Metronidazole cream, jelly, lotion, and vaginal cream at least as early as June 2011.

345.    Metronidazole, also known by the brand name Flagyl, is a medication used to treat parasitic infections including Giardia infections of the small intestine, amebic liver abscess, and amebic dysentery, bacterial vaginosis and trichomonas vaginal infections.

346.    During the relevant time frame, Defendants G&W, Impax, Sandoz, Taro, Teva, and Bausch/Oceanside were the primary manufacturers of Metronidazole.

347.    After a period of relatively low and stable pricing for Metronidazole cream, jelly, lotion and vaginal cream, Defendants imposed a series of rapid price increases that were similar in timing and amount.

**Metronidazole Cream, Jelly & Lotion**

348.    In 2011, Defendants G&W, Sandoz, and Teva were the primary generic manufacturers of Metronidazole cream, jelly and lotion. Impax entered the jelly market in 2012.

349.    Beginning in June 2011, G&W, Sandoz, and Teva imposed price increases of more than 400% for Metronidazole cream, jelly and lotion. When Impax entered the market in 2012, it did not disturb the inflated pricing. Prices have remained at inflated levels since that time.

350.    The NSP price charts below show the large and parallel price increases by Teva, Sandoz, G&W, Taro and Impax on their Metronidazole cream, jelly and lotion products.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**<u>Metronidazole Vaginal Cream</u>**

351. Prior to January 2015, prices for generic Metronidazole vaginal cream remained relatively low and stable for years. Beginning in February 2015, Sandoz and Bausch/Valeant/Oceanside imposed 300% price increases on generic Metronidazole vaginal cream.

352. The NSP price chart below shows the steep and parallel pricing by Sandoz and Bausch/Oceanside for Metronidazole vaginal cream. [redacted]

[redacted]

353. Throughout these periods, G&W, Impax, Sandoz, Teva, and Bausch/ Oceanside met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Metronidazole cream, jelly, lotion and vaginal cream and their Fair Share agreement.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

354. For example, The Metronidazole cream, jelly and lotion price hikes occurred shortly after trade association meetings where representatives (including NAMs) from G&W, Impax, Sandoz, Teva, Taro and Bausch/Oceanside were in attendance. *See* Exhibit A (Trade Association Contacts).

### 20. Chlorpromazine HCL

355. Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Chlorpromazine HCL tablets beginning at least as early as July 2011.

356. Chlorpromazine, also known by the brand name Largactil, is a medication used to treat mood disorders such as schizophrenia or bipolar disorder.

357. During the relevant time frame, Defendants Sandoz and Upsher-Smith were the primary manufacturers of Chlorpromazine tablets.

358. The market for Chlorpromazine tablets was mature and at all relevant times had multiple manufacturers.

359. After years of relatively low and stable prices for Chlorpromazine tablets, Sandoz and Upsher-Smith agreed to implement large price increases. In the summer of 2011, Sandoz and Upsher-Smith began to implement nearly simultaneous and identical price increases. By January 2012, Sandoz and Upsher-Smith list prices approximately quadrupled and NSP prices increased nearly 10 times. These incredibly large price-increases look small on the chart below because Sandoz and Upsher-Smith imposed even larger price increases after that. Both manufacturers' list prices eventually exceeded $7.50 (compared to less than 50 cents before they agreed to raise prices) and their NSP prices peaked over $6.00 (compared to approximately 15 cents before their agreement).

360.   The following charts of NSP prices and list prices show the large and parallel price increases by Sandoz and Upsher-Smith.





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

361.    Throughout this period, Sandoz and Upsher-Smith met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Chlorpromazine HCL tablets and their Fair Share agreement.

362.    For example, in October 2011, as Sandoz and Upsher-Smith began their parallel and coordinated price increases, K.K., a Senior National Account Executive at Sandoz, and D.Z., Upsher-Smith Senior National Account Manager, were in contact throughout that year, with phone communications in (at least) March, April, July, September, November and December of 2011.

363.    By October 2014, when Upsher-Smith again increased prices, K.K. at Sandoz had moved on to Mallinckrodt. So D.Z. at Upsher-Smith instead communicated with C.B., a Sandoz Director of National Accounts. The two spoke on September 16, 2014 for approximately 4 minutes. Upsher-Smith raised its Chlorpromazine prices (again) a few weeks later.

364.    Sandoz didn't immediately follow Upsher-Smith's October 2014 price increase. But eventually it did so, announcing identical list (WAC) prices to Upsher-Smith on May 15, 2015. The day before announcing, C.B. at Sandoz again spoke to D.Z. at Upsher-Smith.

### 21.    Flurbiprofen

365.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Flurbiprofen at least as early as July 2011.

366.    Flurbiprofen, also known by the brand name Ansaid, is a nonsteroidal anti-inflammatory drug (NSAID) used to relieve symptoms of arthritis, such as inflammation, swelling, stiffness, and joint pain.

367.    During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Flurbiprofen.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

368.    The market for Fluribiprofen tablets was mature and at all relevant times had multiple manufacturers.

369.    For years, the prices of Fluribiprofen tablets were relatively low and stable. In the summer of 2011, however, Teva imposed a very large price increase. Notwithstanding its higher prices, Teva was able to maintain its share of the market in light of the Fair Share agreement it reached with Mylan. Mylan eventually raised prices as well, and in 2013 imposed a significant increase, raising its prices well above Teva's. Mylan, too, was able to maintain a relatively stable share of the market notwithstanding its higher prices. The pattern repeated in 2014, when Teva again raised prices, again well above Mylan's. And yet it maintained share. The Fair Share agreement was working.

370.    The chart below shows the ability of Teva and Mylan to significantly raise and maintain the prices of Fluribiprofen tablets.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

371.    Throughout this period, Teva and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Fluribiprofen and their Fair Share agreement.

372.    As described with respect to Amiloride HCL/HCTZ above, when Teva wanted to increase prices in 2013 and 2014, it reached out directly to Mylan to coordinate those increases. Teva's Kevin Green and Jim Nesta spoke numerous times via telephone to coordinate and agree to the price increase. They spoke at least on May 7, 8, 9, 10 and July 10, 11, 23 and August 1, 2, 6, 8 in 2013. In 2014, Teva's Reckenthaler communicated directly with Nesta to coordinate price increases on Fluribiprofen.

## 22.    Clonidine-TTS Patch

373.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Clonidine-TTS beginning at least as early as September 2011.

374.    Clonidine TTS Patch, also known by the brand name Catapres-TTS, is a medication in the form of a transdermal patch that is used to treat high blood pressure.

375.    During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Clonidine-TTS. Defendant Actavis joined the Clonidine-TTS market and the Clonidine-TTS conspiracy in 2014.

376.    Teva and Mylan had roughly equal shares of the Clondine-TTS market, as contemplated by their Fair Share agreement. Mylan, however, encountered some supply disruptions that skewed share in favor of Teva. In order to navigate and reallocate the market, Teva and Mylan communicated frequently to ensure that each of them had a Fair Share.

377.    For example, in early 2012, after the first of Mylan's supply issues were resolved, Teva conceded two large customers to Mylan to help it regain its Fair Share.

378.    In May, not long after ceding the Clonidine-TTS business to Mylan, Teva was approached by another large customer seeking bids on a different drug, Doxazosin. Teva declined the opportunity to the Doxazosin business in an effort to "be cautious after what happened with Clonidine."

379.    Later in 2012, Mylan again experienced supply disruptions, this time severe enough to force it out of the market entirely on certain dosages from approximately September 2012 through February 2013. To coordinate how to deal with this, on September 28, 2012, Mylan's Nesta and Teva's Green spoke by phone at least twice. Mylan and Teva maintained regular contact as former Mylan customers approached Teva because of Mylan's supply issues. For example, Rekenthaler spoke to a contact at Mylan on October 1, and Green spoke to Nesta on October 1 and 4, 2012.  On October 10, 2012, Green and Nesta spoke again.

380.    When Mylan relaunched Clonidine-TTS in early 2013, Teva conceded accounts to Mylan to allow it to regain a Fair Share of the market. For example, Teva's internal documents state that they chose to "concede" a number of large customers to Mylan. Teva's internal documents are explicit that it had no intention of competing on price, but instead was "trying to concede the Clonidine business" to Mylan.

381.    Teva and Mylan remained in regular contact in order to coordinate and maintain Fair Shares. In February and March 2013 alone, Teva and Mylan representatives called each other at least 33 different times.

382.    In the spring of 2014, another manufacturer, Actavis, was preparing to enter the market for Clonidine-TTS. Teva and Actavis immediately commenced an extensive negotiation over price and market share. Teva's Rekenthaler and Actavis's Falkin were in direct phone

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

contact to hammer out the details.  Teva considered which customers to concede, and encouraged Actavis to enter the market with high prices.

383.     Teva's Patel also communicated with Actavis to work out the details of Actavis's entry into the market. She spoke with Actavis's Rogerson multiple times, learning that Actavis wanted 25% of the market and expected that 10%-15% of its share would come from Teva.

384.     Rekenthaler expressed his view that Actavis could have no more than a 15% market share from Teva, which prompted a Teva executive to admonish Reckenthaler to "play nice in the sand box" so that Actavis would be "responsible in the market."

385.     Reckenthaler heeded the advice and Teva conceded share to Actavis in order to allow it to gain its Fair Share of the market for Clonidine-TTS.

### **23.     Oxybutynin Chloride**

386.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Oxybutynin Chloride tablets beginning at least as early as October 2011.

387.     Oxybutynin Chloride, also known by the brand name Ditropan XL, is a medication used to treat certain bladder and urinary conditions.

388.     During the relevant time frame, Defendants Teva, Upsher-Smith and Par were the primary manufacturers of Oxybutynin Chloride.

389.     The market for Oxybutynin Chloride was mature and at all relevant times had multiple manufacturers.

390.      For years, the prices of Oxybutynin Chloride tablets were relatively low and stable. In October 2011, Par and Upsher-Smith approximately ▮▮▮▮▮ their prices. Although Upsher-Smith had even higher prices than Teva, it was able to gain market share, as intended under their Fair Share agreement. The large price increase is hardly visible in the chart below

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

because it is dwarfed by the enormous price increases that Upsher-Smith, Teva and Par imposed in close succession in 2013.

391.    The chart below displays the extraordinary price increases imposed in parallel by Upsher-Smith, Par and Sandoz.



392.    Throughout this period, Teva, Upsher-Smith and Par met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Oxybutynin Chloride and their Fair Share agreement.

393.    In 2013 before the enormous price increases, Teva, Par and Upsher-Smith coordinated their pricing actions. For example, Teva's Patel spoke to B.L. at Upsher-Smtih on April 29, 2013 for nearly twenty (20) minutes reached an understanding that Teva and Upsher-Smith would follow each other's price increases. On June 15, 2013, after Teva, Upsher-Smith and Par had begun to radically raise prices, Patel exchanged six (6) text messages with B.L. Also in June, K.O, VP of National Accounts at Par, spoke multiple times to B.P., National Account Manager at Upsher-Smith.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 24. **Triamterene HCTZ**

394.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Triamterene HCTZ beginning at least as early as October 2011.

395.     Triamterene HCTZ, also known by the brand names Dyazide and Maxzide, is a medication used to treat water retention and high blood pressure.

396.     During the relevant time frame, Defendants Actavis, Mylan, Sandoz and Apotex were the primary manufacturers of Triamterene HCTZ tablets and Defendants Mylan, Sandoz and Lannett were the primary manufacturers of Triamterene HCTZ capsules.

397.     The markets for Triamterene HCTZ capsules and tablets were mature and at all relevant times had multiple manufacturers.

398.     For years, the price of Triamterene HCTZ tablets hovered below ██████ In 2011, prices increased to approximately ██████ when Mylan, Sandoz and Actavis imposed large price increases, all close in time and amount. When Apotex joined the market in late 2012, rather than offer lower prices to win customers, it offered the same elevated prices of Mylan, Sandoz and Actavis. All four manufacturers eventually imposed identical list (WAC) prices.

399.     Prices also were low in the Triamterene HCTZ capsule market, but that too changed in 2011. Sandoz temporarily exited the market, which prompted Mylan to ██████ its price. When Lannett entered the market in December 2011, it did so at elevated prices and was careful not to disturb the market pricing. Sandoz eventually re-entered the market as well, but even with three suppliers, prices did not return to prior—lower—levels. Defendants' Fair Share agreement kept prices inflated above competitive levels.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

400.    The charts below show the elevated and parallel pricing by Mylan, Sandoz, Actavis and Apotex for Triamterene tablets, and by Mylan, Lannett and Sandoz for capsules. (Triamterene HCTZ 75-50 mg tablets exhibit a similar pricing pattern. Charts for that dosage are not included here.) ███████████████



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

401.    Throughout this period, Actavis, Mylan, Sandoz, Apotex and Lannett met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Triamterene HCTZ capsule and tablets and their Fair Share agreement.

402.    For example, in November 2011—when Mylan announced list (WAC) price increases for Triamterene HCTZ tablets—M.W., Mylan Director of National Accounts, was communicating by phone with J.R., Sandoz Director of Institutional Marketing, and K.B., Sandoz National Account Manager.

403.    On March 8, 2012, M.B., Actavis Director of National Accounts, communicated by phone with T.K., Apotex National Account Manager. The next day, Actavis announced list (WAC) price increases for Triamterene-HCTZ. M.B. (Actavis) and T.K. (Apotex) communicated by phone again on March 16.

404.    In April 2012, not long after Lannett entered the Triamterene-HCTZ capsule market, J.K., Mylan VP & Executive Director of Sales, communicated by phone with K.S., VP of Sales and Marketing at Lannett, on April 19, 20 and 23.

### **25.    Ranitidine HCL**

405.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Ranitidine HCL 150 mg and 300 mg capsules and 150 mg tablets beginning at least as early as November 2011.

406.    Ranitidine HCL, also known by the brand name Zantac, among others, is a medication used to treat ulcers of the stomach and intestines and to prevent them from coming back after they have healed.

407.    During the relevant time frame, Defendants Sandoz and Dr. Reddy's were the primary manufacturers of Ranitidine HCL capsules.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

408.    During the relevant time frame, Defendants Teva, Sandoz, Glenmark, and Amneal were the primary manufacturers of Ranitidine HCL tablets.

409.    The markets for Ranitidine HCL capsules and tablets were mature and at all relevant times had multiple manufacturers.

**Ranitidine HCL Capsules**

410.    After years of stable list prices under $1.00, within a couple of months in early 2012, Sandoz and Dr. Reddy's each imposed an increase of approximately 50%. And the prices paid by customers increased even more; transaction prices approximately ████████ over their prior low.

411.    The charts below highlight the parallel and increased pricing by Dr. Reddy's and Sandoz for Ranitidine HCL capsules.  (Pricing for 150 mg capsules follows a similar pattern. Charts for that dosage are not included here.) ████████████████████



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



412.   Throughout this period, Sandoz and Dr. Reddy's met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Ranitidine HCL capsules and their Fair Share agreement.

413.   For example, on March 23 and 26, 2012—around the time that Dr. Reddy's and Sandoz's Ranitidine HCL capsule prices were peaking—J.A., Dr. Reddy's VP of Sales and Marketing, and J.R., Sandoz Director of Institutional Marketing, communicated by phone.

**Ranitidine HCL Tablets**

414.   For years, the prices of Ranitidine HCL tablets were relatively low and stable. With a number of manufacturers in the market, the risks of imposing a price increase were high because there were many alternative sources of supply for customers to turn to. In March of 2013, however, Teva, Sandoz, Amneal and Glenmark decided to dampen price competition and to use the Fair Share agreement to raise prices.

415.   The NSP price chart below shows the sudden and steep price increases by Glenmark, Teva, Amneal and Sandoz on Ranitidine HCL tablets. █████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



416.    To facilitate the price increases and to ensure that each manufacturer was able to obtain a Fair Share of the market, Teva, Glenmark, Amneal and Sandoz communicated by phone to work out the details of their agreement.

417.    For example, Teva's Patel communicated by phone with multiple contacts at Glenmark in May 2013, while Teva's Reckenthaler was communicating with a contact at Amneal during the same period of time.

418.    Teva's Patel also coordinated with a contact at Sandoz to orchestrate the Ranitidine HCL tablet price increase.

419.    On the heels of these communications, all manufacturers raised prices. Glenmark was the first to raise prices. Teva quickly followed the price increase, as did Amneal and Sandoz.

420.    In the wake of the price increases, Glenmark, Teva, Sandoz and Amneal were committed to the Fair Share agreement, as evidenced by their unwillingness to gain share by

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

offering better prices. For example, when Teva was approached by several customers looking for a lower price it refused to bid, or, it intentionally bid high so that it would not win the business.

## 26.   **Amantadine HCL**

421.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Amantadine HCL capsules beginning at least as early as December 2011.

422.   Amantadine HCL, also known by the brand name Symmetrel, is a medication used to treat a certain type of flu and also to treat Parkinson's disease.

423.   During the relevant time frame, Defendants Sandoz, Upsher-Smith and Lannett were the primary manufacturers of Amantadine HCL capsules.

424.   The market for Amantadine HCL capsules was mature and at all relevant times had multiple manufacturers.

425.   Amantadine HCL capsules had relatively low and stable prices for years. In late 2011, however, Sandoz and Upsher-Smith imposed extraordinary price increases, driving the price of Amantadine HCL capsules to ██████████████ its former price. They also imposed identical list (WAC) prices for their capsules.  Lannett, which did not have much presence in the market, made a push into the market in early 2013. Rather than offer lower prices to win customers, Lannett announced an identical list price, and was careful not disturb market pricing, as required by the anticompetitive agreement between Lannett, Upsher-Smith and Sandoz.

426.   The charts below show the extreme price increase by Sandoz and Upsher-Smith that was joined by Lannett. ██████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

427.    Throughout this period, Sandoz, Upsher-Smith and Lannett met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Amantadine HCL capsules and their Fair Share agreement.

428.    For example, in October 2011, as Sandoz and Upsher-Smith began their parallel and coordinated price increases, K.K., a Senior National Account Executive at Sandoz, and D.Z., Upsher-Smith Senior National Account Manager, were in contact throughout that year, with phone communications in (at least) March, April, July, September, November and December of 2011, as well as January and February of 2012. In February, Sandoz followed Upsher-Smith's October 2011 increase.

### 27.    Fluocinolone Acetonide

429.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Fluocinolone Acetonide creams, ointments and solutions beginning at least as early as January 2012.

430.    Fluocinolone Acetonide, also known by the brand name Synalar, among others, is a medication used to treat inflammation and itching caused by certain skin conditions.

431.    During the relevant time frame, the primary manufacturers of Fluocinolone Acetonide were as follows:

| | |
|---|---|
| Fluocinolone Acetonide Cream | Sandoz, G&W, Teligent |
| Fluocinolone Acetonide Ointment | Sandoz, G&W, Teligent |
| Fluocinolone Acetonide Solution | Sandoz, Taro, Teligent |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

432.   Before 2012, Sandoz was the sole supplier of Fluocinolone Acetonide cream, ointment and solution. As the sole supplier, Sandoz's list prices for cream ointment and solution were well under $1 for each product, and its NSP prices were ██████████████

433.   Things changed in January 2012, when G&W entered the cream and ointment markets. Historically, adding a manufacturer (*i.e.*, another source of supply) to a single source market tended to drive down prices. But Defendants' Fair Share agreement aimed to reverse this consequence of competition, and succeeded in doing so with Fluocinonide Acetonide products. Rather than result in lower prices, G&W's entrance into the cream and ointment markets resulted in significantly ***higher*** prices.

434.   In late December 2011, in anticipation of G&W entering the cream and ointment market, Sandoz announced enormous price increases. Sandoz increased list prices on cream, ointment and solution approximately 300%.  When G&W entered the market only weeks later, it announced virtually identical WAC prices on its cream and ointment products.

435.   Almost immediately after G&W announced its prices, Sandoz acknowledged internally that because ████████████████████████████████████████████████ ████████████████ Over the following weeks, ██████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████

436.   In the solution market, a highly similar pattern emerged.  In late October 2012, in anticipation of Teligent entering the market, Sandoz doubled the list prices of its solution (on top of the tripled prices it had imposed less than a year earlier). Weeks later, Teligent announced virtually identical WAC prices for its new solution products.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

437.    As it had done with G&W earlier that year, internally, Sandoz ███████████

███████████████████████████████████████████████████████████████

███████████. Over the ensuing weeks, ██████████████████████████████

████████████████████. Yet again, adherence to the Fair Share agreement enabled Defendants to impose and maintain significantly higher prices by eschewing competition.

438.    In competitive generic markets, the addition of a third manufacturer (and yet another source of supply) tends to drive prices down even more. Yet even the entrance of a third manufacture to the Fluocinolone Acetonide markets did not have that effect. When Teligent joined the ointment market in early 2013 and the cream market in mid-2014 it announced list prices nearly identical to those of Sandoz and G&W. And when Taro entered the solution market in the spring of 2015, it matched the list prices of Sandoz and Teligent.

439.    The list price (WAC) charts for Fluocinolone Acetonide cream, ointment and solution show the large and parallel price increases imposed by Sandoz, G&W, Teligent and Taro. The NSP price charts show that the list price increases had real consquences; customers paid higher prices for these products. The charts also show that prices have remained above prior levels.  (The prices of other dosages of Fluocinolone Acetonide cream exhibit similar patterns and are not included here.) ████████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

440.    Throughout this period, Sandoz, G&W, Teligent and Taro met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Fluocinolone Acetonide and their Fair Share agreement.

441.    For example, around the time that G&W was entering the Fluocinolone Acetonide cream and ointment markets, K.O., G&W President, communicated by phone with W.K., Sandoz Senior VP of Commercial Operations, on February 8, 9 and 10, 2012.

442.    Similarly, when Teligent was entering the Fluocinolone Acetonide cream market in late spring/early summer of 2014, E.V., G&W VP of Sales and Marketing, communicated by phone with S.M., Teligent Director of National Accounts, on April 29 and May 1, 2014. A few months before, E.V. (G&W) also had communicated by phone with J.G., Teligent President and CEO, in November 2013 and January 2014.

## 28.    Irbesartan

443.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Irbesartan tablets beginning at least as early as March 2012.

444.    Irbesartan, also known by the brand name Avapro, is a medication used in the treatment of hypertension.

445.    During the relevant time frame, Defendants Teva and Lupin were the primary manufacturers of Irbesartan.

446.    Teva received approval to manufacture generic Irbesartan in March 2012.

447.    On March 6, 2012, K.G., a Teva senior marketing executive, asked the sales team for information about competitors that were also making offers to supply Irbesartan.

448.    At 11:27 a.m., J.P., an account manager at Teva, responded: "Lupin is promising offers today." Less than twenty minutes later, Teva's Kevin Green called David Berthold at

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Lupin. They talked for seventeen (17) minutes. Shortly after the call, Green emailed his Teva colleagues with the information he obtained: "Lupin is looking for a 15% share. They already have ABC. Confirmed Zydus is out."

449.    That same day, Teva's David Rekenthaler informed the group that he still had not received "a call from any other manufacturer on Irbesartan." A senior commercial operations executive at Teva immediately responded: "Then work harder…." Rekenthaler followed that directive.

450.    The next morning, Green called Berthold again. He learned details regarding which competitors were launching or not launching the drug and the identities of customers who received offers. As a result of the coordination with Lupin, Teva was in a position to take up to a 40% market share when it launched Irbesartan without having to engage in price competition.

### 29.    Isosorbide Dinitrate

451.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Isosorbide Dinitrate tablets beginning at least as early as March 2012.

452.    Isosorbide Dinitrate, also known by the brand name Sorbitrate, is a medication used to treat chest pain (angina) by dilating blood vessels, making it easier for blood to flow through them and easier for the heart to pump.

453.    During the relevant time frame, Defendants Sandoz, Par and West-Ward were the primary manufacturers of Isosorbide Dinitrate tablets.

454.    The market for Isosorbide Dinitrate tablets was mature and at all relevant times had multiple manufacturers.

455.    For years, the prices of Isosorbide Dinitrate tablets were relatively low and stable. For example, before the spring of 2012, Sandoz and West-Ward had list prices for 10 mg tablets

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

of less than 10 cents and NSP prices of less than ███████ Par, which had a negligible presence in the market during that time period, offered similarly low prices.

456.    A supply disruption between March and July 2012 prompted Sandoz and West-Ward to impose enormous price increases on all tablets. Although the supply disruption was mostly resolved within months, thereafter Sandoz and West-Ward relied on their Fair Share agreement to keep prices more than 10 times higher than they had been only months before.

457.    In 2013, an internal Sandoz analysis of the Isosorbide Dinatrate market ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

458.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

459.    In the spring of 2013, Par made a push into the Isosorbide Dinitrate market. Rather than offer lower prices to customers in order to build market share, Par announced list prices that matched Sandoz (and which were higher than West-Ward). Par's NSP prices ████ ██████████████████████████████ Defendants continued to monitor their "fair share" of the Isosorbide Dinatrate market throughout this period.

460.    The charts below show the extreme and parallel price increases for Isosorbide Dinatrate tablets and that price remained elevated well above prior levels at least through the end

of 2018. (The prices for 5 mg, 10 mg, 20 mg and 30 mg tablets exhibit similar patterns. Only the charts for 10 mg tablets are included here.)





461.     Throughout this period, Sandoz, Par and West-Ward met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Isosorbide Dinatrate tablets and their Fair Share agreement.

462.     For example, On June 6, 2012, Sandoz's C.B, Director of National Accounts, spoke for approximately 25 minutes to M.R., West-Ward's Director of National Accounts. The next week, on June 15, Sandoz announced its large list (WAC) price increases on Isosorbide. The two executives next spoke, for approximately 21 minutes, on October 11.  The next day, West-Ward announced its Isosorbide list (WAC) price increases.

463.     Par announced its list (WAC) price increases on March 11, 2013. Not long after, on March 26, K.O, VP of National Accounts at Par, spoke to M.V., Associate Director of Pricing at Sandoz for approximately 25 minutes.

### 30.     Clindamycin Phosphate

464.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Clindamycin Phosphate gel, lotion, vaginal cream and solution beginning at least as early as April 2012.

465.     Clindamycin Phosphate, also known by the brand name Cleocin, is an antibiotic used to treat certain serious bacterial infections.

466.     During the relevant time frame, the following Defendants were the primary manufacturers of Clindamycin Phosphate:

| | |
|---|---|
| Clindamycin Phosphate Gel | Sandoz, Greenstone |
| Clindamycin Phosphate Lotion | Sandoz, Greenstone |
| Clindamycin Phosphate Vaginal Cream | Sandoz, Greenstone |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Clindamycin Phosphate Solution | Sandoz, Greenstone, Perrigo, Taro, Actavis |
|---|---|

467.    The markets for Clindamycin Phosphate gel, lotion, solution and vaginal cream were mature and at all relevant times had multiple manufacturers.

468.    During the relevant period, Sandoz and Greenstone dominated the markets for Clindamycin Phosphate gel, lotion and vaginal cream. After years of relatively low and stable pricing for these products, in late 2012, Sandoz and Greenstone began to impose very large price increases that were close in time and amount. Rather than compete on price, Sandoz and Greenstone abided by their Fair Share agreement.

469.    Sandoz and Greenstone, by adhering to their price-fixing agreement, were able to maintain high prices for Clindamycin Phosphate products. As Sandoz and Greenstone imposed extremely large price increases, their customers began shopping for better prices. Sandoz and Greenstone, however, adhered to their price-fixing agreement. For example, when a large purchaser approached Sandoz seeking better prices for Clindamycin after its incumbent supplier, Greenstone, had raised prices, Armando Kellum, a Vice President at Sandoz, conveyed to his colleague: ██████████████ Throughout this period, Sandoz and Greenstone monitored and adhered to their Fair Share agreement.

470.    The following list (WAC) price and NSP price charts for Clindamycin Phosphate gel, lotion and vaginal cream show the parallel pricing of Sandoz and Greenstone for those products. ██████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





471.    A similar pattern followed with Clindamycin Phosphate solution. Sandoz and

Greenstone imposed coordinated and very large price increases on their solution products, just as

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

they had on gel, lotion and vaginal cream. The high price of Clindamycin Phosphate solution, however, attracted Perrigo, Taro and Actavis to that market. Eager to maintain the high prices that they already had implemented, Taro and Sandoz agreed to cede a Fair Share of the market to the new entrants if they agreed to keep prices high. They did: Perrigo, Taro and Actavis joined at or near the inflated prices that were being offered by Sandoz and Greenstone.

472.    For example, when Taro was preparing to enter the market for Clindamycin Solution, it was extremely careful to abide by the Fair Share agreement. Rather than seek any and all customers it could win by offering favorable pricing, Taro was careful to pursue market share only in a "fair" manner. On October 8, 2013, Ara Aprahamian gave his Taro subordinates the following directive over email: ██████████████████████████████████████

███████████████████████████████████

473.    The following NSP price chart highlights the elevated prices imposed by Sandoz and Greenstone that were followed by Perrigo, Taro and Actavis when they entered the market.

████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



474.    Throughout this period, Sandoz, Greenstone, Perrigo, Taro and Actavis met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Clindamycin Phosphate and their Fair Share agreement.

475.    For example, in August and September of 2013, as Perrigo was preparing to enter the market for solution, T.P., Perrigo's Director of National Accounts, spoke by phone a number of times with C.B., a National Accounts Executive at Sandoz.

476.    Similarly, as Taro was preparing to enter the market in December 2013, it too communicated with the incumbent suppliers before doing so. For example, on October 11 and 14, 2013, D.S., the Assistant Vice President of National Accounts at Taro spoke to D.L., the Director of National Accounts at Sandoz.

477.    The pattern repeated when Actavis was preparing to enter the market in January 2015. Taro's Ara Aprahamian and M.D., Actavis's Senior National Account Executive, had a 25 minute conversation on January 7, 2015. They spoke again on January 30 for 19 minutes.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 31.   Labetalol HCL

478.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Labetalol HCL tablets beginning at least as early as April 2012.

479.    Labetalol, also known by brand names such as Normodyne and Trandate, is a "beta blocker" medication used to treat high blood pressure.

480.    During the relevant time frame, Defendants Sandoz, Teva, Actavis[11] and Par were the primary manufacturers of Labetalol. Defendant Alvogen joined the Labetalol HCL market and the Labetalol HCL conspiracy in late 2014/early 2015.

481.    The market for Labetalol HCL tablets was mature and at all relevant times had multiple manufacturers.

482.    For years, the prices of Labetalol HCL tablets were relatively low and stable. For example, list prices for 200 mg tablets sold by Sandoz, Teva and Actavis were all below 25 cents. Then, between May and July, 2012, all three more than doubled their list prices. Around the same time, Par entered the market at nearly identical list prices.  And when Alvogen entered the market in late 2014, it too matched the existing market list prices. (The same pattern held for other dosages of Labetalol HCL tablets as well.) Rather than compete for share by offering lower prices, all manufacturers abided by their Fair Share agreement, the result of which was higher prices for all purchasers of Labetalol HCL tablets.

---

[11] Watson Pharmaceuticals, Inc. ("Watson") acquired Actavis in October 2012. The two companies operated as a single entity, albeit under separate names, until January 2013, after which the company became knowns as Actavis, Inc.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

483.    The list price chart below shows the parallel pricing of Actavis, Teva, Sandoz, Par and Alvogen for Labetalol HCL tablets.  (Note: A chart for only the 200 mg tablet is included here. Other dosages exhibit a highly similar pricing pattern.)



484.    Throughout this period, Teva, Sandoz, Actavis, Par and Alvogen met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Labetalol HCL and their Fair Share agreement.

485.    Before raising its price, Teva coordinated with its competitors. For example, Rekenthaler spoke to A.S., a senior Actavis/Watson sales executive on July 11, 2012 (2 calls); and Green spoke to a contact at Sandoz on July 29, 2012 (2 calls) and July 31, 2012.

486.    After Teva increased its pricing on Labetalol in the summer of 2012, it continued to coordinate with its competitors to maintain that supracompetitive pricing for that drug.  For example, on October 16, 2012, Green again spoke to his Sandoz contact two (2) times.  After those calls, Green emailed a Teva colleague: "Sandoz is back in good supply. They took a 500%

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

price increase several months back, and they are holding firm with their prices. Stay the course and maintain our higher price."

487.    Teva's Rekenthaler worked the phones to confirm that Actavis/Watson also was still committed to the Labetalol price-fixing agreement. To that end, on October 18, 2012, Rekenthaler called and again spoke to the senior sales executive at Actavis/Watson, four (4) times.

488.    As Par and Alvogen entered the market, Teva, Sandoz and Actavis incorporated them into the Labatelol price-fixing agreement. For example, when Teva learned of a competitive challenge from Par on Labetalol HCL tablets in February 2014, it promptly called Par to coordinate a response. T.S., a National Account Manager at Teva, spoke to R.K., a Senior Vice President of Sales at Par, three times on February 7, 2014, and days later, Rekenthaler called G.B., Vice President of National Accounts at Par, twice to work out the details.

489.    After these discussions between Teva and Par executives, Teva ultimately offered only a nominal price reduction to that customer, knowing that this would likely result in Par gaining the customer, and building its Fair Share of the Labetalol market.

490.    As Alvogen prepared to enter the market in late 2014, B.H., Alvogen's Executive Vice President of Commercial Sales, communicated with Actavis's Falkin. The two spoke multiple times in September, October, and December of 2014 and in January 2015.

### 32.    Lamivudine/Zidovudine

491.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Lamivudine/Zidovudine tablets beginning at least as early as April 2012.

492.     Lamivudine/Zidovudine, also known by the brand name Combivir, is a combination of mediations used in the treatment of human immunodeficiency virus (HIV) infection.

493.     During the relevant time frame, Defendants Teva, Lupin, Aurobindo, and Camber were the primary manufacturers of generic Combivir.

494.     Teva launched its generic Combivir product in December 2011. In mid-May, 2012, two competitors – Lupin and Aurobindo – received FDA approval for generic Combivir and were preparing to enter the market.

495.     Even before Lupin and Aurobindo obtained FDA approval, Teva was communicating with both about how to divvy up the market. In late April 2014, Teva's Rekenthaler was speaking to the CEO at Aurobindo, who was a former colleague of Reckenthaler's at Teva.  Meanwhile, Teva's Green was speaking to David Berthold, an executive at Lupin, and Jim Grauso at Aurobindo.

496.     In early May 2014, with the Lupin and Aurobindo launches just days away, communications among all three competitors accelerated. Between May 7 and 10, for example, the three companies spoke at least 32 times. Green (Teva), Berthold (Lupin) and Grauso (Aurobindo) discussed the specific customers that Teva would concede in order to ensure that Lupin and Aurobindo gained a Fair Share of the market without eroding prices.

497.     Similarly, when Camber received approval to market a generic form of Combivir, Teva, again, coordinated the entry. Konstantin Ostaficiuk, the President of Camber, communicated with Rekenthaler of Teva and Berthold of Lupin to negotiate Camber's entry into the market.  For example, on September 24, 2014, Ostaficiuk spoke to Rekenthaler three times

and to Berthold twice. That same day, Berthold also spoke to a senior operations executive at Aurobindo, to close the loop on generic Combivir communications.

498.     By coordinating the entry of competitors into the generic Combivir market, Teva, Lupin, Aurobindo and Camber were able to keep prices higher than they would have been in a competitive market.

### 33.     Lidocaine HCL

499.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Lidocaine HCL 5% ointment beginning at least as early as April 2012.

500.     Lidocaine HCL 5% is used as an anesthetic lubricant for intubation and for the temporary relief of pain associated with minor burns.

501.     During the relevant time frame, Defendants Sandoz, Taro and Akorn were the primary manufacturers of Lidocaine HCL 5% ointment.

502.     The market for Lidocaine HCL 5% ointment was mature and at all relevant times had multiple manufacturers.

503.     The prices of Lidocaine HCL 5% ointment were relatively low and stable for years. Sandoz and Taro were the only two manufacturers in the market until the spring of 2012, at which point Akorn began to sell Lidocaine ointment. In anticipation Akorn's entry, Sandoz raised prices. At the time, Sandoz had a dominant share of the market. In order to cede share to Akorn—as required by the Fair Share agreement—Sandoz needed to raise prices to maintain (or even augment) its dollar sales notwithstanding the loss of volume.

504.     Shortly after Sandoz raised prices, Akorn launched its product in the spring of 2012. Rather than offer lower prices to win customers based on better pricing, Akorn matched the recently raised prices offered by Sandoz. Sandoz, as anticipated and agreed to with Akorn

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and Taro, ceded share of the Lidocaine market. Although Sandoz's unit sales declined (as customers were ceded to Taro and Akorn) its dollar sales remained relatively stable, owing to the higher prices it was able to charge because of the price-fixing agreement between the manufacturers.

505.   By 2013, all three manufacturers had brought their Lidocaine prices to approximately the same level. They carefully abided by their agreement to ensure that each of them had a Fair Share of the market while maintaining high prices. For example, in early 2013 after Taro raised its prices, a large buyer sent out requests to Akorn and Sandoz for better pricing. Internally, Taro discussed ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████

506.   Taro applauded the success of the Fair Share agreement in allowing it to increase prices and gain share in the Lidocaine market. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

507.   The list (WAC) price and NSP price charts below show the parallel and elevated pricing for Lidocaine HCL 5% ointment by Sandoz, Akorn and Taro beginning in 2012 and that prices remained elevated above prior levels for years. ██████████████████████





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

508.    Throughout this period, Sandoz, Taro and Akorn met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Lidocaine and their Fair Share agreement.

509.    For example, as Akorn was preparing to enter the market in March 2012, it communicated directly with Taro. M.B., a VP of Marketing at Taro, spoke to E.B., Akorn's VP of Sales and Marketing, on February 24, 28 and March 14 and 29.

510.    Meanwhile, the incumbent suppliers—Taro and Sandoz—were in touch as well. On March 7, 8 and 17, 2012, K.K., a Sandoz Senior National Account Executive, communicated by phone with Taro's D.S., AVP of National Accounts at Taro.

### 34.    Ethinyl Estradiol and Levonorgestrel

511.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Ethinyl Estradiol and Levonorgestrel beginning at least as early as May 2012.

512.    Ethinyl estradiol and levonorgestrel, when used in combination, is an oral contraceptive used to prevent pregnancy.

513.    During the relevant time period, both Teva and Sandoz marketed ethinyl estradiol and levonorgestrel under multiple names – including both Portia and Jolessa.

514.     In May 2012, Teva had much higher market share than Sandoz for both Portia and Jolessa. When Walmart contacted Teva with a right of first refusal and explained that Sandoz made an offer for the sale of drugs including Portia and Jolessa, Teva initially sent a competitive offer. However, after Teva's Green spoke to a contact at Sandoz, Teva withdrew its offer for Portia and Jolessa the next day and conceded Walmart to Sandoz.

515.    Sandoz continued to coordinate with Teva to achieve its Fair Share of the markets for Portia and Jolessa. In July 2013, a key customer contacted Teva stating it had received bids

151

on Portia and Jolessa, and in order for Teva to retain the business, Teva would have to submit its "best bids." A few days later, Teva's Patel spoke to a contact at Sandoz, and Teva's Rekenthaler spoke to a different Sandoz contact. Ultimately, Teva submitted a cover bid to the customer for Portia and Jolessa, intentionally inflating the bid to ensure that Sandoz obtained the primary award with the customer.

## **35.** **Etodolac**

516.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Etodolac beginning at least as early as May 2012.

517.    Etodolac, also known by the brand name Lodine, is a nonsteroidal anti-inflammatory drug (NSAID) used to treat pain, swelling and joint stiffness from arthritis.

518.    During the relevant time frame, Defendants Apotex and Taro were the primary manufacturers of Etodolac capsules.

519.    During the relevant time frame, Defendants Teva, Taro, Sandoz and Apotex were the primary manufacturers of regular Etodolac tablets.

520.    During the relevant time frame, Defendants Teva, Taro and Zydus were the primary manufacturers of Etodolac ER tablets.

521.    The markets for Etodolac capsules, tablets and ER tablets were mature and at all relevant times had multiple manufacturers.

**Etodolac Capsules**

522.    For years, the prices for Etodolac capsules were relatively low and stable. That changed in the spring of 2012. Taro was the dominant seller in the market. Teva was preparing to exit the market, and Apotex was preparing to re-enter the market.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

523.    In conjunction with Apotex's entry into the market, Taro and Apotex announced identical and nearly simultaneous list (WAC) price increases. The increases were very large. For example, on 300 mg capsules both manufacturers raised prices more than 250%. Rather than stimulate price competition, Apotex's entry into the market resulted in much higher prices.

524.    Apotex quickly gained market share, all while it and Taro maintained high prices. Their Fair Share agreement made this possible.  For example, in August 2013, ███████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████ Doing so would have disrupted the Fair Shares of each manufacturer in the Etodolac capsule and tablet markets.

525.    The price charts below show the lockstep list pricing of Etodolac capsules by Taro and Aptoex and similar parallel NSP pricing. (Etodolac capsules come in 200 mg and 300 mg dosages, both of which exhibited similar pricing patterns. Charts are provided here only for the 300 mg dosage.) █████████████████████





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

526.    Throughout this period, Apotex and Taro met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Etodolac capsules and their Fair Share agreement.

**Etodolac Tablets**

527.    As was the case with Etodolac capsules, for years the prices of Etodolac tablets and ER tablets were relatively low and stable. That changed in the summer of 2013 when Teva, Taro and Sandoz imposed nearly simultaneous price increases of regular tablets and Teva and Taro did the same on ER tablets. Again, the price increases were very large, and very similar in amount.

528.    When Apotex re-joined the market for regular tablets in the spring of 2015, it matched Sandoz and Teva's prices. And when Zydus entered the ER tablet market, it matched the prices of Taro and Teva.

529.    The Fair Share agreement enabled Taro, Teva, Sandoz, Apotex and Zydus to keep the prices of Etodolac tablets and ER tablets much higher than they would have been in a competitive market.

530.    The list (WAC) price and NSP price charts below show the parallel pricing by Defendants for Etodolac regular and ER tablets. (Note, regular tablets come in 400 mg and 500 mg dosages and ER tablets come in 400 mg, 500 mg and 600 mg dosages. The pricing patterns across all dosages are similar. Charts for only the 500 mg dosages are included here.) ███

██████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





157

531.    Throughout this period, Teva, Sandoz, Taro, Apotex and Zydus met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Etodolac tablets and their Fair Share agreement.

532.    For example, during July of 2013, there were numerous phone calls among Sandoz, Taro and Teva for the express purpose of implementing price increases on Etodolac. Between July 16 and 18, there were a flurry of calls between individuals at all three companies, including C.B., a National Account Executive at Sandoz, Taro's Aprahamian and Teva's Patel. On July 18, 2013, Patel called M.V., the Associate Director of Pricing at Sandoz, during which the companies agreed to raise prices.

533.    Before any price increases took effect or were made public, Teva knew that Sandoz planned to increase its price on Etodolac, and that Taro would follow suit and raise its prices as well. During those conversations, Teva agreed to follow both price increases.

534.    Leading up to their price increases that were imposed in late July and early August, Sandoz, Teva and Taro continued to communicate and re-affirm their intentions to raise Etodolac prices. For example, on July 23, Patel at Teva spoke with her contact at Sandoz, and Aprahamian at Taro spoke with his contact at Sandoz.

535.    Between July 29 and August 2, 2013, Patel engaged in a series of thirteen calls with her Sandoz contact and Aprahamian of Taro. Aprahamian also spoke to his contact at Sandoz during this time, including three calls between July 30 and August 2, 2013.

536.    When Patel sent the "Price Increase Overview" spreadsheet to her supervisor on August 7, 2013, summarizing Teva's upcoming August 9 price increases, she again made it clear that the reason Teva was increasing its prices for Etodolac and Etodolac ER was because Teva senior executives knew that Taro would be raising its prices on both drugs "this week."  Patel's

supervisor quickly instructed her to delete those entries. Notably, he did not tell her to stop colluding with Taro or any of Teva's other ostensible competitors, and so she continued to do so.

537.    On August 8, 2013, Patel again spoke to Aprahamian (Taro) numerous times and to her contact at Sandoz. The next day, Teva and Taro announced identical and very large price increases on their Etodolac and Etodolac ER products.

538.    In the spring of 2014, when Zydus's entry into the Etodolac ER market spurred another round of communications and coordination aimed at keeping prices high. In the days leading up to the Zydus launch, there were numerous communications between Teva, Zydus and Taro to discuss how customers would be ceded to Zydus without driving prices down.

539.    The conversations accomplished their goal. Zydus announced list prices identical to those of Teva and Taro. And Teva and Taro ceded customers to Zydus. For example, when Teva learned on May 14, 2014 that one of its wholesaler customers had received a bid from Zydus for Etodolac ER, it prompted a series of communications between Teva's Patel, Taro's Aprahamian, and Zydus's Green, as well as direct communications between Maureen Cavanaugh at Teva and K.R., Vice President of Sales at Zydus. The end result: Teva ceded its wholesaler customer to Zydus.

540.    In July of 2014, Teva ceded another customer to Zydus to allow it to gain a Fair Share of the market. Patel explained Teva's decision as needed to make room for a new market entrant.

541.    Taro, too, worked to ensure that Zydus maintained a Fair Share of the Etodolac market. For example, in August 2015, Taro declined to bid on Etodolac ER at a large customer where Zydus was the incumbent. Taro worried that pursuing Zydus's customer would result in retaliation, possibly on another product that was part of their Fair Share agreement, Warfarin

Sodium Tablets:  Zydus "could hit us on Warfarin.  Not worth a fight in the sandbox over 300 annual units for Etodolac."

<div align="center">

**36.**     **Tamoxifen Citrate**

</div>

542.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Tamoxifen Citrate tablets beginning at least as early as May 2012.

543.    Tamoxifen Citrate, also known by the brand name Nolvadex, among others, is a medication used to treat certain types of breast cancer.

544.    During the relevant time frame, Defendants Teva, Mylan, and Actavis/Watson were the primary manufacturers of Tamoxifen Citrate.

545.    The market for Tamoxifen Citrate was mature and at all relevant times had multiple manufacturers.

546.    Beginning in the spring of 2012, Teva, Actavis and Mylan began coordinated, steady and sustained price increases for Tamoxifen Citrate.

547.    The NSP price chart below shows the parallel price increases imposed by Actavis, Mylan and Teva on Tamoxifen Citrate tablets. Note: Tamoxifen Citrate tablets come in 10 and 20 mg dosages, each of which demonstrated highly similar pricing patterns. A chart for only the 20 mg dosage is included here. ▮▮▮▮▮▮▮▮▮▮

<div align="center">

160

</div>



548.    Throughout this period, Actavis, Mylan and Teva met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Tamoxifen Citrate and their Fair Share agreement.

549.    For example, in the weeks leading up to their initial price increases, Teva's Green and Rekenthaler communicated directly with Teva's competitors. For example, Green spoke to Nesta of Mylan on July 23, July 24 (2 calls); July 25; July 26; July 30 (2 calls); and July 31, 2012 (5 calls). In addition, Rekenthaler spoke to A.S., Vice President of Sales at Actavis, on July 11, 2012 (2 calls).

550.    Defendants continued to coordinate the pricing of Tamoxifen Citrate in 2014. For example, in March 2014, Rogerson (Actavis) told Patel (Teva) that Actavis was implementing yet another price increase on Tamoxifen Citrate. Teva planned to follow the Actavis price increase. To coordinate, Patel spoke to Rogerson for nineteen minutes on March 17, 2013.  In

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

addition, Rekenthaler (Teva) and Falkin (Actavis) exchanged four text messages and had one call that day. Patel again spoke to Rogerson on April 1, April 3, and April 4, 2014. And Rekenthaler spoke to Falkin on April 1, 2, 3, and 4, 2014.

551.    After the price increases became effective, Defendants took consistent steps not to disrupt the market or steal market share from each other. For example, on May 14, Teva declined to bid at a large wholesaler on both Tamoxifen Citrate and Estazolam in order to maintain the Fair Share agreement.

552.    Mylan, which had temporarily discontinued tamoxifen citrate tablet sales in October 2013 due to technical issues, planned to re-launch in June 2014. In accordance with the Fair Share agreement, Teva employees internally discussed which customer or customers to concede ████████████████████████████████████████ Teva employees also discussed ███████████████████████████████████████ ███████████████████████████████████

### 37.    Cimetidine

553.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Cimetidine beginning at least as early as June 2012.

554.    Cimetidine, also known by the brand name Tagamet, among others, is a medication used to treat stomach or intestinal ulcers.

555.    During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Cimetidine.

556.    The market for Cimetidine tablets was mature and at all relevant times had multiple manufacturers.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

557. Beginning in the summer of 2012, Teva and Mylan began steady and coordinated price increases for Cimetidine tablets. The NSP chart below shows the parallel and increasing prices over time. ████████████████



558. Throughout this period, Teva and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Cimetidine tablets and of their Fair Share agreement.

559. For example, in order to coordinate the pricing of their products, including Cimetidine tablets, Teva's Green spoke to Nesta at Mylan on May 7, 2013 three times. Green and Nesta also spoke a number of times over the next several days, including on May 8, May 9, and May 10, 2013. On May 17, 2013, Green spoke to Nesta six (6) times.

560. Meanwhile, Teva's Patel—who was receiving regular updates from Green— expressed the expectation that Mylan would soon be raising prices on Cimetidine and was preparing Teva to do the same. And both manufacturers did raise prices.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

561.    As Mylan and Teva imposed price increases for Cimetidine, they were careful to maintain Fair Share and not to disrupt pricing or steal customers. To that end, Teva and Mylan continued to communicate throughout this period.   For example, on May 9, 2014, Teva's Rekenthaler and Nesta at Mylan spoke for nearly eight (8) minutes. Rekenthaler and Nesta spoke again on May 20 and May 27, 2014.  The two spoke several more times that summer, including at least on August 4, 7, 11, 18, and 21, 2014 in order to coordinate the prices of Cimetidine and other drugs.

### 38.    Cyproheptadine HCL

562.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Cyproheptadine HCL tablets beginning at least as early as June 2012.

563.    Cyproheptadine HCL, also known by the brand name Periactin, is a medication used to relieve allergy symptoms such as watery eyes, runny nose, itching eyes/nose, sneezing, hives, and itching.

564.    During the relevant time frame, Defendants Teva and Breckenridge were the primary manufacturers of Cyproheptadine HCL tablets. Defendant Impax joined the market and the Cyproheptadine HCL conspiracy in August 2015.

565.    The market for Cyproheptadine HCL tablets was mature and at all relevant times had multiple manufacturers.

566.    For years the prices for Cyproheptadine HCL tablets were relatively low and stable. In the summer of 2012, that changed. Teva announced a 50% list price increase and its NSP prices ████████████████████████████ Although Breckenridge did not announce a list price increase, ██████████████████████████

567.     In November 2013, it was Breckenridge's turn to lead; it announced a list price increase of approximately 150% and its NSP prices ███████████████████ ████████████████████████████████████████████ ██████████████████████████. With roles reversed, this time Teva did not immediately announce a list price increase, but its NSP prices █████████████ ████████████  And when Teva did announce its list price increase in April 2014, it matched Breckenridge's price.

568.     In late summer of 2015, Impax entered the market. Rather than compete for customers by offering better prices, Impax announced a higher list price than either Teva or Breckenridge, and charged its customers █████████████████████████████ Even with higher prices, Impax was able to gain market share, as contemplated by the Fair Share agreement between Teva, Breckenridge and Impax.

569.     The charts below show the list (WAC) price and NSP price increases for Teva and Breckenridge, and the entry of Impax into the market at even higher prices. ███████████ ███████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

570.    Throughout this period, Teva, Breckenridge and Impax met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Cyproheptadine HCL tablets and their Fair Share agreement.

571.    For example, in the weeks before Breckenridge announced enormous list price increases for Cyproheptadine HCL tablets in November 2013, Breckenridge and Teva communicated directly with each other. Teva's Rekenthaler had several phone calls with D.N., Director of Sales at Breckenridge. The two spoke again in mid-January 2014, right around when Teva was preparing its own list price increase for Cyproheptadine HCL.

572.    Breckenridge's large price increase created an opportunity for Teva to win new customers with better prices. But, because of its agreement with Breckenridge, it did not do so. For example, when a potential new customer for Cyproheptadine HCL contacted Teva in February 2014, Teva's Patel promptly called S.C., National Director of Sales, at Breckenridge, after which, Teva declined to submit a bid until after Teva had increased its price.

573.    In the summer of 2015, Impax was preparing to enter the market. On July 20, S.C., Breckenridge's National Director of Sales, and M.G., Impax's Senior National Account Manager, exchanged text messages. On July 31, 2015, Impax announced list (WAC) prices even higher than those of Teva or Breckenridge.

### **39.    Oxaprozin**

574.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Oxaprozin tablets beginning at least as early as June 2012.

575.    Oxaprozin, also known by the brand name Daypro, is a nonsteroidal anti-inflammatory drug (NSAID) used to treat arthritis.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

576.     During the relevant time frame, Defendants Teva, Sandoz, Dr. Reddy's, and Greenstone were the primary manufacturers of Oxaprozin.

577.     The market for Oxaprozin was mature and at all relevant times had multiple manufacturers.

578.     For years, the prices of Oxaprozin tablets were relatively low and stable, with list prices well under 1 dollar, and NSP prices ███████. Although various manufacturers came in and out of the market, prices remained relatively low and stable. By the summer of 2012, Teva and Dr. Reddy's were the primary sellers of Oxaprozin. Both manufacturers had experienced supply disruptions in the preceding year, and yet prices remained relatively low and stable.

579.     In the second half of 2012, Sandoz was preparing to enter the market. In anticipation of Sandoz's entry, in July 2012, Teva raised its list (WAC) prices from less than 50 cents to nearly 3 dollars. When Sandoz entered the market in November, rather than offer better prices to win customers, it matched Teva's list prices.

580.     Meanwhile, Dr. Reddy's continued supply disruptions caused it to leave the market by the end of 2012. By the spring of 2013, however, Dr. Reddy's was preparing to re-enter the market. Around the same time, Greenstone also was planning to enter the market. Both did so, and rather than announce lower prices to compete for customers, both promptly announced WAC prices in line with Teva and Sandoz.

581.     Over the ensuing months, Teva, Sandoz, Dr. Reddy's and Greenstone monitored and adhered to their Fair Share agreement, which enabled them to keep the prices of Oxaprozin elevated above competitive levels. For example, as Dr. Reddy's was preparing to enter the market, Teva was analyzing how to make sure it obtained a Fair Share. Teva's Rekenthaler directed Patel, "look at our business on Oxaprozin in order to accommodate Dr. Reddy's entry."

582.    Leading up to Greenstone's entry into the market, Green (Teva) and R.H., Director of National Accounts at Greenstone, were in frequent communication by phone and text to coordinate the entry, speaking on March 6, 11, 18, 20, 21, 22, and 27, 2013.  During these communications, Teva agreed to concede specific customers to Greenstone in order to avoid competition and price erosion resulting from Greenstone's entry.

583.    After Walmart informed Teva that it had received a bid from Greenstone shortly after Greenstone's entry into the market, Teva immediately called Dr. Reddy's.  On March 27, 2013, Green (Teva) called R.H. at Greenstone, but did not connect.  The next morning, Green reached R.H. After they spoke, R.H. relayed the information from Green to her boss, Jill Nailor, in a series of conversations and text messages. Ultimately, Greenstone agreed to withdraw its offer to Walmart and honor its Fair Share agreement with Teva.

584.    Similarly, when Dr. Reddy's was interested in acquiring Walgreens as a customer, Teva and Dr. Reddy's spoke on the phone to devise a strategy and work out the details of their Fair Share Agreement. In the summer of 2013, J.A., VP of Sales and Marketing at Dr. Reddy's, called Green, and Rekenthaler spoke with T.W., a Senior Director of National Accounts at Dr. Reddy's. Ultimately, Teva and Dr. Reddy's agreed that Teva would keep the Walgreens business, but would concede its next largest customer for Oxaprozin – Econdisc – to Dr. Reddy's.

585.    The following list (WAC) price chart and NSP price chart highlight the parallel pricing by Teva, Sandoz, Dr. Reddy and Greenstone and show that prices for Oxaprozin have remained elevated above competitive levels. ███████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





586.    Throughout this period, Teva, Sandoz, Dr. Reddy's and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Oxaprozin and their Fair Share agreement.

170

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 40.    **Tolterodine**

587.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Tolterodine Tartrate regular and extended release ("ER") tablets beginning at least as early as June 2012.

588.    Tolterodine, also known by the brand name Detrol, is a medication used for the treatment of an overactive bladder.

589.    During the relevant time frame, Defendants Teva, Mylan and Greenstone were the primary manufacturers of Tolterodine regular and ER tablets.

590.    Between June 2012 and January 2013, Teva and Mylan were among the first manufacturers to enter the market for generic Tolterodine tablets. Greenstone joined the tablet market in January 2014. Around the same time that Greenstone entered the tablet market in January 2014, Teva and Mylan were the first manufacturers to launch Tolterodine ER tablets.

591.    Throughout this period, Teva, Mylan and Greenstone met at trade events and communicated directly in order to keep Tolterodine prices higher than they would have been in a competitive market.

592.    For example, in the second half of 2012, Teva and Mylan regularly communicated on the telephone. Teva's Green spoke to Mylan's Nesta numerous times between May and July of 2012, the period during which Teva was launching Tolterodine tablets. Green and Nesta spoke again in January 2013, around the time that Mylan was launching its Tolterodine tablets.

593.    Similarly, in the days leading up to Greenstone's entry to the Tolterodone tablet market, Jill Nailor and a colleague at Greenstone were speaking frequently to Teva's Patel and Rekenthaler to coordinate. For example, on January 21, 2014, Nailor called Patel twice, and on January 22, Patel called Nailor twice, Nailor called Patel once, and the two exchanged multiple text messages. During these communications, Teva and Greenstone agreed that Teva would

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

concede business to Greenstone in order to avoid significant price erosion in the market. And when Greenstone finally entered the market, it announced the exact same list (WAC) prices as Teva.

594.    Teva and Greenstone continued to communicate over the following months to ensure that Greenstone was able to obtain a Fair Share of the market. For example, in late January and early February, Teva's Patel and a contact at Greenstone communicated a number of times to coordinate Teva's concession of a large pharmacy customer to Greenstone on Tolterodine tablets.

595.    During this period, Teva and Mylan planned to launch generic Tolterodine ER.  In order to coordinate market share and pricing, Teva and Mylan were in regular contact. For example, on December 23 and 24, 2013, Teva's Rekenthaler and Mylan's Nesta had a series of calls during which they agreed to allocate the Tolterodine ER market on launch day so that Teva and Mylan could each get a Fair Share without eroding pricing.

### 41.    **Buspirone HCL**

596.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Buspirone HCL beginning at least as early as July 2012.

597.    Buspirone HCL, also known by the brand name Buspar, among others, is a medication used to treat anxiety disorders or to relieve the symptoms of anxiety.

598.    During the relevant time frame, Defendants Teva, Mylan and Actavis/Watson were the primary manufacturers of Buspirone HCL.

599.    In the summer of 2012, Teva increased pricing on Buspirone HCL. Before this price increase, Teva coordinated with its competitors. In the weeks leading up to the price increase, Teva's Green spoke to Nesta of Mylan on July 23, 24, 25, 26, 30, and 31, 2012.  In

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

addition, Teva's Rekenthaler spoke to A.S., VP of Sales at Watson/Actavis, twice on July 11, 2012.

### 42.   Estradiol

600.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Estradiol tablets beginning at least as early as July 2012.

601.    Estradiol, also known by the brand name Cenestin, is a female hormone used to help reduce symptoms of menopause.

602.    During the relevant time frame, Defendants Teva, Mylan and Actavis were the primary manufacturers of Estradiol tablets.

603.    The market for Estradiol tablets was mature and at all relevant times had multiple manufacturers.

604.    For years, the prices of Estradiol tablets were relatively low and stable. In the summer of 2012, however, Teva, Actavis and Mylan began to impose significant price increases.

605.    The NSP price chart below shows the near simultaneous and sustained price increases for Estradiol tablets that were imposed by Teva, Mylan and Actavis. Note: Estradiol tablets come in 0.5, 1 and 2 mg dosages. The pricing patterns for all dosages were highly similar. A chart for only the 1 mg dosage is included here. ████████████████



606.    Throughout this period, Teva, Mylan and Actavis met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Estradiol and their Fair Share agreement.

607.    For example, in the summer of 2012, Teva, Mylan and Actavis began coordinated price increases on Estradiol tablets. As they began to roll out increases to customers, the lines of communication were open and frequently utilized. Teva's Green spoke to Mylan's Nesta on August 1, 2, 6, 7, 8, 10, 13, 15, 16, 17 and 28.

608.    Teva was also in touch with Actavis. T.C., Teva's Senior Director of Sales, spoke twice (once for 10 minutes and another time for 15 minutes) with L.P., a Senior Director of National Accounts at Actavis, on August 6, 2012. By the end of the year, Actavis, Mylan and Teva had increased their Estradiol prices to customers ███████████

609.    In early 2015, Actavis, Mylan and Teva imposed another round of price increases. And they again orchestrated these price increases by direct communication. For example, Teva's Rekenthaler spoke to Nesta of Mylan on January 14 (two calls) and 20, 2015. In addition, Rekenthaler spoke to Falkin of Actavis on January 13, 14 (two calls), and 16, 2015. Over the ensuing months, all three manufacturers were again able to impose price Estradiol price increases for their customers.

### 43.    Ethosuximide

610.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Ethosuximide capsules and oral solution beginning at least as early as July 2012.

611.    Ethosuximide, also known by the brand name Zarontin, is an anticonvulsant medication used to control petit mal seizures in the treatment of epilepsy.

612.    During the relevant time frame, Akorn/Versapharm[12] and Teva were the primary manufacturers of Ethosuximide capsules and oral solution.

613.     To coordinate market share and price increases on Ethosuximide, Teva and Akorn/Versapharm communicated directly with each other.

614.    For example, on May 24, 2012. Teva's Rekenthaler called S.M., Versapharm's Chief Sales and Marketing Office, on his cell phone. S.M. called back later that day and the men spoke for approximately 8 minutes.

615.    On July 31, 2012, Teva announced a large list (WAC) price increase for Ethosuxamide oral solution. Less than one week later, Akorn/Versapharm announced almost

---

[12] Versapharm was acquired by Defendant Akorn in 2014.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

identical list (WAC) prices. In a matter of days, both companies had more than tripled their list (WAC) prices.

616.    In 2014, Teva coordinated another round of price increases with Akorn/Versapharm. On January 22, 2014, Teva's Rekenthaler called J.J., a senior national account executive at Akorn/Versapharm.

617.    On March 7, 2014, Rekenthaler spoke with the same senior national account executive at Akorn/Versapharm. Less than a month later, on April 4, 2014, Teva raised prices on both Ethosuximide capsules and oral solution.

618.    Only five days after the Teva increase—on April 9, 2014—Akorn/Versapharm increased its pricing on both Ethosuximide capsules and oral solution to a nearly identical price to Teva.

619.    The list (WAC) price charts below show the large and nearly simultaneous price increases by Teva and Akorn/Versapharm on Ethosuxamide capsules and oral solution.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



### 44.    Loperamide HCL

620.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Loperamide HCL capsules beginning at least as early as July 2012.

621.    Loperamide HCL, also known by the brand name Imodium, among others, is a medication used to treat diarrhea.

622.    During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Loperamide HCL capsules.

623.    The market for Loperamide HCL capsules was mature and at all relevant times had multiple manufacturers.

624.    After years of relatively low and stable pricing for Loperamide HCL capsules, Teva and Mylan began to coordinate and implement sustained price increases. At their peak, the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

prices that customers of Teva and Mylan paid for Loperamide HCL capsules were approximately ████ more than before Teva and Mylan agreed to fix prices. And prices remain much higher even today.

625.    The NSP price chart below shows the coordinated and sustained price increases by Teva and Mylan for Loperamide HCL capsules.████████████



626.    Throughout this period, Teva and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Loperamide HCL capsules and their Fair Share agreement.

627.    For example, in the weeks leading up to the first price increase for Loperamide, Teva's Green spoke to Nesta of Mylan on July 23, July 24 (2 calls); July 25; July 26; July 30 (2 calls); and July 31, 2012.

628.    Teva and Mylan continued to communicate and monitor the market to ensure that each had a Fair Share and that prices remained high. The two companies even went so far as to

share internal documents and analyses on some occasions. For example, on April 21, 2014, a national account executive at Teva forwarded to Patel two spreadsheets—that were created by Mylan personnel—that included information about Mylan's Loperamide price increases.

629.    With Mylan's price increase information in hand, Teva began to plan how to follow those increases, and communicated directly with Mylan to work out the details. To that end, Teva's Rekenthaler spoke to Nesta at Mylan a number of times in May 2014 and a number of additional times in August 2014.

630.    By agreement, and facilitated through close communication, Teva and Mylan were able to implement higher and sustained prices on Loperamide HCL capsules.

### **45.    Nadolol**

631.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Nadolol tablets beginning at least as early as July 2012.

632.    Nadolol, also known by the brand name Corgard, is a "beta blocker" used to treat high blood pressure and chest pain (angina).

633.    During the relevant time frame, Defendants Teva, Mylan, and Sandoz were the primary manufacturers of Nadolol. In May 2014, Greenstone joined the market and the agreement to inflate the prices of Nadolol tablets.

634.    The market for Nadolol tablets was mature and at all relevant times had multiple manufacturers.

635.    For years, the prices of Nadolol tablets were relatively low and stable. That changed in the summer of 2012. At various points during 2012 and 2013, Teva, Mylan and Sandoz experienced supply problems, though none of the manufacturers exited the market, nor were their supply issues lasting. These supply challenges, however, did provide cover for

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

enormous price increases, kicked off by Sandoz in the second half of 2012, followed by Mylan approximately four months later, and then followed by Teva approximately six months after that.

636.    In less than a year, all three manufacturers announced identical list prices that were more than 8 times the former prices. The NSP prices of Sandoz, Mylan and Teva ████████████████████████████████████████████████████████████████

████████████████████ When Greenstone entered the market in 2014, it matched the inflated Nadolol prices of Sandoz, Mylan and Teva.

637.    The list (WAC) price chart and the NSP price chart below show the extraordinary price increases that Sandoz, Mylan, Teva and Greenstone imposed on Nadolol tablets. (Note: similar price increases were imposed on 20 mg, 40 mg and 80 mg tablets. Only the 40 mg price charts are included here.) ████████████████████████



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



638.    Throughout this period, Sandoz, Mylan, Teva and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Nadolol tablets and of their Fair Share agreement.

639.    For example, before Sandoz, Mylan and Teva began to implement their enormous Nadolol price increases, they were in frequent communication to coordinate market share and pricing. Teva's Green was in frequent communication with executives at both Sandoz and Mylan in 2012. Right before the large Sandoz price increase, Green spoke with Mylan's Nesta and with Armando Kellum, then the Senior Director of Pricing and Contracts at Sandoz.

640.    In January 2013, right before Mylan announced its very large price increases on Nadolol, the same pattern followed. Mylan's Nesta spoke to Teva's Green a number of times, and then Green communicated with Kellum (and others) at Sandoz.

641.    In July, it was Teva's turn to impose extraordinary price increases on Nadolol tablets. Leading up to the increase, Teva, Mylan and Sandoz again were in regular communication. For example, Teva's Green spoke to Nesta at Mylan numerous times during

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

May. And as soon as Teva announced its price increase in early July, Teva's Patel received a congratulatory message from a contact at Sandoz.

642.    By July, Sandoz, Mylan and Teva had brought their list prices into perfect alignment at a level many multiples of the prior prices. Their price-fixing agreement was working. But it required continued work to make sure that each of them maintained a Fair Share of the market.

643.    To assist in monitoring Fair Share, Sandoz decided to ask Teva and Mylan for comprehensive lists of all their anticipated price increases, even for drugs not sold by Sandoz. One Director of National Accounts reached out to Reckenthaler at Teva, another reached out to Nesta at Mylan. Reckenthaler and Nesta complied, and provided lists to Sandoz.

644.    Aware that it was improper to share competitively sensitive pricing information with a competitor, and in an effort to conceal it, Rekenthaler first sent the Teva price increase list from his Teva work e-mail account to a personal e-mail account, and then forwarded the list from his personal e-mail account to the personal e-mail account of the Sandoz contact.

645.    When Nesta provided his list, he also conveyed that Mylan did not want to see its prices challenged and emphasized that Sandoz should keep prices high.

646.    Over the ensuing months, Sandoz, Teva and Mylan lived up to their agreement, and were careful to maintain Fair Shares. For example, in October 2013, a senior pricing executive at Sandoz sent an internal e-mail explaining that Sandoz had decided not to submit bids in response to a customer because: "We have been running up against Mylan a lot lately (Nadolol/Benaz/Hctz), and fear blowback if we take any more products at this moment. Trying to be responsible in the sandbox."

647.     In mid-2014, the Nadolol conspiracy expanded to include Greenstone, which was entering the market. In 2014, Greenstone's Jill Nailor had numerous direct phone communications with Sandoz (Kellum), Mylan (Nesta) and Teva (Patel and Rekenthaler). When it came time for Greenstone to launch its Nadolol tablets, rather than offer lower prices to win customers, it announced identical list prices to Sandoz, Mylan and Teva.

### 46.     Halobetasol Propionate

648.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Halobetasol Propionate cream and ointment beginning at least as early as August 2012.

649.     Halobetasol Propionate, also known by the brand name Ultravate, is a corticosteroid prescribed for the relief of inflammation and itching due to a variety of skin conditions.

650.     During the relevant time frame, Defendants Perrigo, G&W, Sandoz and Taro were the primary manufacturers of Halobetasol Propionate cream and ointment.

651.     The markets for Halobetasol Proprionate cream and ointment were mature and at all relevant times had multiple manufacturers.

652.     For years the prices of Halobetasol Propionate cream and ointment were relatively low and stable. In late 2012, Perrigo and G&W were the dominant manufacturers. In the fall of 2012, they coordinated ███████████████████ and as that gained traction, Perrigo and G&W each implemented enormous price increases in lock step in the spring of 2013. They announced identical list prices that were more than triple the former prices. By the summer of 2013, NSP prices were ███████████████████████████████████████ Throughout this period, Perrigo and G&W had roughly equal shares of the market.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

653.    As Sandoz (late 2013) and Taro (spring 2014) joined the market, they announced list prices identical to Perrigo and G&W. Rather than compete on price to gain share, Sandoz and Taro joined the Halobetasol Propionate price-fixing agreement and all of them abided by their Fair Share agreement.

654.    For example, as Sandoz sought out opportunities to gain its Fair Share in March 2014, ██████████████████████████████████████████████████████████ ████████████████████████████████████

655.    Similarly, when Taro submitted a bid to a Perrigo customer in June 2014, ████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████

656.    By adhering to their Fair Share agreement, Perrigo, G&W, Sandoz and Taro were able to raise and maintain Halobetasol Propionate prices above a competitive level.

657.    The list (WAC) price chart and NSP price chart show the large and parallel price increases by Perrigo, G&W, Sandoz and Taro. ████████████████████████





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

658.    Throughout this period, Perrigo, G&W, Sandoz and Taro met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Halobetasol Propionate cream and ointment and their Fair Share agreement.

659.    For example, D.B., Perrigo EVP and General Manager, and K.O, G&W President, spoke twice by phone on March 19, 2013, texted on March 25 and spoke for approximately six minutes on March 26. Perrigo announced list (WAC) price increases for Halobetasol Propionate the next day.

660.    K.O. at G&W also was communicating with M.P., Taro Chief Commercial Officer, during the same window of time. K.O. tried to connect with M.P. on March 19, 2013 (the same day he had spoken to D.B. at Perrigo) but did not get through. The two did connect, however, on March 21. They text messaged on March 25 (the same day that K.O. texted with D.B. at Perrigo), and had two relatively long conversations (15 and 20 minutes) on March 28, 2012, the day after Perrigo increased its list (WAC) prices.

661.    K.O. (G&W) and M.P. (Taro) continued to communicate by text message in late March and early April 2013, including on April 11, the day that G&W announced list (WAC) price increases for Halobetasol Propionate. The next day, the two executives spoke by phone for approximately 28 minutes.

662.    Meanwhile, Perrigo's T.P., Director of National Accounts, was communicating with C.B., Sandoz's Director of National Accounts. The two spoke on April 10, 2012, the day before G&W announced its price increase. The two also spoke on December 18, 2012, just a few days after Sandoz announced list (WAC) price increases for Halobetasol Priopionate. K.O (G&W) and D.B. (Perrigo) also spoke again after the Sandoz price increase (December 20, 2013) for approximately 10 minutes.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

663.    Another series of communications occurred when Taro raised its list (WAC) prices on May 13, 2014.  In April 2014, before the Taro price increase was announced, M.P. (Taro) and K.O (G&W) again spoke by phone. On May 6, K.O again spoke to D.B (Perrigo) and two days later, Perrigo's T.P. spoke again with C.B at Sandoz. On May 16, shortly after Taro's list price increase became official, E.G., Taro Director of Corporate Accounts, spoke to A.F., Perrigo National Account Director. That same day, K.O. (G&W) re-connected with D.B. (Perrigo).

### 47.    Ketoprofen

664.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Ketoprofen beginning at least as early as September 2012.

665.    Ketoprofen, also known by the brand name Dolobid, is a nonsteroidal anti-inflammatory drug (NSAID) used to treat mild to moderate pain, and to relieve symptoms of arthritis, such as inflammation, swelling, stiffness, and joint pain.

666.    During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Ketoprofen capsules.

667.    The market for Ketoprofen capsules was mature and at all relevant times had multiple manufacturers.

668.    In the summer of 2013, Patel said she had heard "rumors of activity," *i.e.*, a price increase, on Ketoprofen. "Rumors" was a term consistently used by Patel in e-mails to as a euphemism for communicating with competitors about future price increases.

669.    On June 28, 2013, Teva's Green and Mylan's Nesta spoke on the phone.  Shortly thereafter, Patel sent an e-mail internally at Teva stating that Mylan was announcing price increases that day, including for Ketoprofen. In actuality, Mylan did not announce the price

increases until July 1, 2013, with an effective date of July 2, 2013. Teva followed on August 9, 2013.

670.    As Teva prepared to follow the Mylan increase, the companies were in frequent contact. For example, on July 10, 2013, Green and Nesta spoke twice, and the next day, Nesta and Green exchanged several more calls. In addition, Green spoke to Nesta on August 1 (two calls), 2, 6 (three calls), and 8 (three calls), 2013.

671.    The day before Teva officially followed Mylan's price increase – August 8, 2013 – Patel spoke directly to Nesta.

672.    On January 28, 2015, Teva again raised its price on Ketoprofen capsules. Again, Teva's Patel and Rekenthaler communicated with Mylan before doing so. For example, Rekenthaler spoke to Nesta of Mylan on January 14 (2 calls) and January 20, 2015.

### 48.    Methotrexate Sodium

673.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Methotrexate Sodium tablets beginning at least as early as September 2012.

674.    Methotrexate Sodium, also known by the brand name Rheumatrex and Trexall, among others, is used to treat several types of cancer.

675.    During the relevant time frame, Defendants Par,[13] Mylan, Teva and West-Ward[14] were the primary manufacturers of Methotrexate.

676.    The market for Methotrexate was mature and at all relevant times had multiple manufacturers.

---

[13] The relevant entity prior to June 2014 was DAVA, which has since been subsumed into Par.

[14] The relevant entity prior to March 2016 was Roxane, which has since been subsumed into West-Ward.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

677.    For years the prices for Methotrexate Sodium tablets were relatively low and stable. In late 2012 and early 2013, Teva and Mylan experienced supply disruptions. Par immediately ███████████████████████████████, and announced a large list (WAC) price increase in late February 2013. West-Ward soon followed the increases, ███████████████ ███████ and announcing list prices even higher than Par in May. Teva closely followed the price increases as well, closely tracking West-Ward. By fall of 2013, Mylan also joined the price increases.

678.    The NSP price chart and list (WAC) price chart below highlight the large price increases for Methotrexate by Par, West-Ward, Teva and Mylan. ███████████████████



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



679.    Throughout this period, Par/DAVA, Mylan, Teva and West-Ward/Roxane met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Methotrexate and of their Fair Share agreement.

680.    For example, on February 20, 2013—the day that Par/DAVA raised its list (WAC) prices—Teva's Green and Mylan's Nesta spoke by phone. Green and Nesta spoke again on May 17, 2013—two days after West-Ward/Roxane raised its list (WAC) prices. On July 3, Green and Nesta communicated again; that day, Teva raised its list (WAC) prices. Green had moved on to work at Zydus starting in November 2013, so by the time Mylan raised its list (WAC) prices on November 5, Green was no longer at Teva. But in the last days of October— before departing Teva and days before the Mylan increase—Green again spoke with Nesta.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**49.** **Valsartan HCTZ**

681.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Valsartan HCTZ tablets beginning at least as early as September 2012.

682.     Valsartan HCTZ, also known by the brand name Diovan, is a medication used to treat high blood pressure.

683.     During the relevant time frame, Defendants Sandoz and Mylan were the primary manufacturers of Valsartan HCTZ.

684.     Mylan was the first to file an ANDA to market the generic Valsartan HCTZ – which, if approved, would give Mylan 180 days of generic exclusivity. Sandoz manufactured the authorized generic.  This meant that Sandoz and Mylan would be the only two manufacturers of the generic version of the drug for six months.

685.     Mylan and Sandoz both launched Valsartan HCTZ on September 21, 2012.  Prior to the launch, D.L., a Director of National Accounts at Sandoz, and Nesta of Mylan spoke numerous times by phone and discussed, among other things, avoiding price competition for customers in the Valsartan HCTZ market. They agreed to split the market 50/50.

686.     Sandoz's Kellum was kept in the loop about the agreement with Nesta.

687.     On September 21, 2012, a Sandoz employee remarked in an email on news of Mylan's FDA approval for Valsartan HCTZ: "Fyi, good news, Mylan has 180 days as expected." A Sandoz executive in Germany responded, ". . . sometimes a little help from our competition is welcome as well." D.D., the President and CEO of Sandoz North America replied: "**I guess this what they call co-opetition.**"

688.     Shortly after Mylan entered the market, a large wholesaler contacted Sandoz to ask for better prices on Valsartan HCTZ.   Sandoz refused. Kellum at Sandoz continued to

monitor the agreement and to make sure that Sandoz was not taking more than its Fair Share. He explained to colleagues: "I'm concerned we are going to disrupt the market. I understand the need for additional sales but we need to be thoughtful here." A directive went out to the Sandoz sales personnel: "Do not approach new customers" without prior approval from the executives.

## 50.   Diclofenac Potassium

689.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Diclofenac Potassium beginning at least as early as October 2012.

690.    Diclofenac Potassium, also known by the brand name Cataflam, among others, is a non-steroidal anti-inflammatory drug (NSAID) used to relieve pain and swelling.

691.    During the relevant time frame, Defendants Teva, Mylan and Sandoz were the primary manufacturers of Diclofenac Potassium.

692.    The market for Diclofenac Potassium tablets was mature and at all relevant times had multiple manufacturers.

693.    For years, the prices for Diclofenac Potassium tablets were relatively low and stable. In late 2012, however, Mylan, Teva and Sandoz began a series of coordinated price increases that resulted in list (WAC) prices nearly double the prior levels, and NSP prices that were many multiples of the former prices.

694.    The list price and NSP price charts below show the sustained price increases imposed by Mylan, Teva and Sandoz. ████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

695.    Throughout this period, Mylan, Teva and Sandoz met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Diclofenac tablets and their Fair Share agreement.

696.    For example, on August 9, 2013, Teva raised its list price on Diclofenac Potassium to match that of Mylan.  Over the previous months, Teva had been raising its prices to customers (NSP prices) but had not yet raised its list price.

697.    As with numerous other drugs during this period, Teva coordinated with Mylan and Sandoz before announcing a price increase. For example, Green (Teva) spoke to Nesta (Mylan) on August 1 (two times), August 2, August 6 (three times), and August 8 (three times), 2013. The day before the price increase went into effect – August 8, 2013, Patel called Nesta of Mylan twice and also called a contact at Sandoz.

698.    On August 28, 2014, Teva again raised list prices on Diclofenac Potassium tablets. This time it was the first manufacturer to increase prices. Leading up to the price increase, Patel and Rekenthaler were communicating with Mylan and Sandoz to coordinate.  For example, Rekenthaler spoke to Nesta on August 4, 7, 11 (2 calls), 18 (2 calls), and 21. Patel spoke to a contact at Sandoz on August 11, 26, 27 (2 calls), and 28, 2014.

699.    The coordination worked. Sandoz followed Teva's price increases on Diclofenac Potassium tablets and announced an identical list price approximately 6 weeks later.  Mylan followed, also matching Teva and Sandoz's list prices, on March 4, 2015. Rekenthaler coordinated with Nesta of Mylan during two phone calls on February 18 and one call on February 19, 2015.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 51. **Ketorolac Tromethamine**

700.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Ketorolac Tromethamine tablets beginning at least as early as October 2012.

701.    Ketorolac Tromethamine, also known by the brand name Toradol, is a nonsteroidal anti-inflammatory drug (NSAID) indicated for the short-term management of moderately severe acute pain.

702.    During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Ketorolac Tromethamine.

703.    The market for Ketorolac Tromethamine tablets was mature and at all relevant times had multiple manufacturers.

704.    For years, the prices of Ketorolac Tromethamine tablets were relatively low and stable. As with numerous other drugs during manufactured by Teva and Mylan, things changed in mid-2012, when those manufacturers began to implement coordinated and sustained price increases. Over the course of their conspiratorial price increases, Teva and Mylan prices skyrocketed. List (WAC) prices for Ketorolac Tromethamine tablets more than doubled and NSP prices ████████████████ These extraordinary price increases were only possible because of Teva and Mylan's agreement to fix prices and to abide by the Fair Share agreement.

705.    The list (WAC) price chart and NSP price chart below highlight the parallel price increases by Teva and Mylan for Ketorolac Tromethamine tablets. ██████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

706.    Throughout this period, Teva and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Ketorolac Tromethamine tablets and their Fair Share agreement.

707.    Throughout 2012, 2013 and 2014, Teva and Mylan were in regular communication for the purposes of fixing the prices of generic drugs, including Ketorolac Tromethamine. For example, Teva's Green and Mylan's Nesta spoke many times by phone in 2012 and 2013. In 2014, Teva's Reckenthaler stepped in for Green and communicated directly with Nesta to work out pricing and Fair Share for Ketorolac Tromethamine and other drugs.

### 52.    Prazosin HCL

708.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Prazosin HCL capsules beginning at least as early as October 2012.

709.    Prazosin HCL, also known by the brand name Minipress, is a medication used to treat high blood pressure.

710.    During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Prazosin HCL capsules.

711.    The market for Prazosin HCL capsules was mature and at all relevant times had multiple manufacturers.

712.    The NSP price chart and list (WAC) price chart below show the parallel and increased pricing by Teva and Mylan. Note: Prazosin capsules come in 1, 2 and 5 mg dosages, each of which exhibited similar pricing patterns. Charts for only the 2 mg dosage is included here. ███████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

713.     Throughout this period, Teva and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Prazosin HCL capsules and their Fair Share agreement.

714.     For example, Teva had been charging lower prices than Mylan throughout most of 2011 and 2012. In the second half of 2012, during which time Teva and Mylan were in regular phone communication, Teva moved its prices closer to those of Mylan.

715.     Once Teva had brought its prices closer to Mylan, it almost immediately began to plan bigger price increases, and continued its communications with Mylan to coordinate. For example, on July 3, 2013, Teva more than doubled its list (WAC) prices for Prazosin HCL capsules. To coordinate the increase, Teva's Green spoke with Mylan's Nesta numerous times, including at least in May, June, July and August of 2013.

716.     Teva and Mylan continued to coordinate Prazosin HCL price increases in 2014. Since Green had moved on from Teva, Reckenthaler picked up the communication and had numerous calls with Mylan's Nesta between May and August 2014, during which they agreed to additional price increases for Prazosin, among other drugs.  On August 28, 2014, once Teva had collected information about Mylan's customer contract price points, Teva matched Mylan's increase on Prazosin HCL capsules.

717.     On March 4, 2015, Mylan again increased Prazosin HCL capsule list (WAC) prices and again, Teva and Mylan coordinated. Nesta and Rekenthaler spoke on February 18 (2 calls) and 19, 2015.

718.     In April 2015, Teva ███████████████ a Prazosin HCL opportunity at a large customer because ███████████████████

719.     Teva matched Mylan's price increase in July 2015.

### 53.   **Methylphenidate**

720.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Methylphenidate regular tablets beginning at least as early as January 2013.

721.    Methylphenidate, also known by the brand name Ritalin, among others, and is a medication used to treat attention deficit hyperactivity disorder (ADHD).

722.    During the relevant time frame, Defendants Actavis, Sandoz, Mallinckrodt, Sun, Impax[15] and Par were the primary manufacturers of Methylphenidate.

723.    The market for Methylphenidate tablets was mature and at all relevant times had multiple manufacturers.

724.    For years, the prices of Methylphenidate tablets were relatively low and stable. Then, in March 2013, Mallinckrodt experienced supply disruptions. Although Mallinckrodt informed the market that it expected to have the supply disruptions resolved by May or June— and they, in fact, were resolved in that time frame—Sandoz, Sun, Mallinckrodt and Actavis used this shortage as an excuse to hike prices and to keep them high.

725.    Impax and Par, which joined the market later, chose not to offer lower prices to win market share. Instead, both entered at the same inflated prices of Sandoz, Sun, Mallinckrodt and Actavis. Impax announced identical list prices to the incumbent manufacturers, and although Par announced lower list prices, both Impax and Par ███████████████████████████████ ████████████████████████████████████████

726.    As word of Mallinckrodt's supply challenges became known in early 2013, ██████████████████████████████████████████████████████████████████████████

---

[15] The relevant entity at the time of market entry (May 2014) was Corepharma, which was acquired by Impax in October 2014.

███████████████████████████████████████████████

████████████████████ In March 2013, Sandoz announced list (WAC) prices for its Methylphenidate tablets that were approximately five times higher than its former prices.

727.    Within weeks, Actavis and Mallinckrodt followed Sandoz's list price increases. Sun, which was entering the market anew and would begin shipping product in May, also announced list prices nearly identical to those of Sandoz, Actavis and Mallinckrodt. With Mallinckrodt experiencing supply disruptions, and with Sandoz imposing a 500% price increase, Actavis and Sandoz had an incredible opportunity to win new customers by offering better pricing. Instead, they hewed to the Fair Share agreement and looked to sell less Methylphenidate, but to do so at much higher prices.

728.    Similarly, Impax and Par passed up the opportunity to rapidly win market share by competing on price. Instead, they stuck to their Fair Share. Impax announced

729.    The NSP price chart and list (WAC) price chart below show the steep and parallel price increases For Methylphenidate regular tablets imposed by Sandoz, Actavis and Mallinckrodt and which were joined by Sun, Impax and Par. Note: The pricing pattern for 5 mg, 10 mg and 20 mg dosages of Methylphenidate were highly similar. Charts for only the 10 mg dosage are included here. ███████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





**METHYLPHENIDATE HCL: TABLET 10 MG WAC PRICE**

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

730.    Throughout this period, Actavis, Sandoz, Par, Sun, Mallinckrodt and Impax met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Methylphenidate tablets and their Fair Share agreement.

731.    In the spring of 2013, Sandoz, Actavis and Mallinckrodt coordinated large price increases for Methylphenidate. During this period, they communicated with each other by phone a number of times. For example, C.B., Director of National Accounts at Sandoz, communicated by phone (text and/or voice) with W.K. Vice President and General Manager at Mallinckrodt (and former colleague of C.B. at Sandoz), on March 1, 4, 5 and 8. On March 8, the last day in this sequence of communications between Sandoz and Mallinckrodt, Sandoz announced its list (WAC) price increases for Methylphenidate.

732.    On April 22, A.G., Actavis Director of National Accounts, spoke to D.P., Sandoz VP of Institutional Sales, for approximately 21 minutes. Four days later, on April 25, Actavis followed Sandoz and announced identical list (WAC) prices for Methylphenidate.

733.    April 23, 2013—two days *before* Actavis announced its list (WAC) price increase, S.K., Sun's Senior Manager of Sales, updated her boss, G.S., President of Sun: ███████

████████████████████████████████████████████████████

███████████████████████

734.    On May 1, less than a week after Actavis followed Sandoz's price increase, Sun's prescience proved correct: Mallinckrodt also announced list (WAC) price increases identical to those of Sandoz and Actavis. The next day, C.B. at Sandoz spoke to K.K., Mallinckrodt's National Account Director (and another of C.B.'s former Sandoz colleagues).

735.    In April and May 2014, when Impax/Corepharma was entering the market, C.B. (Sandoz) was again in phone contact with Mallinckrodt's K.K (May 2) and with Actavis's A.G.,

Director of National Accounts (April 7). Actavis's A.B., SVP of Sales, was in contact with Mallinckrodt's W.K. (April 2, 3 and May 16). Actavis's A.B. was also in touch with Sun's J.M., National Account Manager, on June 6 and 25.

736.    The next summer (2015), when Par entered the market, Sun's J.M. communicated directly with Par. She spoke to G.B., Par VP of National Accounts, on May 20 and with K.O., Par's VP of National Accounts, on July 10, 2015. Par's G.B. also spoke to Sun's S.S., Senior Director of Sales, on May 21.

### **54.    Spironolactone HCTZ**

737.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Spironolactone HCTZ tablets beginning at least as early as January 2013.

738.    Spironolactone HCTZ, also known by the brand name Aldactazide, is a medication used to treat high blood pressure.

739.    During the relevant time frame, Defendants Mylan, Sun and Greenstone were the primary manufacturers of Spironolactone HCTZ.

740.    The market for Spironolactone HCTZ tablets was mature and at all relevant times had multiple manufacturers.

741.    After years of relatively low and stable pricing, in early 2013 the prices of Spironolactone HCTZ radically increased. Within approximately one month, Mylan, Sun and Greenstone each announced list price increases of approximately 400%.  Their NSP prices ████ ████████████ as customers were forced to pay much higher price.

742.    A little more than a year later, in the summer of 2014, all three manufacturers again raised prices. Almost simultaneously, Mylan, Sun and Greenstone ███████████████ ██████████████████████

743.   The price charts below show the very large and parallel price increases for Spironolactone HCTZ by Mylan, Sun and Greenstone. ████████████████





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

744.    Throughout this period, Mylan, Sun and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Spironolactone HCTZ tablets and their Fair Share agreement.

745.    For example, Greenstone, Mylan and Sun all sent representatives to the GPhA Annual Meeting in Orlando, Florida on February 20 to 22, 2013. All three companies also attended the NACDS 2013 Annual Meeting at the Sands Expo Convention Center in Palm Beach, Florida on April 20 to 23, 2013. During this window of time, all three manufacturers announced list (WAC) price increases of more than 400%.

746.    These companies also communicated directly with each other. For example, Mylan's Nesta was in frequent contact with Greenstone during the period in which the two companies coordinated pricing on Spironolactone HCTZ. He exchanged hundreds of telephone calls or text messages with Greenstone's R.H. from 2011 through 2014, and dozens of phone calls or texts with Greenstone's Nailor between December 2012 and November 2015.

### 55.    Bromocriptine Mesylate

747.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Bromocriptine Mesylate tablets beginning at least as early as February 2013.

748.    Bromocriptine Mesylate, also known by the brand name Parlodel, is a medication used to treat certain conditions caused by a hormone imbalance.

749.    During the relevant time frame, Defendants Mylan, Sandoz and Perrigo were the primary manufacturers of Bromocriptine Mesylate tablets.

750.    The market for Bromocriptine Mesylate tablets was mature and at all relevant times had multiple manufacturers.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

751.    For years the prices of Bromocriptine Mesylate tablets were relatively low and stable. In early 2013, however, things changed. Mylan was experiencing supply challenges. It did not exit the market, but reduced sales. Sandoz used this as an opportunity to more than triple its prices. Mylan promptly followed Sandoz's prices up. Perrigo did not immediately follow the price increases, but instead steadily and slowly raised prices over time.

752.    Throughout the period, however, all three manufacturers adhered to Fair Share principals. Sandoz and Perrigo had very close to equal unit sales of Bromocriptine Mesylate tablets throughout this period. Although Perrigo should have been able to gain much more share with lower prices, it stuck to its Fair Share.

753.    For example, Sandoz analyzed the market in an internal July 2013 document.

754.    The Fair Share agreement continued to dictate the behavior of Sandoz, Perrigo and Mylan in 2014. In an April internal analysis,

755.    The NSP price chart below shows the large and sustained price increases by Mylan, Perrigo and Sandoz for Bromocriptine Mesylate tablets.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



756.    Throughout this period, Sandoz, Mylan and Perrigo met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Bromocriptine Mesylate tablets and of their Fair Share agreement.

757.    For example, as Sandoz, Mylan and Perrigo coordinated pricing for Bromocriptine, they communicated directly by phone. Mylan's Jim Nesta communicated with D.L., Director of National Accounts at Sandoz, on March 4 and 11; May 8, 13 and, 29; June 13; and July 16 and 19, 2013. Another Sandoz Director of National Accounts, C.B., communicated with Perrigo's National Account Director, A.F., on July 16, 17, 18, 2013.

### **56.    Budesonide**

758.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Budesonide inhalation suspension and delayed release ("DR") capsules beginning at least as early as February 2013.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

759.     Budesonide, also known by the brand name Pulmicort, among others, is a corticosteroid medication. The inhaled form is used in the long-term management of asthma and chronic obstructive pulmonary disease (COPD).  The pills in a delayed release form may be used for inflammatory bowel disease including Crohn's disease, ulcerative colitis and microscopic colitis.

760.     During the relevant time frame, Defendants Teva, Actavis and Sandoz were the primary manufacturers of Budesonide inhalation. Teva, Mylan and Par were the primary manufacturers of Budesonide DR capsules.

**<u>Budesonide Inhalation Suspension</u>**

761.     As of February 2013, Teva was the only company in the market for generic Budesonide Inhalation Suspension. Teva knew, however, that there was a good chance that Actavis would soon be entering the market, followed by others. In anticipation of needing to cede market share to the new entrants, Teva pre-emptively decided to raise prices, so that when it eventually ceded share it would not lose as much dollar revenue.

762.      Teva raised the list price for its Budesonide Inhalation Suspension by 9%. Although a very modest increase in percentage terms, the 9% price increase added millions to Teva's annual revenues.

763.     On April 1, 2013, Actavis won a legal challenge that would enable it to enter the market. That day, Teva's Rekenthaler called A.B., his counterpart at Actavis – a senior sales and marketing executive – and they spoke for two (2) minutes.

764.     The next day, April 2, 2013, Rekenthaler spoke to A.B of Actavis two more times. Actavis then immediately began shipping the product. Instead of offering better prices to win over customers, Actavis entered the market with the same list (WAC) price as Teva.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

765.     At some point thereafter, further legal action from the brand manufacturer delayed Actavis (or any other manufacturer) from fully entering the market until February 2015. As Actavis was (again) preparing to ramp up sales of Budesonide, Teva's Rekenthaler and Falkin of Actavis were communicating by phone to coordinate Actavis's entry into the market and the ceding of market share to Actavis by Teva.

766.     A few months later, Sandoz was the next to enter the market. The same pattern held. Rather than compete for customers with better prices, Sandoz announced identical WAC prices to those of Teva and Actavis. Owing to their Fair Share agreement, Sandoz was able to gain market share as Teva ceded customers to it.

**Budesonide DR Capsules**

767.     Teva was preparing to enter the market for Budesonide DR in the spring of 2014. At the time, Par and Mylan were the only other manufacturers in the market.

768.     Just as Teva had done in anticipation of Actavis's entry into the Budesonide Inhalation market, shortly before Teva entered the Budesonide DR market, Par increased the price of the drug.

769.     As Teva was preparing to enter the market, and as Par was raising prices, all three manufacturers were communicating with each other by phone. Teva's Rekenthaler was in touch with a senior national account executive at Par and with Nesta at Mylan. Meanwhile, another account executive at Par was in touch with a counterpart at Mylan.

### 57.     Fenofibrate

770.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Fenofibrate tablets (48 mg and 145 mg) beginning at least as early as March 2013.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

771.    Fenofibrate, also known by the brand name Tricor, is a medication used to treat cholesterol conditions.

772.    During the relevant time frame, Defendants Teva, Lupin, Perrigo and Mylan were the primary manufacturers of Fenofibrate. Defendant Zydus joined the Fenofibrate market and the Fenofibrate conspiracy in February 2014.

773.    Initially, Teva and Lupin were the first major suppliers of generic Fenofibrate 48 mg and 145 mg tablets. Perrigo and Mylan joined the market not long after. In order to keep prices high, the Fenofibrate manufacturers coordinated pricing and market share.

774.    For example, in early 2013, Teva's Green called Mylan's Nesta to find out more about Mylan's plans with Fenofibrate. Green reported back to his Teva colleagues that Mylan planned to launch Fenofibrate 48 mg and 145 mg sometime around November 2013.

775.    A few months later in 2013, however, Teva learned that Mylan was moving up its launch date for Fenofibrate. In advance of this launch, Teva, Lupin, Mylan and Perrigo conspired to allocate the market for Fenofibrate.

776.    For example, executives for Teva, Mylan, and Lupin were in regular contact by phone. Patel (Teva) spoke to Berthold (Lupin) on May 6 and 7, and Green (Teva) spoke to Berthold on May 6 and 9, 2013. Further, Green spoke to Nesta (Mylan) on May 7, 8, and 9, 2013.  And Nesta spoke to Berthold on May 7 and 8, 2013. On these calls, Teva, Mylan, and Lupin executives shared information about Mylan's Fenofibrate launch and the plan to allocate market share to Mylan.

777.    All of the coordination had real effects. For example, Teva decided to concede one of its largest customers to Mylan so that Mylan could obtain a Fair Share of the market and thus avoid price competition.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

778.     Similarly, in February 2014, Zydus was preparing to enter the Fenofibrate market. Green, formerly at Teva but now at Zydus, colluded with Teva's Patel and Rekenthaler, Mylan's Nesta, and Lupin's Berthold to share pricing information and allocate market share to his new employer, Zydus. Mylan's Nesta spoke to T.P., Perrigo's Director of National Accounts, on February 6, 2014.

779.     In March 2014, when Zydus entered the Fenofibrate market, it announced list prices that matched Teva, Mylan, and Lupin.  In the days leading up to the launch, executives from all four competitors were in regular contact with each other to discuss pricing and allocating market share to Zydus.  Between March 3 and March 7, these competitors exchanged at least 26 calls with each other.

780.     In the months that followed, Teva "strategically conceded" several customers to Zydus in accordance with the agreement they had reached. Throughout, Teva communicated directly with competitors to keep them apprised of developments and to ensure that Fair Share was maintained for Fenofibrate. For example, Patel continued to communicate directly with Berthold (Lupin) and Green (Zydus) in May and June.

781.     By coordinating prices and market share, Teva, Mylan, Lupin, Perrigo and Zydus were able to keep Fenofibrate prices higher than they would have been in a competitive market.

## 58.     Medroxyprogesterone

782.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Medroxyprogesterone tablets beginning at least as early as March 2013.

783.     Medroxyprogesterone, also known by the brand name Provera, among others, is a medication used to treat amenorrhea (unusual stopping of menstrual periods) and abnormal uterine bleeding.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

784.    During the relevant time frame, Defendants Teva and Greenstone were the primary manufacturers of Medroxyprogesterone tablets.

785.    In early 2013, Teva and Greenstone began planning to increase the prices of Medroxyprogesterone tablets. Teva's Patel and R.H., Director of National Accounts at Greenstone, communicated frequently to orchestrate the price increases. For example, they exchanged six (6) text messages on November 16, 2013 and spoke by phone on November 23, 2013.

786.    Not long after Greenstone had been communicating with Teva, a Greenstone executive informed Pfizer, its parent company, about the price increase proposal. Pfizer granted approval for the price increases on November 22, 2013, and the next day, Patel communicated with R.H. at Greenstone.  Patel also spoke to R.H. three times on December 2, 2013, the day Greenstone planned to send price increase notices to its customers.

787.    After the price increases, Teva and Greenstone were careful to maintain Fair Shares of the market.

### <u>59.</u>    <u>Alclometasone Dipropionate</u>

788.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Alclometasone Dipropionate cream and ointment beginning at least as early as April 2013.

789.    Alclometasone Dipropionate, also known by the brand name Alcovate, is a medication used to treat the inflammation and itching caused by a number of skin conditions such as allergic reactions, eczema, and psoriasis.

790.    During the relevant time frame, Defendants Sandoz, Taro, and Glenmark were the primary manufacturers of Alclometasone Dipropionate.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

791.     The market for Alclometasone cream and ointment was mature and at all relevant times had multiple manufacturers.

792.     After years of relatively low pricing, the prices of Alclometasone Dipropionate cream and ointment sold by Glenmark, Taro and Sandoz leaped to approximately three times their former prices.

793.     By sticking to their Fair Share agreement, Glenmark, Taro and Sandoz were able to impose and sustain higher prices for Alclometasone Dipropionate. For example, in May 2013, after Glenmark raised its prices, one of Glenmark's large customers solicited bids on Alclometasone Dipropionate from Taro, seeking a better price. ████████████████████ ████████████████████████████████████████████████████ ████████████████████ The reason was their Fair Share agreement, not inadequate supply.

794.     The following NSP price charts show the sudden, parallel and large price increases by Glenmark, Taro and Sandoz on Alclometasone Dipropionate cream and ointment. ████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

795.    Throughout this period, Glenmark, Sandoz and Taro met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Alclometasone Dipropionate cream and ointment and of their Fair Share agreement.

796.    As Sandoz, Taro and Glenmark began to raise prices in May 2013 continuing through the summer, all three companies were communicating.  For example, D.S., AVP of Sales at Taro, and M.B., VP of Sales and Marketing at Glenmark (and a former Taro employee), spoke on May 5 for approximately 21 minutes and twice on May 31 for three minutes and approximately 19 minutes.  Glenmark's M.B. also communicated by phone with Taro's Aprahamian on August 15, 20 and 21.

797.    D.S. at Taro also communicated with Sandoz that month.  He spoke with D.L., a Director of National Accounts at Sandoz, on May 16 for approximately 22 minutes, and the two communicated by phone the next day as well. They communicated again in July and August.

798.    By the end of the summer, and after the series of communications between Sandoz, Taro and Glenmark, each manufacturer had approximately ▬ their prices for Alclometasone Dipropionate.

### 60.    Carbamazepine

799.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Carbamazepine extended release ("ER") tablets, regular tablets and chewable tablets beginning at least as early as April 2013.

800.    Carbamazepine, also known by the brand name Tegretol, among others, is an anticonvulsant medication used to treat trigeminal neuralgia.

801.    During the relevant time frame, Taro and Sandoz were the primary manufacturers of Carbamazepine ER tablets; Taro, Teva, Apotex and Torrent were the primary manufacturers

of regular Carbamazepine tablets; and Taro, Teva and Torrent were the primary manufacturers of Carbamazepine chewable tablets.

802.    The markets for Carbamazepine ER tablets, regular tablets and chewable tablets were mature and at all relevant times had multiple manufacturers.

803.    The prices for Carbamazepine tablets were relatively low and stable for years. Taro, which marketed and sold three types of Carbamazepine tablets—ER, regular and chewable—led coordinated price increases on each of those products beginning in the spring of 2013.

804.    Taro and Sandoz were the primary manufacturers of Carbamazepine ER tablets. In May 2013, Taro and Sandoz virtually simultaneously began to increase their prices. They announced identical list (WAC) prices, and immediately ███████████████████████████ They continued to raise prices over the next few years, and maintained relatively stable market shares. Prices remain high even today.

805.    In the spring and early summer of 2014, Taro imposed a second price increase on Carbamazepine ER tablets, that Sandoz quickly followed. During the same period, Taro also led price increases on the other two Carbamazepine products that it sold, regular tablets and chewable tablets. In June, Taro announced list (WAC) price increases on all of its Carbamazepine tablets. Over the following three months, Apotex, Teva and Torrent announced increased list prices that were identical to Taro's new prices. ███████████████████████ ██ The increases were breathtakingly large, more than 20 times the former prices in some instances.

806.    Taro, Teva, Sandoz, Apotex and Torrent monitored and abided by the Fair Share agreement and worked together to keep prices high. For example, a March 2014 internal Taro

analysis of the Carbamazepine chewable tablet market acknowledged that ████████████

████████████

807.    The NSP price chart and the list (WAC) price chart below show the parallel

pricing by Taro and Sandoz for Carbamazepine ER tablets. Note: The pricing patterns for 200

mg and 400 mg ER tablets were very similar. Charts for only the 200 mg dosage are included

here. ████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



808.    The NSP price chart and the list (WAC) price chart below show the abrupt and large parallel price increases by Taro, Apotex, Teva and Torrent for Carbamazepine regular tablets.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



809.    The NSP price chart and the list (WAC) price chart below show the large parallel

price increases by Taro, Teva and Torrent for Carbamazepine chewable tablets.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



810.    Throughout this period, Taro, Sandoz, Teva, Apotex and Torrent met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Carbamazepine and of their Fair Share agreement.

811.    For example, in May 2013, when Taro and Sandoz each announced list (WAC) price increases for Carbamazepine ER tablets, Taro's D.S., AVP of National Accounts, spoke to D.L., a Director of National Accounts at Sandoz, on May 16 and 17.

812.    The next summer, on June 3, 2014, Taro increased prices on all three of its Carbamazepine products (ER tablets, regular tablets and chewable tablets). Before the increases were implemented, Teva's Patel exchanged eight text messages and a phone call with Taro's Aprahamian on May 14, 2014.  After speaking with Aprahamian, Patel directed a colleague to create a list of future price increase candidates, based on her instructions.  That list included Carbamazepine with the notation "Follow/Urgent." On the day of the Taro price increases, Patel and Aprahamian communicated several times. A couple days later (June 5), Teva's Rekenthaler

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and J.H., SVP and General Manager at Apotex, communicated by text message, and spoke for approximately 8 minutes on June 17.

813.    Apotex announced its Carbamazepine list (WAC) price increases on July 14. J.H at Apotex and Rekenthaler spoke again before the increase (July 3) and after (July 15). Teva's Patel was again in touch with Taro's Aprahamian that month. The two spoke for approximately 21 minutes on July 29.

814.    On August 27, 2014, Patel and Aprahamian spoke yet again. The next day, August 28, Teva announced list (WAC) price increases on its Carbamazepine products.

815.    On September 11, 2014—the day before Torrent announced list (WAC) price increases on Carbamazepine—T.C., Teva Senior Director of Sales and K.G., Torrent VP of Sales, communicated by phone.

816.    Teva's Patel and Taro's Aprahamian next spoke on September 12, the same day that Torrent announced list (WAC) price increases for its Carbamazepine products. Apotex's J.H. also was in touch with Teva that month. He spoke to Rekenthaler on September 8, 10, 25 and 27. He also spoke to Maureen Cavanaugh, Teva's SVP of Sales and Marketing, on September 18 for approximately 17 minutes.

### **61.    Cefdinir**

### **62.    Cefprozil**

817.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Cefdinir capsules and oral suspension and Cefprozil tablets beginning at least as early as April 2013.

818.    Cefdinir and Cefprozil are medications used to treat bacterial infections.

819.    During the relevant time frame, Defendants Teva, Sandoz and Lupin were the primary manufacturers of Cefdinir capsules and oral suspension and Cefprozil tablets.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

820.    Not long after Patel started at Teva, she sent her first list of proposed price increases to her supervisor on May 24, 2013.  The list included Cefdinir oral suspension and capsules and Cefprozil tablets.

821.    Patel communicated with competitors to coordinate the proposed price increases. For example, Patel spoke to Berthold of Lupin six (6) times on May 16, two (2) times on May 17, once on May 20, once on May 21, and three (3) times on May 23, 2013.

822.     By summer, Teva and Lupin had raised prices on Cefdinir and Cefprozil, as agreed. Patel and Reckenthaler at Teva also communicated with contacts at Sandoz, which joined the price-fixing agreement on Cefdinir and Cefprozil.

### 63.    Cholestyramine

823.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Cholestyramine oral powder and oral solid beginning at least as early as April 2013.

824.    Cholestyramine, also known by the brand name Prevalite, is a medication used to lower high cholesterol levels in the blood.

825.    During the relevant time frame, Defendants Sandoz, Par, and Upsher-Smith were the primary manufacturers of Cholestyramine.

826.    The market for Cholestyramine was mature and at all relevant times had multiple manufacturers.

827.    For years, the prices for Cholestyramine were relatively low and stable. Then, in the space of a few months during the summer of 2013, Upsher-Smith, Sandoz and Par all implemented large and very similar price increases in very close succession. The manufacturers all had different list prices for Cholestyramine before the summer, but by the end, they all had

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

identical list prices that were much higher than before. Their NSP prices ███████████

████████████████

828.    The list (WAC) price charts and NSP price charts below show the sudden, steep, large and sustained price increases imposed by Par, Sandoz and Upsher-Smith on Cholestyramine. ████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





**CHOLESTYRAMINE: ORAL POWDER 4 GM/DOSE WAC PRICE**

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



829.    Throughout this period, Par, Sandoz and Upsher-Smith met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Cholestyramine and of their Fair Share agreement.

830.    For example, D.Z., Upsher-Smith Senior National Account Manager, and C.B., Sandoz Director of National Accounts, spoke briefly on May 29, 2013. Upsher-Smith announced its list (WAC) price increase on June 7, 2013.

831.    Shortly after raising prices, Upsher-Smith reached out directly to Par. On June 20, 2013, C.O., Upsher-Smith's Director of Strategic Generic Portfolio and Marketing, spoke twice to K.O., Par's VP of National Accounts. The two spoke again on June 25.

832.    On July 16, Upsher-Smith's M.M., National Account Manager, spoke to Sandoz's C.B. for approximately 14 minutes. Ten days later, on July 26, 2013, Sandoz announced its list (WAC) price increase on Cholestyramine. A few days later, on July 29, Upsher-Smith's C.O. and Par's K.O. spoke again for nearly 20 minutes.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

833.    Par followed the list (WAC) price increase on August 27, 2013. On September 5, K.O. at Par again spoke to C.O. at Upsher-Smith for nearly 22 minutes.

### 64.    Ciclopirox

834.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Ciclopirox dermatological liquid beginning at least as early as April 2013.

835.    Ciclopirox, also known by the brand name Loprox, among others, is a medication used to treat infections caused by fungus.

836.    During the relevant timeframe, Defendants Akorn, Perrigo and G&W were the primary manufacturers of Ciclopirox.

837.    The market for Ciclopirox was mature and at all relevant times had multiple manufacturers.

838.    For years, the prices of Ciclopirox were relatively low and stable. In the spring of 2013, things changed. Akorn and G&W prices ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████

839.    Notwithstanding the enormous shifts in pricing, each manufacturer's share of the market remained relatively stable, as contemplated by the Fair Share agreement.

840.    The NSP price chart below shows the large and parallel price increases by Akorn, G&W and Perrigo and that prices remain elevated through the present. ████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



841.    Throughout this period, Akorn, G&W and Perrigo met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Ciclopirox and of their Fair Share agreement.

842.    For example, Akorn, G&W and Perrigo all sent representatives to the GPhA Annual Meeting in Orlando, Florida on February 20 to 22, 2013. All three companies also attended the NACDS 2013 Annual Meeting at the Sands Expo Convention Center in Palm Beach, Florida on April 20 to 23, 2013. Shortly after these meetings, each manufacturer's prices for Ciclopirox skyrocketed.

843.    In addition, T.P., Perrigo Director of National Accounts, and E.V., G&W VP of Sales, communicated by phone multiple times in July and August 2013. In the midst of these communications, Perrigo announced its list (WAC) price increase for Ciclopirox on August 1, 2013.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 65.    Drospirenone and Ethinyl Estradiol

844.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Drospirenone and Ethinyl Estradiol beginning at least as early as April 2013.

845.    Drospirenone and Ethinyl Estradiol, commonly known by the brand name Ocella, is an oral contraceptive.

846.    During the relevant time frame, Defendants Teva, Lupin and Actavis were the primary manufacturers of Drospirenone and Ethinyl Estradiol.

847.    In early 2013, Lupin was planning to enter the market. Rather than strategize on how to gain market share through competition, Lupin contacted Teva to reach an agreement on pricing and market share. In late April, Berthold (Lupin) and Green (Teva) spoke multiple times.

848.    Communications between Teva and Lupin eventually looped in Actavis. For example, Rekenthaler and Patel each spoke with a senior sales and marketing executive at Actavis on April 30, and the next day Patel exchanged a number of text messages with him as well.

849.    Throughout May, intense communications among the competitors continued as they worked out the details of their agreement. On May 6, Patel and Berthold spoke twice by phone. Green and Berthold also spoke that same day.  On May 7, Patel and Berthold had yet another call.  Patel also placed a call to Rogerson at Actavis. Patel again spoke to Rogerson on May 8. And on May 9, Green again spoke with Berthold twice. On May 10, Patel spoke to Berthold three times, and also spoke to Rogerson again.

850.    In the wake of all of these communications, Teva agreed to concede business to Actavis in order to maintain higher prices for generic Ocella.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

851.   Communications continued through the summer. Numerous calls between Patel and Green at Teva and Berthold at Lupin took place, all aimed at orchestrating Lupin's acquisition of a Fair Share of the generic Ocella market, which they did.

### 66.   Tizanidine HCL

852.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Tizanidine HCL tablets beginning at least as early as April 2013.

853.   Tizanidine, also known by the brand name Zanaflex, is used to treat muscle spasticity due to spinal cord injury or multiple sclerosis.

854.   During the relevant time frame, Defendants Apotex, Dr. Reddy's, Mylan, Sandoz and Sun were the primary manufacturers of Tizanidine.

855.   The market for Tizanidine HCL tablets was mature and at all relevant times had multiple manufacturers.

856.   For years, the prices of Tizanidine HCL tablets were relatively low and stable. In the spring of 2013, however, all manufacturers began to impose very large price increases within weeks of each other. Between May 13 and July 2, 2013, Apotex, Dr. Reddy's, Mylan, Sandoz and Sun each announced a list (WAC) price increase. They each also began to increase NSP prices. Over the ensuing few months, every manufacturer imposed multi-fold increases in their NSP prices.

857.   The NSP price chart below highlights the abrupt and parallel price increases by Apotex, Dr. Reddy's, Mylan, Sandoz and Sun for Tizanidine HCL tablets. Note: 2 mg and 4 mg Tizanidine HCL tablets exhibited very similar pricing patterns. Only the 4 mg chart is included here. ████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



858.    Throughout this period, Apotex, Dr. Reddy's, Mylan, Sandoz and Sun met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Tizanidine HCL and of their Fair Share agreement.

859.    For example, On May 13, 2013—the day that Dr. Reddy's announced its new list (WAC) prices for Tizanidine—Mylan's Nesta called D.L., the Director of National Accounts at Sandoz, and they spoke for four (4) minutes.

860.    On May 24, 2013, Sandoz followed Dr. Reddy's list (WAC) price increases. In the days leading up to the Sandoz increase, Nesta of Mylan exchanged phone calls with D.L. at Sandoz and J.A., a Director of National Accounts at Dr. Reddy's, to coordinate the Tizanidine price increase.

861.    On May 29, 2013, a large customer called Sandoz and asked whether it wanted to submit a bid for Tizanidine.  After D.L., the Director of National Accounts at Sandoz, spoke to Nesta (Mylan) again, Sandoz decided not to submit a bid.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

862.    On June 11, 2013, V.B., Dr. Reddy Director of National Accounts, spoke to T.B., Apotex National Account Manager, for approximately 13 minutes.

863.    On June 14, 2013, a large wholesale customer e-mailed J.A., the Director of National Accounts at Dr. Reddy's asking "[d]id mylan follow your increase?" He responded, "We've heard they did." The Dr. Reddy's Director had learned of Mylan's intent to follow the price increase through his prior communications with Nesta. However, Mylan had not actually raised its price on Tizanidine at the time of the inquiry.

864.    On June 26, 2013, a large supermarket chain customer e-mailed Dr. Reddy's requesting a bid for Tizanidine. Dr. Reddy's decided not to go after additional market share. J.A. (Dr. Reddy's) and S.G., Sun Director of Marketing, communicated by phone two days later, on June 28. A few weeks later, the supermarket forwarded the same request to Sandoz, and Sandoz declined to submit a bid.

### 67.    Adapalene

865.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Adapalene gel beginning at least as early as May 2013.

866.    Adapalene, also known by the brand name Differin, is a medication used to treat acne.

867.    During the relevant time frame, Defendants Glenmark, Teva and Taro were the primary manufacturers of Adapalene.

868.    In May 2013, Teva, Taro and Glenmark wanted to fix, raise or stabilize the prices of Adapalene. Accordingly, the manufacturers engaged in a series of direct telephone communications to put their plan into action.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

869.    For example, Teva's Patel communicated multiple times with multiple contacts at Glenmark during May of 2013 to discuss price increases on Adapalene and other drugs. Patel also spoke with Taro's Aprahamian in May to coordinate the Adapalene price increase.

870.    The manufacturers were careful to maintain Fair Share as they implemented price increases. For example, internally, Teva closely monitored price requests from customers to make sure that no unintended shifts in market share occurred.

871.    Between May and July, 2013, Glenmark, Teva and Taro all increased prices on Adapalene.

### **68.    Captopril**

872.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Captopril tablets beginning at least as early as May 2013.

873.    Captopril, also known by the brand name Capoten, is an angiotensin-converting enzyme (ACE) inhibitor used for the treatment of hypertension and some types of congestive heart failure.

874.    During the relevant time frame, Defendants Mylan, West-Ward and Wockhardt were the primary manufacturers of Captopril.

875.    The market for Captopril was mature and at all relevant times had multiple manufacturers.

876.    For years, the prices for Captopril tablets were relatively low and stable. West-Ward was the dominant manufacturer in the market up until 2013, when it experienced supply disruptions and essentially exited the market. In the spring of 2013, as West-Ward exited, Mylan and Wockhardt imposed very large price increases. At first, only Mylan raised its list (WAC)

prices, but the NSP prices ██████████████████████████████████

██████████████████████████████████████████████████

877.    By spring of 2014, West-Ward was ready to re-enter the market. At the same time, Wockhardt was exiting the market, leaving only Mylan and West-Ward as the main Captopril suppliers. Rather than offer lower prices than Mylan to win back all of the market share it used to have, West-Ward instead announced—virtually simultaneously with Mylan—a large list (WAC) price *increase*. West-Ward's new list prices were identical to Mylan's and, for the 12.5 mg dosage, approximately ***100 times higher*** than they were before it had exited the market. (Other dosages were "only" 35 to 45 times higher.) Mylan and West-Ward list (WAC) and NSP prices have remained elevated ever since.

878.    Even with the higher prices, West-Ward quickly was able to build share. Although West-Ward had a smaller share of the market than it did before exiting, it was making a lot more money, albeit on a smaller volume of sales. For example, ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ The Fair Share agreement facilitated higher prices, which allowed each manufacturer to sell less, but make more money doing so.

879.    For Mylan, ██████████████████████████████████████

████████████████████████████████████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

███████████████████████████████████████████████████

███████████████████████████████████████████████████. The Fair Share

agreement worked as planned.

880.    The NSP price chart and list price chart below show the large and parallel price

increases by Mylan, Wockhardt and West-Ward for Captopril tablets. (Note: pricing for 12.5 mg,

25 mg, 50 mg and 100 mg tablets was very similar. Only the 50 mg charts are included here.)

███████████████████



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



881.    Throughout this period, Mylan, Wockhardt and West-Ward met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Captopril and of their Fair Share agreement.

882.    For example, Mylan's M.W., Director of National Accounts, communicated by phone with K.B., West-Ward National Account Manager, in March, April, June and July 2013, including on July 1, 2013. Mylan announced its first list (WAC) price increase for Captopril on July 2, 2013.

883.    Representatives from Wockhardt and West-Ward convened at the ECRM Retail Pharmacy Efficient Program Planning Session at the Omni Amelia Island Plantation Resort, in Amelia Island, Florida on February 23 to 26, 2014. In April, both companies announced large list (WAC) price increases on the heels of Mylan's second list price increase.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 69.    Diltiazem HCL

884.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Diltiazem HCL beginning at least as early as May 2013.

885.    Diltiazem HCL, also known by the brand name Cardizem, among others, is a medication to treat angina (severe chest pain) or hypertension (high blood pressure).

886.    During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Diltiazem HCL.

887.    The market for Diltiazem HCL tablets was mature and at all relevant times had multiple manufacturers.

888.    For years, the prices for Diltiazem HCL tablets were relatively low and stable. In the spring of 2013, however, Teva and Mylan imposed a series of coordinate price increases, first in mid-2013, then again in late 2014 and early 2015. By January 2015, Teva and Mylan list (WAC) prices ▮▮▮▮▮▮▮ were nearly three times higher than they were before the collusive price increases.

889.    The list (WAC) price chart and NSP price chart below show the two rounds of closely coordinated price increases for Diltiazem HCL tablets by Teva and Mylan. Prices have remained elevated through at least early 2019. Note: the pricing patterns for 30, 60, 90 and 120 mg tablets are highly similar. Charts for only the 120 mg dosage are included here. ▮▮▮

▮▮▮▮▮▮

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

890.    Throughout this period, Mylan and Teva met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Diltiazem HCL tablets and of their Fair Share agreement.

891.    For example, immediately after she began at Teva, Patel began to investigate Mylan drugs as a potential source for coordinated price increases. She asked her colleague, Kevin Green, to "gather as much market intelligence as possible" for certain, specific items, including Diltiazem HCL Tablets.

892.    On, May 7, 2013, Teva's Green spoke to Nesta at Mylan three times.  Green and Nesta also spoke a number of times over the next several days, including on May 8, May 9, and May 10, 2013.

893.    On May 14, 2013, Patel asked several Teva account managers, including Green, to obtain "price points" on certain drugs in preparation for a potential price increase. She indicated internally to another Teva colleague that she was expecting "additional Mylan intel" and that she was expecting Mylan "to take an additional increase" on those items.  On May 17, 2013, Green spoke to Nesta six times.

894.    Green communicated extensively with Mylan to coordinate the price increases. For example, on July 10, 2013, Green and Mylan's Nesta spoke twice. Shortly after the second call, Green called Patel, and the two spoke for just over seven (7) minutes.  The next day, on July 11, Nesta and Green exchanged several more calls.

895.    Patel and Green coordinated the increase with Mylan in the days and weeks leading up to the increase.  For example, Green spoke to Nesta (Mylan) twice on August 1, once on August 2 and three times on August 6.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

896.    The day before the price increase went into effect – August 8, 2013 – Patel had three calls with Nesta of Mylan, and on August 9, 2013, Teva raised prices on numerous drugs, including Diltiazem HCL.

### **70.    Doxazosin Mesylate**

897.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Doxazosin Mesylate beginning at least as early as May 2013.

898.    Doxazosin Mesylate, also known by the brand name Cardura, among others, is a medication used to treat high blood pressure.

899.    During the relevant time frame, Defendants Teva, Mylan, Apotex, and Par were the primary manufacturers of Doxazosin Mesylate. Greenstone joined the Doxazosin Mesylate market and the Doxazosin Mesylate conspiracy in August 2014.

900.    The market for Doxazosin Mesylate tablets was mature and at all relevant times had multiple manufacturers.

901.    For years, the prices for Doxazosin Mesylate tablets were relatively low and stable. In the spring of 2013, Teva, Mylan and Apotex were the dominant manufacturers. Within the space of approximately one month, all three of them dramatically increased Doxazosin prices. They announced much higher and virtually identical list (WAC) prices, ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮

902.    Par, which had been in the Doxazosin market but had effectively exited before the coordinated price increase by Teva, Mylan and Apotex, re-joined the market in early 2014. Rather than announce lower prices to win customers, it matched the elevated list (WAC) prices of Teva, Mylan and Apotex, ▮▮▮▮▮▮▮▮▮▮▮▮

903.    Similarly, when Greenstone joined the market in the summer of 2014, it too chose not to compete on price, but instead offered similar—and inflated—prices to those of Teva, Mylan, Apotex and Par.

904.    By adhering to the Fair Share agreement, all Doxazosin Mesylate manufacturers were able to keep prices higher than they would have been if they were competing for customers. For example, on May 4, 2012, Teva was approached by a large customer about Doxazosin. At the time, Mylan was the primary supplier for that customer. Rather than take this business, Teva decided that it "will need to be cautious" and was not interested in securing a long term customer at Mylan's expense.

905.    The list (WAC) price chart and NSP price chart below show the significant and parallel price increases imposed by the manufacturers of Doxazosin Mesylate tablets. Note: the pricing patterns for 1 mg, 2 mg, 4 mg and 8 mg tablets are highly similar. Charts for only the 4 mg dosage are included here.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



906.    Throughout this period, Teva, Mylan, Apotex, Par and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement for Doxazosin Mesylate tablets and of the Fair Share agreement.

907.    For example, in the spring and summer of 2013, Teva's Patel and Green communicated directly and frequently with competitors to coordinate price increases on numerous drugs, including Doxazosin Mesylate. Teva's Green spoke with Mylan's Nesta numerous times in May, June, July and August of 2013 to coordinate price increases for Doxazosin Mesylate tablets, among other drugs.

908.    Teva's Patel communicated directly with B.H. at Apotex on multiple occasions between May and August of 2013 for the express purpose of coordinating price increases, including for Doxazosin Mesylate. Mylan announced its list (WAC) price increase on July 2, 2013. Apotex raised its prices on July 23, 2013, and Teva followed in August.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

909.    Teva's Rekenthaler, for his part, was in contact with M.B, VP of National Accounts at Par, during this period. The two spoke on May 1 and 9, 2013. The two were in contact again in December and in February 2014. Par re-entered the market and raised its list (WAC) prices in January 2014.

910.    As Greenstone prepared to enter the market, Mylan's M.A., National Account Director, communicated by phone with R.H., Greenstone's Director of National Accounts. They spoke multiple times in April, again in June, and twice in July, 2014. When Greenstone finally launched its product in August 2014, rather than offer lower prices to win customers, it announced list (WAC) prices the same as the other companies that were party to the price-fixing and Fair Share agreement.

### **71.**    **Fluconazole**

911.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Fluconazole tablets beginning at least as early as May 2013.

912.    Fluconazole, also known by the brand name Diflucan, is a medication used to treat serious fungal or yeast infections.

913.    During the relevant time frame, Defendants Teva, Glenmark, and Greenstone were the primary manufacturers of Fluconazole. Citron and Dr. Reddy's joined the market and the Fluconazole price-fixing agreement in January 2014 and January 2015, respectively.

914.    For years, the prices of Fluconazole tablets were relatively low and stable. In the spring of 2013, however, Glenmark, Teva and Greenstone coordinated massive price increases on all dosages of Fluconazole tablets. With a very short window of time, all three manufacturers announced identical list (WAC) prices that were many times higher than they had ever been before. Their NSP prices ████████████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

915.    Citron and Dr. Reddy's, which entered the Fluconazole market after the price increases, were careful not to disrupt pricing, or to seek more than a Fair Share of the market; both announced list (WAC) prices identical to those of Glenmark, Teva and Greenstone.

916.    At the same time that Teva, Glenmark, Greenstone, Citron and Dr. Reddy's imposed high prices on Fluconazole tablets, they carefully monitored the market to ensure that each of them maintained a Fair Share.  For example, Teva was approached by several customers looking for lower prices than Glenmark was offering. Rather than seize the opportunity to grow its sales, Teva refused to bid on most of these solicitations in order to maintain market stability. And when it did provide a customer with a bid, Teva intentionally bid high to ensure that it would not win the business. For example, on May 17, 2013, Nisha Patel explained the strategy with a large wholesale purchaser to a Teva colleague: "IF we bid [on Fluconazole and Nabumetone], we need to bid high, or we will disturb the market."

917.    The NSP price chart and list (WAC) price chart below show the extraordinary Fluconazole price increases by Glenmark, Teva and Greenstone, and that Dr. Reddy's and Citron matched those inflated prices when they entered the market. Note: Fluconazole tablets come in 50 mg, 100 mg, 150 mg and 200 mg dosages, all of which exhibited similar pricing patterns. Charts for only the 150 mg dosage are included here. ████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

918.     Throughout this period, Teva, Glenmark, Greenstone, Dr. Reddy's and Citron met at trade conferences and spoke directly to each other in furtherance of their price-fixing agreement on Fluconazole and on the Fair Share agreement.

919.     For example, Teva's Patel had four calls with a contact at Glenmark on May 2, 2013, after which she sent an internal email where she identified six different "high priority" Glenmark drugs to add to the price increase list. Notably, Glenmark had not yet increased price on any of those drugs, nor had it sent any notices to customers indicating that it would be doing so. On May 16 and 17—immediately after Glenmark announced price increases—Patel again spoke to her contact at Glenmark.

920.     Teva's Patel also reached out to coordinate Fluconazole price increases with a contact at Greenstone. After speaking with a Greenstone National Account Manager by phone on May 28, 2013, Patel added Fluconazole to the Teva price increase list the next day.

921.     In early July 2013, when Teva announced its price increases, Patel again reached out to her contacts at Glenmark and Greenstone to solidify their agreement.

922.     As Citron was preparing to enter the market in late 2013 and early 2014, L.S., Citron VP of Sales, communicated with T.C., Teva Senior Director of Sales. The two communicated by phone multiple times in November and December 2013 and again in February 2014. In addition, K.S., Citron EVP of Sales, communicated by phone multiple times in March 2014 with Jim Grauso, Glenmark EVP.

923.     When Dr. Reddy's was entering the market, Teva's Patel again reached out to communicate. She was in phone contact (voice and text) with V.B., Dr. Reddy's VP of Sales, in June, July and August 2014.

**72.**    **Moexipril HCL**

**73.**    **Moexipril HCL HCTZ**

924.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Moexipril Hydrochloride and Moexipril HCL HCTZ tablets beginning at least as early as May 2013.

925.    Moexipril HCL ("Moexipril"), also known by the brand name Univasc, is part of a class of drugs called angiotensin-converting enzyme (ACE) inhibitors. It is used to treat high blood pressure by reducing the tightening of blood vessels, allowing blood to flow more readily and the heart to pump more efficiently.

926.    Moexipril HCL HCTZ ("Moexipril HCTZ") is a combination of Moexipril and Hydrochlorothiazide (a diuretic).  This combination is used to treat high blood pressure.

927.    During the relevant time frame, Defendants Teva and Glenmark were the primary manufacturers of Moexipril and Moexipril HCL HCTZ.

928.    As soon as Patel started at Teva, she began to identify price increase candidates through her conversations with various contacts at other drug manufacturers, including Glenmark. For example, Patel had four calls with an Executive Vice President of Glenmark on May 2, 2013.

929.    Shortly after one of those calls, Patel sent an internal e-mail where she identified six Glenmark drugs to add to the price increase list, including Moexipril and Moexipril HCTZ. Glenmark had not yet increased prices or announced price increases on any of those drugs.

930.    Patel also made efforts to ensure that Teva abided by the Fair Share agreement. On May 15, 2013, in anticipation of the Glenmark price increases that were not yet public, Patel instructed her Teva colleagues to alert her of any requests by customers for pricing relating to a number of Glenmark drugs, including Moexipril and Moexipril HCTZ. In accordance with the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Fair Share agreement, Patel wanted to be careful to avoid obtaining any market share from Glenmark after the price increases.

931.    Patel also spoke to the same Executive Vice President at Glenmark on May 16, 2013 – the day of the Glenmark price increases. Effective that day, Glenmark increased prices on numerous drugs also sold by Teva, including Moexipril and Moexipril HCTZ. Patel again spoke to the EVP as well as to an Associate Director of Sales and Marketing at Glenmark multiple times on May 17, 2013.

932.    After the Glenmark price increases, Teva was approached by several customers looking for lower prices. Teva declined the invitations in order to maintain Fair Shares and avoid price erosion. On occasions when it did provide a customer with a bid, Teva intentionally bid high so that it would not win the business.

933.    Teva, as agreed, soon followed the Glenmark price increases for Moexipril and Moexipril HCTZ tablets; Teva's increases went into effect on July 3, 2013. Thereafter, Teva and Glenmark monitored the Fair Share agreement and communicated as necessary to ensure that prices remained high.

934.    For example, on August 5, 2013, Teva learned that it had been underbid by Glenmark at one of its largest wholesaler customers. That same day, Patel called the Executive Vice President at Glenmark, to find out what was going on. They spoke three times that day. The following day – August 6, 2013 – Patel spoke to Jim Brown, the Vice President of Sales at Glenmark, two times. During these calls, Teva and Glenmark reaffirmed their prior agreement to maintain Fair Share and not to poach each other's customers after a price increase, and Glenmark withdrew its offer to Teva's customer.

74.   **Nabumetone**

935.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Nabumetone tablets beginning at least as early as May 2013.

936.   Nabumetone, also known by the brand name Relafen, is a nonsteroidal anti-inflammatory drug (NSAID) used to treat mild to moderate pain and help relieve symptoms of arthritis, such as inflammation, swelling, stiffness, and joint pain.

937.   During the relevant time frame, Defendants Teva, Sandoz, Glenmark and Actavis were the primary manufacturers of Nabumetone.

938.   As soon as Patel started working at Teva, she began to identify price increase candidates through her conversations with various sales and marketing executives at other drug manufacturers.

939.   For example, on May 1, 2013, Patel communicated by text message with A.B., Senior VP of Sales at Actavis. The next day, on May 2, she spoke to an Executive Vice President of Glenmark four times, after which she sent an internal e-mail identifying six drugs for price increases, including Nabumetone. Glenmark had not yet increased prices or announced price increases on those drugs. She again spoke with Glenmark contacts on May 16 and 17, 2013.

940.   After coordinating with Glenmark, Patel instructed her Teva colleagues to let her know of any pricing requests relating to various Glenmark drugs, including Nabumetone. In accordance with the Fair Share agreement, Patel wanted to be careful to avoid poaching any customers from Glenmark after the price increases.

941.   Throughout this period, Teva, Sandoz, Glenmark and Actavis monitored the Fair Share agreement and were careful not to poach customers from each other. For example, when Teva was approached by several Glenmark customers looking for a lower price, it declined the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

opportunity to gain market share. On occasions when it provided bids, it intentionally bid high so that it would not win the business.

942.   On May 24, 2013, Patel sent a list of recommended Teva price increases (including for Nabumetone) to her supervisor. Patel also explained that she was not worried about raising prices because Sandoz was "bidding high" on Nabumetone. Patel, who already had spoken to an Associate Director of Pricing at Sandoz for nearly twenty-five (25) minutes on May 15, 2013, and again for more than eighteen (18) minutes on May 20, 2013, had assurances from Sandoz that it would abide by the Fair Share agreement and would work to keep prices high. Patel spoke with Actavis's A.B. on June 20 for approximately 20 minutes.

### **75.   Prednisone**

943.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Prednisone tablets (1, 2.5, 5, 10 and 20 mg) beginning at least as early as May 2013.

944.   Prednisone, also known by the brand name Deltasone, is a corticosteroid that is used to treat conditions such as arthritis, blood disorders, breathing problems, severe allergies, skin diseases, cancer, eye problems, and immune system disorders.

945.   During the relevant time frame, Defendants Actavis, Cadista, Par and West-Ward were the primary manufacturers of Prednisone tablets.

946.   The market for Prednisone was mature and at all relevant times had multiple manufacturers.

947.   For years the prices of Prednisone tablets were relatively low and stable. There were limited supply disruptions in 2012 and early 2013, but market supply recovered and, for some dosages, increased in 2014. Nonetheless, in the spring of 2013, all manufacturers shifted their prices significantly higher. By the end of 2013, Prednisone tablet prices were more than

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

triple the prices that they were at the beginning of the year, and prices have remained higher than former levels through the present.

948.    The NSP price charts below show the large and abrupt shift in pricing for Prednisone tablets. While different combinations of manufacturers sold the various dosages of Prednisone tablets, all dosages experienced similarly large price hikes. ▮▮▮▮▮▮▮▮▮▮



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



949.     Throughout this period, Actavis, Cadista, Par and West-Ward met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Prednisone tablets and their Fair Share agreement.

950.     For example, Cadista, which had exited the market but then re-entered in late 2013 at the elevated prices already imposed by West-Ward and Actavis, communicated with its competitors around the time of its re-entry. Shortly before re-entering the market, Cadista's M.D., VP of Sales, spoke with Falkin (Actavis) on July 31, 2013 for six minutes. Shortly after re-joining the market, on November 1, 2013, M.D. at Cadista spoke for nearly 40 minutes with S.G, VP of Sales and Marketing at West-Ward.

951.     D.S., who began as Head of Sales at West-Ward in January 2014 after leaving Taro, called K.O., VP of National Accounts at Par, during his first weeks on the job. The two had communicated when D.S. was at Taro, and the practice continued when D.S. moved to West-Ward. D.S. communicated by phone with K.O. throughout 2014. They communicated in

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

January, February, April, May, June, July, October, November and December. Prices for Prednisone remained high throughout this time.

952.    J.H., Par Regional VP of Sales at Par, began communicating with Falkin shortly after Falkin joined Actavis. The two communicated by phone in September 2013, then throughout 2014, including (at least) in February, March, April, May, June, July, August and October.

953.    Throughout the period of these communications, Actavis, West-Ward, Par and Cadista were able to raise and maintain elevated prices for Prednisone.

### **76.    Tolmetin Sodium**

954.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Tolmetin Sodium capsules beginning at least as early as May 2013.

955.    Tolmetin Sodium, also known by the brand name Tolectin, is a medication used to reduce pain, swelling, and joint stiffness from rheumatoid arthritis and osteoarthritis.

956.    During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Tolmetin Sodium capsules.

957.    On August 9, 2013, Teva raised prices on a number of drugs, including Tolmetin Sodium. Leading up to these price increases, Teva coordinated via direct communication with other drug manufacturers, including Mylan.

958.    For example, on July 10, 2013, Teva's Green and Mylan's Nesta spoke twice. The next day, July 11, Nesta and Green exchanged several more calls.

959.    On August 1, 2013, Green again spoke to Nesta (Mylan) 2 times; shortly after the second call, Green called Patel to update her.  On August 2, 2013, Patel called Green, after which

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Green immediately called Nesta. Green spoke to Nesta three more times on August 6 and three times on August 8, 2013. Patel also spoke to Nesta twice on August 8, 2013.

960. The day before the price increase went into effect – August 8, 2013 –Patel and Nesta spoke again. Price increases followed the next day.

### **77.** **Disopyramide Phosphate**

961. Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Disopyramide Phosphate capsules beginning at least as early as June 2013.

962. Disopyramide Phosphate, also known by the brand name Norpace, is a medication used to treat certain types of serious irregular heartbeat, such as persistent ventricular tachycardia. It is used to restore normal heart rhythm and maintain a regular, steady heartbeat.

963. During the relevant time frame, Defendants Teva and Actavis were the primary manufacturers of Disopyramide Phosphate.

964. In late summer of 2014, Teva wanted to raise prices on Disopyramide Phosphate. The only other manufacturer in the market was Actavis. To ensure that Teva could impose a large price increase without losing customers to Actavis, Teva's Patel and Rekenthaler reached out directly to contacts at Actavis to coordinate. Patel spoke to Rogerson (Actavis) on August 27 (3 calls), and Rekenthaler spoke to Falkin (Actavis) on August 18 (2 calls), August 24, and August 26 (4 calls).

965. Rekenthaler again spoke to Falkin on August 28, 2014, the same day that Teva announced list (WAC) price increases of approximately 100% on Disopyramide Phosphate.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**78.**     **Isoniazid**

966.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Isoniazid tablets beginning at least as early as June 2013.

967.     Isoniazid, also known by the brand name Nydrazid, is a medication used to treat tuberculosis or prevent its return.

968.     During the relevant time frame, Defendants Teva and Sandoz were the primary manufacturers of Isoniazid.

969.      In June 2013, Teva was "attempting to understand how [its] pricing for Isoniazid compares to the rest of the market." On June 11, 2013, a Teva marketing representative asked Patel whether she was "aware of any competitive market intel for this family?" According to the marketing representative, Sandoz was also in the market for Isoniazid and had "drastically increased their pricing" in January 2013. Patel responded, "I will try to get the scoop on Sandoz pricing tomorrow.  When do you need this by?"

970.     The next day – June 12, 2013 – Patel exchanged at least five (5) calls with the Associate Director of Pricing at Sandoz.  Internally, Teva weighed the Fair Share allocations in the market. Later that day, Patel shared the specific price points she had received from the Associate Director of Pricing at Sandoz: "Wholesaler nets for Sandoz product are around $100 for the 300 mg 100s and $80 for 100 mg 100s.  Our WACs are very low."

971.     Although Teva did not match Sandoz's price increase on Isoniazid, neither did it poach all of Sandoz's customers.

972.     Eventually, Teva increased price on Isoniazid on January 28, 2015. Teva communicated with Sandoz in the days and weeks leading up to January 28, 2015.  For example, Patel spoke to the Sandoz Associate Director of Pricing on January 22, 2015.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**79.**    **Enalapril Maleate**

973.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Enalapril Maleate tablets (2.5, 5, 10, 20 mg) beginning at least as early as July 2013.

974.    Enalapril Maleate, also known by the brand name Vasotec, is a medication used to treat high blood pressure and congestive heart failure.

975.    During the relevant time frame, Defendants Teva, Mylan, Taro, and Wockhardt were the primary manufacturers of Enalapril Maleate tablets. Defendant Bausch/Oceanside joined the Enalapril Maleate tablet market and the conspiracy in August 2015.

976.    The market for Enalapril Maleate was mature and at all relevant times had multiple manufacturers.

977.    For years, the prices of Enalapril Maleate tablets were relatively low and stable. By mid-2013, the market was shared by three Defendants: Mylan, Wockhardt, and Teva. Those three companies coordinated a significant price increase for Enalapril in the second half of 2013.

978.    Mylan increased its list (WAC) price for Enalapril effective July 2, 2013. Enalapril was on a list of drugs slated for a price increase that Teva had received from Mylan in June 2013, before those price increases were put into effect.

979.    Teva quickly followed Mylan's increase, announcing its own list (WAC) price increases on July 19, 2013.

980.    Wockhardt, quickly followed the increases as well, raising list (WAC) prices for its Enalapril on August 13, 2013.

981.    Taro, which was in the process of re-entering the market in mid-2013, joined the price increases. Rather than offer better prices to gain market share, Taro raised its list (WAC) prices.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

982. The list (WAC) price increases had the desired effect. ████████████
████████████████████████████████████████████ Shockingly, these increases in 2013 appear relatively small in the charts below because Defendants imposed a second round of even larger price increases in 2014.

983. The enormous price increases in 2013 did not satisfy Defendants. In the spring of 2014, Mylan led another even more extreme round of price increases. In 2013, Mylan increased list prices by approximately 100%. In April 2014, it increased list (WAC) prices again, by approximately 300%. Teva followed the increase—announcing identical WAC prices—in August. Taro did exactly the same in October. And Wockhardt raised its list (WAC) prices again in December.

984. After Mylan, Teva, Wockhardt and Taro had completed their second round of coordinated price increases, Bausch/Oceanside entered the market. Rather than offer better prices to win new customers, Bausch/Oceanside matched the list (WAC) prices of the other sellers, and ██████████████████████████████████████████████

985. The list (WAC) price chart and NSP price chart below show the large, parallel and sustained price increases by Mylan, Teva, Wockhardt and Taro, and the entry by Bausch/Oceanside at the extraordinarily elevated prices. Note: The pricing patterns for 2.5, 5, 10 and 20 mg dosages of Enalapril Maleate tablets are highly similar. Charts for only the 20 mg dosage are included here. ████████████████████ ]



ENALAPRIL MALEATE TABLET 20 MG WAC PRICE



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

986.   Throughout this period, Mylan, Teva, Wockhardt, Taro and Bausch/Oceanside met at trade conferences and communicated directly with each other in furtherance of their price fixing agreement for Enalapril Maleate tablets and of the Fair Share agreement.

987.   For example, in the short window of time after Mylan raised prices in 2013 and before Teva, Taro and Wockhardt followed the increase, Teva received a request on July 10, 2013 from a customer seeking a lower price on Enalapril. This set off a series of communications the purpose of which was to ensure that Teva, Taro and Wockhardt joined Mylan's increase. On July 10, Green of Teva and Nesta of Mylan had two phone calls, and they spoke twice more the following day. During these conversations, Nesta explained to Green that Wockhardt already had agreed to follow the Mylan price increase on Enalapril. Teva's Patel also called Nesta directly on July 12, 2013 and they spoke three times. Not long after, K.K., a senior national account executive at Wockhardt, spoke to Green of Teva (twice on July 15, 2013), and reported internally the specific price ranges for Enalapril that he had obtained from Green. Soon thereafter, Teva and Wockhardt implemented price increases on their Enalapril Maleate tablets.

988.   Similarly, as Taro evaluated whether to re-enter the Enalapril market, it engaged in a series of communications to shore up the Fair Share agreement among Defendants. Aprahamian of Taro communicated with Patel of Teva and M.C., Senior Vice President of Sales and Marketing at Wockhardt in July 2013, in the midst of the coordinate price increases by those manufacturers.

989.   Aprahamian also coordinated with M.A., Mylan National Account Director, on how to allocate the Enalapril market; the two spoke on December 6, 11 and 12, 2013.

990.   On December 5, 2013, Aprahamian spoke to Teva's Patel and sought her input before sending a proposal to a Teva customer.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

991.    On December 31, 2013, Aprahamian spoke with M.C. at Wockhardt, and they agreed that Wockhardt would concede one large customer to Taro so long as Wockhardt was able to retain a different large customer.

992.    In early 2014, market share was allocated "fairly" among the four competitors. As Teva was considering whether to bid on an RFP, with regard to Enalapril Patel cautioned: "no bid due to potential market/customer disruption, aka strategic reasons." The same day, Patel spoke to Aprahamian and exchanged 8 text messages with him.

993.    As 2014 progressed, Defendants again communicated directly in order to coordinate a second round of price increases. For example, Taro's Aprahamian spoke with his contact at Wockhardt on August 8 and August 14, 2014, and spoke with Teva's Patel on August 27.

### 80.    Haloperidol

994.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Haloperidol tablets (0.5, 1, 2, 5, 10 and 20 mg) beginning at least as early as July 2013.

995.    Haloperidol, also known by the brand name Haldol, is a medication used to treat disorders such as schizophrenia and Tourette syndrome.

996.    During the relevant time frame, Defendants Mylan, Sandoz and Zydus were the primary manufacturers of Haloperidol tablets.

997.    The market for Haloperidol tablets was mature and at all relevant times had multiple manufacturers.

998.    For years, the prices for Haloperidol tablets were relatively low and stable. In the summer of 2013, however, the manufacturers of Haloperidol were determined to raise prices. In the second half of 2013, they did so. For example, on the 5 mg dosage, Mylan first announced a

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

list (WAC) price increase that more than tripled its prices. Sandoz followed the increase, announcing similar list (WAC) prices in January 2014. And Zydus, which entered the market in the fall of 2014, offered virtually identical prices as Mylan and Sandoz instead of trying to win customers through price competition.

999.    The list (WAC) price chart and NSP price chart below show the large and parallel price increases by Mylan and Sandoz that were joined by Zydus. Note: in the second half of 2013 and early 2014, Mylan, Sandoz and Zydus imposed price increases (list and/or NSP) on all of the dosages of Haloperidol that they sold. Charts for only the 5 mg dosage are included here.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1000.   Throughout this period, Mylan, Sandoz and Zydus met at trade conferences and communicated directly with each other in furtherance of their price fixing agreement on Haloperidol and of their Fair Share agreement.

1001.   For example, in July 2013, Sandoz executives were carefully monitoring the generic market in order to ensure that they adhered to the Fair Share agreement. Sandoz did not want to accidentally poach customers from its co-conspirators. As part of this effort, D.L., a Sandoz Director of National Accounts, called her contact at Mylan, Jim Nesta, and obtained a list of drugs for which Mylan had increased prices, including Haloperidol, so that Sandoz could follow with its own price increase.

1002.   Not long after, Nesta twice called this Director of National Accounts at Sandoz on August 6, a few days before Mylan imposed price increases on Haloperidol. On August 9, 2013, Mylan implemented significant list price increases on Haloperidol.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1003.   Nesta also kept Zydus in the loop. On August 15, Nesta and K.R., a Vice President of Sales at Zydus, exchanged text messages, and the next day the two spoke by phone.

1004.   After the Mylan price increase, Sandoz and Zydus were careful not to take business and instead endeavored to maintain high prices, as contemplated by their price-fixing agreement and Fair Share agreement.

1005.   For example, on October 2, 2013, M.V., the Associate Director of Pricing at Sandoz, advised a colleague to decline to bid on Haloperidol and Trifluoperazine: "We have been running up against Mylan a lot lately (Nadolol, Benaz/Hctz), and fear blowback if we take on any more products at this moment. Trying to be responsible in the sandbox." M.V. went to suggest that a pretextual excuse be offered to the customer: "I recommend you blame supply." Of course, the real reason for turning down the competitive opportunity was Sandoz's adherence to the Fair Share agreement.

1006.   On October 3, 2013, the day after this internal discussion at Sandoz in which it re-affirmed its commitment to "be responsible in the sandbox," D.L. (Sandoz Director of National Accounts) and Nesta of Mylan spoke by phone. The two spoke again on October 4 and 14, 2013. Nesta also exchanged text messages with the VP of Sales at Zydus on October 9, 2013. Not long after, Sandoz increased its pricing on Haloperidol.

1007.   In November and December of 2013, as well as in January, February, March, April, June, July, August, September and October of 2014, Nesta (Mylan) and Kevin Green (who by then had left Teva and had begun working at Zydus) communicated by phone numerous times. Zydus also joined the Haloperidol price increases during this period.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 81.    **Prednisolone Acetate**

1008.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Prednisolone Acetate ophthalmic suspension beginning at least as early as July 2013.

1009.   Prednisolone Acetate, also known by the brand name Omnipred and Pred Forte, is a medication used to treat swelling, redness, itching, and allergic reactions in the eye.

1010.   During the relevant timeframe, Defendants Sandoz and Greenstone[16] were the primary manufacturers of Prednisolone Acetate.

1011.   The market for Prednisolone Acetate was mature and at all relevant times had multiple manufacturers.

1012.   For years, the prices for Prednisolone Acetate ophthalmic suspension were relatively low and stable. Between August and November 2013, however, Sandoz and Greenstone coordinated enormous price increases. List prices for Prednisolone Acetate jumped more than 500% and to identical levels. NSP prices ███████████████.

1013.   During this period, Sandoz and Greenstone market shares remained relatively stable owing to their Fair Share agreement, to which they closely adhered during the relevant period. For example, in early 2014 (after the large price increases in late 2013) a large customer approached Sandoz to see if it was interested in a new account for Prednisolone Acetate. ██████████████████████████████████████████████████ ██████████████████████████████████ Kellum further advised, ███████████████ ██████████████████████████████

---

[16] Greenstone's Prednisolone Acetate product is marketed under a Pacific Pharma label.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1014.   The list (WAC) price chart and NSP price chart below show the large and parallel price increases by Sandoz and Greenstone on Prednisolone Acetate. ▮▮ ▮▮

▮▮▮▮





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1015.   Throughout this period, Sandoz and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on generic Prednisolone Acetate and of their Fair Share agreement.

1016.   For example, representatives from Greenstone and Sandoz convened at the NACDS 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada on August 10-13, 2013. Less than two weeks later, Sandoz announced a large list (WAC) price increase, which Greenstone promptly followed.

**82.   Temozolomide**

1017.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Temozolomide capsules beginning at least as early as July 2013.

1018.   Temozolomide, also known by the brand name Temodar, is a medication used to treat glioblastoma multiforme and refractory anaplastic astrocytoma, both cancers of the brain.

1019.   During the relevant time frame, Defendants Teva and Sandoz were the primary manufacturers of Temozolomide.

1020.   Teva and Sandoz had each gained the right to launch on Temozolomide in August 2013. In preparation for the launch, Teva coordinated with Sandoz to divide up the market. For example, when Sandoz received an RFP from a large retail pharmacy customer on July 18, 2013, and after another large customer contacted Teva asking for an offer on Temozolomide on July 30, 2013, Teva and Sandoz communicated with each other to coordinate responses.

1021.   For example, Patel of Teva called the Associate Director of Pricing at Sandoz on July 29.  Also on July 29, 2013, Green of Teva spoke to Director of National Accounts at Sandoz twice, and then again on July 31, 2013.  A different Sandoz Director of National Accounts also coordinated with a National Account Manager at Teva via phone.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1022.   Sandoz and Teva continued to monitor and coordinate the price fixing and Fair Share agreement on Temozolomide. For example, on August 12, 2013, the day of Teva's launch, a Sandoz Director of National Accounts met in person with Rekenthaler at the Grand Lux Cafe in Las Vegas during the NACDS Total Store Expo Conference. There, Rekenthaler discussed, among other things, Temozolomide and informed the Sandoz Director that Teva had officially launched and shipped all formulations of the drug.

1023.   The Sandoz Associate Director of Pricing spoke to Patel both before and after Sandoz sent out offers regarding Temozolomide in an effort to ensure that each had a Fair Share of the market.

### **83.   Trifluoperazine HCL**

1024.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Trifluoperazine HCL tablets (1, 2, 5 and 10 mg) beginning at least as early as July, 2013.

1025.   Trifluoperazine HCL, also known by the brand name Stelazine, is a medication used to treat disorders such as schizophrenia and Tourette syndrome.

1026.   During the relevant time frame, Defendants Mylan and Sandoz were the primary manufacturers of Trifluoperazine HCL. Defendant Upsher-Smith joined the Trifluoperazine HCL market and the conspiracy in March 2015.

1027.   The market for Trifluoperazine HCL tablets was mature and at all relevant times had multiple manufacturers.

1028.   For years, the prices for Trifluoperazine HCL tablets were relatively low and stable. In the summer of 2013, Mylan and Sandoz coordinated large price increases for their Trifluoperazine tablets. Within a small window of time, Mylan and Sandoz approximately doubled their list (WAC) prices to identical levels, ███████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1029. When Upsher-Smith joined the market in spring of 2015, rather than offer better pricing to win customers, it announced identical list (WAC) prices to Mylan and Sandoz,

1030. The list (WAC) price chart and the NSP price chart below highlight the abrupt and parallel price increases by Mylan and Sandoz, and the elevated prices at which Upsher-Smith joined the market for Trifluoperazine HCL tablets. Note: the pricing patterns for all Trifluoperazine HCL tablets are highly similar. Charts for only the 10 mg dosage are included here.






PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1031.  Throughout this period, Mylan, Sandoz and Upsher-Smith met at trade conferences and communicated directly with each other in furtherance of their price fixing agreement on Trifluoperazine HCL tablets and of the Fair Share agreement.

1032.  For example, on August 6, 2013—just a few days prior to Mylan's price increases—Nesta (Mylan) was in phone contact with a Sandoz Director of National Accounts.

1033.  Once the Mylan price increases were imposed, Sandoz was careful not to take Mylan's customers and to maintain Fair Shares.

1034.  Sandoz and Mylan were in contact by phone on numerous occasions in October, and on October 25, 2013, Sandoz announced identical list (WAC) prices to Mylan.

1035.  In January, February and March of 2015, Sandoz's Kellum was in phone contact with S.H., Senior VP of Global Sales, and J.H., Senior Director of Marketing, at Upsher-Smith. In February 2015, M.A., National Account Director at Mylan, communicated by text message

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

with D.Z., National Accounts Senior Director at Upsher-Smith. On March 17, Upsher-Smith announced identical list prices to Sandoz and Mylan.

### 84.    Clemastine Fumarate

1036.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Clemastine Fumarate tablets beginning at least as early as August 2013.

1037.   Clemastine Fumarate, also known by the brand name Tavist, is a medication used to treat hay fever and allergy symptoms.

1038.   During the relevant time frame, Defendants Teva and Sandoz were the primary manufacturers of Clemastine Fumarate tablets.

1039.   Teva and Sandoz coordinated a price increase on Clemastine Fumarate tablets for Teva's August 9, 2013 round of price increases. Patel of Teva spoke with an Associate Director of Pricing at Sandoz several times in August regarding Clemastine Fumarate, including calls on August 1, 2, and 8, 2013.

1040.   On August 28, 2014, Teva raised list (WAC) prices on Clemastine Fumarate tablets. Patel again spoke to her contact at Sandoz several times in August 2014 before that increase.

### 85.    Oxycodone/Acetaminophen

1041.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Oxycodone Acetaminophen 10-325 mg, 7.5-325 mg and 5-325 mg tablets beginning at least as early as August 2013.

1042.   Oxycodone/Acetaminophen, also known by the brand name Percocet, is a medication used to treat moderate to severe pain.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1043.   During the relevant timeframe, Defendants Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt and Par were the primary manufacturers of generic Percocet.

1044.   The market for Oxycodone/Acetaminophen was mature and at all relevant times had multiple manufacturers.

1045.   For years, the prices of Oxycodone/Acetaminophen were relatively low and stable. In the summer of 2013, however, market prices shifted radically higher. In the space of less than two months, Mallinckrodt, Alvogen, Amneal and Actavis ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ Around the same time, Aurobindo and Par re-entered the market. Rather than offer lower prices to win market share, they each entered ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

1046.   Notwithstanding the enormous shifts in pricing, each manufacturer's share of the market remained relatively stable, as contemplated by the Fair Share agreement.

1047.   The NSP price chart below shows the large and parallel price increases by Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt and Par. ▮▮▮▮▮▮▮▮▮▮▮

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1048.   Throughout this period, Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt and Par met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on generic Percocet and of their Fair Share agreement.

1049.   For example, between September and December 2013—when Oxycodone prices were skyrocketing—Actavis's Falkin communicated by phone with Par (multiple calls in September with J.H., Par Regional VP of Sales), with Alvogen (multiple calls in October and November with B.H., Alvogen EVP of Sales), with Amneal (voice and text in October with S.R., Amneal VP of Sales) and with Aurobindo (communications in November and December with R.C., Aurobindo CEO).

1050.   While Falkin was communicating with all of the rest of the manufacturers, A.S., Actavis VP of Sales, and A.B., Senior VP of Sales and Marketing at Actavis, were in touch with

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

W.K., VP and General Manager at Mallinckrodt, between September and December 2013. Actavis's A.B. also had multiple phone communications during this period with S.R., Senior Director of Sales Finance at Amneal.

1051.   Alvogen's B.H. also was in touch with Aurobindo's J.K., Director of National Accounts, in December 2013 and January 2014.

### **86.   Cephalexin**

1052.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Cephalexin oral suspension beginning at least as early as October 2013.

1053.   Cephalexin, also known by the brand name Keflex, is a medication used to treat certain infections.

1054.   During the relevant time frame, Defendants Lupin and Teva were the primary manufacturers of Cephalexin oral suspension.

1055.   The market for Cephalexin was mature and at all relevant times had multiple manufacturers.

1056.   For years, the prices for Cephalexin oral suspension were relatively low and stable. In the fall of 2013, however, Lupin and Teva conspired to impose significant price increases. List (WAC) prices for Lupin and Teva Cephalexin more than doubled. ▓▓▓▓▓

▓▓▓▓▓

1057.   The list (WAC) price chart and NSP price chart below show the abrupt and large price increases imposed by Lupin and Teva. Note: the pricing patterns for 125 mg and 250 mg suspension are very similar. Charts for only the 125 mg dosage are included here. ▓▓▓▓▓

▓▓▓▓▓

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1058.   Throughout this period, Lupin and Teva and met at trade conferences and communicated directly with each other in furtherance of their price fixing agreement on Cephalexin oral suspension and of the Fair Share agreement.

1059.   For example, as Lupin planned to increase prices in early November 2013, Berthold of Lupin communicated with Teva's Rekenthaler by phone on October 14, 2013, and with T.S., a National Account Manager at Teva, on October 31, 2013. Shortly after her call with Berthold, T.S. notified her Teva colleagues: "I have heard [] Lupin is implementing a price increase today on Cephalexin Oral Suspension (4-6x's current price)."

1060.   Because Teva did not announce its own Cephalaxin price increase until April 2014, customers approached Teva seeking better prices after Lupin raised prices. In line with their Fair Share and price fixing agreement, Teva opted not to compete for these customers. For example, Teva's Patel called Berthold of Lupin on November 22, 2013, after Teva decided it would not respond to a request from a large customer to bid on Cephalexin.

1061.   As Teva prepared to announce its price increase on Cephalaxin, Patel coordinated with Lupin's Berthold via phone communications throughout the period.

1062.   On April 4, 2014, Teva raised its list (WAC) prices on Cephalexin oral suspension to the identical level of Lupin's prices.

### 87.   Estradiol and Norethindrone Acetate (Mimvey)

1063.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Estradiol and Norethindrone Acetate (Mimvey) tablets beginning at least as early as October 2013.

1064.   Estradiol and Norethindrone Acetate (Mimvey) is an oral contraceptive.

1065.   During the relevant time frame, Defendants Teva and Breckenridge were the primary manufacturers of Mimvey.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1066.   On November 14, 2013, Breckenridge increased its pricing on Mimvey. Leading up to that increase, Rekenthaler of Teva had several phone calls with the Director of Sales at Breckenridge to coordinate the price increases, including two calls on October 14, 2013 and one on October 24, 2013. After those calls, they did not speak again until mid-January 2014, when Teva began preparing to implement its increase.

1067.   On April 4, 2014, Teva increased pricing on a number of drugs, including Mimvey. Teva's new list (WAC) price exactly matched Breckenridge's list price. As Patel of Teva planned for Teva's April 4, 2014 price increases, both she and Rekenthaler continued to communicate with their counterparts at Breckenridge. Rekenthaler spoke again to the Director of Sales at Breckenridge on January 15, 2014 and Patel spoke with a Director of National Accounts at Breckenridge two times on February 7, 2014.

## 88.   Hydroxyzine Pamoate

1068.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Hydroxyzine Pamoate capsules beginning at least as early as October 2013.

1069.   Hydroxyzine Pamoate, also known by the brand name Vistaril, is an antihistamine with anticholinergic (drying) and sedative properties used as a sedative to treat anxiety and tension.

1070.   During the relevant time frame, Defendants Teva, Sandoz, Actavis, and Rising were the primary manufacturers of Hydroxyzine Pamoate.

1071.   In 2013, Rising was preparing to enter the market for Hydroxyzine Pamoate. During several calls in early October 2013, Rising's Senior Vice President of Sales coordinated with Green and Rekenthaler of Teva to acquire a large customer and facilitate Rising's entry into the Hydroxyzine Pamoate market.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1072.   In March and early April 2014, Patel and Rekenthaler both were communicating frequently with Teva's competitors to coordinate price increases. For example, Teva's Rekenthaler spoke to Falkin (Actavis) on March 11, 12 (twice), 14, 15, and 17, 2014, as well as on April 1, 2, 3, and 4, 2014. Teva's Patel spoke to Rogerson (Actavis) numerous times on both March 14 and 17, 2014, as well as on April 1, 3, and 4, 2014. Patel spoke to M.V., Associate Director of Pricing at Sandoz, on March 31, 2014 for fifteen (15) minutes and on April 4, 2014 for twenty-five (25) minutes. Rekenthaler spoke to P.K., SVP of Sales at Rising, on March 17 and 31, 2014.

1073.   After reaching a pricing and Fair Share agreement with the other Hydroxyzine Pamoate manufacturers, Teva increased its prices on April 4, 2014.

### **89.**    **Tobramycin**

1074.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Tobramycin eye drops beginning at least as early as October 2013.

1075.   Tobramycin, also known by the brand name Tobi, is a medication used to treat eye infections.

1076.   During the relevant time frame, Defendants Teva and Sandoz were the primary manufacturers of Tobramycin eye drops.

1077.   Beginning in October 2013, Sandoz began making plans to enter the Tobramycin market, where Teva was the sole supplier. To facilitate Sandoz's entry into the market and to allow it to gain a Fair Share, Teva and Sandoz began sharing information and coordinating to divide up the market for Tobramycin.

1078.   Patel of Teva exchanged seven calls with the Associate Director of Pricing at Sandoz on July 1, 2014, five calls on July 7, 2014, and one call on July 9, 2014. During these

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

calls, Sandoz and Teva discussed how to coordinate Fair Shares of the market for Tobramycin, including specific accounts that each would maintain or concede.

### 90. Azithromycin

1079.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Azithromycin oral suspension ( 100 mg and 200 mg/5 ml) beginning at least as early as November 2013.

1080.   Azithromycin, also known by the brand name Zithromax, is a medication used to treat certain bacterial infections.

1081.   During the relevant time frame, Defendants Teva and Greenstone/Pfizer were the primary manufacturers of Azithromycin.

1082.   In November 2013, Greenstone began planning to increase prices on several drugs that overlapped with Teva, including Azithromycin. Greenstone began to raise prices shortly thereafter and announced a list (WAC) price increase on January 1, 2014.

1083.   Over the next several months—during the period of time before Teva followed Greenstone's price increase—Teva declined to bid on Azithromycin at multiple customers, as contemplated by the Fair Share agreement between them.

1084.   Patel of Teva and a Director of National Accounts at Greenstone were in frequent communication, including calls on November 23, 2013, December 2, 2013, December 5, 2013, two calls on March 17, 2014, and two calls on April 4, 2014.

1085.   Teva followed Greenstone's price increases on April 4, 2014. Patel spoke to the Greenstone Director of National Accounts twice on that day.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**91.**   **Balsalazide Disodium**

1086.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Balsalazide Disodium capsules beginning at least as early as November 2013.

1087.   Balsalazide Disodium, also known by the brand name Giazo, is an anti-inflammatory drug used in the treatment of inflammatory bowel disease.

1088.   During the relevant time frame, Defendants West-Ward and Apotex were the primary manufacturers of Balsalazide Disodium.

1089.   The market for Balsalazide Disodium was mature and at all relevant times had multiple manufacturers.

1090.   For years, the prices for Balsalazide Disodium capsules were relatively low and stable. West-Ward and Mylan were the dominant manufacturers in the market during the earlier years. Apotex joined the market in the spring of 2012, but remained a small player. Then, in the early summer of 2013, Mylan exited the market. West-Ward managed to gain most of Mylan's market share.

1091.   In January 2014, Apotex experienced a brief supply disruption and exited the market for approximately one month. West-Ward immediately increased prices. It raised list prices approximately 400% and NSP prices ▇▇▇▇▇▇.

1092.   Apotex, which had only been out of the market for the blink of an eye, could have offered lower prices to win market share. Instead, it immediately followed West-Ward's price increases. It announced an identical list price, and raised NSP prices ▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇.

1093.   Even with the higher prices, Apotex was able to build share. It quickly captured nearly twice the unit sales it had before the price increase, and owing to the much higher prices,

its dollar sales increased more than five-fold. Meanwhile, although it had to cede some share to Apotex, West-Ward's dollar sales more than doubled as a result of the higher market prices. The Fair Share agreement was working exactly as it was intended.

1094.   The NSP price chart and list price chart below show the abrupt and nearly simultaneous price increases by West-Ward and Apotex.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1095.   Throughout this period, West-Ward and Apotex met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Balsalazide Disodium and of their Fair Share agreement.

## 92.   Butorphanol Tartrate

1096.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Butorphanol Tartrate nasal spray beginning at least as early as December 2013.

1097.   Butorphanol Tartrate, also known by the brand name Stadol NS, is used to treat moderate to severe pain, including pain from surgery, muscle pain, and migraine headaches.

1098.   During the relevant time frame, Defendants Mylan, West-Ward and Apotex were the primary manufacturers of Butorphanol Tartrate.

1099.   The market for Butorphanol Tartrate was mature and at all relevant times had multiple manufacturers.

1100.   For years, the prices for Butorphanol Tartrate nasal spray were relatively low and stable. West-Ward, Mylan and Apotex were the dominant manufacturers in the market during the earlier years. West-Ward and Mylan had roughly equal and larger shares of the market than did Apotex. In late 2013, Apotex exited the market, at which point West-Ward and Mylan immediately raised prices. Rather than compete with Mylan to pick up what had been Apotex's share of the market, West-Ward promptly announced a significant increase in its WAC price to make it identical to Mylan's. Both manufacturers ███████████████████████ ██████████████████████

1101.   In the spring of 2015, Apotex re-joined the market. Rather than offer better prices to win market share, it announced list prices identical to West-Ward, and roughly matched NSP prices as well. Even without better pricing, Apotex rapidly gained share, and the market shifted to roughly equal shares split between Mylan, West-Ward and Apotex. Even with three manufacturers back in the market, prices did not decline, and have never returned to prior levels. Yet again, the Fair Share agreement was working exactly as intended.

1102.   The NSP price chart and list (WAC) price chart below show the abrupt and nearly simultaneous price increases by West-Ward and Mylan, which were later matched by Apotex when it re-entered the market. ███████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1103.   Throughout this period, Mylan, West-Ward and Apotex met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Butorphanol Tartrate and of their Fair Share agreement.

## **93.**   **Cefuroxime Axetil**

1104.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Cefuroxime Axetil tablets beginning at least as early as December 2013.

1105.   Cefuroxime Axetil, also known by the brand name Ceftin, is used to treat a wide variety of bacterial infections.

1106.   During the relevant time frame, Defendants Lupin, Aurobindo and Citron were the primary manufacturers of Cefuroxime Axetil.

1107.   The market for Cefuroxime Axetil was mature and at all relevant times had multiple manufacturers.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1108.   For years, the prices for Cefuroxime Axetil tablets were relatively low and stable. In late 2013, however, Wockhardt exited the market, at which point Lupin and Aurobindo immediately imposed large price increases, notwithstanding the fact that each had enough supply to compete for more sales. Instead, they each only took a Fair Share at much higher prices.

1109.   Almost simultaneously, Lupin and Aurobindo announced identical, 500% list (WAC) price increases.

1110.   In line with the higher WAC prices, Lupin's and Aurobindo's NSP prices ▮▮▮



1111.   Not long after the large price increases imposed by Lupin and Aurobindo, Citron entered the market. Rather than offer lower prices to compete for share, in late March 2014, Citron announced list (WAC) prices identical to those of Lupin and Aurobindo.

1112.   Lupin, Aurobindo and Citron adhered to their Fair Share agreement to avoid competition and its attendant downward pressure on prices. For example, in the spring of 2014, a large customer requested that Aurobindo lower its prices significantly for Cefuroxime Axetil. Internally at Aurobindo, T.G., Director of National Accounts, shot down the idea: ▮▮▮▮

1113.   The NSP price chart and list (WAC) price chart below show the abrupt and nearly simultaneous price increases by Lupin and Aurobindo, which were later matched by Citron when it entered the market. Note: the prices of 250 mg and 500 mg tablets followed a very similar pattern. Only the 250 mg charts are included here. ▮▮▮▮

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1114.   Throughout this period, Lupin, Aurobindo and Citron met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Cefuroxime Axetil and of their Fair Share agreement.

1115.   For example, Lupin's David Berthold, VP of Sales, communicated with K.S., Citron's EVP of Sales, on January 10, 2014.

1116.   Lupin's Berthold also communicated by phone multiple times in January and February 2014 with Aurobindo's P.M., Senior Director of Commercial Operations, including on the day before and the day immediately after both companies announced identical list (WAC) price increases.

### 94.   Clarithromycin

1117.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Clarithromycin Extended Release ("ER") tablets beginning at least as early as December 2013.

1118.   Clarithromycin, also known by the brand name Biaxin, among others, is a medication used to treat bacterial infections.

1119.   During the relevant time frame, Defendants Actavis, Zydus, and Teva were the primary manufacturers of Clarithromycin ER tablets.

1120.   On December 30, 2013, a large wholesaler approached Teva looking for a bid on Clarithromycin ER because Zydus was exiting the market. Rather than compete for this new customer, Teva opted to coordinate with Actavis to increase prices.

1121.   Teva's Patel spoke to Rogerson at Actavis for more than seventeen minutes on January 2, and then submitted a bid at an elevated price to the wholesaler. Patel called Rogerson again on January and 9, 2014, after the customer had accepted Teva's bid.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1122.   Teva and Actavis worked together over the next few months to implement market wide price increases. Patel spoke to Rogerson at Actavis on February 5, 6, and 7, 2014. The communications between Teva and Actavis intensified in March, when Patel spoke to Rogerson repeatedly on March 14 and 17, as well as once on March 15.  In addition, Teva's Rekenthaler spoke to Actavis's Falkin on March 11, 12, (twice), 14, 15, and 17, 2014.

1123.   In the spring of 2014, Teva and Actavis increased pricing on Clarithromycin ER tablets for all customers.

### 95.   Timolol Maleate

1124.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Timolol Maleate ophthalmic gel forming solution beginning at least as early as December 2013.

1125.   Timolol Maleate, also known by the brand names Betamol and Timoptic, is used to treat high pressure inside the eye due to glaucoma (open angle-type) or other eye diseases (*e.g.*, ocular hypertension).

1126.   During the relevant time frame, Defendants Bausch Health and Sandoz were the primary manufacturers of Timolol Maleate.

1127.   The market for Timolol Maleate was mature and at all relevant times had multiple manufacturers.

1128.   For years, the prices for Timolol Maleate ophthalmic gel forming solution were relatively low and stable.

1129.   A May 2013 Sandoz internal document posed the following question: ███████ ████████████████████████████████████████████████████████ ██████████████ Not long after this analysis, Sandoz and Bausch Health almost simultaneously and out of the blue, imposed very large price increases. List (WAC) prices more than tripled, █

██████████ Even as prices skyrocketed, market share remained roughly split between the companies.

1130. The list (WAC) price chart and NSP price chart below show the large increases and parallel pricing by Bausch Health and Sandoz. (Note: the prices of the 0.5% formulation of Timolol Maleate followed a very similar pattern. Only the 0.25% charts are included here.) ██████



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1131.   Throughout this period, Bausch Health and Sandoz met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Timolol Maleate and of their Fair Share agreement.

1132.   For example, both companies sent representatives to the ECRM Retail Pharmacy Efficient Program Planning Session at the Omni Amelia Island Plantation Resort in Amelia Island, Florida on February 23-26, 2014. Sandoz had raised its list (WAC) prices shortly before the conference. Bausch announced its own list (WAC) price increases for Timolol Maleate shortly after the conference, on March 12, 2014.

### 96.   Capecitabine

1133.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Capecitabine tablets beginning at least as early as January 2014.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1134.   Capecitabine, also known by the brand name Xeloda, is a chemotherapy medication used to treat multiple types of cancer, including breast and colon cancer.

1135.   During the relevant time frame, Teva and Mylan were the primary manufacturers of Capecitabine.

1136.   As early as January 2014, Teva and Mylan shared commercially sensitive information about their preparations to launch Capecitabine, which was just opening up to generic competition. For example, Teva and Mylan shared customer-specific sales information, which they provided to one another in order to allocate the Capecitabine market between them.

1137.   By late February, Mylan had informed Teva that its launch would be delayed. Teva proceeded with its launch, and became the exclusive generic Capecitabine manufacturer in early March 2014.

1138.   Leading up to Mylan's launch in August 2014, Mylan and Teva communicated by phone on multiple occasions about the drug and Fair Share allocation of the market. For example, Teva's Rekenthaler and Mylan's Nesta discussed three large customers and a targeted market share of 35% for Mylan. Mylan ultimately sought business from each of the three customers that Rekenthaler and Nesta had spoken about, and Teva conceded each of them, pursuant to an agreement the two had reached around the time of Mylan's launch.

1139.   The agreement between Teva and Mylan as to these three customers was part of broader market allocation scheme for Capecitabine, as further demonstrated by Teva's concession other smaller customers to Mylan as well.

## 97.   Norethindrone/Ethinyl Estradiol (Balziva)

1140.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Norethindrone/Ethinyl Estradiol tablets beginning at least as early as January 2014.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1141.   Norethindrone/Ethinyl Estradiol, also known by the brand name Ovcon35, is an oral contraceptive formulation. Teva markets its generic of this medication under the name Balziva.

1142.   During the relevant time frame, Teva and Lupin were the primary manufacturers of Norethindrone/Ethinyl Estradiol.

1143.   On January 23, 2014, a customer informed Teva that a new market entrant was seeking a share of its business on Norethindrone/Ethinyl Estradiol. Teva employees surmised that the entrant was Lupin, as it had recently obtained approval to begin marketing the generic drug.

1144.   Teva employees discussed internally how to respond to the entrant, with at least one expressing concern that conceding business would cause Teva to lose its position as the Norethindrone/Ethinyl Estradiol market leader.

1145.   On January 24, 2014, Teva's Patel spoke to Berthold at Lupin twice by phone. Several days after that call, on January 29, 2014, Patel internally recommended conceding "part of the business" with the customer at issue to Lupin, in order "to be responsible in the market." Patel and Berthold spoke again on February 4, 2014 to further coordinate Lupin's entry into the market.

1146.   As a result of the agreement and anticompetitive coordination between Teva and Lupin, prices for Norethindrone/Ethinyl Estradiol tablets were higher than they would have been in a competitive market.

## 98.   Penicillin V Potassium

1147.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Penicillin V Potassium tablets beginning at least as early as January 2014.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1148.   Penicillin V Potassium, or Penicillin VK, also known by the brand name Pen-Vee, is an antibiotic used to a fight a broad-spectrum of bacteria.

1149.   During the relevant time frame, Teva, Sandoz, Aurobindo, and Greenstone/Pfizer were the primary manufacturers of Penicillin VK tablets.

1150.   On August 28, 2014, Teva raised prices on a number of different drugs, including Penicillin VK tablets. Prior to the increase, Teva's Patel and Rekenthaler communicated with Aurobindo, Sandoz, and Greenstone. Rekenthaler spoke to R.C., CEO of Aurobindo, twice on July 29. Patel spoke to a Greenstone executive on August 25, and to the Associate Director of Pricing at Sandoz on August 26, 27 (two calls) and 28.

1151.   On October 10, 2014, Sandoz followed Teva's price increase. Teva's Patel again spoke to the Associate Director of Pricing at Sandoz that day, just as on the day of Teva's price increase. On October 15, Rekenthaler again spoke to R.C. at Aurobindo.

## **99.    Pilocarpine HCL**

1152.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Pilocarpine HCL tablets (5 mg) beginning at least as early as January 2014.

1153.   Pilocarpine HCL tablets, also known by the brand name Salagen, is used to treat dryness of the mouth and throat caused by a decrease in the amount of saliva that may occur after radiation treatment for cancer.

1154.   During the relevant time frame, Defendants Lannett, Actavis and Impax were the primary manufacturers of Pilocarpine HCL tablets.

1155.   The market for Pilocarpine HCL tablets was mature and at all relevant times had multiple manufacturers.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1156.   For years, the prices for Pilocarpine HCL tablets were relatively low and stable. In late 2013 and early 2014, Impax experienced supply disruptions, at which point Actavis and Lannett immediately imposed very large price increases. Rather than compete for Impax's old customers on price, Actavis and Lannett relied on the Fair Share agreement to raise prices instead.

1157.   In the fall of 2015, when Impax was finally ready to re-enter the market, rather than compete for customers with better pricing, Impax offered higher prices than either Actavis or Lannett. Even with higher prices, Impax was quickly able to build market share. Meanwhile, prices for all three manufacturers remained higher than before the increases had been implemented.

1158.   The NSP price chart below shows the large increases and parallel pricing by Lannett, Actavis and Impax for Pilocarpine HCL 5 mg tablets:



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1159.   Throughout this period, Actavis, Lannett and Impax met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Pilocarpine HCL and of their Fair Share agreement.

1160.   For example, in late 2013 and early 2014—the time of the Pilocarpine price increases—Actavis's Falkin and Lannett's K.S. communicated multiple times by phone. Falkin (Actavis) also communicated by phone on November 15, 2013 with M.G., Senior National Account Manager at Impax. Lannett's K.S. also communicated by phone with Impax during this same window of time; on January 15, 2014, he spoke to D.D., Impax National Accounts Manager.

### **100.**   **Dexmethylphenidate HCL**

1161.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Dexmethylphenidate HCL ER capsules (5, 15, 20, 40 mg) beginning at least as early as February 2014.

1162. Dexmethylphenidate HCL, or Dexmeth ER, also known by the brand name Focalin, is a muscle relaxant used to treat attention deficit hyperactivity disorder (ADHD).

1163.   During the relevant time frame, Teva, Sandoz, and Par were the primary manufacturers of Dexmethylphenidate HCL.

1164.   In February 2014, Sandoz was preparing to enter the market for Dexmeth ER. To coordinate, Teva's Patel spoke frequently with the Associate Director of Pricing at Sandoz about how to divide the market in order to permit Sandoz to obtain a Fair Share.

1165.   Following multiple conversations between Patel and her contact at Sandoz, Teva conceded two large customers to Sandoz. As Patel explained in a February 12 internal email

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

reflecting the understanding reached between Teva and Sandoz, "**Sandoz is being responsible with their pricing. We should be responsible with our share**."

1166.   Around the same time, on February 14, 2014, Teva also refused to lower its price for Dexmeth ER when approached by yet another large customer, thereby conceding the business to Sandoz.

1167.   On February 20, 2014, another large retail customer approached Teva seeking price protection terms. Patel spoke to the Associate Director of Pricing at Sandoz that same day, and the next day, internal emails indicated that Patel had inside information about Sandoz's plans for Dexmeth ER.

1168.   Par also abided by the Fair Share agreement when Sandoz entered, and when faced with a decision to cede share, "gave up the business to keep the market share even."

1169.   Again, to coordinate Fair Share, Rekenthaler of Teva was speaking to the Vice President of National Accounts at Par, right around the same time that Patel had been speaking to Sandoz Associate Director of Pricing, to confirm their agreement.

1170.   In May 2015, Teva again passed on an opportunity to sell more than its Fair Share of Dexmeth ER. It declined to bid for the Dexmeth ER business with a large customer, because "there is equal share in the market between competitors."

1171.   Similarly, in June 2015, Sandoz declined to bid on Dexmeth ER business because it already had more than its Fair Share. When a Sandoz national account representative communicated the decision to the customer, he mispresented the reason, falsely explaining that the decision not to bid was based on limited supply. In fact, it was because of the Fair Share agreement between Teva, Sandoz and Par.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1172.  As a result of the agreement and anticompetitive coordination between Teva, Sandoz, and Par, prices for Dexmeth ER were higher than they would have been in a competitive market.

## 101.  Ketoconazole

1173.  Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Ketoconazole cream and tablets beginning at least as early as February 2014.

1174.  Ketoconazole, also known by the brand name Nizoral, among others, is a medication used to treat certain fungal and yeast infections, and is sold as a cream and in tablet form.

1175.  During the relevant time frame, Teva, Sandoz, Taro and G&W were the primary manufacturers of Ketoconazole cream, and Teva, Mylan, and Taro were the primary manufacturers of Ketoconazole tablets.

1176.  The markets for Ketoconazole cream and tablets were mature and at all relevant times had multiple manufacturers.

1177.  For years, the prices of Ketoconazole cream and tablets were relatively low and stable. That changed in February 2014, at which point Teva and Taro began to implement large and nearly simultaneous price increases on their tablet and cream products. By summer, Teva and Taro cream list prices had doubled, and NSP prices ████████████████████ Teva and Taro tablet list prices quadrupled, and their NSP prices ████████████████████ ████████████████████

1178.  In the tablet market, after a brief supply disruption, Mylan followed Teva and Taro in raising prices. Although its prices did not rise to the same level as Taro and Teva, the increase was significant. Mylan list prices nearly doubled, and NSP prices ███████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1179.   In the cream market, Sandoz followed the Taro and Teva price increases in the fall of 2014. In October, it announced list (WAC) prices identical to those of Taro and Teva, and by the end of the year its NSP prices ████████████████████ Thus, by the start of 2015, all three Ketoconazole cream manufacturers had NSP prices ████████████████████████████

1180.   In August 2015, G&W entered the Ketoconazole cream market. It announced list (WAC) prices in June, even before it entered. Rather than offer lower prices to persuade customers to switch suppliers, G&W announced list prices more than four times higher than any other manufacturer. Taro almost immediately raised its own list prices to be identical to G&W, and its NSP prices ████████████████. Even with high prices, G&W quickly gained share. Adding another supplier to the Ketoconazole cream market did not drive prices lower, but on the contrary, drove prices higher, just as Defendants' Fair Share agreement contemplated.

1181.   The NSP price charts below show the large and sustained price increases imposed by Taro, Teva, Mylan, Sandoz and G&W on their Ketoconazole products. ████████████
████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1182.  Throughout this period, Taro, Teva, Mylan, Sandoz and G&W met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Ketoconazole and of the Fair Share agreement.

1183.  For example, in February and March 2014, as Teva prepared for price increases across multiple drugs, including Ketoconazole cream and tablets, Teva coordinated with its competitors. On April 4, 2014—the day that Teva's list price increases were formally announced—Teva's Patel spoke separately with both Aprahamian of Taro and the Director of Pricing at Sandoz, to let them know that Teva was increasing its Ketoconazole prices. That same day, Teva's Rekenthaler spoke to Nesta of Mylan.

1184.  Taro and Sandoz were also communicating directly with each other, including on April 4, when Aprahamian of Taro spoke with C.B., a Director of National Accounts at Sandoz. After that call, the Director of National Accounts informed his colleagues at Sandoz of Taro's price increase plans.

1185.  The following Monday, April 7, Taro received a request from a customer seeking a competitive bid on Ketoconazole tablets due to the Teva price increase. Taro declined to bid, but decided to misrepresent the reason as "due to supply."

1186.  The following day, April 8, Aprahamian of Taro called Patel at Teva and the two spoke for more than 19 minutes. Shortly thereafter, Taro announced its own list price increases for Ketoconazole cream and tablets. Teva, for its part, declined a request from a large customer for a bid on Ketoconazole, explaining in an internal email: ███████████████████ ████████████████████████████████████████████ ████████████████████ Teva was committed to the agreement that each manufacturer would get a Fair Share.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1187.   Sandoz followed the Teva and Taro increases for Ketoconazole cream on October 10, 2014. That same day, Patel and the Sandoz Associate Director of Pricing spoke for more than three minutes.

1188.   After imposing price increases, Teva, Taro and Sandoz monitored the market and were careful not to disrupt Fair Shares. For example, Teva repeatedly turned down opportunities to grow its Ketoconazole sales at large customers; as Teva's Patel explained: "Unable to bid at this time. For internal purposes, it is for strategic reasons." Teva was careful to keep secret the real reason it turned down these business opportunities: Defendants' Fair Share agreement.

1189.   During the period when Taro prices spiked even higher than the other manufacturers, Taro was in touch with G&W, which eventually followed Taro's price spike. Taro's M.P., Chief Commercial Officer, communicated by phone with K.O., G&W's President, in July, October, and multiple times in November, 2015. Also, Taro's Aprahamian had phone contact with E.V., G&W VP of Sales and Marketing, on September 24, 2015.

### 102.   Paricalcitol

1190.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Paricalcitol capsules beginning at least as early as February 2014.

1191. Paricalcitol, also known by the brand name Zemplar, is a medication used to treat and prevent high levels of parathyroid hormone in patients with chronic kidney disease.

1192.   During the relevant time frame, Defendants Teva, Dr. Reddy's, and Zydus were the primary manufacturers of Paricalcitol.

1193.   Teva was the first generic manufacturer to enter the market for Paricalcitol and thus had 180 days of exclusivity. In March 2014, as the end of the exclusivity period was approaching, Teva began to plan for the ceding of Fair Shares to new market entrants.

1194.  Zydus was one of the new market entrants. Before Zydus launched its product, Patel and Rekenthaler of Teva spoke with Green of Zydus and discussed which Paricalcitol customers Teva would retain and which customers it would concede to Zydus. Rekenthaler and Green spoke on February 28 and March 3, and Green and Patel spoke at least five times over the course of two days (March 3 and March 4).

1195.  Throughout March and April, Patel, Rekenthaler, and Green continued to coordinate closely about divvying up the market. Representatives of the two companies spoke on March 14 (Patel called Green, and Rekenthaler called Patel), March 17 (three calls between Patel and Green), March 27 (Patel to Green), April 1-2 (voicemail and call between Patel and Green), and April 17 (Green and Patel spoke). In close proximity to these communications, Teva strategically conceded several Paricalcitol customers to Zydus.

1196.  By May 2014, Dr. Reddy's was preparing to enter the Paricalcitol market.

1197.  On May 1, 2014, a Senior Director of National Accounts at Dr. Reddy's spoke with Rekenthaler of Teva. On June 10, 2014, Patel spoke with the Vice President of Sales for North American Generics at Dr. Reddy's.

1198.  As Dr. Reddy's solicited business from Teva customers, Teva conceded them to Dr. Reddy's as agreed. For example, a large grocery chain informed Teva that it had received a competing offer for Paricalcitol from Dr. Reddy's. Internally, Patel recommended that Teva concede the business, and it did.

1199.  On July 10, 2014, another grocery chain informed Teva that it had received a Paricalcitol offer. That day, the Head of National Accounts at Dr. Reddy's called Patel. The next day, Teva conceded the customer to Dr. Reddy's.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1200.   In July, after Teva conceded yet another grocery customer to Dr. Reddy's, a large wholesaler informed Teva that it had received a competing bid for Paricalcitol.  On July 18, 2014, Patel called the Head of National Accounts at Dr. Reddy's and left a message. On July 21st, they spoke, and again on the following day. During these calls, Patel and the Head of National Accounts at Dr. Reddy's agreed that Dr. Reddy's would stop soliciting Teva customers if Teva conceded the large wholesaler to Dr. Reddy's. Dr. Reddy's confirmed to Teva that it "would be done after this."   The next day, Teva conceded the wholesale customer to Dr. Reddy's.

### **103.    Atenolol Chlorthalidone**

1201.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Atenolol Chlorthalidone tablets beginning at least as early as March 2014.

1202.   Atenolol Chlorthalidone, also known by the brand name Tenoretic, is a medication used to treat high blood pressure.

1203.   During the relevant time frame, Defendants Actavis and Mylan were the primary manufacturers of Atenolol Chlorthalidone tablets.

1204.   The market for Atenolol Chlorthalidone tablets was mature and at all relevant times had multiple manufacturers.

1205.   For years, the prices for Atenolol Chlorthalidone tablets were relatively low and stable. Beginning in the spring of 2014, Mylan and Actavis began to steadily and consistently raise the prices of Atenolol Chlorthalidone tablets. By the end of 2014, list (WAC) prices for both manufacturers had more than doubled, and NSP prices for both manufacturers ███████████ ██████ .

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1206.  As Mylan and Actavis raised prices, they aimed to divide the market between themselves. Whenever market share diverged from a roughly equal split (as happened in a couple of instances when Mylan experienced supply disruptions), they eventually worked back toward a 50/50 division. All the while, Mylan and Actavis were careful not to erode pricing.

1207.  The NSP price chart and list (WAC) price chart below show the sustained increases and parallel pricing by Actavis and Mylan for Atenolol Chlorthalidone tablets. (Note: Atenolol Chlorthalidone tablets come in two dosages, 100-25 mg and 50-25 mg, and the pricing patterns for them are very similar. Only the 100-25 mg price charts are included here.)



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1208. Throughout this period, Actavis and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Atenolol Chlorthalidone and of their Fair Share agreement.

1209. For example, Nesta (Mylan) and Falkin (Actavis) communicated extensively throughout the time of the price increases.

### 104. Diphenoxylate Atropine

1210. Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Diphenoxylate Atropine tablets beginning at least as early as March 2014.

1211. Diphenoxylate Atropine, also known by the brand name Lomotil, is used to treat acute diarrhea.

1212. During the relevant time frame, Defendants Mylan and Greenstone were the primary manufacturers of Diphenoxylate Atropine tablets.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1213.  The market for Diphenoxylate Atropine tablets was mature and at all relevant times had multiple manufacturers.

1214.  For years, the prices for Diphenoxylate Atropine tablets were relatively low and stable. Then, in the space of about six weeks in the spring of 2014, Mylan and Greenstone imposed large and identical price increases on Diphenoxylate Atropine tablets. Mylan and Greenstone announced identical list (WAC) prices that were nearly double the old prices, and their NSP prices ███████████████████████████████████████████

1215.  Both manufacturers saw an immediate jump in revenue from sales of Diphenoxylate Atropine. Prices have never returned to their former levels, and for years after the price increases, the dollar sales of Mylan and Greenstone remained remarkably stable.

1216.  The list (WAC) price chart and the NSP price chart below show the sudden and sustained price increases by Mylan and Greenstone for Diphenoxylate Atropine tablets. ████

████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1217.  Throughout this period, Mylan and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Diphenoxylate Atropine and of their Fair Share agreement.

1218.  For example, M.A., Mylan's National Account Director, communicated by phone with R.H., Greenstone's Director of National Accounts, on April 3, 4, 22, 28 and 29. Mylan announced its list (WAC) price increases on April 17, 2004.

1219.  When Greenstone followed the increase on June 2, 2004, R.H. (Greenstone) again spoke to M.A. (Mylan) on June 24.

### **105.   Estazolam**

1220.  Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Estazolam tablets beginning at least as early as March 2014.

1221.  Estazolam, also known by the brand name Prosom, is a benzodiazepine used to treat insomnia.

1222.  During the relevant time frame, Teva and Actavis were the primary manufacturers of Estazolam tablets.

1223.  On March 14, 2014, Rogerson at Actavis and Patel at Teva spoke at some length. Shortly after that call, Teva's Patel relayed to her Teva colleagues that Actavis would be increasing its Estazolam prices, notwithstanding the fact that the price increase would not be effective until April 15, 2014, approximately one month later.  Rogerson and Patel spoke for a second time on the same day.

1224.  On Monday, March 17, Patel called Rogerson again. Rekenthaler of Teva and Falkin of Actavis also exchanged four text messages that day and had one call. Meanwhile, Patel was sure to include Estazolam on Teva's internal price increase list.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1225.   Less than three weeks later, on April 4, 2014, Teva increased its Estazolam prices. Patel and Rogerson spoke twice by phone that day. Rekenthaler and Falkin also spoke by phone on April 4. Actavis, as promised, raised its Estazolam prices on April 15. ████████████
████████████████████

1226.   After the price increases became effective, Teva took consistent steps not to disrupt the market or steal market share from Actavis, including declining to bid on Estazolam business at a large wholesaler that presented what would have been a great opportunity in a competitive market. But Estazolam was not a competitive market because of Defendants' Fair Share agreement.

### **106.   Niacin**

1227.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Niacin ER tablets beginning at least as early as March 2014.

1228.   Niacin, also known by the brand name Niaspan ER, among others, is a medication used to high cholesterol.

1229.   During the relevant time frame, Defendants Teva, Lupin, and Zydus were the primary manufacturers of Niacin ER tablets.

1230.   Teva entered the market for Niacin ER on September 20, 2013 as the first-to-file generic manufacturer and was awarded 180 days of exclusivity.

1231.   Teva's exclusivity was set to expire on March 20, 2014. Teva learned that Lupin planned to enter that day, and that Zydus planned to enter on June 28, 2014.

1232.   In order to facilitate the entry of Lupin and Zydus, and to maintain dollar revenue while ceding share to those new entrants, Teva increased prices on Niacin ER on March 7, 2014, before the new generics entered the market. Yet again, the entrance of additional suppliers had

the perverse effect of increasing prices, which was a hallmark feature of the Fair Share agreement.

1233.   Prior to Teva's price increase, Teva, Lupin and Zydus exchanged calls during which they discussed the pricing of Niacin ER and ensuring that Fair Share principles would be followed. The calls were between Green of Zydus, Patel and Rekenthaler of Teva, and Berthold of Lupin.

1234.   Similarly, in the days leading up to the Lupin launch on March 20, 2014, all three competitors spoke again to discuss their plans for Niacin ER, with Teva agreeing to concede a Fair Share of the market to Lupin upon entry.

1235.   When Lupin entered the market for Niacin ER on March 20, 2014, it entered at the exact same list (WAC) prices as Teva. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ suggesting that it was not trying to lure away Teva's customers with better prices.

1236.   After Lupin's launch, Patel and Berthold continued to coordinate to make sure Lupin obtained the agreed-upon customers. They coordinated a number of concessions by Teva that allowed Lupin to acquire large customers and its Fair Share without resorting to unfettered price competition.

1237.   In May 2014, Zydus was preparing to enter the Niacin ER market. On May 6, Rekenthaler and Patel exchanged calls with Zydus's Green, after which Teva internally agreed to concede a large wholesaler customer, though it required a number of follow-up conversations with Zydus to hammer out the details.  On May 29, 2014, Rekenthaler again called Green, and they spoke twice that day. Patel also called Green that day, and there were additional phone calls between Green and Rekenthaler and Patel on June 2.   After these communications, Teva committed to conceding a large wholesale customer to Zydus.

1238.   On June 28, 2014, Zydus launched Niacin ER and announced list (WAC) prices that matched Teva and Lupin. ███████████████████████

### 107.   **Phenytoin Sodium**

1239.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Phenytoin Sodium capsules beginning at least as early as March 2014.

1240.   Phenytoin Sodium, also known by the brand name Dilantin, is used to prevent and control seizures.

1241.   During the relevant time frame, Defendants Mylan, Taro, Sun and Amneal were the primary manufacturers of Phenytoin Sodium capsules.

1242.   The market for Phenytoin Sodium capsules was mature and at all relevant times had multiple manufacturers.

1243.   For years, the prices for Phenytoin Sodium capsules were relatively low and declining. Mylan, which had a dominant share of the market going back to at least January 2008, kept its NSP prices ████ but as a result of its higher prices, Mylan saw its market share erode. Sun, Taro and Amneal gained market share in the Phenytoin Sodium market. But once shares began to equalize into Fair Shares, the manufacturers were ready to coordinate a price increase.

1244.   In 2014, Mylan, Taro, Amneal and Sun decided to re-align prices at a much higher level. Within the space of a few months, Mylan, Taro and Amneal announced price increases that brought their list (WAC) prices to identical levels. The increases ranged from a little less than 200% to more than 300%, but all ended up at the same price.

1245.   Sun did not change its list (WAC) price, but it did dramatically increase the prices it charged its customers. Sun's Phenytoin Sodium NSP prices ██████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

████████████████████████████████████████████████

███████████████████████████████

1246.   Thereafter, Defendants were careful to adhere to the Fair Share agreement. For example, in July 2014, a large retail customer approached Mylan seeking a bid. Mylan declined, because it already had sufficient share. Having been turned down by Mylan, the customer turned to Taro. But Taro, too, abided by the Fair Share agreement and refused to bid on the business, explaining: ████████████████████████████████████

1247.   The list (WAC) price chart and the NSP price chart below show the sudden and sustained price increases by Mylan, Taro, Amneal and Sun for Phenytoin Sodium capsules. ████

███████████████



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1248.  Throughout this period, Mylan, Taro, Sun and Amneal met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Phenytoin Sodium and of their Fair Share agreement.

1249.  For example, on April 21, 2014, W.F., Sun Senior Manager of National Accounts, informed a colleague: "No price increase yet on Phenytoin but I have heard one might be coming." Earlier that day, G.S., President of Sun, communicated by phone with Taro's M.P., Chief Commercial Officer. The two communicated by phone again later that month, and in May, June, July, August and September 2014. During this period, Sun's Phenytoin Sodium pricing rose along with the other manufacturers, consistent with their price-fixing and Fair Share agreement.

1250.  Taro announced its list (WAC) price increase on June 3, 2014. Taro's Aprahamian then communicated by phone with M.A., Mylan National Account Director, on June 6, 9 and July 2 and 10. Mylan then raised its list (WAC) prices on July 16.

1251.  Mylan's Nesta was in touch with A.L., Amneal's Director of Pricing, in June, August and September 2014. Amneal announced list price increases on September 1, 2014.

1252.  Defendants continued to abide by the Fair Share agreement well after the price increases became effective.  For example, in July 2015, Taro chose not to bid on Phenytoin Sodium Capsules at a particular customer "due to Taro having enough market share." Again in August 2015, Taro declined an opportunity because "we have our share."

### 108.  Bumetanide

1253.  Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Bumetanide tablets beginning at least as early as April 2014.

1254.  Bumetanide, also known by the brand name Bumex, is a medication used to treat fluid retention (edema) and swelling that is caused by congestive heart failure, liver disease, kidney disease, or other medical conditions.

1255.  During the relevant time frame, Teva and Sandoz were the primary manufacturers of Bumetanide.

1256.  Bumetanide was among the drugs subject to Teva's April 4, 2014 price increases. As with other drugs on Teva's list, Teva actively planned and coordinated the price increase for Bumetanide. For example, a few days before the price increase, Teva's Patel and Sandoz's Associate Director of Pricing spoke at length. They spoke again on the day of the increase for twenty-five minutes.  Ultimately Teva increased prices dramatically on Bumetanide, and Sandoz eventually followed the increase.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**109.    Dicloxacillin Sodium**

1257.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Dicloxacillin Sodium capsules beginning at least as early as April 2014.

1258.   Dicloxacillin Sodium, also known by the brand name Dycill, is a medication used to treat a broad variety of bacterial infections.

1259.   During the relevant time frame, Defendants Teva and Sandoz were the primary manufacturers of Dicloxacillin Sodium.

1260.   Teva increased prices on various drugs on April 4, 2014, including Dicloxacillin Sodium. As with Bumetanide, the increase on Dicloxacillin Sodium was coordinated via calls between Patel and the Associate Director of Pricing at Sandoz in March and April of 2014.

**110.    Diflunisal**

1261.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Diflunisal tablets beginning at least as early as April 2014.

1262.   Diflunisal, also known by the brand name Dolobid, is a nonsteroidal anti-inflammatory drug (NSAID) used to treat mild to moderate pain, and to relieve symptoms of arthritis, such as inflammation, swelling, stiffness, and joint pain.

1263.   During the relevant time frame, Defendants Teva and Rising were the primary manufacturers of Diflunisal.

1264.   In late 2013 and early 2014, Teva's Rekenthaler and the Senior Vice President of Sales and Marketing at Rising coordinated pricing and Fair Shares in the Diflunisal market. For example, the two spoke by phone on December 5, March 17 and March 31. During this period, Teva solidified plans to raise prices on Diflunisal tablets.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1265.   On April 4, 2014, Teva increased is list (WAC) prices on Diflunisal.

1266.   Rising exited the Diflunisal market for a short period of time starting in mid-July 2014. Rising's SVP of Sales called Rekenthaler to let him know about Rising's supply issues and temporary market exit in advance.

1267.   After Rising's supply problems were resolved four months later, Rising's SVP of Sales and Rekenthaler spoke by phone several more times to coordinate Rising's re-acquisition of a Fair Share of the market and to maintain pricing for Diflunisal.

1268.   When Rising re-entered the market for Diflunisal tablets, rather than win back customers by offering better pricing, it announced list (WAC) prices that matched Teva's.

### **111.**   **Fluvastatin Sodium**

1269.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Fluvastatin Sodium capsules beginning at least as early as April 2014.

1270.   Fluvastatin Sodium, also known by the brand name Lescol, among others, is a medication used to reduce the amount of cholesterol in the blood, and is among the class of drugs known as statins.

1271.   During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Fluvastatin Sodium.

1272.   Mylan increased its list (WAC) prices on a number of different drugs in April 2014. A number of these drugs also were manufactured by Teva, including Fluvastatin Sodium.

1273.   Almost immediately after Mylan announced price increases, Teva confirmed internally that it intended to follow the increases for Fluvastatin Sodium consistent with the established Fair Share and price fixing agreements between the two companies.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1274.   Teva's Rekenthaler spoke with Mylan's Nesta on April 24, May 20, and twice on May 27.

1275.   On August 28, 2014, Teva raised prices on a number of different drugs, including Fluvastatin Sodium. Leading up to the price increase, Rekenthaler spoke to Nesta on August 4, 7, 11, 18, and 21.

1276.   As a result of the agreement and anticompetitive coordination between Teva and Mylan, prices for Fluvastatin Sodium were higher than they would have been in a competitive market.

### 112.   Topiramate

1277.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Topiramate sprinkle capsules beginning at least as early as April 2014.

1278.   Topiramate, also known by the brand name Topamax, is a medication used to treat seizures in adults or children with epilepsy, and also to help control the type of pain caused by damaged nerves.

1279.   During the relevant time frame, Defendants Teva, Actavis, and Zydus were the primary manufacturers of Topiramate.

1280.   In April 2014, Zydus raised its price for Topiramate sprinkle capsules.  Teva's Patel was in frequent communication with Green of Zydus at the time of the Zydus price increase.

1281.   Zydus's Green coordinated with both Patel and Rekenthaler at Teva, including conversations on June 2, 11, and 13. In addition, on June 11, Rekenthaler spoke twice with Falkin of Actavis, the only other company in the market for Topiramate.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1282.   On June 13—the same day the Zydus price increase on Warfarin became effective—Patel added Topiramate sprinkle capsules to Teva's price increase list, with the notation, "Follow/Urgent - Zydus."

1283.   Teva followed the Zydus price increase for Topiramate sprinkle capsules on August 28, 2014. Patel spoke with Zydus's Green and Actavis's Rogerson on August 27; Rekenthaler spoke with Green on August 19 and 20; and Rekenthaler spoke with Falkin on August 18, 24, 26, and 28. The day before the increase became effective, Patel spent most of the morning discussing price increases with her contacts at Actavis and Zydus, among other companies.

### **113.   Allopurinol**

1284.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Allopurinol tablets beginning at least as early as May 2014.

1285.   Allopurinol, also known by the brand name Zyloprim, is a xanthine oxidase inhibitor used to treat gout and certain kinds of kidney stones.

1286.   During the relevant time frame, Defendants Actavis, Dr. Reddy's, Mylan and Par were the primary manufacturers of Allopurinol.

1287.   The market for Allopurinol was mature and at all relevant times had multiple manufacturers.

1288.   For years, the prices for Allopurinol were relatively low and stable. Par/Qualitest, Actavis, Dr. Reddy's and Mylan all offered prices for Allopurinol tablets for ▮▮▮▮▮▮▮. Dr. Reddy's exited the market in 2012, and prices remained low and stable. Then, in the spring of 2014, there were brief supply disruptions for Allopurinol. Par/Qualitest and Actavis used this as a reason to impose enormous price increases, which they did almost simultaneously. Actavis

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

announced list prices approximately 5 times higher than its former prices, and Par/Qualitest announced list prices slightly higher even than Actavis. Their NSP prices ███████████

1289.   Mylan did not immediately follow the Actavis and Par/Qualitest price increases, but eventually did so. Approximately six months after Actavis and Par announced their list prices, Mylan joined them, announcing list prices identical to those of Actavis, and it also ████ ████████████████

1290.   High prices tend to attract competition, which in turn, tends to drive prices down as more manufacturers compete with each other by offering lower prices. When prices spiked in the Allopurinol market, Dr. Reddy's began to assess whether it should re-enter. But Dr. Reddy's—and Par/Qualitest, Actavis and Mylan—did not want added competition to drive down prices.

1291.   In August 2014, Dr. Reddy's assessed possible re-entry into the Allopurinol market. Since it would be the fourth manufacturer in the market, the Head of National Accounts at Dr. Reddy's recognized—in line with the Fair Share agreement—████████████████ ██████

1292.   Dr. Reddy's did decide to re-enter the market. As it ramped up for re-entry, it conscientiously hewed to the Fair Share agreement between the Allopurinol manufacturers. In January 2015, rather than offer better prices to win market share, Dr. Reddy's announced identical list (WAC) prices as Actavis.

1293.   When Dr. Reddy's began pursuing a Fair Share of the market, it was careful not to disrupt pricing. For example, in January 2015, as Dr. Reddy's internally discussed an Allopurinol opportunity at a large customer, the Vice President and Head of Prescription Drugs reminded his team, ██████████████████████████

1294.  Dr. Reddy's was similarly conscientious in abiding by its Fair Share agreement when opportunities to take Allopurinol business from Mylan arose: ████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████

1295.  The list (WAC) price chart and the NSP price chart below show the large price increases by Actavis, Par/Qualitest, Dr. Reddy's and Mylan on Allopurinol tablets. Note: Allopurinol tablets come in 100 mg and 300 mg dosages. The pricing patterns for each dosage were highly similar. Only the 100 mg charts are included here.  [████████████████]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1296.   Throughout this period, Actavis, Dr. Reddy's, Mylan and Par/Qualitest met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Allopurinol and of their Fair Share agreement.

1297.   For example, Falkin (Actavis) was in touch with Nesta (Mylan) in September 2014. Falkin (Actavis) also communicated with C.S., Dr. Reddy's Senior Director of National Accounts, in September. Mylan's M.A., National Account Director, spoke with Par's K.O., VP of National Accounts, on September 18, 2014. Actavis announced its list (WAC) price increases on Allopurinol on September 19, 2014.

1298.   On September 26, 2014, a week after Actavis's price increase, A.S., Actavis VP of Sales, spoke to T.P., VP of National Accounts at Par/Qualitest, for nearly 15 minutes. A few days later, Par announced list (WAC) prices for Allopurinol that were even higher than those of Actavis.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1299.   Falkin (Actavis) again spoke to C.S. (Dr. Reddy's) multiple times in January and in early February. Dr. Reddy's announced its list (WAC) price increases on January 26, 2015.

1300.   Falkin (Actavis) also spoke to Nesta (Mylan) again in March 2015, shortly after Mylan announced its list (WAC) price increases on Allopurinol on March 4, 2015.

## 114.   Clotrimazole

1301.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Clotrimazole 1% solution beginning at least as early as May 2014.

1302.   Clotrimazole, also known by the brand name Gyne-Lotrimin, among others, is an antifungal medication used to treat yeast infections and certain types of ringworm, among other fungal infections.

1303.   During the relevant time frame, Teva and Taro were the primary manufacturers of Clotrimazole.

1304.   The market for Clotrimazole was mature and at all relevant times had multiple manufacturers.

1305.   For years, the prices of Clotrimazole lotion were relatively low and stable. In the spring of 2014, Taro and Teva began to coordinate extraordinary price increases. The first round of increases occurred in the summer of 2014, and a second round took place in the summer of 2015. The pricing of Taro and Teva was virtually lockstep, as they announced identical list prices in close succession. By July 2015, Taro and Teva prices were more than 400% higher than the previous summer.

1306.   The list (WAC) price chart and the NSP price chart below show the large and parallel price increases imposed by Teva and Taro in the summer of 2014 and again in the summer of 2015.  █████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1307.  Throughout this period, Taro and Teva met at trade conferences and communicated with each other directly in furtherance of their price-fixing agreement on Clotrimazole and of their Fair Share agreement.

1308.  For example, shortly before implementing price increases in early June 2014, Teva and Taro were in regular contact to coordinate the increases. On May 14, 2014, Teva's Patel and Taro's Aprahamian exchanged eight text messages and communicated by phone. Two weeks later, on May 28, 2014, pursuant to directions from Patel, a Teva employee circulated a list titled "2014 Future Price Increase Candidate Analysis" that included several drugs sold by Taro. Clotrimazole appeared along with the notation "Follow/Urgent" identified as the reason for the increase, even though Taro had not yet increased its price on those drugs or notified its customers that it would be doing so.

1309.  On June 3, 2014, the date that Taro announced its list price increase, Patel and Aprahamian exchanged five text messages. The two continued to communicate over the next few days.

1310.  After Taro announced its increase, but before Teva had followed, Teva declined an opportunity to take a large customer from Taro. Patel explained internally: ███████████ ████████████████████████████████████ █ ████████████████ ████████████████████████████████

1311.  On August 28, 2014, Teva raised prices on a number of different drugs, including Clotrimazole. Leading up to the increase, Patel of Teva spoke with Aprahamian of Taro on August 18 and 27. In addition to those phone communications, representatives from Teva and Taro, along with representatives from numerous Defendants, met in Boston, MA, shortly before the increase from August 23-26, 2014 for the NACDS annual event.

1312.   As a result of the agreement and anticompetitive coordination between Teva and Taro, prices for Clotrimazole were higher than they would have been in a competitive market.

### 115.   Desogestrel and Ethinyl Estradiol

1313.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Desogestrel and Ethinyl Estradiol tablets beginning at least as early as May 2014.

1314.   Desogestrel and Ethinyl Estradiol, also known by the brand names Kariva and Mircette, is an oral contraceptive.

1315.   During the relevant time frame, Teva, Actavis and Glenmark were the primary manufacturers of Desogestrel and Ethinyl Estradiol.

1316.   From at least May 2014 forward, Teva, Actavis and Glenmark monitored their Fair Share agreement on Desogestrel and Ethinyl Estradiol tablets to ensure that market shares remained relatively equal. They frequently communicated by phone to facilitate this process.

1317.   For example, during the morning of May 19, 2014, Patel learned that Glenmark had bid a low price for its own version of Kariva (known as Viorele) at a large retail pharmacy purchaser. This triggered a flurry of communications between Patel and at least three different Glenmark representatives, including Jim Brown (VP of Sales), Jim Grauso (Executive VP of Commercial Operations), and another sales and marketing executive.

1318.   Patel also spoke with Rogerson at Actavis that same day (May 19). In fact, Patel was regularly in contact with Rogerson throughout May. The two spoke on at least May 8, 9, 12, 19 and 22.

1319.   After communicating with Glenmark and Actavis, Patel decided that Teva would not compete on price. Instead, it would bid high, thereby ensuring that the large retail pharmacy business would be conceded to Glenmark.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 116.   Prochlorperazine

1320.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Prochlorperazine tablets beginning at least as early as May 2014.

1321.   Prochlorperazine, also known by the brand name Compro, is a medication used to treat psychotic disorders such as schizophrenia, as well as control severe nausea.

1322.   During the relevant time frame, Teva, Mylan, Sandoz and Cadista were the primary manufacturers of Prochlorperazine.

1323.   Prochlorperazine was among the drugs that Teva targeted for price increases in late August 2014. In order to coordinate prices and Fair Shares for Prochlorperazine, Patel and Rekenthaler communicated with each of the other primary manufacturers in the market.

1324.   Teva's Patel communicated frequently with the Associate Director of Pricing at Sandoz in July, August and September 2014.

1325.   Rekenthaler spoke to M.D., Vice President of Sales at Cadista, on at least June 18, 2014. And he spoke to Nesta at Mylan on June 24 and at least four times in August (on the 7th, 11th, 18th, and 21st).

1326.   Nesta (Mylan) also communicated with M.D. at Cadista, on at least July 2, 30, 31 and August 7, 11, 21, 22 and 23.

### 117.   Fluoxetine HCL

1327.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Fluoxetine HCL tablets beginning at least as early as June 2014.

1328.   Fluoxetine HCL, also known by the brand name Prozac, is a medication used to treat depression, obsessive-compulsive disorder (OCD), and panic disorder, among other conditions.

1329.   During the relevant time frame, Teva, Mylan, and Par were the primary manufacturers of Fluoxetine HCL tablets.

1330.   In late June 2014, Mylan imposed large price increases on Fluoxetine HCL. Around the time of the increases, Mylan, Teva and Par directly communicated via phone to coordinate.

1331.   For example, on June 18, 2014, less than a week before Mylan announced its Fluoxetine HCL price increases, a National Account Manager at Mylan spoke to the Vice President of National Accounts at Par.

1332.   On June 24, the day after Mylan announced its price increases, Mylan's Nesta spoke to Teva's Rekenthaler.

1333.   Two days later, on June 26, Teva's Patel exchanged a series of text messages with the Chief Commercial Officer at Par.

1334.   In January 2015, Teva followed Mylan's price increases for Fluoxetine HCL Tablets. Again, the manufacturers of Fluoxetine were in communication to coordinate.

1335.   On January 5, 14 and 20, Teva's Rekenthaler spoke with Mylan's Nesta.

1336.   On January 26, Rekenthaler spoke with a Vice President of National Accounts at Par for 14 minutes, and on January 28, he spoke with Par's Vice President of Sales.

1337.   Also, in the months leading up to Teva increasing the prices of Fluoxetine HCL tablets, Teva's Patel met in-person with many of Teva's competitors. *See, e.g.*, Exhibit A (Trade Association Contacts).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 118.   **Methadone HCL**

1338.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Methadone HCL tablets beginning at least as early as June 2014.

1339.   Methadone HCL, also known by the brand name Methadose, is used to manage moderate to severe pain.  It is also used to treat addiction to opioids.

1340.   During the relevant time frame, Defendants West-Ward and Mallinckrodt were the primary manufacturers of Methadone HCL tablets.

1341.   The market for Methadone HCL tablets was mature and at all relevant times had multiple manufacturers.

1342.   For years, the prices for Methadone HCL tablets were relatively low and stable. Before the summer of 2014, West-Ward and Mallinckrodt sold Methadone HCL tablets for ▮ ▮▮▮▮▮▮▮▮▮▮▮▮. In the second half of 2014, however, West-Ward and Mallinckrodt nearly simultaneously imposed large price increases, approximately tripling their list (WAC) prices ▮ ▮▮▮▮▮▮▮

1343.   The list (WAC) price chart and the NSP price chart below show the large and nearly simultaneous price increases by West-Ward and Mallinckrodt on Methadone HCL tablets. (Note: Methadone HCL tablets come in 5 mg and 10 mg dosages. The pricing patterns for each dosage were highly similar. Only the 10 mg charts are included here.) ▮▮▮▮▮▮▮ ▮▮▮▮





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1344.   Throughout this period, West-Ward and Mallinckrodt met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Methadone HCL tablets and of their Fair Share agreement.

1345.   For example, West-Ward's D.S., Senior Director and Head of Sales, and Mallinckrodt's K.K., National Account Director, both attended the ECRM event at the Omni Amelia Island Plantation Resort in Amelia Island, Florida on February 23-26, 2014.

1346.   On May 15, 2014, West-Ward's D.S. and Mallinckrodt's K.K communicated by phone.

1347.   In August, the two sales executives attended the NACDS Total Store Expo in Boston on August 23 to 26, 2014.

1348.   Approximately one month after the NACDS meeting, West-Ward announced list (WAC) price increases for Methadone. A few weeks later, Mallickrodt matched West-Ward's list (WAC) prices.

### **119.**   **Omega-3-Acid Ethyl Esters**

1349.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Omega-3-Acid Ethyl Esters capsules beginning at least as early as June 2014.

1350.   Omega-3-Acid Ethyl Esters, also known by the brand name Lovaza, is a medication used to lower high triglyceride levels in the blood.

1351.   During the relevant time frame, Teva, Par and Apotex were the primary manufacturers of Omega-3-Acid Ethyl Esters.

1352.   On April 8, 2014, Teva launched Omega-3 Acid Ethyl Esters.

1353.   On the morning of June 26, 2014, Patel emailed a colleague at Teva relaying that Par had recently received FDA approval for this drug. Patel said that she would "snoop around"

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

to see if Par had begun shipping product. That morning, Patel sent a message to T.P., Chief Commercial Officer at Par through LinkedIn. Later that day, they exchanged a number of text messages.

1354.   The next morning, Par's Chief Commercial Officer called Patel and they spoke for nearly 30 minutes. That same morning, Patel told colleagues that she now had "some more color" on Par's launch of Omega-3-Acid Ethyl Esters. Internally, Teva documents evidence a clear understanding of Par's confidential bidding and pricing plans.

1355.   Par launched Omega-3-Acid Ethyl Esters capsules on June 30, 2014. Teva proceeded to concede business to Par to ensure Par's smooth entry into the market.

1356.   As new competitors entered the market, Teva coordinated with them to avoid competition and keep prices high, including phone calls between Rekenthaler and a Senior Vice President and General Manager of U.S. Sales at Apotex on September 25 and 27, 2014.

1357.   Due to supply limitations, Par was not able to pursue a full Fair Share of the market until late November 2014. On November 10, 2014, Patel and Par's Chief Commercial Officer exchanged 5 text messages.

1358.   By mid-February 2015, Teva had conceded several large customers to Par. During this time, Rekenthaler was speaking frequently with M.B., a senior national account executive at Par, to coordinate.

1359.   By April 2015, Apotex had officially entered the market, and consistent with the Fair Share understanding, Teva conceded customers to accommodate the new entrant. During this period, Rekenthaler spoke multiple times with J.H., Senior VP at Apotex.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 120.   **Warfarin Sodium**

1360.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Warfarin Sodium tablets beginning at least as early as June 2014.

1361.   Warfarin Sodium, also known by the brand name Coumadin, is an anticoagulant medication used to treat and prevent blood clots.

1362.   During the relevant time frame, Teva, Taro, Zydus and Amneal were the primary manufacturers of Warfarin Sodium.

1363.   The market for Warfarin Sodium tablets was mature and at all relevant times had multiple manufacturers.

1364.   For years, the prices for Warfarin Sodium tablets were relatively low and stable. Then, in the summer of 2014, Taro, Teva, Zydus and Amneal orchestrated a coordinated price increase.

1365.   Between June and August, █████████████████████████████████████████ ███████████████████████████████████████

1366.   Taro, Teva, Zydus and Amneal also coordinated their list (WAC) pricing. Within a short window of time in June, Taro and Zydus announced large list (WAC) price increases. Teva, which already had higher list prices for Warfarin Sodium, announced a smaller list price increase in late August. Amneal, which had supply issues shortly after the price increase and briefly exited the market, did not raise list (WAC) prices until April 2015, when it rejoined the market. At that point, it matched Teva's list prices.

1367.   The NSP price chart and list (WAC) price chart below show the Warfarin Sodium price increases that were close in time and amount that Taro, Teva, Zydus and Amneal imposed in the summer of 2014.  Note: The pricing patterns for all dosages of Warfarin Sodium tablets (1,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

2, 2.5, 3, 4, 5, 6, 7.5 and 10 mg) were highly similar. Charts for only the 5 mg dosage are included here.





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1368.   Throughout this period, Teva, Taro, Zydus and Amneal met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Warfarin Sodium tablets and of the Fair Share agreement.

1369.   For example, when Taro implemented substantial price increases on Warfarin Sodium tablets on June 3, 2014, Teva's Patel already knew the price increases were coming from discussions with Taro's Aprahamian in the preceding weeks.

1370.   On the day of Taro's increase, Teva's Patel and Taro's Aprahamian exchanged 5 text messages, and, that evening, Patel called Aprahamian. The following morning, Patel and Aprahamian exchanged text messages and again spoke by phone.

1371.   On June 13, 2014, Zydus followed with a Warfarin Sodium price increase of its own. During the ten days between Taro's list price increase and Zydus's list price increase, Teva, Taro and Zydus coordinated through various phone communications between Patel, Aprahamian, Rekenthaler, and Green of Zydus.

1372.   On June 13, 2014—the date of the Zydus increase on Warfarin—Teva was presented with an offer from a customer for a one-time buy on that drug. On June 17, 2014, Patel had another conversation with Aprahamian, and, the following day, on June 18, 2014, Patel took preparatory steps internally for a price increase. Zydus's Green also spoke with A.L., the Director of Pricing at Amneal on June 17, and the two spoke a number of additional times later that month.

1373.   On August 28, 2014, Teva increased its list (WAC) prices on Warfarin Sodium. In the period before the price increase, Patel and Rekenthaler were communicating with the other Warfarin Sodium manufacturers. Patel spoke with Aprahamian of Taro on August 18.   On August 27 Patel spoke to Aprahamian and Green of Zydus. Rekenthaler also communicated with

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Green on August 19 and 20, and Rekenthaler spoke to S.R., the Vice President of Sales at Amneal, on August 21. The same Amneal VP exchanged text messages and then spoke with K.R., a Vice President of Sales at Zydus on August 18.

1374.   Similarly, when Amneal was preparing to re-enter the market in the spring of 2015, it coordinated with the other Warfarin Sodium manufacturers.  For example, on March 3, 2015, Teva's Rekenthaler spoke to S.R., Amneal's Vice President of Sales, for 11 minutes. The next day, Amneal announced list (WAC) price increases on Warfarin Sodium. On March 6, Rekenthaler and the Amneal VP spoke again.

### 121.   Ciprofloxacin HCL

1375.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Ciprofloxacin HCL tablets beginning at least as early as August 2014.

1376.   Ciprofloxacin HCL, also known by the brand names Cetraxal, Otiprio, and Ciloxan, is a medication used to treat a variety of infections, including anthrax infection after inhalational exposure, urinary tract infections, and pneumonic and septicemic plague.

1377.   During the relevant time frame, Defendants Teva, Actavis, and Dr. Reddy's were the primary manufacturers of Ciprofloxacin HCL.

1378.   The market for Ciprofloxacin HCL tablets was mature and at all relevant times had multiple manufacturers.

1379.   After years of relatively low and stable pricing for Ciprofloxacin HCL tablets, Dr. Reddy's, Teva and Actavis orchestrated large price increases in the latter months of 2014. Within a matter of months, all four manufacturers announced large list (WAC) price increases and identical list prices.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1380.   The list (WAC) price chart below shows the large and parallel price increases for Ciprofloxacin HCL tablets.



1381.   Throughout this period, Teva, Dr. Reddy's and Actavis met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Ciprofloxacin HCL tablets and of the Fair Share agreement.

1382.   For example, prior to announcing a five-fold increase to its list (WAC) prices on August 18, 2014, Dr. Reddy's communicated with the other manufacturers to coordinate. A senior sales executive at Dr. Reddy's spoke frequently with Teva's Patel about the planned price increase, and the two also exchanged four text messages on August 25, 2014.

1383.   Similarly, around the time that Actavis announced its price increases for Ciprofloxacin HCL (December 19, 2014), Rekenthaler of Teva spoke to Falkin of Actavis several times to coordinate, including twice on December 17 and once on December 18. This drug was also referenced in calls between Rekenthaler and Falkin in a call on January 13, 2014, and two calls on January 14, 2014, and also in a call on January 16, 2015.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1384.   Falkin (Actavis) also spoke with a Senior Director of National Accounts at Dr. Reddy's on January 5, 12, 15, 16 and 21.

1385.   On January 28, 2015, Teva raised its Ciprofloxacin HCL prices, to match Dr. Reddy's and Actavis's list (WAC) prices exactly. The same day as the Teva price increase, Dr. Reddy's was able to obtain a full copy of Teva's price increase list.

### **122.   Desmopressin Acetate**

1386.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Desmopressin Acetate tablets beginning at least as early as August 2014.

1387.   Desmopressin Acetate, also known by the brand names Concentraid, DDAVP, and Stimate, is an antidiuretic agent used in the treatment of central diabetes insipidus.

1388.   During the relevant time frame, Teva and Actavis were the primary manufacturers of Desmopressin Acetate.

1389.   In August 2014, Teva increased prices on Desmopressin Acetate tablets, along with a number of other drugs. In the lead up and follow-up to the price increases, Teva was in frequent contact with other drug manufacturers to coordinate price increases and Fair Shares. Actavis, which was the only other manufacturer of Desmopressin Acetate, was no exception.

1390.   On October 15, 2014, Teva received a request from a customer asking Teva to reduce prices for Desmopressin Acetate. Teva's Patel—who already knew that Actavis would be raising prices—responded to the customer by declining to lower the price with the explanation: "[w]e believe the market is still settling on this product."

1391.   On December 19, 2014, Actavis followed Teva's price increase on Desmopressin Acetate, announcing identical list (WAC) prices.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1392.   Leading up to Actavis's price increase, Rekenthaler of Teva and Falkin of Actavis spoke frequently, including calls on November 18, November 21, and November 25, 2014.

### **123.**   **Entecavir**

1393.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Entecavir tablets beginning at least as early as August 2014.

1394.   Entecavir, also known by the brand name Baraclude, among others, is a medication used to treat chronic Hepatitis B.

1395.   During the relevant time frame, Defendants Teva and Par were the primary manufacturers of Entecavir.

1396.   In August 2014, Teva and Par were preparing to enter the market for Entecavir. Both companies were soliciting new customers before their launch. On August 28, 2014, Rekenthaler had three phone calls with M.B, a Vice President of National Accounts at Par. The next day, one of Teva's potential customers sought a lower price from Teva, suggesting it could lose the business to Par. Teva, reassured by its discussions with Par, refused to lower its price, and retained the customer's Entecavir business. In light of the successful coordination internally at Teva, Rekenthaler discussed the possibility of conceding a large customer to Par.

1397.   Teva and Par both launched their respective Entecavir products on September 4, 2014. Within a few weeks, however, Teva and Par had divided the market according to the Fair Share agreement.

1398.   Teva and Par continued to coordinate pricing and allocate customers, with Rekenthaler and the VP at Par speaking twice on October 2. For the entirety of the period in which Par and Teva were the only generic suppliers of Entecavir, market share and prices remained stable and higher than they would have been in a competitive market.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 124. **Flutamide**

1399. Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Flutamide capsules beginning at least as early as August 2014.

1400. Flutamide, also known by the brand names Flucinom, Flugerel, and Niftolide, among others, is a medication used to treat prostate cancer, along with other conditions.

1401. During the relevant time frame, Defendants Teva, Par and Actavis were the primary manufacturers of Flutamide.

1402. In late August 2014, Teva aimed to raise prices on a number of different drugs, including Flutamide. To coordinate prices and Fair Share, Teva (Patel and Rekenthaler), Actavis (Rogerson and Falkin) and Par (M.B., Vice President of National Accounts and J.H., Vice President of Sales), communicated directly with each other via telephone.

1403. Rekenthaler (Teva) communicated by phone with Falkin (Actavis) on August 4, 5, 6, 7, 18, 24, 26 and 28.

1404. Falkin (Actavis) communicated by phone with a Par Vice President of Sales on August 5 and 26.

1405. Rekenthaler (Teva) had three phone calls with a Vice President of National Accounts at Par on August 28.

### 125. **Glimepiride**

1406. Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Glimepiride tablets beginning at least as early as August 2014.

1407. Glimepiride, also known by the brand name Amaryl, is a medication used to control high blood sugar in type 2 diabetics.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1408.  During the relevant time frame, Defendants Teva and Dr. Reddy's were the primary manufacturers of Glimepiride.

1409.  On August 28, 2014, Dr. Reddy's significantly increased its Glimepiride pricing. The increases were significant—with the Glimepiride WAC going up by approximately 300% across dosage strengths. Dr. Reddy's price increases for Glimepiride were preceded by frequent calls between a Vice President of Sales at Dr. Reddy's, and Teva's Patel. They also exchanged text messages on August 25, 2014, three days before the price increase. The Dr. Reddy's VP and Patel continued to communicate after the price increase as well.

1410.  Although Teva did not initially follow Dr. Reddy's price increases for Glimepiride, the Dr. Reddy's VP and Patel continued to communicate, and they exchanged four text messages on October 10, 2014.

1411.  Several months later, on January 25, 2015, Teva raised prices on a number of different drugs, including Glimepiride. Teva raised its list (WAC) prices to match Dr. Reddy's list prices exactly.

### **126.   Griseofulvin**

1412.  Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Griseofulvin suspension beginning at least as early as September 2014.

1413.  Griseofulvin, also known by the brand name Grifulvin V, is an anti-fungal medication used to treat certain infections that do not respond to other medications.

1414.  During the relevant time frame, Defendants Teva and Actavis were the primary manufacturers of Griseofulvin.

1415.  On September 9, 2014, Actavis notified its customers of a price increase on Griseofulvin microsize oral suspension. From September, through the day of the price increase,

Patel and Rekenthaler communicated with Falkin and Rogerson of Actavis to coordinate the increase over the course of at least ten telephone calls.

1416.   Teva added Griseofulvin to its own price increase list, with the notation "Follow Competitor – Actavis" as the reason for the price increase, and followed the Actavis increase for Griseofulvin during its next price increase event on January 28, 2015.

1417.   As with the Actavis price increase in September, in the days leading up to the January 2015 price increase, Rekenthaler of Teva and Falkin of Actavis coordinated frequently. Teva's price increase for Griseofulvin matched Actavis's list (WAC) pricing exactly.

### **127.   Norethindrone Acetate**

1418.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Norethindrone Acetate tablets beginning at least as early as September 2014.

1419.   Norethindrone Acetate, also known by the brand name Primolut-Nor, is a medicine used to treat menstrual cycle disorders, primary and secondary amenorrhea, pre-menstrual syndrome, menstrual cycle regulation and endometritis.

1420.   During the relevant time frame, Defendants Teva, Amneal, and Glenmark were the primary manufacturers of Norethindrone Acetate.

1421.   On September 9, 2014, as Teva was also communicating with competitors about other drugs, a customer approached Teva seeking lower pricing on Norethindrone Acetate. One of Teva's competitors for this drug was Amneal. Also on September 9, 2014, Teva's Patel received phone calls from two different Amneal employees—the Vice President of Sales, and the Senior Director of Sales and Finance. Also that same day, the Amneal Director of Sales and Finance spoke several times with Glenmark (Jim Brown), the only other competitor in the market for Norethindrone Acetate.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1422.   After speaking with the two Amneal executives, Teva offered only a nominal reduction to the customer, because it did not want to compete for the business since the market already was allocated according to Fair Shares.

1423.   Patel acknowledged internally that Teva had "bid high" based on its understanding that "it would be an increase candidate for Amneal." Thus, by bidding high and not taking business from Amneal, in anticipation of future price increases, Teva reinforced the Fair Share understanding among them.

### 128.   Raloxifene HCL

1424.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Raloxifene HCL tablets beginning at least as early as September 2014.

1425.   Raloxifene HCL, also known by the brand name Evista, is a medication used to combat the effects of osteoporosis in postmenopausal women.

1426.   During the relevant time frame, Defendants Teva and Camber were the primary manufacturers of Raloxifene HCL.

1427.   In March 2014, Teva began marketing Raloxifene. Actavis had received approval to begin marketing Raloxifene in 2014 as well, but, by September 2014, had not entered the market. Camber entered the market in September 2014.

1428.   With anticipated product launches approaching, the market entrants discussed an allocation scheme in September 2014: On September 9, 2014, Teva's Rekenthaler had a twenty-six (26) minute phone call with the Senior Vice President of U.S. Sales at Actavis, and, over the course of the following week, Rekenthaler spoke with multiple Actavis employees, including the SVP of U.S. Sales again, on September 16, 2014, for over half an hour.

1429.  On September 17, 2014, Camber sent an offer for Raloxifene to a large Teva customer. That day, Rekenthaler shared internally the information he had gathered from other manufacturers, including that Actavis would be "late" to the market, and that he would learn more about Camber's plan following an upcoming trip.

1430.  Rekenthaler and Kon Ostaficiuk, the President of Camber Pharmaceuticals, spent the next three days playing golf during the day and socializing at night at an industry outing in Kentucky. On September 21 and 22, 2014, Ostaficiuk had a series of five phone calls with Rekenthaler. After those calls, Camber sent a revised offer to a potential customer that same afternoon, containing modified prices for Raloxifene.

1431.  On September 24, Patel discussed a Raloxifene market strategy with her Teva colleagues in light of Camber's offer to the large Teva customer. Later that morning, Rekenthaler called Ostaficiuk and the two spoke for 2 minutes. They spoke two more times that day.

1432.  On September 25, after discussing with his colleagues which customers Teva should concede to give Camber its Fair Share of the Raloxifene market, and armed with the information Rekenthaler had gathered from Ostaficiuk, Teva decided to concede certain additional, smaller customers. Rekenthaler and Ostaficiuk spoke again twice that day.

1433. On Friday, September 26, 2014, Camber announced that it was launching Raloxifene. Rekenthaler called Ostaficiuk that day to convey that Teva did not want Camber taking any more of its Raloxifene customers. Camber agreed, and on September 29, 2014, Ostaficiuk sent an email to colleagues at Camber warning them not to "offer anything to any Teva customers...Not even a 'bad price'! Please acknowledge....We do not want to upset them more!" The Director of Sales and Operations at Camber, replied, "We have not made any offers

to any Teva Raloxifene accounts…. Both Sales and Contracts are aware, & requesting incumbent detail for all offers, if Teva, no offer."

1434.   About a week later, on October 7, 2014, a large Teva customer informed a Teva sales representative that Camber had made an unsolicited bid for its Raloxifene business. A Director of National Accounts at Teva sent an internal email at Teva, expressing surprise given the agreement that Teva had previously reached with Camber: "I thought they were done after securing [our large customer]?" Rekenthaler doubted that Camber made an offer to another Teva customer, stating, "You're positive they sent them an offer?" The Teva Director of National Accounts then "relayed 'the message'" to the customer that "the market should be stable at this point" and Teva doubted that Camber intended to make an offer on Raloxifene. After further discussion with the customer, Teva learned that it was a misunderstanding. Camber never actually made the offer; it complied with the Fair Share agreement with Teva.

### 129.   Amoxicillin/Clavulanate

1435.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Amoxicillin/Clavulanate chewable tablets beginning at least as early as October 2014.

1436.   Amoxicillin/Clavulanate, also known by the brand name Augmentin, is a medication used to treat various infections caused by bacteria, including sinusitis, pneumonia, ear infections, and bronchitis, among others.

1437.   During the relevant time frame, Defendants Teva and Sandoz were the primary manufacturers of Amoxicillin/Clavulanate chewable tablets.

1438.   In late summer and early fall of 2014, Teva and Sandoz orchestrated price increases on Amoxicillin/Clavulanate chewable tablets. Throughout this period, Teva and Sandoz were in regular contact. Teva's Patel spoke with the Associate Director of Pricing at

Sandoz multiple times to fix the prices of Amoxicillin/Clavulanate and other drugs (including at least Diclofenac Potassium and Penicillin V Potassium).

1439.  For example, on October 10, 2014, the day that Sandoz followed Teva's price increase for Amoxicillin/Potassium Clavulanate, Patel of Teva spoke to the Associate Director of Pricing at Sandoz.

### 130.    Bethanechol Chloride

1440.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Bethanechol Chloride beginning at least as early as October 2014.

1441.   Bethanechol Chloride, also known by the brand name Urecholine, is a medication used to treat certain disorders of the urinary tract or bladder.

1442.   During the relevant time frame, Defendants Amneal, Teva and Upsher-Smith were the primary manufacturers of Bethanechol Chloride tablets.

1443.   In the fall of 2014, Amneal, Teva and Upsher-Smith ████████████████ ████ Amneal also announced a list (WAC) price increase in early November, and Teva followed the list price increase in January.

1444.   During this period, Amneal, Teva and Upsher-Smith met at trade conferences and communicated directly in furtherance of their price-fixing agreement on Bethanechol Chloride and the Fair Share agreement.

1445.   On January 28, 2015, Teva announced a list (WAC) price increase on Bethanechol Chloride tablets. Teva's price increase spreadsheet identified the reason for the increase as "Follow Competitor – Amneal." Prior to Teva's increase, Patel had a fifty-one minute phone call with the Senior Director of Sales and Finance at Amneal.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 131.   Gabapentin

1446.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Gabapentin tablets (600 and 800 mg) beginning at least as early as October 2014.

1447.   Gabapentin, also known by the brand name Neurotonin, is an anticonvulsant medication used to treat, among other things, pain that occurs after shingles.

1448.   During the relevant time frame, Defendants Teva, Glenmark and Aurobindo were the primary manufacturers of Gabapentin.

1449.   In October 2014, Teva, Glenmark and Aurobindo met and communicated for the purposes of fixing the prices of Gabapentin tablets.

1450.   For example, Jim Grauso at Glenmark communicated directly by phone with the CEO of Aurobindo (voice or text message) on October 3, 14, 26, 29 and 31. He also communicated with the Vice President of Commercial operations at Aurobindo on October 7, 27, and 28.

1451.   Grauso (Glenmark) also communicated directly by phone with Teva during this period. He had phone contact with a National Account Manager at Teva on October 3, 10, and 23.

1452.   For his part, in addition to communicating directly with Glenmark during this period, the CEO of Aurobindo was in direct contact with Teva as well. He communicated by phone with Teva's Rekenthaler on October 17, 22 and 24. He also communicated with a National Account Manager at Teva multiple times on October 23 (the same day that the Teva NAM communicated with Grauso of Glenmark).

1453.   Nisha Patel also coordinated the Gabapentin Fair Share agreement. For example, on October 13 and 14, 2014, a number of Defendants' employees attended the Annual Meeting

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

of the Pharmaceutical Care Management Association, including Teva's Patel. On the morning of October 15, 2014, right after returning from the trade association meeting, Patel informed colleagues at Teva that Glenmark would be taking a price increase on Gabapentin. That same day, Patel and Jim Brown (Glenmark) exchanged text messages. The Glenmark increase had not yet been made public.

1454.  Because Teva had less share of the Gabapentin market than Glenmark, Teva discussed whether it should use the price increase as an opportunity to gain market share. In a competitive market, that would have been the clear choice. Instead, Teva moderated its desire for more share only to the extent that it could do so "in line with fair share principles." Teva did not "want to disrupt Glenmark's business too much."

### 132.  Celecoxib

1455.  Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Celecoxib capsules beginning at least as early as November 2014.

1456.  Celecoxib, also known by the brand name Celebrex, among others, is a medication used to treat the pain and inflammation associated with arthritis.

1457.  During the relevant time frame, Defendants Teva and Actavis were the primary manufacturers of Celecoxib.

1458.  In November 2014, as Actavis and Teva were preparing to launch generic Celebrex, they communicated directly with each other to coordinate Fair Shares. For example, Actavis's Falkin communicated by phone with Teva's Rekenthaler on November 17, 18, 25, and with Maureen Cavanaugh (Senior Vice President of Sales) on November 11 and 14.

1459.  The lines of communication remained open the following month as well. In the days leading up to and following Teva's December 10, 2014 launch of Celecoxib, Teva's Patel

and the Senior Vice President of U.S. Sales at Actavis communicated by phone on December 5 and 8.

1460.  In addition, Actavis's Falkin communicated by phone with Rekenthaler (December 3, 9, 10, 17, 18), including at least three times on the day of the launch.

### **133.    Cabergoline**

1461.  Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Cabergoline tablets beginning at least as early as December 2014.

1462.  Cabergoline, also known by the brand name Dostinex, is a medication used in the treatment of Parkinson's disease and hyperprolactinemia, as well as certain menstrual and fertility problems, and tumors of the pituitary gland.

1463.  During the relevant time frame, Defendants Teva, Par and Greenstone were the primary manufacturers of Cabergoline.

1464.  As Greenstone was preparing to enter the Cabergoline market in December 2014, one of its senior executives approached the Senior Director of Sales at Teva. The Greenstone executive – F.H., who had responsibility for generic products at a large joint venture between a retail pharmacy and a wholesaler – did so in order to facilitate a customer allocation between the two competitors, and his December 9 email to T.C made clear: "Greenstone has promised to play nice in the sandbox."

1465.  That same day, on December 9, the Senior Director of Sales at Teva called the Senior Director of National Accounts at Par, the other primary manufacturer of Cabergoline. The two executives spoke for approximately four minutes.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1466.   The next day, after some internal discussions at Teva, the Senior Director of Sales agreed to the proposed allocation, stating:  "Tell Greenstone we are playing nice in the sandbox and we will let them have" the wholesaler customer at issue.

1467.   Greenstone was able to acquire the wholesaler as a customer for Cabergoline without any fear that Teva or Par would retaliate. In exchange, Greenstone agreed not to compete for other customers and drive prices down in the market.

### **134.**    **Naproxen Sodium**

1468.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Naproxen Sodium tablets beginning at least as early as January 2015.

1469.   Naproxen Sodium, also known by the brand name Naprosyn, is a nonsteroidal anti-inflammatory drug (NSAID) used to treat pain, menstrual cramps, inflammatory diseases such as rheumatoid arthritis, and fever.

1470.   During the relevant timeframe, Defendants Glenmark and Amneal were the primary manufacturers of Naproxen Sodium tablets.

1471.   The market for Naproxen Sodium tablets was mature and at all relevant times had multiple manufacturers.

1472.   For years, the prices for Naproxen Sodium tablets were relatively low and stable. In 2015, Teva prepared to and eventually did exit the market, leaving Glenmark and Amneal as the dominant suppliers. Rather than compete against each other to pick up Teva's market share, Glenmark and Amneal imposed very large and nearly simultaneous price increases.

1473.   In close succession, Glenmark and Amneal increased list (WAC) prices more than ten-fold, and NSP prices ████████. The NSP price chart and the list (WAC) price chart below show the large and parallel price increases by Glenmark and Amneal on Naproxen

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Sodium tablets. (Note: Naproxen Sodium tablets come in 275 mg and 550 mg dosages. The pricing patterns for each dosage are highly similar. Only the charts for the 550 mg dosage are included here.) ▮▮▮▮▮▮▮▮▮▮▮▮]





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1474.   Throughout this period, Glenmark and Amneal met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on generic Naproxen Sodium and of their Fair Share agreement.

1475.   For example, Jim Brown, VP of Sales at Glenmark, and S.R., Senior Director of Sales at Amneal, frequently communicated during the period when Glenmark and Amneal raised and maintained the prices of Naproxen Sodium. The two executives communicated by phone multiple times per month in every month of 2015.

### 135.   Metformin ER (F) [Fortamet]

1476.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Metformin ER (F) tablets beginning at least as early as June 2015.

1477.   Metformin ER (F), also known by the brand name Fortamet, is a medication used to improve blood sugar control in adults with type 2 diabetes mellitus.

1478.   During the relevant period, Actavis and Lupin were the primary manufacturers of Metformin ER (F).

1479.   The market for Metformin ER (F) was mature and at all relevant times had multiple manufacturers.

1480.   For years, the prices for generic Fortamet were relatively low, stable and declining. In the summer of 2015, Lupin and Actavis began to impose large price increases. Lupin increased prices more than 300% and Actavis prices shot up approximately 250%.

1481.   Note: Metformin ER (F) is available in 500 mg and 1000 mg dosages. The pricing patterns for the dosages are highly similar. The chart for only the 1000 mg dosage is included here.



1482.  Throughout this period, Actavis and Lupin met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Metformin ER (F) and their Fair Share agreement.

1483.  For example, Lupin's David Berthold, VP of Sales, communicated by phone with Actavis's T.G., Director of National Accounts, throughout the period in which Lupin and Actavis raised and maintained high prices for Metformin ER (F). They communicated by phone in June, July and October 2015, and again in May, June and July of 2016.

## VIII.   INTERSTATE AND INTRASTATE TRADE AND COMMERCE

1484.  During the Class Period, Defendants sold and distributed generic drugs in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

1485.  Defendants' and their co-conspirators' conduct, including the marketing and sale of generic drugs, took place within the United States and has had, and was intended to have, a

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

1486.   Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter alia*, retailers within each state and territory were foreclosed from offering less expensive generic drugs to Plaintiffs inside each respective state and territory. The foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

## IX.   BACKGROUND OF THE GENERIC DRUG INDUSTRY

### A.   Generic Drugs Are Commodity Products.

1487.   Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[17] In 2015, generic drug sales in the United States were estimated at $74.5 billion.[18]

1488.   According to the U.S. Food & Drug Administration ("FDA"), a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[19] Once the FDA approves a generic drug as "therapeutically equivalent" to a brand name drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[20]

---

[17] GPhA, *Generic Drug Savings in the U.S.* (2015) ("GPhA Report") at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

[18] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://portal.ct.gov/AG/Press-Releases/2016-Press-Releases.

[19] FDA Website, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

[20] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1489.   In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name counterpart."[21] And that may be conservative. According to a Federal Trade Commission ("FTC") study, in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[22] Mature generic markets typically have several manufacturers that compete for sales, hence keeping prices in check.

1490.   Generic drug price competition provides enormous savings to Plaintiffs, as well as to consumers, pharmacies, other drug purchasers, and state Medicaid programs.

1491.   The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585). The Act streamlines the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs. Generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA") that establishes that its product is bioequivalent to the branded counterpart.

1492.   Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

---

[21] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sep. 15, 2010), *available at* https://www.cbo.gov/publication/21800.

[22] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions* (Jan. 2010), *available at* http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1493.  Because each generic is readily substitutable for another generic of the same brand name drug, pricing is the main differentiating feature. As recognized by the FTC, "generic drugs are commodity products" and, as a consequence of that, are marketed "primarily on the basis of price."[23] In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

1494.  It is well established that competition among generic manufacturers drives down prices. Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of sales. When lower-priced generics become available, the brand drug quickly loses market share as purchasers switch to the less expensive alternatives. Over time, the price of a generic drug approaches the manufacturers' marginal costs. As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:



Generic Competition and Drug Prices

Source: FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

---

[23] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1495.   When new entrants join a competitive generic market, they typically will price their product below the prevailing market price in order to gain market share. A recent government report confirmed this phenomenon in interviews with generic manufacturers: "manufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a price that is lower than the current market price in order to build its customer base. Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[24]

1496.   When there are multiple generic manufacturers in an established generic market, prices should remain low and stable, and should not increase absent a market disruption or, as is the case here, anticompetitive conduct.

**B.      Pricing in the U.S. Prescription Drug Industry.**

1497.   In essence, the generic pharmaceutical supply chain flows as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (*e.g.*, a co-pay or co-insurance) if they are insured. The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies. These agreements and payments are sometimes arranged and intermediated by middlemen known as Pharmacy Benefit Managers ("PBMs").

1498.   Because the prices paid by purchasers of generic drugs differ at different levels of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious. Market-wide pricing for a

---

[24] U.S. Government Accountability Office Report: Generic Drugs Under Medicare ("GAO Report") at 23, (August 2016), *available at* https://www.gao.gov/assets/680/679022.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC"). NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription . . . drugs."[25] "NADAC is a simple average of the drug acquisition costs submitted by retail community pharmacies."[26] In effect, NADAC is "a single national average."[27] Thus, NADAC is one way to track general price trends in the marketplace.

1499.   While NADAC provides the average price level across all manufacturers of a given drug, other prices are manufacturer specific. Drug manufacturers typically report benchmarks—like WACs (Wholesale Acquisition Costs)—for their drugs, which are then published in compendia used by participants in the pharmaceutical industry. The benchmarks are not actual transaction prices; rather, they are the manufacturer's reported list price. Accordingly, WAC prices do not take into account discounts that may be provided, *e.g.*, for volume sales.[28]

1500.   The amount that an end-payer will pay a pharmacy for a generic drug typically is determined with reference to a benchmark or list price like a WAC. The end-payer pays the pharmacy an amount based on the manufacturer's list price for the drug, plus a small mark-up or

---

[25] CMS, Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

[26] *Id.* at 15.

[27] *Id.*

[28] Average Wholesale Price ("AWP") is another benchmark price that is used in the pharmaceutical industry. AWP is the average price wholesalers pay to purchase drugs from pharmaceutical manufacturers, inclusive of rebates and discounts. *See* Ctrs. for Medicare & Medicaid Servs., *Medicare Part B Average Sales Price*, *available at* https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Part-B-Drugs/McrPartBDrugAvgSalesPrice/. QuintilesIMS's National Sales Perspectives ("IMS NSP") is a measure of manufacturer specific pricing. IMS NSP data captures sales at actual transaction prices and includes sales by manufacturers into various outlets. IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* http://quintilesimsconsultinggroup.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

dispensing fee. Over time, third-party payers and PBMs have learned that manufacturers' list prices for some generic drugs can be substantially higher than the actual costs incurred by certain pharmacies to acquire the drugs. As a consequence, end-payers were paying more than simply the acquisition cost plus a small amount.

1501.   To combat this, some third-party payers and PBMs have implemented their own proprietary benchmark prices—Maximum Allowable Costs ("MACs")—that set the amounts they will pay pharmacies for some generic drugs. A MAC caps the amount that an end-payer will pay a pharmacy for a given strength and dosage of a generic drug, regardless of the pharmacy's acquisition costs.

1502.   Third-party payers and PBMs set the MAC of a drug based on several factors, one of which is believed to be the lowest acquisition cost in the market for that generic drug. So, for example, if there are three manufacturers offering the same generic drug at three different prices, a PBM or third-party payer might set the MAC price at or near the lowest of the three prices. A pharmacy could elect to buy from a manufacturer with a higher price, but upon resale to a customer of the PBM or third-party payer, the pharmacy would only be paid the MAC price.

1503.   Drug purchasers always have an incentive to buy the least expensive available drug. Because MAC prices further incentivize pharmacies to choose the lowest priced option, a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price. Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales. A manufacturer can only raise its price if it knows its competitors will raise their prices, too, *e.g.*, if they are conspiring.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## X.  FACTORS INCREASING THE SUSCEPTIBILITY TO COLLUSION OF THE DRUGS AT ISSUE

1504.  Publicly available data on the generic drug market in the United States demonstrate that it is susceptible to cartelization by Defendants. Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) inter-competitor contacts and communication.

### 1.  Industry Concentration

1505.  A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators. Here, Defendants control the generic market. For each of the generic drugs described above, a small number of competitors—between two and six manufacturers in the United States—controlled a significant market share for that drug during the relevant time period. Defendants were the dominant players in each individual drug market. As explained above, industry consolidation and exits have led to this dominance.

### 2.  Barriers to Entry

1506.  Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

1507.  There are significant capital, regulatory, and intellectual property barriers to entry in the generic drug market that make such entry time-consuming and expensive. For example, as explained above, manufacturers must undergo an intense application process—that lasts nearly

four years—in order to obtain ANDA approval to manufacture a generic drug. Historically, the price of ANDA filing is approximately $1 million. Numerous other barriers to entry exist in the generic drug market, including costs of manufacture and expenses related to regulatory oversight.

### 3.   Demand Inelasticity

1508.   Price elasticity of demand is defined as the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product. It is a measure of how demand for a product reacts to a change in price. The basic necessities of life— food, water, and shelter—are examples of goods that experience nearly perfectly inelastic demand at or near the minimums necessary to sustain life. In other words, a person on the verge of dying of thirst will pay almost anything for water.

1509.   In order for a cartel to profit from raising prices above competitive levels, demand for the product must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made. Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

1510.   Demand for generic drugs is highly inelastic. Each generic drug described above is medically necessary to the health and well-being of the patient for whom it is prescribed. Despite the substantial price increases alleged in this Complaint, demand for each of the generic drugs remained largely the same following the price increase.

### 4.   Lack of Substitutes

1511.   For most generic drugs, there are significant barriers to changing treatments. A generic drug is considered a therapeutic equivalent of the brand-name version of a drug.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

However, generic drugs are not generally considered therapeutic equivalents of other drug products, even similar ones. A patient who is prescribed a specific generic drug cannot purchase a different drug using his or her prescription regardless of the respective prices of the drugs.

1512.   Branded versions of generic drugs do not generally serve as economic substitutes for generic versions, because branded products generally maintain substantial price premiums over even supracompetitively priced generic counterparts.

### 5.   Standardized Product with High Degree of Interchangeability

1513.   A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively.

1514.   Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price. When approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug. This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

1515.   Each generic drug described above is an interchangeable bioequivalent of the branded counterpart.

### 6.   Inter-Competitor Contacts and Communications

1516.   As discussed above, Defendants' representatives met at conferences convened by customers and trade associations of customers (such as the ECRM and NACDS), private industry dinners, and similar events. Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry meetings.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1517.   Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events such as industry dinners, girls nights out, lunches, parties, and frequent telephone calls, emails, and text messages. *See, e.g.*, Table 2 above (listing inter-Defendant contacts for each Defendant).

1518.   DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, have uncovered numerous inter-competitor communications. These types of communications are not unique or isolated, but are rampant. The sheer number of companies implicated in the investigations (including many of the Defendants here) highlights the prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion. In addition to the Heritage and Rising deferred prosecution agreements and the guilty pleas of the Heritage CEO and President, there are the following:

(a)     **Aceto**:  On April 23, 2018, Aceto disclosed: "In connection with the DOJ's ongoing investigation into marketing and pricing practices throughout the generic pharmaceutical industry, Aceto Corporation (the "Company") received a subpoena from the Antitrust Division of the U.S. Department of Justice (the "DOJ"). The Company is one of many operating companies in the generic pharmaceutical industry to receive a subpoena from the DOJ relating to its years-long investigation into the industry.[29]

(b)     **Actavis**:   In February 2016, Actavis's former parent, Allergan plc, disclosed that it received a DOJ subpoena "seeking information relating to the marketing and

---

[29] Aceto, SEC 2018 Form 8-K (April 23, 2018), *available at* http://investor.aceto.com/static-files/6fed4dee-5d2f-419c-9c11-6b9828c079d1.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pricing of certain of the Company's generic products and communications with competitors about such products."[30]

(c)     **Aurobindo**: Aurobindo has disclosed receipt of a subpoena relating to DOJ's generic drug investigation.[31] The company stated that it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[32]

(d)     **Citron**: In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ products." The Connecticut AG requested that Citron produce all documents produced to DOJ.[33]

(e)     **Dr. Reddy's**: In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[34]

(f)     **Heritage**: As a private company, Heritage is not required to make public disclosures. Nonetheless, in the wake of the criminal guilty pleas by two of its executives,

---

[30] Allergan, SEC 2015 Form 10-K (Feb. 26, 2016), at F-106, *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459016013478/agn-10k_20151231.htm.

[31] Zeba Siddiqui, *India's Aurobindo shares hit nine-month low on US price-fixing lawsuit,* Reuters (Dec 16, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV.

[32] Aurobindo Pharma, Ltd., BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf.

[33] Aceto Corp., SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm.

[34] Dr. Reddy's, SEC Form 6-K (Nov. 10, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Heritage confirmed that it is "fully cooperating" with DOJ.[35] The company has entered into a deferred prosecution agreement with DOJ.

(g) **Impax**:  In July 2014, Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic digoxin.[36]  In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and documents about "any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications."[37]  In February 2016, Impax disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications. In particular…digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[38]

(h) **Lannett**: In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price-fixing of digoxin.[39] On November 3, 2014, Lannett disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry

---

[35] Tom Schoenberg , David McLaughlin & Sophia Pearson, *U.S. Generic Drug Probe Seen Expanding After Guilty Pleas,* Bloomberg (Dec. 14, 2016), *available at* https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe.

[36] Impax SEC Form 8-K (July 15, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm.

[37] Impax SEC Form 8-K (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm.

[38] Impax, SEC 2015 Form 10-K (Feb. 22, 2016), at F-53, *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm.

[39] Lannett press release (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

into possible violations of the Sherman Act." The subpoena also requested "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[40] On August 27, 2015, Lannett further explained that DOJ sought, among other things, "communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas."[41]

 (i) **Lupin**:  "In January 2017, [Lupin] and one of its employees (David Berthold) were issued subpoenas by Department of Justice (DOJ) requesting documents as part of DOJ's investigation into possible antitrust violations within the generic drug industry. [Lupin] has been cooperating in the ongoing investigation. Further in April 2018, [Lupin] and one of its employees received a non-party subpoena from the state of Connecticut Attorney General related to a civil antitrust case they filed in 2016, requesting documents and other information."[42]

 (j) **Mallinckrodt**:  "In March 2018, the Company received a grand jury subpoena issued by the U.S. District Court for the Eastern District of Pennsylvania pursuant to which the Antitrust Division of the DOJ is seeking documents regarding generic products and pricing, communications with generic competitors and other related matters."[43]

 (k) **Mayne**:  On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a

---

[40] Lannett, SEC Form 10-Q (Nov. 6, 2014) at 16, *available at* https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm.

[41] Lannett, SEC Form 10-K (Aug. 27, 2015) at 18, *available at* http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm.

[42] Lupin Annual Report 2018-19 at 157, *available at* https://www.lupin.com/pdf/annual-report/2019/lupin-annual-report-2018-19.pdf.

[43] Mallinckrodt 2018 Annual Report at 127, *available at* http://www.annualreports.com/HostedData/AnnualReports/PDF/NYSE_MNK_2018.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

subpoena…seeking information relating to marketing, pricing and sales of select generic products" and that it had received a subpoena from the Connecticut AG seeking similar information.[44]   On November 4, 2016, Mayne Pharma Group Limited issued a press release stating: "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products. The investigation relating to Mayne Pharma is focused on Doxycycline Hyclate delayed-release tablets (generic) and potassium chloride powders."[45]

(l)    **Mylan**: In February 2016, Mylan disclosed that it received a DOJ subpoena "seeking information relating to . . . generic Doxycycline" and a similar subpoena from the Connecticut AG seeking "information relating to . . . certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[46] In September 2016, Mylan's Pennsylvania headquarters was raided by federal authorities in connection with the generic drugs investigation. And on November 9, 2016, Mylan disclosed that "certain employees and a member of senior management, received subpoenas from the DOJ seeking additional information relating to the marketing, pricing and sale of our generic

---

[44] Mayne Pharma, 2016 Annual Report (Aug. 25, 2016), at 75, *available at* https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf.

[45] Mayne Pharma, Update on Status of DOJ Investigation (Nov. 4, 2016), *available at* http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf.

[46] Mylan, SEC 2015 Form 10-K (Feb. 16, 2016), at 160, *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdoc.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Cidofovir, Glipizide-Metformin, Propranolol and Verapamil products" and that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[47]

(m)      **Par**: In March 2015, Par disclosed that it received subpoenas from the Connecticut AG and DOJ relating to Digoxin and Doxycycline.[48] In November 2015, Endo, the parent company of Par, elaborated: "In December 2014, our subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania. The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic Doxycycline products, and on communications with competitors and others regarding those products. Par is currently cooperating fully with the investigation."[49] Endo also disclosed that in December 2015 it "received Interrogatories and Subpoena Duces Tecum from the State of Connecticut Office of Attorney General requesting information regarding pricing of certain of its generic products, including   Doxycycline   Hyclate,   Amitriptyline   Hydrochloride,   Doxazosin   Mesylate, Methotrexate Sodium and Oxybutynin Chloride."[50] Notably, the inquiry appears to focus on at least three products (doxycycline, doxazosin mesylate, and methotrexate sodium) that were manufactured by Par (via its acquisition of DAVA).

---

[47] Mylan SEC Form 10-Q, at 58 (Nov. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdo c.htm.

[48] Par Pharmaceutical Companies, Inc., SEC 2014 Form 10-K (Mar. 12, 2015) at 37, *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm.

[49] Endo International plc, SEC Form 10-Q (March 31, 2016) at 30, *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-3312016x10q.htm.

[50] *Id.* at 31.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(n)   **Perrigo**:  "On May 2, 2017, we disclosed that search warrants were executed at a number of Perrigo facilities and other locations in connection with the Antitrust Division's ongoing investigation related to drug pricing in the pharmaceutical industry."[51]

(o)   **Pfizer:**  On August 10, 2017, Pfizer disclosed: "As of July 2017, the U.S. Department of Justice's Antitrust Division is investigating our Greenstone generics business. We believe this is related to an ongoing antitrust investigation of the generic pharmaceutical industry. The government has been obtaining information from Greenstone."[52]

(p)   **Rising:**  "On April 16, 2018 . . . Rising . . . received a Grand Jury subpoena (the "DOJ Subpoena") from the Antitrust Division of the DOJ.  Rising is one of many operating companies in the generic pharmaceutical industry to receive a subpoena from the DOJ relating to its years-long investigation into the industry."[53]

(q)   **Sandoz**: In March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly-owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products . . . and related communications with competitors."[54]

(r)   **Sun**: On May 27, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of Sun) stated in a filing with the National Stock Exchange of India that one of its U.S. subsidiaries, namely Sun, "received a grand jury subpoena from the United States Department of Justice,

---

[51] Perrigo, SEC Form 10-K (May 22, 2017) at 45, available at https://www.sec.gov/Archives/edgar/data/1585364/000158536417000071/cy16q410k.htm.
[52] Pfizer, SEC Form 10-Q (Aug. 10, 2017) at 37, *available at* https://investors.pfizer.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=12225193.
[53] Aceto, SEC Form 10-K (Sep. 28, 2018) at 29, *available at* https://www.sec.gov/Archives/edgar/data/2034/000114420418051414/tv501271_10k.htm.
[54] Novartis 2016 Financial Report at 217, *available at* https://www.novartis.com/sites/www.novartis.com/files/novartis-annual-report-2016-en.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Antitrust Division seeking documents . . . relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[55]

      (s)    **Taro**:  In September 2016, Taro disclosed that the Company "as well as two senior officers" received DOJ subpoenas seeking documents relating to "generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[56]

      (t)    **Teva**: In August 2016, Teva disclosed that it received subpoenas from DOJ and the Connecticut AG seeking documents and other information "relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[57]

      (u)    **West-Ward (Hikma)**: In January 2017, Hikma Pharmaceuticals PLC, the parent company of West-Ward, disclosed in its 2016 annual report: "In January 2017 the Group received a subpoena from a state attorney general, requesting certain pricing and costing information."[58]

---

[55] Sun Pharmaceuticals Indus., Ltd., BSE Disclosure (May 27, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/8E568708_8D00_472E_B052_666C76A4263D_081648.pdf.

[56] Taro, SEC Form 6-K (Sept. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/906338/000115752316006685/a51417528.htm.

[57] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), *available at* https://www.sec.gov/Archives/edgar/data/818686/000119312516671785/d187194d6k.htm.

[58] Hikma Pharmaceuticals PLC, 2016 Annual Report, *available at* https://www.hikma.com/media/1189/2016-annual-report.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(v)     **Zydus**: Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[59]

## XI.     THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.     The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy.

1519.   Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' disclosures of the existence of the government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic drugs.

1520.   Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth against these Defendants, until (at the earliest) the filing of the States' May 10, 2019 Complaint.

1521.   No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the Defendants was involved in a criminal conspiracy to fix prices for generic drugs.

1522.   Plaintiffs are purchasers who indirectly purchased generic drugs manufactured by one or more Defendants. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered Defendants' conspiracy.

---

[59] *See* Rupali Mukherjeel, *US Polls, Pricing Pressure May Hit Indian Pharma Cos*, The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian- pharma-cos/articleshow/55301060.cms.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1523. Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies, which prohibited the type of collusion alleged in this Complaint. For example:

(a)   Allergan's (predecessor to Actavis) Code of Conduct states: "We support a free and open market, which is why we comply with competition laws everywhere we do business and strive to always compete fairly."[60]

(b)   Apotex's Code of Conduct directs employees: "Do not communicate with competitors about competitive business matters such as prices, costs discounts, customer suppliers, marketing plans, production capacities or any terms of conditions of sale that could create the appearance of improper agreements or understandings. Do not make agreements or reach understandings with competitors regarding allocation of customers, territories or market share. Do not conspire with other bidders when competing for contracts."[61]

(c)   Dr. Reddy's' Code of Conduct provides: "We believe in free and open competition and never engage in improper practices that may hamper fair competition. We never look to gain competitive advantages through unethical or unlawful business practices. . . . [W]e must never enter into agreements with competitors to engage in any anti-competitive behavior, including colluding or cartelization, fixing prices, dividing up customers, suppliers or markets."[62]

(d)   Glenmark's Code of Conduct states: "We must engage in fair competition and must ensure that our business dealings comply with all applicable local antitrust and competition laws, such as monopoly, unfair trade, or price discrimination laws. We must not make agreements or engage in concerted actions with a competitor with the intent of improperly dividing markets by allocating territories, customers, goods, or services, or price-fixing or collusion."[63]

---

[60] Allergan Code of Conduct, *available at* http://www.allergan.com/investors/corporate-governance/code-of-conduct.

[61] Apotex Code of Conduct, *available at* http://www1.apotex.com/docs/librariesprovider3/business-ethics/code-of-conduct-en.pdf?sfvrsn=6.

[62] Dr. Reddy's Code of Conduct, *available at* http://www.drreddys.com/media/508807/cobe_booklet.pdf.

[63] Glenmark Code of Conduct, *available at* https://www.glenmarkpharma.com/sites/all/themes/glenmark/pdf/glenmark-code-english.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(e)     Hikma's (the parent of West-Ward) Code of Conduct provides: "Hikma will engage in free and fair competition and not seek competitive advantage through unlawful means. Hikma will not collude with competitors on prices, bids or market allocations, nor exchange information with third parties in a way that could improperly influence business outcomes."[64]

(f)     Mayne's Business Code of Conduct provides: "Do not agree, even informally, with competitors on price (or any elements of price including discounts or rebates), production, customers or markets without a lawful reason."[65]

(g)     Mylan's Code of Conduct and Business Ethics states: "Mylan is committed to complying with applicable antitrust and fair competition laws."[66]

(h)     Novartis' (Parent of Sandoz) Code of Conduct states: "We are committed to fair competition and will not breach competition laws and regulations."[67]

(i)     Par's Code of Conduct provides: "It is Company policy to comply with the antitrust and competition laws of each country in which the Company does business."[68]

(j)     Perrigo's Code of Conduct provides: "We will succeed based on the quality and value of our products and not by illegal or otherwise improper business practices. Competition laws, also known as "antitrust" laws, generally prohibit agreements with competitors, suppliers or customers that could unfairly limit free and open competition."[69]

(k)     Sun Pharmaceutical Industries, Ltd. (parent of Sun and Taro) has a Global Code of Conduct that provides: "We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior

---

[64] Hikma Code of Conduct, *available at* https://www.hikma.com/media/1687/code-of-coduct-en.pdf.

[65] Mayne Pharma Group Business Code of Conduct, *available at* https://www.maynepharma.com/media/1786/business-code-of-conduct.pdf.

[66] Mylan Code of Business Conduct and Ethics, *available at* https://www.mylan.com/-/media/mylancom/files/code%20of%20business%20conduct%20and%20ethics.pdf.

[67] Novartis Code of Conduct, *available at* https://www.novartis.com/sites/www.novartis.com/files/code-of-conduct-english.pdf.

[68] Par Code of Ethics, *available at* http://corpdocs.msci.com/ethics/eth_19100.pdf.

[69] Perrigo Code of Conduct, *available at* http://perrigo.investorroom.com/download/Code+of+Conduct.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

performance, never through unethical or illegal business practices." It goes on to state: "Sun Pharma shall compete only in an ethical and legitimate manner and prohibits all actions that are anti-competitive or otherwise contrary to applicable competition or anti-trust laws."[70]

(l)    Taro's Code of Conduct provides: "we do not discuss any of the following topics with our competitors: prices or price-fixing, customer or market allocation, bids or bid-rigging, any topic that seems to be about restricting competition. If a competitor attempts to engage you in a discussion on any of these topics, make it clear that you do not wish to participate. Leave the conversation immediately, and report the matter to Corporate Compliance."[71]

(m)    Teva's Code of Conduct provides: "We believe that customers and society as a whole benefit from fair, free and open markets. Therefore, we compete on the merits of our products and services and conduct business with integrity. We recognize that the potential harm to Teva's reputation and the penalties for breaching competition laws are severe, and can subject Teva, members of the Board of Directors and employees to severe civil fines and criminal penalties."[72]

1524.  It was reasonable for members of the Class to believe that Defendants were complying with their own antitrust policies.

1525.  For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

**B.    Fraudulent Concealment Tolled the Statutes of Limitations.**

1526.  In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs. Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on

---

[70] Sun Pharma Global Code of Conduct, *available at* http://www.sunpharma.com/Shareholder-Information/Policies/93092/Global-Code-of-Conduct.

[71] Taro Code of Conduct, *available at* https://secure.ethicspoint.com/domain/media/en/gui/20249/Code_of_Conduct.pdf.

[72] Teva Code of Conduct, *available at* http://www.tevapharm.com/files/about/corporate_governance/code_of_conduct/TEVA_CodeOf Conduct_FINAL_111715%5B2%5D.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

inquiry notice of their claims, until Defendants disclosed the existence of government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic drugs.

1527.   Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth against these Defendants, until (at the earliest) the filing of the States' May 2019 Complaint.

1528.   No information evidencing these antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the Defendants was involved in a criminal conspiracy to fix prices for generic drugs.

1529.   As described in more detail below, Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic drugs. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of generic drugs they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic drugs. Defendants' false statements and conduct concerning the prices of generic drugs were deceptive, as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing generic drugs at prices established by a free and fair market.

### 1.    Active Concealment of the Conspiracy.

1530.   Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe. Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1531.   Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than the consequences of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic drugs.

1532.   For example, Defendants took overt steps to conceal their illegal activity and destroy evidence of any wrongdoing going back to at least 2009.

1533.   Defendants avoided putting incriminating information in writing. Examples include:

- Nailor of Greenstone instructing subordinates to avoid putting sensitive market intelligence in writing;[73]

- Kellum of Sandoz routinely admonishing colleagues for putting incriminating information in e-mails and voicing concern that the conduct they were engaging in could lead to significant legal exposure;[74]

- Teva's Green and Patel sending text messages to competitors saying "call me";[75]

- Teva's K.G. instructing Patel to remove from an August 2013 e-mail information obtained from competitors about their price increase plans;[76]

- Taro's Aprahamian instructing colleagues in May 2014 to avoid discussing fair share by e-mail and to discuss by phone instead;[77]

- Citron instructing Heritage to communicate by phone and not through e-mail;[78] and

---

[73] 5/10/19 State AG Complaint ¶ 1125.

[74] 5/10/19 State AG Complaint ¶¶ 159, 1124.

[75] 5/10/19 State AG Complaint ¶ 1123.

[76] 5/10/19 State AG Complaint ¶ 1115.

[77] 5/10/19 State AG Complaint ¶ 158.

[78] 6/18/18 State AG Complaint ¶ 459.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

- Sandoz avoiding "fair share" language in an internal presentation in May 2017.[79]

1534.   When incriminating information was put in writing, Defendants took overt and calculated steps to destroy evidence of those communications.  Examples include:

- G.S. of Mayne deleting incriminating messages between her and A.S. from her cell phone before the data on that phone were produced to the Connecticut AG's office;[80]

- Patel deleting text communications with competitors after Rekenthaler warned her in 2015 about the government investigation;[81] and

- Apotex deleting an entire custodial file for one of its key employees after the States requested it through an investigatory subpoena in 2017.[82]

1535.   Defendants lied to customers about why they increased prices or declined to submit bids.  Examples include:

- In an April 2013 e-mail, Kellum of Sandoz told CW-4 that Sandoz could "blame supply" when declining to bid for Publix's business;[83]

- In June of 2015, a Sandoz national account representative told a customer that Sandoz was declining to bid based on limited supply, when in fact the reason was the fair share agreement with competitors;[84]

- Taro blamed supply for its decision not to submit a bid to MMCAP in April 2014, when in fact the reason the fair share agreement;[85] and

- K.K. told a customer in July 2013 that Wockhardt was simply following a Mylan price increase, when in fact Wockhardt had coordinated with Mylan.[86]

1536.   Defendants also lied to the public. For example, in December 2013, Sandoz received an inquiry from a Bloomberg reporter who questioned the propriety of Sandoz's recent

---

[79] 5/10/19 State AG Complaint ¶ 158.

[80] 6/18/18 State AG Complaint ¶ 462.

[81] 5/10/19 State AG Complaint ¶¶ 1127-28.

[82] 5/10/19 State AG Complaint ¶ 1129.

[83] 5/10/19 State AG Complaint ¶ 1035.

[84] 5/10/19 State AG Complaint ¶ 255.

[85] 5/10/19 State AG Complaint ¶ 787.

[86] 5/10/19 State AG Complaint ¶ 661.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

price increases.  Sandoz responded that it just "followed Mylan and Taro" and learned about their increases from "pricing services we subscribe to." In reality, Sandoz had coordinated the increases with Taro and Mylan in advance.[87]

1537.  Defendants have coordinated to obstruct the investigations into generic drug prices and to coordinate their responses.[88]  For example, when the federal government executed a search warrant against Patel on June 21, 2017, she immediately called Rekenthaler, who was then Vice President of Sales at Apotex.  Rekenthaler called Cavanaugh and C.B., another senior Teva executive. Later that day, Patel called Rekenthaler two more times to coordinate her response to the government.[89]  Employees of other Defendants took similar action in response to the States' investigation. For example, on July 17, 2018, the States sent a subpoena to Grauso (Aurobindo, Glenmark), through his counsel. That same day, Grauso spoke to Aprahamian (Taro). The States then set up a conference call with Grauso's counsel for July 25, 2018.  On the day before that call and on the day after it, Aprahamian spoke to Grauso.[90]

1538.   These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic drugs to inflated, supracompetitive levels.

1539.   Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. The public

---

[87] 5/10/19 State AG Complaint ¶¶ 1048-49.

[88] 5/10/19 State AG Complaint ¶ 1130.

[89]  5/10/19 State AG Complaint ¶ 1132.

[90]  5/10/19 State AG Complaint ¶ 1133.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic drugs.

1540.   The evidence available to date confirms that Defendants chose to communicate in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The structure of the generic drug industry provided numerous opportunities for collusive communications at trade shows, customer events and smaller more intimate dinners and meetings. When communications were reduced to writing or text message, Defendants often took overt and calculated steps to destroy evidence of those communications.

<div align="center"><b>2.</b>      <b><u>Plaintiffs Exercised Reasonable Diligence.</u></b></div>

1541.   Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

1542.   Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

1543.   Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct. Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

<div align="center">378</div>

1544.  For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

## XII.   CONTINUING VIOLATIONS

1545.  This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## XIII.   DEFENDANTS' ANTITRUST VIOLATIONS

1546.  During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix, raise, and/or stabilize prices for Drugs at Issue sold in the United States.

1547.  In formulating and effectuating the contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of Drugs at Issue sold in the United States. These activities included the following:

(a)     Defendants participated in meetings and/or conversations regarding the price of Drugs at Issue in the United States;

(b)     Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of Drugs at Issue sold in the United States;

(c)     Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of Drugs at Issue; and

(d)     Defendants issued price announcements and price quotations in accordance with their agreements.

1548.   Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

1549.   During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased Drugs at Issue at inflated and supracompetitive prices.

1550.   Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various End-Payer Damages Jurisdictions enumerated below.

1551.   As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for Drugs at Issue than they would have paid in a competitive market.

1552.   General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end-payers such as Plaintiffs. Wholesalers and retailers passed on the inflated prices to Plaintiffs and members of the Class. The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of the drugs.

1553.   The unlawful contract, combination and conspiracy has had the following effects, among others:

(a)      price competition in the market for Drugs at Issue has been artificially restrained;

(b)      prices for Drugs at Issue sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

(c)      end-payer purchasers of Drugs at Issue sold by Defendants have been deprived of the benefit of free and open competition in the market for Drugs at Issue.

## XIV.   CLASS ACTION ALLEGATIONS

1554.   Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States and its territories that indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Drugs at Issue, other than for resale, from July 1, 2009 through the present.

Drugs at Issue are defined herein to include all drugs identified in Table 1.

> This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities; (c) state governmental entities for which that state's Attorney General is seeking damages arising from the same purchases of Drugs at Issue (except for cities, towns, municipalities, or counties with self-funded prescription drug plans, all of which are included in the class); (d) all persons or entities who purchased Defendants' Drugs at Issue for purposes of resale or directly from Defendants; (e) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); and (f) pharmacy benefit managers.

1555.   Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

protection laws of the states and territories listed below (the "End-Payer Damages Jurisdictions")[91] on behalf of the following class (the "Damages Class"):

> All persons and entities in the End-Payer Damages Jurisdictions that indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Drugs at Issue, other than for resale, from July 1, 2009 through the present.

Drugs at Issue are defined herein to include all drugs identified in Table 1.

> This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities; (c) state governmental entities for which that state's Attorney General is seeking damages arising from the same purchases of Drugs at Issue (except for cities, towns, municipalities, or counties with self-funded prescription drug plans, all of which are included in the class); (d) all persons or entities who purchased Defendants' Drugs at Issue for purposes of resale or directly from Defendants; (e) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); and (f) pharmacy benefit managers.

1556. The Nationwide Class and the Damages Class are referred to herein as the "Classes."

1557. While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are thousands of members in each Class.

1558. Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

---

[91] The "End-Payer Damages Jurisdictions" include all States (except Indiana and Ohio), as well as the District of Columbia and Puerto Rico.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(a)      Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of Drugs at Issue and/or engaged in market allocation for Drugs at Issue sold in the United States;

(b)      The identity of the participants of the conspiracy;

(c)      The duration of the conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)      Whether the conspiracy violated the Sherman Act, as alleged in the First Count;

(e)      Whether the conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(f)      Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(g)      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)      The effect of the conspiracy on the prices of Drugs at Issue sold in the United States during the Class Period;

(i)      Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for Drugs at Issue, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

1559.  Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Drugs at Issue purchased indirectly from Defendants and/or their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

1560.  Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

1561.  The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

1562.  Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1563.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## XV.   CAUSES OF ACTION

1564.   As to the overarching conspiracy in which all Defendants participated, and as to each drug-specific conspiracy in which certain Defendants participated as alleged above and as identified above in Table 1, Plaintiffs seek relief under the laws specified in Counts 1 through 4 below.

### FIRST COUNT

**Violation of Sections 1 and 3 of the Sherman Act
(on behalf of Plaintiffs and the Nationwide Class)**

1565.   Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

1566.   This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of Drugs at Issue.

1567.   This count also is brought against each Defendant-participant in each of the drug-specific price-fixing conspiracies alleged above and identified in Table 1.

1568.   Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

1569.   During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for Drugs at Issue, thereby creating anticompetitive effects.

385

1570.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for Drugs at Issue.

1571.   As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated End-Payers in the Nationwide Class who purchased Drugs at Issue have been harmed by being forced to pay inflated, supracompetitive prices for Drugs at Issue.

1572.   In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

1573.   Defendants' conspiracy had the following effects, among others:

(a)   Price competition in the market for Drugs at Issue has been restrained, suppressed, and/or eliminated in the United States;

(b)   Prices for Drugs at Issue provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)   Plaintiffs and members of the Nationwide Class who purchased Drugs at Issue indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

1574.   Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Drugs at Issue purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1575.   Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

1576.   Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## SECOND COUNT

### Violation of State Antitrust Statutes[92]
### (on behalf of Plaintiffs and the Damages Class)

1577.   Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

1578.   This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of Drugs at Issue.

1579.   This count also is brought against each Defendant-participant in each of the drug-specific price-fixing conspiracies alleged above and identified in Table 1.

1580.   During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Drugs at Issue in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

1581.   The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of Drugs at Issue and to allocate customers for Drugs at Issue in the United States.

---

[92] Statutory antitrust violations are alleged herein for the following jurisdictions: Arizona, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1582.   In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Drugs at Issue at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize prices paid by Plaintiffs and members of the Damages Class with respect to Drugs at Issue provided in the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

1583.   Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for Drugs at Issue.

1584.   Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

**Arizona**

1585.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, *et seq.* Defendants' combination and conspiracy had the following effects: (1) price competition for Drugs at Issue was restrained, suppressed, and eliminated throughout Arizona; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant.   As a direct and proximate

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

**California**

1586.   Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 et seq. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code § 16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of Drugs at Issue at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of Drugs at Issue. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of Drugs at Issue. The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) price competition for Drugs at Issue has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for Drugs at Issue provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased Drugs at Issue

389

indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Drugs at Issue than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

**Connecticut**

1587.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-35, et seq.   Defendants' combinations and conspiracy had the following effects: (1) price competition for generic Drugs at Issue was restrained, suppressed, and eliminated throughout Connecticut; (2) generic Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Connecticut; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Drugs at Issue.   During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.   By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-

35, et seq.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Connecticut law.

**District of Columbia**

1588.  Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, *et seq*. Defendants' combination and conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Drugs at Issue in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Drugs at Issue in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for Drugs at Issue, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Hawaii**

1589.  Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-4, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated § 480-4, *et seq*.

**Illinois**

1590.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq*.). Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

at Issue. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.

**Iowa**

1591.  Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, *et seq*.

**Kansas**

1592.  Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, *et seq*. Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of Drugs at Issue, increasing

the prices of Drugs at Issue, preventing competition in the sale of Drugs at Issue, or binding themselves not to sell Drugs at Issue, in a manner that established the price of Drugs at Issue and precluded free and unrestricted competition among themselves in the sale of Drugs at Issue, in violation of Kan. Stat. Ann. § 50-101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, *et seq.*

**Maine**

1593.  Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, *et seq.*) Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Maine; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs

at Issue. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, *et seq*.

**Maryland**

1594.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maryland Antitrust Act, Maryland Code, Com. Law § 11-204, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Maryland; (2) generic Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maryland; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the Maryland Antitrust Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maryland law.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Michigan**

1595.  Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, *et seq*.

**Minnesota**

1596.  Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

at Issue. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, *et seq*.

**Mississippi**

1597.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, *et seq*. Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

trade in violation of Mississippi Code Ann. § 75-21-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq*.

**Nebraska**

1598.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, *et seq*.

**Nevada**

1599.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Drugs at Issue prices were raised, fixed,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, *et seq*.

**New Hampshire**

1600. Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes §

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq*.

**New Mexico**

1601. Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, *et seq*.

**New York**

1602. Defendants have entered into an unlawful agreement in restraint of trade in violation of New York's Donnelly Act, New York General Business Law § 340, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New York; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout New

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the New York's Donnelly Act, New York General Business Law § 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, *et seq*.

**North Carolina**

1603.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, *et. seq*.

**North Dakota**

1604.   Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, *et seq*.

**Oregon**

1605.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Drugs at Issue prices were raised, fixed, maintained and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, *et seq*.

**Rhode Island**

1606.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

violation of Rhode Island General Laws § 6-36-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, *et seq*.

**South Dakota**

1607.   Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, *et seq*.

**Tennessee**

1608.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, *et seq.*

**Utah**

1609.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Utah; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Vermont**

1610.  Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, *et seq*.

**West Virginia**

1611.  Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq*. Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, *et seq*.

**Wisconsin**

1612. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, *et seq*. Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. §

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

133.01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, *et seq*.

**As to All Jurisdictions Above**

1613.   Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for Drugs at Issue than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

1614.   In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

1615.   Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

<u>**THIRD COUNT**</u>

**Violation of State Consumer Protection Statutes**[93]
**<u>(on behalf of Plaintiffs and the Damages Class)</u>**

1616.   Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

---

[93] Statutory consumer protection violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Hawaii, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Virginia and Wisconsin.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1617.   This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of Drugs at Issue.

1618.   This count also is brought against each Defendant-participant in each of the drug-specific price-fixing conspiracies alleged above and identified in Table 1.

1619.   Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

**Alaska**

1620.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq*.   Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law.  Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Alaska; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been

injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Arkansas**

1621.  Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and,

<div align="center">410</div>

accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**California**

1622. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed Drugs at Issue in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq*., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, *et seq*. of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720, *et seq*. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of Drugs at Issue in the State of California within the meaning of § 17200,

California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for Drugs at Issue. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

**Colorado**

1623.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq.* Defendants engaged in an unfair and deceptive trade practices during the

course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Colorado; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**Delaware**

1624.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Delaware; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**District of Columbia**

1625. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Drugs at Issue were sold, distributed or obtained in the District of Columbia. During the Class

Period, Defendants' illegal conduct substantially affected District of Columbia commerce and consumers. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing Drugs at Issue because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of Drugs at Issue, including their illegal conspiracy to secretly fix the price of Drugs at Issue at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for Drugs at Issue. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are

threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Florida**

1626.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Florida; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Georgia**

1627.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq*. and the Georgia Fair Businesses Practices Act, Georgia Code

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Ann. § 10-1-390, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Georgia; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia law, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Hawaii**

1628. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated § 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480-1 *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Massachusetts**

1629. Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch 93A, § 1, *et seq*. Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unfair

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, §§ 2, 11. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch 93A, §§ 2, 11, that were knowing or willful, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute, including multiple damages.

**Michigan**

1630.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Minnesota**

1631. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.* Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury.

Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**Missouri**

1632.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq*. Plaintiffs and members of the Damages Class purchased and/or reimbursed for Drugs at Issue for personal or family purposes. Defendants engaged in the conduct described herein in connection with the sale of Drugs at Issue in trade or commerce in a market that includes Missouri. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of Drugs at Issue they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Drugs at Issue by making public statements that were not in accord with the facts. Defendants' statements and conduct concerning the price of Drugs at Issue were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing Drugs at Issue at prices established by a free and fair market. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. The foregoing acts and practices substantially affected Missouri commerce and consumers and constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

trade or commerce…", as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq*., 15 CSR 60-8.010, *et seq*., and 15 CSR 60-9.010, *et seq*., and Mo. Rev. Stat. § 407.025.

**Montana**

1633. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, § 30-14-103, *et seq*., and § 30-14-201, *et seq*. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Montana; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants marketed, sold, or distributed Drugs at Issue in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, § 30-14-103, *et seq*., and § 30-14-201, *et. seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nebraska**

1634. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue

price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants marketed, sold, or distributed Drugs at Issue in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nevada**

1635.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Drugs at Issue prices were raised, fixed, maintained, and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Hampshire**

1636. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq*. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants marketed, sold, or distributed Drugs at Issue in New Hampshire, and Defendants'
illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and
proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class
have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or
practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, and, accordingly, Plaintiffs and
members of the Damages Class seek all relief available under that statute.

**New Jersey**

1637.   Defendants have engaged in unfair competition or unfair, unconscionable, or
deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes §
56:8-1, et seq.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in
New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-
competitive levels, the prices at which generic Drugs at Issue were sold, distributed, or obtained
in New Jersey.  Defendants deliberately failed to disclose material facts to Plaintiffs and
members of the Damages Class concerning Defendants' unlawful activities and artificially
inflated prices for generic Drugs at Issue.  Defendants misrepresented to all purchasers during
the Class Period that Defendants' generic Drugs at Issue prices were competitive and fair.
Defendants' unlawful conduct had the following effects: (1) generic Drugs at Issue price
competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic
Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels
throughout New Jersey; (3) Plaintiffs and members of the Damages Class were deprived of free
and open competition; and (4) Plaintiffs and members of the Damages Class paid
supracompetitive, artificially inflated prices for generic Drugs at Issue.  During the Class Period,
Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Drugs at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.J. Statutes § 56:8-1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Mexico**

1638.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Drugs at Issue were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of New Mexico Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for Drugs at Issue as set forth in New Mexico Stat. § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that

price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing Drugs at Issue because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of Drugs at Issue, including their illegal conspiracy to secretly fix the price of Drugs at Issue at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Drugs at Issue. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**New York**

1639.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of Drugs at Issue that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for Drugs at Issue; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased Drugs at Issue were misled to believe that they were paying a fair price for Drugs at Issue or the price increases for Drugs at Issue were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing Drugs at Issue would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing Drugs at Issue would have a broad impact, causing consumer class members who indirectly purchased Drugs at Issue to be injured by paying more for Drugs at Issue than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New York; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants marketed, sold, or distributed Drugs at Issue in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Drugs at Issue in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

**North Carolina**

1640.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of Drugs at Issue created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants marketed, sold, or distributed Drugs at Issue in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Drugs at Issue in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**North Dakota**

1641.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### Rhode Island

1642.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq*. Members of the Damages Class purchased and/or reimbursed for Drugs at Issue for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Drugs at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**South Carolina**

1643.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

**South Dakota**

1644.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. Defendants' illegal conduct

435

substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Drugs at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Utah**

1645.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Ut. Stat. § 13-11-1, *et seq*.  Members of the Damages Class purchased and/or reimbursed for Drugs at Issue for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Utah, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Utah. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants owed a duty to disclose such facts, and

considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Utah; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. Defendants' illegal conduct substantially affected Utah commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Drugs at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ut. Stat. § 13-11-1 *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Vermont**

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1646.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Statutes § 2451, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants'
misleading conduct and unconscionable activities constitutes unfair competition or unfair or
deceptive acts or practices in violation of 9 Vt. Stat. § 2451, *et seq*., and, accordingly, Plaintiffs
and members of the Damages Class seek all relief available under that statute.

**Virginia**

1647.   Defendants have engaged in unfair competition or unfair, unconscionable, or
deceptive acts or practices in violation of the Virginia Consumer Protection Act of 1977, Va.
Code § 59.1-196, *et seq*.  Members of the Damages Class purchased and/or reimbursed for Drugs
at Issue to be used for personal, family, or household purposes. Defendants agreed to, and did in
fact, act in restraint of trade or commerce in a market that includes Virginia, by affecting, fixing,
controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which
Drugs at Issue were sold, distributed, or obtained in Virginia. Defendants deliberately failed to
disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants'
unlawful activities and artificially inflated prices for Drugs at Issue. Defendants misrepresented
to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive
and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price
competition was restrained, suppressed, and eliminated throughout Virginia; (2) Drugs at Issue
prices were raised, fixed, maintained, and stabilized at artificially high levels throughout
Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open
competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive,
artificially inflated prices for Drugs at Issue. Defendants' illegal conduct substantially affected
Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of
law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Drugs at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Wisconsin**

1648.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Drugs at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

## FOURTH COUNT

### Unjust Enrichment[94]
### (on behalf of Plaintiffs and the Damages Class)

1649.   Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

1650.   This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of Drugs at Issue.

1651.   This count also is brought against each Defendant-participant in each of the drug-specific price-fixing conspiracies alleged above and identified in Table 1.

---

[94] Unjust enrichment claims are alleged herein under the laws of all States (except Ohio and Indiana) as well as the District of Columbia and Puerto Rico.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1652.  To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

1653.  Defendants have unlawfully benefited from their sales of Drugs at Issue because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue at prices that were more than they would have been but for Defendants' unlawful actions.

1654.  Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and the Damages Class.

1655.  Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

1656.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue while Plaintiffs and the Damages Class have been impoverished by the overcharges they paid for Drugs at Issue imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.

1657.  There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

1658.  Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1659.   The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Drugs at Issue.

1660.   The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Drugs at Issue are ascertainable by review of sales records.

1661.   It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Drugs at Issue.

1662.   It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Drugs at Issue, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

1663.   The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Drugs at Issue is a direct and proximate result of Defendants' unlawful practices.

1664.   The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

1665.   It would be inequitable under unjust enrichment principles under the laws of all States (except Ohio and Indiana) and of the District of Columbia and Puerto Rico, for Defendants to be permitted to retain any of the overcharges for Drugs at Issue derived from

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1666.   Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

1667.   Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of Drugs at Issue.

1668.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of Drugs at Issue by Plaintiffs and the Damages Class.

1669.   Plaintiffs and the Damages Class have no adequate remedy at law.

1670.   By engaging in the foregoing unlawful or inequitable conduct depriving Plaintiffs and the Damages Class of the opportunity to purchase lower-priced generic versions of Drugs at Issue and forcing them to pay higher prices for Drugs at Issue, Defendants have been unjustly enriched in violation of the common law of various states, as outlined below:

**Alabama**

1671.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Alabama at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

unlawful overcharges for Drugs at Issue.  It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiffs and the Damages Class.

**Alaska**

1672.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Alaska at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Arizona**

1673.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Arizona at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue. Plaintiffs and the Damages Class have been impoverished by the overcharges for Drugs at Issue resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.   There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs and the Damages Class have no remedy at law.

**Arkansas**

1674.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Arkansas at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**California**

1675.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in California at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges.  Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

**Colorado**

1676.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Colorado at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants have

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

benefitted at the expense of Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Connecticut**

1677. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Connecticut at prices that were more than they would have been but for Defendants' actions. Defendants were benefitted in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants have paid no consideration to any other person in exchange for this benefit. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

**Delaware**

1678. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Delaware at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue. Plaintiffs and the Damages Class have been impoverished by the overcharges for Drugs at Issue resulting from Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs and the Damages Class have no remedy at law.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**District of Columbia**

1679.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in the District of Columbia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

**Florida**

1680.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Florida at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Georgia**

1681.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Georgia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Hawaii**

1682.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Hawaii at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Idaho**

1683.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Idaho at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Illinois**

1684.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Illinois at prices that were more than they would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  It is against equity, justice, and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Iowa**

1685. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Iowa at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Kansas**

1686. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Kansas at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs

and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Kentucky**

1687. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Kentucky at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Louisiana**

1688. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Louisiana at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue. Plaintiffs and the Damages Class have been impoverished by the overcharges for Drugs at Issue resulting from Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs and the Damages Class have no other remedy at law.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Maine**

1689.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Maine at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Maryland**

1690.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Maryland at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Massachusetts**

1691.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Massachusetts at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Michigan**

1692.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Michigan at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

resulted from anticompetitive prices that inured to the benefit of Defendants.   Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Minnesota**

1693.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Minnesota at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Mississippi**

1694.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Mississippi at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges.  Defendants retain the benefit of overcharges received on the sales of Drugs at Issue, which in equity and good conscience belong to Plaintiffs and the Damages Class on account of Defendants' anticompetitive conduct.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Missouri**

1695.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Missouri at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.

**Montana**

1696.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Montana at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Nebraska**

1697.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Nebraska at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  In justice and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

fairness, Defendants should disgorge such money and remit the overcharged payments back to Plaintiffs and the Damages Class.

**Nevada**

1698. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Nevada at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for Drugs at Issue. Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class, for which they have paid no consideration to any other person. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**New Hampshire**

1699. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in New Hampshire at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

**New Jersey**

1700. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in New Jersey at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

resulted from anticompetitive prices that inured to the benefit of Defendants.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  Defendants have paid no consideration to any other person for any of the unlawful benefits they received from Plaintiffs and the Damages Class with respect to Defendants' sales of Drugs at Issue.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**New Mexico**

1701.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in New Mexico at prices that were more than they would have been but for Defendants' actions.  Defendants have knowingly benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Drugs at Issue.  To allow Defendants to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

**New York**

1702.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in New York at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  It is against equity

and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

### North Carolina

1703.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in North Carolina at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.   The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.   The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records.   Defendants consciously accepted the benefits conferred upon them.

### North Dakota

1704.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in North Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue.   Plaintiffs and the Damages Class have been impoverished by the overcharges for Drugs at Issue resulting from Defendants' unlawful conduct.   Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.   There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Oklahoma**

1705. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Oklahoma at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  Plaintiffs and the Damages Class have no remedy at law.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Oregon**

1706. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Oregon at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Pennsylvania**

1707.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Pennsylvania at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Puerto Rico**

1708.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Puerto Rico at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue.   Plaintiffs and the Damages Class have been impoverished by the overcharges for Drugs at Issue resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.   There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs and the Damages Class have no remedy at law.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Rhode Island**

1709.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Rhode Island at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**South Carolina**

1710.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in South Carolina at prices that were more than they would have been but for Defendants' actions.   The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.   Defendants realized value from the benefit bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**South Dakota**

1711.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in South Dakota at prices that were more than they would have been but for Defendants' actions.   Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiffs and the Damages Class.

**Tennessee**

1712. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Tennessee at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class. It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Drugs at Issue. It would be futile for Plaintiffs and the Damages Class to exhaust all remedies against the entities with which Plaintiffs and the Damages Class have privity of contract because Plaintiffs and the Damages Class did not purchase Drugs at Issue directly from any Defendant.

**Texas**

1713. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Texas at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from Plaintiffs and the Damages

Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class. The circumstances under which Defendants have retained the benefits bestowed upon them by Plaintiffs and the Damages Class are inequitable in that they result from Defendants' unlawful overcharges for Drugs at Issue. Plaintiffs and the Damages Class have no remedy at law.

**Utah**

1714. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Utah at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Vermont**

1715. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Vermont at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants accepted the benefit bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Case 2:19-cv-06011-CMR   Document 1   Filed 12/19/19   Page 474 of 479


inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Virginia**

1716. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Virginia at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants were aware of the benefit bestowed upon them. Defendants should reasonably have expected to repay Plaintiffs and the Damages Class. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Drugs at Issue. Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiffs and the Damages Class.

**Washington**

1717. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Washington at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**West Virginia**

1718.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in West Virginia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Wisconsin**

1719.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Wisconsin at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Wyoming**

1720.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Wyoming at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

economic detriment of Plaintiffs and the Damages Class.  Defendants accepted, used and enjoyed the benefits bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

## XVI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment for the following relief:

1.      The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

2.      That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act; (b) a *per se* violation of Sections 1 and 3 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

3.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

4.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

5.      Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a *pro rata* basis;

6.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

7.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

8.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## XVII.   <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Date:  December 19, 2019                           Respectfully submitted,

*Roberta D. Liebenberg*

Roberta D. Liebenberg, Esquire
Fine, Kaplan and Black, R.P.C.
One South Broad Street, 23rd Floor
Philadelphia, PA  19107
(215) 567-6565
rliebenberg@finekaplan.com

**Lead Counsel for the End-Payer Plaintiffs**

Gregory S. Asciolla, Esquire                    Michael M. Buchman, Esquire
Labaton Sucharow LLP                           Motley Rice LLC
140 Broadway                                   600 Third Avenue, Suite 2101
New York, NY  10005                            New York, NY  10016
(212) 907-0700                                 (212) 577-0040
gasciolla@labaton.com                          mbuchman@motleyrice.com

Elizabeth J. Cabraser, Esquire                 James R. Dugan, II, Esquire
Lieff Cabraser Heimann & Bernstein LLP         The Dugan Law Firm, APLC
275 Battery Street, 29th Floor                  365 Canal Street, Suite 1000
San Francisco, CA  94111-3339                  New Orleans, LA 70130
(415) 956-1000                                 (504) 648-0180
ecabraser@lchb.com                             jdugan@dugan-lawfirm.com

Jayne A. Goldstein, Esquire                    Mindee J. Reuben, Esquire
Shepherd Finkelman Miller & Shah, LLP          Lite DePalma Greenberg, LLC
1625 N. Commerce Parkway, Suite 320            1835 Market Street, 27th Floor
Fort Lauderdale, FL 33326                       Philadelphia, PA  19103
(886) 849-7545                                 (267) 314-7980
jgoldstein@sfmslaw.com                         mreuben@litedepalma.com

Joseph R. Saveri, Esquire                      Dena C. Sharp, Esquire
Joseph Saveri Law Firm, Inc.                   Girard Sharp LLP
555 Montgomery Street, Suite 1210              601 California Street, Suite 1400
San Francisco, CA  94111                       San Francisco, CA 94108
(415) 500-6800                                 (415) 981-4800
jsaveri@saverilawfirm.com                      chc@girardsharp.com

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Heidi M. Silton, Esquire
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401
(612) 339-6900
hmsilton@locklaw.com

Bonny E. Sweeney, Esquire
Hausfeld LLP
600 Montgomery Street, Suite 3200
San Francisco, CA  94111
(415) 633-1908
bsweeney@hausfeld.com

Adam J. Zapala, Esquire
Cotchett, Pitre & McCarthy, LLP
840 Malcolm Road, Suite 200
Burlingame, CA  94010
(650) 697-6000
azapala@cpmlegal.com

## End-Payer Plaintiffs' Steering Committee

Audrey A. Browne, Esquire
American Federation of State, County and
  Municipal Employees District Council 37
  Health & Security Plan
125 Barclay Street, Room 313
New York, NY 10007
(212) 815-1304
abrowne@dc37.net

Dan Drachler, Esquire
Zwerling Schachter & Zwerling, LLP
41 Madison Avenue
New York, NY 10010
(212) 223-3900
ddrachler@zsz.com

Peter Safirstein, Esquire
Elizabeth Metcalf, Esquire
Safirstein Metcalf LLP
The Empire State Building
350 Fifth Avenue, Suite 5960
New York, NY 10018
(212) 201-2845
PSafirstein@SafirsteinMetcalf.com
EMetcalf@SafirsteinMetcalf.com

Bryan F. Aylstock, Esquire
Justin G. Witkin, Esquire
Aylstock, Witkin, Kreis & Overholtz, PLLC
17 East Main Street
Suite 200
Pensacola, Florida 32502
(850) 202-1010
BAylstock@awkolaw.com
JWitkin@awkolaw.com

## Additional End-Payer Plaintiffs' Counsel

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER