**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724<br>HON. CYNTHIA M. RUFE |
| 1199SEIU NATIONAL BENEFIT FUND; 1199SEIU GREATER NEW YORK BENEFIT FUND; 1199SEIU NATIONAL BENEFIT FUND FOR HOME CARE WORKERS; 1199SEIU LICENSED PRACTICAL NURSES WELFARE FUND;<br>AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN;<br>LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY D/B/A BLUE CROSS AND BLUE SHIELD OF LOUISIANA AND HMO LOUISIANA, INC.;<br>SELF-INSURED SCHOOLS OF CALIFORNIA; and SERGEANTS BENEVOLENT ASSOCIATION HEALTH AND WELFARE FUND, on behalf of themselves and all others similarly situated,<br><br>                          Plaintiffs,<br>          v.<br><br>ACTAVIS HOLDCO U.S., INC.;<br>ACTAVIS ELIZABETH LLC;<br>ACTAVIS PHARMA, INC.;<br>AKORN, INC.;<br>AKORN SALES, INC.;<br>ALVOGEN INC.;<br>AMNEAL PHARMACEUTICALS, INC.;<br>AMNEAL PHARMACEUTICALS, LLC;<br>APOTEX CORP.;<br>ASCEND LABORATORIES, LLC;<br>AUROBINDO PHARMA USA, INC.;<br>BARR PHARMACEUTICALS, LLC;<br>BAUSCH HEALTH AMERICAS, INC.;<br>BAUSCH HEALTH US LLC;<br>BRECKENRIDGE PHARMACEUTICALS, INC.; | CIVIL ACTION NO.<br>19-CV-06011-CMR<br><br><br>JURY TRIAL DEMANDED<br><br><br><u>END-PAYER AMENDED<br>CLASS ACTION COMPLAINT</u> |

CAMBER PHARMACEUTICALS, INC.;
CITRON PHARMA, LLC;
DAVA PHARMACEUTICALS, LLC;
DR. REDDY'S LABORATORIES, INC.;
EPIC PHARMA, LLC;
FOUGERA PHARMACEUTICALS INC.;
GENERICS BIDCO I, LLC;
GLENMARK PHARMACEUTICALS INC., USA;
GREENSTONE, LLC;
G&W LABORATORIES, INC.;
HERITAGE PHARMACEUTICALS, INC.;
HIKMA LABS, INC.;
HIKMA PHARMACEUTICALS USA, INC.;
HI-TECH PHARMACAL CO., INC.;
IMPAX LABORATORIES, LLC;
JUBILANT CADISTA PHARMACEUTICALS, INC.;
LANNETT COMPANY, INC.;
LUPIN PHARMACEUTICALS, INC.;
MALLINCKRODT INC.;
MAYNE PHARMA INC.;
MORTON GROVE PHARMACEUTICALS, INC.;
MUTUAL PHARMACEUTICAL COMPANY, INC.;
MYLAN INC.;
MYLAN PHARMACEUTICALS, INC.;
OCEANSIDE PHARMACEUTICALS, INC.;
PAR PHARMACEUTICAL, INC.;
PERRIGO NEW YORK, INC.;
PFIZER, INC.;
PLIVA, INC.;
SANDOZ INC.;
SUN PHARMACEUTICAL INDUSTRIES, INC.;
TARO PHARMACEUTICALS USA, INC.;
TELIGENT INC.;
TEVA PHARMACEUTICALS USA, INC.;
TORRENT PHARMA INC.;
UPSHER-SMITH LABORATORIES, LLC;
VERSAPHARM, INC.;
WEST-WARD COLUMBUS, INC.;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

WOCKHARDT USA LLC; and,

ZYDUS PHARMACEUTICALS (USA), INC.

Defendants.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ................................................................................ 1

II.     JURISDICTION AND VENUE ......................................................................... 18

III.    PLAINTIFFS ................................................................................................... 19

IV.     DEFENDANTS ............................................................................................... 23

        A.      Actavis Defendants ...........................................................................23

        B.      Akorn Defendants .............................................................................24

        C.      Alvogen ............................................................................................25

        D.      Amneal Defendants ...........................................................................25

        E.      Apotex ..............................................................................................26

        F.      Ascend ..............................................................................................26

        G.      Aurobindo .........................................................................................26

        H.      Bausch Defendants ...........................................................................26

        I.      Breckenridge .....................................................................................27

        J.      Cadista ..............................................................................................27

        K.      Camber ..............................................................................................27

        L.      Citron ...............................................................................................28

        M.      Dr. Reddy's .......................................................................................28

        N.      Epic ..................................................................................................28

        O.      Glenmark ..........................................................................................28

        P.      Greenstone Defendants .....................................................................29

        Q.      G&W .................................................................................................29

        R.      Heritage ............................................................................................29

        S.      Impax ................................................................................................30

        T.      Lannett ..............................................................................................30

        U.      Lupin ................................................................................................30

        V.      Mallinckrodt......................................................................................30

        W.      Mayne ...............................................................................................31

        X.      Mylan Defendants .............................................................................31

        Y.      Par Defendants ..................................................................................32

        Z.      Perrigo...............................................................................................32

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

AA.     Sandoz Defendants ...................................................................................33

BB.     Sun Defendants .......................................................................................33

CC.     Taro .........................................................................................................34

DD.     Teligent ...................................................................................................34

EE.     Teva Defendants .....................................................................................35

FF.     Torrent .....................................................................................................35

GG.     Upsher-Smith ...........................................................................................36

HH.     West-Ward Defendants ...........................................................................36

II.     Wockhardt Defendants ...........................................................................36

JJ.     Zydus .......................................................................................................37

V.     CO-CONSPIRATORS ......................................................................................... 37

A.     Rising ......................................................................................................37

B.     Unknown Co-Conspirators .....................................................................38

VI.     DEFENDANTS' OVERARCHING CONSPIRACY .......................................... 38

A.     Defendants Are Competitors or Potential Competitors for All Drugs at Issue......40

B.     The Principles of "Playing Fair" and "Fair Share" Governed Defendants' Interactions.............................................................................................41

C.     Defendants' Conspiracy Spanned Multiple Drugs and Manufacturers ................44

     1.     Example 1: Nisha Patel and Teva's Systematic Price Fixing ................... 44

     2.     Example 2: Price Fixing of Multiple Drugs All at Once .......................... 47

     3.     Example 3: Collusion on Drugs that Manufacturers Did Not Sell ........... 48

     4.     Example 4: Widespread Sharing of Competitively Sensitive Confidential Information ...................................................................................... 49

D.     Frequent Meetings and Contacts among Industry Personnel Facilitated Defendants' Conspiracy..........................................................................50

E.     Defendants Frequently Communicated Directly and Privately As Part of the Overarching Conspiracy. ......................................................................51

VII.     DEFENDANTS CONSPIRED TO FIX PRICES, ALLOCATE MARKETS AND/OR RIG BIDS FOR THE DRUGS AT ISSUE ........................................................ 55

     1.     Carbamazepine................................................................................. 57

     2.     Perphenazine ................................................................................... 64

     3.     Pentoxifylline................................................................................... 66

     4.     Atropine Sulfate ............................................................................... 69

     5.     Fluticasone Propionate ..................................................................... 70

6.      Hydroxyurea ................................................................................. 75

7.      Imiquimod ...................................................................................... 77

8.      Neomycin Polymyxin Hydrocortisone ............................................ 80

9.      Piroxicam ....................................................................................... 82

10.     Permethrin ...................................................................................... 85

11.     Triamcinolone Acetonide ............................................................... 88

12.     Potassium Chloride ........................................................................ 92

13.     Adapalene ....................................................................................... 96

14.     Betamethasone Dipropionate ......................................................... 99

15.     Betamethasone Dipropionate Augmented ...................................... 99

16.     Betamethasone Dipropionate Clotrimazole ................................... 99

17.     Betamethasone Valerate ................................................................. 99

18.     Hydrocortisone Valerate ................................................................ 99

19.     Nitrofurantoin ............................................................................... 113

20.     Carisoprodol ................................................................................. 116

21.     Nortriptyline HCL ........................................................................ 117

22.     Methylprednisolone ...................................................................... 119

23.     Amiloride HCL/HCTZ .................................................................. 122

24.     Erythromycin ................................................................................ 124

25.     Amphetamine Salts (Adderall) ..................................................... 128

26.     Calcipotriene ................................................................................ 131

27.     Dextroamphetamine Sulfate ......................................................... 134

28.     Metronidazole ............................................................................... 140

29.     Chlorpromazine HCL .................................................................... 145

30.     Flurbiprofen .................................................................................. 147

31.     Clonidine-TTS Patch .................................................................... 149

32.     Latanoprost ................................................................................... 151

33.     Oxybutynin Chloride .................................................................... 153

34.     Triamterene HCTZ ....................................................................... 154

35.     Ranitidine HCL ............................................................................. 158

36.     Amantadine HCL .......................................................................... 161

37.     Fluocinolone Acetonide ................................................................ 163

38.     Prochlorperazine Maleate ............................................................. 169

39.     Ciclopirox ..................................................................................... 173

40.     Irbesartan ...................................................................................... 178

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

41.  Isosorbide Dinitrate ................................................................... 179

42.  Clindamycin Phosphate ............................................................. 182

43.  Labetalol HCL ........................................................................... 189

44.  Lamivudine/Zidovudine ............................................................ 192

45.  Lidocaine HCL ........................................................................... 193

46.  Ethinyl Estradiol and Levonorgestrel ...................................... 196

47.  Etodolac ..................................................................................... 197

48.  Silver Sulfadiazine ................................................................... 205

49.  Tamoxifen Citrate ..................................................................... 206

50.  Cimetidine ................................................................................. 209

51.  Cyproheptadine HCL ................................................................ 211

52.  Oxaprozin .................................................................................. 214

53.  Tolterodine ................................................................................ 217

54.  Buspirone HCL .......................................................................... 219

55.  Estradiol ..................................................................................... 219

56.  Ethosuximide ............................................................................. 221

57.  Loperamide HCL ....................................................................... 224

58.  Nadolol ....................................................................................... 226

59.  Desoximetasone ........................................................................ 230

60.  Halobetasol Propionate ............................................................ 232

61.  Promethazine HCL .................................................................... 237

62.  Ketoprofen ................................................................................. 240

63.  Methotrexate Sodium ................................................................ 241

64.  Tobramycin Dexamethasone ................................................... 244

65.  Valsartan HCTZ ........................................................................ 246

66.  Diclofenac Potassium ............................................................... 247

67.  Ketorolac Tromethamine .......................................................... 250

68.  Prazosin HCL ............................................................................ 252

69.  Ethambutol HCL ........................................................................ 255

70.  Nystatin Triamcinolone Acetonide .......................................... 256

71.  Nafcillin Sodium ........................................................................ 260

72.  Oxacillin Sodium ....................................................................... 260

73.  Cefpodoxime Proxetil ............................................................... 261

74.  Methylphenidate HCL ............................................................... 263

75.  Spironolactone HCTZ ............................................................... 268

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

76. Bromocriptine Mesylate .................................................................................. 270

77. Budesonide ...................................................................................................... 272

78. Pioglitazone Metformin HCL ......................................................................... 274

79. Fenofibrate ...................................................................................................... 277

80. Medroxyprogesterone ..................................................................................... 279

81. Alclometasone Dipropionate .......................................................................... 280

82. Ammonium Lactate ......................................................................................... 283

83. Cefdinir ........................................................................................................... 285

84. Cefprozil ......................................................................................................... 285

85. Cholestyramine ............................................................................................... 286

86. Drospirenone and Ethinyl Estradiol ............................................................... 290

87. Terconazole ..................................................................................................... 291

88. Tizanidine HCL ............................................................................................... 293

89. Captopril ......................................................................................................... 295

90. Diltiazem HCL ................................................................................................ 299

91. Doxazosin Mesylate ........................................................................................ 302

92. Fluconazole ..................................................................................................... 305

93. Moexipril HCL ................................................................................................ 309

94. Moexipril HCL HCTZ .................................................................................... 309

95. Mometasone Furoate ....................................................................................... 311

96. Nabumetone ..................................................................................................... 313

97. Prednisone ....................................................................................................... 314

98. Tolmetin Sodium ............................................................................................. 317

99. Disopyramide Phosphate ................................................................................ 318

100. Hydrocortisone Acetate .................................................................................. 318

101. Isoniazid .......................................................................................................... 320

102. Enalapril Maleate ............................................................................................ 321

103. Haloperidol ...................................................................................................... 326

104. Prednisolone Acetate ...................................................................................... 330

105. Temozolomide ................................................................................................. 332

106. Trifluoperazine HCL ....................................................................................... 333

107. Clemastine Fumarate ...................................................................................... 336

108. Oxycodone/Acetaminophen ............................................................................ 336

109. Griseofulvin .................................................................................................... 339

110. Cephalexin ...................................................................................................... 341

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

111.  Estradiol and Norethindrone Acetate (Mimvey)..................................................344

112.  Hydroxyzine Pamoate .................................................................................345

113.  Oxycodone HCL ........................................................................................346

114.  Tobramycin ...............................................................................................348

115.  Azithromycin ............................................................................................349

116.  Balsalazide Disodium .................................................................................350

117.  Butorphanol Tartrate ..................................................................................353

118.  Cefuroxime Axetil .....................................................................................355

119.  Clarithromycin ..........................................................................................357

120.  Exemestane ..............................................................................................358

121.  Timolol Maleate ........................................................................................361

122.  Capecitabine .............................................................................................363

123.  Fluocinonide 0.1% Cream ...........................................................................364

124.  Norethindrone/Ethinyl Estradiol (Balziva) ....................................................366

125.  Penicillin V Potassium ................................................................................367

126.  Pilocarpine HCL ........................................................................................367

127.  Calcipotriene Betamethasone Dipropionate ....................................................369

128.  Dexmethylphenidate HCL ...........................................................................371

129.  Ketoconazole.............................................................................................373

130.  Paricalcitol ...............................................................................................377

131.  Atenolol Chlorthalidone ..............................................................................379

132.  Diphenoxylate Atropine ..............................................................................381

133.  Estazolam .................................................................................................384

134.  Niacin .....................................................................................................385

135.  Phenytoin Sodium ......................................................................................387

136.  Bumetanide ..............................................................................................390

137.  Dicloxacillin Sodium ..................................................................................391

138.  Diflunisal..................................................................................................391

139.  Eplerenone ...............................................................................................392

140.  Fluvastatin Sodium ....................................................................................393

141.  Topiramate ...............................................................................................394

142.  Allopurinol ...............................................................................................395

143.  Clotrimazole.............................................................................................399

144.  Desogestrel and Ethinyl Estradiol.................................................................402

145.  Fluoxetine HCL .........................................................................................403

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

146.    Methadone HCL.................................................................................. 404

147.    Methazolamide ................................................................................. 406

148.    Omega-3-Acid Ethyl Esters .............................................................. 408

149.    Warfarin Sodium ............................................................................... 409

150.    Ciprofloxacin HCL ............................................................................ 413

151.    Desmopressin Acetate ....................................................................... 415

152.    Entecavir ........................................................................................... 416

153.    Flutamide .......................................................................................... 417

154.    Glimepiride ....................................................................................... 417

155.    Tacrolimus ........................................................................................ 418

156.    Norethindrone Acetate ...................................................................... 419

157.    Raloxifene HCL ................................................................................ 420

158.    Amoxicillin/Clavulanate ................................................................... 423

159.    Bethanechol Chloride ........................................................................ 423

160.    Gabapentin ........................................................................................ 424

161.    Celecoxib .......................................................................................... 426

162.    Cabergoline ....................................................................................... 426

163.    Naproxen Sodium .............................................................................. 427

164.    Trazodone HCL ................................................................................. 430

165.    Metformin ER (F) [Fortamet] ........................................................... 432

VIII.    INTERSTATE AND INTRASTATE TRADE AND COMMERCE ............................ 434

IX.    BACKGROUND OF THE GENERIC DRUG INDUSTRY ....................................... 434

    A.    Generic Drugs Are Commodity Products. ........................................434

    B.    Pricing in the U.S. Prescription Drug Industry. ...................................438

X.    FACTORS INCREASING THE SUSCEPTIBILITY TO COLLUSION OF THE
    DRUGS AT ISSUE ................................................................................................... 440

    1.    Industry Concentration ...................................................................... 441

    2.    Barriers to Entry ................................................................................ 441

    3.    Demand Inelasticity ........................................................................... 441

    4.    Lack of Substitutes ............................................................................ 442

    5.    Standardized Product with High Degree of Interchangeability ......... 442

    6.    Inter-Competitor Contacts and Communications .............................. 443

XI.    THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS ........ 451

vii

A. The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy.........................451

B. Fraudulent Concealment Tolled the Statutes of Limitations. ..............................455

    1. Active Concealment of the Conspiracy. ..................................................456

    2. Plaintiffs Exercised Reasonable Diligence. ...........................................459

XII. CONTINUING VIOLATIONS ........................................................................ 460

XIII. DEFENDANTS' ANTITRUST VIOLATIONS............................................. 460

XIV. CLASS ACTION ALLEGATIONS ................................................................ 462

XV. CAUSES OF ACTION ..................................................................................... 466

FIRST COUNT:  Violation of Sections 1 and 3 of the Sherman Act (on behalf of Plaintiffs and the Nationwide Class).................................................................... 466

SECOND COUNT:  Violation of State Antitrust Statutes (on behalf of Plaintiffs and the Damages Class).......................................................................................................469

THIRD COUNT:  Violation of State Consumer Protection Statutes (on behalf of Plaintiffs and the Damages Class) .................................................................... 490

FOURTH COUNT: Unjust Enrichment (on behalf of Plaintiffs and the Damages Class) .................................................................................................................. 523

XVI. PRAYER FOR RELIEF ................................................................................ 546

XVII. JURY DEMAND ............................................................................................ 548

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## I.   NATURE OF THE ACTION

1.      This suit brings claims on behalf of End-Payer Purchasers ("End-Payers" or "Plaintiffs" or "EPPs") of generic pharmaceutical drugs to secure injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise, and/or stabilize the prices of 165 generic pharmaceutical drugs beginning at least as early as May 2009. Together, these drugs are referred to herein as "Drugs at Issue."

2.      Defendants participated in an overarching conspiracy, the purpose of which was to raise prices and minimize competition in the generic drug industry for numerous generic drugs. This overarching conspiracy encompassed an agreement among all Defendants that covered all Drugs at Issue, and included subsidiary agreements among certain Defendants relating to individual Drugs at Issue.

3.      The Drugs at Issue discussed in this complaint are listed alphabetically in Table 1.

### Table 1: Drugs at Issue

|    | Drug | Start Date | Formulations | Defendants[1] |
|----|------|------------|--------------|---------------|
| 1. | Adapalene | 8/2010 | Cream<br>Gel | Cream: Perrigo, Sandoz<br>Gel: Teva, Taro, Glenmark |
| 2. | Alclometasone Dipropionate | 4/2013 | Cream<br>Ointment | Sandoz, Taro, Glenmark |
| 3. | Allopurinol | 5/2014 | Tablets (100, 300 mg) | Actavis, Par, Mylan, Dr. Reddy's |
| 4. | Amantadine HCL | 12/2011 | Capsules | Sandoz, Upsher-Smith, Lannett |
| 5. | Amiloride HCL/HCTZ | 5/2011 | Tablets | Teva, Mylan |

---

[1] Non-Defendant co-conspirators also are included here, marked by parentheses.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| 6. | Ammonium Lactate | 4/2013 | Cream<br>Lotion | Actavis, Perrigo, Taro |
|---|---|---|---|---|
| 7. | Amoxicillin/Clavulanate | 10/2014 | Chewable tablets | Teva, Sandoz |
| 8. | Amphetamine Salts ("MAS") [Adderall] | 6/2011 | ER capsules ("MAS-XR")<br>IR tablets ("MAS-IR") | ER: Teva, Actavis, Impax<br>IR: Teva, Impax, Sandoz, Aurobindo, Mallinckrodt |
| 9. | Atenolol Chlorthalidone | 3/2014 | Tablets<br>(100-25, 50-25 mg) | Actavis, Mylan |
| 10. | Atropine Sulfate | 1/2010 | Opthalmic solution (1%) | Bausch, Sandoz |
| 11. | Azithromycin | 11/2013 | Oral suspension<br>(100, 200 mg/5 ml) | Teva, Greenstone |
| 12. | Balsalazide Disodium | 11/2013 | Capsules | West-Ward, Apotex |
| 13. | Betamethasone Dipropionate | 10/2010 | Ointment<br>Cream<br>Lotion | Actavis, Taro, Sandoz, Perrigo |
| 14. | Betamethasone Dipropionate Augmented | 10/2010 | Lotion | Taro, Sandoz |
| 15. | Betamethasone Dipropionate Clotrimazole | 10/2010 | Cream<br>Lotion | Actavis, Taro, Sandoz |
| 16. | Betamethasone Valerate | 10/2010 | Ointment<br>Cream<br>Lotion | Actavis, Taro, Sandoz, G&W |
| 17. | Bethanechol Chloride | 10/2014 | Tablets | Teva, Amneal, Upsher-Smith |
| 18. | Bromocriptine Mesylate | 2/2013 | Tablets | Mylan, Sandoz, Perrigo |
| 19. | Budesonide | 2/2013 | Inhalation<br>DR capsules | Inhalation: Teva, Actavis, Sandoz<br>DR capsules: Teva, Mylan, Par |
| 20. | Bumetanide | 4/2014 | Tablets | Teva, Sandoz |

PUBLIC VERSION<br>REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| 21. | Buspirone HCL | 7/2012 | Tablets | Teva, Mylan, Actavis |
|---|---|---|---|---|
| 22. | Butorphanol Tartrate | 12/2013 | Nasal spray | Mylan, West-Ward, Apotex |
| 23. | Cabergoline | 12/2014 | Tablets | Teva, Greenstone, Par |
| 24. | Calcipotriene | 6/2011 | Solution (0.005%) | G&W, Impax, Sandoz |
| 25. | Calcipotriene Betamethasone Dipropionate | 2/2014 | Ointment | Perrigo, Sandoz |
| 26. | Capecitabine | 1/2014 | Tablets | Teva, Mylan |
| 27. | Captopril | 5/2013 | Tablets (12.5, 25, 50, 100 mg) | Mylan, West-Ward, Wockhardt |
| 28. | Carbamazepine | 5/2009 | Chewable tablets (100 mg) Tablets (200 mg) ER tablets (200, 400 mg) | Chewable: Teva, Taro, Torrent<br><br>Tabs: Apotex, Teva, Taro, Torrent<br><br>ER tabs: Sandoz, Taro |
| 29. | Carisoprodol | 1/2011 | Tablets (350 mg) | Par, Actavis |
| 30. | Cefdinir | 4/2013 | Capsules Oral suspension | Teva, Sandoz, Lupin |
| 31. | Cefpodoxime Proxetil | 1/2013 | Oral suspension (50 mg/100ml, 100mg/100ml) Tablets (100, 200 mg) | Aurobindo, Sandoz |
| 32. | Cefprozil | 4/2013 | Tablets | Teva, Sandoz, Lupin |
| 33. | Cefuroxime Axetil | 12/2013 | Tablets (250, 500 mg) | Lupin, Aurobindo, Citron |
| 34. | Celecoxib | 11/2014 | Capsules | Teva, Actavis |
| 35. | Cephalexin | 10/2013 | Oral suspension | Lupin, Teva |
| 36. | Chlorpromazine HCL | 7/2011 | Tablets | Sandoz, Upsher-Smith |
| 37. | Cholestyramine | 4/2013 | Powder Solid | Sandoz, Par, Upsher-Smith |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| 38. | Ciclopirox | 2/2012 | 8% Solution<br>Cream<br>Shampoo | Solution: G&W, Perrigo, Akorn, Sandoz<br><br>Cream: Perrigo, Glenmark, G&W<br><br>Shampoo: Actavis, Perrigo, Taro, Sandoz |
|---|---|---|---|---|
| 39. | Cimetidine | 6/2012 | Tablets | Teva, Mylan |
| 40. | Ciprofloxacin HCL | 8/2014 | Tablets | Teva, Actavis, Dr. Reddy's |
| 41. | Clarithromycin | 12/2013 | ER tablets | Actavis, Teva |
| 42. | Clemastine Fumarate | 8/2013 | Tablets | Teva, Sandoz |
| 43. | Clindamycin Phosphate | 4/2012 | Gel<br>Lotion<br>Solution<br>Vaginal cream | Sandoz, Greenstone, Perrigo, Taro, Actavis |
| 44. | Clonidine TTS | 9/2011 | Patch | Teva, Mylan, Actavis |
| 45. | Clotrimazole | 5/2014 | Solution | Teva, Taro |
| 46. | Cyproheptadine HCL | 6/2012 | Tablets | Teva, Breckenridge, Impax |
| 47. | Desmopressin Acetate | 8/2014 | Tablets | Teva, Actavis |
| 48. | Desogestrel and Ethinyl Estradiol [Kariva] | 5/2014 | Tablets | Teva, Glenmark, Actavis |
| 49. | Desoximetasone | 8/2012 | Ointment | Glenmark, Sandoz, Taro |
| 50. | Dexmethylphenidate HCL [Focalin] | 2/2014 | ER capsules (5, 15, 20, 40 mg) | Teva, Sandoz, Par |
| 51. | Dextroamphetamine Sulfate ER ("Dex Sulfate XR") | 6/2011 | Tablets<br><br>Capsules | Tablets: Teva, Mallinckrodt, Aurobindo<br><br>Capsules: Teva, Mallinckrodt, Impax, Actavis |
| 52. | Diclofenac Potassium | 10/2012 | Tablets | Teva, Mylan, Sandoz |

4

PUBLIC VERSION<br>REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| 53. | Dicloxacillin Sodium | 4/2014 | Capsules | Teva, Sandoz |
|---|---|---|---|---|
| 54. | Diflunisal | 4/2014 | Tablets | Teva, (Rising) |
| 55. | Diltiazem HCL | 5/2013 | Tablets (30, 60, 90, 120 mg) | Teva, Mylan |
| 56. | Diphenoxylate Atropine | 3/2014 | Tablets | Mylan, Greenstone |
| 57. | Disopyramide Phosphate | 6/2013 | Capsules | Teva, Actavis |
| 58. | Doxazosin Mesylate | 5/2013 | Tablets (1, 2, 4, 8 mg) | Teva, Mylan, Apotex, Par, Greenstone |
| 59. | Drospirenone and Ethinyl Estradiol | 4/2013 | Tablets | Teva, Lupin, Actavis |
| 60. | Enalapril Maleate | 7/2013 | Tablets (2.5, 5, 10, 20 mg) | Teva, Mylan, Taro, Wockhardt, Bausch |
| 61. | Entecavir | 8/2014 | Tablets | Teva, Par |
| 62. | Eplerenone | 4/2014 | Tablets | Greenstone, Sandoz |
| 63. | Erythromycin | 5/2011 | Solution | Sandoz, Perrigo, Wockhardt |
| 64. | Estazolam | 3/2014 | Tablets | Teva, Actavis |
| 65. | Estradiol | 7/2012 | Tablets (0.5, 1, 2 mg) | Teva, Mylan, Actavis |
| 66. | Estradiol and Norethindrone Acetate [Mimvey] | 10/2013 | Tablets | Teva, Breckenridge |
| 67. | Ethambutol HCL | 11/2012 | Tablets | G&W, Lupin |
| 68. | Ethinyl Estradiol and Levonorgestrel [Portia and Jolessa] | 5/2012 | Tablets | Teva, Sandoz |
| 69. | Ethosuximide | 7/2012 | Capsules Oral solution | Teva, Akorn |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| | | | | |
|---|---|---|---|---|
| 70. | Etodolac | 5/2012 | Capsules (200, 300 mg)<br>Tablets (400, 500 mg)<br>ER tablets (400, 500, 600 mg) | Caps: Apotex, Taro<br><br>Tabs: Teva, Sandoz, Taro, Apotex<br><br>ER tabs: Teva, Taro, Zydus |
| 71. | Exemestane | 12/2013 | Tablets (25 mg) | Greenstone, West-Ward, Alvogen |
| 72. | Fenofibrate | 3/2013 | Tablets (48 and 145 mg) | Teva, Mylan, Lupin, Zydus, Perrigo |
| 73. | Fluconazole | 5/2013 | Tablets (50, 100, 150, 200 mg) | Teva, Glenmark, Greenstone, Citron, Dr. Reddy's |
| 74. | Fluocinolone Acetonide | 1/2012 | Cream<br>Ointment<br>Solution | Cream & Ointment: Sandoz, G&W, Teligent<br><br>Solution: Sandoz, Taro, Teligent |
| 75. | Fluocinonide | 1/2014 | Cream (0.1%) | Bausch, Glenmark, Perrigo, Sandoz, Taro |
| 76. | Fluoxetine HCL | 6/2014 | Tablets | Teva, Mylan, Par |
| 77. | Flurbiprofen | 7/2011 | Tablets | Teva, Mylan |
| 78. | Flutamide | 8/2014 | Capsules | Teva, Actavis, Par |
| 79. | Fluticasone Propionate | 3/2010 | Nasal spray<br>Lotion | Nasal Spray: Apotex, West-Ward, Wockhardt, (Akorn)<br><br>Lotion: Glenmark, Perrigo, Sandoz |
| 80. | Fluvastatin Sodium | 4/2014 | Capsules | Teva, Mylan |
| 81. | Gabapentin | 10/2014 | Tablets (600 and 800 mg) | Teva, Glenmark, Aurobindo |
| 82. | Glimepiride | 8/2014 | Tablets | Teva, Dr. Reddy's |
| 83. | Griseofulvin | 9/2013 | Suspension<br>Microsize tablets | Suspension: Teva, Actavis<br><br>Tablets: Sandoz, (Rising) |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| 84. | Halobetasol Proprionate | 8/2012 | Cream<br>Ointment | Perrigo, G&W, Sandoz, Taro |
|---|---|---|---|---|
| 85. | Haloperidol | 7/2013 | Tablets (0.5, 1, 2, 5, 10, 20 mg) | Sandoz, Mylan, Zydus |
| 86. | Hydrocortisone Acetate | 6/2013 | Suppositories | G&W, Perrigo |
| 87. | Hydrocortisone Valerate | 10/2010 | Cream | Taro, Perrigo, G&W |
| 88. | Hydroxyurea | 3/2010 | Capsules | Teva, Par |
| 89. | Hydroxyzine Pamoate | 10/2013 | Capsules | Teva, Sandoz, Actavis, (Rising) |
| 90. | Imiquimod | 2/2010 | Cream | Sandoz, Perrigo, Taro |
| 91. | Irbesartan | 3/2012 | Tablets | Teva, Lupin |
| 92. | Isoniazid | 6/2013 | Tablets | Teva, Sandoz |
| 93. | Isosorbide Dinitrate | 3/2012 | Tablets (5, 10, 20, 30 mg) | Sandoz, Par, West-Ward |
| 94. | Ketoconazole | 2/2014 | Cream<br>Tablets | Cream: Teva, Sandoz, Taro, G&W<br><br>Tablets: Teva, Mylan, Taro |
| 95. | Ketoprofen | 9/2012 | Capsules | Teva, Mylan |
| 96. | Ketorolac Tromethamine | 10/2012 | Tablets | Teva, Mylan |
| 97. | Labetalol HCL | 4/2012 | Tablets (100, 200, 300 mg) | Teva, Sandoz, Par, Actavis, Alvogen |
| 98. | Lamivudine/ Zidovudine | 4/2012 | Tablets | Teva, Lupin, Aurobindo, Camber |
| 99. | Latanoprost | 9/2011 | Opthalmic solution | Bausch, Greenstone, Sandoz, (Akorn) |
| 100. | Lidocaine HCL | 4/2012 | 5% Ointment | Sandoz, Taro, Akorn |
| 101. | Loperamide HCL | 7/2012 | Capsules | Teva, Mylan |
| 102. | Medroxyprogesterone | 3/2013 | Tablets | Teva, Greenstone |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| 103. | Metformin ER (F) | 6/2015 | Tablets (500, 1000 mg) | Actavis, Lupin |
|---|---|---|---|---|
| 104. | Methadone HCL | 6/2014 | Tablets (5 & 10 mg) | West-Ward, Mallinckrodt |
| 105. | Methazolamide | 6/2014 | Tablets | Sandoz, Perrigo |
| 106. | Methotrexate Sodium | 9/2012 | Tablets | Teva, Mylan, Par, West-Ward |
| 107. | Methylphenidate HCL | 1/2013 | Tablets (5, 10, 20 mg)<br><br>ER tablets (20 mg) | Tablets: Sandoz, Actavis, Sun, Mallinckrodt, Impax, Par<br><br>ER: Sandoz, Mallinckrodt |
| 108. | Methylprednisolone | 2/2011 | Tablets (4 mg) | Sandoz, Par, Breckenridge, Greenstone, Cadista |
| 109. | Metronidazole | 6/2011 | Cream<br>Gel<br>Lotion<br>Vaginal cream | Teva, Sandoz, G&W, Taro, Impax, Bausch |
| 110. | Moexipril HCL | 5/2013 | Tablets | Teva, Glenmark |
| 111. | Moexipril HCL HCTZ | 5/2013 | Tablets | Teva, Glenmark |
| 112. | Mometasone Furoate | 5/2013 | Cream<br>Ointment<br>Solution | Glenmark, Perrigo, G&W, Impax |
| 113. | Nabumetone | 5/2013 | Tablets | Teva, Sandoz, Glenmark, Actavis |
| 114. | Nadolol | 7/2012 | Tablets (20, 40, 80 mg) | Teva, Mylan, Sandoz, Greenstone |
| 115. | Nafcillin Sodium | 12/2012 | Injectable vials | Aurobindo, Sandoz |
| 116. | Naproxen Sodium | 1/2015 | Tablets (275, 550 mg) | Amneal, Glenmark |
| 117. | Neomycin Polymyxin Hydrocortisone | 3/2010 | Otic solution | Bausch, Sandoz |
| 118. | Niacin | 3/2014 | ER tablets | Teva, Lupin, Zydus |
| 119. | Nitrofurantoin | 12/2010 | Macrocrystal capsules | Teva, Mylan, Alvogen |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| 120. | Norethindrone Acetate | 9/2014 | Tablets | Teva, Amneal, Glenmark |
|---|---|---|---|---|
| 121. | Norethindrone / Ethinyl Estradiol (Balziva) | 1/2014 | Tablets | Teva, Lupin |
| 122. | Nortriptyline Hydrochloride | 1/2011 | Capsules | Teva, Taro, Actavis |
| 123. | Nystatin Triamcinolone Acetonide | 11/2012 | Cream Ointment | Sandoz, Taro |
| 124. | Omega-3-Acid Ethyl Esters | 6/2014 | Capsules | Teva, Par, Apotex |
| 125. | Oxacillin Sodium | 12/2012 | Injectable vials | Aurobindo, Sandoz |
| 126. | Oxaprozin | 6/2012 | Tablets (600 mg) | Teva, Dr. Reddy's, Greenstone, Sandoz |
| 127. | Oxybutynin Chloride | 10/2011 | Tablets | Teva, Upsher-Smith, Par |
| 128. | Oxycodone HCL | 10/2013 | Tablets (5, 15, 30 mg) | Actavis, Mallinckrodt, Par, Sun |
| 129. | Oxycodone/ Acetaminophen | 8/2013 | Tablets (5/7.5/10-325 mg) | Actavis, Mallinckrodt, Alvogen, Aurobindo, Par, Amneal |
| 130. | Paricalcitol | 2/2014 | Capsules | Teva, Dr. Reddy's, Zydus |
| 131. | Penicillin V Potassium | 1/2014 | Tablets | Teva, Sandoz, Aurobindo, Greenstone |
| 132. | Pentoxifylline | 8/2009 | Tablets | Teva, Mylan, Apotex, Bausch |
| 133. | Permethrin | 5/2010 | Cream | Actavis, Perrigo, Mylan |
| 134. | Perphenazine | 7/2009 | Tablets | Sandoz, Par |
| 135. | Phenytoin Sodium | 3/2014 | ER capsules | Mylan, Taro, Amneal, Sun |
| 136. | Pilocarpine HCL | 1/2014 | Tablets | Actavis, Lannett, Impax |
| 137. | Pioglitazone Metformin HCL | 2/2013 | Tablets | Mylan, Teva, Aurobindo, Sandoz, Torrent |

9

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| 138. | Piroxicam | 4/2010 | Capsules (10, 20 mg) | Teva, Mylan, Greenstone |
|---|---|---|---|---|
| 139. | Potassium Chloride | 7/2010 | Tablets (8, 10, 20 mEq) | Actavis, Sandoz, Zydus, Mylan, Upsher-Smith |
| 140. | Prazosin HCL | 10/2012 | Capsules (1, 2, 5 mg) | Teva, Mylan |
| 141. | Prednisolone Acetate | 7/2013 | Ophthalmic suspension | Sandoz, Greenstone |
| 142. | Prednisone | 5/2013 | Tablets (1, 2.5, 5, 10, 20 mg) | Actavis, West-Ward, Par, Cadista |
| 143. | Prochlorperazine Maleate | 1/2012 | Suppositories Tablets | Suppositories: G&W, Perrigo<br><br>Tablets: Teva, Mylan, Sandoz, Cadista |
| 144. | Promethazine HCL | 8/2012 | Suppositories (12.5, 25 mg) | Actavis, G&W, Perrigo, Mylan, Taro |
| 145. | Raloxifene HCL | 9/2014 | Tablets | Teva, Camber |
| 146. | Ranitidine HCL | 11/2011 | Capsules (150 & 300 mg)<br><br>Tablets (150 mg) | Capsules: Dr. Reddy's, Sandoz<br><br>Tablets: Teva, Sandoz, Glenmark, Amneal |
| 147. | Silver Sulfadiazine | 5/2012 | Cream | Actavis, Ascend |
| 148. | Spironolactone HCTZ | 1/2013 | Tablets | Mylan, Sun, Greenstone |
| 149. | Tacrolimus | 8/2014 | Ointment (30, 60, 100 gm) | Sandoz, Perrigo |
| 150. | Tamoxifen Citrate | 5/2012 | Tablets (10, 20 mg) | Teva, Mylan, Actavis |
| 151. | Temozolomide | 7/2013 | Capsules | Teva, Sandoz |
| 152. | Terconazole | 4/2013 | Vaginal cream (0.8%, 0.4%) | Actavis, Taro |
| 153. | Timolol Maleate | 12/2013 | Opthalmic Gel | Sandoz, Bausch |
| 154. | Tizanidine HCL | 4/2013 | Tablets (2 & 4 mg) | Sandoz, Mylan, Dr. Reddy's, Sun, Apotex |
| 155. | Tobramycin | 10/2013 | Inhalation solution | Teva, Sandoz |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| 156. | Tobramycin Dexamethasone | 9/2012 | Opthalmic suspension | Bausch, Sandoz |
|------|--------------------------|--------|----------------------|----------------|
| 157. | Tolmetin Sodium | 5/2013 | Capsules | Teva, Mylan |
| 158. | Tolterodine | 6/2012 | Regular tablets<br>ER tablets | Teva, Mylan, Greenstone |
| 159. | Topiramate | 4/2014 | Sprinkle capsules | Teva, Actavis, Zydus |
| 160. | Trazodone HCL | 4/2015 | Tablets (50, 100, 150 mg) | Apotex, Par, Sun, Teva |
| 161. | Triamcinolone Acetonide | 6/2010 | Cream<br>Ointment<br>Paste | Cream: Sandoz, Perrigo, Par, Taro, Ascend<br>Ointment: Sandoz, Perrigo, Taro<br>Paste: Taro, (Rising) |
| 162. | Triamterene HCTZ | 10/2011 | Tablets (37.5-25, 75-50 mg)<br>Capsules (37.5-25 mg) | Tablets: Actavis, Mylan, Sandoz, Apotex<br>Capsules: Mylan, Sandoz, Lannett |
| 163. | Trifluoperazine HCL | 7/2013 | Tablets (1, 2, 5, 10 mg) | Sandoz, Mylan, Upsher-Smith |
| 164. | Valsartan HCTZ | 9/2012 | Tablets | Sandoz, Mylan |
| 165. | Warfarin Sodium | 6/2014 | Tablets<br>(1, 2, 2.5, 3, 4, 5, 6, 7.5, 10 mg) | Teva, Taro, Zydus, Amneal |

4.     In addition to the Drugs at Issue identified in this complaint, End-Payers have filed complaints alleging conspiratorial conduct relating to 30 other drugs involving nearly all of these Defendants.[2] These existing cases are related to and are part of the same conspiracy alleged here.

_____

[2] The EPP complaints for other drugs implicated in this MDL include: Albuterol (Case 2:16-AL-27242-CMR, Doc. 109); Amitriptyline (Case 2:16-AM-27242-CMR, Doc. 101); Baclofen (Case 2:16-BC-27242-CMR, Doc. 107); Benazepril (Case 2:16-BZ-27242-CMR, Doc. 89); Clobetasol (Case 2:16-CB-27242-CMR, Doc. 168); Clomipramine (Case 2:16-CM-27242-CMR, Doc. 134); Desonide (Case 2:16-DS-27242-CMR, Doc. 160); Digoxin (Case 2:16-DG-

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Accordingly, all Defendants in the existing EPP complaints have been named as Defendants here, even if they did not market or sell a Drug at Issue in this complaint.

5.        Defendants' conspiratorial conduct was widespread and criminal in nature. It has had a tremendous impact on the marketplace, and on End-Payers in particular, who have been forced to pay higher prices for essential drugs. Defendants knew that End-Payers needed their products, and they used this to their advantage. For example, as memorialized in internal Teva documents, Defendants knew that they could raise certain drug prices to extraordinary levels ████████████████████████████████████ In other words, people's lives were in jeopardy, and Defendants used this to maximize the profits of their conspiracy.

6.        In a competitive marketplace, each generic drug manufacturer should price its drugs competitively relative to other manufacturers. Accordingly, if any one company decided to raise prices, it would do so at the risk of losing customers and sales to its rivals with more competitive prices. But, beginning at least as early as May 2009, the generic pharmaceutical market has not been characterized by such competition.

7.        Defendants engaged in pervasive conspiratorial conduct designed to impose and maintain inflated prices and to avoid competition with one another. Throughout the conspiracy, Defendants communicated with each other to reach agreements on market share and pricing. The

---

27242-CMR, Doc. 173); Divalproex (Case 2:16-DV-27242-CMR, Doc. 124); Econazole (Case 2:16-EC-27242-CMR, Doc. 146); Fluocinonide (Case 2:16-FL-27242-CMR, Doc. 142); Levothyroxine (Case 2:16-LV-27242-CMR, Doc. 110); Lidocaine-Prilocaine (Case 2:16-LD-27242-CMR, Doc. 113); Pravastatin (Case 2:16-PV-27242-CMR, Doc. 153); Propranolol (Case 2:16-PP-27242-CMR, Doc. 132); Ursodiol (Case 2:16-UR-27242-CMR, Doc. 113); Multi-Drug (Case 18-CV-02401, Doc. 154) (involving Acetazolamide, Doxycycline Hyclate, Doxycycline Monohydrate, Fosinopril-Hydrochlorothiazide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline, Verapamil and Zoledronic Acid). The factual allegations in the foregoing EPP complaints are incorporated herein by reference, although the legal claims asserted therein remain separate.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

volume and frequency of inter-Defendant communication that occurred in furtherance of the conspiracy is mind-boggling. Plaintiffs are aware of numerous direct and private telephone communications between generic manufacturers, and discovery will likely uncover even more.

8.     The purpose of Defendants' unlawful "Fair Share" agreement was to fix, maintain and stabilize prices—either for a particular generic drug or any number of generic drugs. In this way, each entrant would benefit from coordination as a whole, even if a manufacturer did not seek a market allocation for a particular drug. Defendants implemented the "Fair Share" agreement by refusing to bid for a particular customer or by providing a pretextual bid that they knew would not be successful. Defendants also frequently ceded customers to co-conspirators rather than compete on price.

9.     Defendants also agreed to raise prices for certain Drugs at Issue. Defendants were able to raise, maintain or slow the decline of prices that would have been lower absent their conspiratorial agreements.

10.     The generic drug pricing described in this Complaint cannot be explained by changes in supply, the costs of production, or demand, or any other competitive market feature. Instead, the price levels were the result of an illegal agreement among Defendants to fix the prices of the Drugs at Issue and not the result of free and fair market competition.

11.     The generic pharmaceutical industry has a number of features that make it highly susceptible to collusion. The markets for the Drugs at Issue were controlled by Defendants, and are subject to high barriers to entry, including substantial manufacturing costs and regulatory requirements. Each generic drug described in this Complaint is a commodity product, for which reasonable substitutes are not available and demand is highly inelastic. Federal regulations require generic products to contain the same type and amount of active pharmaceutical ingredient and to

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

be therapeutically equivalent to one another. Interchangeability facilitates collusion, as cartel members can easily monitor and detect deviations from a price-fixing or market allocation agreement.

12.     Because purchasers choose whose generic pharmaceutical product to buy based primarily on price, and unilateral price increases generally result in loss of market share, it would have been economically irrational for any one Defendant to raise its prices without assurance that its competitors either would also increase prices or at least not compete on pricing.

13.     Moreover, due to the regulated nature of the industry, generic pharmaceutical manufacturers are typically able to determine in advance which manufacturers are coming in and out of the market for a particular generic drug. Armed with that knowledge, Defendants were able to reach a common understanding that each competitor would be entitled to a "Fair Share," meaning that each Defendant would be entitled to a percentage of the market for each generic drug that it manufactures.

14.     Defendants' attendance at trade association meetings, conferences, and workshops provided ample opportunities to agree on generic drug prices and allocate markets and customers. As alleged in greater detail below, the sheer volume of industry meetings provided the perfect opportunity for Defendants to implement and maintain their conspiracy, and evidence uncovered in the pending governmental investigations confirms that Defendants availed themselves of this opportunity. Defendants implemented their conspiracy through numerous meetings and communications between and among their representatives, including at industry events such as the Generic Pharmaceutical Association ("GPhA") (now the Association for Accessible Medicines), the National Association of Chain Drug Stores ("NACDS"), the Healthcare Distribution Management Association ("HDMA") (now the Healthcare Distribution Alliance) ("HDA"),

Efficient Collaborative Retail Marketing ("ECRM"), and Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP").

15.     Indeed, such routine meetings facilitated the Defendants' ability to reach agreements on their "Fair Shares" of the market for any given drug.

16.     Extreme and unprecedented price increases in the generic drug industry have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

17.     The Office of the Attorney General for the State of Connecticut ("Connecticut AG") has been leading a multi-state attorney general investigation of the generic drug industry and has identified "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States….[and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[3]

18.     An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, criminally charged or entered deferred prosecution agreements with Apotex, Glenmark, Heritage, Rising Pharmaceuticals, Sandoz, Taro and Teva.  Most of these entities have pleaded guilty or entered into a deferred prosecution agreement, under which they are required to pay substantial fines and cooperate with the Division as it continues its criminal investigation:

| GENERIC MANUFACTURER | PENALTY |
|---|---|
| Heritage | $225,000 criminal fine |
| Rising Pharmaceuticals | $1.5 million criminal fine |

---

[3] Connecticut AG, Press Release (Dec. 15, 2016), https://portal.ct.gov/AG/Press-Releases-Archived/2016-Press-Releases/Connecticut-Leads-20-State-Coalition-Filing-Federal-Antitrust-Lawsuit-against-Heritage-Pharmaceutica.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Sandoz | $195 million criminal fine |
|--------|----------------------------|
| Apotex | $24.1 million fine |
| Taro | $205.6 million criminal fine |
| Glenmark | Case pending |
| Teva | Case pending |

19.     DOJ also has pursued criminal sanctions against a number of individuals for the price-fixing of generic pharmaceuticals. In January 2017, two senior executives from Heritage—Jeffrey Glazer and Jason Malek—pleaded guilty to Sherman Act violations arising from conduct relating to the sale of Glyburide and Doxycycline Hyclate. Armando Kellum, Sandoz Director of Contracts and Pricing, also has pleaded guilty to Sherman Act violations. Ara Aprahamian, former Taro Vice President of Sales and Marketing, has been charged with criminal violations of the Sherman Act and his trial is pending.

20.     In addition to the non-prosecution agreements and guilty pleas, numerous other Defendants named here have received criminal subpoenas in connection with the DOJ investigation, including: Actavis Holdco U.S., Inc.; Aurobindo Pharma USA, Inc.; Citron Pharma LLC; Dr. Reddy's Laboratories, Inc.; Impax Laboratories, Inc.; Lannett Company, Inc.; Lupin Pharmaceuticals, Inc.; Mallinckrodt plc; Mayne Pharma Inc.; Mylan Pharmaceuticals, Inc.; Par Pharmaceutical, Inc.; Perrigo New York, Inc.; Pfizer, Inc.; Sun Pharmaceutical Industries, Inc.; West-Ward Pharmaceuticals Corp.; and Zydus Pharmaceuticals USA, Inc.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

21.    Further, at least two Defendants have been raided by federal authorities in connection with the investigation. Perrigo disclosed that its offices were raided in 2017, and Mylan's Pennsylvania headquarters were raided by the FBI in the fall of 2016.[4]

22.    Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws set forth below. Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Drugs at Issue manufactured by any Defendant, other than for resale, from at least May 2009 to the present ("Class Period"), and (b) a damages class of persons and entities in the states and territories identified herein who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Drugs at Issue manufactured by any Defendant, other than for resale, from at least May 2009 to the present.

23.    The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Plaintiffs' counsel. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of themselves and the classes they seek to represent, Plaintiffs allege as follows:

---

[4] David McLaughlin & Drew Armstrong, *Generic-Drug Companies to Face First Charges in U.S. Probe*, BLOOMBERG (Apr. 24, 2018), https://www.bloomberg.com/news/articles/2018-04-24/generic-drug-companies-said-to-face-first-charges-in-u-s-probe.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## II.    JURISDICTION AND VENUE

24.    Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

25.    This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

26.    Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1332(d) and 1367.

27.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C §§ 1391(b), (c), and (d); and § 1407 and MDL Order dated April 6, 2017 (ECF No. 291), and because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here. According to DOJ guidelines, an "investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[5]

---

[5] DOJ, Antitrust Division Manual at III-83.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

28.     This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold generic drugs throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably have expected to be sued in this District. In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

### III.     PLAINTIFFS

29.     Plaintiffs 1199SEIU National Benefit Fund, 1199SEIU Greater New York Benefit Fund, 1199SEIU National Benefit Fund for Home Care Workers, and 1199SEIU Licensed Practical Nurses Welfare Fund are jointly administered health and welfare funds (collectively, "1199SEIU Benefit Funds"). The 1199SEIU Benefit Funds are among the largest labor-management funds in the nation, providing comprehensive health benefits to hundreds of thousands of working and retired healthcare industry workers and their families. They provide health and welfare benefits to 400,000 members, retirees, and their families, who reside in numerous locations in the United States. During the Class Period, the 1199SEIU Benefit Funds indirectly purchased and paid, not for resale, for some or all of the purchase price for numerous Drugs at Issue manufactured by the Defendants. Plaintiffs made such payments and/or reimbursements in numerous jurisdictions, thereby suffering injury to its business and property. During the Class Period, the 1199SEIU Benefit Funds paid and reimbursed more for these products than they would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and

stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, the 1199SEIU Benefit Funds were injured in their business or property by reason of the violations of law alleged herein. The 1199SEIU Benefit Funds intend to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

30.     Plaintiff American Federation of State, County and Municipal Employees District Council 37 Health & Security Plan ("DC 37") is a health and welfare benefit plan headquartered in New York, New York. District Council 37 (the "Union") is New York City's largest public employee union. The Union includes 51 local unions, representing public sector employees serving in thousands of job titles from Accountants to Zoo Keepers. Members covered by DC 37's benefit plan work in almost every agency in New York City, including but not limited to the City's police and fire departments, hospitals, schools, libraries, social service centers, water treatment facilities, and city colleges. DC 37 provides supplemental health benefits, including a prescription drug benefit, to approximately 313,000 individuals, including both active members and their families and 50,000 retirees, who reside in numerous locations in the United States.  During the Class Period, DC 37 indirectly purchased and paid, other than for resale, for some or all of the purchase price for numerous Drugs at Issue manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in numerous jurisdictions, thereby suffering injury to its business and property.  During the Class Period, DC 37 paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, DC 37 was injured in its business or property by reason of the violations of law alleged herein. DC

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

37 intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

31.     Plaintiff Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana and HMO Louisiana, Inc. is a not-for-profit mutual insurance company organized and existing under the laws of the state of Louisiana. HMO Louisiana, Inc. ("HMOLA") is a domestic health maintenance organization licensed to conduct business in the state of Louisiana and is a wholly owned subsidiary of Louisiana Health Service & Indemnity Company (collectively, "BCBS-LA"). BCBS-LA provides health insurance coverage to over one million members who reside in numerous locations in the United States and also provides third party administrative ("TPA") services for self-funded employee health plans. During the Class Period, BCBS-LA indirectly purchased and paid, not for resale, for some or all of the purchase price for numerous Drugs at Issue manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in numerous jurisdictions, thereby suffering injury to its business and property. During the Class Period, BCBS-LA paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, BCBS-LA was injured in its business or property by violations of law alleged herein. BCBS-LA intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

32.     Plaintiff Self-Insured Schools of California ("SISC") is a Joint Powers Authority under California law that serves the interests of California public schools. It is headquartered in Bakersfield, California. It provides pharmacy benefits to approximately 260,000 members who reside in numerous locations in the United States. During the Class Period, SISC indirectly

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

purchased and paid, other than for resale, for some or all of the purchase price for numerous Drugs at Issue manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in numerous jurisdictions, thereby suffering injury to its business and property. During the Class Period, SISC paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products. As a result of the alleged conspiracy, SISC was injured in its business or property by reason of the violations of law alleged herein. SISC intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

33.     Sergeants Benevolent Association Health and Welfare Fund ("SBA Fund") is a citizen of the State of New York and has its principal place of business at 35 Worth Street, New York, New York. SBA Fund is an independent labor organization operating under Internal Revenue Code section 501(c)(5) and is sponsored and administered by a Board of Trustees. As such, SBA Fund is a legal entity entitled to bring suit in its own name. SBA Fund is an "employee welfare benefit plan" and an "employee benefit plan" with membership of approximately 4,700 active and 7,600 retired sergeants of the New York City Police Department. It provides comprehensive health care benefits, including prescription drug benefits, to participants and their dependents. During the Class Period, SBA Fund indirectly purchased and paid, other than for resale, for some or all of the purchase price for numerous Drugs at Issue manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in numerous jurisdictions, thereby suffering injury to its business and property. During the Class Period, SBA Fund paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

products. As a result of the alleged conspiracy, SBA Fund was injured in its business or property by reason of the violations of law alleged herein. SBA Fund intends to continue paying and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

## IV.   DEFENDANTS

### A.   Actavis Defendants

34.   Defendant Actavis Holdco U.S., Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. In August 2016, Teva Pharmaceuticals USA, Inc. acquired the Actavis Generics business of Allergan plc, including Actavis, Inc. Upon the acquisition, Actavis, Inc.—the acquired Allergan plc generics operating company (formerly known as Watson Pharmaceuticals)—was renamed Allergan Finance, LLC, which in turn assigned all of the assets and liabilities of the former Allergan plc generic business to the newly formed Actavis Holdco, including subsidiaries Actavis Pharma, Inc. and Actavis Elizabeth LLC (a research, development and manufacturing entity for Actavis generic operations), among others. Actavis Holdco is a wholly-owned subsidiary of Teva Pharmaceuticals USA, Inc., which is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. Teva Pharmaceuticals USA, Inc. is a wholly-owned subsidiary of Teva Pharmaceuticals Industries Ltd., an Israeli entity.

35.   Defendant Actavis Pharma, Inc. ("Actavis Pharma") is Delaware corporation with its principal place of business in Parsippany, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc. It manufactures, markets, and/or distributes generic drugs. Actavis Pharma is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

36.     Actavis Elizabeth LLC ("Actavis Elizabeth") is a Delaware limited liability company with its principal place of business in Elizabeth, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco and is a research, development and manufacturing entity for Actavis generic operations.

37.     Unless addressed individually, Actavis Holdco, Actavis Pharma and Actavis Elizabeth are collectively referred to herein as "Actavis." During the Class Period, Actavis marketed and sold generic pharmaceuticals in this District and throughout the United States.

**B.     Akorn Defendants**

38.     Defendant Akorn, Inc. is a Louisiana corporation with its principal place of business in Lake Forest, Illinois. It is the parent company of Hi-Tech Pharmacal Co., Inc. and Akorn Sales, Inc.

39.     Defendant Akorn Sales, Inc. is a Delaware corporation. It is a wholly-owned subsidiary of Akorn, Inc. It is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

40.     Defendant Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") is a Delaware corporation with its principal place of business in Amityville, New York. It is a wholly-owned subsidiary of Akorn, Inc. Akorn, Inc. acquired and integrated Hi-Tech into its operations in April 2014.

41.     Defendant Versapharm, Inc. is a Georgia corporation with its principal place of business in Marietta, GA. It is a wholly-owned subsidiary of Akorn, Inc. Versapharm was acquired by Akorn, Inc. in August 2014.

42.     Unless addressed individually, Akorn, Inc., Akorn Sales, Inc., Hi-Tech and Versapharm are collectively referred to herein as "Akorn." During the Class Period, Akorn marketed and sold generic pharmaceuticals in this District and throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

43.     On May 20, 2020, Akorn filed for bankruptcy. By operation of 11 U.S. Code § 362, further action against Akorn is enjoined. Accordingly, Akorn is not named as a Defendant with respect to those claims that have been added by amendment to this complaint and EPPs do not seek to hold Akorn accountable for those claims either arising from its own conduct or as joint and several liability.

## C.     Alvogen

44.     Defendant Alvogen Inc. is a Delaware corporation with its principal place of business in Pine Brook, New Jersey. It is a privately held company that was founded in 2009 by a former CEO of Defendant Actavis. During the Class Period, Alvogen marketed and sold generic pharmaceuticals in this District and throughout the United States.

## D.     Amneal Defendants

45.     Defendant Amneal Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business in Bridgewater, New Jersey. It is the parent company of Defendant Amneal Pharmaceuticals LLC.

46.     Defendant Amneal Pharmaceuticals, LLC is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey. Amneal Pharmaceuticals LLC is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

47.     Unless addressed individually, Amneal Pharmaceuticals, Inc. and Amneal Pharmaceuticals, LLC are collectively referred to as "Amneal." During the Class Period, Amneal marketed and sold generic pharmaceuticals in this District and throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### E. Apotex

48. Defendant Apotex Corp. ("Apotex") is a Delaware corporation with its principal place of business in Weston, Florida. During the Class Period, Apotex marketed and sold generic pharmaceuticals in this District and throughout the United States.

### F. Ascend

49. Defendant Ascend Laboratories, LLC ("Ascend") is a New Jersey limited liability company with its principal place of business in Parsippany, New Jersey. It is a wholly-owned subsidiary of Alkem Labs, an Indian pharmaceutical company. During the Class Period, Ascend marketed and sold generic pharmaceuticals in this District and throughout the United States.

### G. Aurobindo

50. Defendant Aurobindo Pharma USA, Inc. ("Aurobindo") is a Delaware corporation with its principal place of business in Dayton, New Jersey. Aurobindo is a subsidiary of Aurobindo Pharma Limited, a corporation based in Hyderabad, India. During the Class Period, Aurobindo marketed and sold generic pharmaceuticals in this District and throughout the United States.

### H. Bausch Defendants

51. Defendant Bausch Health Americas, Inc. (formerly Valeant Pharmaceuticals International, Inc.) is a Delaware corporation with its US headquarters located in Bridgewater, New Jersey.

52. Bausch Health US, LLC (formerly Valeant Pharmaceuticals North America LLC) is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey. Bausch Health US is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

53.     Defendant Oceanside Pharmaceuticals, Inc. ("Oceanside") is a wholly-owned subsidiary of Bausch Health Americas, Inc. It is a Delaware corporation with its principal place of business in Bridgewater, New Jersey.

54.     Unless addressed individually, Bausch Health Americas, Bausch Health USA, Oceanside and Valeant are collectively referred to as "Bausch." During the Class Period, Bausch marketed and sold generic pharmaceuticals in this District and throughout the United States.

## I.      Breckenridge

55.     Defendant Breckenridge Pharmaceuticals, Inc. ("Breckenridge") is a Delaware corporation with its headquarters in Boca Raton, Florida. During the Class Period, Breckenridge marketed and sold generic pharmaceuticals in this District and throughout the United States.

## J.      Cadista

56.     Defendant Jubilant Cadista Pharmaceuticals Inc. ("Cadista") is a Delaware corporation with its principal place of business in Salisbury, Maryland. It is a wholly-owned subsidiary of Jubilant Life Sciences Company, an Indian pharmaceutical company. Cadista is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. During the Class Period, Cadista marketed and sold generic pharmaceuticals in this District and throughout the United States.

## K.      Camber

57.     Defendant Camber Pharmaceuticals, Inc. ("Camber") is a Delaware corporation with its principal place of business in Piscataway, New Jersey. Camber is a wholly-owned subsidiary of Hetero Drugs, an Indian pharmaceutical company. During the Class Period, Camber marketed and sold generic pharmaceuticals in this District and throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**L.      Citron**

58.      Citron Pharma, LLC ("Citron") is a New Jersey limited liability company with its principal place of business in East Brunswick, New Jersey. The operating assets of Citron were acquired in December 2016 by co-conspirator Rising Pharmaceuticals Inc., which is a subsidiary of Aceto Corp. During the Class Period, Citron marketed and sold generic pharmaceuticals in this District and throughout the United States.

**M.      Dr. Reddy's**

59.      Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's") is a New Jersey corporation with its principal place of business in Princeton, New Jersey. It is a wholly-owned subsidiary of Dr. Reddy's Laboratories Ltd., which is an Indian company with its principal place of business in Hyderabad, Telangana, India. Dr. Reddy's is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.  During the Class Period, Dr. Reddy's marketed and sold generic pharmaceuticals in this District and throughout the United States.

**N.      Epic**

60.      Defendant Epic Pharma, LLC ("Epic") is a Delaware limited liability company with its principal place of business in Laurelton, New York. During the Class Period, Epic marketed and sold generic pharmaceuticals in this District and throughout the United States.

**O.      Glenmark**

61.      Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark") is a Delaware corporation with its principal place of business in Mahwah, New Jersey.  It is a wholly-owned subsidiary of Glenmark Pharmaceuticals Ltd., headquartered in Mumbai, India. During the Class Period, Glenmark marketed and sold generic pharmaceuticals in this District and throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**P.    Greenstone Defendants**

62.    Defendant Pfizer, Inc. ("Pfizer") is a Delaware corporation that is headquartered in New York, New York. Pfizer is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. Pfizer is the parent company of Defendant Greenstone LLC.

63.    Defendant Greenstone LLC ("Greenstone") is a Delaware limited liability company with its principal place of business in Peapack, New Jersey. It is a wholly-owned subsidiary of Pfizer. Greenstone operates out of Pfizer's Peapack, New Jersey campus. A majority of Greenstone's employees—including its President—also are employees of Pfizer's Essential Health Division. Greenstone employees use Pfizer for financial analysis, human resources and employee benefit purposes, making the two companies essentially indistinguishable.

64.    Unless addressed individually, Greenstone and Pfizer are collectively referred to herein as "Greenstone." During the Class Period, Greenstone marketed and sold generic pharmaceuticals in this District and throughout the United States.

**Q.    G&W**

65.    Defendant G&W Laboratories, Inc. ("G&W") is a New Jersey corporation with its principal place of business in South Plainfield, New Jersey. During the Class Period, G&W marketed and sold generic pharmaceuticals in this District and throughout the United States.

**R.    Heritage**

66.    Defendant Heritage Pharmaceuticals, Inc. ("Heritage") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. It is the exclusive United States commercial operation for Emcure Pharmaceuticals Ltd., an Indian company headquartered in Pune, India. During the Class Period, Heritage marketed and sold generic pharmaceuticals in this District and throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### S.      Impax

67.      Defendant Impax Laboratories, LLC ("Impax") is a Delaware limited liability company that is the successor entity of Impax Laboratories, Inc. As of May 2018, Impax merged with Amneal and became a wholly-owned subsidiary of Defendant Amneal Pharmaceutical, LLC. During the relevant period, Impax's generics division was called Global Pharmaceuticals ("Global"). Impax is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. During the Class Period, Impax marketed and sold generic pharmaceuticals in this District and throughout the United States.

### T.      Lannett

68.      Defendant Lannett Company, Inc. ("Lannett") is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. Lannett is registered with the Pennsylvania Department of State as a foreign corporation.  During the Class Period, Lannett marketed and sold generic pharmaceuticals in this District and throughout the United States.

### U.      Lupin

69.      Defendant Lupin Pharmaceuticals, Inc. ("Lupin") is a Delaware corporation with its principal place of business in Baltimore, Maryland. It is a wholly-owned subsidiary of Lupin Ltd., an Indian company with its principal place of business in Mumbai, India. Lupin is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. During the Class Period, Lupin marketed and sold generic pharmaceuticals in this District and throughout the United States.

### V.      Mallinckrodt

70.      Defendant Mallinckrodt Inc. is a Delaware corporation with its principal place of business in Webster Groves, Missouri. As a result of a tax inversion acquisition, as of 2013 it is a wholly-owned subsidiary of Mallinckrodt plc, which is based in the United Kingdom.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Mallinckrodt is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. During the Class Period, Mallinckrodt marketed and sold generic pharmaceuticals in this District and throughout the United States.

### W.   Mayne

71.     Defendant Mayne Pharma Inc. is a Delaware corporation with its principal place of business in Raleigh, North Carolina. Mayne is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. In 2012, Mayne acquired Metrics, Inc. and its division, Midlothian Laboratories, and has also operated under the name Midlothian since that time. In 2013, Mayne acquired Libertas Pharma. Unless addressed individually, Metrics, Inc., Midlothian Laboratories, Libertas Pharma and Mayne Pharma Inc. are collectively referred to herein as "Mayne." During the Class Period, Mayne marketed and sold generic pharmaceuticals in this District and throughout the United States.

### X.   Mylan Defendants

72.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

73.     Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia. It is a subsidiary of Mylan Inc. Mylan Pharmaceuticals, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

74.     Mylan Inc. and Mylan Pharmaceuticals, Inc. are wholly-owned subsidiaries of Mylan N.V., a Dutch pharmaceutical company. Unless addressed individually, Mylan Inc. and Mylan Pharmaceuticals, Inc. are collectively referred to herein as "Mylan." During the Class Period, Mylan marketed and sold generic pharmaceuticals in this District and throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Y.      Par Defendants**

75.      Defendant Par Pharmaceutical, Inc. ("PPI") is a New York corporation with its principal place of business in Chestnut Ridge, New York. PPI is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

76.      Defendant Generics Bidco I, LLC ("Generics Bidco") is a Delaware limited liability company with its principal place of business in Huntsville, Alabama. Generics Bidco formerly conducted business as Qualitest Pharmaceuticals ("Qualitest").

77.      Defendant DAVA Pharmaceuticals, LLC ("DAVA") is a Delaware limited liability company with its principal place of business in Fort Lee, New Jersey.

78.      PPI, Generics Bidco and DAVA are wholly-owned subsidiaries of Endo International plc ("Endo"), an Irish corporation with its principal place of business located in Dublin, Ireland and its U.S. headquarters located in Malvern, Pennsylvania. PPI, Generics Bidco and DAVA collectively do business as Par Pharmaceutical. Unless addressed individually, Endo, PPI, Generics Bidco, DAVA and Qualitest are collectively referred to herein as "Par." During the Class Period, Par marketed and sold generic pharmaceuticals in this District and throughout the United States.

**Z.      Perrigo**

79.      Defendant Perrigo New York, Inc. ("Perrigo") is a Delaware corporation with its executive offices in Allegan, Michigan and its primary business location in Bronx, NY. It is a subsidiary of Perrigo Company plc, an Irish company with its principal place of business in Dublin, Ireland. Perrigo is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. During the Class Period, Perrigo marketed and sold generic pharmaceuticals in this District and throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### AA.    Sandoz Defendants

80.    Defendant Sandoz Inc. is a Colorado corporation with its principal place of business in Princeton, New Jersey. Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland. Sandoz is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

81.    Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York. Foguera is a wholly-owned subsidiary of Defendant Sandoz, Inc. In 2012, Sandoz acquired and integrated Fougera into its US-based generic pharmaceutical business.

82.    Unless addressed individually, Fougera and Sandoz Inc. are collectively referred to herein as "Sandoz." During the Class Period, Sandoz marketed and sold generic pharmaceuticals in this District and throughout the United States.

### BB.    Sun Defendants

83.    Defendant Sun Pharmaceutical Industries, Inc. ("SPII") is a Michigan corporation with its principal place of business in Cranbury, New Jersey. SPII is a wholly-owned subsidiary of Sun Pharmaceutical Industries Ltd. ("Sun Pharma"), an Indian corporation, which also owns a majority stake in Taro Pharmaceutical Industries, Ltd., and Taro's U.S. subsidiary, Taro Pharmaceutical USA, Inc. Beginning in 1997, Sun Pharma began a series of investments in Caraco Pharmaceutical Laboratories Ltd. ("Caraco") and in 2013 acquired 100% of Caraco and merged it into SPII to become Sun Pharma's US operations for generic pharmaceutical products.  In late 2012, SPII acquired URL Pharma, Inc. ("URL") and its subsidiary, Mutual Pharmaceutical Company, Inc. ("Mutual"), both of which have their principal place of business in Philadelphia, PA. Until at least June 2016, URL and Mutual operated a pharmaceutical manufacturing facility in Philadelphia. URL was registered with the Pennsylvania Department of State as a foreign

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

corporation and maintained a registered agent in Pennsylvania during the Class Period until April 28, 2015, at which time it was merged with Mutual.

84.     Defendant Mutual is a Delaware corporation with its principal place of business located in Philadelphia, PA. It is a wholly-owned subsidiary of SPII. Since April 29, 2015 (the day after Mutual and URL merged), Mutual has been registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. Many of the pharmaceutical products sold and distributed throughout the United States during the Class Period by SPII, URL and Mutual were marked with the trade name "MUTUAL" on the pill or capsule.

85.     Unless addressed individually, SPII, URL, Mutual and Caraco are collectively referred to herein as "Sun." During the Class Period, Sun marketed and sold generic pharmaceuticals in this District and throughout the United States.

### CC.   Taro

86.     Defendant Taro Pharmaceuticals USA, Inc. ("Taro") is a New York corporation with its principal place of business in Hawthorne, New York. Taro is a wholly-owned subsidiary of Taro Pharmaceutical Industries, Ltd., an Israeli entity, which in turn is majority owned by Sun Pharma. During the Class Period, Taro marketed and sold generic pharmaceuticals in this District and throughout the United States.

### DD.   Teligent

87.     Defendant Teligent, Inc. ("Teligent") is a Delaware corporation with its principal place of business in Buena, New Jersey. Teligent is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. Teligent was known as IGI Laboratories, Inc. until 2015. During the Class Period, Teligent sold generic pharmaceuticals in this District and throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**EE.     Teva Defendants**

88.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. It is a subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli entity. Teva USA is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

89.     Defendant Barr Pharmaceuticals, LLC ("Barr") is a Delaware limited liability company with its principal place of business in North Wales, Pennsylvania. Barr is a wholly-owned subsidiary of Teva USA, which acquired Barr (then called Barr Pharmaceuticals, Inc.) in 2008.

90.     Defendant PLIVA, Inc. is a New Jersey corporation with its principal place of business in East Hanover, New Jersey. PLIVA is a wholly-owned subsidiary of Teva USA, which acquired the PLIVA assets as part of the Barr acquisition.

91.     Unless addressed individually, Teva USA, Barr and PLIVA are collectively referred to herein as "Teva." During the Class Period, Teva sold generic pharmaceuticals in this District and throughout the United States.

**FF.     Torrent**

92.     Defendant Torrent Pharma Inc. ("Torrent") is a Delaware corporation with its principal place of business in Basking Ridge, New Jersey. Torrent is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania. It is a wholly-owned subsidiary of Torrent Pharmaceuticals Ltd., an Indian pharmaceutical company. During the Class Period, Torrent sold generic pharmaceuticals in this District and throughout the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### GG.    Upsher-Smith

93.    Defendant Upsher-Smith Laboratories, LLC ("Upsher-Smith") is a Minnesota limited liability company with its principal place of business in Maple Grove, Minnesota. It is wholly owned by Sawai Pharmaceutical Co., Ltd. ("Sawai"), a large publicly traded generic pharmaceutical company in Japan. Sawai acquired Upsher-Smith Laboratories, Inc. in June 2017. During the Class Period, Upsher-Smith sold generic pharmaceuticals to customers in this District and throughout the United States.

### HH.    West-Ward Defendants

94.    Defendant West-Ward Columbus, Inc. is a Delaware corporation with its principal place of business in Eatontown, New Jersey.

95.    Defendant Hikma Pharmaceuticals USA, Inc. is a Delaware corporation with its principal place of business in Eatontown, New Jersey.

96.    Defendant Hikma Labs, Inc. (formerly Roxane Laboratories, Inc.) is a Nevada corporation with its principal place of business in Eatontown, New Jersey.

97.    Defendants West-Ward Columbus, Hikma Pharmaceuticals USA and Hikma Labs are subsidiaries of Hikma Pharmaceuticals PLC ("Hikma"), a London-based global pharmaceutical company. Unless addressed individually, these Hikma subsidiaries are collectively referred to herein as "West-Ward." During the Class Period, West-Ward marketed and sold generic pharmaceuticals in this District and throughout the United States.

### II.    Wockhardt Defendants

98.    Defendant Wockhardt USA LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. It is a wholly-owned subsidiary of Morton Grove Pharmaceuticals, Inc.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

99.     Defendant Morton Grove Pharmaceuticals, Inc. ("Morton Grove") is a Delaware corporation with its principal place of business in Morton Grove, Illinois. It is a wholly-owned subsidiary of Wockhardt Ltd., a pharmaceutical and biotechnology company headquartered in Mumbai, India.  Morton Grove is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

100.     Unless addressed individually, Wockhardt and Morton Grove are collectively referred to herein as "Wockhardt." During the Class Period, Wockhardt marketed and sold generic pharmaceuticals in this District and throughout the United States.

**JJ.     Zydus**

101.     Defendant Zydus Pharmaceuticals (USA), Inc. ("Zydus") is a New Jersey corporation with its principal place of business in Pennington, New Jersey. It is a subsidiary of Cadila HealthCare, an Indian company headquartered in Mumbai. Zydus is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.  During the Class Period, Zydus marketed and sold generic pharmaceuticals in this District and throughout the United States.

## V.     CO-CONSPIRATORS

**A.     Rising**

102.     Rising Pharmaceuticals, Inc. ("Rising") is a Delaware corporation with its principal place of business in East Brunswick, New Jersey. Rising is a wholly-owned subsidiary of Aceto Corp., which, along with Rising, filed for bankruptcy in 2019. On December 3, 2019, the Department of Justice announced that Rising entered into a deferred prosecution agreement relating to a felony price-fixing charge and that Rising has agreed to cooperate with the ongoing DOJ investigation into generic pharmaceutical price fixing.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

B.    **Unknown Co-Conspirators**

103.    Various other persons, firms, corporations, and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein. Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

## VI.    <u>DEFENDANTS' OVERARCHING CONSPIRACY</u>

104.    Defendants have participated in a long-running conspiracy to allocate market shares and to fix, raise and/or stabilize the prices of the Drugs at Issue.

105.    As detailed below, Defendants facilitated their conspiracy through personal connections formed through frequent movement within the industry, through frequent in-person meetings at various happy hours, dinners, lunches, golf outings, trade shows, and industry conferences, and through frequent direct communications in person, via chat and email, and on the telephone (both voice and text).

106.    Inter-defendant communications were commonplace in the industry and date as far back as 2006. Starting in at least May 2009, if not before, Defendants implemented anti-competitive agreements to increase the prices and allocate the markets of at least the Drugs at Issue, and possibly many more.

107.    The foundational agreement between all Defendants was premised on the understanding that they are current or future competitors with each other across numerous generic drugs. All of these Defendants market and sell multiple products. The effectiveness of an agreement on any one drug would be limited and unstable without a broader agreement that encompassed other drugs as well. For example, an agreement between two Defendants to raise prices or to allocate market share on one drug would not likely hold where those same two

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants engaged in vigorous price competition on another drug, or where a third manufacturer not party to that agreement entered the market with an intent to compete on price. Therefore, Defendants understood that in order to be effective, their agreement needed to extend to multiple manufacturers and drugs.

108.    In furtherance of that objective, Defendants developed the concept of "Fair Share," in which each market participant (within and across multiple drugs) was able to obtain an allocated share of market sales without resorting to free and fair price competition. Because Defendants are repeat players who routinely enter new markets but face the same competitors, their basic agreement—to eschew price competition and seek only a "Fair Share" of the market—became the "rules of the road" that governed their overarching conspiracy. As described more fully below, Defendants' decisions whether and if so when to enter a market, how to price their drugs, and which customers to target were made in accordance with their unlawful "Fair Share" agreement.

109.    From this broad agreement among all Defendants to market and sell the Drugs at Issue under a "Fair Share" understanding, sprang subsidiary agreements among the manufacturing Defendants relating to each of the Drugs at Issue.

110.    The higher prices and overcharges for Drugs at Issue that resulted from Defendants' anticompetitive conduct are directly traceable through the pharmaceutical distribution chain to End-Payers.

111.    The drug-specific agreements involve only those Defendants that marketed and sold the relevant Drug at Issue during the Class Period. But each Defendant, including the Defendants who did not manufacture the particular drug involved in each drug-specific agreement, was a party to the broader, overarching conspiracy to abide by the "Fair Share" agreement covering

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

all Drugs at Issue. The purpose and effect of these agreements was to lessen competition in the markets for each of the Drugs at Issue.

112.    Both the "Fair Share" agreement and the drug-specific agreements created a web of relationships and understandings among and between all Defendants that had the purpose and effect of lessening competition among Defendants for all the Drugs at Issue.

### A.    Defendants Are Competitors or Potential Competitors for All Drugs at Issue.

113.    All Defendants are competitors or potential competitors with each other for every Drug at Issue. As described below, far more Defendants had the right (*i.e.*, regulatory approval) to sell the Drugs at Issue than actually did so during the Class Period. And all Defendants could have obtained approval or otherwise acquired marketing rights (by, *e.g.*, licensing) to sell the Drugs at Issue, had they chosen to do so.

114.    Although the process for obtaining approval to sell a generic drug can be long, Defendants were able to obtain and did obtain numerous ANDAs covering the Drugs at Issue. The core function of Defendants' businesses is to market and sell generic pharmaceuticals and, accordingly, Defendants are highly adept at obtaining access to the markets for generic pharmaceuticals, including the Drugs at Issue.

115.    Defendants gain access to generic pharmaceutical markets through at least three methods, all of which were employed by Defendants during the relevant time frame. *First*, Defendants can go through the ANDA process to obtain approval from the FDA to sell a specific drug. *Second*, Defendants can obtain existing ANDAs by purchasing them from companies that have ANDAs, or by acquiring the company that owns them. *Third*, Defendants can license the use of an ANDA held by someone else.

116.    The ANDAs owned or licensed by Defendants for Drugs at Issue demonstrate the extent to which these Defendants can and do access the markets for generic drugs and highlight

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

that Defendants have the resources and ability to access the market for any Drug at Issue.[6]

**B.      The Principles of "Playing Fair" and "Fair Share" Governed Defendants' Interactions.**

117.    In a competitive generic drug market, new market entrants typically price their product below the prevailing market price in order to gain market share.[7] As a result, each subsequent entry into a generic market tends to decrease the market prices as manufacturers compete for market share. As discussed in detail below, this did not happen for the Drugs at Issue because Defendants used their "fair play" and "Fair Share" agreement to coordinate market share and pricing.

118.    Because application for entry into a generic market is a public process, Defendants know which manufacturers have approval to manufacture a generic drug and approximately when they will enter the market. This creates an incentive and opportunity to coordinate pricing and allocate the market among competitors in order to maintain pricing levels and maximize profit.

119.    The practice of contacting competitors to determine their market intentions—whether through in-person meetings, telephone communications, or other interactions—is a long-standing and common industry practice.

120.    Defendants understood and engaged in the practice of contacting their competitors when they were preparing to enter a particular generic market so that they could reach agreements

---

[6] The FDA Orange Book (available at https://www.fda.gov/drugs/drug-approvals-and-databases/approved-drug-products-therapeutic-equivalence-evaluations-orange-book) lists current and discontinued ANDAs for all Drugs at Issue. "Discontinued" ANDAs can be re-activated with relative ease. *See* Kurt R. Karst, "Waking From a Drug Coma: How to Bring a Drug Out of Discontinued Status – It's As Easy As 1, 2, 3 . . . 4, and 5," *available at* http://www.fdalawblog.net/2015/09/waking-from-a-drug-coma-how-to-bring-a-drug-out-of-discontinued-status-its-as-easy-as-1-2-3-4-and-5/.

[7] U.S. Government Accountability Office Report: Generic Drugs Under Medicare ("GAO Report") at 23, (August 2016), *available at* https://www.gao.gov/assets/680/679022.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

on pricing and allocate the market according to their Fair Share agreement. Reaching out to competitors was part of the "tool kit" used in the ordinary course of business.

121.    Fair Shares were allocated to Defendants within a particular drug market based upon the number of competitors in the market and the timing of their entry into the market. This system aimed to allocate to each Defendant a Fair Share of the market without depressing prices. As detailed below, through this overarching conspiracy, Defendants often were able to raise prices or enter the market at elevated prices.

122.    Another common feature of Defendants' Fair Share agreement was to coordinate and implement price increases by incumbent manufacturers immediately before a new manufacturer entered the market. When new manufacturers entered a market, the existing manufacturers would bring them into the Fair Share agreement by ceding market share to them. By raising prices, and then having the new manufacturer enter the market at the higher prices, all manufacturers were able to maintain—and sometimes even increase—dollar sales, even as their unit sales decreased as market share was ceded to the new entrant.

123.    The Fair Share agreement was so ingrained that some Defendant account managers and sales teams viewed contacting their counterparts at other companies—even to discuss market allocation and/or price increases—as part of the normal course of business. Indeed, Defendants trained their employees on Fair Share principles and in some instances paid bonuses based on the ability to obtain "market intel." For example, a September 2013 Taro Pricing Department Training presentation instructed: ███████████████████████████████████████

████████████████████████ The training presentation explained that when Taro launched a new product, ███████████████████████████████████████████████████

███████████████████ Taro's training was not limited to specific drugs, but rather, was broadly aimed

at inculcating Taro personnel on how to adhere to the Fair Share agreement in their daily business dealings.

124.    Defendants understood the "rules of the road" and that they needed to "play nice in the sandbox." This understanding meant that Defendants did not compete with each other on price and did not take advantage of another Defendant's price increase by providing a lower bid to "steal" the customer.

125.    "Playing nice in the sandbox" was not just a slogan—it was a key to keeping prices high. As an Associate Director of Generic Rx Marketing at Dr. Reddy's explained with respect to price increases: ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪ Similarly, in a Sandoz July 2013 Commercial Operations presentation, the company recognized that being "responsible" and abiding by the Fair Share agreement translated into higher profits: ▪▪▪▪▪▪

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

126.    The Fair Share agreement was utilized repeatedly during the Class Period. Defendants routinely and readily agreed to follow or not to compete on price increases for a number of generic drugs. Additionally, when customers requested new bids in response to price increases instituted from other Defendants, the Defendant-competitors spoke to each other and devised strategies for responding without undermining pricing. Consequently, consistent with their understanding of Fair Share, Defendants sometimes refused to bid or provided a cover bid that allowed a competitor's price increase to succeed.

127.    The Fair Share practice injured Plaintiffs and the Class. Plaintiffs paid more for the Drugs at Issue than they otherwise would have paid absent Defendants' anticompetitive "Fair Share" and drug-specific agreements.

### C.      Defendants' Conspiracy Spanned Multiple Drugs and Manufacturers

128.     The concept of Fair Share was not limited to a specific drug. Rather, the concept of Fair Share extended across (at least) the Drugs at Issue. Defendants that "played fair" and maintained a Fair Share would benefit from the overarching conspiracy as a whole, even if Defendants would occasionally "lose out" on one specific drug. For example, customers for one generic drug were sometimes traded for customers for a different generic drug so that Fair Shares could be allocated across the larger market. In other instances, competitors would support a price increase for one drug with the understanding that their competitors would support a price increase for a different drug. Defendants who undercut other Defendants' prices were seen as "not playing fair" and "punishing" a competitor, which was contrary to the Fair Share agreement.

129.     Although many of the allegations in this Complaint highlight the drug-specific conduct and price-fixing agreements between manufacturers of certain drugs, it is clear that Defendants also reached a broader Fair Share agreement that spanned the Drugs at Issue. A few specific examples—elaborated in detail in the States' Complaint—highlight the overarching nature of Defendants' Fair Share agreement.

### 1.      Example 1: Nisha Patel and Teva's Systematic Price Fixing

130.     In April 2013, Defendant Teva hired Nisha Patel as its Director of Strategic Customer Marketing. As the States' Complaint makes plain, Patel's "strategy" primarily focused on a widespread effort to implement collusive price increases on numerous drugs manufactured by numerous manufacturers. Before joining Teva, Patel worked at a large drug wholesaler, working her way up to Director of Global Generic Sourcing. During her time at the wholesaler, Patel developed and maintained relationships with many sales and marketing executives at Teva's competitors. Teva hired Patel for the express purpose of strengthening Teva's relationships with other manufacturers in order to maintain prices and to implement price increases.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

131.    On May 1, 2013, Patel began creating a spreadsheet with a list of "Price Increase Candidates." In a separate tab of the spreadsheet, she rated Teva's "Quality of Competition" by assigning companies into several categories, including "Strong Leader/Follower," "Lag Follower," "Borderline," and "Stallers."

132.    As she was creating the list, Patel was talking to competitors to determine their willingness to increase prices and adjusted the ratings accordingly. For example, in one of her first conversations with another manufacturer after joining Teva, Patel learned that Sandoz would follow Teva's price increases and would not poach Teva's customers after Teva price increases. Sandoz was thus rated as one of Teva's highest "quality" competitors. Patel and Teva based many anticompetitive decisions on this understanding with Sandoz over the next several years.

133.    By May 6, 2013, Patel created an initial rating of fifty-six (56) different manufacturers in the generic drug market by their "quality." Patel defined "quality" by her assessment of whether a manufacturer would agree to lead or follow price increases. The rating system was a scale from +3 for the "highest quality" manufacturer to a -3 ranking for the "lowest quality" manufacturer.

134.    Patel used her rating system, in conjunction with other market factors, to identify drugs that were candidates for price increases. The best candidates (aside from a drug where Teva was the sole supplier) were drugs where there was only one other "high quality" manufacturer in the market. Drug markets with several "low quality" competitors were less desirable candidates for price increases.

135.    Patel's systematic approach to collusive pricing was understood and authorized by her supervisors and executives at Teva, including Maureen Cavanaugh (Senior Vice President of Sales and Marketing) and David Rekenthaler (Vice President of Sales).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

136.    Approximately one year after her initial set of "competitor" ratings, on May 9, 2014, Patel updated her ratings of the various manufacturers. The updates took into account Teva's work over the prior year to expand and solidify agreements with numerous manufacturers, including many Defendants here. Some manufacturers had a high-quality rating throughout the entire relevant time period, while other competitors' ratings increased after successfully colluding with Teva on one or more drugs.

137.    The breadth of Patel's list—56 manufacturers—and Teva's systematic effort to maintain and strengthen the Fair Share agreement across all of them, even those with "low" quality rankings, underscores the overarching and multi-drug aspect of Defendants' conspiracy.

138.    For example, Apotex was one of the "lowest" rated manufacturers in May 2013. A year later, Apotex's rating was adjusted to +2. Apotex made this jump in large part due to Patel's relationship with B.H., National Sales Director at Apotex, and the successful coordination between Apotex and Teva in 2013 on Pravastatin and Doxazosin Mesylate price increases.

139.    Notably, Apotex's low rating in 2013 does not indicate that it was not colluding with Teva—or other manufacturers—during that period. Quite the contrary. For example, Apotex's B.H., National Sales Director, communicated with more than just Nisha Patel; she also communicated with M.B., a Director of National Accounts at Actavis, at least as early as May 2011 and numerous times thereafter. Apotex's B.H. also communicated with M.D., a Vice President of Sales at Cadista, at least as early as February 2012, and with C.M., a Director of National Accounts at Aurobindo, at least as early as May 2013.

140.    Other Apotex employees also communicated with generic manufacturers notwithstanding its "low quality" rating by Patel in 2013. For example, at least as early as 2010, J.V., Apotex's Vice President of Retail Sales, communicated with (at least) D.D., the Senior

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

National Account Manager at Defendant Impax. Almost as soon as Apotex hired J.H., a new Senior Vice President and General Manager, in April 2013, Teva's Rekenthaler began to communicate directly with him by phone, and did so throughout 2013 (and thereafter). That same Apotex SVP also communicated by phone with individuals at (at least) Defendants Actavis, Aurobindo and Par during 2013, and additional Defendants in 2014.

### 2.    Example 2: Price Fixing of Multiple Drugs All at Once

141.    Defendants' businesses—and their anticompetitive agreements with each other—were not siloed by drug. Rather, all Defendants market and sell multiple generic drugs, many of which also are marketed and sold by various other manufacturers. Defendants thus are repeat players that compete on any number of drugs and can expect to compete on additional drugs as their portfolios expand. Accordingly, Defendants' agreements to fix, raise or stabilize the prices of Drugs at Issue often were coordinated across groups or portfolios of overlapping drugs.

142.    For example, Teva orchestrated and implemented price increases (effective July 31, 2012) for at least seven drugs all at once: Buspirone HCL, Estradiol, Labetalol HCL, Loperamide, Nadolol, Nitrofurantoin and Tamoxifen Citrate. Teva's Rekenthaler and Kevin Green (Director of National Accounts) communicated with the other manufacturers of those drugs (which included Mylan, Sandoz, Actavis and Alvogen). Rekenthaler communicated by phone with A.S., the Vice President of Sales at Actavis, twice on July 11, 2012. Green spoke to P.K., Director of National Accounts at Sandoz, on July 29 and July 31, 2012 and to Jim Nesta (Vice President of National Accounts at Mylan) on July 23, 24, 25, 26, 30, and 31, 2012. Nesta (Mylan) spoke with B.H., Executive Vice President of Sales at Alvogen, on a number of occasions in April, May, June and July 2012. Teva's Green also spoke to the Alvogen EVP in April 2012.

143.    Similarly, Teva and Glenmark coordinated pricing on at least six drugs all at once in the spring of 2013. On May 2, 2013, Patel spoke to P.D., an Executive Vice President at

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Glenmark, several times. Those two manufacturers worked out pricing agreements on Adapalene, Nabumetone, Pravastatin, Ranitidine, Moexipril and Moexipril HCTZ. Other Defendants, including Amneal, Apotex, Lupin, Sandoz, Taro and Zydus manufactured at least one of these drugs. During the week preceding and the week following Patel's discussions with the Glenmark EVP, contacts between and among all of the manufacturers also took place. For example, Teva's Rekenthaler communicated by phone with S.R., Vice President of Sales at Amneal, and with J.H., SVP and General Manager at Apotex. Teva's Green communicated with multiple sales personnel at Zydus and with David Berthold, the Vice President of Sales at Lupin. Mitchell Blashinsky, Vice President of Sales at Glenmark, spoke with Ara Aprahamian (Vice President of Sales at Taro) as well as additional contacts at Taro. This series of communications and agreements is an example of Defendants' broader, coordinated anticompetitive conduct, which involved overlapping webs of communications in furtherance not only of the drug-specific price-fixing agreements that they reached, but also of the Fair Share agreement that spanned multiple drugs.

### <u>3.</u>      <u>Example 3: Collusion on Drugs that Manufacturers Did Not Sell</u>

144.    All Defendants market and sell numerous drugs and are in the business of adding new drugs to their product offerings. This means that they regularly enter new drug markets. It also means that new competitors sometimes enter the markets that they already occupy. Thus, during the relevant period, each Defendant was a potential competitor of every other Defendant. Accordingly, each Defendant had an interest in the conduct and pricing of their co-conspirators relating to drugs that they did not (at least at that juncture) market or sell. Monitoring co-conspirator conduct served at least two purposes. <u>First</u>, it provided each Defendant with information about whether and the extent to which co-conspirators were abiding by their anticompetitive agreements. The rating system for 56 manufacturers compiled by Teva's Nisha Patel is another manifestation of the same interest. <u>Second</u>, by monitoring co-conspirator conduct,

48

each Defendant was able to ascertain when and where supracompetitive prices were in place and likely to hold, which provided an incentive and opportunity for them to enter that market. Without some confidence that the Fair Share agreement would hold across drugs, it was less likely that each Defendant would abide by it for any single drug.

145.     The States' Complaint demonstrates that Defendants' interest in drugs beyond those that each of them sold was not merely theoretical. For example, after Teva and Mylan coordinated a number of price increases in the summer of 2013, Sandoz sought to obtain a "comprehensive list of items" subject to those price increases, even as to drugs that Sandoz did not sell. P.K., a Director of National Accounts at Sandoz, reached out to Rekenthaler at Teva to obtain a copy of the Teva price increase list, including drugs that Sandoz did not sell. During the same period, D.L., another Director of National Accounts at Sandoz, reached out to Nesta at Mylan, and asked him to identify all of Mylan's price increases. Nesta complied, and provided the Sandoz Director with a list that included at least one drug—Haloperidol—on which Mylan had not yet raised its price.

### 4.     Example 4: Widespread Sharing of Competitively Sensitive Confidential Information

146.     In competitive generic drug markets, manufacturers battle with each other to win customers by offering a better price. For the Drugs at Issue, Defendants turned their competitors into allies and their customers into the enemies. The foremost and common goal of all Defendants was to charge their customers higher prices for Drugs at Issue than they would have been able to do in a competitive environment. To tilt the field in their own favor, Defendants communicated extensively. The free flow of information, including competitively sensitive and confidential information, allowed Defendants to develop relationships that were then used to effectuate enormous price increases.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

147.    For example, relatively early in the relevant time period, Fougera (not yet acquired by Sandoz) was compiling information about how other manufacturers handled list (WAC) price increases and associated contract terms. In August 2010, A.T., Fougera National Account Executive, sent his supervisor, Walter Kaczmarek, Fougera Vice President of National Accounts, an email with information concerning eleven manufacturers, all of which are Defendants (or have merged with or been acquired by Defendants). ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████. To gather this information, A.T. communicated directly with the competition. Between July 1, 2010 and August 4, 2010, the month before the email, A.T. (Fougera) communicated by phone directly with at least six of these companies, and three more that are not mentioned in the email. He communicated with: T.P., Perrigo Director of National Accounts; M.R., West-Ward Director of National Accounts; D.C., Glenmark Director of Contracts; Jim Grauso, G&W Vice President of Sales; David Berthold, Lupin Vice President of Sales; R.F., Par/DAVA Director of National Accounts; M.D., Cadista Vice President of Sales; E.B., Akorn/Hi-Tech Vice President of Sales; and V.M., CorePharma Vice President of National Accounts.

### D.    Frequent Meetings and Contacts among Industry Personnel Facilitated Defendants' Conspiracy

148.    Executives and managers at Defendants, as well as sales and marketing personnel and National Account Managers ("NAMs") in particular, had numerous opportunities to meet and communicate both in professional and social settings. Although Defendants compete for the same customers, their employees have developed close relationships. These relationships, and the many opportunities to meet and communicate, facilitated Defendants' ability to reach anticompetitive agreements.

149.     Moreover, many of the personnel employed by Defendants have worked at multiple companies—including other Defendants—during their careers. These employees maintained contact with people at their prior employers. In turn, this facilitated the ease with which conspiratorial agreements could be reached. Among Defendants, this familiarity spawned collusion.

150.     Defendants' geographic proximity to each other—at least 41 different generic drug manufacturers are concentrated between the New York City and Philadelphia metropolitan areas— facilitated Defendants' frequent in-person meetings at "industry dinners" and other social events. These events provided Defendants with additional opportunities to collude.

151.     Defendants also had almost constant opportunities to conspire and interact with each other at trade shows and customer conferences and such contacts were commonplace and encouraged by industry executives. *See* Exhibit A (Trade Association Contacts).

152.     But trade shows were not the only place where Defendant personnel communicated with one another. Defendants also had their own events and activities that presented numerous opportunities for sharing competitive information.

153.     For instance, certain sales representatives, including those employed by Defendants, regularly met for what was referred to as "Girls Night Out" ("GNO") or "Women in the Industry" meetings or dinners which were used as a place to meet with competitors and discuss competitively sensitive information.

**E.     Defendants Frequently Communicated Directly and Privately As Part of the Overarching Conspiracy.**

154.     In addition to their regular meetings in person, Defendants used text messages, phone calls, and messages passed through third-party services such as LinkedIn to facilitate their conspiratorial communications.

155.    For example, every Defendant named in this Complaint communicated directly by telephone with multiple other Defendants. The following table shows some (and almost certainly not all, given the preliminary stage of discovery in this litigation) of the private and direct inter-Defendant communications between sales, marketing and executive personnel at Defendants.

**Table 2: Widespread Inter-Defendant Communications**

| Defendant | Direct Phone Communication between May 2009 and March 2016 |
|---|---|
| Actavis | Akorn, Alvogen, Amneal, Apotex, Ascend, Aurobindo, Bausch, Breckenridge, Cadista, Camber, Citron, Dr. Reddy's, Epic, Glenmark, Greenstone, G&W, Heritage, Impax, Lannett, Mallinckrodt, Mayne, Mylan, Par, Perrigo, Rising, Sandoz, Sun, Taro, Teligent, Teva, Torrent, Upsher-Smith, West-Ward, Wockhardt, Zydus |
| Akorn | Actavis, Alvogen, Amneal, Apotex, Aurobindo, Bausch, Camber, Epic, Glenmark, Greenstone, Impax, Lannett, Mallinckrodt, Mayne, Par, Perrigo, Sandoz, Taro, Teva, West-Ward, Wockhardt |
| Alvogen | Actavis, Akorn, Amneal, Apotex, Aurobindo, Bausch, Breckenridge, Citron, Dr. Reddy's, Epic, G&W, Heritage, Impax, Lannett, Mylan, Par, Sandoz, Taro, Teva, Upsher-Smith, Wockhardt, Zydus |
| Amneal | Actavis, Akorn, Alvogen, Ascend, Aurobindo, Breckenridge, Cadista, Citron, Dr. Reddy's, Glenmark, G&W, Heritage, Impax, Lannett, Mallinckrodt, Mylan, Par, Perrigo, Sandoz, Taro, Teva, Torrent, Upsher-Smith, West-Ward, Zydus |
| Apotex | Actavis, Akorn, Alvogen, Ascend, Aurobindo, Cadista, Citron, Dr. Reddy's, Glenmark, Greenstone, Heritage, Impax, Lupin, Mallinckrodt, Par, Perrigo, Rising, Sandoz, Taro, Teva, Torrent, Upsher-Smith, Zydus |
| Ascend | Actavis, Amneal, Apotex, Aurobindo, Breckenridge, Camber, Citron, Dr. Reddy's, Epic, Glenmark, Heritage, Lannett, Par, Sun, Taro, Teva, West-Ward |
| Aurobindo | Actavis, Akorn, Alvogen, Amneal, Apotex, Ascend, Breckenridge, Cadista, Camber, Citron, Dr. Reddy's, Glenmark, Greenstone, G&W, Heritage, Lannett, Lupin, Mallinckrodt, Mayne, Mylan, Par, Perrigo, Rising, Sandoz, Sun, Taro, Teligent, Teva, Torrent, Upsher-Smith, West-Ward, Wockhardt, Zydus |
| Bausch | Actavis, Akorn, Alvogen, Aurobindo, Breckenridge, Citron, Glenmark, G&W, Heritage, Lannett, Mallinckrodt, Perrigo, Sandoz, Wockhardt, Zydus |

52

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| | |
|---|---|
| Breckenridge | Actavis, Alvogen, Amneal, Ascend, Aurobindo, Bausch, Cadista, Camber, Citron, Glenmark, Greenstone, G&W, Heritage, Impax, Lannett, Lupin, Par, Perrigo, Sandoz, Sun, Taro, Teligent, Teva, Upsher-Smith, Wockhardt |
| Cadista | Actavis, Akorn, Amneal, Apotex, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark, G&W, Heritage, Impax, Lannett, Lupin, Mylan, Par, Perrigo, Rising, Sandoz, Sun, Teva, West-Ward, Wockhardt, Upsher-Smith, Zydus |
| Camber | Actavis, Akorn, Amneal, Ascend, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Glenmark, G&W, Impax, Lannett, Lupin, Mallinckrodt, Mayne, Par, Sandoz, Sun, Taro, Teva, Upsher-Smith, Wockhardt, Zydus |
| Citron | Actavis, Alvogen, Amneal, Apotex, Ascend, Aurobindo, Bausch, Breckenridge, Camber, Dr. Reddy's, Glenmark, Greenstone, G&W, Heritage, Impax, Lannett, Lupin, Par, Perrigo, Sandoz, Sun, Taro, Teva, Torrent, Upsher-Smith, Zydus |
| Dr. Reddy's | Actavis, Alvogen, Amneal, Apotex, Ascend, Aurobindo, Cadista, Camber, Citron, Glenmark, Greenstone, G&W, Heritage, Impax, Lannett, Lupin, Mallinckrodt, Mayne, Mylan, Par, Perrigo, Rising, Sandoz, Sun, Taro, Teva, Upsher-Smith, West-Ward, Wockhardt, Zydus |
| Epic | Actavis, Akorn, Alvogen, Ascend, Lannett, Perrigo, Sun, Torrent, West-Ward |
| Glenmark | Actavis, Akorn, Amneal, Apotex, Ascend, Aurobindo, Breckenridge, Cadista, Camber, Citron, Dr. Reddy's, Greenstone, G&W, Heritage, Impax, Lannett, Lupin, Mallinckrodt, Par, Perrigo, Rising, Sandoz, Sun, Taro, Teva, Torrent, West-Ward, Wockhardt, Zydus |
| Greenstone | Actavis, Akorn, Apotex, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Glenmark, G&W, Heritage, Impax, Lannett, Lupin, Mylan, Par, Perrigo, Sandoz, Teva, Zydus |
| G&W | Actavis, Alvogen, Amneal, Aurobindo, Bausch, Breckenridge, Cadista, Camber, Citron, Dr. Reddy's, Glenmark, Greenstone, Heritage, Impax, Lannett, Lupin, Mallinckrodt, Mylan, Par, Perrigo, Sandoz, Sun, Taro, Teligent, Teva, Torrent, Upsher-Smith, Wockhardt, Zydus |
| Heritage | Actavis, Alvogen, Amneal, Apotex, Ascend, Aurobindo, Bausch, Breckenridge, Cadista, Citron, Dr. Reddy's, Glenmark, Greenstone, G&W, Lannett, Lupin, Mallinckrodt, Mayne, Mylan, Par, Sandoz, Sun, Teligent, Taro, Teva, Torrent, Upsher-Smith, West-Ward, Wockhardt |
| Impax | Actavis, Akorn, Alvogen, Amneal, Apotex, Breckenridge, Cadista, Camber, Citron, Dr. Reddy's, Glenmark, Greenstone, G&W, Lannett, Lupin, Mylan, Par, Perrigo, Sandoz, Sun, Taro, Teligent, Upsher-Smith, Wockhardt, Zydus |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| | |
|---|---|
| Lannett | Actavis, Alvogen, Amneal, Ascend, Aurobindo, Bausch, Breckenridge, Cadista, Camber, Citron, Dr. Reddy's, Epic, Glenmark, Greenstone, G&W, Heritage, Impax, Lupin, Mallinckrodt, Mayne, Mylan, Par, Perrigo, Sandoz, Sun, Taro, Teligent, Teva, Upsher-Smith, West-Ward, Wockhardt, Zydus |
| Lupin | Actavis, Akorn, Apotex, Aurobindo, Breckenridge, Camber, Cadista, Citron, Dr. Reddy's, Glenmark, G&W, Heritage, Impax, Lannett, Mallinckrodt, Mylan, Par, Sandoz, Sun, Teva, Torrent, Wockhardt, Zydus |
| Mallinckrodt | Actavis, Akorn, Amneal, Apotex, Aurobindo, Bausch, Camber, Dr. Reddy's, Glenmark, G&W, Heritage, Lannett, Lupin, Mylan, Perrigo, Sandoz, Taro, Teligent, Upsher-Smith, West-Ward, Wockhardt |
| Mayne | Actavis, Akorn, Aurobindo, Camber, Dr. Reddy's, Heritage, Lannett, Mylan, Perrigo, Sun, Taro, Teva, Upsher-Smith |
| Mylan | Actavis, Alvogen, Amneal, Aurobindo, Cadista, Dr. Reddy's, Greenstone, G&W, Heritage, Impax, Lannett, Lupin, Mallinckrodt, Mayne, Par, Perrigo, Sandoz, Taro, Teva, Upsher-Smith, West-Ward, Zydus |
| Par | Actavis, Akorn, Alvogen, Amneal, Apotex, Ascend, Aurobindo, Breckenridge, Cadista, Camber, Citron, Dr. Reddy's, Glenmark, Greenstone, G&W, Heritage, Impax, Lannett, Mylan, Perrigo, Sandoz, Sun, Taro, Teligent, Teva, Torrent, Upsher-Smith, West-Ward, Wockhardt, Zydus |
| Perrigo | Actavis, Akorn, Amneal, Apotex, Aurobindo, Bausch, Breckenridge, Cadista, Citron, Dr. Reddy's, Epic, Glenmark, Greenstone, G&W, Heritage, Impax, Lannett, Mallinckrodt, Mayne, Mylan, Par, Sandoz, Sun, Taro, Teligent, Upsher-Smith, West-Ward, Wockhardt, Zydus |
| Rising[8] | Actavis, Apotex, Aurobindo, Cadista, Dr. Reddy's, Glenmark, Sandoz, Taro, Teva, Upsher-Smith, West-Ward, Zydus |
| Sandoz | Actavis, Akorn, Alvogen, Amneal, Apotex, Aurobindo, Bausch, Breckenridge, Cadista, Camber, Citron, Dr. Reddy's, Glenmark, Greenstone, G&W, Heritage, Impax, Lannett, Lupin, Mallinckrodt, Mylan, Par, Perrigo, Rising, Taro, Teva, Upsher-Smith, West-Ward, Wockhardt, Zydus |
| Sun | Actavis, Ascend, Aurobindo, Breckenridge, Cadista, Camber, Citron, Dr. Reddy's, Epic, Glenmark, G&W, Heritage, Impax, Lannett, Lupin, Mayne, Par, Perrigo, Taro, Teva, Upsher-Smith, West-Ward, Zydus |

---

[8] Rising, although not named as a Defendant in this complaint, was a co-conspirator in the alleged conspiracy and therefore is included here.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Taro | Actavis, Akorn, Alvogen, Amneal, Apotex, Ascend, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Glenmark, G&W, Heritage, Impax, Lannett, Mallinckrodt, Mayne, Mylan, Par, Perrigo, Rising, Sandoz, Sun, Teligent, Teva, West-Ward, Wockhardt |
|---|---|
| Teligent | Actavis, Aurobindo, Breckenridge, Glenmark, G&W, Heritage, Impax, Lannett, Mallinckrodt, Par, Perrigo, Taro, Teva, West-Ward, Wockhardt |
| Teva | Actavis, Akorn, Alvogen, Amneal, Apotex, Ascend, Aurobindo, Breckenridge, Cadista, Camber, Citron, Dr. Reddy's, Glenmark, Greenstone, G&W, Heritage, Lannett, Lupin, Mayne, Mylan, Par, Rising, Sandoz, Sun, Taro, Teligent, Torrent, Upsher-Smith, West-Ward, Wockhardt, Zydus |
| Torrent | Actavis, Apotex, Amneal, Aurobindo, Citron, Epic, Glenmark, G&W, Heritage, Lupin, Par, Teva, Zydus |
| Upsher-Smith | Actavis, Alvogen, Amneal, Apotex, Aurobindo, Breckenridge, Cadista, Camber, Citron, Dr. Reddy's, G&W, Heritage, Impax, Lannett, Mallinckrodt, Mayne, Mylan, Par, Perrigo, Rising, Sandoz, Sun, Teva, Wockhardt |
| West-Ward | Actavis, Akorn, Amneal, Ascend, Aurobindo, Cadista, Dr. Reddy's, Epic, Glenmark, G&W, Heritage, Lannett, Mallinckrodt, Mylan, Par, Perrigo, Rising, Sandoz, Sun, Taro, Teligent, Teva, Wockhardt |
| Wockhardt | Actavis, Akorn, Alvogen, Aurobindo, Bausch, Breckenridge, Cadista, Camber, Dr. Reddy's, Glenmark, G&W, Heritage, Impax, Lannett, Lupin, Mallinckrodt, Par, Perrigo, Sandoz, Taro, Teligent, Teva, Upsher-Smith, West-Ward, Zydus |
| Zydus | Actavis, Alvogen, Amneal, Apotex, Aurobindo, Bausch, Cadista, Camber, Citron, Dr. Reddy's, Glenmark, Greenstone, G&W, Lannett, Lupin, Mylan, Par, Perrigo, Rising, Sandoz, Sun, Teva, Wockhardt |

156.    The above catalog of inter-defendant phone contacts is by no means complete. It is clear, however, even from the incomplete information available to date, that direct communications between Defendants were commonplace during the conspiracy period.

## VII.    DEFENDANTS CONSPIRED TO FIX PRICES, ALLOCATE MARKETS AND/OR RIG BIDS FOR THE DRUGS AT ISSUE

157.    From at least as early as May 2009 until the present, Defendants agreed to raise the prices of and allocate the markets for the Drugs at Issue.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

158.    No shortages or other market features can explain Defendants' price increases for the Drugs at Issue.

159.    The elevated prices of Drugs at Issue that resulted from Defendants' anticompetitive conduct have injured Plaintiffs and the Class and caused them to pay more than they would have paid in a free and fair market.

160.    Each Defendant entered into the Fair Share agreement, which encompassed all Drugs at Issue.

161.    Each Defendant also entered into drug-specific price-fixing agreements as to those Drugs at Issue which it sold. The drug-specific agreements between certain Defendants with respect to each of the individual Drugs at Issue was part of all Defendants' overarching conspiracy to unreasonably restrain trade and to fix, raise or stabilize the prices of all Drugs at Issue.

162.    Throughout the relevant period, each Defendant attended trade association and other events along with other Defendants. *See, e.g.*, Exhibit A (Trade Association Contacts). These trade events provided opportunities for Defendants to reach agreement on price fixing and Fair Share for Drugs at Issue.

163.    Defendants' conduct clearly cuts across multiple drugs and inculpates all Defendants. Allegations relating to each of the Drugs at Issue are included below.[9]

164.    Two types of price charts are included in the allegations relating to Defendants' conduct: (1) charts of list prices, also known as WAC (wholesale acquisition cost) prices; and (2) charts of IQVIA NSP (National Sales Perspectives) prices. Defendants' anticompetitive

---

[9] The narration of each Drug at Issue as an individual set of events does not mean and is not intended to suggest that the events and actions relating to individual Drugs at Issue are unrelated. As described in the preceding section, the opposite was true: Defendants' anticompetitive efforts were systematic, widespread and not limited to individual drugs.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

agreements often are evidenced in one or both of these types of prices. For example, in some instances, Defendants coordinated increases in their list (WAC) prices, and communications among them occurred around the times of list (WAC) price increase announcements. In other instances, Defendants agreed to raise prices—and did raise prices—without ever announcing a list (WAC) price increase. In other words, Defendants increased the prices that they charged their customers, but did not update the list (WAC) prices for those products. The prices actually paid by Defendants' customers are reflected in the NSP prices.

165.    The allegations below include the conduct of numerous individuals employed by Defendants. Individuals named as Defendants in the States' complaints are identified by name. All other individuals are identified only by their initials.

### 1.    Carbamazepine

166.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Carbamazepine extended release ("ER") tablets, regular tablets and chewable tablets beginning at least as early as May 2009.

167.    Carbamazepine, also known by the brand name Tegretol, among others, is an anticonvulsant medication used to treat trigeminal neuralgia.

168.    During the relevant time frame, Taro and Sandoz were the primary manufacturers of Carbamazepine ER tablets; Taro, Teva, Apotex and Torrent were the primary manufacturers of regular Carbamazepine tablets; and Taro, Teva and Torrent were the primary manufacturers of Carbamazepine chewable tablets.

169.    The story of Carbamazepine provides a snapshot of the Fair Share agreement in operation over time. What began as coordination between two manufacturers—Sandoz and Taro— that focused on allocating customers and avoiding price erosion, evolved into large and

unprecedented price increases, and metastasized to incorporate multiple products and numerous manufacturers.

170.    In the spring and summer of 2009, Taro and Sandoz were preparing to launch Carbamazepine ER tablets. They would be the first generics on the market. Typically, prices tend to go down as manufacturers compete for customers. Taro and Sandoz wanted to avoid this.

171.    Frequent trade events in the generic pharmaceutical industry provided Taro and Sandoz—and, as discussed below, numerous other Defendants—opportunities to develop relationships with competitors. And, as described throughout, these relationships fostered anticompetitive agreements among numerous Defendants. D.S., Taro Assistant Vice President of National Accounts, and D.L, Sandoz Director of National Accounts, met at one such trade event. Their conversations quickly turned to business, and soon the two executives agreed that it was much preferable for each manufacturer to get a Fair Share of the market, instead of chasing prices down in pursuit of every last customer.

172.    The general understanding and agreement that D.S. (Taro) and D.L. (Sandoz) reached about Fair Share was not just an abstraction; it provided the framework for specific action, and the two executives began to communicate by phone after becoming acquainted at the trade event. Once the lines of communication were open, they soon began to collude about numerous Drugs at Issue.

173.    In the spring and early summer of 2009, as Taro and Sandoz were in the process of launching Carbamazepine ER, D.L. (Sandoz) called D.S. (Taro) to coordinate their product launches. D.S. shared Taro's confidential plans, including which customers it was targeting, with D.L. (Sandoz). D.L. understood that Sandoz should pursue other customers and thus each company would obtain a Fair Share of the market without needing to compete. And that is what each

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

company did. Taro launched in May 2009, and Sandoz launched about one month later. As shown on the NSP price chart below, ████████████████████████ ████████████████████████, because the two manufacturers had eliminated competition from the market. The Fair Share agreement put into action had exactly the desired result.

174.    For years thereafter, the prices for Carbamazepine ER tablets were relatively stable. But eventually, Taro and Sandoz were not satisfied with the inflated prices they were getting and were greedy for more. To bolster profits, they orchestrated very large price increases in the spring of 2013. This too became a feature of the Fair Share agreement.  As Taro and Sandoz became immersed in thinking about the market not as a place for competition, but for coordination and Fair Share, it soon became feasible to impose extraordinarily large and resilient price increases— something competitive generic pharmaceutical markets do not typically see.

175.    The Fair Share agreement enabled Taro and Sandoz to capture outsized profits. And this further incentivized them to expand their agreements to other drugs and competitors. Again, Carbamazepine is instructive. As described in more detail below, Taro, which marketed and sold three types of Carbamazepine tablets—ER, regular and chewable—led coordinated price increases on each of those products, not just the one it manufactured in common with Sandoz.

176.    In the spring and early summer of 2014, Taro imposed a second price increase on Carbamazepine ER tablets, that Sandoz quickly followed. During the same period, Taro also led price increases on the other two Carbamazepine products that it sold, regular tablets and chewable tablets. In June, Taro announced list (WAC) price increases on all of its Carbamazepine tablets. Over the following three months, Apotex, Teva and Torrent announced increased list prices that were identical to Taro's new prices. ████████████████████████. The increases were breathtakingly large, more than 20 times the former prices in some instances.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

177.    Taro, Teva, Sandoz, Apotex and Torrent monitored and abided by the Fair Share agreement and worked together to keep prices high. For example, a March 2014 internal Taro analysis of the Carbamazepine chewable tablet market acknowledged that ███████████████

████████████████

178.    The NSP price chart and the list (WAC) price chart below show the parallel pricing by Taro and Sandoz for Carbamazepine ER tablets. Note: The pricing patterns for 200 mg and 400 mg ER tablets were very similar. Charts for only the 200 mg dosage are included here. [NSP CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



179.    The NSP price chart and the list (WAC) price chart below show the abrupt and

large parallel price increases by Taro, Apotex, Teva and Torrent for Carbamazepine regular tablets.

[NSP CHART REDACTED]



61



180.    The NSP price chart and the list (WAC) price chart below show the large parallel price increases by Taro, Teva and Torrent for Carbamazepine chewable tablets. [NSP CHART REDACTED]





181.    Throughout this period, Taro, Sandoz, Teva, Apotex and Torrent met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Carbamazepine and of their Fair Share agreement.

182.    For example, in May 2013, when Taro and Sandoz each announced list (WAC) price increases for Carbamazepine ER tablets, Taro's D.S., spoke to Sandoz's D.L. on May 16 and 17. As explained above, D.S. (Taro) and D.L. (Sandoz) had been communicating and colluding since the launches of Carbamazepine ER in the spring and summer of 2009.

183.    The next summer, on June 3, 2014, Taro increased prices on all three of its Carbamazepine products (ER tablets, regular tablets and chewable tablets). Before the increases were implemented, Teva's Patel exchanged eight text messages and a phone call with Taro's Aprahamian on May 14, 2014.   After speaking with Aprahamian, Patel directed a colleague to create a list of future price increase candidates, based on her instructions.   That list included Carbamazepine with the notation "Follow/Urgent." On the day of the Taro price increases, Patel and Aprahamian communicated several times. A couple days later (June 5), Teva's Rekenthaler

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and J.H., SVP and General Manager at Apotex, communicated by text message, and spoke for approximately 8 minutes on June 17.

184.    Apotex announced its Carbamazepine list (WAC) price increases on July 14. J.H at Apotex and Rekenthaler spoke again before the increase (July 3) and after (July 15). Teva's Patel was again in touch with Taro's Aprahamian that month. The two spoke for approximately 21 minutes on July 29.

185.    On August 27, 2014, Patel and Aprahamian spoke yet again. The next day, August 28, Teva announced list (WAC) price increases on its Carbamazepine products. On September 11, 2014—the day before Torrent announced list (WAC) price increases on Carbamazepine—T.C., Teva Senior Director of Sales and K.G., Torrent VP of Sales, communicated by phone. Teva's Patel and Taro's Aprahamian next spoke on September 12, the same day that Torrent announced list (WAC) price increases for its Carbamazepine products. Apotex's J.H. also was in touch with Teva that month. He spoke to Rekenthaler on September 8, 10, 25 and 27. He also spoke to Maureen Cavanaugh, Teva's SVP of Sales and Marketing, on September 18 for approximately 17 minutes.

## 2.    Perphenazine

186.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Perphenazine tablets beginning at least as early as July 2009.

187.    Perphenazine, also known by the brand name Trilafon, is an anti-psychotic medication.

188.    During the relevant time frame, Defendants Par/Qualitest and Sandoz were the primary manufacturers of Perphenazine.

189. The market for Perphenazine was mature and at all relevant times had multiple manufacturers.

190. In 2007 and 2008, Par/Qualitest and Sandoz sold Perphenazine tablets for less than ████████████

191. When Par/Qualitest experienced supply disruptions and temporarily left the market, Sandoz more than doubled its prices for Perphenazine tablets.

192. When Par/Qualitest re-entered the market in the summer of 2009, rather than resume its formerly low pricing to compete with Sandoz to win back customers, it joined the market at Sandoz's elevated prices. This was consistent with the Fair Share agreement between Sandoz, Par/Qualitest and all Defendants.

193. Over the ensuing years, Par/Qualitest and Sandoz continued to dominate the market for Perphenazine. Notably, Par/Qualitest and Sandoz prices for Perphenazine have never returned to the lower levels of 2008.

194. Even when Par/Qualitest or Sandoz wanted to increase their market share of Perphenazine, they eschewed price competition and instead adhered to their Fair Share agreement. For example, █████████████████████████████████████████████████████
████████████████████████████████████████. Par/Qualitest nonetheless maintained its prices well above competitive levels and endeavored to gain share without resorting to free and fair price competition.

195. The price chart below shows the close coordination of pricing between Par/Qualitest and Sandoz for 8 mg Perphenazine tablets (which also is true of the other dosages of tablets sold by Par/Qualitest and Sandoz): [CHART REDACTED]

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



196.    Throughout this period, Sandoz and Par/Qualitest met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Perphenazine and of their Fair Share agreement.

197.    For example, in June 2012, Armando Kellum, Sandoz Director of Contracts and Pricing, spoke on the phone with a former Sandoz colleague, W.P., Par/Qualitest Senior Director of National Accounts. Kellum (Sandoz) and W.P. (Par/Qualitest) spoke again multiple times in early April 2013, as Sandoz and Par/Qualitest began to implement another price increase on Perphenazine.

### 3.    Pentoxifylline

198.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Pentoxifylline tablets beginning at least as early as August 2009.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

199.    Pentoxifylline, also known by the brand names Pentopak, Pentoxil, and TRENtal, is a medication used to reduce leg pain caused by poor blood circulation.

200.    During the relevant time frame, Defendants Teva, Mylan, Apotex and Bausch Health/Oceanside were the primary manufacturers of Pentoxifylline.

201.    The market for Pentoxifylline was mature and at all relevant times had multiple manufacturers.

202.    In 2008 and 2009, Teva, Mylan and Apotex NSP unit prices for Pentoxifylline tablets were ████████████████. Beginning at least as early as August 2009, these Defendants agreed to impose significant price increases.

203.    When Apotex exited the market in late 2009, Mylan and Teva took the opportunity to raise prices significantly. ███████████████████████. Consistent with their Fair Share agreement, Teva and Mylan achieved nearly an equal split of dollar sales during 2010 and most of 2011.

204.    In October 2011, Apotex re-joined the market. Instead of competing for customers by lowering prices, as would be expected in a competitive generic market, the addition of another manufacturer had the opposite effect; all three manufactures *increased* prices. By early 2012, Pentoxifylline effective prices had ██████████ over 2008 levels and remain elevated today.

205.    The pattern repeated in October 2014, when Bausch/Oceanside entered the market. Rather than offer lower prices to win customers, Bausch/Oceanside matched the market pricing of Teva, Mylan and Apotex.

206.    The following chart of Pentoxifylline NSP prices shows the coordinated increase by Teva and Mylan in late 2009, which was joined by Apotex when it re-entered the market in 2011. [CHART REDACTED]



207.    Throughout this period, Teva, Mylan, Apotex and Bausch/Oceanside met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Pentoxifylline and of their Fair Share agreement.

208.    For example, during 2010 and 2011, when Teva and Mylan imposed price increases and split the market for Pentoxifylline, the contacts between the two manufacturers were extensive. For example, Teva's David Rekenthaler was communicating by phone with Mylan employees at least as early as April 2010. Rekenthaler communicated with J.K., Mylan Vice President and Executive Director of Sales, in April and May 2010. Rekenthaler also communicated frequently with Jim Nesta, Mylan Vice President of National Accounts, from 2012 until Rekenthaler departed Teva in the spring of 2015.

209.    Rekenthaler was not the only Teva employee to cultivate relationships with Mylan. R.C., a Teva Vice President of Sales, was, until he left Teva to become the CEO of Aurobindo, in contact with B.P., Mylan's Senior Vice President of National Accounts, as well as Nesta.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

210.    Similarly, in 2014 when Teva wanted to increase its prices for Pentoxifylline, it reached out to coordinate with Mylan and Apotex in the days and weeks leading up to the increase. For example, Teva's Rekenthaler spoke to J.H., a Senior Vice President and General Manager at Apotex, on March 20 for four (4) minutes and March 25, 2013 for two (2) minutes. Then, on the day that Teva imposed price increases, April 4, 2014, Rekenthaler spoke to Nesta of Mylan for six (6) minutes. A week after Teva increased its price – on April 11, 2014 – Rekenthaler followed-up with the SVP at Apotex and the two spoke again for five (5) minutes. During these calls, Rekenthaler gathered Apotex's pricing plans and conveyed them to his Teva colleague, Nisha Patel.

### 4.    Atropine Sulfate

211.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Atropine Sulfate ophthalmic solution beginning at least as early as January 2010.

212.    Atropine Sulfate, also known by the brand name Isopto Atropine, among others, is available as a 1% ophthalmic solution, which is used to dilate the pupil before eye exams and to treat certain eye conditions.

213.    During the relevant time frame, Defendants Bausch and Sandoz were the primary manufacturers of Atropine Sulfate.

214.    The market for Atropine Sulfate was mature and at all relevant times had multiple manufacturers.

215.    For years, the prices for Atropine Sulfate were relatively low and stable. In January 2010, however, Sandoz and Bausch increased their customers' prices ████████████ Both manufacturers maintained elevated prices for years thereafter. In late 2014, both manufacturers

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

raised prices again in lockstep. Whereas NSP unit prices before the coordinated increases were

██████████████████████████████

216.    The price chart below shows the sustained price increases imposed by Bausch and

Sandoz. [CHART REDACTED]



217.    Throughout this period, Bausch and Sandoz met at trade conferences and

communicated directly with each other in furtherance of their price-fixing agreements on Atropine

Sulfate and their Fair Share agreement.

218.    For example, representatives from both Bausch and Sandoz attended the ECRM

Retail Pharmacy Generic Pharmaceutical Conference from February 15-18, 2010 and the NACDS

2010 Annual Meeting on April 24, 2010.

### 5.    Fluticasone Propionate

219.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to

the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Fluticasone

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Propionate nasal spray beginning at least as early as March 2010 and Fluticasone Propionate lotion beginning at least as early as November 2012.

**Fluticasone Propionate Nasal Spray**

220.    Fluticasone Propionate nasal spray, also known by the brand names Flovent and Flonase, among others, is a steroid medication used for the long-term management of asthma and chronic obstructive pulmonary disease (COPD).

221.    During the relevant time frame, the primary manufacturers of Fluticasone Propionate nasal spray were Akorn[10] and Defendants Apotex, West-Ward[11] and Wockhardt.

222.    The market for Fluticasone Propionate was mature and at all relevant times had multiple manufacturers.

223.    For years, the prices for Fluticasone Propionate were relatively low and stable.  In early 2010, however, Akorn, Apotex, and West-Ward/Roxane imposed large and nearly simultaneous price increases. By the summer of 2010, customers were paying approximately ████ ████████ as before the increases. In February 2012, Wockhardt entered the market. Rather than undercut the elevated prices of Akorn, Apotex and West-Ward/Roxane, Wockhardt matched their prices, and, as contemplated by the Fair Share agreement, it nonetheless managed to gain market share.

224.    The price chart below shows the large and nearly simultaneous price increases imposed by Akorn, Apotex, West-Ward/Roxane and Wockhardt. [CHART REDACTED]

---

[10] Akorn and related entities filed for bankruptcy on May 20, 2020. Accordingly, Akorn is not named as a Defendant or sought to be held liable with respect to Fluticasone Propionate nasal spray or any other drug added by amendment to this complaint.

[11] The relevant entity at this point in time was Roxane, which eventually was acquired by West-Ward during the relevant period (announced July 2015, completed March 2016).



225.    Throughout this period, Akorn, Apotex, West-Ward/Roxane and Wockhardt met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Fluticasone Propionate and their Fair Share agreement.

226.    For example, shortly before imposing sharp price increases, representatives from Akorn/Hi-Tech, Apotex and Wockhardt attended the ECRM Retail Pharmacy Generic Pharmaceutical Conference from February 15-18, 2010. Those three manufacturers were joined by West-Ward/Roxane at the GPhA Annual Meeting later that same month. In April 2010, Apotex and West-Ward/Roxane attended the HDMA CEO Roundtable. Those two companies were joined later that month by Wockhardt at the NACDS Annual Meeting.

227.    Shortly before Wockhardt entered the market in February 2012, the companies again attended trade events together. Akorn/Hi-Tech, Apotex and Wockhardt attended the ECRM conference in late January. In February, all four companies sent representatives to the GPhA Annual Meeting.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

228.    During these periods, Defendants also communicated by telephone. For example, on January 9, 2012, around the time that Wockhardt was entering the market, E.B., Akorn/Hi-Tech Vice President of Sales, spoke on the phone to M.C., Wockhardt Vice President of Sales, for nearly nine minutes. The two spoke again multiple times in March and April of 2012.

**Fluticasone Propionate Lotion**

229.    Fluticasone Propionate lotion, also known by the brand name Cutivate, is a topical corticosteroid used to treat swelling and itching that result from various chronic skin disorders, including atopic dermatitis.

230.    During the relevant time frame, Defendants Glenmark, Perrigo and Sandoz were the primary manufacturers of Fluticasone lotion.

231.    Generic versions of Fluticasone lotion first became available in 2012. Glenmark was the first manufacturer to enter the market. As Sandoz and Perrigo prepared to enter the market in late 2012, the three companies communicated to coordinate pricing and market share.

232.    In August 2012, C.B., Sandoz Director of National Accounts, was directed by Armando Kellum, Sandoz Director of Contracts and Pricing, to figure out what Perrigo was planning to do with respect to Fluticasone lotion. To find out the answers, C.B. (Sandoz) called T.P., Perrigo Director of National Accounts.

233.    C.B. (Sandoz) also made inroads with Glenmark during August 2012. At the NACDS Conference C.B. connected with Mitchell Blashinsky, Glenmark Vice President of Sales. As Sandoz's launch date for Fluticasone lotion approached in November 2012, C.B. (Sandoz) followed-up by telephone with Blashinsky (Glenmark) to coordinate. The men discussed pricing and customers for Fluticasone lotion. C.B. (Sandoz) also communicated directly with T.P. (Perrigo) during this period, sometimes on the same day he spoke to Blashinsky (Glenmark).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

234.     In December 2012 and January 2013, the three companies continued to coordinate. Each company was careful to abide by the Fair Share agreement. Perrigo's entry to the market was delayed, so Sandoz and Glenmark focused on their Fair Shares. For example, Sandoz targeted the customers that were discussed by C.B. (Sandoz) and Blashinsky (Glenmark) and refused to pursue other customers, even when solicited by potential new customers.

235.     In the first months of 2013, Sandoz concluded that the customers it had agreed to target for Fluticasone lotion were not sufficient to give it a Fair Share. Rather than compete with better pricing to win the share it wanted, C.B. (Sandoz) redoubled communications with Blashinsky (Glenmark) to reach an agreement. And they did. Glenmark agreed to cede additional business to Sandoz.

236.     In April and May 2013, C.B. (Sandoz) and Blashinsky (Glenmark) continued to communicate and coordinated additional price increases for Fluticasone lotion, among other drugs. During the same period, C.B. (Sandoz) kept in touch with T.P. (Perrigo), as Perrigo was preparing to launch Fluticasone lotion. The men discussed pricing, and as C.B learned information from Perrigo, he shared it with his colleagues at Sandoz. He also called Blashinsky (Glenmark) to keep him in the loop.

237.     In July, as Perrigo's launch approached, Sandoz and Perrigo communicated to hammer out details of the Fair Share agreement. Because Glenmark had a majority share of the market at that time, Perrigo agreed to focus on certain of Glenmark's customers. C.B. (Sandoz) kept contemporaneous notes of his discussions with T.P. (Perrigo) concerning Fluticasone lotion.

238.     When Perrigo entered the market on August 1, 2013, it announced pricing in line with Glenmark and Sandoz. T.P. (Perrigo) and C.B. (Sandoz) communicated by phone multiple times that day.

74

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 6. Hydroxyurea

239.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Hydroxyurea beginning at least as early as March 2010.

240.    Hydroxyurea, also known by the brand names Droxia and Hydrea, is a medication used to treat sickle cell anemia and cancer of the white blood cells (chronic myeloid leukemia).

241.    During the relevant time frame, Defendants Teva and Par were the primary manufacturers of Hydroxyurea.

242.    The market for Hydroxyurea was mature and at all relevant times had multiple manufacturers.

243.    After a period of relatively low and stable prices for Hydroxyurea capsules in 2008 and 2009, Teva and Par agreed to implement large price increases. In the spring of 2010, Teva and Par began to implement nearly simultaneous and identical price increases. By summer, Par and Teva Hydroxyurea effective prices were approximately ██ higher and remained elevated for years thereafter.

244.    In late 2011, Teva experienced a supply disruption and briefly exited the market. When it re-entered the market approximately 3 months later, rather than offer lower prices to win back market share, Teva matched the elevated prices to which it had previously raised prices in parallel with Par.

245.    The following chart of Hydroxyurea NSP prices shows the coordinated increase by Teva and Par in the spring of 2010, and the later increase by Teva in 2014. [CHART REDACTED]



246.    Throughout this period, Teva and Par met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Hydroxyurea and of their Fair Share agreement.

247.    For example, between March and June 2010 (when Par and Teva imposed their first coordinated price increases) Teva's Rekenthaler spoke with G.B., Par's Vice President of National Accounts via telephone on at least 5 occasions.

248.    In 2014, Teva (again) raised its Hydroxyurea prices. This created a risk that Teva would lose customers and market share to Par. However, Defendants' Fair Share agreement allowed Teva to implement a significant price increase without a commensurate loss in sales. Before increasing prices in 2014, Teva again communicated directly with Par. Teva's Rekenthaler again reached out to the VP of National Accounts at Par. They spoke at least three times between August 24 and August 28, 2014 in furtherance of the Hydroxyurea price-fixing agreement and the Fair Share agreement.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

7.     **Imiquimod**

249.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Imiquimod cream beginning at least as early as February 2010.

250.    Imiquimod cream, also known by the brand names Aldara and Zyclara, is a topical medication used to treat actinic keratosis, or pre-cancerous growths on the skin.

251.    During the relevant time frame, Defendants Fougera, Perrigo, Sandoz and Taro were the primary manufacturers of Imiquimod cream.[12]

252.    Fougera received approval to launch generic Imiquimod cream in late February 2010. It would be the first generic on the market. Perrigo publicly announced in April 2010 that it would be launching a generic Imiquimod cream. Even before either company entered the market, they began to communicate to coordinate pricing and to target customers.

253.    Walter Kaczmarek, Fougera Senior Vice President of Commercial Operations, and A.T., Fougera National Account Executive, worked to ensure that Fougera and Perrigo would be able to charge the highest prices possible for Imiquimod. To that end, A.T. (Fougera) began to communicate with T.P., Perrigo Director of National Accounts, in February 2010. The two men spoke multiple times in February 2010 leading up to Sandoz's launch of Imiquimod cream. They spoke again in April multiple times, leading up to Perrigo's launch of Imiquimod cream.

254.    Typically, the entrant of a second generic manufacturer into a new market tends to drive prices down as the manufacturers compete for customers by reducing price. Here, and which would prove to be a repeated feature of the Fair Share agreement among Defendants, the entry of

---

[12] Fougera was acquired by Sandoz in July 2012. As described below, before Sandoz and Fougera joined together officially via merger in 2012, they joined together as price-fixing co-conspirators.

77

a second manufacturer had the perverse effect of leading to price *increases*. That is what happened with Imiquimod cream. In advance of Perrigo's entry, and on the heels of coordination between the two companies, Fougera increased its prices for Imiquimod cream. And the coordination had its intended effect: although there were now two competitors in the market, prices for Imiquimod cream remained *higher* than they had been with only one manufacturer in the market, and they remained higher for more than a year thereafter.

255.    The elevated pricing of Imiquimod cream was a direct result of the communications between Fougera and Perrigo. A.T. (Fougera) and T.P. (Perrigo) continued to communicate frequently for the rest of 2010 and through the summer of 2011. At Fougera, A.T. kept his colleague Kaczmarek informed of the communications. At Perrigo, T.P. kept his colleague John Wesolowski, Senior Vice President of Commercial Operations, informed of the coordination and agreement with Fougera.

256.    In what would prove to be another feature of the Fair Share conspiracy, Fougera and Perrigo used in-person, face-to-face meetings at trade conferences to reach anticompetitive agreements. For example, as Perrigo was about to enter the Imiquimod cream market, representatives from Fougera and Perrigo convened at the NACDS annual meeting in Palm Beach, Florida from April 24 to 27, 2010. Kaczmarek (Fougera), A.T. (Fougera), D.K., Fougera Senior Vice President and General Manager, Wesolowski (Perrigo) and S.K., Perrigo Executive Vice President and General Manager, among others, attended the event. While there, A.T. (Fougera) spoke with T.P. (Perrigo) on the phone. In emails sent during the conference, Sandoz was plain about its intentions to coordinate face-to-face:

257.    Immediately after the trade conference, Fougera internally made clear that it would cede market share to Perrigo. ████████████████████████████████████ ██████████████████████████ Fougera and Perrigo were no longer competing. As C.B., Fougera Director of National Accounts recognized, ████████████████████████████████ Perrigo and Fougera were not competitors, but collaborators.

258.    In 2011, Sandoz, and Taro entered the market for Imiquimod cream. Fougera and Perrigo stuck with what worked—they coordinated with the companies through direct phone communications and in-person, face-to-face meetings at trade events.

259.    In late February 2011, Sandoz gained approval to sell Imiquimod cream. The news immediately prompted phone calls between A.T. (Fougera) and T.P. (Perrigo) to come up with a plan. Around this same time, Taro also was planning to enter the Imiquimod cream.

260.    As Sandoz and Taro were preparing to enter the market, they, along with Fougera and Perrigo, convened at the ECRM Retail Pharmacy Generic Pharmaceutical Conference in Florida between March 6 and 10, 2011. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████. While at the conference, A.T. (Fougera) spoke with T.P. (Perrigo). D.L. (Sandoz) spoke with D.S. (Taro).

261.    In the wake of the meeting in Florida, Sandoz entered the market in March 2011 and Fougera and Perrigo ceded customers to Sandoz, as planned. The companies also focused on Taro's imminent launch and continued to communicate by phone to coordinate. For example, A.T. (Fougera) communicated with H.M. (Taro) multiple times in March through July 2011, when Taro finally launched Imiquimod cream. A.T. (Fougera) also communicated with T.P. (Perrigo) during

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

this period. Meanwhile, D.L. (Sandoz) and D.S. (Taro) also communicated multiple times between April and July 2011. During these calls, the companies exchanged information about customers and pricing. At Fougera, A.T. kept Kaczmarek in the loop. At Sandoz, D.L. kept Kellum in the loop. And at Perrigo, T.P. kept Wesolowski in the loop.

262.    After Taro entered the market, each company stuck to the Fair Share agreement. Rather than compete on price, the companies coordinated to ensure that everyone got a Fair Share; they continued to communicate through July and August 2011 to cede customers and prop up the price of Imiquimod cream.

263.    The success of the Fair Share agreement was noted internally at Fougera. D.K. (Fougera) sent an email, noting the remarkable success at eliminating price competition ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

### 8.    Neomycin Polymyxin Hydrocortisone

264.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Neomycin Polymyxin Hydrocortisone beginning at least as early as March 2010.

265.    Neomycin Polymyxin Hydrocortisone, also known by the brand name Cortisporin and Pediotic, is available in multiple forms, including a solution used to treat outer ear infections caused by bacteria.

266.    During the relevant time frame, Defendants Bausch and Sandoz were the primary manufacturers of Neomycin Polymyxin Hydrocortisone.

267.    The market for Neomycin Polymyxin Hydrocortisone was mature and at all relevant times had multiple manufacturers.

268.    For years, the prices for Neomycin Polymyxin Hydrocortisone were relatively low and stable. In spring 2010, however, Bausch and Sandoz began coordinated price increases, the first of which was in the spring of 2010. Bausch and Sandoz increased their prices ███████████████ in close succession. In the fall of 2012, both companies again increased prices. And then, in the summer of 2015, both companies imposed very large price increases, ████████████ ████████████████.

269.    The price chart below shows the series of price increases imposed by Bausch and Sandoz. [CHART REDACTED]



270.    Throughout this period, Bausch and Sandoz met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Neomycin Polymyxin Hydrocortisone and their Fair Share agreement.

271.    For example, representatives from both Bausch and Sandoz attended trade events together before each of the price increases that they imposed. Bausch and Sandoz each attended the ECRM Retail Pharmacy Generic Pharmaceutical Conference from February 15-18, 2010.

Representatives of both companies also attended the NACDS 2012 Pharmacy and Technology Conference in Denver, Colorado on August 25-28, 2012. Both companies also attended multiple conferences together during the summer of 2015.

### 9. Piroxicam

272.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Piroxicam capsules beginning at least as early as April 2010.

273.   Piroxicam, also known by the brand name Feldene, is a nonsteroidal anti-inflammatory drug (NSAID). Piroxicam is used to treat rheumatoid arthritis, osteoarthritis, and juvenile rheumatoid arthritis.

274.   During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Piroxicam. Defendant Greenstone joined the Piroxicam market and the Piroxicam conspiracy in 2014.

275.   The market for Piroxicam capsules was mature and at all relevant times had multiple manufacturers.

276.   Piroxicam capsule prices were relatively low and stable for years, but in the spring of 2010 prices skyrocketed and have remained elevated above competitive levels ever since. Teva and Mylan announced identical list (WAC) prices that were more than 30 times higher than the former list prices. NSP prices ███████████████████████ When Greenstone later joined the market, it matched those inflated WAC prices, and its NSP prices ███████████████ ███

277.   The list (WAC) price chart and the NSP price chart below show the extraordinary price increases that were imposed in the spring of 2010, and that Greenstone matched Teva and

Mylan's high prices when it joined the market in 2014. (Note: 10 mg and 20 mg Piroxicam capsules exhibited a similar pricing pattern. Charts for only the 20 mg dosage are included here. Also note: During the period between March and July 2010, Nostrum Pharmaceuticals marketed Piroxicam using Mylan's ANDAs; Nostrum sales and Mylan sales are shown as a single line of sales in the NSP chart below.) [NSP CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



278.    Throughout this period, Teva, Mylan and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Piroxicam and of their Fair Share agreement.

279.    For example, in the period immediately preceding Teva's announcement of list (WAC) price increases on May 12, 2010, Teva's Rekenthaler communicated directly with Mylan via telephone. He spoke with J.K., Mylan's Vice President and Executive Director of Sales, shortly before the increase, on April 27, 2010, and then again right after the increase, on May 14, 2010.

280.    When Teva and Mylan learned that Greenstone would be entering the Piroxicam market in the spring of 2014, they quickly moved to bring Greenstone into their Piroxicam price-fixing agreement and the broader Fair Share agreement. First, on March 3, 2014, Teva's Rekenthaler and Nesta connected by phone for nearly 10 minutes. Then, over the ensuing days, Teva's Patel reached out to Greenstone. On March 5, 6, 12 and 17, 2014—within days of Greenstone's entrance to the market—Teva's Nisha Patel had multiple phone conversations with Jill Nailor and R.H., the Director of National Accounts at Greenstone (who had worked at

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

AmerisourceBergen during the same period as Patel), during which Teva and Greenstone reached agreement that Teva would cede a Fair Share of the Piroxicam market to Greenstone.

### 10. Permethrin

281.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Permethrin cream beginning at least as early as May 2010.

282.    Permethrin, also known by the brand name Acticin, among others, is used to treat scabies.

283.    During the relevant time frame, Defendants Actavis, Perrigo and Mylan were the primary manufacturers of Permethrin cream.

284.    The market for Permethrin cream was mature and at all relevant times had multiple manufacturers.

285.    In the early summer of 2010, effective prices for Permethrin cream sold by Perrigo and Actavis were low and stable at less than ███████ per unit. In the summer of 2010, however, Perrigo and Actavis agreed to implement significant price increases and by the summer of 2013 when Mylan entered the market, prices were more than ██████████ than in 2009 and early 2010.

286.    In the summer of 2010, Actavis and Perrigo approximately ██████ their NSP prices. This large increase appears small on the chart below because their subsequent coordinated price increases were even more extreme.

287.    In the summer of 2011, Actavis and Perrigo approximately ████████ the already inflated Permethrin cream NSP prices. They also announced large and identical list (WAC) price increases in close succession.

288.     Then, in the summer of 2013, shortly before Mylan entered the market, Actavis and Perrigo imposed additional price increases, which were again very similar in timing and size. When Mylan entered the market in the late summer of 2013, rather than offer lower prices to gain market share (as would be expected in a competitive market), Mylan entered at prices ███████ ████████████████ and announced identical list (WAC) prices, which was consistent with their price-fixing agreement on Permethrin and their Fair Share agreement.

289.     The NSP price chart and the list (WAC) price chart below show the large and parallel price increases by Actavis and Perrigo, and the subsequent market entry by Mylan at those inflated prices.  [CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



290. Throughout this period, Actavis, Perrigo and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Permethrin and of their Fair Share agreement.

291. For example, on May 27, 2010—right around the time that Actavis and Perrigo first raised NSP prices—M.D., Actavis's Director of National Accounts spoke by phone with T.P., Perrigo's Director of National Accounts for nearly 10 minutes.

292. The two spoke again the following summer. In late July 2011, Actavis announced a list (WAC) price increase. Shortly thereafter, the Perrigo Director of National Accounts and the Actavis Director of National Accounts spoke for three minutes on August 3. Two days later, Perrigo announced an identical list (WAC) price. That day, the Perrigo Director called the Actavis Director and appears to have left a message. A few days later, on August 8, they finally connected and spoke for nearly 9 minutes.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

293.     The pattern repeated in 2013. This time, Perrigo led the list (WAC) price increase on March 13, 2013. The next day, the Actavis and Perrigo Directors spoke for more than 10 minutes. They spoke again for nearly 25 minutes on April 12. On April 25, Actavis announced list (WAC) prices identical to those of Perrigo.

294.     Before Mylan entered the market in late 2013, Mylan's Jim Nesta and Perrigo's T.P. (Director of National Accounts) communicated. On August 27, the two executives exchanged messages but finally connected on the 28th and spoke for 10 minutes. They spoke again on November 15. Perrigo's Director of National Accounts kept Actavis in the loop. He again spoke to M.D., Director of National Accounts at Actavis on August 21, 23 and September 11, 2013.

### 11.     Triamcinolone Acetonide

295.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Triamcinolone Acetonide cream and ointment beginning at least as early as June 2010, and paste beginning at least as early as February 2013.

296.     Triamcinolone Acetonide, also known by the brand name Cinolar, is a topical corticosteroid used to treat inflammation caused by conditions such as allergic reactions, eczema, and psoriasis.

297.     During the relevant time frame, Defendants Sandoz/Fougera, Perrigo, Taro, Par/Qualitest, and Ascend were the primary manufacturers of Triamcinolone Acetonide cream and Sandoz/Fougera, Perrigo and Taro were the primary manufacturers of Triamcinolone Acetonide ointment. Defendant Taro and Rising were the primary manufacturers of Triamcinolone Acetonide paste.

298.     The markets for Triamcinolone Acetonide cream and ointment were mature and at all relevant times had multiple manufacturers.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

299.    All dosages and formulations of Triamcinolone Acetonide cream, ointment and paste were subject to Defendants' conspiracy.

300.    Between June and December 2010, Triamcinolone Acetonide cream and ointment prices significantly increased and remain at supracompetitive levels even today.

301.    Between February and November 2013, Triamcinolone Acetonide paste prices significantly increased and remain at supracompetitive levels even today.

302.    In the cream market, Sandoz/Fougera, Perrigo and Par/Qualitest approximately ███ their prices in the second half of 2010 to bring them in line with those of Taro. In early 2011, Taro then proceeded to more than ███ its prices. Although Taro's prices were much higher than Sandoz/Fougera, Perrigo and Par/Qualitest, it was nonetheless able to maintain a relatively stable share of the market, consistent with their Fair Share agreement. As Taro noted in an internal document in 2012, █████████████████

303.    In the ointment market, after years of relatively low and stable pricing, Sandoz/Fougera and Perrigo imposed significant price increases between June and September 2010.  Their prices more than ███ and remained at supracompetitive levels thereafter. When Taro re-launched its ointment in June 2011, rather than offer lower prices to win customers, it entered the market at even higher prices than Sandoz and Perrigo, thus entering without disturbing the already high prices.

304.    In the paste market, Taro initiated a price increase in February 2013, followed by an even larger increase imposed by Rising in the fall, which Taro immediately matched. As described below, the price increases on all Triamcinolone Acetonide products were preceded by numerous inter-defendant communications.

305.    The following NSP price charts for Triamcinolone Acetonide cream and ointment show the parallel and inflated pricing by Sandoz/Fougera, Perrigo, Taro, Par/Qualitest and Ascend. The list (WAC) price chart for Triamcinolone Acetonide paste shows the coordinated increases by Taro and Rising. [NSP CHARTS REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

306.    Throughout this period, Sandoz/Fougera, Perrigo, Taro, Par/Qualitest and Ascend met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Triamcinolone Acetonide and of their Fair Share agreement.

307.    For example, in the summer of 2010, Sandoz/Fougera and Perrigo raised prices for Triamcinolone Acetonide cream significantly to match those of Taro. During this period, A.T., Sandoz/Fougera National Account Executive, and T.P., Perrigo Director of National Accounts, frequently communicated by phone. A.T. (Sandoz/Fougera) also was communicating with H.M., Taro Director of Corporate Accounts, in late summer 2010, and they continued to communicate with some frequency through at least July 2012.

308.    D.S., Assistant Vice President of National Accounts at Taro, kept in touch with Perrigo, and had phone calls with A.F., a National Account Director at Perrigo, on January 24 and February 10, 2011.

309.    Shortly after Ascend entered the market in 2012, G.W., Ascend's Vice President of National Accounts, spoke to D.S., the AVP at Taro (on July 11, 19 and 20).

310.    Taro's D.S. did not limit his communications to the cream and ointment competitors; he also communicated with P.K., Rising Senior Vice President of Sales, to coordinate price increases and to target customers for Triamcinolone Acetonide paste.

## 12.    Potassium Chloride

311.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Potassium Chloride tablets (8 mEq, 10 mEq, 20 mEq) beginning at least as early as July 2010.

312.    Potassium Chloride tablets, also known by the brand name K-Dur, among others, is a medication used to prevent and to treat low potassium, which is important for the heart, muscles, and nerves.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

313.    During the relevant time frame, Defendants Upsher-Smith, Sandoz, Actavis, Zydus and Mylan were the primary manufacturers of Potassium Chloride 8 MEQ, 10 MEQ and 20 MEQ tablets.

314.    The market for Potassium Chloride tablets was mature and at all relevant times had multiple manufacturers.

315.    For years, the prices of Potassium Chloride tablets were relatively low and stable. Upsher-Smith, Sandoz and Actavis were the dominant suppliers in the market in the early years. Upsher-Smith manufactured tablets and marketed and sold them under the brand name Klor-Con. Upsher-Smith also supplied tablets to Sandoz, which in turn marketed and sold them under a Sandoz label.

316.    In the summer of 2010, Upsher-Smith, Sandoz and Actavis imposed nearly simultaneous and very large price increases. In the space of approximately 6 weeks, all three manufacturers tripled their list (WAC) prices. ████████████████████████

317.    In June 2011, Zydus entered the market. Rather than offer better prices to win market share, Zydus tracked the high prices of Upsher-Smith, Sandoz and Actavis.

318.    As of July 1, 2014, Upsher-Smith ceased to market and sell Klor-Con under the Upsher-Smith label, but instead licensed the Klor-Con name to Sandoz. Thus, after July 1, 2014, Sandoz sold Klor-Con Potassium Chloride tablets under the Sandoz label, though the tablets continued to be manufactured by Upsher-Smith.

319.    In the second half of 2014, Mylan entered the market for Potassium Chloride tablets. Like Zydus before it, Mylan entered at high prices that tracked the other manufacturers already in the market.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

320.    The WAC price chart below shows the large, parallel and sustained price increases for Potassium Chloride tablets. Note: The pricing patterns for 8 MEQ, 10 MEQ and 20 MEQ dosages were very similar. Only the chart for the 10 MEQ dosage is included here. [NSP CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



321.    Throughout this period, Upsher-Smith, Sandoz, Actavis, Zydus and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Potassium Chloride tablets and of their Fair Share agreement.

322.    For example, during the summer of 2010, D.Z, the Senior National Account Manager at Upsher-Smith, and K.K., a Senior National Account Executive at Sandoz, communicated a number of times by telephone both before and after the August list (WAC) price increases by Sandoz and Upsher-Smith.

323.    Before Zydus entered the Potassium Chloride ER market, it first communicated with the incumbent suppliers. K.R., Zydus's Assistant Vice President of National Accounts, and K.S., Zydus Vice President of Sales, communicated frequently by phone with D.L., a Director of National Accounts at Sandoz. K.R. (Zydus) began communicating with D.L. (Sandoz) at least as

early as March 2011; K.S. (Zydus) began communicating with D.L. (Sandoz) at least as early as April 2011.

324.    In the fall of 2014 when Mylan was entering the Potassium Chloride ER market, Mylan's Jim Nesta spoke to Marc Falkin at Actavis twice on September 23, 2014. They also had been communicating over the summer leading up to Mylan's entry. When Mylan finally joined the market, it did so at elevated prices consistent with the Fair Share and price-fixing agreement.

### 13.    Adapalene

325.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Adapalene cream beginning at least as early as August 2010 and gel beginning at least as early as May 2013.

326.    Adapalene, also known by the brand name Differin, is a medication used to treat acne.

### Adapalene Cream

327.    During the relevant time frame, Defendants Sandoz[13] and Perrigo were the primary manufacturers of Adapalene cream.

328.    In the summer of 2010, generic Adapalene cream first became available. Sandoz/Fougera was the first generic manufacturer to launch in July 2010. Sandoz, however, learned that Perrigo also would be entering the market.

329.    Sandoz/Fougera began seeking "intel" on Perrigo. This included direct contact between the companies. For example, in late August, a Sandoz representative relayed to colleagues: ████████████████████████████████████████

---

[13] The relevant entity at this time was Fougera, which was acquired by Sandoz in July 2012.

██████████████████████████████ Several Perrigo representatives were at the trade event, including T.P., Perrigo Director of National Accounts.

330.    In September and October 2010, T.P. (Perrigo) communicated multiple times by phone with A.T., Sandoz/Fougera National Account Executive, to discuss Adapalene cream. Each man kept his boss informed of the inter-competitor communications. A.T. provided regular updates to Walter Kaczmarek, Sandoz/Fougera Senior Vice President of Commercial Operations; T.P. kept John Wesolowski, Perrigo's Senior Vice President of Commercial Operations, informed.

331.    Perrigo launched Adapalene cream in October 2010 and matched Sandoz/Fougera list (WAC) prices. On the day of Perrigo's launch, T.P. (Perrigo) and A.T. (Sandoz) communicated by phone multiple times.

332.    Internally, Sandoz/Fougera prepared to relinquish customers/market share to Perrigo, as was contemplated by the Fair Share agreement between them. To that end, in October 2010, A.T. (Sandoz) and T.P. (Perrigo) continued their communications by phone. They discussed specific customers that Perrigo would target and which Sandoz/Fougera would cede.

333.    Both companies hewed to the agreement. By the end of October 2010, Perrigo had targeted the agreed upon customers, and Sandoz/Fougera let those customers go. When Sandoz/Fougera sales staff questioned whether it made sense to cede certain accounts, Kaczmarek (Sandoz) admonished them that market share had to be ceded to Perrigo.

334.    Toward the end of 2012, Sandoz experienced supply disruptions for Adapalene cream. By mid-2013, Sandoz had resolved its supply issues and was re-entering the market. Sandoz and Perrigo communicated by phone to coordinate.

335.    In June and July 2013, T.P. (Perrigo) spoke multiple times to C.B., Sandoz National Account Executive, and provided Sandoz with certain of Perrigo's nonpublic customer pricing so

that Sandoz knew where to price its own offers to those customers. Perrigo and Sandoz discussed which customers would be ceded to Sandoz. Perrigo also identified specific customers that it intended to keep. C.B. kept contemporaneous notes of the discussions.

336.    Again, the companies hewed to the agreement. Sandoz targeted the agreed upon customers at the agreed upon prices and avoided the customers that Perrigo had flagged. Perrigo, for its part, ceded those customers to Sandoz. C.B. (Sandoz) and T.P. (Perrigo) continued to communicate by phone that summer. C.B. also communicated with A.F., Perrigo National Account Director, during this period. Over the ensuing months, the companies continued to communicate and abide by the Fair Share agreement.

**Adapalene Gel**

337.    During the relevant time frame, Defendants Glenmark, Teva and Taro were the primary manufacturers of Adapalene gel.

338.    In May 2013, Teva, Taro and Glenmark wanted to fix, raise or stabilize the prices of Adapalene gel. Accordingly, the manufacturers engaged in a series of direct telephone communications to put their plan into action.

339.    For example, Teva's Patel communicated multiple times with multiple contacts at Glenmark during May of 2013 to discuss price increases on Adapalene gel and other drugs. Patel also spoke with Taro's Aprahamian in May to coordinate the Adapalene price increase.

340.    The manufacturers were careful to maintain Fair Share as they implemented price increases. For example, internally, Teva closely monitored price requests from customers to make sure that no unintended shifts in market share occurred.

341.    Between May and July, 2013, Glenmark, Teva and Taro all increased prices on Adapalene gel.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**14.** **Betamethasone Dipropionate**

**15.** **Betamethasone Dipropionate Augmented**

**16.** **Betamethasone Dipropionate Clotrimazole**

**17.** **Betamethasone Valerate**

**18.** **Hydrocortisone Valerate**

342.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Betamethasone Dipropionate cream, ointment and lotion, Betamethasone Valerate cream, ointment, and lotion, Betamethasone Dipropionate Clotrimazole cream and lotion, Betamethasone Dipropionate Augmented lotion and Hydrocortisone Valerate cream at least as early as October 2010.

343.     These five drugs treat related conditions, are sold by the same manufacturers, and involve related anticompetitive conduct. Accordingly, all five drugs are discussed together.

344.     Betamethasone Dipropionate, also known by the brand names Alphatrex, Del-Beta, and Diprosone, is a medication used to help relieve redness, itching, swelling or other discomforts caused by certain skin conditions.

345.     Betamethasone Dipropionate Augmented, also known by the brand name Diprolene, is a corticosteroid used to treat itching, redness, and swelling caused by certain skin conditions.

346.     Betamethasone Dipropionate Clotrimazole, also known by the brand name Lotrisone, is a medication used to treat fungal infections.

347.     Betamethasone Valerate, also known by the brand name Betamethacot, among others, is a medication used to help relieve redness, itching, swelling or other discomforts caused by certain skin conditions.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

348. Hydrocortisone Valerate, also known by the brand name Westcort, is a corticosteroid used to help relieve redness, itching, swelling, or other discomfort caused by skin conditions.

349. During the relevant time frame, the primary manufacturers of these products were as follows:

| Betamethasone Dipropionate | Cream | Actavis, Sandoz, Taro |
| --- | --- | --- |
| | Ointment | Actavis, Sandoz |
| | Lotion | Sandoz, Perrigo |
| Betamethasone Dipropionate Augmented | Lotion | Sandoz, Taro |
| Betamethasone Dipropionate Clotrimazole | Cream | Actavis, Sandoz, Taro |
| | Lotion | Sandoz, Taro |
| Betamethasone Valerate | Cream | Actavis, Sandoz, Taro |
| | Ointment | Actavis, Sandoz |
| | Lotion | Sandoz, G&W |
| Hydrocortisone Valerate | Cream | Taro, Perrigo, G&W |

350. The markets for the above products were mature and at all relevant times had multiple manufacturers.

351. The Defendant manufacturers imposed extraordinary price increases across all formulations of these drugs. Defendants increased the prices of some formulations by more than 20 times. Indeed, ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████. As the various charts below highlight, the price increases by Defendants were close in time and amount.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

352.    Throughout, Defendants were hyper-conscientious about monitoring and adhering to Fair Shares and maintaining high prices. For example, an internal analysis by Sandoz in November 2013 ██████████████████████████████████████████ ██████████████████████████████████████. The analysis noted that ██████████████████████ Another Sandoz internal analysis admonished employees ████████████████████████ ████████████████████████ In line with the Fair Share agreement (and as memorialized in an internal Sandoz document), rather than compete for new business, ███████████████████████

353.    The following charts present NSP prices (*i.e.*, prices paid by Defendants' customers) and list prices (*i.e.*, WAC) for the cream formulations of Betamethasone Dipropionate, Betamethasone Valerate, Betamethasone Dipropionate Clotrimazole and Hydrocortisone Valerate. The charts highlight the parallel pricing by Actavis, Sandoz/Fougera and Taro. The charts also show that when G&W entered the Hydrocortisone Valerate market, rather than offer lower prices to win customers, they offered prices equal or higher to the incumbent manufacturers.  [NSP CHARTS REDACTED]





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





103





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

354.    The following charts present NSP prices and list (WAC) prices for ointment formulations of Betamethasone Dipropionate and Betamethasone Valerate and highlight the parallel pricing by Actavis and Sandoz/Fougera.  [NSP CHARTS REDACTED]





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





355.    The following charts present NSP and list prices for the lotion formulations of

Betamethasone    Dipropionate,    Betamethasone    Valerate,    Betamethasone    Dipropionate

Clotrimazole and Betamethasone Dipropionate Augmented and highlight the parallel pricing by

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Sandoz/Fougera and Perrigo, Sandoz/Fougera and G&W, and Sandoz/Fougera and Taro.  [NSP CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





109
PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





356.   Throughout this period, Actavis, Sandoz/Fougera, Taro, Perrigo and G&W met at trade conferences and communicated directly with each other in furtherance of their price-fixing

agreements on Betamethasone Dipropionate, Betamethasone Valerate, Betamethasone Dipropionate Clotrimazole, Hydrocortisone Valerate and their Fair Share agreement.

357. For example, on January 4, 2011, Perrigo implemented a large list (WAC) price increase on Betamethasone Dipropionate lotion. On January 7, T.P., Director of National Accounts at Perrigo, spoke to A.T., a National Account Executive at Sandoz/Fougera. On January 11, Sandoz/Fougera imposed its own list (WAC) price increase.

358. In December 2011, Sandoz/Fougera planned a large price increase on Betamethasone Valerate lotion. A.T., Sandoz/Fougera National Account Executive, spoke by telephone numerous times with Jim Grauso, G&W Vice President of Sales, to coordinate the increase.

359. Similarly, D.L., Director of National Accounts at Sandoz and D.S., AVP of National Accounts at Taro, communicated a number of times during the relevant period as Sandoz and Taro coordinated pricing. In October 2012, when Sandoz announced another price increase on lotion, the two spoke. In February 2013, when Taro raised its lotion prices to follow Sandoz, the two spoke again.

360. Mitchell Blashinsky, Taro VP of Marketing, and Michael Perfetto, Actavis VP of Sales and Marketing, also were communicating; the two men communicated by phone every month from February 2011 through May 2012.

361. In March 2013, when Taro and Perrigo began to raise prices to customers for Hydrocortisone Valerate cream, the two companies were communicating. D.S., the AVP of National Accounts at Taro, and A.F., Perrigo National Account Director, communicated by phone on March 13, 2013.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

362.     When G&W was preparing to enter the Hydrocortisone Valerate cream market in early 2015, T.P, Director of National Accounts at Perrigo, spoke a number of times to Erika Vogel-Baylor, Vice President of Sales and Marketing at G&W, between January and March 2015. When G&W entered the market, it matched the prices of Perrigo and Taro.

### 19.     Nitrofurantoin

363.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Nitrofurantoin Macrocrystal capsules beginning at least as early as December 2010.

364.     Nitrofurantoin Macrocrystal, also known by the brand name Macrodantin, is a medication used to treat urinary tract infections.

365.     During the relevant time frame, Defendants Teva, Mylan, and Alvogen were the primary manufacturers of Nitrofurantoin Macrocrystal capsules.

366.     The market for Nitrofurantoin was mature and at all relevant times had multiple manufacturers.

367.     For years, the prices of Nitrofurantoin Macrocrystal capsules were relatively low and stable. Teva, Mylan and Sandoz were the dominant manufacturers, but in late 2009, Sandoz effectively exited the market. Even then, prices did not rise.

368.     In December 2010, however, Mylan began to raise prices. It announced a large list (WAC) price increase, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Even with higher prices, Mylan did not lose market share to Teva, and as the new year began, Teva ▮▮▮▮▮▮▮▮▮▮▮▮

369.     As summer 2011 approached, a new manufacturer, Alvogen, was planning to enter the market. In anticipation of Alvogen's entry, Teva began to raise its NSP prices more aggressively. And when Alvogen finally entered, it announced list (WAC) prices close to Mylan's already high prices, and its NSP prices were high as well. Mylan responded by raising its list

(WAC) prices again, even higher than Alvogen's. Instead of driving prices down, Alvogen's entry into the market had the perverse effect of causing all manufacturers to raise prices, which was exactly what the Fair Share agreement was supposed to do.

370.    Alvogen quickly gained market share, even with higher prices than Teva.  Teva, for its part, continued to steadily raise prices. In July 2012, Teva announced a list (WAC) price increase that made its prices the highest in the market. Before implementing this large price increase, Teva coordinated with Mylan and Alvogen to ensure that Fair Share's would be maintained.

371.    The NSP price chart below shows the large price increases imposed on Nitrofurantoin by Mylan and Teva, which were then matched by Alvogen when it entered the market. Note: The pricing patterns for Nitrofurantoin Macrocrystalline 50 mg and 100 mg capsules were very similar. Charts for only the 100 mg dosage are included here. [CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

372.     Throughout the relevant period, Mylan, Teva and Alvogen met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Nitrofurantoin and of the Fair Share agreement.

373.     For example, In December 2010, as Mylan began to increase its prices for Macrodantin, Mylan communicated by phone with Teva, the other incumbent generic manufacturer, as well as with Alvogen, which was still six months away from launching its product. On December 16, 2010, R.P., Mylan Senior Vice President of National Accounts, spoke to R.C., Teva Vice President of Sales, for approximately 11 minutes. On the same day, R.P. (Mylan) exchanged calls with D.M., Alvogen Vice President of Strategic Development. From there forward, the three companies communicated frequently. R.P. (Mylan) and R.C. (Teva) communicated by text message and voice call numerous times in 2011. R.C. (Teva) also communicated with D.M. (Alvogen), exchanging texts or voice calls multiple times in May, June, July and October of 2011.

374.     There were other points of contact between the companies during this period, as well. B.H., Alvogen, Executive Vice President of Sales, was in frequent communication with Jim Nesta, Mylan Vice President of National Accounts, beginning at least as early as January 2011. The two men communicated multiple times per month thereafter. Nesta (Mylan) also communicated with R.C. (Teva) frequently in the second half of 2011.

375.     In the weeks before Teva raised its list (WAC) prices in 2012 to bring them more in line with Mylan's list prices, Teva's Green spoke to Nesta of Mylan on July 23, July 24 (2 calls); July 25; July 26; July 30 (2 calls); and July 31, 2012 (5 calls).

376.     After some of the calls between Green and Nesta on July 31, 2012, Nesta called B.H. (Alvogen).

377.     Teva, Mylan and Alvogen continued to coordinate and communicate in order to maintain Fair Shares. For example, on October 10, 2012, a distributor customer approached Teva requesting a lower price for Nitrofurantoin Macrocrystal. This prompted Teva's Green to reach out to both Nesta at Mylan and again to B.H. at Alvogen. Nesta separately spoke to the same contact at Alvogen. After coordinating with Mylan and Alvogen and re-confirming their price-fixing agreement on Nitrofurantoin Macrocrystal capsules, Teva did not lower its price.

### **20.     Carisoprodol**

378.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Carisoprodol tablets beginning at least as early as January 2011.

379.     Carisoprodol, also known by the brand name Soma, among others, is medication used to relax certain muscles and to relieve pain.

380.     During the relevant time frame, Defendants Par/Qualitest and Actavis were the primary manufacturers of Carisoprodol tablets.

381.     The market for Carisoprodol was mature and at all relevant times had multiple manufacturers.

382.     For years, the prices for Carisoprodol tablets were relatively low and stable. In early 2011, however, Par and Actavis abruptly and in close succession imposed large price increases. The price chart below shows the sudden price increases imposed by Par and Actavis. [CHART REDACTED]

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



383.    Throughout this period, Par/Qualitest and Actavis/Watson met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Carisoprodol and their Fair Share agreement.

384.    For example, on April 6, 2011, around the time that both companies were increasing prices for Carisoprodol, S.B., Par/Qualitest Senior National Accounts Manager, and L.P., Actavis Senior Director of National Accounts, spoke via telephone for nearly 10 minutes.

### 21.    Nortriptyline HCL

385.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Nortriptyline Hydrochloride capsules beginning at least as early as January 2011.

386.    Nortriptyline HCL, also known by the brand name Pamelor, is a medication used to treat depression.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

387.    During the relevant time frame, Defendants Teva, Taro, and Actavis were the primary manufacturers of Nortriptyline HCL.

388.    The market for Nortriptyline HCL was mature and at all relevant times had multiple manufacturers.

389.    For years, the prices for Nortriptyline HCL capsules were low and relatively stable. In the spring and summer of 2011, however, Teva and Actavis reached an agreement to impose significant price increases on all doses of Nortriptyline HCL capsules. Both manufacturers approximately ▮▮▮▮ their prices. In late 2013, when Taro was preparing to enter the market, Teva and Actavis brought it into their price-fixing agreement and Taro entered the market at elevated prices.

390.    The chart below shows the coordinated price increase by Actavis and Teva, as well as the market entry by Taro at elevated prices. [CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

391.    Throughout this period, Actavis, Teva and Taro met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Nortriptaline HCL and their Fair Share agreement.

392.    For example, in late 2013, Teva, Actavis and Taro carefully orchestrated Taro's entry into the Nortryptaline HCL market. In order to accommodate Taro's entry without disrupting prices, David Rekenthaler of Teva and Marc Falkin of Actavis spoke by phone on November 10, 14, 15 and 18. Falkin also exchanged text messages with Maureen Cavanaugh of Teva on November 17 and 18. Also during November, Ara Aprahamian of Taro spoke by telephone with Teva's Patel and Actavis's M.D. to hammer out their agreement.  Teva and Actavis both agreed to cede customers to Taro, and Taro was careful not to pursue more than its "fair share" from Teva or Actavis. Thereafter, Aprahamian (Taro), Falkin (Actavis) and Rekenthaler and Patel (Teva) continued to coordinate the pricing of Nortriptyline HCL, with numerous direct communications between them in 2014 and 2015.

## **22.    Methylprednisolone**

393.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Methylpredinosolone 4 mg tablets beginning at least as early as February 2011.

394.    Methylprednisolone, also known by the brand name Solu-Medrol, is an adrenocortical steroid used to treat arthritis, lupus, psoriasis, and ulcerative colitis.

395.    During the relevant time frame, Defendants Sandoz, Par, Greenstone, Breckenridge and Cadista were the primary manufacturers of Methylprednisolone.

396.    The market for Methylprednisolone 4 mg tablets was mature and at all relevant times had multiple manufacturers.

397.    For years, the prices of Methylprednisolone were relatively low and stable, but that changed abruptly in early 2011. When some manufacturers had supply disruptions, all manufacturers used it as pretext to increase prices; prices shot up from approximately ███ to more than ███. Although the supply disruption—which in any event did not impact all manufacturers—was resolved in few months, prices never returned to the prior, lower levels.

398.    Sandoz and Cadista announced identical list (WAC) prices in close succession, and when Greenstone entered the market in the fall of 2011, it matched the list prices of Sandoz and Cadista. Although Par and Breckenridge did not announce identical list prices, they followed ███

███

399.    Defendants' Fair Share agreement and agreement to fix the prices of Methylprednisolone enabled them to maintain elevated prices. In a 2012 internal analysis, Sandoz lamented that ███████████████████████████████████████████ ███████████████████████████████████████████ That, of course, is how a competitive market is supposed to work. Notably, it did not happen with Methylpredinsolone because of Defendants' adherence to their Fair Share agreement.

400.    For example, in late 2012, when Breckenridge and Greenstone were re-entering the market, R.T. and Armando Kellum of Sandoz were careful not to disrupt other manufacturers' Fair Shares. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

Kellum was concerned that ███████████████████████

401.    In September 2013, ███████████████████████████ ███████████████ Kellum quickly followed up ███████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

████████████████████████████████████████████████████████████

████████████████████████████████████████ Kellum admonished, consistent

with the Fair Share agreement between Sandoz and Cadista (and the other Defendants), ██████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████

402.    The   following   chart   highlights   the   extraordinary   price   increases   for
Methylprednisolone and prices have remained above former levels through the present.  [CHART
REDACTED]

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

403.    Throughout  this  period,  Sandoz,  Par/Qualitest,  Greenstone,  Breckenridge  and
Cadista met at trade conferences and communicated directly with each other in furtherance of their
price-fixing agreements on Methylprednisolone and their Fair Share agreement.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

404. For example, as Greenstone entered the market and ramped up from the spring to the fall of 2012, R.H., a Director of National Accounts at Greenstone, communicated by phone with M.S., Breckenridge Vice President of Sales, in February and again in November.

### 23. Amiloride HCL/HCTZ

405. Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Amiloride HCL/HCTZ beginning at least as early as May 2011.

406. Amiloride HCL/HCTZ, also known by the brand name Moduretic 5-50, is a medication used to treat high blood pressure.

407. During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Amiloride HCL/HCTZ.

408. The market for Amiloride HCL/HCTZ tablets was mature and at all relevant times had multiple manufacturers.

409. For years, the prices of Amiloride HCL/HCTZ were relatively low and stable. Abruptly, between May and October 2011, Teva and Mylan approximately ▬▬▬▬ their prices, and continued to raise prices thereafter. Teva and Mylan prices at the end of 2018 are more than ▬ ▬ higher than before the companies began their coordinated increases.

410. The following charts present NSP prices and list prices for Amiloride HCL/HCTZ and highlight the parallel pricing by Mylan and Teva. [NSP CHART REDACTED]

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





411.    Throughout this period, Teva and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Amiloride and their Fair Share agreement.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

412.     Teva's Rekenthaler communicated consistently with Mylan at least as early as April 2010 and continued thereafter with Mylan's J.K. (VP and Executive Director of Sales), B.P. (Senior VP of Sales) and Nesta over the following months and years.

413.     In the spring and summer of 2013, Teva wanted to raise its Amiloride prices again. Accordingly, Teva's Kevin Green and Mylan's Jim Nesta spoke numerous times via telephone to coordinate and agree to the price increase. They spoke at least on May 7, 8, 9, 10 and July 10, 11, 23 and August 1, 2, 6, 8 in 2013.

414.     In 2014, Teva was eager to impose yet another price increase, and again coordinated with Mylan to do so. This time, Teva's Rekenthaler communicated with Mylan's Nesta. They spoke by phone at least on May 9, 20 and 27, 2014.

415.     Teva and Mylan's prices increased in parallel throughout the period of communications between Nesta (Mylan) and Rekenthaler (Teva).

## **24.**     **Erythromycin**

416.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Erythromycin solution beginning at least as early as May 2011.

417.     Erythromycin solution, also known by the brand name A/T/S, among others, is a topical medication used to treat acne.

418.     During the relevant time frame, Sandoz/Fougera, Perrigo, and Wockhardt were the primary manufacturers of Erythromycin solution.

419.     In 2011, Sandoz/Fougera and Wockhardt were the only manufacturers selling Erythromycin solution. In the spring of 2011, Perrigo assessed whether it should re-enter the Erythromycin solution market. To that end, in May 2011, Perrigo reached out directly to Sandoz/Fougera to gather information and begin coordination under the Fair Share agreement.

T.P., a Perrigo Director of National Accounts, called A.T., a Sandoz/Fougera National Account Executive. T.P. then updated his boss, John Wesolowski, Perrigo's Senior V.P. of Commercial Operations, who greenlighted Perrigo's plans to re-launch Erythromycin solution.

420.    As word got out that Perrigo would be re-joining the market, Sandoz/Fougera began to lay the groundwork to ensure that the Fair Share agreement would hold. The plan worked. When Perrigo re-entered the market in late 2011, rather than offer lower prices to win customers, it announced list (WAC) prices more than three times higher than Sandoz/Fougera and Wockhardt. Sandoz/Fougera quickly followed the price increase. Wockhardt, which experienced supply disruptions, briefly left the market, but when it resumed sales, it also joined the price increases. As the three companies had agreed, price competition for Erythromycin had been stifled.

421.    The price charts below show the large and sustained price increases imposed by Perrigo, Sandoz/Fougera and Wockhardt. [NSP CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



422.     Throughout this period, Perrigo, Sandoz/Fougera and Wockhardt met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Erythromycin and their Fair Share agreement.

423.     For example, during the period in which Perrigo was planning to enter the market, Sandoz/Fougera, Perrigo and Wockhardt communicated by phone to coordinate and reach agreement. In August 2011, A.T. (Sandoz/Fougera) contacted M.C., Wockhardt Senior Vice President of Sales and Marketing, by telephone multiple times. At the same time, A.T. continued his communications with T.P. (Perrigo). Throughout, A.T. kept his Sandoz/Fougera supervisor, Walter Kaczmarek, updated on the inter-competitor discussions.

424.     As Perrigo's launch date approached, the companies continued to communicate. In November 2011, T.P. (Perrigo) and A.T. (Sandoz/Fougera) spoke multiple times. A.T. also continued his communications with M.C. (Wockhardt) during this time.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

425.     Also in November 2011, K.K., a Wockhardt National Account Manager, reached out directly to C.B., a Sandoz/Fougera Director of National Accounts, via telephone. C.B. updated his Sandoz/Fougera colleague, Kaczmarek, via email: ████████████████████████████ ████████████████████████████████████████████████ In fact, C.B. had learned the information directly from Wockhardt.

426.     In December 2011, Perrigo entered the Erythromycin solution market. It announced much higher prices. Throughout the Perrigo launch period, T.P. (Perrigo) and A.T. (Sandoz/Fougera) communicated by phone to coordinate pricing and to target customers.

427.     In early 2012, Sandoz/Fougera had experienced supply issues with Erythromycin solution. By late spring, however, the issues were resolved and Sandoz/Fougera prepared to ramp up production. Before doing so, Sandoz/Fougera again opened up lines of communication with Perrigo to coordinate. For example, in May 2012, Sandoz/Fougera, Perrigo and Wockhardt communicated by phone multiple times. A.T. (Sandoz/Fougera) communicated with T.P. (Perrigo); C.B. (Sandoz/Fougera) communicated with K.K. (Wockhardt) and A.F. (Perrigo National Account Director).

428.     As Sandoz/Fougera ramped up, it was careful to abide by the Fair Share agreement. Kaczmarek (Sandoz/Fougera) warned the Sandoz/Fougera sales staff to be mindful and take the ████████████████████ that had been agreed with the other Erythromycin manufacturers. Similarly, at Perrigo, Wesolowski reminded the sales staff: ████████████████████████████████ ██████████████

429.     In the summer and fall of 2012, Sandoz, Perrigo and Wockhardt continued to communicate in order to ensure that Fair Share and high prices for Erythromycin were maintained through various events (*e.g.,* supply challenges and the Sandoz acquisition of Fougera). For

example, in August and September 2012, C.B. (Sandoz) communicated by phone with T.P. (Perrigo) and K.K (Wockhardt). C.B. kept his Sandoz colleagues, including Kellum and M.V. (Associate Director of Pricing) informed of the discussions. As a result of the Fair Share agreement, Sandoz passed up opportunities with large customers and kept Perrigo and Wockhardt informed of its intention to target customers only as contemplated by their Fair Share agreement.

### 25. Amphetamine Salts (Adderall)

430.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Amphetamine Salts tablets (5, 10, 20 and 30 mg dosages) and capsules (5, 10, 15, 20, 25 and 30 mg dosages) beginning at least as early as June 2011.

431.    Amphetamine Salts, also known by the brand name Adderall, is a medication used to treat attention deficit hyperactivity disorder (ADHD). The drug is comprised of a combination of dextroamphetamine salts and levoamphetamine salts and is sometimes referred to as "Mixed Amphetamine Salts" or "MAS" or simply "amphetamine/dextroamphetamine." The drug is available in two formulations: Extended Release ("XR") capsules and Immediate Release ("IR") tablets.  Both formulations were part of Defendants' Fair Share agreement.

432.    During the relevant time frame, Defendants Teva, Sandoz and Impax[14] were the primary manufacturers of generic Adderall IR tablets. Defendants Aurobindo and Mallinckrodt joined the generic Adderall IR tablet market and conspiracy in 2014.

433.    During the relevant time frame, Defendants Teva, Impax and Actavis were the primary manufacturers of Adderall XR capsules.

---

[14] The relevant entity at the time of the MAS-IR price increase (summer 2011) was Corepharma, which was acquired by Impax in October 2014.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

434.    The NSP price chart for IR tablets below highlights the large and sustained price increases for generic Adderall tablets (MAS-IR) by Teva, Sandoz and Impax and the high price at which Aurobindo and Mallinckrodt later joined the market. Note: Generic Adderall IR tablets come in 5, 10, 20 and 30 mg dosages, all of which exhibited highly similar pricing patterns. The chart for only the 20 mg dosage is included here. [CHART REDACTED]



435.    Throughout this period, Teva, Sandoz, Mallinckrodt, Impax, Actavis and Aurobindo met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on generic Adderall and of the Fair Share agreement.

436.    For example, Teva began marketing generic Amphetamine/Dextroamphetamine Extended Release ("MAS-XR") after the expiration of brand manufacturer Shire's patent on Adderall XR. In April 2012, a large customer contacted Teva to request a price reduction because a new competitor had expressed an interest in "all or some" of its MAS-XR business.  When Teva

learned the new competitor was Actavis, which was expecting approval for the drug soon, Teva deferred its decision in pricing until Actavis entered the market.

437.    Actavis obtained FDA approval to manufacture various formulations of MAS-XR on June 22, 2012.  Teva and Actavis immediately began coordinating regarding market share. That evening, Rekenthaler instructed Teva employees to find out Actavis's plans, including shipping details and inventory levels. The next morning, T.S., a National Account Manager at Teva, confirmed that she had spoken to a contact at Actavis. She conveyed to Rekenthaler what she had learned: "Spoke to [Actavis]. Going after approx 15 share. 1 wholesaler (either McKesson or Cardinal) as backup and possibly Econdisc. NOT Walgreens and CVS."

438.    Defendants also communicated and coordinated shares in the MAS-IR market. For example, Teva announced its list (WAC) price increase on August 17 and Sandoz followed on August 24, 2011. Teva's Kevin Green spoke to P.K., Sandoz Director of National Accounts, on August 3, 9, 16, 17 and 18.

439.    Just as in the MAS-XR capsule market, when new entrants joined the MAS-IR tablet market, Defendants again coordinated to ensure Fair Shares. For example, on January 24, 2014, as Mallinckrodt was preparing to enter the MAS-IR market, K.K., the National Account Director at Mallinckrodt (who was a former National Account Executive at Sandoz) called C.B., a former colleague and National Account Executive at Sandoz. The two spoke for approximately 25 minutes. They spoke again for approximately 19 minutes on February 10. Mallinckrodt entered the market at high prices the next week.

440.    Similarly, in March 2014, Aurobindo was making plans to enter the MAS-IR market. On March 11 and 12, T.G., a Director of National Accounts at Aurobindo, spoke to C.B., a National Accounts Manager at Sandoz. The next week, on March 18, Teva's Rekenthaler and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

R.C., the CEO of Aurobindo, had a thirty (30) minute telephone conversation. That same day, Teva's Manager of Corporate Accounts shared with her colleagues that Aurobindo was targeting a 10% share. A few days later, Teva's Patel spoke with M.V., the Associate Director of Pricing at Sandoz on March 21.

441.    Teva, Sandoz, Impax, Aurobindo and Mallinckrodt continued to communicate and to monitor Fair Shares in the MAS-IR market and acted accordingly. For example, in 2014, Teva declined to bid on one of Impax's major customers because ███████████████████ ████████████████████████████ Yet again, in March 2016, Teva passed on a large customer because ██████████████████████████████ ███████

### 26.    Calcipotriene

442.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Calcipotriene solution beginning at least as early as June 2011.

443.    Calcipotriene, also known by the brand name Dovonex Scalp, is a topical medication used to treat chronic plaque psoriasis of the scalp.

444.    During the relevant time frame, the primary manufacturers of Calcipotriene were Sandoz, G&W, and Impax.

445.    In early 2010, the primary manufacturers of Calcipotriene were Sandoz/Fougera and Akorn/Hi-Tech. By the fall of 2010, however, Akorn/Hi-Tech was exiting the market for Calcipotriene.

446.    For a brief period, Sandoz/Fougera was the sole generic in the Calcipotriene market, but in 2011, G&W entered. Before G&W entered the market, it coordinated directly with Sandoz/Fougera. And the coordination between ostensible competitors worked; rather than

driving down prices, as would be expected in a competitive market, G&W's entry led to dramatic price increases—as occurred with numerous other drugs subject to Defendants' conspiracy.

447.    In October 2012, Impax entered the Calcipotriene market, as well. Rather than undercut market prices to gain share, Impax announced the highest list (WAC) prices in the market and nonetheless managed to gain share.

448.    The price charts below show the sustained price increases imposed by Sandoz/Fougera and G&W, which were matched by Impax when it joined the market. [NSP CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



449.    Throughout this period, G&W, Impax and Sandoz/Fougera met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Calcipotriene and their Fair Share agreement.

450.    For example, as G&W was preparing to enter the market for Calcipotriene, Jim Grauso, G&W Vice President of Sales, and A.T., Sandoz/Fougera National Account Executive, spoke multiple times by phone during the first week of June to coordinate. Not long after, on June 10, 2011, G&W launched Calcipotriene.

451.    The two men spoke again in November to orchestrate a large price increase on Calcipotriene. Between November 10 and November 17, 2011, Grauso (G&W) and A.T. (Sandoz/Fougera) spoke multiple times and agreed to raise prices for Calcipotriene.

452.    On November 18, 2011, G&W significantly increased prices on Calcipotriene. Five days later, Sandoz/Fougera—as agreed—also raised prices. In the interim between the two companies' price increases, Grauso and A.T. again communicated by phone to coordinate.

### 27.    Dextroamphetamine Sulfate

453.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Dextroamphetamine Sulfate Extended Release (also referred to as "Dex Sulfate XR") tablets (5 and 10 mg) and capsules (5, 10 and 15 mg) beginning at least as early as June 2011.

454.    Dex Sulfate XR, also known by the brand name Dexedrine, among others, is a medication used to treat attention deficit hyperactivity disorder (ADHD).

455.    During the relevant time frame, Defendants Teva, Impax, Mallinckrodt and Actavis were the primary manufacturers of Dextroamphetamine Sulfate ER capsules.

456.    Teva, Mallinckrodt and Aurobindo were the primary manufacturers of Dextroamphetamine Sulfate tablets.

457.    For years, Teva was effectively the sole supplier of Dextroamphetamine Sulfate capsules and tablets. Mallinckrodt, which had been a supplier of both products, exited both markets in late 2008. Without competitive pressure to keep prices low, Teva slowly and steadily raised prices. Eventually, however, both the capsule market and the tablet market attracted additional manufacturers. Typically, this would have driven prices lower; the addition of suppliers tends to spur price competition which drives down prices. Here, however, because of Defendants' Fair Share agreement, the addition of suppliers to the market caused the prices of Dextroamphetamine Sulfate capsules and tablets to skyrocket.

458.    In the ER capsule market, Impax was the first to enter in the fall of 2011. In anticipation of Impax's entry, Teva announced a large list (WAC) price increase in August 2011. Teva immediately raised the prices it charged customers, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ When Impax entered the market, rather than offer lower prices to win customers, it matched Teva's

market prices. Impax did not announce list (WAC) prices until much later, but when it did so, they were even higher than Teva's.

459.     Similarly, when Mallinckrodt re-entered the ER capsule market in the summer of 2012, it did so at the high prices that Teva and Impax already had coordinated. Even before it began shipping product, Mallinckrodt announced list (WAC) prices in April 2012 that matched Teva's, and which were more than five times higher than Mallinckrodt's former prices for Dextroamphetamine Sulfate ER capsules.

460.     Not long after Mallinckrodt entered the ER capsule market, it also re-launched its Dextroamphetamine Sulfate tablet products. The same pattern as the capsule market followed. In anticipation of Mallinckrodt's entry, Teva drastically increased its prices. At the end of July 2012, Teva increased its list (WAC) prices on tablets by more than 800%. Within weeks, Mallinckrodt matched the price increase. As it had done with capsules, rather than offer lower prices to win customers, Mallinckrodt coordinated with Teva to impose higher prices.

461.     In 2014, Actavis joined the ER capsule market and Aurobindo joined the tablet market. Like Mallinckrodt and Impax before them, they eschewed price competition and instead announced identical list (WAC) prices as Teva and Mallinckrodt. Adding yet another supplier to the capsule and tablet markets did not drive prices back down to a competitive level. Instead, the Fair Share agreement kept prices high.

462.     Throughout this period, Defendants monitored their Fair Share agreement, and made sure to cede share where necessary to keep prices high. For example, in January 2013, Teva was confronted with a request for pricing from a large customer that had been approached by Mallinckrodt. This prompted Teva to assess Fair Shares of the tablet market. Teva's David Rekenthaler pointed out that Teva was expecting to cede share to Mallinckrodt:

135

████████████████████████████████████████████████████████████

███████████████████████████████████████████ Teva's Director of

Marketing responded, ████████████████████████████████████████

████████████████████ Ultimately, however, Teva's Senior Director of Sales signed off, ████

████████ By ceding customers, Teva ensured that each manufacturer obtained a Fair Share of

the market, and all manufacturers ensured that prices for Dextroamphetamine Sulfate remained

high.

463.    Similarly, in February 2014, Teva again recognized the need to walk away from

business in order to maintain Fair Shares and higher prices. In an internal analysis describing the

Dextroamphetamine Sulfate market, Teva noted: ██████████████████████████

████████████████████████████████████████████████████████████

The underlying premise of the Fair Share agreement—less sales but higher prices—continued to

work throughout the period. That same month, Teva confirmed in an internal document ████

████████████████████████████████████████████████████████████

██████████████████████████████████

464.    The NSP price charts and list (WAC) price charts below highlight the large and

sustained price increases for Dextroamphetamine Sulfate capsules and tablets. Note:

Dextroamphetamine Sulfate capsules and tablets come in a number of dosages, which all exhibit

highly similar pricing patterns. Charts for only a single dosage of tablets and capsules are included

here. [NSP CHARTS REDACTED]





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

465.    Throughout this period, Teva, Mallinckrodt, Impax, Actavis and Aurobindo met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Dextroamphetamine Sulfate and the Fair Share agreement.

466.    For example, representatives from Teva and Impax attended the NACDS 2011 Pharmacy & Technology Meeting in Boston on August 27 to 30, 2011, shortly before Impax entered the Dextroamphetamine Sulfate ER capsule market in September 2011 at the inflated prices that Teva had recently imposed.

467.    Similarly, representatives of Mallinckrodt and Teva attended the HDMA 2012 Business and Leadership Conference in San Antonio on June 13, 2012, not long before Teva announced list (WAC) price increases on Dextroamphetamine Sulfate tablets in July that Mallinckrodt quickly followed.

468.    Defendants also communicated directly with each other by phone to coordinate pricing. For example, in January and February 2014—when Aurobindo was entering the market for Dextroamphetamine Sulfate tablets, Teva's Rekenthaler spoke to R.C., the CEO of Aurobindo multiple times.

469.    Teva's Rekenthaler also coordinated with Actavis when it entered the Dextroamphetamine Sulfate capsule market later that year. On June 19, 2014, as Actavis was entering the market, Rekenthaler spoke twice with Falkin of Actavis, and they discussed Actavis's market share goal of "20-25%." Actavis entered the market not long after, and as contemplated by the Fair Share agreement between them, Teva conceded a large Dextroamphetamine Sulfate customer to Actavis. That same week (on June 13, 20, 23 and 26), Falkin (Actavis) communicated by phone with T.E., Impax Senior Director of Sales Operations.

**28.**     **Metronidazole**

470.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Metronidazole cream, gel, lotion, and vaginal cream at least as early as June 2011.

471.     Metronidazole, also known by the brand name Flagyl, is a medication used to treat parasitic infections including Giardia infections of the small intestine, amebic liver abscess, and amebic dysentery, bacterial vaginosis and trichomonas vaginal infections.

472.     During the relevant time frame, Defendants G&W, Impax, Sandoz/Fougera, Taro, Teva, and Bausch/Oceanside were the primary manufacturers of Metronidazole.

473.     After a period of relatively low and stable pricing for Metronidazole cream, gel, lotion and vaginal cream, Defendants imposed a series of rapid price increases that were similar in timing and amount.

**Metronidazole Cream, Gel & Lotion**

474.     In 2011, Defendants G&W, Sandoz/Fougera, and Teva were the primary generic manufacturers of Metronidazole cream, gel (0.75%) and lotion. Impax entered the gel market in 2012.

475.     Beginning in June 2011, G&W, Sandoz/Fougera, and Teva imposed price increases of more than 400% for Metronidazole cream, gel and lotion. When Impax entered the market in 2012, it did not disturb the inflated pricing. Prices have remained at inflated levels since that time.

476.     The NSP price charts below show the large and parallel price increases by Teva, Sandoz/Fougera, G&W, Taro and Impax on their Metronidazole cream, gel and lotion products.

[CHARTS REDACTED]





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



**Metronidazole 1% Gel**

477.   Before the summer of 2014, Sandoz was the lone manufacturer of generic metronidazole 1% gel. In July 2014, Taro entered the market. Before doing so, Taro and Sandoz extensively communicated to coordinate pricing and Fair Shares of the market.

478.   C.B., Sandoz Director of National Accounts, and Ara Aprahamian, Taro Vice President of Sales, spoke a number of times during the summer of 2014, even before Taro entered the market. They expressly discussed pricing and which customers Taro should target, and which customers Sandoz, in turn, would relinquish.

479.   As Taro began to approach customers during the summer of 2014, Sandoz monitored the market. Internally, Sandoz made sure that it was abiding by the agreement with Taro and ceding an appropriate amount of market share. C.B. (Sandoz) and Aprahamian (Taro) remained in contact to coordinate throughout that summer.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Metronidazole Vaginal Cream**

480.    Prior to January 2015, prices for generic Metronidazole vaginal cream remained relatively low and stable for years. Beginning in February 2015, Sandoz and Bausch/Valeant/Oceanside imposed 300% price increases on generic Metronidazole vaginal cream.

481.    The NSP price chart below shows the steep and parallel pricing by Sandoz and Bausch/Oceanside for Metronidazole vaginal cream. [CHART REDACTED]



482.    Throughout these periods, G&W, Impax, Sandoz/Fougera, Teva, and Bausch/Oceanside met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Metronidazole cream, gel, lotion and vaginal cream and their Fair Share agreement.

483.    For example, The Metronidazole cream, gel and lotion price hikes occurred shortly after trade association meetings where representatives (including NAMs) from G&W, Impax, Sandoz/Fougera, Teva, Taro and Bausch/Oceanside were in attendance. *See* Exhibit A (Trade Association Contacts).

484.    Direct communications between the Metronidazole manufacturers were extensive, going at least as far back as early 2011. For example, in the months leading up to price increases on Metronidazole cream by G&W, Sandoz/Fougera and Teva, all three manufacturers communicated by phone beginning at least as early as February 2011. For example, on February 16, 2011, Jim Grauso, G&W Vice President of Sales, communicated by phone with R.C., Teva Vice President of Sales. The same day, Grauso (G&W) spoke multiple times with A.T., Sandoz/Fougera National Account Executive. As the June 2011 price increases approached, Grauso had multiple communications with Teva in March, April, May and June 2011 with R.C. (Teva), Kevin Green, Teva Director of National Accounts, and T.S., Teva National Account Manager. Grauso (G&W) also stayed in contact with A.T. (Sandoz/Fougera), communicating again in February, April, May and June 2011.

485.    At Sandoz/Fougera, Walter Kaczmarek, Senior Vice President of Commercial Operations, and A.T. communicated with competitors about pricing and customers for Metronidazole. At Taro, inter-competitor communications relating to Metronidazole were undertaken by B.S., Taro Chief Commercial Officer, and Mitchell Blashinsky, Taro Vice President of Marketing. After Jim Grauso moved on to Aurobindo, Kurt Orlofski, G&W President, and Erika Vogel-Baylor, Vice President of Sales, took over communicating with competitors to coordinate pricing on Metronidazole beginning at least as early as February 2012. At Teva, Kevin Green,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Teva Director of National Accounts, and David Rekenthaler, Vice President of Sales, communicated with competitors at least as early as 2011.

### 29.   Chlorpromazine HCL

486.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Chlorpromazine HCL tablets beginning at least as early as July 2011.

487.    Chlorpromazine, also known by the brand name Largactil, is a medication used to treat mood disorders such as schizophrenia or bipolar disorder.

488.    During the relevant time frame, Defendants Sandoz and Upsher-Smith were the primary manufacturers of Chlorpromazine tablets.

489.    The market for Chlorpromazine tablets was mature and at all relevant times had multiple manufacturers.

490.    After years of relatively low and stable prices for Chlorpromazine tablets, Sandoz and Upsher-Smith agreed to implement large price increases. In the summer of 2011, Sandoz and Upsher-Smith began to implement nearly simultaneous and identical price increases. By January 2012, Sandoz and Upsher-Smith list prices approximately quadrupled and NSP prices increased nearly 10 times. These incredibly large price-increases look small on the chart below because Sandoz and Upsher-Smith imposed even larger price increases after that. Both manufacturers' list prices eventually exceeded $7.50 (compared to less than 50 cents before they agreed to raise prices) and their NSP prices peaked over $6.00 (compared to approximately 15 cents before their agreement).

491.    The following charts of NSP prices and list prices show the large and parallel price increases by Sandoz and Upsher-Smith. [NSP CHART REDACTED]

145





492.    Throughout this period, Sandoz and Upsher-Smith met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Chlorpromazine HCL tablets and their Fair Share agreement.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

493.    In October 2014, when Upsher-Smith increased prices, D.Z., Upsher-Smith National Account Manager, communicated with C.B., a Sandoz Director of National Accounts. The two spoke on September 16, 2014 for approximately 4 minutes. Upsher-Smith raised its Chlorpromazine prices (again) a few weeks later.

494.    Sandoz didn't immediately follow Upsher-Smith's October 2014 price increase. But eventually it did so, announcing identical list (WAC) prices to Upsher-Smith on May 15, 2015. The day before announcing, C.B. at Sandoz again spoke to D.Z. at Upsher-Smith.

### **30.    Flurbiprofen**

495.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Flurbiprofen at least as early as July 2011.

496.    Flurbiprofen, also known by the brand name Ansaid, is a nonsteroidal anti-inflammatory drug (NSAID) used to relieve symptoms of arthritis, such as inflammation, swelling, stiffness, and joint pain.

497.    During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Flurbiprofen.

498.    The market for Flurbiprofen tablets was mature and at all relevant times had multiple manufacturers.

499.    For years, the prices of Flurbiprofen tablets were relatively low and stable. In the summer of 2011, however, Teva imposed a very large price increase. Notwithstanding its higher prices, Teva was able to maintain its share of the market in light of the Fair Share agreement it reached with Mylan. Mylan eventually raised prices as well, and in 2013 imposed a significant increase, raising its prices well above Teva's. Mylan, too, was able to maintain a relatively stable share of the market notwithstanding its higher prices. The pattern repeated in 2014, when Teva

147

again raised prices, again well above Mylan's. And yet it maintained share. The Fair Share agreement was working.

500.     The chart below shows the ability of Teva and Mylan to significantly raise and maintain the prices of Flurbiprofen tablets. [CHART REDACTED]



501.     Throughout this period, Teva and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Flurbiprofen and their Fair Share agreement.

502.     As described with respect to Amiloride HCL/HCTZ above, when Teva wanted to increase prices in 2013 and 2014, it reached out directly to Mylan to coordinate those increases. Teva's Kevin Green and Mylan's Jim Nesta spoke numerous times via telephone to coordinate and agree to the price increase. They spoke at least on May 7, 8, 9, 10 and July 10, 11, 23 and August 1, 2, 6, 8 in 2013. In 2014, Teva's Rekenthaler communicated directly with Nesta to coordinate price increases on Flurbiprofen.

**31.**   **Clonidine-TTS Patch**

503.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Clonidine-TTS beginning at least as early as September 2011.

504.   Clonidine TTS Patch, also known by the brand name Catapres-TTS, is a medication in the form of a transdermal patch that is used to treat high blood pressure.

505.   During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Clonidine-TTS. Defendant Actavis joined the Clonidine-TTS market and the Clonidine-TTS conspiracy in 2014.

506.   Teva and Mylan had roughly equal shares of the Clonidine-TTS market, as contemplated by their Fair Share agreement. Mylan, however, encountered some supply disruptions that skewed share in favor of Teva. In order to navigate and reallocate the market, Teva and Mylan communicated frequently to ensure that each of them had a Fair Share.

507.   For example, in early 2012, after the first of Mylan's supply issues were resolved, Teva conceded two large customers to Mylan to help it regain its Fair Share.

508.   In May, not long after ceding the Clonidine-TTS business to Mylan, Teva was approached by another large customer seeking bids on a different drug, Doxazosin. Teva declined the opportunity to the Doxazosin business in an effort to "be cautious after what happened with Clonidine."

509.   Later in 2012, Mylan again experienced supply disruptions, this time severe enough to force it out of the market entirely on certain dosages from approximately September 2012 through February 2013. To coordinate how to deal with this, on September 28, 2012, Mylan's Nesta and Teva's Green spoke by phone at least twice. Mylan and Teva maintained regular contact as former Mylan customers approached Teva because of Mylan's supply issues.  For example,

Rekenthaler spoke to a contact at Mylan on October 1, and Green spoke to Nesta on October 1 and 4, 2012.  On October 10, 2012, Green and Nesta spoke again.

510.    When Mylan relaunched Clonidine-TTS in early 2013, Teva conceded accounts to Mylan to allow it to regain a Fair Share of the market. For example, Teva's internal documents state that they chose to "concede" a number of large customers to Mylan. Teva's internal documents are explicit that it had no intention of competing on price, but instead was "trying to concede the Clonidine business" to Mylan.

511.    Teva and Mylan remained in regular contact in order to coordinate and maintain Fair Shares. In February and March 2013 alone, Teva and Mylan representatives called each other at least 33 different times.

512.    In the spring of 2014, another manufacturer, Actavis, was preparing to enter the market for Clonidine-TTS. Teva and Actavis immediately commenced an extensive negotiation over price and market share. Teva's Rekenthaler and Actavis's Falkin were in direct phone contact to hammer out the details.  Teva considered which customers to concede, and encouraged Actavis to enter the market with high prices.

513.    Teva's Patel also communicated with Actavis to work out the details of Actavis's entry into the market. She spoke with Actavis's Rogerson multiple times, learning that Actavis wanted 25% of the market and expected that 10%-15% of its share would come from Teva.

514.    Rekenthaler expressed his view that Actavis could have no more than a 15% market share from Teva, which prompted a Teva executive to admonish Rekenthaler to "play nice in the sand box" so that Actavis would be "responsible in the market."

515.    Rekenthaler heeded the advice and Teva conceded share to Actavis in order to allow it to gain its Fair Share of the market for Clonidine-TTS.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## 32.     Latanoprost

516.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Latanoprost beginning at least as early as September 2011.

517.    Latanoprost, also known by the brand name Xalatan, is available as a 0.005% ophthalmic solution used to treat glaucoma and to lower pressure in the eye.

518.    During the relevant time frame, the primary manufacturers of Latanoprost were Akorn[15] and Defendants Bausch, Greenstone, and Sandoz.

519.    The market for Latanoprost was mature and at all relevant times had multiple manufacturers.

520.    For years, the prices for Latanoprost were relatively low and stable. In fall 2011, however, Bausch, Greenstone and Sandoz imposed large and unprecedented price increases in close succession. When Akorn entered the market in July 2012, rather than offer lower prices to win customers, it announced prices at the same or higher levels than Bausch, Greenstone and Sandoz.

521.    The price chart below shows the large and parallel price increases imposed by Akorn, Bausch, Greenstone, and Sandoz. [CHART REDACTED]

---

[15] Akorn and related entities filed for bankruptcy on May 20, 2020. Accordingly, Akorn is not named as a Defendant or sought to be held liable with respect to Latanoprost or any other drug added by amendment to this complaint.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



522.    Throughout this period, Akorn/Hi-Tech, Bausch, Greenstone, and Sandoz met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Latanoprost and their Fair Share agreement.

523.    For example, representatives from Akorn/Hi-Tech, Bausch, Greenstone, and Sandoz all attended the following trade association events: NACDS 2011 Pharmacy & Technology Meeting in Boston, Massachusetts from August 27-30, 2011; ECRM Retail Pharmacy Generic Pharmaceutical Conference in Atlanta, Georgia from January 29-February 1, 2012; and GPhA 2012 Annual Meeting from February 22-24, 2012.

524.    Defendants also communicated directly by telephone during this period. For example, Sandoz and Greenstone communicated by phone regularly throughout the period of the price increases on Latanoprost. Armando Kellum, Sandoz Director of Contracts and Pricing,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

communicated directly with Robin Hatosy, Greenstone Director of National Accounts. Hatosy, meanwhile, was communicating directly with B.P., Bausch Vice President of Sales.

525.    Sandoz also communicated directly with Akorn during the price increase period. On July 31, 2012, shortly before Akorn joined the market, C.B., Sandoz Director of National Accounts, spoke to J.S., Akorn Senior Vice President of National Accounts for more than 7 minutes, and to M.M., Akorn Director of National Accounts for more than 14 minutes. Akorn's M.M., who had previously worked at Bausch, also communicated by phone on August 15, 2012 with D.C., Bausch National Account Director.

### 33.    Oxybutynin Chloride

526.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Oxybutynin Chloride tablets beginning at least as early as October 2011.

527.    Oxybutynin Chloride, also known by the brand name Ditropan XL, is a medication used to treat certain bladder and urinary conditions.

528.    During the relevant time frame, Defendants Teva, Upsher-Smith and Par were the primary manufacturers of Oxybutynin Chloride.

529.    The market for Oxybutynin Chloride was mature and at all relevant times had multiple manufacturers.

530.    For years, the prices of Oxybutynin Chloride tablets were relatively low and stable. In October 2011, Par/Qualitest and Upsher-Smith approximately ███ their prices. Although Upsher-Smith had even higher prices than Teva, it was able to gain market share, as intended under their Fair Share agreement. The large price increase is hardly visible in the chart below because it is dwarfed by the enormous price increases that Upsher-Smith, Teva and Par/Qualitest imposed in close succession in 2013.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

531.    The chart below displays the extraordinary price increases imposed in parallel by Upsher-Smith, Par/Qualitest and Sandoz.  [CHART REDACTED]



532.    Throughout this period, Teva, Upsher-Smith and Par/Qualitest met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Oxybutynin Chloride and their Fair Share agreement.

533.    In 2013 before the enormous price increases, Teva, Par/Qualitest and Upsher-Smith coordinated their pricing actions. For example, Teva's Patel spoke to B.L. at Upsher-Smith on April 29, 2013 for nearly twenty (20) minutes reached an understanding that Teva and Upsher-Smith would follow each other's price increases. On June 15, 2013, after Teva, Upsher-Smith and Par/Qualitest had begun to radically raise prices, Patel exchanged six (6) text messages with B.L.

## 34.    Triamterene HCTZ

534.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Triamterene HCTZ beginning at least as early as October 2011.

535.    Triamterene HCTZ, also known by the brand names Dyazide and Maxzide, is a medication used to treat water retention and high blood pressure.

536.    During the relevant time frame, Defendants Actavis, Mylan, Sandoz and Apotex were the primary manufacturers of Triamterene HCTZ tablets and Defendants Mylan, Sandoz and Lannett were the primary manufacturers of Triamterene HCTZ capsules.

537.    The markets for Triamterene HCTZ capsules and tablets were mature and at all relevant times had multiple manufacturers.

538.    For years, the price of Triamterene HCTZ tablets hovered below ▮▮▮▮▮ In 2011, prices increased to approximately ▮▮▮▮ when Mylan, Sandoz and Actavis imposed large price increases, all close in time and amount. When Apotex joined the market in late 2012, rather than offer lower prices to win customers, it offered the same elevated prices of Mylan, Sandoz and Actavis. All four manufacturers eventually imposed identical list (WAC) prices.

539.    Prices also were low in the Triamterene HCTZ capsule market, but that too changed in 2011. Sandoz temporarily exited the market, which prompted Mylan to ▮▮▮ its price. When Lannett entered the market in December 2011, it did so at elevated prices and was careful not to disturb the market pricing. Sandoz eventually re-entered the market as well, but even with three suppliers, prices did not return to prior—lower—levels. Defendants' Fair Share agreement kept prices inflated above competitive levels.

540.    The charts below show the elevated and parallel pricing by Mylan, Sandoz, Actavis and Apotex for Triamterene tablets, and by Mylan, Lannett and Sandoz for capsules. (Triamterene HCTZ 75-50 mg tablets exhibit a similar pricing pattern. Charts for that dosage are not included here.) [NSP CHARTS REDACTED]





156



541.    Throughout this period, Actavis, Mylan, Sandoz, Apotex and Lannett met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Triamterene HCTZ capsule and tablets and their Fair Share agreement.

542.    For example, in November 2011—when Mylan announced list (WAC) price increases for Triamterene HCTZ tablets—M.W., Mylan Director of National Accounts, was communicating by phone with J.R., Sandoz Director of Institutional Marketing, and K.B., Sandoz National Account Manager.

543.    On March 8, 2012, M.B., Actavis Director of National Accounts, communicated by phone with T.K., Apotex National Account Manager. The next day, Actavis announced list (WAC) price increases for Triamterene-HCTZ. M.B. (Actavis) and T.K. (Apotex) communicated by phone again on March 16.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

544.    In April 2012, not long after Lannett entered the Triamterene-HCTZ capsule market, J.K., Mylan VP & Executive Director of Sales, communicated by phone with K.S., VP of Sales and Marketing at Lannett, on April 19, 20 and 23.

### 35.    Ranitidine HCL

545.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Ranitidine HCL 150 mg and 300 mg capsules and 150 mg tablets beginning at least as early as November 2011.

546.    Ranitidine HCL, also known by the brand name Zantac, among others, is a medication used to treat ulcers of the stomach and intestines and to prevent them from coming back after they have healed.

547.    During the relevant time frame, Defendants Sandoz and Dr. Reddy's were the primary manufacturers of Ranitidine HCL capsules.

548.    During the relevant time frame, Defendants Teva, Sandoz, Glenmark, and Amneal were the primary manufacturers of Ranitidine HCL tablets.

549.    The markets for Ranitidine HCL capsules and tablets were mature and at all relevant times had multiple manufacturers.

### Ranitidine HCL Capsules

550.    After years of stable list prices under $1.00, within a couple of months in early 2012, Sandoz and Dr. Reddy's each imposed an increase of approximately 50%. And the prices paid by customers increased even more; transaction prices approximately ███████ over their prior low.

551.    The charts below highlight the parallel and increased pricing by Dr. Reddy's and Sandoz for Ranitidine HCL capsules.  (Pricing for 150 mg capsules follows a similar pattern. Charts for that dosage are not included here.) [NSP CHART REDACTED]





552.    Throughout this period, Sandoz and Dr. Reddy's met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Ranitidine HCL capsules and their Fair Share agreement.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

553.    For example, on March 23 and 26, 2012—around the time that Dr. Reddy's and Sandoz's Ranitidine HCL capsule prices were peaking—J.A., Dr. Reddy's VP of Sales and Marketing, and J.R., Sandoz Director of Institutional Marketing, communicated by phone.

**Ranitidine HCL Tablets**

554.    For years, the prices of Ranitidine HCL tablets were relatively low and stable. With a number of manufacturers in the market, the risks of imposing a price increase were high because there were many alternative sources of supply for customers to turn to. In March of 2013, however, Teva, Sandoz, Amneal and Glenmark decided to dampen price competition and to use the Fair Share agreement to raise prices.

555.    The NSP price chart below shows the sudden and steep price increases by Glenmark, Teva, Amneal and Sandoz on Ranitidine HCL tablets. [CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

556.     To facilitate the price increases and to ensure that each manufacturer was able to obtain a Fair Share of the market, Teva, Glenmark, Amneal and Sandoz communicated by phone to work out the details of their agreement.

557.     For example, Teva's Patel communicated by phone with multiple contacts at Glenmark in May 2013, while Teva's Rekenthaler was communicating with a contact at Amneal during the same period of time.

558.     Teva's Patel also coordinated with a contact at Sandoz to orchestrate the Ranitidine HCL tablet price increase.

559.     On the heels of these communications, all manufacturers raised prices. Glenmark was the first to raise prices. Teva quickly followed the price increase, as did Amneal and Sandoz.

560.     In the wake of the price increases, Glenmark, Teva, Sandoz and Amneal were committed to the Fair Share agreement, as evidenced by their unwillingness to gain share by offering better prices. For example, when Teva was approached by several customers looking for a lower price it refused to bid, or, it intentionally bid high so that it would not win the business.

## 36.     Amantadine HCL

561.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Amantadine HCL capsules beginning at least as early as December 2011.

562.     Amantadine HCL, also known by the brand name Symmetrel, is a medication used to treat a certain type of flu and also to treat Parkinson's disease.

563.     During the relevant time frame, Defendants Sandoz, Upsher-Smith and Lannett were the primary manufacturers of Amantadine HCL capsules.

564.     The market for Amantadine HCL capsules was mature and at all relevant times had multiple manufacturers.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

565.     Amantadine HCL capsules had relatively low and stable prices for years. In late 2011, however, Sandoz and Upsher-Smith imposed extraordinary price increases, driving the price of Amantadine HCL capsules to ████████████ ts former price. They also imposed identical list (WAC) prices for their capsules.  Lannett, which did not have much presence in the market, made a push into the market in early 2013. Rather than offer lower prices to win customers, Lannett announced an identical list price, and was careful not disturb market pricing, as required by the anticompetitive agreement between Lannett, Upsher-Smith and Sandoz.

566.     The charts below show the extreme price increase by Sandoz and Upsher-Smith that was joined by Lannett.  [NSP CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



567.    Throughout this period, Sandoz, Upsher-Smith and Lannett met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Amantadine HCL capsules and their Fair Share agreement.

### 37.    Fluocinolone Acetonide

568.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Fluocinolone Acetonide creams, ointments and solutions beginning at least as early as January 2012.

569.    Fluocinolone Acetonide, also known by the brand name Synalar, among others, is a medication used to treat inflammation and itching caused by certain skin conditions.

570.    During the relevant time frame, the primary manufacturers of Fluocinolone Acetonide were as follows:

| Fluocinolone Acetonide Cream | Sandoz, G&W, Teligent |
|---|---|
| Fluocinolone Acetonide Ointment | Sandoz, G&W, Teligent |
| Fluocinolone Acetonide Solution | Sandoz, Taro, Teligent |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

571.    Before 2012, Sandoz/Fougera was the sole supplier of Fluocinolone Acetonide cream, ointment and solution. As the sole supplier, Sandoz/Fougera's list prices for cream ointment and solution were well under $1 for each product, and its NSP prices were ▮▮▮▮▮▮▮

572.    Things changed in January 2012, when G&W entered the cream and ointment markets. Historically, adding a manufacturer (*i.e.*, another source of supply) to a single source market tended to drive down prices. But Defendants' Fair Share agreement aimed to reverse this consequence of competition, and succeeded in doing so with Fluocinonide Acetonide products. Rather than result in lower prices, G&W's entrance into the cream and ointment markets resulted in significantly ***higher*** prices.

573.    In late December 2011, in anticipation of G&W entering the cream and ointment market, Sandoz/Fougera announced enormous price increases. Sandoz/Fougera increased list prices on cream, ointment and solution approximately 300%.  When G&W entered the market only weeks later, it announced virtually identical WAC prices on its cream and ointment products.

574.    Almost   immediately   after   G&W   announced   its   prices,   Sandoz/Fougera acknowledged internally that because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Over the following weeks, ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

575.    In the solution market, a highly similar pattern emerged.  In late October 2012, in anticipation of Teligent entering the market, Sandoz doubled the list prices of its solution (on top

of the tripled prices it had imposed less than a year earlier). Weeks later, Teligent announced virtually identical WAC prices for its new solution products.

576.    As it had done with G&W earlier that year, internally, Sandoz ███████████████

███████████████████████████████████████████████████████████████████

████████████. Over the ensuing weeks, ████████████████████████████████████

████████████████████████. Yet again, adherence to the Fair Share agreement enabled Defendants to impose and maintain significantly higher prices by eschewing competition.

577.    In competitive generic markets, the addition of a third manufacturer (and yet another source of supply) tends to drive prices down even more. Yet even the entrance of a third manufacturer to the Fluocinolone Acetonide markets did not have that effect. When Teligent joined the ointment market in early 2013 and the cream market in mid-2014 it announced list prices nearly identical to those of Sandoz and G&W. And when Taro entered the solution market in the spring of 2015, it matched the list prices of Sandoz and Teligent.

578.    The list price (WAC) charts for Fluocinolone Acetonide cream, ointment and solution show the large and parallel price increases imposed by Sandoz, G&W, Teligent and Taro. The NSP price charts show that the list price increases had real consequences; customers paid higher prices for these products. The charts also show that prices have remained above prior levels. (The prices of other dosages of Fluocinolone Acetonide cream exhibit similar patterns and are not included here.) [NSP CHARTS REDACTED]

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

579.    Throughout this period, Sandoz/Fougera, G&W, Teligent and Taro met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Fluocinolone Acetonide and their Fair Share agreement.

580.    For example, around the time that G&W was entering the Fluocinolone Acetonide cream and ointment markets, Kurt Orlofski, G&W President, communicated by phone with Walter Kaczmarek, Sandoz/Fougera Senior VP of Commercial Operations, on February 8, 9 and 10, 2012.

581.    Similarly, when Teligent was entering the Fluocinolone Acetonide ointment and solution markets in early 2013, H.M., Taro Director of Corporate Accounts, communicated by phone with S.M., Teligent Director of Nationals Accounts, on February 6 and 26, 2013. When Teligent was entering the cream market in late spring/early summer of 2014, S.M. (Teligent) communicated by phone with Erika Vogel-Baylor, G&W Vice President of Sales and Marketing, on April 29 and May 1, 2014. A few months before, Vogel-Baylor (G&W) also had communicated by phone with J.G., Teligent President and CEO, in November 2013 and January 2014. S.M. (Teligent) also communicated with E.G., Taro Director of Corporate Accounts, on July 25, 2009.

### 38.    Prochlorperazine Maleate

582.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Prochlorperazine Maleate suppositories beginning at least as early as January 2012, and Prochlorperazine Maleate tablets beginning at least as early as May 2014.

583.    Prochlorperazine, also known by the brand name Compro, is a medication used to treat psychotic disorders such as schizophrenia, as well as control severe nausea.

### Prochlorperazine Maleate Suppositories

584.    During the relevant time frame, Defendants G&W and Perrigo were the primary manufacturers of Prochlorperazine Maleate suppositories.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

585.    The market for Prochlorperazine Maleate suppositories was mature and at all relevant times had multiple manufacturers.

586.    For years, the prices for Prochlorperazine Maleate suppositories were relatively low and stable. Then, in January 2012, G&W and Perrigo orchestrated a large price increase. Both companies more than doubled their prices within a few months. A little more than a year later, in March 2013, G&W and Perrigo again coordinated a nearly simultaneous price increase that dwarfed the increase of the prior year.

587.    The list (WAC) price chart and the NSP price chart below show the large and parallel price increases imposed by G&W and Perrigo in January 2012 and then again in March 2013. [NSP CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



588.    Throughout this period, G&W and Perrigo met at trade conferences and communicated with each other directly in furtherance of their price-fixing agreement on Prochlorperazine Maleate suppositories and of their Fair Share agreement.

589.    For example, in January 2012, G&W raised announced a list (WAC) price increase. Not long after, in February 2012, Kurt Orlofksi, G&W President, communicated multiple times by phone with S.K., Executive Vice President and General Manager at Perrigo. The two communicated multiple times in April 2012, as well, including the exchange of multiple text messages on April 19, 2012, the day that Perrigo announced a list (WAC) price increase for Prochlorperazine Maleate suppositories that essentially matched the earlier G&W price increase.

590.    In January 2013, Perrigo hired Douglas Boothe to serve as Executive Vice President. Almost immediately, Boothe began to communicate directly with competitors. For example, on January 25, 2013, Boothe communicated by phone with Orlofski (G&W), and on March 1, 2013, the two executives met for lunch at Al Dente Ristorante in Piscataway, New Jersey.

Within a week of their lunch date, both companies put into motion price increases on Prochlorperazine Maleate suppositories.

591.    By the third week of March, G&W had announced large price increases. Around the time of the price increase, Orlofski (G&W) called Boothe (Perrigo). Within a few weeks, Perrigo announced that it, too, would be increasing prices on Prochlorperazine.

592.    Boothe (Perrigo), Orlofksi (G&W), and Vogel-Baylor, G&W Vice President, attended the NACDS 2013 annual meeting in Palm Beach, Florida between April 20 and April 23, 2013. The competitors capitalized on the opportunities to meet in person at the conference.

593.    Over the ensuing months, G&W and Perrigo adhered to the Fair Share agreement and declined to seek more than their agreed upon share of the Prochlorperazine Maleate suppository market.

### Prochlorperazine Maleate Tablets

594.    During the relevant time frame, Teva, Mylan, Sandoz and Cadista were the primary manufacturers of Prochlorperazine Maleate tablets.

595.    Prochlorperazine tablets were among the drugs that Teva targeted for price increases in late August 2014. In order to coordinate prices and Fair Shares for Prochlorperazine, Teva's Patel and Rekenthaler communicated with each of the other primary manufacturers in the market.

596.    Teva's Patel communicated frequently with the Associate Director of Pricing at Sandoz in July, August and September 2014.

597.    Rekenthaler spoke to M.D., Vice President of Sales at Cadista, on at least June 18, 2014. And he spoke to Nesta at Mylan on June 24 and at least four times in August (on the 7th, 11th, 18th, and 21st).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

598.     Nesta (Mylan) also communicated with M.D. at Cadista, on at least July 2, 30, 31 and August 7, 11, 21, 22 and 23.

### **39.     Ciclopirox**

599.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Ciclopirox Olamine ("Ciclopirox") cream at least as early as February 2012, shampoo at least as early as September 2012, and solution at least as early as April 2013.

#### **Ciclopirox Cream**

600.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Ciclopirox cream beginning at least as early as February 2012.

601.     Ciclopirox cream, also known by the brand name Loprox, is an antifungal medication used to treat skin infections such as athlete's foot and ringworm.

602.     During the relevant time frame, the primary manufacturers of Ciclopirox cream were Defendants Perrigo, Glenmark, and G&W.

603.     In early 2012, the incumbent generic manufacturers of Ciclopirox cream were Perrigo and Glenmark. G&W was planning to enter the market, but before doing so, coordinated with Perrigo and Glenmark to ensure that it obtained a Fair Share without the risks of price competition.

604.     In February 2012, Kurt Orlofksi, G&W President, communicated multiple times by phone with S.K., Executive Vice President and General Manager at Perrigo. The two communicated multiple times in April 2012, as well.

605.     In March 2012, Erika Vogel-Baylor, G&W Vice President of Sales, communicated with Glenmark. After meeting P.D., Glenmark Executive Vice President, at a trade event, the two

sales executives communicated dozens of times to coordinate pricing, including on Ciclopirox cream.

606.    In April 2012, the conspirators convened at the NACDS annual meeting in Palm Beach, Florida. G&W's Orlofski and Vogel-Baylor attended, as did S.K. (Perrigo) and P.D. (Glenmark). Their direct phone communications with each other continued throughout April 2012.

607.    The coordination worked. The companies imposed price increases and continued to communicate in the summer of 2012. They also refused to offer competitive bids to each other's customers so that each company could maintain a Fair Share of the market.

608.    The following spring, in May 2013, Glenmark coordinated another price increase on Ciclopirox Cream.

609.    Glenmark's P.D. and Jim Brown, Vice President of Sales, communicated by phone multiple times with Vogel-Baylor (G&W). Vogel-Baylor also communicated with Perrigo via a conduit; A.T., Aurobindo Director of National Accounts, served as a go-between with T.P. (Perrigo).

610.    Again, the coordination worked. Each company imposed price increases on Ciclopirox cream. As the companies made their price-increase announcements in May 2013, they continued to communicate to ensure that Fair Shares were maintained.

**<u>Ciclopirox Shampoo</u>**

611.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Ciclopirox shampoo beginning at least as early as September 2012.

612.    Ciclopirox shampoo, also known by the brand name Loprox, is used to treat seborrheic dermatitis, an inflammatory skin condition of the scalp.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

613.    During the relevant time frame, the primary manufacturers of Ciclopirox shampoo were Perrigo, Actavis, Taro, and Sandoz.

614.    In the summer of 2012, Perrigo, Actavis, and Taro were the manufacturers of generic Ciclopirox shampoo. Sandoz (then Fougera) had exited the market in the year prior, but was making plans to re-enter in July 2012. This prompted a series of conspiratorial communications among Sandoz, Perrigo, Taro and Actavis.

615.    In September 2012, C.B., Sandoz Director of National Accounts, communicated by phone with T.P., Perrigo Director of National Accounts, and H.M., Taro Director of Corporate Accounts. The express purpose of the communications was to coordinate Sandoz's re-entry into the market for Ciclopirox shampoo.

616.    In November 2012, C.B. (Sandoz) communicated by phone multiple times with Ara Aprahamian, Actavis Director of Pricing, to coordinate on Ciclopirox Shampoo. C.B. (Sandoz) also continued his communications with T.P. (Perrigo) in November to coordinate on pricing and market share for Ciclopirox shampoo.

617.    In early December 2012, Sandoz re-entered the market. That week, C.B. (Sandoz) again communicated with Aprahamian (Actavis). Meanwhile, T.P. (Perrigo) communicated by phone directly with M.D., Actavis Director of National Accounts. C.B. (Sandoz) communicated again with H.M. (Taro) in mid-December 2012.

618.    The coordination among conspirators worked. Sandoz launched Ciclopirox shampoo and quickly obtained its Fair Share of the market, as agreed with Actavis, Perrigo and Taro.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Ciclopirox Solution**

619.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Ciclopirox solution beginning at least as early as April 2013.

620.    Ciclopirox solution, also known by the brand names Penlac and Ciclodan, is a medication used to treat fungal infections of the fingernails and toenails.

621.    During the relevant timeframe, Defendants Akorn, Perrigo, G&W and Sandoz were the primary manufacturers of Ciclopirox solution.

622.    The market for Ciclopirox solution was mature and at all relevant times had multiple manufacturers.

623.    For years, the prices of Ciclopirox solution were relatively low and stable. In the spring of 2013, things changed. Akorn and G&W prices ███████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████

624.    Notwithstanding the enormous shifts in pricing, each manufacturer's share of the market remained relatively stable, as contemplated by the Fair Share agreement.

625.    The NSP price chart below shows the large and parallel price increases by Akorn, G&W, Perrigo and Sandoz and that prices remain elevated through the present. [CHART REDACTED]



626.    Throughout this period, Akorn, G&W, Perrigo and Sandoz met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Ciclopirox and of their Fair Share agreement.

627.    For example, Akorn, G&W, Perrigo and Sandoz all sent representatives to the GPhA Annual Meeting in Orlando, Florida on February 20 to 22, 2013. All companies also attended the NACDS 2013 Annual Meeting at the Sands Expo Convention Center in Palm Beach, Florida on April 20 to 23, 2013. Shortly after these meetings, each manufacturer's prices for Ciclopirox skyrocketed.

628.    In addition, T.P., Perrigo Director of National Accounts, and Erika Vogel-Baylor, G&W Vice President of Sales, communicated by phone multiple times in July and August 2013. T.P. (Perrigo) also communicated directly with C.B., Sandoz Director of National Accounts,

during this period. In the midst of these communications, Perrigo announced its list (WAC) price increase for Ciclopirox on August 1, 2013.

### 40.   Irbesartan

629.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Irbesartan tablets beginning at least as early as March 2012.

630.   Irbesartan, also known by the brand name Avapro, is a medication used in the treatment of hypertension.

631.   During the relevant time frame, Defendants Teva and Lupin were the primary manufacturers of Irbesartan.

632.   Teva received approval to manufacture generic Irbesartan in March 2012.

633.   On March 6, 2012, K.G., a Teva senior marketing executive, asked the sales team for information about competitors that were also making offers to supply Irbesartan.

634.   At 11:27 a.m., J.P., an account manager at Teva, responded: "Lupin is promising offers today." Less than twenty minutes later, Teva's Kevin Green called David Berthold at Lupin. They talked for seventeen (17) minutes. Shortly after the call, Green emailed his Teva colleagues with the information he obtained: "Lupin is looking for a 15% share. They already have ABC. Confirmed Zydus is out."

635.   That same day, Teva's David Rekenthaler informed the group that he still had not received "a call from any other manufacturer on Irbesartan." A senior commercial operations executive at Teva immediately responded: "Then work harder…." Rekenthaler followed that directive.

636.   The next morning, Green called Berthold again. He learned details regarding which competitors were launching or not launching the drug and the identities of customers who received

offers. As a result of the coordination with Lupin, Teva was in a position to take up to a 40% market share when it launched Irbesartan without having to engage in price competition.

### 41.   Isosorbide Dinitrate

637.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Isosorbide Dinitrate tablets beginning at least as early as March 2012.

638.     Isosorbide Dinitrate, also known by the brand name Sorbitrate, is a medication used to treat chest pain (angina) by dilating blood vessels, making it easier for blood to flow through them and easier for the heart to pump.

639.     During the relevant time frame, Defendants Sandoz, Par and West-Ward were the primary manufacturers of Isosorbide Dinitrate tablets.

640.     The market for Isosorbide Dinitrate tablets was mature and at all relevant times had multiple manufacturers.

641.     For years, the prices of Isosorbide Dinitrate tablets were relatively low and stable. For example, before the spring of 2012, Sandoz and West-Ward had list prices for 10 mg tablets of less than 10 cents and NSP prices of less than ██████ Par, which had a negligible presence in the market during that time period, offered similarly low prices.

642.     A supply disruption between March and July 2012 prompted Sandoz and West-Ward to impose enormous price increases on all tablets. Although the supply disruption was mostly resolved within months, thereafter Sandoz and West-Ward relied on their Fair Share agreement to keep prices more than 10 times higher than they had been only months before.

643.     In 2013, an internal Sandoz analysis of the Isosorbide Dinitrate market ████

644.

645.    In the spring of 2013, Par made a push into the Isosorbide Dinitrate market. Rather than offer lower prices to customers in order to build market share, Par announced list prices that matched Sandoz (and which were higher than West-Ward). Par's NSP prices ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮. Defendants continued to monitor their "fair share" of the Isosorbide Dinitrate market throughout this period.

646.    The charts below show the extreme and parallel price increases for Isosorbide Dinitrate tablets and that price remained elevated well above prior levels at least through the end of 2018. (The prices for 5 mg, 10 mg, 20 mg and 30 mg tablets exhibit similar patterns. Only the charts for 10 mg tablets are included here.) [NSP CHART REDACTED]

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

647.    Throughout this period, Sandoz, Par and West-Ward met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Isosorbide Dinitrate tablets and their Fair Share agreement.

648.    For example, on October 11, 2012, Sandoz's C.B, Director of National Accounts, spoke for approximately 21 minutes to M.R., West-Ward's Director of National Accounts. The next day, West-Ward announced its Isosorbide list (WAC) price increases that tracked the earlier price increases by Sandoz.

649.    Par announced its list (WAC) price increases on March 11, 2013. Not long after, on March 26, K.O, VP of National Accounts at Par, spoke to M.V., Associate Director of Pricing at Sandoz for approximately 25 minutes.

### **42.    Clindamycin Phosphate**

650.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Clindamycin Phosphate gel, lotion, vaginal cream and solution beginning at least as early as April 2012.

651.    Clindamycin Phosphate, also known by the brand name Cleocin, is an antibiotic used to treat certain serious bacterial infections.

652.    During the relevant time frame, the following Defendants were the primary manufacturers of Clindamycin Phosphate:

| | |
|---|---|
| Clindamycin Phosphate Gel | Sandoz, Greenstone |
| Clindamycin Phosphate Lotion | Sandoz, Greenstone |
| Clindamycin Phosphate Vaginal Cream | Sandoz, Greenstone |
| Clindamycin Phosphate Solution | Sandoz, Greenstone, Perrigo, Taro, Actavis |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

653.    The markets for Clindamycin Phosphate gel, lotion, solution and vaginal cream were mature and at all relevant times had multiple manufacturers.

654.    During the relevant period, Sandoz and Greenstone dominated the markets for Clindamycin Phosphate gel, lotion and vaginal cream. After years of relatively low and stable pricing for these products, in late 2012, Sandoz and Greenstone began to impose very large price increases that were close in time and amount. Rather than compete on price, Sandoz and Greenstone abided by their Fair Share agreement.

655.    Sandoz and Greenstone, by adhering to their price-fixing agreement, were able to maintain high prices for Clindamycin Phosphate products. As Sandoz and Greenstone imposed extremely large price increases, their customers began shopping for better prices. Sandoz and Greenstone, however, adhered to their price-fixing agreement. For example, when a large purchaser approached Sandoz seeking better prices for Clindamycin after its incumbent supplier, Greenstone, had raised prices, Armando Kellum, a Vice President at Sandoz, conveyed to his colleague: ███████████████████████████ Throughout this period, Sandoz and Greenstone monitored and adhered to their Fair Share agreement.

656.    The following list (WAC) price and NSP price charts for Clindamycin Phosphate gel, lotion and vaginal cream show the parallel pricing of Sandoz and Greenstone for those products. [NSP CHARTS REDACTED]

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





657.    A similar pattern followed with Clindamycin Phosphate solution. Sandoz and

Greenstone imposed coordinated and very large price increases on their solution products, just as

they had on gel, lotion and vaginal cream. The high price of Clindamycin Phosphate solution, however, attracted Perrigo, Taro and Actavis to that market. Eager to maintain the high prices that they already had implemented, Taro and Sandoz agreed to cede a Fair Share of the market to the new entrants if they agreed to keep prices high. They did: Perrigo, Taro and Actavis joined at or near the inflated prices that were being offered by Sandoz and Greenstone.

658.    For example, when Taro was preparing to enter the market for Clindamycin Solution, it was extremely careful to abide by the Fair Share agreement. Rather than seek any and all customers it could win by offering favorable pricing, Taro was careful to pursue market share only in a "fair" manner. On October 8, 2013, Ara Aprahamian gave his Taro subordinates the following directive over email: ████████████████████████████

████████████████████████████████

659.    The following NSP price chart highlights the elevated prices imposed by Sandoz and Greenstone that were followed by Perrigo, Taro and Actavis when they entered the market.

[CHART REDACTED]

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

660.     Throughout this period, Sandoz, Greenstone, Perrigo, Taro and Actavis met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Clindamycin Phosphate and their Fair Share agreement.

661.     For example, in the fall of 2012, before Sandoz and Greenstone embarked on the very large and nearly simultaneous price increases for Clindamycin Phosphate lotion, gel and vaginal cream, Armando Kellum, Sandoz Director of Pricing, and Robin Hatosy, Greenstone Director of National Accounts, communicated multiple times by phone to coordinate. Kellum was confident that Greenstone would abide by the Fair Share agreement, because he had previously been successful in colluding with Greenstone and Hatosy to inflate the prices of Latanoprost. Kellum assured his colleagues that Greenstone would ██████████████████████████ ██████████ and follow the Sandoz price increase.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

662.     In August and September of 2013, as Perrigo was preparing to enter the market for solution, T.P., Perrigo's Director of National Accounts, spoke by phone a number of times with C.B., a National Accounts Executive at Sandoz.

663.     Similarly, as Taro was preparing to enter the market in December 2013, it too communicated with the incumbent suppliers before doing so. For example, on October 11 and 14, 2013, D.S., the Assistant Vice President of National Accounts at Taro spoke to D.L., the Director of National Accounts at Sandoz.

664.     The pattern repeated when Actavis was preparing to enter the market in January 2015. Taro's Ara Aprahamian and M.D., Actavis's Senior National Account Executive, had a 25 minute conversation on January 7, 2015. They spoke again on January 30 for 19 minutes.

### **43.**     **Labetalol HCL**

665.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Labetalol HCL tablets beginning at least as early as April 2012.

666.     Labetalol, also known by brand names such as Normodyne and Trandate, is a "beta blocker" medication used to treat high blood pressure.

667.     During the relevant time frame, Defendants Sandoz, Teva, Actavis[16] and Par were the primary manufacturers of Labetalol. Defendant Alvogen joined the Labetalol HCL market and the Labetalol HCL conspiracy in late 2014/early 2015.

668.     The market for Labetalol HCL tablets was mature and at all relevant times had multiple manufacturers.

---

[16] Watson Pharmaceuticals, Inc. ("Watson") acquired Actavis in October 2012. The two companies operated as a single entity, albeit under separate names, until January 2013, after which the company became knowns as Actavis, Inc.

669.     For years, the prices of Labetalol HCL tablets were relatively low and stable. For example, list prices for 200 mg tablets sold by Sandoz, Teva and Actavis were all below 25 cents. Then, between May and July, 2012, all three more than doubled their list prices. Around the same time, Par entered the market at nearly identical list prices.  And when Alvogen entered the market in late 2014, it too matched the existing market list prices. (The same pattern held for other dosages of Labetalol HCL tablets as well.) Rather than compete for share by offering lower prices, all manufacturers abided by their Fair Share agreement, the result of which was higher prices for all purchasers of Labetalol HCL tablets.

670.     The list price chart below shows the parallel pricing of Actavis, Teva, Sandoz, Par and Alvogen for Labetalol HCL tablets.  (Note: A chart for only the 200 mg tablet is included here. Other dosages exhibit a highly similar pricing pattern.)



190
PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

671.    Throughout this period, Teva, Sandoz, Actavis, Par and Alvogen met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Labetalol HCL and their Fair Share agreement.

672.    Before raising its price, Teva coordinated with its competitors. For example, Rekenthaler spoke to A.S., a senior Actavis/Watson sales executive on July 11, 2012 (2 calls); and Green spoke to a contact at Sandoz on July 29, 2012 (2 calls) and July 31, 2012.

673.    After Teva increased its pricing on Labetalol in the summer of 2012, it continued to coordinate with its competitors to maintain that supracompetitive pricing for that drug.  For example, on October 16, 2012, Green again spoke to his Sandoz contact two (2) times.  After those calls, Green emailed a Teva colleague: "Sandoz is back in good supply. They took a 500% price increase several months back, and they are holding firm with their prices. Stay the course and maintain our higher price."

674.    Teva's Rekenthaler worked the phones to confirm that Actavis/Watson also was still committed to the Labetalol price-fixing agreement. To that end, on October 18, 2012, Rekenthaler called and again spoke to the senior sales executive at Actavis/Watson, four (4) times.

675.    As Par and Alvogen entered the market, Teva, Sandoz and Actavis incorporated them into the Labetalol price-fixing agreement. For example, when Teva learned of a competitive challenge from Par on Labetalol HCL tablets in February 2014, it promptly called Par to coordinate a response. T.S., a National Account Manager at Teva, spoke to R.K., a Senior Vice President of Sales at Par, three times on February 7, 2014, and days later, Rekenthaler called G.B., Vice President of National Accounts at Par, twice to work out the details.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

676.     After these discussions between Teva and Par executives, Teva ultimately offered only a nominal price reduction to that customer, knowing that this would likely result in Par gaining the customer, and building its Fair Share of the Labetalol market.

677.     As Alvogen prepared to enter the market in late 2014, B.H., Alvogen's Executive Vice President of Commercial Sales, communicated with Actavis's Falkin. The two spoke multiple times in September, October, and December of 2014 and in January 2015.

### 44.     Lamivudine/Zidovudine

678.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Lamivudine/Zidovudine tablets beginning at least as early as April 2012.

679.     Lamivudine/Zidovudine, also known by the brand name Combivir, is a combination of mediations used in the treatment of human immunodeficiency virus (HIV) infection.

680.     During the relevant time frame, Defendants Teva, Lupin, Aurobindo, and Camber were the primary manufacturers of generic Combivir.

681.     Teva launched its generic Combivir product in December 2011. In mid-May, 2012, two competitors – Lupin and Aurobindo – received FDA approval for generic Combivir and were preparing to enter the market.

682.     Even before Lupin and Aurobindo obtained FDA approval, Teva was communicating with both about how to divvy up the market. In late April 2012, Teva's Rekenthaler was speaking to the CEO at Aurobindo, who was a former colleague of Rekenthaler's at Teva. Meanwhile, Teva's Green was speaking to David Berthold, an executive at Lupin, and Jim Grauso at Aurobindo.

192

683.     In early May 2012, with the Lupin and Aurobindo launches just days away, communications among all three competitors accelerated. Between May 7 and 10, for example, the three companies spoke at least 32 times. Green (Teva), Berthold (Lupin) and Grauso (Aurobindo) discussed the specific customers that Teva would concede in order to ensure that Lupin and Aurobindo gained a Fair Share of the market without eroding prices.

684.     Similarly, when Camber received approval to market a generic form of Combivir, Teva, again, coordinated the entry. Konstantin Ostaficiuk, the President of Camber, communicated with Rekenthaler of Teva and Berthold of Lupin to negotiate Camber's entry into the market.  For example, on September 24, 2014, Ostaficiuk spoke to Rekenthaler three times and to Berthold twice. That same day, Berthold also spoke to a senior operations executive at Aurobindo, to close the loop on generic Combivir communications.

685.     By coordinating the entry of competitors into the generic Combivir market, Teva, Lupin, Aurobindo and Camber were able to keep prices higher than they would have been in a competitive market.

### **45.**    **Lidocaine HCL**

686.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Lidocaine HCL 5% ointment beginning at least as early as April 2012.

687.     Lidocaine HCL 5% is used as an anesthetic lubricant for intubation and for the temporary relief of pain associated with minor burns.

688.     During the relevant time frame, Defendants Sandoz, Taro and Akorn were the primary manufacturers of Lidocaine HCL 5% ointment.

689.     The market for Lidocaine HCL 5% ointment was mature and at all relevant times had multiple manufacturers.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

690.    The prices of Lidocaine HCL 5% ointment were relatively low and stable for years. Sandoz/Fougera and Taro were the only two manufacturers in the market until the spring of 2012, at which point Akorn began to sell Lidocaine ointment. In anticipation Akorn's entry, Sandoz/Fougera raised prices. At the time, Sandoz/Fougera had a dominant share of the market. In order to cede share to Akorn—as required by the Fair Share agreement—Sandoz needed to raise prices to maintain (or even augment) its dollar sales notwithstanding the loss of volume.

691.    Shortly after Sandoz/Fougera raised prices, Akorn launched its product in the spring of 2012. Rather than offer lower prices to win customers based on better pricing, Akorn matched the recently raised prices offered by Sandoz. Sandoz, as anticipated and agreed to with Akorn and Taro, ceded share of the Lidocaine market. Although Sandoz's unit sales declined (as customers were ceded to Taro and Akorn) its dollar sales remained relatively stable, owing to the higher prices it was able to charge because of the price-fixing agreement between the manufacturers.

692.    By 2013, all three manufacturers had brought their Lidocaine prices to approximately the same level. They carefully abided by their agreement to ensure that each of them had a Fair Share of the market while maintaining high prices. For example, in early 2013 after Taro raised its prices, a large buyer sent out requests to Akorn and Sandoz for better pricing. Internally, Taro discussed ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████

693.    Taro applauded the success of the Fair Share agreement in allowing it to increase prices and gain share in the Lidocaine market. ████████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



694.    The list (WAC) price and NSP price charts below show the parallel and elevated pricing for Lidocaine HCL 5% ointment by Sandoz, Akorn and Taro beginning in 2012 and that prices remained elevated above prior levels for years. [NSP CHART REDACTED]





695.    Throughout this period, Sandoz, Taro and Akorn met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Lidocaine and their Fair Share agreement.

696.    For example, as Akorn was preparing to enter the market in March 2012, it communicated directly with Taro. Mitchell Blashinsky, a VP of Marketing at Taro, spoke to E.B., Akorn's VP of Sales and Marketing, on February 24, 28 and March 14 and 29.

697.    Meanwhile, the incumbent suppliers—Taro and Sandoz—were in touch as well. On March 7, 8 and 17, 2012, K.K., a Sandoz/Fougera Senior National Account Executive, communicated by phone with Taro's D.S., AVP of National Accounts at Taro.

### 46.    Ethinyl Estradiol and Levonorgestrel

698.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Ethinyl Estradiol and Levonorgestrel beginning at least as early as May 2012.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

699.    Ethinyl estradiol and levonorgestrel, when used in combination, is an oral contraceptive used to prevent pregnancy.

700.    During the relevant time period, both Teva and Sandoz marketed ethinyl estradiol and levonorgestrel under multiple names – including both Portia and Jolessa.

701.    In May 2012, Teva had much higher market share than Sandoz for both Portia and Jolessa. When Walmart contacted Teva with a right of first refusal and explained that Sandoz made an offer for the sale of drugs including Portia and Jolessa, Teva initially sent a competitive offer. However, after Teva's Green spoke to a contact at Sandoz, Teva withdrew its offer for Portia and Jolessa the next day and conceded Walmart to Sandoz.

702.    Sandoz continued to coordinate with Teva to achieve its Fair Share of the markets for Portia and Jolessa. In July 2013, a key customer contacted Teva stating it had received bids on Portia and Jolessa, and in order for Teva to retain the business, Teva would have to submit its "best bids." A few days later, Teva's Patel spoke to a contact at Sandoz, and Teva's Rekenthaler spoke to a different Sandoz contact.  Ultimately, Teva submitted a cover bid to the customer for Portia and Jolessa, intentionally inflating the bid to ensure that Sandoz obtained the primary award with the customer.

## **47.**    **Etodolac**

703.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Etodolac beginning at least as early as May 2012.

704.    Etodolac, also known by the brand name Lodine, is a nonsteroidal anti-inflammatory drug (NSAID) used to treat pain, swelling and joint stiffness from arthritis.

705.    During the relevant time frame, Defendants Apotex and Taro were the primary manufacturers of Etodolac capsules.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

706.    During the relevant time frame, Defendants Teva, Taro, Sandoz and Apotex were the primary manufacturers of regular Etodolac tablets.

707.    During the relevant time frame, Defendants Teva, Taro and Zydus were the primary manufacturers of Etodolac ER tablets.

708.    The markets for Etodolac capsules, tablets and ER tablets were mature and at all relevant times had multiple manufacturers.

**Etodolac Capsules**

709.    For years, the prices for Etodolac capsules were relatively low and stable. That changed in the spring of 2012. Taro was the dominant seller in the market. Teva was preparing to exit the market, and Apotex was preparing to re-enter the market.

710.    In conjunction with Apotex's entry into the market, Taro and Apotex announced identical and nearly simultaneous list (WAC) price increases. The increases were very large. For example, on 300 mg capsules both manufacturers raised prices more than 250%. Rather than stimulate price competition, Apotex's entry into the market resulted in much higher prices.

711.    Apotex quickly gained market share, all while it and Taro maintained high prices. Their Fair Share agreement made this possible. For example, in August 2013 ██████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████ Doing so would have disrupted the Fair Shares of each manufacturer in the Etodolac capsule and tablet markets.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

712.    The price charts below show the lockstep list pricing of Etodolac capsules by Taro and Apotex and similar parallel NSP pricing. (Etodolac capsules come in 200 mg and 300 mg dosages, both of which exhibited similar pricing patterns. Charts are provided here only for the 300 mg dosage.) [NSP CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



713.   Throughout this period, Apotex and Taro met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Etodolac capsules and their Fair Share agreement.

**Etodolac Tablets**

714.   As was the case with Etodolac capsules, for years the prices of Etodolac tablets and ER tablets were relatively low and stable. That changed in the summer of 2013 when Teva, Taro and Sandoz imposed nearly simultaneous price increases of regular tablets and Teva and Taro did the same on ER tablets. Again, the price increases were very large, and very similar in amount.

715.   When Apotex re-joined the market for regular tablets in the spring of 2015, it matched Sandoz and Teva's prices. And when Zydus entered the ER tablet market, it matched the prices of Taro and Teva.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

716.    The Fair Share agreement enabled Taro, Teva, Sandoz, Apotex and Zydus to keep the prices of Etodolac tablets and ER tablets much higher than they would have been in a competitive market.

717.    The list (WAC) price and NSP price charts below show the parallel pricing by Defendants for Etodolac regular and ER tablets. (Note, regular tablets come in 400 mg and 500 mg dosages and ER tablets come in 400 mg, 500 mg and 600 mg dosages. The pricing patterns across all dosages are similar. Charts for only the 500 mg dosages are included here.) [NSP CHARTS REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



718.    Throughout this period, Teva, Sandoz, Taro, Apotex and Zydus met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Etodolac tablets and their Fair Share agreement.

719.    For example, during July of 2013, there were numerous phone calls among Sandoz, Taro and Teva for the express purpose of implementing price increases on Etodolac. Between July 16 and 18, there were a flurry of calls between individuals at all three companies, including C.B., a National Account Executive at Sandoz, Taro's Aprahamian and Teva's Patel. On July 18, 2013, Patel called M.V., the Associate Director of Pricing at Sandoz, during which the companies agreed to raise prices.

720.    Before any price increases took effect or were made public, Teva knew that Sandoz planned to increase its price on Etodolac, and that Taro would follow suit and raise its prices as well. During those conversations, Teva agreed to follow both price increases.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

721.    Leading up to their price increases that were imposed in late July and early August, Sandoz, Teva and Taro continued to communicate and re-affirm their intentions to raise Etodolac prices. For example, on July 23, Patel at Teva spoke with her contact at Sandoz, and Aprahamian at Taro spoke with his contact at Sandoz.

722.    Between July 29 and August 2, 2013, Patel engaged in a series of thirteen calls with her Sandoz contact and Aprahamian of Taro. Aprahamian also spoke to his contact at Sandoz during this time, including three calls between July 30 and August 2, 2013.

723.    When Patel sent the "Price Increase Overview" spreadsheet to her supervisor on August 7, 2013, summarizing Teva's upcoming August 9 price increases, she again made it clear that the reason Teva was increasing its prices for Etodolac and Etodolac ER was because Teva senior executives knew that Taro would be raising its prices on both drugs "this week."  Patel's supervisor quickly instructed her to delete those entries. Notably, he did not tell her to stop colluding with Taro or any of Teva's other ostensible competitors, and so she continued to do so.

724.    On August 8, 2013, Patel again spoke to Aprahamian (Taro) numerous times and to her contact at Sandoz. The next day, Teva and Taro announced identical and very large price increases on their Etodolac and Etodolac ER products.

725.    In the spring of 2014, Zydus's entry into the Etodolac ER market spurred another round of communications and coordination aimed at keeping prices high. In the days leading up to the Zydus launch, there were numerous communications between Teva, Zydus and Taro to discuss how customers would be ceded to Zydus without driving prices down.

726.    The conversations accomplished their goal. Zydus announced list prices identical to those of Teva and Taro. And Teva and Taro ceded customers to Zydus. For example, when Teva learned on May 14, 2014 that one of its wholesaler customers had received a bid from Zydus for

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Etodolac ER, it prompted a series of communications between Teva's Patel, Taro's Aprahamian, and Zydus's Green, as well as direct communications between Maureen Cavanaugh at Teva and K.R., Vice President of Sales at Zydus. The end result: Teva ceded its wholesaler customer to Zydus.

727.    In July of 2014, Teva ceded another customer to Zydus to allow it to gain a Fair Share of the market. Patel explained Teva's decision as needed to make room for a new market entrant.

728.    Taro, too, worked to ensure that Zydus maintained a Fair Share of the Etodolac market. For example, in August 2015, Taro declined to bid on Etodolac ER at a large customer where Zydus was the incumbent. Taro worried that pursuing Zydus's customer would result in retaliation, possibly on another product that was part of their Fair Share agreement, Warfarin Sodium Tablets:  Zydus "could hit us on Warfarin.  Not worth a fight in the sandbox over 300 annual units for Etodolac."

## **48.**    **Silver Sulfadiazine**

729.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Silver Sulfadiazine beginning at least as early as May 2012.

730.    Silver Sulfadiazine, also known by the brand name Silvadene, among others, is an antibiotic available in a 1% cream used to prevent and treat infections in patients with burns.

731.    During the relevant time frame, Defendants Actavis and Ascend were the primary manufacturers of Silver Sulfadiazine 1% cream.

732.    The market for Silver Sulfadiazine cream was mature and at all relevant times had multiple manufacturers.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

733.    For years, the prices for Silver Sulfadiazine cream were relatively low and stable. In the spring of 2012, however, Actavis and Ascend imposed large price increases in close succession. The price chart below shows the price increases. [CHART REDACTED]



734.    Throughout this period, Actavis and Ascend met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Silver Sulfadiazine and their Fair Share agreement.

735.    For example, representatives from both Actavis and Ascend attended the GPhA 2012 Annual Meeting from February 22-24, 2012 and the NACDS 2012 Pharmacy and Technology Conference in Denver, Colorado from August 25-28, 2012.

### 49.    Tamoxifen Citrate

736.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Tamoxifen Citrate tablets beginning at least as early as May 2012.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

737.    Tamoxifen Citrate, also known by the brand name Nolvadex, among others, is a medication used to treat certain types of breast cancer.

738.    During the relevant time frame, Defendants Teva, Mylan, and Actavis/Watson were the primary manufacturers of Tamoxifen Citrate.

739.    The market for Tamoxifen Citrate was mature and at all relevant times had multiple manufacturers.

740.    Beginning in the spring of 2012, Teva, Actavis and Mylan began coordinated, steady and sustained price increases for Tamoxifen Citrate.

741.    The NSP price chart below shows the parallel price increases imposed by Actavis, Mylan and Teva on Tamoxifen Citrate tablets. Note: Tamoxifen Citrate tablets come in 10 and 20 mg dosages, each of which demonstrated highly similar pricing patterns. A chart for only the 20 mg dosage is included here. [CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

742.     Throughout this period, Actavis, Mylan and Teva met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Tamoxifen Citrate and their Fair Share agreement.

743.     For example, in the weeks leading up to their initial price increases, Teva's Green and Rekenthaler communicated directly with Teva's competitors. For example, Green spoke to Nesta of Mylan on July 23, July 24 (2 calls); July 25; July 26; July 30 (2 calls); and July 31, 2012 (5 calls). In addition, Rekenthaler spoke to A.S., Vice President of Sales at Actavis, on July 11, 2012 (2 calls).

744.     Defendants continued to coordinate the pricing of Tamoxifen Citrate in 2014. For example, in March 2014, Rogerson (Actavis) told Patel (Teva) that Actavis was implementing yet another price increase on Tamoxifen Citrate. Teva planned to follow the Actavis price increase. To coordinate, Patel spoke to Rogerson for nineteen minutes on March 17, 2013.  In addition, Rekenthaler (Teva) and Falkin (Actavis) exchanged four text messages and had one call that day. Patel again spoke to Rogerson on April 1, April 3, and April 4, 2014. And Rekenthaler spoke to Falkin on April 1, 2, 3, and 4, 2014.

745.     After the price increases became effective, Defendants took consistent steps not to disrupt the market or steal market share from each other. For example, on May 14, Teva declined to bid at a large wholesaler on both Tamoxifen Citrate and Estazolam in order to maintain the Fair Share agreement.

746.     Mylan, which had temporarily discontinued tamoxifen citrate tablet sales in October 2013 due to technical issues, planned to re-launch in June 2014. In accordance with the Fair Share agreement, Teva employees internally discussed which customer or customers to concede ████████████████████████████████████████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Teva employees also discussed ███████████████████████████████████████

████████████████████████████████████

### 50.   Cimetidine

747.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Cimetidine beginning at least as early as June 2012.

748.   Cimetidine, also known by the brand name Tagamet, among others, is a medication used to treat stomach or intestinal ulcers.

749.   During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Cimetidine.

750.   The market for Cimetidine tablets was mature and at all relevant times had multiple manufacturers.

751.   Beginning in the summer of 2012, Teva and Mylan began steady and coordinated price increases for Cimetidine tablets. The NSP chart below shows the parallel and increasing prices over time. [CHART REDACTED]



752.    Throughout this period, Teva and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Cimetidine tablets and of their Fair Share agreement.

753.    For example, in order to coordinate the pricing of their products, including Cimetidine tablets, Teva's Green spoke to Nesta at Mylan on May 7, 2013 three times. Green and Nesta also spoke a number of times over the next several days, including on May 8, May 9, and May 10, 2013. On May 17, 2013, Green spoke to Nesta six (6) times.

754.    Meanwhile, Teva's Patel—who was receiving regular updates from Green— expressed the expectation that Mylan would soon be raising prices on Cimetidine and was preparing Teva to do the same. And both manufacturers did raise prices.

755.    As Mylan and Teva imposed price increases for Cimetidine, they were careful to maintain Fair Share and not to disrupt pricing or steal customers. To that end, Teva and Mylan continued to communicate throughout this period.  For example, on May 9, 2014, Teva's

Rekenthaler and Nesta at Mylan spoke for nearly eight (8) minutes. Rekenthaler and Nesta spoke again on May 20 and May 27, 2014. The two spoke several more times that summer, including at least on August 4, 7, 11, 18, and 21, 2014 in order to coordinate the prices of Cimetidine and other drugs.

### 51.    Cyproheptadine HCL

756.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Cyproheptadine HCL tablets beginning at least as early as June 2012.

757.    Cyproheptadine HCL, also known by the brand name Periactin, is a medication used to relieve allergy symptoms such as watery eyes, runny nose, itching eyes/nose, sneezing, hives, and itching.

758.    During the relevant time frame, Defendants Teva and Breckenridge were the primary manufacturers of Cyproheptadine HCL tablets. Defendant Impax joined the market and the Cyproheptadine HCL conspiracy in August 2015.

759.    The market for Cyproheptadine HCL tablets was mature and at all relevant times had multiple manufacturers.

760.    For years the prices for Cyproheptadine HCL tablets were relatively low and stable. In the summer of 2012, that changed. Teva announced a 50% list price increase and its NSP prices ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Although Breckenridge did not announce a list price increase. ▮▮▮▮▮▮▮▮▮▮▮

761.    In November 2013, it was Breckenridge's turn to lead; it announced a list price increase of approximately 150% and its NSP prices ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮ With roles reversed, this time Teva did not

immediately announce a list price increase, but its NSP prices ███████████████████

███████████ And when Teva did announce its list price increase in April 2014, it matched

Breckenridge's price.

762.    In late summer of 2015, Impax entered the market. Rather than compete for

customers by offering better prices, Impax announced a higher list price than either Teva or

Breckenridge, and charged its customers ██████████████████████████████████Even

with higher prices, Impax was able to gain market share, as contemplated by the Fair Share

agreement between Teva, Breckenridge and Impax.

763.    The charts below show the list (WAC) price and NSP price increases for Teva and

Breckenridge, and the entry of Impax into the market at even higher prices. [NSP CHART

REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



764.     Throughout this period, Teva, Breckenridge and Impax met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Cyproheptadine HCL tablets and their Fair Share agreement.

765.     For example, in the weeks before Breckenridge announced enormous list price increases for Cyproheptadine HCL tablets in November 2013, Breckenridge and Teva communicated directly with each other. Teva's Rekenthaler had several phone calls with D.N., Director of Sales at Breckenridge. The two spoke again in mid-January 2014, right around when Teva was preparing its own list price increase for Cyproheptadine HCL.

766.     Breckenridge's large price increase created an opportunity for Teva to win new customers with better prices. But, because of its agreement with Breckenridge, it did not do so. For example, when a potential new customer for Cyproheptadine HCL contacted Teva in February 2014, Teva's Patel promptly called S.C., National Director of Sales, at Breckenridge, after which, Teva declined to submit a bid until after Teva had increased its price.

767.     In the summer of 2015, Impax was preparing to enter the market. On July 20, S.C., Breckenridge's National Director of Sales, and M.G., Impax's Senior National Account Manager, exchanged text messages. On July 31, 2015, Impax announced list (WAC) prices even higher than those of Teva or Breckenridge.

## 52.     Oxaprozin

768.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Oxaprozin tablets beginning at least as early as June 2012.

769.     Oxaprozin, also known by the brand name Daypro, is a nonsteroidal anti-inflammatory drug (NSAID) used to treat arthritis.

770.     During the relevant time frame, Defendants Teva, Sandoz, Dr. Reddy's, and Greenstone were the primary manufacturers of Oxaprozin.

771.     The market for Oxaprozin was mature and at all relevant times had multiple manufacturers.

772.     For years, the prices of Oxaprozin tablets were relatively low and stable, with list prices well under 1 dollar, and NSP prices ███████ Although various manufacturers came in and out of the market, prices remained relatively low and stable. By the summer of 2012, Teva and Dr. Reddy's were the primary sellers of Oxaprozin. Both manufacturers had experienced supply disruptions in the preceding year, and yet prices remained relatively low and stable.

773.     In the second half of 2012, Sandoz was preparing to enter the market. In anticipation of Sandoz's entry, in July 2012, Teva raised its list (WAC) prices from less than 50 cents to nearly 3 dollars. When Sandoz entered the market in November, rather than offer better prices to win customers, it matched Teva's list prices.

774.     Meanwhile, Dr. Reddy's continued supply disruptions caused it to leave the market by the end of 2012. By the spring of 2013, however, Dr. Reddy's was preparing to re-enter the market. Around the same time, Greenstone also was planning to enter the market. Both did so, and rather than announce lower prices to compete for customers, both promptly announced WAC prices in line with Teva and Sandoz.

775.     Over the ensuing months, Teva, Sandoz, Dr. Reddy's and Greenstone monitored and adhered to their Fair Share agreement, which enabled them to keep the prices of Oxaprozin elevated above competitive levels. For example, as Dr. Reddy's was preparing to enter the market, Teva was analyzing how to make sure it obtained a Fair Share. Teva's Rekenthaler directed Patel, "look at our business on Oxaprozin in order to accommodate Dr. Reddy's entry."

776.     Leading up to Greenstone's entry into the market, Green (Teva) and R.H., Director of National Accounts at Greenstone, were in frequent communication by phone and text to coordinate the entry, speaking on March 6, 11, 18, 20, 21, 22, and 27, 2013.  During these communications, Teva agreed to concede specific customers to Greenstone in order to avoid competition and price erosion resulting from Greenstone's entry.

777.     After Walmart informed Teva that it had received a bid from Greenstone shortly after Greenstone's entry into the market, Teva immediately called Dr. Reddy's.  On March 27, 2013, Green (Teva) called R.H. at Greenstone, but did not connect.  The next morning, Green reached R.H. After they spoke, R.H. relayed the information from Green to her boss, Jill Nailor, in a series of conversations and text messages. Ultimately, Greenstone agreed to withdraw its offer to Walmart and honor its Fair Share agreement with Teva.

778.     Similarly, when Dr. Reddy's was interested in acquiring Walgreens as a customer, Teva and Dr. Reddy's spoke on the phone to devise a strategy and work out the details of their

Fair Share Agreement. In the summer of 2013, J.A., VP of Sales and Marketing at Dr. Reddy's, called Green, and Rekenthaler spoke with T.W., a Senior Director of National Accounts at Dr. Reddy's. Ultimately, Teva and Dr. Reddy's agreed that Teva would keep the Walgreens business, but would concede its next largest customer for Oxaprozin – Econdisc – to Dr. Reddy's.

779.     The following list (WAC) price chart and NSP price chart highlight the parallel pricing by Teva, Sandoz, Dr. Reddy and Greenstone and show that prices for Oxaprozin have remained elevated above competitive levels. [NSP CHART REDACTED]





780.     Throughout this period, Teva, Sandoz, Dr. Reddy's and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Oxaprozin and their Fair Share agreement.

### 53.     Tolterodine

781.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Tolterodine Tartrate regular and extended release ("ER") tablets beginning at least as early as June 2012.

782.     Tolterodine, also known by the brand name Detrol, is a medication used for the treatment of an overactive bladder.

783.     During the relevant time frame, Defendants Teva, Mylan and Greenstone were the primary manufacturers of Tolterodine regular and ER tablets.

784.     Between June 2012 and January 2013, Teva and Mylan were among the first manufacturers to enter the market for generic Tolterodine tablets. Greenstone joined the tablet

market in January 2014. Around the same time that Greenstone entered the tablet market in January 2014, Teva and Mylan were the first manufacturers to launch Tolterodine ER tablets.

785.    Throughout this period, Teva, Mylan and Greenstone met at trade events and communicated directly in order to keep Tolterodine prices higher than they would have been in a competitive market.

786.    For example, in the second half of 2012, Teva and Mylan regularly communicated on the telephone. Teva's Green spoke to Mylan's Nesta numerous times between May and July of 2012, the period during which Teva was launching Tolterodine tablets. Green and Nesta spoke again in January 2013, around the time that Mylan was launching its Tolterodine tablets.

787.    Similarly, in the days leading up to Greenstone's entry to the Tolterodine tablet market, Jill Nailor and a colleague at Greenstone were speaking frequently to Teva's Patel and Rekenthaler to coordinate. For example, on January 21, 2014, Nailor called Patel twice, and on January 22, Patel called Nailor twice, Nailor called Patel once, and the two exchanged multiple text messages. During these communications, Teva and Greenstone agreed that Teva would concede business to Greenstone in order to avoid significant price erosion in the market. And when Greenstone finally entered the market, it announced the exact same list (WAC) prices as Teva.

788.    Teva and Greenstone continued to communicate over the following months to ensure that Greenstone was able to obtain a Fair Share of the market. For example, in late January and early February, Teva's Patel and a contact at Greenstone communicated a number of times to coordinate Teva's concession of a large pharmacy customer to Greenstone on Tolterodine tablets.

789.    During this period, Teva and Mylan planned to launch generic Tolterodine ER.  In order to coordinate market share and pricing, Teva and Mylan were in regular contact. For example, on December 23 and 24, 2013, Teva's Rekenthaler and Mylan's Nesta had a series of

calls during which they agreed to allocate the Tolterodine ER market on launch day so that Teva and Mylan could each get a Fair Share without eroding pricing.

## **54.    Buspirone HCL**

790.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Buspirone HCL beginning at least as early as July 2012.

791.    Buspirone HCL, also known by the brand name Buspar, among others, is a medication used to treat anxiety disorders or to relieve the symptoms of anxiety.

792.    During the relevant time frame, Defendants Teva, Mylan and Actavis/Watson were the primary manufacturers of Buspirone HCL.

793.    In the summer of 2012, Teva increased pricing on Buspirone HCL. Before this price increase, Teva coordinated with its competitors. In the weeks leading up to the price increase, Teva's Green spoke to Nesta of Mylan on July 23, 24, 25, 26, 30, and 31, 2012.  In addition, Teva's Rekenthaler spoke to A.S., VP of Sales at Watson/Actavis, twice on July 11, 2012.

## **55.    Estradiol**

794.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Estradiol tablets beginning at least as early as July 2012.

795.    Estradiol, also known by the brand name Cenestin, is a female hormone used to help reduce symptoms of menopause.

796.    During the relevant time frame, Defendants Teva, Mylan and Actavis were the primary manufacturers of Estradiol tablets.

797.    The market for Estradiol tablets was mature and at all relevant times had multiple manufacturers.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

798. For years, the prices of Estradiol tablets were relatively low and stable. In the summer of 2012, however, Teva, Actavis and Mylan began to impose significant price increases.

799. The NSP price chart below shows the near simultaneous and sustained price increases for Estradiol tablets that were imposed by Teva, Mylan and Actavis. Note: Estradiol tablets come in 0.5, 1 and 2 mg dosages. The pricing patterns for all dosages were highly similar. A chart for only the 1 mg dosage is included here. [CHART REDACTED]



800. Throughout this period, Teva, Mylan and Actavis met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Estradiol and their Fair Share agreement.

801. For example, in the summer of 2012, Teva, Mylan and Actavis began coordinated price increases on Estradiol tablets. As they began to roll out increases to customers, the lines of

communication were open and frequently utilized. Teva's Green spoke to Mylan's Nesta on August 1, 2, 6, 7, 8, 10, 13, 15, 16, 17 and 28.

802.    Teva was also in touch with Actavis. T.C., Teva's Senior Director of Sales, spoke twice (once for 10 minutes and another time for 15 minutes) with L.P., a Senior Director of National Accounts at Actavis, on August 6, 2012. By the end of the year, Actavis, Mylan and Teva had increased their Estradiol prices to customers ▮▮▮▮▮▮

803.    In early 2015, Actavis, Mylan and Teva imposed another round of price increases. And they again orchestrated these price increases by direct communication. For example, Teva's Rekenthaler spoke to Nesta of Mylan on January 14 (two calls) and 20, 2015. In addition, Rekenthaler spoke to Falkin of Actavis on January 13, 14 (two calls), and 16, 2015. Over the ensuing months, all three manufacturers were again able to impose price Estradiol price increases for their customers.

### 56.    Ethosuximide

804.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Ethosuximide capsules and oral solution beginning at least as early as July 2012.

805.    Ethosuximide, also known by the brand name Zarontin, is an anticonvulsant medication used to control petit mal seizures in the treatment of epilepsy.

806.    During the relevant time frame, Akorn/Versapharm[17] and Teva were the primary manufacturers of Ethosuximide capsules and oral solution.

807.     To coordinate market share and price increases on Ethosuximide, Teva and Akorn/Versapharm communicated directly with each other.

[17] Versapharm was acquired by Defendant Akorn in 2014.

808.    For example, on May 24, 2012. Teva's Rekenthaler called S.M., Versapharm's Chief Sales and Marketing Office, on his cell phone. S.M. called back later that day and the men spoke for approximately 8 minutes.

809.    On July 31, 2012, Teva announced a large list (WAC) price increase for Ethosuximide oral solution. Less than one week later, Akorn/Versapharm announced almost identical list (WAC) prices. In a matter of days, both companies had more than tripled their list (WAC) prices.

810.    In 2014, Teva coordinated another round of price increases with Akorn/Versapharm. On January 22, 2014, Teva's Rekenthaler called J.J., a senior national account executive at Akorn/Versapharm.

811.    On March 7, 2014, Rekenthaler spoke with the same senior national account executive at Akorn/Versapharm. Less than a month later, on April 4, 2014, Teva raised prices on both Ethosuximide capsules and oral solution.

812.    Only five days after the Teva increase—on April 9, 2014—Akorn/Versapharm increased its pricing on both Ethosuximide capsules and oral solution to a nearly identical price to Teva.

813.    The list (WAC) price charts below show the large and nearly simultaneous price increases by Teva and Akorn/Versapharm on Ethosuximide capsules and oral solution.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 57.    Loperamide HCL

814.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Loperamide HCL capsules beginning at least as early as July 2012.

815.    Loperamide HCL, also known by the brand name Imodium, among others, is a medication used to treat diarrhea.

816.    During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Loperamide HCL capsules.

817.    The market for Loperamide HCL capsules was mature and at all relevant times had multiple manufacturers.

818.    After years of relatively low and stable pricing for Loperamide HCL capsules, Teva and Mylan began to coordinate and implement sustained price increases. At their peak, the prices that customers of Teva and Mylan paid for Loperamide HCL capsules were approximately ███ more than before Teva and Mylan agreed to fix prices. And prices remain much higher even today.

819.    The NSP price chart below shows the coordinated and sustained price increases by Teva and Mylan for Loperamide HCL capsules.  [CHART REDACTED]

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



820.     Throughout this period, Teva and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Loperamide HCL capsules and their Fair Share agreement.

821.     For example, in the weeks leading up to the first price increase for Loperamide, Teva's Green spoke to Nesta of Mylan on July 23, July 24 (2 calls); July 25; July 26; July 30 (2 calls); and July 31, 2012.

822.     Teva and Mylan continued to communicate and monitor the market to ensure that each had a Fair Share and that prices remained high. The two companies even went so far as to share internal documents and analyses on some occasions. For example, on April 21, 2014, a national account executive at Teva forwarded to Patel two spreadsheets—that were created by Mylan personnel—that included information about Mylan's Loperamide price increases.

823.     With Mylan's price increase information in hand, Teva began to plan how to follow those increases, and communicated directly with Mylan to work out the details. To that end, Teva's

Rekenthaler spoke to Nesta at Mylan a number of times in May 2014 and a number of additional times in August 2014.

824.     By agreement, and facilitated through close communication, Teva and Mylan were able to implement higher and sustained prices on Loperamide HCL capsules.

### 58.     Nadolol

825.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Nadolol tablets beginning at least as early as July 2012.

826.     Nadolol, also known by the brand name Corgard, is a "beta blocker" used to treat high blood pressure and chest pain (angina).

827.     During the relevant time frame, Defendants Teva, Mylan, and Sandoz were the primary manufacturers of Nadolol. In May 2014, Greenstone joined the market and the agreement to inflate the prices of Nadolol tablets.

828.     The market for Nadolol tablets was mature and at all relevant times had multiple manufacturers.

829.     For years, the prices of Nadolol tablets were relatively low and stable. That changed in the summer of 2012. At various points during 2012 and 2013, Teva, Mylan and Sandoz experienced supply problems, though none of the manufacturers exited the market, nor were their supply issues lasting. These supply challenges, however, did provide cover for enormous price increases, kicked off by Sandoz in the second half of 2012, followed by Mylan approximately four months later, and then followed by Teva approximately six months after that.

830.     In less than a year, all three manufacturers announced identical list prices that were more than 8 times the former prices. The NSP prices of Sandoz, Mylan and Teva ███████████

When Greenstone entered the market in 2014, it matched the inflated Nadolol prices of Sandoz, Mylan and Teva.

831.    The list (WAC) price chart and the NSP price chart below show the extraordinary price increases that Sandoz, Mylan, Teva and Greenstone imposed on Nadolol tablets. (Note: similar price increases were imposed on 20 mg, 40 mg and 80 mg tablets. Only the 40 mg price charts are included here.) [NSP CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



832. Throughout this period, Sandoz, Mylan, Teva and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Nadolol tablets and of their Fair Share agreement.

833. For example, before Sandoz, Mylan and Teva began to implement their enormous Nadolol price increases, they were in frequent communication to coordinate market share and pricing. Teva's Green was in frequent communication with executives at both Sandoz and Mylan in 2012. Right before the large Sandoz price increase, Green spoke with Mylan's Nesta and with Armando Kellum, then the Senior Director of Pricing and Contracts at Sandoz.

834. In January 2013, right before Mylan announced its very large price increases on Nadolol, the same pattern followed. Mylan's Nesta spoke to Teva's Green a number of times, and then Green communicated with Kellum (and others) at Sandoz.

835. In July, it was Teva's turn to impose extraordinary price increases on Nadolol tablets. Leading up to the increase, Teva, Mylan and Sandoz again were in regular communication. For example, Teva's Green spoke to Nesta at Mylan numerous times during May. And as soon as

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Teva announced its price increase in early July, Teva's Patel received a congratulatory message from a contact at Sandoz.

836.    By July, Sandoz, Mylan and Teva had brought their list prices into perfect alignment at a level many multiples of the prior prices. Their price-fixing agreement was working. But it required continued work to make sure that each of them maintained a Fair Share of the market.

837.    To assist in monitoring Fair Share, Sandoz decided to ask Teva and Mylan for comprehensive lists of all their anticipated price increases, even for drugs not sold by Sandoz. One Director of National Accounts reached out to Rekenthaler at Teva, another reached out to Nesta at Mylan. Rekenthaler and Nesta complied, and provided lists to Sandoz.

838.    Aware that it was improper to share competitively sensitive pricing information with a competitor, and in an effort to conceal it, Rekenthaler first sent the Teva price increase list from his Teva work e-mail account to a personal e-mail account, and then forwarded the list from his personal e-mail account to the personal e-mail account of the Sandoz contact.

839.    When Nesta provided his list, he also conveyed that Mylan did not want to see its prices challenged and emphasized that Sandoz should keep prices high.

840.    Over the ensuing months, Sandoz, Teva and Mylan lived up to their agreement, and were careful to maintain Fair Shares. For example, in October 2013, a senior pricing executive at Sandoz sent an internal e-mail explaining that Sandoz had decided not to submit bids in response to a customer because: "We have been running up against Mylan a lot lately (Nadolol/Benaz/Hctz), and fear blowback if we take any more products at this moment. Trying to be responsible in the sandbox."

841.    In mid-2014, the Nadolol conspiracy expanded to include Greenstone, which was entering the market. In 2014, Greenstone's Jill Nailor had numerous direct phone communications with Sandoz (Kellum), Mylan (Nesta) and Teva (Patel and Rekenthaler). When it came time for Greenstone to launch its Nadolol tablets, rather than offer lower prices to win customers, it announced identical list prices to Sandoz, Mylan and Teva.

### 59.    Desoximetasone

842.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Desoximetasone ointment (0.05%, 0.25%) beginning at least as early as August 2012.

843.    Desoximetasone, also known by the brand name Topicort, is a corticosteroid used to treat a variety of skin conditions, including eczema and dermatitis.

844.    During the relevant time frame, the primary manufacturers of Desoximetasone were Taro, Sandoz, and Glenmark.

845.    In 2012, Taro was the exclusive generic manufacturer of Desoximetasone. But in August 2012, Sandoz began making plans to enter the market.

846.    To avoid price competition and ensure that it obtained a Fair Share of the market, Sandoz reached out to Taro to coordinate its entry to the Desoximetasone market. On August 22, 2012, K.K., Senior National Account Executive at Sandoz, called D.S., Assistant Vice President of National Accounts at Taro, and they spoke for approximately nine minutes. The two men spoke again on August 30. Internally, Sandoz used the information collected by K.K. to devise pricing and target only certain customers for Desoximetasone in a way that was consistent with the Fair Share agreement.

847.    In addition to the direct communications in August between K.K. at Sandoz and D.S. at Taro, in September, C.B., a Sandoz Director of National Accounts, spoke multiple times

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

with H.M., Taro's Director of Corporate Accounts. The two executives discussed pricing and customers to target for Desoximetasone.

848.   The coordination worked. When Sandoz officially announced pricing for Desoximetasone in late September 2012, it matched Taro's list (WAC) prices. Because of their Fair Share agreement, Sandoz was confident that it did not need to offer better prices than Taro to win business. C.B. (Sandoz) and H.M. (Taro) spoke again via phone when Sandoz announced its pricing.

849.   With their agreement in place, once Sandoz began soliciting customers, Taro readily conceded them. In October 2012, internal discussions at Sandoz focused on acquiring a Fair Share. Meanwhile, internal discussions at Taro focused on conceding a Fair Share to Sandoz. Throughout the month, C.B. (Sandoz) and H.M. (Taro) continued to communicate by phone to keep the two companies aligned.

850.   In September 2013, about a year after Sandoz entered the market, Glenmark obtained FDA approval to sell Desoximetasone. Typically, the addition of a third generic manufacturer to a market would lead to increased competition and lower prices. Precisely for that reason, Taro, Sandoz and Glenmark began to coordinate to make sure that each company would obtain a Fair Share without eroding prices.

851.   Glenmark's Mitchell Blashinsky, Vice President of Sales and Marketing, was a former Taro employee. As Glenmark prepared to enter the market for Desoximetasone, Blashinsky joined the web of communications between Taro and Sandoz. In August and September 2013, Blashinsky spoke to his former Taro colleagues, Aprahamian, Perfetto and D.S. Blashinsky also spoke multiple times with C.B. at Sandoz during this period. Taro and Sandoz also remained in

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

contact during this time; Taro's Aprahamian spoke with Sandoz's C.B. and Taro's D.S. spoke with Sandoz's D.L.

852.    The communications between Taro, Sandoz and Glenmark led to their agreement to coordinate the pricing of Desoximetasone and to abide by the Fair Share agreement. To that end, Taro and Sandoz began conceding customers to Glenmark, just as Taro had conceded customers to Sandoz the year prior.

853.    For example, when a customer approached Taro in November 2013, Taro declined to pursue the opportunity, not because the account wouldn't have been profitable, but because Taro already had a Fair Share of the market, explaining internally: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## 60.    Halobetasol Propionate

854.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Halobetasol Propionate cream and ointment beginning at least as early as August 2012.

855.    Halobetasol Propionate, also known by the brand name Ultravate, is a corticosteroid prescribed for the relief of inflammation and itching due to a variety of skin conditions.

856.    During the relevant time frame, Defendants Perrigo, G&W, Sandoz and Taro were the primary manufacturers of Halobetasol Propionate cream and ointment.

857.    The markets for Halobetasol Proprionate cream and ointment were mature and at all relevant times had multiple manufacturers.

858.    For years the prices of Halobetasol Propionate cream and ointment were relatively low and stable. In late 2012, Perrigo and G&W were the dominant manufacturers. In the fall of 2012, they coordinated ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and as that gained traction, Perrigo and G&W each implemented enormous price increases in lock step in the spring of 2013. They

announced identical list prices that were more than triple the former prices. By the summer of

2013, NSP prices were ███████████████████████████████████████

Throughout this period, Perrigo and G&W had roughly equal shares of the market.

859.    As Sandoz (late 2013) and Taro (spring 2014) joined the market, they announced

list prices identical to Perrigo and G&W. Rather than compete on price to gain share, Sandoz and

Taro joined the Halobetasol Propionate price-fixing agreement and all of them abided by their Fair

Share agreement.

860.    For example, as Sandoz sought out opportunities to gain its Fair Share in March

2014, ████████████████████████████████████████████

███████████████████████

861.    Similarly, when Taro submitted a bid to a Perrigo customer in June 2014, ████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

862.    By adhering to their Fair Share agreement, Perrigo, G&W, Sandoz and Taro were

able to raise and maintain Halobetasol Propionate prices above a competitive level.

863.    The list (WAC) price chart and NSP price chart show the large and parallel price

increases by Perrigo, G&W, Sandoz and Taro. [NSP CHARTS REDACTED]





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

864.    Throughout this period, Perrigo, G&W, Sandoz and Taro met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Halobetasol Propionate cream and ointment and their Fair Share agreement.

865.    For example, Douglas Boothe, Perrigo EVP and General Manager, and Kurt Orlofski, G&W President, spoke twice by phone on March 19, 2013, texted on March 25 and spoke for approximately six minutes on March 26. Perrigo announced list (WAC) price increases for Halobetasol Propionate the next day.

866.    Orlofski (G&W) also was communicating with Michael Perfetto, Taro Chief Commercial Officer, during the same window of time. Orlofski tried to connect with Perfetto on March 19, 2013 (the same day he had spoken to Boothe at Perrigo) but did not get through. The two did connect, however, on March 21. They text messaged on March 25 (the same day that Orlofski texted with Boothe at Perrigo), and had two relatively long conversations (15 and 20 minutes) on March 28, 2012, the day after Perrigo increased its list (WAC) prices.

867.    Orlofski (G&W) and Perfetto (Taro) continued to communicate by text message in late March and early April 2013, including on April 11, the day that G&W announced list (WAC) price increases for Halobetasol Propionate. The next day, the two executives spoke by phone for approximately 28 minutes.

868.    Meanwhile, Perrigo's T.P., Director of National Accounts, was communicating with C.B., Sandoz's Director of National Accounts. The two spoke on April 10, 2012, the day before G&W announced its price increase. The two also spoke on December 18, 2012, just a few days after Sandoz announced list (WAC) price increases for Halobetasol Propionate. Orlofski (G&W) and Boothe (Perrigo) also spoke again after the Sandoz price increase (December 20, 2013) for approximately 10 minutes.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

869.    Another series of communications occurred when Taro raised its list (WAC) prices on May 13, 2014.  In April 2014, before the Taro price increase was announced, Perfetto (Taro) and Orlofski (G&W) again spoke by phone. On May 6, K.O again spoke to Boothe (Perrigo) and two days later, Perrigo's T.P. spoke again with C.B at Sandoz. On May 16, shortly after Taro's list price increase became official, E.G., Taro Director of Corporate Accounts, spoke to A.F., Perrigo National Account Director. That same day, Orlofski (G&W) re-connected with Boothe (Perrigo).

## 61.    Promethazine HCL

870.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Promethazine HCL suppositories (12.5 and 25 mg) beginning at least as early as August 2012.

871.    Promethazine HCL, also known by the brand name Promethegan, is used to treat some allergies, nausea, and vomiting.

872.    During the relevant time frame, the primary manufacturers of Promethazine HCL were Actavis, Perrigo, G&W, Mylan and Taro.

873.    The market for Promethazine HCL was mature and at all relevant times had multiple manufacturers.

874.    For years the prices for Promethazine HCL suppositories were relatively low and stable. Beginning in August 2012, G&W, Actavis and Perrigo coordinated large price increases in close succession. In September 2014, Mylan joined the market and rather than offer lower prices to win market share, it imposed prices even higher than G&W, Actavis and Perrigo. When Taro entered the market during the summer of 2015, it too offered inflated prices.

875.    The chart below shows the dramatic price increases imposed by Actavis, G&W and Perrigo in close succession, and that Mylan and Taro offered similarly inflated prices when they

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

entered the market. Note: Prices for 12.5 mg suppositories exhibited a similar pricing pattern. The charts for only the 25 mg dosage is included here. [CHART REDACTED]



876.    Throughout this period, Actavis, G&W, Perrigo, Mylan and Taro met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Promethazine HCL and their Fair Share agreement.

877.    For example, in August 2012, G&W began planning to raise prices for Promethazine HCL. G&W began to reach out to competitors to coordinate the price increase.

878.    In September 2012, Vogel-Baylor, G&W Vice President of Sales and Marketing, communicated by phone numerous times with Rick Rogerson, Actavis Senior Director of Pricing. Vogel-Baylor also used A.T., Aurobindo Director of National Accounts, as a conduit to exchange information with T.P., Perrigo Director of National Accounts. The express purpose of Vogel-

Baylor's communications with Actavis and Perrigo was to effectuate a large price increase for Promethazine HCL.

879.    During the same period, T.P. (Perrigo) communicated by phone with M.D., Actavis Director of National Accounts.

880.    After solidifying an agreement with Perrigo and Actavis to raise prices, G&W proceeded to announce increases for Promethazine HCL in early October 2012. Perrigo announced its own price increase for Promethazine HCL in early December 2012, with prices taking effect in January 2013. Actavis announced price increases as well, not long after Perrigo.

881.    Having demonstrated the success of their pricing agreement on Promethazine HCL, the companies were greedy for a larger increase and started to plan for a second increase that would dwarf the first.

882.    In March 2013, Orlofski, G&W President, and Douglas Boothe, Perrigo Executive Vice President and General Manager, communicated by phone multiple times.

883.    In March and April 2013, Vogel-Baylor (G&W) continued to communicate with Rogerson (Actavis) and with T.P. (Perrigo) through her conduit, A.T. (Aurobindo). T.P. also resumed his communications with M.D. (Actavis). All three companies agreed to a second price increase for Promethazine HCL

884.    Again, the coordination worked. In April 2013, G&W announced a large price increase for Promethazine HCL. In June 2013, Actavis matched G&W's prices. And on August 1, 2013, Perrigo followed suit and matched prices as well. The companies continued to communicate by phone in the lead up to each of the price increases.

885.    As each manufacturer raised prices, customers shopped around for better prices. But each company repeatedly stuck to the Fair Share agreement and turned away opportunities to

gain share. In some instances, customers were given pre-textual excuses for turning away business. For example, when G&W was approached by a large Actavis customer seeking a new supplier for Promethazine HCL, G&W declined the opportunity by saying that it did not have the capacity to take on the account. In fact, G&W was simply abiding by the Fair Share agreement.

### 62. Ketoprofen

886. Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Ketoprofen beginning at least as early as September 2012.

887. Ketoprofen, also known by the brand name Dolobid, is a nonsteroidal anti-inflammatory drug (NSAID) used to treat mild to moderate pain, and to relieve symptoms of arthritis, such as inflammation, swelling, stiffness, and joint pain.

888. During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Ketoprofen capsules.

889. The market for Ketoprofen capsules was mature and at all relevant times had multiple manufacturers.

890. In the summer of 2013, Patel said she had heard "rumors of activity," *i.e.*, a price increase, on Ketoprofen. "Rumors" was a term consistently used by Patel in e-mails to as a euphemism for communicating with competitors about future price increases.

891. On June 28, 2013, Teva's Green and Mylan's Nesta spoke on the phone.  Shortly thereafter, Patel sent an e-mail internally at Teva stating that Mylan was announcing price increases that day, including for Ketoprofen. In actuality, Mylan did not announce the price increases until July 1, 2013, with an effective date of July 2, 2013.  Teva followed on August 9, 2013.

892.    As Teva prepared to follow the Mylan increase, the companies were in frequent contact. For example, on July 10, 2013, Green and Nesta spoke twice, and the next day, Nesta and Green exchanged several more calls. In addition, Green spoke to Nesta on August 1 (two calls), 2, 6 (three calls), and 8 (three calls), 2013.

893.    The day before Teva officially followed Mylan's price increase – August 8, 2013 – Patel spoke directly to Nesta.

894.    On January 28, 2015, Teva again raised its price on Ketoprofen capsules. Again, Teva's Patel and Rekenthaler communicated with Mylan before doing so. For example, Rekenthaler spoke to Nesta of Mylan on January 14 (2 calls) and January 20, 2015.

### 63.    Methotrexate Sodium

895.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Methotrexate Sodium tablets beginning at least as early as September 2012.

896.    Methotrexate Sodium, also known by the brand name Rheumatrex and Trexall, among others, is used to treat several types of cancer.

897.    During the relevant time frame, Defendants Par,[18] Mylan, Teva and West-Ward[19] were the primary manufacturers of Methotrexate.

898.    The market for Methotrexate was mature and at all relevant times had multiple manufacturers.

---

[18] The relevant entity prior to June 2014 was DAVA, which has since been subsumed into Par.

[19] The relevant entity at this point in time was Roxane, which eventually was acquired by West-Ward during the relevant period (announced July 2015, completed March 2016).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

899.    For years the prices for Methotrexate Sodium tablets were relatively low and stable. In late 2012 and early 2013, Teva and Mylan experienced supply disruptions. Par immediately ███████████████████████████████████ and announced a large list (WAC) price increase in late February 2013. West-Ward/Roxane soon followed the increases, ███████████████ and announcing list prices even higher than Par in May. Teva closely followed the price increases as well, closely tracking West-Ward/Roxane. By fall of 2013, Mylan also joined the price increases.

900.    The NSP price chart and list (WAC) price chart below highlight the large price increases for Methotrexate by Par, West-Ward/Roxane, Teva and Mylan. [NSP CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



901. Throughout this period, Par/DAVA, Mylan, Teva and West-Ward/Roxane met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Methotrexate and of their Fair Share agreement.

902. For example, on February 20, 2013—the day that Par/DAVA raised its list (WAC) prices—Teva's Green and Mylan's Nesta spoke by phone. Green and Nesta spoke again on May 17, 2013—two days after West-Ward/Roxane raised its list (WAC) prices. On July 3, Green and Nesta communicated again; that day, Teva raised its list (WAC) prices. Green had moved on to work at Zydus starting in November 2013, so by the time Mylan raised its list (WAC) prices on November 5, Green was no longer at Teva. But in the last days of October—before departing Teva and days before the Mylan increase—Green again spoke with Nesta.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 64.   **Tobramycin Dexamethasone**

903.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Tobramycin Dexamethasone ophthalmic suspension beginning at least as early as September 2012.

904.    Tobramycin Dexamethasone, also known by the brand name Tobradex, among others, is available an ophthalmic suspension, which is used to treat eye infections.

905.    During the relevant time frame, Defendants Bausch and Sandoz were the primary manufacturers of Tobramycin Dexamethasone.

906.    The market for Tobramycin Dexamethasone was mature and at all relevant times had multiple manufacturers.

907.    For years, the prices for Tobramycin Dexamethasone were relatively low and stable. In the fall of 2012, however, Bausch and Sandoz imposed large price increases almost simultaneously.

908.    The price charts below show the large and nearly identical and simultaneous price increases imposed by Bausch and Sandoz. [NSP CHART REDACTED]

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





245
PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

909.   Throughout this period, Bausch and Sandoz met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Tobramycin Dexamethasone and their Fair Share agreement.

910.   For example, representatives from both Bausch and Sandoz attended the following trade association events: NACDS 2012 Pharmacy and Technology Conference in Denver, Colorado (August 25-28, 2012); GPhA Board of Directors Meeting: in Washington, D.C. (November 29, 2012); and GPhA Annual Meeting in Orlando, Florida (February 20-22, 2013).

### 65.   Valsartan HCTZ

911.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Valsartan HCTZ tablets beginning at least as early as September 2012.

912.   Valsartan HCTZ, also known by the brand name Diovan, is a medication used to treat high blood pressure.

913.   During the relevant time frame, Defendants Sandoz and Mylan were the primary manufacturers of Valsartan HCTZ.

914.   Mylan was the first to file an ANDA to market the generic Valsartan HCTZ – which, if approved, would give Mylan 180 days of generic exclusivity. Sandoz manufactured the authorized generic.  This meant that Sandoz and Mylan would be the only two manufacturers of the generic version of the drug for six months.

915.   Mylan and Sandoz both launched Valsartan HCTZ on September 21, 2012.  Prior to the launch, D.L., a Director of National Accounts at Sandoz, and Nesta of Mylan spoke numerous times by phone and discussed, among other things, avoiding price competition for customers in the Valsartan HCTZ market. They agreed to split the market 50/50.

916.   Sandoz's Kellum was kept in the loop about the agreement with Nesta.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

917.    On September 21, 2012, a Sandoz employee remarked in an email on news of Mylan's FDA approval for Valsartan HCTZ: "Fyi, good news, Mylan has 180 days as expected." A Sandoz executive in Germany responded, ". . . sometimes a little help from our competition is welcome as well." D.D., the President and CEO of Sandoz North America replied: "**I guess this what they call co-opetition.**"

918.    Shortly after Mylan entered the market, a large wholesaler contacted Sandoz to ask for better prices on Valsartan HCTZ.  Sandoz refused. Kellum at Sandoz continued to monitor the agreement and to make sure that Sandoz was not taking more than its Fair Share. He explained to colleagues: "I'm concerned we are going to disrupt the market. I understand the need for additional sales but we need to be thoughtful here." A directive went out to the Sandoz sales personnel: "Do not approach new customers" without prior approval from the executives.

### 66.    Diclofenac Potassium

919.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Diclofenac Potassium beginning at least as early as October 2012.

920.    Diclofenac Potassium, also known by the brand name Cataflam, among others, is a non-steroidal anti-inflammatory drug (NSAID) used to relieve pain and swelling.

921.    During the relevant time frame, Defendants Teva, Mylan and Sandoz were the primary manufacturers of Diclofenac Potassium.

922.    The market for Diclofenac Potassium tablets was mature and at all relevant times had multiple manufacturers.

923.    For years, the prices for Diclofenac Potassium tablets were relatively low and stable. In late 2012, however, Mylan, Teva and Sandoz began a series of coordinated price

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

increases that resulted in list (WAC) prices nearly double the prior levels, and NSP prices that were many multiples of the former prices.

924.   The list price and NSP price charts below show the sustained price increases imposed by Mylan, Teva and Sandoz. [NSP CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



925.    Throughout this period, Mylan, Teva and Sandoz met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Diclofenac tablets and their Fair Share agreement.

926.    For example, on August 9, 2013, Teva raised its list price on Diclofenac Potassium to match that of Mylan.  Over the previous months, Teva had been raising its prices to customers (NSP prices) but had not yet raised its list price.

927.    As with numerous other drugs during this period, Teva coordinated with Mylan and Sandoz before announcing a price increase. For example, Green (Teva) spoke to Nesta (Mylan) on August 1 (two times), August 2, August 6 (three times), and August 8 (three times), 2013. The day before the price increase went into effect – August 8, 2013, Patel called Nesta of Mylan twice and also called a contact at Sandoz.

928.    On August 28, 2014, Teva again raised list prices on Diclofenac Potassium tablets. This time it was the first manufacturer to increase prices. Leading up to the price increase, Patel

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and Rekenthaler were communicating with Mylan and Sandoz to coordinate. For example, Rekenthaler spoke to Nesta on August 4, 7, 11 (2 calls), 18 (2 calls), and 21. Patel spoke to a contact at Sandoz on August 11, 26, 27 (2 calls), and 28, 2014.

929. The coordination worked. Sandoz followed Teva's price increases on Diclofenac Potassium tablets and announced an identical list price approximately 6 weeks later. Mylan followed, also matching Teva and Sandoz's list prices, on March 4, 2015. Rekenthaler coordinated with Nesta of Mylan during two phone calls on February 18 and one call on February 19, 2015.

### **67.    Ketorolac Tromethamine**

930. Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Ketorolac Tromethamine tablets beginning at least as early as October 2012.

931. Ketorolac Tromethamine, also known by the brand name Toradol, is a nonsteroidal anti-inflammatory drug (NSAID) indicated for the short-term management of moderately severe acute pain.

932. During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Ketorolac Tromethamine.

933. The market for Ketorolac Tromethamine tablets was mature and at all relevant times had multiple manufacturers.

934. For years, the prices of Ketorolac Tromethamine tablets were relatively low and stable. As with numerous other drugs during manufactured by Teva and Mylan, things changed in mid-2012, when those manufacturers began to implement coordinated and sustained price increases. Over the course of their conspiratorial price increases, Teva and Mylan prices skyrocketed. List (WAC) prices for Ketorolac Tromethamine tablets more than doubled and NSP

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

prices ███████████████ These extraordinary price increases were only possible because of Teva and Mylan's agreement to fix prices and to abide by the Fair Share agreement.

935.    The list (WAC) price chart and NSP price chart below highlight the parallel price increases by Teva and Mylan for Ketorolac Tromethamine tablets. [NSP CHART REDACTED]





936.    Throughout this period, Teva and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Ketorolac Tromethamine tablets and their Fair Share agreement.

937.    Throughout 2012, 2013 and 2014, Teva and Mylan were in regular communication for the purposes of fixing the prices of generic drugs, including Ketorolac Tromethamine. For example, Teva's Green and Mylan's Nesta spoke many times by phone in 2012 and 2013. In 2014, Teva's Rekenthaler stepped in for Green and communicated directly with Nesta to work out pricing and Fair Share for Ketorolac Tromethamine and other drugs.

### 68.    Prazosin HCL

938.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Prazosin HCL capsules beginning at least as early as October 2012.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

939.    Prazosin HCL, also known by the brand name Minipress, is a medication used to treat high blood pressure.

940.    During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Prazosin HCL capsules.

941.    The market for Prazosin HCL capsules was mature and at all relevant times had multiple manufacturers.

942.    The NSP price chart and list (WAC) price chart below show the parallel and increased pricing by Teva and Mylan. Note: Prazosin capsules come in 1, 2 and 5 mg dosages, each of which exhibited similar pricing patterns. Charts for only the 2 mg dosage is included here.

[NSP CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



943.     Throughout this period, Teva and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Prazosin HCL capsules and their Fair Share agreement.

944.     For example, Teva had been charging lower prices than Mylan throughout most of 2011 and 2012. In the second half of 2012, during which time Teva and Mylan were in regular phone communication, Teva moved its prices closer to those of Mylan.

945.     Once Teva had brought its prices closer to Mylan, it almost immediately began to plan bigger price increases, and continued its communications with Mylan to coordinate. For example, on July 3, 2013, Teva more than doubled its list (WAC) prices for Prazosin HCL capsules. To coordinate the increase, Teva's Green spoke with Mylan's Nesta numerous times, including at least in May, June, July and August of 2013.

946.     Teva and Mylan continued to coordinate Prazosin HCL price increases in 2014. Since Green had moved on from Teva, Rekenthaler picked up the communication and had

numerous calls with Mylan's Nesta between May and August 2014, during which they agreed to additional price increases for Prazosin, among other drugs.  On August 28, 2014, once Teva had collected information about Mylan's customer contract price points, Teva matched Mylan's increase on Prazosin HCL capsules.

947.    On March 4, 2015, Mylan again increased Prazosin HCL capsule list (WAC) prices and again, Teva and Mylan coordinated. Nesta and Rekenthaler spoke on February 18 (2 calls) and 19, 2015.

948.    In April 2015, Teva ███████████████ a Prazosin HCL opportunity at a large customer because ███████████████████

949.    Teva matched Mylan's price increase in July 2015.

### 69.    Ethambutol HCL

950.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Ethambutol HCL tablets ("Ethambutol") beginning at least as early as November 2012.

951.    Ethambutol, also known by the brand name Myambutol, is a drug used to treat tuberculosis.

952.    During the relevant time frame, G&W and Lupin were the primary manufacturers of Ethambutol.

953.    In 2012, G&W marketed the authorized generic of Ethambutol for the manufacturer, STI Pharma ("STI"), and Lupin, Akorn/VersaPharm, and Teva sold the generic version.

954.    By early 2013, Akorn/VersaPharm and Teva were exiting the market as a result of supply issues for Ethambutol. Rather than compete with each other to acquire Akorn/VersaPharm and Teva customers, Lupin and G&W opted to conspire instead.

955.     In November and December 2012, G&W President Kurt Orlofski and G&W Vice President of Sales Erika Vogel-Baylor each communicated by phone with David Berthold, Lupin Vice President of Sales, to discuss Ethambutol. During the same period, Berthold communicated with Teva's Kevin Green.

956.     As G&W and Lupin developed pricing plans and customer strategies, they continued to communicate and to keep each other informed. For example, between December 9 and 19, as Lupin was devising its pricing announcements, Berthold (Lupin) called Vogel-Baylor (G&W) to keep her in the loop. Orlofski (G&W) also communicated by phone with Berthold.

957.     In January 2013, as purchasers of Ethambutol sought new suppliers, G&W and Lupin continued to coordinate. When G&W was contacted by a potential customer, Vogel-Baylor would communicate with Berthold. When Lupin was contacted by a potential customer, Orlofski communicated with Berthold.

958.     In January and February 2013, G&W and Lupin announced price increases. Orlofski, Vogel-Baylor and Berthold continued to communicate throughout that period. Berthold also kept Teva's Kevin Green in the loop.

**70.     Nystatin Triamcinolone Acetonide**

959.     Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Nystatin Triamcinolone Acetonide ("NT") cream and ointment beginning at least as early as November 2012.

960.     NT cream and ointment, also known by the brand names Mycolog-II and Mytrex, among others, are used to treat certain fungal or yeast infections of the skin.

961.     During the relevant time frame, Sandoz and Taro were the primary manufacturers of NT cream and ointment.

962.    Sandoz and Taro have admitted that they conspired to fix, raise or stabilize the prices of NT cream and ointment in violation of federal law and have entered into deferred prosecution agreements with the U.S. Department of Justice.

963.    In 2011, Sandoz temporarily exited the market for NT cream and ointment. Taro promptly imposed very large price increases. Customers paid ▬▬▬▬▬▬▬▬

▬▬▬▬

964.    As Sandoz prepared to re-enter the market, the two companies conspired to keep the prices for NT cream and ointment as high as possible; they wanted to ensure that competition did not drive prices back to where they were when the companies had to compete for customers.

965.    The price charts below show the low and stable prices of NT cream and ointment that prevailed when two competitors were in the market, followed by the extraordinarily elevated prices that Taro and Sandoz were able to maintain once they began their illegal coordination.

[CHARTS REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



966.    Throughout this period, Sandoz and Taro met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on NT cream and ointment and their Fair Share agreement.

967.    For example, as Sandoz began preparing to re-enter the NT cream and ointment markets in late 2012, it communicated with Taro regularly in order to coordinate. In November 2012 and January 2013, H.M., Taro Director of Corporate Accounts and C.B., Sandoz National Account Director, communicated by phone multiple times to discuss NT cream and ointment.

968.    As Sandoz conveyed its launch plans to Taro, Taro prepared to announce another price increase and to cede half the market to Sandoz when it finally re-launched NT cream and ointment. Michael Perfetto, Taro Chief Commercial Officer, advised the Taro sales staff ███.

969.    Although Taro already had imposed extraordinarily large price increases when Sandoz had exited the market the year prior, Taro rushed to increase prices even higher in

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

anticipation of Sandoz's entry. Although Taro did not fear price competition from Sandoz, it knew that it would have to give up half of its market share as part of their Fair Share agreement. To keep sales as high as possible, Taro greedily pursued yet another price increase.

970.    In February 2013, Taro increased pricing on NT cream and ointment.

971.    At Taro, Perfetto kept tabs on the NT cream and ointment developments. At Sandoz, D.P., V.P. of Institutional Sales, prodded C.B. to collect information from Taro about NT cream and ointment. To that end, in February and March 2013, Sandoz and Taro continued to communicate. C.B. (Sandoz) communicated multiple times with H.M. (Taro). C.B (Sandoz) also communicated with Aprahamian (Taro).

972.    On March 22, 2013, C.B. sent an email to his Sandoz colleagues and supervisors with purported ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ about the NT cream and ointment market. In fact, C.B. had acquired the information directly from Taro during his phone calls over the preceding weeks. C.B.'s Sandoz colleagues knew the truth—that the information was obtained through conspiratorial communications.

973.    In April, C.B. (Sandoz) and Aprahamian continued their conspiratorial coordination for NT cream and ointment. C.B let Taro know that Sandoz's entry was imminent. Aprahamian and C.B. also discussed pricing and which customers Sandoz should target. C.B. took notes of the call and shared the information with his colleagues and supervisors.

974.    After the calls with Sandoz, Taro directed its sales team not to compete with Sandoz for customers ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

975.    When Sandoz re-entered the NT cream market in late April, it matched Taro's pricing. As Sandoz began to pursue customers—as had been discussed between C.B. (Sandoz) and

Aprahamian (Taro)—Taro declined to put up a fight. Throughout May and June 2013, C.B and Aprahamian continued to communicate by phone.

976.    In November 2013, Sandoz was ready to re-launch NT ointment. Following the template for their successful coordination on NT cream, C.B. (Sandoz) and Aprahamian (Taro) exchanged multiple phone communications to make sure that NT ointment prices remained high. The companies agreed that Sandoz would target the same customers that it had pursued for NT cream and that Taro would again cede those customers without a fight.

977.    Both companies remained true to their agreement. Sandoz matched Taro's pricing on NT ointment and pursued only the Fair Share of the market, as agreed with Taro.

### **71.    Nafcillin Sodium**

### **72.    Oxacillin Sodium**

978.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Oxacillin Sodium and Nafcillin Sodium beginning at least as early as December 2012.

979.    Oxacillin and Nafcillin are separately marketed antibiotics used to treat infections caused by penicillin-resistant staphylococci, among other bacteria.

980.    In December 2012 and January 2013, Aurobindo began planning to enter the Nafcillin and Oxacillin markets. Before entering the market, Aurobindo coordinated with Sandoz, the market leader on both products. A.T., Aurobindo Director of National Accounts, and C.B., Sandoz National Account Executive, communicated by phone multiple times during those months. The purpose of the calls was to identify customers for Aurobindo to target and which Sandoz would concede.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

981.    Internally, during January 2013, Sandoz prepared to cede customers to Aurobindo on Nafcillin and Oxacillin. A.T. (Aurobindo) and C.B. (Sandoz) continued to communicate and coordinate.

982.    When Aurobindo finally entered the markets for Oxacillin and Nafcillin, it announced prices in line with what had been agreed with Sandoz. Sandoz, for its part, ▮▮▮▮▮▮▮▮ customers to enable Aurobindo to obtain a Fair Share of the market.

### 73.    Cefpodoxime Proxetil

983.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Cefpodoxime Proxetil beginning at least as early as January 2013.

984.    Cefpodoxime, also known by the brand name Vantin, is an antibiotic used to treat a wide variety of bacterial infections. It is sold in both oral suspension and tablet form.

985.    During the relevant time frame, Sandoz and Aurobindo were the primary manufacturers of Cefpodoxime.

986.    In January 2013, C.B., Sandoz Director of National Accounts, called his former colleague, A.T., who moved on from Sandoz to become a Director of National Accounts at Aurobindo. This call initiated a series of communications over the ensuing months between Sandoz and Aurobindo that led to the inclusion of Cefpodoxime in the two companies' Fair Share agreement.

987.    During the course of their communications, A.T. (Aurobindo) informed C.B. (Sandoz) that Aurobindo was planning to enter the market for Cefpodoxime. C.B., in turn, informed A.T., that Sandoz was planning to increase prices on Cefpodoxime. The Sandoz and Aurobindo National Account Directors also discussed which customers would be allocated to Aurobindo, and Sandoz shared confidential customer pricing as well.

988.    Each of the men kept their colleagues and supervisors informed of the discussions. At Sandoz, C.B. kept Kellum in the loop. At Aurobindo, A.T. apprised Grauso of the discussions with Sandoz.

989.    On January 11, 2013, Sandoz increased WAC (list) pricing on Cefpodoxime. That day, C.B. (Sandoz) and A.T. (Aurobindo) communicated multiple times by telephone.

990.    In late February 2013, A.T. and Grauso of Aurobindo and C.B., Kellum, and P.K. (Director of National Accounts) of Sandoz attended the ECRM annual Retail Pharmacy Generic Pharmaceuticals Conference. While at the conference, P.K. (Sandoz) sent an email to Sandoz colleagues conveying that he "heard at ECRM" that Aurobindo would soon be launching Cefpodoxime.

991.    In the second half of April 2013, A.T. (Aurobindo) and C.B. (Sandoz) continued their discussions about Cefpodoxime. They spoke on the phone multiple times, including on the day that Aurobindo entered the market and announced list (WAC) prices on par with those of Sandoz. The two men also continued their discussions about which customers would be ceded by Sandoz to Aurobindo.

992.    Over the following months, Aurobindo proceeded to acquire the customers that had been agreed upon with Sandoz. Internally, Sandoz made sure to abide by the agreement, and to cede the agreed upon Fair Share to Aurobindo. For example, when Sandoz was approached by its existing customer seeking a bid to retain the Cefpodoxime business, Sandoz declined the invitation, telling its customer that it would be ███████████ the account. The customer took its business to Aurobindo, just as Sandoz and Aurobindo had planned.

993.    Similarly, Aurobindo monitored its share and was careful to ensure that it abided by the terms of the agreement with Sandoz. For example, in September 2013, after realizing that

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

it did not have a Fair Share of the market, Aurobindo, at the direction of Grauso, decided to pursue an additional large customer for Cefpodoxime. Aurobindo succeeded in winning the customer. In December 2013, Sandoz evaluated the loss of this customer, and concluded—consistent with the Fair Share agreement—not to try to win the customer back because, as Kellum explained: ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

### 74. Methylphenidate HCL

994. Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Methylphenidate HCL regular tablets ( 5, 10 and 20 mg) and extended release tablets (20 mg) beginning at least as early as January 2013.

995. Methylphenidate, also known by the brand name Ritalin, among others, and is a medication used to treat attention deficit hyperactivity disorder (ADHD).

996. During the relevant time frame, Defendants Actavis, Sandoz, Mallinckrodt, Sun, Impax[20] and Par were the primary manufacturers of Methylphenidate regular release tablets and Defendants Sandoz and Mallinckrodt were the primary manufacturers of Methylphenidate extended release tablets.

997. The market for Methylphenidate tablets was mature and at all relevant times had multiple manufacturers.

998. For years, the prices of Methylphenidate tablets were relatively low and stable. Then, in March 2013, Mallinckrodt experienced supply disruptions. Although Mallinckrodt informed the market that it expected to have the supply disruptions resolved by May or June—and

---

[20] The relevant entity at the time of market entry (May 2014) was Corepharma, which was acquired by Impax in October 2014.

they, in fact, were resolved in that time frame—Sandoz, Sun, Mallinckrodt and Actavis used this shortage as an excuse to hike prices and to keep them high.

999.    Impax and Par, which joined the market later, chose not to offer lower prices to win market share. Instead, both entered at the same inflated prices of Sandoz, Sun, Mallinckrodt and Actavis. Impax announced identical list prices to the incumbent manufacturers, and although Par/Qualitest announced lower list prices, both Impax and Par ████████████████████████

████████████████████████

1000.    As word of Mallinckrodt's supply challenges became known in early 2013, ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████    In March 2013, Sandoz announced list (WAC) prices for its Methylphenidate regular release tablets that were approximately five times higher than its former prices and also imposed significant increases on ER tablets.

1001.    Within weeks, Actavis and Mallinckrodt followed Sandoz's list price increases. Sun, which was entering the market anew and would begin shipping product in May, also announced list prices nearly identical to those of Sandoz, Actavis and Mallinckrodt. With Mallinckrodt experiencing supply disruptions, and with Sandoz imposing a 500% price increase, Actavis and Sandoz had an incredible opportunity to win new customers by offering better pricing. Instead, they hewed to the Fair Share agreement and looked to sell less Methylphenidate, but to do so at much higher prices.

1002.    Similarly, Impax and Par passed up the opportunity to rapidly win market share by competing on price. Instead, they stuck to their Fair Share.

1003.   The NSP price chart and list (WAC) price chart below show the steep and parallel price increases For Methylphenidate regular tablets imposed by Sandoz, Actavis and Mallinckrodt and which were joined by Sun, Impax and Par. The charts also show similar price increases during the same period by Sandoz and Mallinckrodt on ER tablets. Note: The pricing pattern for 5 mg, 10 mg and 20 mg dosages of Methylphenidate regular tablets were highly similar. Charts for only the 10 mg dosage are included here. [NSP CHARTS REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1004.   Throughout this period, Actavis, Sandoz, Par/Qualitest, Sun, Mallinckrodt and Impax met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Methylphenidate tablets and their Fair Share agreement.

1005.   In the spring of 2013, Sandoz, Actavis and Mallinckrodt coordinated large price increases for Methylphenidate. During this period, they communicated with each other by phone a number of times. For example, C.B., Director of National Accounts at Sandoz, communicated by phone (text and/or voice) with Walter Kaczmarek, Vice President and General Manager at Mallinckrodt (and former colleague of C.B. at Sandoz), on March 1, 4, 5 and 8. On March 8, the last day in this sequence of communications between Sandoz and Mallinckrodt, Sandoz announced its list (WAC) price increases for Methylphenidate.

1006.   On April 22, A.G., Actavis Director of National Accounts, spoke to D.P., Sandoz Vice President of Institutional Sales, for approximately 21 minutes. Four days later, on April 25, Actavis followed Sandoz and announced identical list (WAC) prices for Methylphenidate.

1007.   April 23, 2013—two days *before* Actavis announced its list (WAC) price increase, S.K., Sun's Senior Manager of Sales, updated her boss, G.S., President of Sun ███████████████████

███████████████████████████████████████████████████████████

███████████████████████████████

1008.   On May 1, less than a week after Actavis followed Sandoz's price increase, Sun's prescience proved correct: Mallinckrodt also announced list (WAC) price increases identical to those of Sandoz and Actavis. The next day, C.B. at Sandoz spoke to K.K., Mallinckrodt's National Account Director (and another of C.B.'s former Sandoz colleagues).

1009.   In April and May 2014, when Impax/Corepharma was entering the market, C.B. (Sandoz) was again in phone contact with Mallinckrodt's K.K (May 2) and with Actavis's A.G.,

Director of National Accounts (April 7). Actavis's A.B., Senior Vice President of Sales, was in contact with Mallinckrodt's Kaczmarek (April 2, 3 and May 16). Actavis's A.B. was also in touch with Sun's J.M., National Account Manager, on June 6 and 25.

1010.   The next summer (2015), when Par entered the market, Sun's J.M. communicated directly with Par. She spoke to G.B., Par VP of National Accounts, on May 20 and with K.O., Par's VP of National Accounts, on July 10, 2015. Par's G.B. also spoke to Sun's S.S., Senior Director of Sales, on May 21.

### 75.   Spironolactone HCTZ

1011.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Spironolactone HCTZ tablets beginning at least as early as January 2013.

1012.   Spironolactone HCTZ, also known by the brand name Aldactazide, is a medication used to treat high blood pressure.

1013.   During the relevant time frame, Defendants Mylan, Sun and Greenstone were the primary manufacturers of Spironolactone HCTZ.

1014.   The market for Spironolactone HCTZ tablets was mature and at all relevant times had multiple manufacturers.

1015.   After years of relatively low and stable pricing, in early 2013 the prices of Spironolactone HCTZ radically increased. Within approximately one month, Mylan, Sun and Greenstone each announced list price increases of approximately 400%.  Their NSP prices ▮ ▮ as customers were forced to pay much higher price.

1016.   A little more than a year later, in the summer of 2014, all three manufacturers again raised prices. Almost simultaneously, Mylan, Sun and Greenstone ▮

▮

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1017. The price charts below show the very large and parallel price increases for Spironolactone HCTZ by Mylan, Sun and Greenstone. [NSP CHART REDACTED]





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1018.   Throughout this period, Mylan, Sun and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Spironolactone HCTZ tablets and their Fair Share agreement.

1019.   For example, Greenstone, Mylan and Sun all sent representatives to the GPhA Annual Meeting in Orlando, Florida on February 20 to 22, 2013. All three companies also attended the NACDS 2013 Annual Meeting at the Sands Expo Convention Center in Palm Beach, Florida on April 20 to 23, 2013. During this window of time, all three manufacturers announced list (WAC) price increases of more than 400%.

1020.   These companies also communicated directly with each other. For example, Mylan's Nesta was in frequent contact with Greenstone during the period in which the two companies coordinated pricing on Spironolactone HCTZ. He exchanged hundreds of telephone calls or text messages with Greenstone's R.H. from 2011 through 2014, and dozens of phone calls or texts with Greenstone's Nailor between December 2012 and November 2015.

## 76.   Bromocriptine Mesylate

1021.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Bromocriptine Mesylate tablets beginning at least as early as February 2013.

1022.   Bromocriptine Mesylate, also known by the brand name Parlodel, is a medication used to treat certain conditions caused by a hormone imbalance.

1023.   During the relevant time frame, Defendants Mylan, Sandoz and Perrigo were the primary manufacturers of Bromocriptine Mesylate tablets.

1024.   The market for Bromocriptine Mesylate tablets was mature and at all relevant times had multiple manufacturers.

1025.   For years the prices of Bromocriptine Mesylate tablets were relatively low and stable. In early 2013, however, things changed. Mylan was experiencing supply challenges. It did not exit the market, but reduced sales. Sandoz used this as an opportunity to more than triple its prices. Mylan promptly followed Sandoz's prices up. Perrigo did not immediately follow the price increases, but instead steadily and slowly raised prices over time.

1026.   Throughout the period, however, all three manufacturers adhered to Fair Share principals. Sandoz and Perrigo had very close to equal unit sales of Bromocriptine Mesylate tablets throughout this period. Although Perrigo should have been able to gain much more share with lower prices, it stuck to its Fair Share.

1027.   For example, Sandoz analyzed the market in an internal July 2013 document.

1028.   The Fair Share agreement continued to dictate the behavior of Sandoz, Perrigo and Mylan in 2014. In an April internal analysis, The next month, Sandoz internally

1029.   The NSP price chart below shows the large and sustained price increases by Mylan, Perrigo and Sandoz for Bromocriptine Mesylate tablets. [CHART REDACTED]

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1030. Throughout this period, Sandoz, Mylan and Perrigo met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Bromocriptine Mesylate tablets and of their Fair Share agreement.

1031. For example, as Sandoz, Mylan and Perrigo coordinated pricing for Bromocriptine, they communicated directly by phone. Mylan's Jim Nesta communicated with D.L., Director of National Accounts at Sandoz, on March 4 and 11; May 8, 13 and, 29; June 13; and July 16 and 19, 2013. Another Sandoz Director of National Accounts, C.B., communicated with Perrigo's National Account Director, A.F., on July 16, 17, 18, 2013.

### 77.    Budesonide

1032. Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Budesonide inhalation suspension and delayed release ("DR") capsules beginning at least as early as February 2013.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1033.   Budesonide, also known by the brand name Pulmicort, among others, is a corticosteroid medication. The inhaled form is used in the long-term management of asthma and chronic obstructive pulmonary disease (COPD).  The pills in a delayed release form may be used for inflammatory bowel disease including Crohn's disease, ulcerative colitis and microscopic colitis.

1034.   During the relevant time frame, Defendants Teva, Actavis and Sandoz were the primary manufacturers of Budesonide inhalation. Teva, Mylan and Par were the primary manufacturers of Budesonide DR capsules.

**Budesonide Inhalation Suspension**

1035.   As of February 2013, Teva was the only company in the market for generic Budesonide Inhalation Suspension. Teva knew, however, that there was a good chance that Actavis would soon be entering the market, followed by others. In anticipation of needing to cede market share to the new entrants, Teva pre-emptively decided to raise prices, so that when it eventually ceded share it would not lose as much dollar revenue.

1036.   Teva raised the list price for its Budesonide Inhalation Suspension by 9%. Although a very modest increase in percentage terms, the 9% price increase added millions to Teva's annual revenues.

1037.   On April 1, 2013, Actavis won a legal challenge that would enable it to enter the market. That day, Teva's Rekenthaler called A.B., his counterpart at Actavis – a senior sales and marketing executive – and they spoke for two (2) minutes.

1038.   The next day, April 2, 2013, Rekenthaler spoke to A.B of Actavis two more times. Actavis then immediately began shipping the product. Instead of offering better prices to win over customers, Actavis entered the market with the same list (WAC) price as Teva.

1039.   At some point thereafter, further legal action from the brand manufacturer delayed Actavis (or any other manufacturer) from fully entering the market until February 2015. As Actavis was (again) preparing to ramp up sales of Budesonide, Teva's Rekenthaler and Falkin of Actavis were communicating by phone to coordinate Actavis's entry into the market and the ceding of market share to Actavis by Teva.

1040.   A few months later, Sandoz was the next to enter the market. The same pattern held. Rather than compete for customers with better prices, Sandoz announced identical WAC prices to those of Teva and Actavis. Owing to their Fair Share agreement, Sandoz was able to gain market share as Teva ceded customers to it.

**Budesonide DR Capsules**

1041.    Teva was preparing to enter the market for Budesonide DR in the spring of 2014. At the time, Par and Mylan were the only other manufacturers in the market.

1042.   Just as Teva had done in anticipation of Actavis's entry into the Budesonide Inhalation market, shortly before Teva entered the Budesonide DR market, Par increased the price of the drug.

1043.   As Teva was preparing to enter the market, and as Par was raising prices, all three manufacturers were communicating with each other by phone. Teva's Rekenthaler was in touch with a senior national account executive at Par and with Nesta at Mylan. Meanwhile, another account executive at Par was in touch with a counterpart at Mylan.

**78.     Pioglitazone Metformin HCL**

1044.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Pioglitazone Metformin HCL tablets beginning at least as early as February 2013.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1045.   Pioglitazone Metformin, also known by the brand name Actoplus Met, is used to control high blood sugar in patients with type 2 diabetes.

1046.   During the relevant time frame, Mylan, Teva, Aurobindo, Sandoz and Torrent were the primary manufacturers of Pioglitazone Metformin.

1047.   Before February 2013, Mylan and Teva were the only generic suppliers of Pioglitazone Metformin. Mylan and Teva launched their products in August 2012. In the weeks preceding their launches and continuing throughout their period of exclusivity, Mylan and Teva were in regular contact to coordinate pricing and market share. For example, Teva's Kevin Green, Director of National Accounts, and Mylan's Jim Nesta, Vice President of National Accounts, communicated by phone multiple times per month from June 2012 and continuing through to February 2013. The Pioglitazone Metformin market share was almost exactly evenly split between Teva and Mylan during this period, just as contemplated by their Fair Share agreement.

1048.   Mylan and Teva's 180-day exclusivity period expired in February 2013, after which other manufacturers were eligible to enter the market. Aurobindo and Torrent launched Pioglitazone Metformin in February and Sandoz launched in April 2013.

1049.   Teva's Green and Mylan's Nesta continued to communicate frequently as the Pioglitazone Metformin market opened up to other manufacturers. Green and Nesta also expanded their outreach and began to communicate with Aurobindo and Sandoz to coordinate pricing and target customers.

1050.   For example, in February 2013, Nesta (Mylan) communicated with A.T., Aurobindo Director of National Accounts, both before and after Aurobindo entered the market. Green (Teva) communicated with Jim Grauso, Aurobindo Senior Vice President of Commercial

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Operations, during the same period. Teva's T.S., National Account Manager, also communicated directly with Grauso.

1051.   Also in February 2013, Green (Teva) communicated directly with Kellum, Sandoz Director of Contracts and Pricing, and P.K., Sandoz Director of National Accounts.

1052.   Sandoz and Aurobindo also communicated directly about the pricing and market share of Pioglitazone Metformin in February 2013. C.B., Sandoz National Account Executive, and A.T. (Aurobindo) spoke numerous times. C.B. kept contemporaneous notes of the pricing and customer discussions that were shared between the two companies.

1053.   On February 24 through February 27, 2013, ECRM held its annual Retail Pharmacy Generic Pharmaceuticals Conference in Dallas, Texas. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1054.   Upon returning from the ECRM conference, Kellum (Sandoz) relayed to his Sandoz colleagues ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ With respect to Pioglitazone Metformin, after convening with the other manufacturers in Texas, Kellum was confident that the market would be ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ owing to the fact that ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ Kellum used typical euphemisms for conspiratorial conduct: ▮▮▮▮▮▮ meant that Aurobindo and Torrent could be expected *not* to compete on price, but instead to abide by the Fair Share agreement; ▮▮▮▮▮▮ meant that Sandoz would be sure to coordinate directly with the other manufacturers so as not to disrupt the market pricing.

1055.   Kellum kept his word, and Sandoz did its ▮▮▮▮▮ before launching in April. C.B. (Sandoz) communicated by phone with A.T. (Aurobindo) multiple times during that month.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

The two discussed in detail pricing and customers for Pioglitazone Metformin. C.B. again took contemporaneous notes of these discussions.

1056.  Sandoz also did its ███████ with Teva that month. Green (Teva) communicated by phone multiple times in April 2013 with P.K. (Sandoz).

1057.  The ███████ paid off. When Sandoz launched its Pioglitazone Metformin, it matched the prices of the other manufacturers. Notwithstanding that it was not offering better prices, Sandoz was able to win share. Teva, for example, internally discussed Sandoz's entry in April 2013 and decided to concede a large wholesale customer to help Sandoz get its Fair Share. Aurobindo, Mylan, Sandoz, Teva and Torrent continued to communicate after Sandoz entered the market. For example, Green (Teva) communicated with Grauso (Aurobindo), Nesta (Mylan) and Kellum (Sandoz) multiple times between April and August 2013. In addition to Green (Teva), Grauso (Aurobindo) communicated by phone directly with Nisha Patel at Teva in the second half of 2013. Grauso also communicated by phone directly with K.G. (Torrent) in May 2013. Nesta (Mylan) communicated frequently with D.L., Sandoz Director of National Accounts during the second half of 2013.

### 79.    **Fenofibrate**

1058.  Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Fenofibrate tablets (48 mg and 145 mg) beginning at least as early as March 2013.

1059.  Fenofibrate, also known by the brand name Tricor, is a medication used to treat cholesterol conditions.

1060.  During the relevant time frame, Defendants Teva, Lupin, Perrigo and Mylan were the primary manufacturers of Fenofibrate. Defendant Zydus joined the Fenofibrate market and the Fenofibrate conspiracy in February 2014.

1061.   Initially, Teva and Lupin were the first major suppliers of generic Fenofibrate 48 mg and 145 mg tablets. Perrigo and Mylan joined the market not long after. In order to keep prices high, the Fenofibrate manufacturers coordinated pricing and market share.

1062.   For example, in early 2013, Teva's Green called Mylan's Nesta to find out more about Mylan's plans with Fenofibrate. Green reported back to his Teva colleagues that Mylan planned to launch Fenofibrate 48 mg and 145 mg sometime around November 2013.

1063.   A few months later in 2013, however, Teva learned that Mylan was moving up its launch date for Fenofibrate. In advance of this launch, Teva, Lupin, Mylan and Perrigo conspired to allocate the market for Fenofibrate.

1064.   For example, executives for Teva, Mylan, and Lupin were in regular contact by phone. Patel (Teva) spoke to Berthold (Lupin) on May 6 and 7, and Green (Teva) spoke to Berthold on May 6 and 9, 2013. Further, Green spoke to Nesta (Mylan) on May 7, 8, and 9, 2013.  And Nesta spoke to Berthold on May 7 and 8, 2013. On these calls, Teva, Mylan, and Lupin executives shared information about Mylan's Fenofibrate launch and the plan to allocate market share to Mylan.

1065.   All of the coordination had real effects. For example, Teva decided to concede one of its largest customers to Mylan so that Mylan could obtain a Fair Share of the market and thus avoid price competition.

1066.   Similarly, in February 2014, Zydus was preparing to enter the Fenofibrate market. Green, formerly at Teva but now at Zydus, colluded with Teva's Patel and Rekenthaler, Mylan's Nesta, and Lupin's Berthold to share pricing information and allocate market share to his new employer, Zydus. Mylan's Nesta spoke to T.P., Perrigo's Director of National Accounts, on February 6, 2014.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1067.   In March 2014, when Zydus entered the Fenofibrate market, it announced list prices that matched Teva, Mylan, and Lupin.  In the days leading up to the launch, executives from all four competitors were in regular contact with each other to discuss pricing and allocating market share to Zydus.  Between March 3 and March 7, these competitors exchanged at least 26 calls with each other.

1068.   In the months that followed, Teva "strategically conceded" several customers to Zydus in accordance with the agreement they had reached. Throughout, Teva communicated directly with competitors to keep them apprised of developments and to ensure that Fair Share was maintained for Fenofibrate. For example, Patel continued to communicate directly with Berthold (Lupin) and Green (Zydus) in May and June.

1069.   By coordinating prices and market share, Teva, Mylan, Lupin, Perrigo and Zydus were able to keep Fenofibrate prices higher than they would have been in a competitive market.

### **80.    Medroxyprogesterone**

1070.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Medroxyprogesterone tablets beginning at least as early as March 2013.

1071.   Medroxyprogesterone, also known by the brand name Provera, among others, is a medication used to treat amenorrhea (unusual stopping of menstrual periods) and abnormal uterine bleeding.

1072.   During the relevant time frame, Defendants Teva and Greenstone were the primary manufacturers of Medroxyprogesterone tablets.

1073.   In early 2013, Teva and Greenstone began planning to increase the prices of Medroxyprogesterone tablets. Teva's Patel and R.H., Director of National Accounts at Greenstone,

communicated frequently to orchestrate the price increases. For example, they exchanged six (6) text messages on November 16, 2013 and spoke by phone on November 23, 2013.

1074.   Not long after Greenstone had been communicating with Teva, a Greenstone executive informed Pfizer, its parent company, about the price increase proposal. Pfizer granted approval for the price increases on November 22, 2013, and the next day, Patel communicated with R.H. at Greenstone.  Patel also spoke to R.H. three times on December 2, 2013, the day Greenstone planned to send price increase notices to its customers.

1075.   After the price increases, Teva and Greenstone were careful to maintain Fair Shares of the market.

### 81.   Alclometasone Dipropionate

1076.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Alclometasone Dipropionate cream and ointment beginning at least as early as April 2013.

1077.   Alclometasone Dipropionate, also known by the brand name Alcovate, is a medication used to treat the inflammation and itching caused by a number of skin conditions such as allergic reactions, eczema, and psoriasis.

1078.   During the relevant time frame, Defendants Sandoz, Taro, and Glenmark were the primary manufacturers of Alclometasone Dipropionate.

1079.   The market for Alclometasone cream and ointment was mature and at all relevant times had multiple manufacturers.

1080.   After years of relatively low pricing, the prices of Alclometasone Dipropionate cream and ointment sold by Glenmark, Taro and Sandoz leaped to approximately three times their former prices.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1081.   By sticking to their Fair Share agreement, Glenmark, Taro and Sandoz were able to impose and sustain higher prices for Alclometasone Dipropionate. For example, in May 2013, after Glenmark raised its prices, one of Glenmark's large customers solicited bids on Alclometasone Dipropionate from Taro, seeking a better price. ███████████████ ████████████████████████████████████████████████████████████████████ ██████████████████ The reason was their Fair Share agreement, not inadequate supply.

1082.   The following NSP price charts show the sudden, parallel and large price increases by Glenmark, Taro and Sandoz on Alclometasone Dipropionate cream and ointment.  [CHARTS REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1083.   Throughout this period, Glenmark, Sandoz and Taro met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Alclometasone Dipropionate cream and ointment and of their Fair Share agreement.

1084.   As Sandoz, Taro and Glenmark began to raise prices in May 2013 continuing through the summer, all three companies were communicating. For example, D.S., AVP of Sales at Taro, and Mitchell Blashinsky, VP of Sales and Marketing at Glenmark (and a former Taro employee), spoke on May 5 for approximately 21 minutes and twice on May 31 for three minutes and approximately 19 minutes. Glenmark's Blashinsky also communicated by phone with Taro's Aprahamian on August 15, 20 and 21.

1085.   D.S. at Taro also communicated with Sandoz that month. He spoke with D.L., a Director of National Accounts at Sandoz, on May 16 for approximately 22 minutes, and the two communicated by phone the next day as well. They communicated again in July and August.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1086.   By the end of the summer, and after the series of communications between Sandoz, Taro and Glenmark, each manufacturer had approximately ██████ their prices for Alclometasone Dipropionate.

### 82.   Ammonium Lactate

1087.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Ammonium Lactate beginning at least as early as April 2013.

1088.   Ammonium Lactate, also known by the brand name AmLactin, among others, is a topical medication used to treat dry, scaly, itchy skin.  It is available in cream and lotion (both 12%).

1089.   During the relevant time frame, Defendants Actavis, Perrigo and Taro were the primary manufacturers of Ammonium Lactate cream and lotion.

1090.   The market for Ammonium Lactate was mature and at all relevant times had multiple manufacturers.

1091.   For years, the prices for Ammonium Lactate were relatively low and stable. That changed in April 2013, when Taro implemented a price increase on both cream and lotion, which Actavis and Perrigo both followed.

1092.   The price charts below show the sustained price increases imposed in close succession on Ammonium Lactate by Taro, Actavis and Perrigo. [CHARTS REDACTED]

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1093.   Throughout this period, Actavis, Perrigo and Taro met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Ammonium Lactate and their Fair Share agreement.

1094.   For example, before increasing prices, Taro reached out to coordinate with Actavis and Perrigo. During April 2013—when Taro was raising prices—Taro's Aprahamian (Vice President of Sales) and Perfetto (Chief Commercial Officer) had multiple phone calls with competitors. Perfetto spoke with Douglas Boothe, Perrigo Executive Vice President and General Manager; he also spoke with M.D., Actavis Director of National Accounts. Aprahamian also communicated with Actavis's M.D., as well as with A.G., another Actavis Director of National Accounts.

1095.   During the same period, Actavis and Perrigo also were communicating directly with one another. For example, in April, on the heels of communicating with Taro, M.D. (Actavis) and T.P, Perrigo's Director of National Accounts, communicated by phone multiple times.

1096.   Also during April 2013, representatives from Taro, Perrigo and Actavis convened at the NACDS Annual Meeting.

### **83.   Cefdinir**

### **84.   Cefprozil**

1097.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Cefdinir capsules and oral suspension and Cefprozil tablets beginning at least as early as April 2013.

1098.   Cefdinir and Cefprozil are medications used to treat bacterial infections.

1099.   During the relevant time frame, Defendants Teva, Sandoz and Lupin were the primary manufacturers of Cefdinir capsules and oral suspension and Cefprozil tablets.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1100.   Not long after Patel started at Teva, she sent her first list of proposed price increases to her supervisor on May 24, 2013.  The list included Cefdinir oral suspension and capsules and Cefprozil tablets.

1101.   Patel communicated with competitors to coordinate the proposed price increases. For example, Patel spoke to Berthold of Lupin six (6) times on May 16, two (2) times on May 17, once on May 20, once on May 21, and three (3) times on May 23, 2013.

1102.   By summer, Teva and Lupin had raised prices on Cefdinir and Cefprozil, as agreed. Patel and Rekenthaler at Teva also communicated with contacts at Sandoz, which joined the price-fixing agreement on Cefdinir and Cefprozil.

### **85.   Cholestyramine**

1103.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Cholestyramine oral powder and oral solid beginning at least as early as April 2013.

1104.   Cholestyramine, also known by the brand name Prevalite, is a medication used to lower high cholesterol levels in the blood.

1105.   During the relevant time frame, Defendants Sandoz, Par, and Upsher-Smith were the primary manufacturers of Cholestyramine.

1106.   The market for Cholestyramine was mature and at all relevant times had multiple manufacturers.

1107.   For years, the prices for Cholestyramine were relatively low and stable. Then, in the space of a few months during the summer of 2013, Upsher-Smith, Sandoz and Par all implemented large and very similar price increases in very close succession. The manufacturers all had different list prices for Cholestyramine before the summer, but by the end, they all had

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

identical list prices that were much higher than before. Their NSP prices ███████████
███████████████████████████████████████████

1108.   The list (WAC) price charts and NSP price charts below show the sudden, steep,

large and sustained price increases imposed by Par, Sandoz and Upsher-Smith on Cholestyramine.

[NSP CHART REDACTED]



287

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1109.   Throughout this period, Par, Sandoz and Upsher-Smith met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Cholestyramine and of their Fair Share agreement.

1110.   For example, D.Z., Upsher-Smith Senior National Account Manager, and C.B., Sandoz Director of National Accounts, spoke briefly on May 29, 2013. Upsher-Smith announced its list (WAC) price increase on June 7, 2013.

1111.   Shortly after raising prices, Upsher-Smith reached out directly to Par. On June 20, 2013, C.O., Upsher-Smith's Director of Strategic Generic Portfolio and Marketing, spoke twice to K.O., Par's VP of National Accounts. The two spoke again on June 25.

1112.   On July 16, Upsher-Smith's M.M., National Account Manager, spoke to Sandoz's C.B. for approximately 14 minutes. Ten days later, on July 26, 2013, Sandoz announced its list (WAC) price increase on Cholestyramine. A few days later, on July 29, Upsher-Smith's C.O. and Par's K.O. spoke again for nearly 20 minutes.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1113.   Par followed the list (WAC) price increase on August 27, 2013. On September 5, K.O. at Par again spoke to C.O. at Upsher-Smith for nearly 22 minutes.

### **86.**   **Drospirenone and Ethinyl Estradiol**

1114.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Drospirenone and Ethinyl Estradiol beginning at least as early as April 2013.

1115.   Drospirenone and Ethinyl Estradiol, commonly known by the brand name Ocella, is an oral contraceptive.

1116.   During the relevant time frame, Defendants Teva, Lupin and Actavis were the primary manufacturers of Drospirenone and Ethinyl Estradiol.

1117.   In early 2013, Lupin was planning to enter the market. Rather than strategize on how to gain market share through competition, Lupin contacted Teva to reach an agreement on pricing and market share. In late April, Berthold (Lupin) and Green (Teva) spoke multiple times.

1118.   Communications between Teva and Lupin eventually looped in Actavis. For example, Rekenthaler and Patel each spoke with a senior sales and marketing executive at Actavis on April 30, and the next day Patel exchanged a number of text messages with him as well.

1119.   Throughout May, intense communications among the competitors continued as they worked out the details of their agreement. On May 6, Patel and Berthold spoke twice by phone. Green and Berthold also spoke that same day.  On May 7, Patel and Berthold had yet another call.  Patel also placed a call to Rogerson at Actavis. Patel again spoke to Rogerson on May 8. And on May 9, Green again spoke with Berthold twice. On May 10, Patel spoke to Berthold three times, and also spoke to Rogerson again.

1120.   In the wake of all of these communications, Teva agreed to concede business to Actavis in order to maintain higher prices for generic Ocella.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1121. Communications continued through the summer. Numerous calls between Patel and Green at Teva and Berthold at Lupin took place, all aimed at orchestrating Lupin's acquisition of a Fair Share of the generic Ocella market, which they did.

### 87.    Terconazole

1122. Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Terconazole vaginal cream (0.8% and 0.4%) beginning at least as early as April 2013.

1123. Terconazole cream, also known by the brand name Terazol, is a medication used to treat vaginal fungal or yeast infections.

1124. During the relevant time frame, Actavis and Taro were the primary manufacturers of Terconazole Cream.

1125. The market for Terconazole cream was mature and at all relevant times had multiple manufacturers.

1126. For years, the prices for Terconazole cream were relatively low and stable. By 2013, Sandoz exited the market for 0.8% Terconazole cream and had a small market share and low capacity for 0.4% Terconazole cream. That left the bulk of the market to Actavis and Taro. In the spring of 2013, Taro increased its list (WAC) prices to match those of Actavis. Although Actavis had higher list prices at the time, the prices it actually charged customers (NSP prices) ▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ In conjunction with its list (WAC) price increase, Actavis imposed very large price increases on customers; Actavis ▆▆▆▆▆▆▆▆▆▆▆▆ Taro quickly followed Actavis's price increases.

1127. The charts below show the large price increases imposed on Terconazole cream by Actavis and Taro in very close succession. Note: Prices for 0.4% Terconazole cream exhibited a

similar pricing pattern. Charts for only the 0.8% cream are included here. [NSP CHART REDACTED]





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1128.  Throughout this period, Actavis and Taro met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Terconazole cream and their Fair Share agreement.

1129.  For example, in late April and May 2013, Taro's Aprahamian and Perfetto communicated by phone multiple times and with multiple contacts at Actavis. During the same period, when Taro customers approached Actavis seeking better pricing for Terconazole cream, Actavis declined to pursue those opportunities, as contemplated by the Fair Share agreement. Actavis instead raised its own Terconazole prices.

### **88.    Tizanidine HCL**

1130.  Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Tizanidine HCL tablets beginning at least as early as April 2013.

1131.  Tizanidine, also known by the brand name Zanaflex, is used to treat muscle spasticity due to spinal cord injury or multiple sclerosis.

1132.  During the relevant time frame, Defendants Apotex, Dr. Reddy's, Mylan, Sandoz and Sun were the primary manufacturers of Tizanidine.

1133.  The market for Tizanidine HCL tablets was mature and at all relevant times had multiple manufacturers.

1134.  For years, the prices of Tizanidine HCL tablets were relatively low and stable. In the spring of 2013, however, all manufacturers began to impose very large price increases within weeks of each other. Between May 13 and July 2, 2013, Apotex, Dr. Reddy's, Mylan, Sandoz and Sun each announced a list (WAC) price increase. They each also began to increase NSP prices. Over the ensuing few months, every manufacturer imposed multi-fold increases in their NSP prices.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1135.   The NSP price chart below highlights the abrupt and parallel price increases by Apotex, Dr. Reddy's, Mylan, Sandoz and Sun for Tizanidine HCL tablets. Note: 2 mg and 4 mg Tizanidine HCL tablets exhibited very similar pricing patterns. Only the 4 mg chart is included here. [NSP CHART REDACTED]



1136.   Throughout this period, Apotex, Dr. Reddy's, Mylan, Sandoz and Sun met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Tizanidine HCL and of their Fair Share agreement.

1137.   For example, On May 13, 2013—the day that Dr. Reddy's announced its new list (WAC) prices for Tizanidine—Mylan's Nesta called D.L., the Director of National Accounts at Sandoz, and they spoke for four (4) minutes.

1138.   On May 24, 2013, Sandoz followed Dr. Reddy's list (WAC) price increases. In the days leading up to the Sandoz increase, Nesta of Mylan exchanged phone calls with D.L. at Sandoz and J.A., a Director of National Accounts at Dr. Reddy's, to coordinate the Tizanidine price increase.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1139.   On May 29, 2013, a large customer called Sandoz and asked whether it wanted to submit a bid for Tizanidine.  After D.L., the Director of National Accounts at Sandoz, spoke to Nesta (Mylan) again, Sandoz decided not to submit a bid.

1140.   On June 11, 2013, V.B., Dr. Reddy Director of National Accounts, spoke to T.B., Apotex National Account Manager, for approximately 13 minutes.

1141.   On June 14, 2013, a large wholesale customer e-mailed J.A., the Director of National Accounts at Dr. Reddy's asking "[d]id mylan follow your increase?" He responded, "We've heard they did." The Dr. Reddy's Director had learned of Mylan's intent to follow the price increase through his prior communications with Nesta. However, Mylan had not actually raised its price on Tizanidine at the time of the inquiry.

1142.   On June 26, 2013, a large supermarket chain customer e-mailed Dr. Reddy's requesting a bid for Tizanidine. Dr. Reddy's decided not to go after additional market share. J.A. (Dr. Reddy's) and S.G., Sun Director of Marketing, communicated by phone two days later, on June 28. A few weeks later, the supermarket forwarded the same request to Sandoz, and Sandoz declined to submit a bid.

## **89.**   **Captopril**

1143.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Captopril tablets beginning at least as early as May 2013.

1144.   Captopril, also known by the brand name Capoten, is an angiotensin-converting enzyme (ACE) inhibitor used for the treatment of hypertension and some types of congestive heart failure.

1145.   During the relevant time frame, Defendants Mylan, West-Ward and Wockhardt were the primary manufacturers of Captopril.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1146.   The market for Captopril was mature and at all relevant times had multiple manufacturers.

1147.   For years, the prices for Captopril tablets were relatively low and stable. West-Ward was the dominant manufacturer in the market up until 2013, when it experienced supply disruptions and essentially exited the market. In the spring of 2013, as West-Ward exited, Mylan and Wockhardt imposed very large price increases. At first, only Mylan raised its list (WAC) prices, but the NSP prices ███████████████████████████

███████████████████████████████████████

1148.   By spring of 2014, West-Ward was ready to re-enter the market. At the same time, Wockhardt was exiting the market, leaving only Mylan and West-Ward as the main Captopril suppliers. Rather than offer lower prices than Mylan to win back all of the market share it used to have, West-Ward instead announced—virtually simultaneously with Mylan—a large list (WAC) price *increase*. West-Ward's new list prices were identical to Mylan's and, for the 12.5 mg dosage, approximately *100 times higher* than they were before it had exited the market. (Other dosages were "only" 35 to 45 times higher.) Mylan and West-Ward list (WAC) and NSP prices have remained elevated ever since.

1149.   Even with the higher prices, West-Ward quickly was able to build share. Although West-Ward had a smaller share of the market than it did before exiting, it was making a lot more money, albeit on a smaller volume of sales. For example, ███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███ The Fair Share agreement facilitated higher prices, which allowed each manufacturer to sell less, but make more money doing so.

1150.  For Mylan, ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████ The Fair Share agreement worked as planned.

1151.   The NSP price chart and list price chart below show the large and parallel price increases by Mylan, Wockhardt and West-Ward for Captopril tablets. (Note: pricing for 12.5 mg, 25 mg, 50 mg and 100 mg tablets was very similar. Only the 50 mg charts are included here.)

[NSP CHART REDACTED]

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1152.   Throughout this period, Mylan, Wockhardt and West-Ward met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Captopril and of their Fair Share agreement.

1153.   For example, Mylan's M.W., Director of National Accounts, communicated by phone with K.B., West-Ward National Account Manager, in March, April, June and July 2013, including on July 1, 2013. Mylan announced its first list (WAC) price increase for Captopril on July 2, 2013.

1154.   Representatives from Wockhardt and West-Ward convened at the ECRM Retail Pharmacy Efficient Program Planning Session at the Omni Amelia Island Plantation Resort, in Amelia Island, Florida on February 23 to 26, 2014. In April, both companies announced large list (WAC) price increases on the heels of Mylan's second list price increase.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER