### 90. Diltiazem HCL

1155.  Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Diltiazem HCL beginning at least as early as May 2013.

1156.  Diltiazem HCL, also known by the brand name Cardizem, among others, is a medication to treat angina (severe chest pain) or hypertension (high blood pressure).

1157.  During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Diltiazem HCL.

1158.  The market for Diltiazem HCL tablets was mature and at all relevant times had multiple manufacturers.

1159.  For years, the prices for Diltiazem HCL tablets were relatively low and stable. In the spring of 2013, however, Teva and Mylan imposed a series of coordinate price increases, first in mid-2013, then again in late 2014 and early 2015. By January 2015, Teva and Mylan list (WAC) prices ▮▮▮▮▮▮ were nearly three times higher than they were before the collusive price increases.

1160.  The list (WAC) price chart and NSP price chart below show the two rounds of closely coordinated price increases for Diltiazem HCL tablets by Teva and Mylan. Prices have remained elevated through at least early 2019. Note: the pricing patterns for 30, 60, 90 and 120 mg tablets are highly similar. Charts for only the 120 mg dosage are included here. [NSP CHART REDACTED]

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1161.   Throughout this period, Mylan and Teva met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Diltiazem HCL tablets and of their Fair Share agreement.

1162.   For example, immediately after she began at Teva, Patel began to investigate Mylan drugs as a potential source for coordinated price increases. She asked her colleague, Kevin Green, to "gather as much market intelligence as possible" for certain, specific items, including Diltiazem HCL Tablets.

1163.   On, May 7, 2013, Teva's Green spoke to Nesta at Mylan three times.  Green and Nesta also spoke a number of times over the next several days, including on May 8, May 9, and May 10, 2013.

1164.   On May 14, 2013, Patel asked several Teva account managers, including Green, to obtain "price points" on certain drugs in preparation for a potential price increase. She indicated internally to another Teva colleague that she was expecting "additional Mylan intel" and that she was expecting Mylan "to take an additional increase" on those items.  On May 17, 2013, Green spoke to Nesta six times.

1165.   Green communicated extensively with Mylan to coordinate the price increases. For example, on July 10, 2013, Green and Mylan's Nesta spoke twice. Shortly after the second call, Green called Patel, and the two spoke for just over seven (7) minutes.  The next day, on July 11, Nesta and Green exchanged several more calls.

1166.   Patel and Green coordinated the increase with Mylan in the days and weeks leading up to the increase.  For example, Green spoke to Nesta (Mylan) twice on August 1, once on August 2 and three times on August 6.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1167.   The day before the price increase went into effect – August 8, 2013 – Patel had three calls with Nesta of Mylan, and on August 9, 2013, Teva raised prices on numerous drugs, including Diltiazem HCL.

### 91.   Doxazosin Mesylate

1168.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Doxazosin Mesylate beginning at least as early as May 2013.

1169.   Doxazosin Mesylate, also known by the brand name Cardura, among others, is a medication used to treat high blood pressure.

1170.   During the relevant time frame, Defendants Teva, Mylan, Apotex, and Par were the primary manufacturers of Doxazosin Mesylate. Greenstone joined the Doxazosin Mesylate market and the Doxazosin Mesylate conspiracy in August 2014.

1171.   The market for Doxazosin Mesylate tablets was mature and at all relevant times had multiple manufacturers.

1172.   For years, the prices for Doxazosin Mesylate tablets were relatively low and stable. In the spring of 2013, Teva, Mylan and Apotex were the dominant manufacturers. Within the space of approximately one month, all three of them dramatically increased Doxazosin prices. They announced much higher and virtually identical list (WAC) prices, ███████████████

████████████

1173.   Par, which had been in the Doxazosin market but had effectively exited before the coordinated price increase by Teva, Mylan and Apotex, re-joined the market in early 2014. Rather than announce lower prices to win customers, it matched the elevated list (WAC) prices of Teva, Mylan and Apotex, ███████████████

1174.   Similarly, when Greenstone joined the market in the summer of 2014, it too chose not to compete on price, but instead offered similar—and inflated—prices to those of Teva, Mylan, Apotex and Par.

1175.   By adhering to the Fair Share agreement, all Doxazosin Mesylate manufacturers were able to keep prices higher than they would have been if they were competing for customers. For example, on May 4, 2012, Teva was approached by a large customer about Doxazosin. At the time, Mylan was the primary supplier for that customer. Rather than take this business, Teva decided that it "will need to be cautious" and was not interested in securing a long term customer at Mylan's expense.

1176.   The list (WAC) price chart and NSP price chart below show the significant and parallel price increases imposed by the manufacturers of Doxazosin Mesylate tablets. Note: the pricing patterns for 1 mg, 2 mg, 4 mg and 8 mg tablets are highly similar. Charts for only the 4 mg dosage are included here. [NSP CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1177.  Throughout this period, Teva, Mylan, Apotex, Par and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement for Doxazosin Mesylate tablets and of the Fair Share agreement.

1178.  For example, in the spring and summer of 2013, Teva's Patel and Green communicated directly and frequently with competitors to coordinate price increases on numerous drugs, including Doxazosin Mesylate. Teva's Green spoke with Mylan's Nesta numerous times in May, June, July and August of 2013 to coordinate price increases for Doxazosin Mesylate tablets, among other drugs.

1179.  Teva's Patel communicated directly with B.H. at Apotex on multiple occasions between May and August of 2013 for the express purpose of coordinating price increases, including for Doxazosin Mesylate. Mylan announced its list (WAC) price increase on July 2, 2013. Apotex raised its prices on July 23, 2013, and Teva followed in August.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1180.   As Greenstone prepared to enter the market, Mylan's M.A., National Account Director, communicated by phone with R.H., Greenstone's Director of National Accounts. They spoke multiple times in April, again in June, and twice in July, 2014. When Greenstone finally launched its product in August 2014, rather than offer lower prices to win customers, it announced list (WAC) prices the same as the other companies that were party to the price-fixing and Fair Share agreement.

### 92.   Fluconazole

1181.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Fluconazole tablets beginning at least as early as May 2013.

1182.   Fluconazole, also known by the brand name Diflucan, is a medication used to treat serious fungal or yeast infections.

1183.   During the relevant time frame, Defendants Teva, Glenmark, and Greenstone were the primary manufacturers of Fluconazole. Citron and Dr. Reddy's joined the market and the Fluconazole price-fixing agreement in January 2014 and January 2015, respectively.

1184.   For years, the prices of Fluconazole tablets were relatively low and stable. In the spring of 2013, however, Glenmark, Teva and Greenstone coordinated massive price increases on all dosages of Fluconazole tablets. With a very short window of time, all three manufacturers announced identical list (WAC) prices that were many times higher than they had ever been before. Their NSP prices ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1185.   Citron and Dr. Reddy's, which entered the Fluconazole market after the price increases, were careful not to disrupt pricing, or to seek more than a Fair Share of the market; both announced list (WAC) prices identical to those of Glenmark, Teva and Greenstone.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1186.   At the same time that Teva, Glenmark, Greenstone, Citron and Dr. Reddy's imposed high prices on Fluconazole tablets, they carefully monitored the market to ensure that each of them maintained a Fair Share.  For example, Teva was approached by several customers looking for lower prices than Glenmark was offering. Rather than seize the opportunity to grow its sales, Teva refused to bid on most of these solicitations in order to maintain market stability. And when it did provide a customer with a bid, Teva intentionally bid high to ensure that it would not win the business. For example, on May 17, 2013, Nisha Patel explained the strategy with a large wholesale purchaser to a Teva colleague: "IF we bid [on Fluconazole and Nabumetone], we need to bid high, or we will disturb the market."

1187.   The NSP price chart and list (WAC) price chart below show the extraordinary Fluconazole price increases by Glenmark, Teva and Greenstone, and that Dr. Reddy's and Citron matched those inflated prices when they entered the market. Note: Fluconazole tablets come in 50 mg, 100 mg, 150 mg and 200 mg dosages, all of which exhibited similar pricing patterns. Charts for only the 150 mg dosage are included here. [NSP CHART REDACTED]

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1188.   Throughout this period, Teva, Glenmark, Greenstone, Dr. Reddy's and Citron met at trade conferences and spoke directly to each other in furtherance of their price-fixing agreement on Fluconazole and on the Fair Share agreement.

1189.   For example, Teva's Patel had four calls with a contact at Glenmark on May 2, 2013, after which she sent an internal email where she identified six different "high priority" Glenmark drugs to add to the price increase list. Notably, Glenmark had not yet increased price on any of those drugs, nor had it sent any notices to customers indicating that it would be doing so. On May 16 and 17—immediately after Glenmark announced price increases—Patel again spoke to her contact at Glenmark.

1190.   Teva's Patel also reached out to coordinate Fluconazole price increases with a contact at Greenstone. After speaking with a Greenstone National Account Manager by phone on May 28, 2013, Patel added Fluconazole to the Teva price increase list the next day.

1191.   In early July 2013, when Teva announced its price increases, Patel again reached out to her contacts at Glenmark and Greenstone to solidify their agreement.

1192.   As Citron was preparing to enter the market in late 2013 and early 2014, L.S., Citron VP of Sales, communicated with T.C., Teva Senior Director of Sales. The two communicated by phone multiple times in November and December 2013 and again in February 2014. In addition, K.S., Citron EVP of Sales, communicated by phone multiple times in March 2014 with Jim Grauso, Glenmark EVP.

1193.   When Dr. Reddy's was entering the market, Teva's Patel again reached out to communicate. She was in phone contact (voice and text) with V.B., Dr. Reddy's VP of Sales, in June, July and August 2014.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**93.**   **Moexipril HCL**

**94.**   **Moexipril HCL HCTZ**

1194.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Moexipril Hydrochloride and Moexipril HCL HCTZ tablets beginning at least as early as May 2013.

1195.   Moexipril HCL ("Moexipril"), also known by the brand name Univasc, is part of a class of drugs called angiotensin-converting enzyme (ACE) inhibitors. It is used to treat high blood pressure by reducing the tightening of blood vessels, allowing blood to flow more readily and the heart to pump more efficiently.

1196.   Moexipril HCL HCTZ ("Moexipril HCTZ") is a combination of Moexipril and Hydrochlorothiazide (a diuretic).  This combination is used to treat high blood pressure.

1197.   During the relevant time frame, Defendants Teva and Glenmark were the primary manufacturers of Moexipril and Moexipril HCL HCTZ.

1198.   As soon as Patel started at Teva, she began to identify price increase candidates through her conversations with various contacts at other drug manufacturers, including Glenmark. For example, Patel had four calls with an Executive Vice President of Glenmark on May 2, 2013.

1199.   Shortly after one of those calls, Patel sent an internal e-mail where she identified six Glenmark drugs to add to the price increase list, including Moexipril and Moexipril HCTZ. Glenmark had not yet increased prices or announced price increases on any of those drugs.

1200.   Patel also made efforts to ensure that Teva abided by the Fair Share agreement. On May 15, 2013, in anticipation of the Glenmark price increases that were not yet public, Patel instructed her Teva colleagues to alert her of any requests by customers for pricing relating to a number of Glenmark drugs, including Moexipril and Moexipril HCTZ. In accordance with the Fair

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Share agreement, Patel wanted to be careful to avoid obtaining any market share from Glenmark after the price increases.

1201.  Patel also spoke to the same Executive Vice President at Glenmark on May 16, 2013 – the day of the Glenmark price increases. Effective that day, Glenmark increased prices on numerous drugs also sold by Teva, including Moexipril and Moexipril HCTZ. Patel again spoke to the EVP as well as to an Associate Director of Sales and Marketing at Glenmark multiple times on May 17, 2013.

1202.  After the Glenmark price increases, Teva was approached by several customers looking for lower prices. Teva declined the invitations in order to maintain Fair Shares and avoid price erosion. On occasions when it did provide a customer with a bid, Teva intentionally bid high so that it would not win the business.

1203.  Teva, as agreed, soon followed the Glenmark price increases for Moexipril and Moexipril HCTZ tablets; Teva's increases went into effect on July 3, 2013. Thereafter, Teva and Glenmark monitored the Fair Share agreement and communicated as necessary to ensure that prices remained high.

1204.  For example, on August 5, 2013, Teva learned that it had been underbid by Glenmark at one of its largest wholesaler customers. That same day, Patel called the Executive Vice President at Glenmark, to find out what was going on. They spoke three times that day. The following day – August 6, 2013 – Patel spoke to Jim Brown, the Vice President of Sales at Glenmark, two times. During these calls, Teva and Glenmark reaffirmed their prior agreement to maintain Fair Share and not to poach each other's customers after a price increase, and Glenmark withdrew its offer to Teva's customer.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 95.    **Mometasone Furoate**

1205.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Mometasone Furoate ("Mometasone") beginning at least as early as May 2013.

1206.   Mometasone, also known by the brand name Elocon, is a corticosteroid used to treat skin conditions such as eczema, psoriasis, allergies, and rashes. Mometasone is available in several forms, including cream, ointment, and solution.

1207.   During the relevant time frame, Glenmark, Perrigo, G&W and Impax were the primary manufacturers of Mometasone.

1208.   Beginning as early as May 2013, Glenmark, G&W, Perrigo and Impax coordinated price increases on Mometasone. That month, Glenmark's Jim Brown, Vice President of Sales, and P.D., Executive Vice President, communicated by telephone with Vogel-Baylor, G&W Vice President of Sales, to discuss price increases for Mometasone. Vogel-Baylor also used A.T. (a contact at Aurobindo) as a conduit to coordinate price increases with T.P., Perrigo National Account Director. Orlofski, G&W President, communicated by telephone with C.B., President of Impax's generic drugs division. As a result of these communications, Glenmark, G&W, Perrigo and Impax increased prices for Mometasone.

1209.   Glenmark was the first company to announce the Mometasone price increases. After the increases, the other Mometasone manufacturers declined opportunities to take Glenmark's customers by offering better pricing.

1210.   For example, shortly after the Glenmark price increase, a large wholesaler customer of Glenmark's sought a bid from G&W for Mometasone. This prompted Vogel-Baylor (G&W) to reach out to her contacts at Glenmark before responding to the inquiry. After coordinating with Glenmark, G&W declined the invitation to bid on the Mometasone business and instead ████

311

██████████████████████████████████████████ in fact, the reason that G&W declined the opportunity was because of its Fair Share agreement with the other Mometasone manufacturers.

1211.   On May 21, 2013, Vogel-Baylor informed the G&W sales team that Glenmark had increased prices on Mometasone and let them know that G&W also was going to increase prices. That same day, Orlofski (G&W) exchanged text messages and placed a call to C.B. (Impax President of generics).

1212.   Over the next 10 days, G&W prepared to announce its own price increases on Mometasone. Vogel-Baylor (G&W) continued to communicate with her contacts at Glenmark during this period.

1213.   On June 4, 2013, G&W announced price increases on Mometasone. That same day, Vogel-Baylor (G&W) called Brown (Glenmark); Orlofski (G&W) and C.B. (Impax) exchanged multiple text messages and two phone calls, one lasting 2 minutes and one lasting 3 minutes.

1214.   After the G&W price increases, the Mometasone manufacturers continued to abide by the Fair Share agreement and declined to compete on price or take each other's customers. For example, in June 2013, Glenmark was approached by a G&W customer that was seeking better pricing on Mometasone. Glenmark—after communicating by phone directly with G&W— decided: ███████████████████████

1215.   Impax also imposed Mometasone price increases during this period. In December 2013, when assessing its year-to-date Mometasone sales, T.E., Impax Senior Director of Sales, prepared an analysis for his boss, C.B., concluding that ████████████████████████████████ ██████████████████████████████████

### 96.   **Nabumetone**

1216.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Nabumetone tablets beginning at least as early as May 2013.

1217.   Nabumetone, also known by the brand name Relafen, is a nonsteroidal anti-inflammatory drug (NSAID) used to treat mild to moderate pain and help relieve symptoms of arthritis, such as inflammation, swelling, stiffness, and joint pain.

1218.   During the relevant time frame, Defendants Teva, Sandoz, Glenmark and Actavis were the primary manufacturers of Nabumetone.

1219.   As soon as Patel started working at Teva, she began to identify price increase candidates through her conversations with various sales and marketing executives at other drug manufacturers.

1220.   For example, on May 1, 2013, Patel communicated by text message with A.B., Senior VP of Sales at Actavis. The next day, on May 2, she spoke to an Executive Vice President of Glenmark four times, after which she sent an internal e-mail identifying six drugs for price increases, including Nabumetone. Glenmark had not yet increased prices or announced price increases on those drugs. She again spoke with Glenmark contacts on May 16 and 17, 2013.

1221.   After coordinating with Glenmark, Patel instructed her Teva colleagues to let her know of any pricing requests relating to various Glenmark drugs, including Nabumetone. In accordance with the Fair Share agreement, Patel wanted to be careful to avoid poaching any customers from Glenmark after the price increases.

1222.   Throughout this period, Teva, Sandoz, Glenmark and Actavis monitored the Fair Share agreement and were careful not to poach customers from each other. For example, when Teva was approached by several Glenmark customers looking for a lower price, it declined the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

opportunity to gain market share. On occasions when it provided bids, it intentionally bid high so that it would not win the business.

1223.   On May 24, 2013, Patel sent a list of recommended Teva price increases (including for Nabumetone) to her supervisor. Patel also explained that she was not worried about raising prices because Sandoz was "bidding high" on Nabumetone. Patel, who already had spoken to an Associate Director of Pricing at Sandoz for nearly twenty-five (25) minutes on May 15, 2013, and again for more than eighteen (18) minutes on May 20, 2013, had assurances from Sandoz that it would abide by the Fair Share agreement and would work to keep prices high. Patel spoke with Actavis's A.B. on June 20 for approximately 20 minutes.

### **97.**    **Prednisone**

1224.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Prednisone tablets (1, 2.5, 5, 10 and 20 mg) beginning at least as early as May 2013.

1225.   Prednisone, also known by the brand name Deltasone, is a corticosteroid that is used to treat conditions such as arthritis, blood disorders, breathing problems, severe allergies, skin diseases, cancer, eye problems, and immune system disorders.

1226.   During the relevant time frame, Defendants Actavis, Cadista, Par/Qualitest and West-Ward were the primary manufacturers of Prednisone tablets.

1227.   The market for Prednisone was mature and at all relevant times had multiple manufacturers.

1228.   For years the prices of Prednisone tablets were relatively low and stable. There were limited supply disruptions in 2012 and early 2013, but market supply recovered and, for some dosages, increased in 2014. Nonetheless, in the spring of 2013, all manufacturers shifted their prices significantly higher. By the end of 2013, Prednisone tablet prices were more than triple the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

prices that they were at the beginning of the year, and prices have remained higher than former levels through the present.

1229.   The NSP price charts below show the large and abrupt shift in pricing for Prednisone tablets. While different combinations of manufacturers sold the various dosages of Prednisone tablets, all dosages experienced similarly large price hikes. [CHARTS REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1230.    Throughout this period, Actavis, Cadista, Par/Qualitest and West-Ward met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Prednisone tablets and their Fair Share agreement.

1231.    For example, Cadista, which had exited the market but then re-entered in late 2013 at the elevated prices already imposed by West-Ward and Actavis, communicated with its competitors around the time of its re-entry. Shortly before re-entering the market, Cadista's M.D., Vice President of Sales, spoke with Falkin (Actavis) on July 31, 2013 for six minutes. Shortly after re-joining the market, on November 1, 2013, M.D. at Cadista spoke for nearly 40 minutes with S.G, Vice President of Sales and Marketing at West-Ward. T.R., Cadista Vice President of Marketing, communicated by phone with N.C., Actavis Executive Director of Marketing, in July and October 2013, and with A.G., Actavis Director of National Accounts, in September 2013. Also in late 2013 and again in the fall of 2014, C.P., Par/Qualitest Vice President of National Accounts, communicated multiple times by phone with A.S., Actavis Vice President of Sales.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1232.   Throughout the period of these communications, Actavis, West-Ward, Par/Qualitest and Cadista were able to raise and maintain elevated prices for Prednisone.

### 98.   Tolmetin Sodium

1233.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Tolmetin Sodium capsules beginning at least as early as May 2013.

1234.   Tolmetin Sodium, also known by the brand name Tolectin, is a medication used to reduce pain, swelling, and joint stiffness from rheumatoid arthritis and osteoarthritis.

1235.   During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Tolmetin Sodium capsules.

1236.   On August 9, 2013, Teva raised prices on a number of drugs, including Tolmetin Sodium. Leading up to these price increases, Teva coordinated via direct communication with other drug manufacturers, including Mylan.

1237.   For example, on July 10, 2013, Teva's Green and Mylan's Nesta spoke twice.  The next day, July 11, Nesta and Green exchanged several more calls.

1238.   On August 1, 2013, Green again spoke to Nesta (Mylan) 2 times; shortly after the second call, Green called Patel to update her.  On August 2, 2013, Patel called Green, after which Green immediately called Nesta. Green spoke to Nesta three more times on August 6 and three times on August 8, 2013.  Patel also spoke to Nesta twice on August 8, 2013.

1239.   The day before the price increase went into effect – August 8, 2013 –Patel and Nesta spoke again. Price increases followed the next day.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 99.    Disopyramide Phosphate

1240.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Disopyramide Phosphate capsules beginning at least as early as June 2013.

1241.   Disopyramide Phosphate, also known by the brand name Norpace, is a medication used to treat certain types of serious irregular heartbeat, such as persistent ventricular tachycardia. It is used to restore normal heart rhythm and maintain a regular, steady heartbeat.

1242.   During the relevant time frame, Defendants Teva and Actavis were the primary manufacturers of Disopyramide Phosphate.

1243.   In late summer of 2014, Teva wanted to raise prices on Disopyramide Phosphate. The only other manufacturer in the market was Actavis. To ensure that Teva could impose a large price increase without losing customers to Actavis, Teva's Patel and Rekenthaler reached out directly to contacts at Actavis to coordinate. Patel spoke to Rogerson (Actavis) on August 27 (3 calls), and Rekenthaler spoke to Falkin (Actavis) on August 18 (2 calls), August 24, and August 26 (4 calls).

1244.   Rekenthaler again spoke to Falkin on August 28, 2014, the same day that Teva announced list (WAC) price increases of approximately 100% on Disopyramide Phosphate.

### 100.    Hydrocortisone Acetate

1245.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Hydrocortisone Acetate suppositories beginning at least as early as June 2013.

1246.   Hydrocortisone Acetate suppositories ("Hydrocortisone Acetate"), also known by the brand name Anucort-HC, are used to treat itching or swelling caused by hemorrhoids as well as ulcerative colitis, proctitis, and other inflammatory conditions of the intestines, rectum, or anus.

1247.   During the relevant time frame, G&W and Perrigo were the primary manufacturers of Hydrocortisone Acetate.

1248.   In 2013, the Hydrocortisone Acetate market was divided among G&W, Perrigo and County Line Pharmaceuticals. By late June 2013, however, County Line was exiting the market.

1249.   Rather than compete to win County Line's customers with better pricing, Perrigo and G&W opted to collude in order to impose significant price increases on Hydrocortisone Acetate.

1250.   In late June 2013, representatives from Perrigo and G&W convened in Las Vegas at McKesson's annual trade show. While at the trade show in Las Vegas, Vogel-Baylor (G&W) announced to her team that G&W would be raising prices on Hydrocortisone Acetate.

1251.   During July, shortly after the trade show, G&W and Perrigo hammered out details of their Fair Share agreement via multiple telephone conversations. For example, on July 8, 2013, T.P. (Perrigo) and Vogel-Baylor (G&W) spoke, and then followed-up with calls to their respective supervisors (Orlofski at G&W and Wesolowski at Perrigo) to keep them in the loop.

1252.   Within days of the conversation between Vogel-Baylor and T.P., Perrigo and G&W announced large price increases on Hydrocortisone Acetate. On July 11, 2013, once each company's price increases had been announced, T.P. (Perrigo) and Vogel-Baylor (G&W) again communicated by phone.

1253.   In the wake of the price increases in July 2013, some customers contacted the manufacturers to seek better pricing. But with the Fair Share agreement in place, G&W and Perrigo held the line on pricing and declined to take customers from one another.

1254.   The companies continued to abide by the Fair Share agreement thereafter. For example, in April 2014, Vogel-Baylor (G&W) advised her colleague that G&W should not be trying to win back customers from Perrigo, even if opportunities arose.

1255.   Approximately one year after the first coordinated price increase, G&W and Perrigo decided to coordinate a second price increase. In June 2014, Vogel-Baylor and Orlofski at G&W began to discuss price increases for Hydrocortisone Acetate. At the same time, Vogel-Baylor resumed her communications with T.P at Perrigo to coordinate. Shortly after speaking with G&W, Perrigo began planning to implement a Hydrocortisone Acetate price increase of its own.

1256.   Yet again, the coordination between the two companies had the intended effect. In late July 2014, Perrigo announced a large price increase on Hydrocortisone Acetate. Within a couple of weeks, G&W also announced a large price increase.

1257.   In the wake of the large price increases by Perrigo and G&W, customers were upset and sought better pricing. But Perrigo and G&W maintained contact and stuck to the Fair Share agreement. For example, T.P. (Perrigo) and Vogel-Baylor (G&W) communicated by telephone on August 11 and 18, 2014.

### **101.   Isoniazid**

1258.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Isoniazid tablets beginning at least as early as June 2013.

1259.   Isoniazid, also known by the brand name Nydrazid, is a medication used to treat tuberculosis or prevent its return.

1260.   During the relevant time frame, Defendants Teva and Sandoz were the primary manufacturers of Isoniazid.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1261.   In June 2013, Teva was "attempting to understand how [its] pricing for Isoniazid compares to the rest of the market." On June 11, 2013, a Teva marketing representative asked Patel whether she was "aware of any competitive market intel for this family?" According to the marketing representative, Sandoz was also in the market for Isoniazid and had "drastically increased their pricing" in January 2013. Patel responded, "I will try to get the scoop on Sandoz pricing tomorrow.  When do you need this by?"

1262.  The next day – June 12, 2013 – Patel exchanged at least five (5) calls with the Associate Director of Pricing at Sandoz.  Internally, Teva weighed the Fair Share allocations in the market. Later that day, Patel shared the specific price points she had received from the Associate Director of Pricing at Sandoz: "Wholesaler nets for Sandoz product are around $100 for the 300 mg 100s and $80 for 100 mg 100s.  Our WACs are very low."

1263.  Although Teva did not match Sandoz's price increase on Isoniazid, neither did it poach all of Sandoz's customers.

1264.  Eventually, Teva increased price on Isoniazid on January 28, 2015.  Teva communicated with Sandoz in the days and weeks leading up to January 28, 2015.  For example, Patel spoke to the Sandoz Associate Director of Pricing on January 22, 2015.

## **102.**   **Enalapril Maleate**

1265. Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Enalapril Maleate tablets (2.5, 5, 10, 20 mg) beginning at least as early as July 2013.

1266. Enalapril Maleate, also known by the brand name Vasotec, is a medication used to treat high blood pressure and congestive heart failure.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1267.  During the relevant time frame, Defendants Teva, Mylan, Taro, and Wockhardt were the primary manufacturers of Enalapril Maleate tablets. Defendant Bausch/Oceanside joined the Enalapril Maleate tablet market and the conspiracy in August 2015.

1268.  The market for Enalapril Maleate was mature and at all relevant times had multiple manufacturers.

1269.  For years, the prices of Enalapril Maleate tablets were relatively low and stable. By mid-2013, the market was shared by three Defendants: Mylan, Wockhardt, and Teva. Those three companies coordinated a significant price increase for Enalapril in the second half of 2013.

1270.  Mylan increased its list (WAC) price for Enalapril effective July 2, 2013. Enalapril was on a list of drugs slated for a price increase that Teva had received from Mylan in June 2013, before those price increases were put into effect.

1271.  Teva quickly followed Mylan's increase, announcing its own list (WAC) price increases on July 19, 2013.

1272.  Wockhardt, quickly followed the increases as well, raising list (WAC) prices for its Enalapril on August 13, 2013.

1273.  Taro, which was in the process of re-entering the market in mid-2013, joined the price increases. Rather than offer better prices to gain market share, Taro raised its list (WAC) prices.

1274.  The list (WAC) price increases had the desired effect. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Shockingly, these increases in 2013 appear relatively small in the charts below because Defendants imposed a second round of even larger price increases in 2014.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1275. The enormous price increases in 2013 did not satisfy Defendants. In the spring of 2014, Mylan led another even more extreme round of price increases. In 2013, Mylan increased list prices by approximately 100%. In April 2014, it increased list (WAC) prices again, by approximately 300%. Teva followed the increase—announcing identical WAC prices—in August. Taro did exactly the same in October. And Wockhardt raised its list (WAC) prices again in December.

1276. After Mylan, Teva, Wockhardt and Taro had completed their second round of coordinated price increases, Bausch/Oceanside entered the market. Rather than offer better prices to win new customers, Bausch/Oceanside matched the list (WAC) prices of the other sellers, and

███████████████████████████████████

1277.   The list (WAC) price chart and NSP price chart below show the large, parallel and sustained price increases by Mylan, Teva, Wockhardt and Taro, and the entry by Bausch/Oceanside at the extraordinarily elevated prices. Note: The pricing patterns for 2.5, 5, 10 and 20 mg dosages of Enalapril Maleate tablets are highly similar. Charts for only the 20 mg dosage are included here. [NSP CHART REDACTED]





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1278.  Throughout this period, Mylan, Teva, Wockhardt, Taro and Bausch/Oceanside met at trade conferences and communicated directly with each other in furtherance of their price fixing agreement for Enalapril Maleate tablets and of the Fair Share agreement.

1279.  For example, in the short window of time after Mylan raised prices in 2013 and before Teva, Taro and Wockhardt followed the increase, Teva received a request on July 10, 2013 from a customer seeking a lower price on Enalapril. This set off a series of communications the purpose of which was to ensure that Teva, Taro and Wockhardt joined Mylan's increase. On July 10, Green of Teva and Nesta of Mylan had two phone calls, and they spoke twice more the following day. During these conversations, Nesta explained to Green that Wockhardt already had agreed to follow the Mylan price increase on Enalapril. Teva's Patel also called Nesta directly on July 12, 2013 and they spoke three times. Not long after, K.K., a senior national account executive at Wockhardt, spoke to Green of Teva (twice on July 15, 2013), and reported internally the specific price ranges for Enalapril that he had obtained from Green. Soon thereafter, Teva and Wockhardt implemented price increases on their Enalapril Maleate tablets.

1280.  Similarly, as Taro evaluated whether to re-enter the Enalapril market, it engaged in a series of communications to shore up the Fair Share agreement among Defendants. Aprahamian of Taro communicated with Patel of Teva and M.C., Senior Vice President of Sales and Marketing at Wockhardt in July 2013, in the midst of the coordinate price increases by those manufacturers.

1281.  Aprahamian also coordinated with M.A., Mylan National Account Director, on how to allocate the Enalapril market; the two spoke on December 6, 11 and 12, 2013.

1282.  On December 5, 2013, Aprahamian spoke to Teva's Patel and sought her input before sending a proposal to a Teva customer.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1283.   On December 31, 2013, Aprahamian spoke with M.C. at Wockhardt, and they agreed that Wockhardt would concede one large customer to Taro so long as Wockhardt was able to retain a different large customer.

1284.   In early 2014, market share was allocated "fairly" among the four competitors. As Teva was considering whether to bid on an RFP, with regard to Enalapril Patel cautioned: "no bid due to potential market/customer disruption, aka strategic reasons." The same day, Patel spoke to Aprahamian and exchanged 8 text messages with him.

1285.   As 2014 progressed, Defendants again communicated directly in order to coordinate a second round of price increases. For example, Taro's Aprahamian spoke with his contact at Wockhardt on August 8 and August 14, 2014, and spoke with Teva's Patel on August 27.

### 103.   Haloperidol

1286.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Haloperidol tablets (0.5, 1, 2, 5, 10 and 20 mg) beginning at least as early as July 2013.

1287.   Haloperidol, also known by the brand name Haldol, is a medication used to treat disorders such as schizophrenia and Tourette syndrome.

1288.   During the relevant time frame, Defendants Mylan, Sandoz and Zydus were the primary manufacturers of Haloperidol tablets.

1289.   The market for Haloperidol tablets was mature and at all relevant times had multiple manufacturers.

1290.   For years, the prices for Haloperidol tablets were relatively low and stable. In the summer of 2013, however, the manufacturers of Haloperidol were determined to raise prices. In the second half of 2013, they did so. For example, on the 5 mg dosage, Mylan first announced a

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

list (WAC) price increase that more than tripled its prices. Sandoz followed the increase, announcing similar list (WAC) prices in January 2014. And Zydus, which entered the market in the fall of 2014, offered virtually identical prices as Mylan and Sandoz instead of trying to win customers through price competition.

1291.   The list (WAC) price chart and NSP price chart below show the large and parallel price increases by Mylan and Sandoz that were joined by Zydus. Note: in the second half of 2013 and early 2014, Mylan, Sandoz and Zydus imposed price increases (list and/or NSP) on all of the dosages of Haloperidol that they sold. Charts for only the 5 mg dosage are included here.



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1292.   Throughout this period, Mylan, Sandoz and Zydus met at trade conferences and communicated directly with each other in furtherance of their price fixing agreement on Haloperidol and of their Fair Share agreement.

1293.   For example, in July 2013, Sandoz executives were carefully monitoring the generic market in order to ensure that they adhered to the Fair Share agreement. Sandoz did not want to accidentally poach customers from its co-conspirators. As part of this effort, D.L., a Sandoz Director of National Accounts, called her contact at Mylan, Jim Nesta, and obtained a list of drugs for which Mylan had increased prices, including Haloperidol, so that Sandoz could follow with its own price increase.

1294.   Not long after, Nesta twice called this Director of National Accounts at Sandoz on August 6, a few days before Mylan imposed price increases on Haloperidol. On August 9, 2013, Mylan implemented significant list price increases on Haloperidol.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1295.   Nesta also kept Zydus in the loop. On August 15, Nesta and K.R., a Vice President of Sales at Zydus, exchanged text messages, and the next day the two spoke by phone.

1296.   After the Mylan price increase, Sandoz and Zydus were careful not to take business and instead endeavored to maintain high prices, as contemplated by their price-fixing agreement and Fair Share agreement.

1297.   For example, on October 2, 2013, M.V., the Associate Director of Pricing at Sandoz, advised a colleague to decline to bid on Haloperidol and Trifluoperazine: "We have been running up against Mylan a lot lately (Nadolol, Benaz/Hctz), and fear blowback if we take on any more products at this moment. Trying to be responsible in the sandbox." M.V. went to suggest that a pretextual excuse be offered to the customer: "I recommend you blame supply." Of course, the real reason for turning down the competitive opportunity was Sandoz's adherence to the Fair Share agreement.

1298.   On October 3, 2013, the day after this internal discussion at Sandoz in which it re-affirmed its commitment to "be responsible in the sandbox," D.L. (Sandoz Director of National Accounts) and Nesta of Mylan spoke by phone. The two spoke again on October 4 and 14, 2013. Nesta also exchanged text messages with the VP of Sales at Zydus on October 9, 2013. Not long after, Sandoz increased its pricing on Haloperidol.

1299.   In November and December of 2013, as well as in January, February, March, April, June, July, August, September and October of 2014, Nesta (Mylan) and Kevin Green (who by then had left Teva and had begun working at Zydus) communicated by phone numerous times. Zydus also joined the Haloperidol price increases during this period.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 104. Prednisolone Acetate

1300.  Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Prednisolone Acetate ophthalmic suspension beginning at least as early as July 2013.

1301.  Prednisolone Acetate, also known by the brand name Omnipred and Pred Forte, is a medication used to treat swelling, redness, itching, and allergic reactions in the eye.

1302.  During the relevant timeframe, Defendants Sandoz and Greenstone[21] were the primary manufacturers of Prednisolone Acetate.

1303.  The market for Prednisolone Acetate was mature and at all relevant times had multiple manufacturers.

1304.  For years, the prices for Prednisolone Acetate ophthalmic suspension were relatively low and stable. Between August and November 2013, however, Sandoz and Greenstone coordinated enormous price increases. List prices for Prednisolone Acetate jumped more than 500% and to identical levels. NSP prices ███████████████

1305.  During this period, Sandoz and Greenstone market shares remained relatively stable owing to their Fair Share agreement, to which they closely adhered during the relevant period. For example, in early 2014 (after the large price increases in late 2013) a large customer approached Sandoz to see if it was interested in a new account for Prednisolone Acetate. ████████

████████████████████████████████████████████████

████████████████████████ Kellum further advised, █████████████████████

████████████████████████

---

[21] Greenstone's Prednisolone Acetate product is marketed under a Pacific Pharma label.

1306.   The list (WAC) price chart and NSP price chart below show the large and parallel price increases by Sandoz and Greenstone on Prednisolone Acetate. [NSP CHART REDACTED]





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1307.   Throughout this period, Sandoz and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on generic Prednisolone Acetate and of their Fair Share agreement.

1308.   For example, representatives from Greenstone and Sandoz convened at the NACDS 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada on August 10-13, 2013. Less than two weeks later, Sandoz announced a large list (WAC) price increase, which Greenstone promptly followed.

## **105.   Temozolomide**

1309.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Temozolomide capsules beginning at least as early as July 2013.

1310.   Temozolomide, also known by the brand name Temodar, is a medication used to treat glioblastoma multiforme and refractory anaplastic astrocytoma, both cancers of the brain.

1311.   During the relevant time frame, Defendants Teva and Sandoz were the primary manufacturers of Temozolomide.

1312.   Teva and Sandoz had each gained the right to launch on Temozolomide in August 2013. In preparation for the launch, Teva coordinated with Sandoz to divide up the market. For example, when Sandoz received an RFP from a large retail pharmacy customer on July 18, 2013, and after another large customer contacted Teva asking for an offer on Temozolomide on July 30, 2013, Teva and Sandoz communicated with each other to coordinate responses.

1313.   For example, Patel of Teva called the Associate Director of Pricing at Sandoz on July 29.  Also on July 29, 2013, Green of Teva spoke to Director of National Accounts at Sandoz twice, and then again on July 31, 2013.  A different Sandoz Director of National Accounts also coordinated with a National Account Manager at Teva via phone.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1314.   Sandoz and Teva continued to monitor and coordinate the price fixing and Fair Share agreement on Temozolomide. For example, on August 12, 2013, the day of Teva's launch, a Sandoz Director of National Accounts met in person with Rekenthaler at the Grand Lux Cafe in Las Vegas during the NACDS Total Store Expo Conference. There, Rekenthaler discussed, among other things, Temozolomide and informed the Sandoz Director that Teva had officially launched and shipped all formulations of the drug.

1315.   The Sandoz Associate Director of Pricing spoke to Patel both before and after Sandoz sent out offers regarding Temozolomide in an effort to ensure that each had a Fair Share of the market.

### 106.   Trifluoperazine HCL

1316.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Trifluoperazine HCL tablets (1, 2, 5 and 10 mg) beginning at least as early as July, 2013.

1317.   Trifluoperazine HCL, also known by the brand name Stelazine, is a medication used to treat disorders such as schizophrenia and Tourette syndrome.

1318.   During the relevant time frame, Defendants Mylan and Sandoz were the primary manufacturers of Trifluoperazine HCL. Defendant Upsher-Smith joined the Trifluoperazine HCL market and the conspiracy in March 2015.

1319.   The market for Trifluoperazine HCL tablets was mature and at all relevant times had multiple manufacturers.

1320.   For years, the prices for Trifluoperazine HCL tablets were relatively low and stable. In the summer of 2013, Mylan and Sandoz coordinated large price increases for their Trifluoperazine tablets. Within a small window of time, Mylan and Sandoz approximately doubled their list (WAC) prices to identical levels, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1321. When Upsher-Smith joined the market in spring of 2015, rather than offer better pricing to win customers, it announced identical list (WAC) prices to Mylan and Sandoz, ████ ████████████████████████████████████████████.

1322. The list (WAC) price chart and the NSP price chart below highlight the abrupt and parallel price increases by Mylan and Sandoz, and the elevated prices at which Upsher-Smith joined the market for Trifluoperazine HCL tablets. Note: the pricing patterns for all Trifluoperazine HCL tablets are highly similar. Charts for only the 10 mg dosage are included here. [NSP CHART REDACTED]





1323.   Throughout this period, Mylan, Sandoz and Upsher-Smith met at trade conferences and communicated directly with each other in furtherance of their price fixing agreement on Trifluoperazine HCL tablets and of the Fair Share agreement.

1324.   For example, on August 6, 2013—just a few days prior to Mylan's price increases—Nesta (Mylan) was in phone contact with a Sandoz Director of National Accounts.

1325.   Once the Mylan price increases were imposed, Sandoz was careful not to take Mylan's customers and to maintain Fair Shares.

1326.   Sandoz and Mylan were in contact by phone on numerous occasions in October, and on October 25, 2013, Sandoz announced identical list (WAC) prices to Mylan.

1327.   In January, February and March of 2015, Sandoz's Kellum was in phone contact with S.H., Senior VP of Global Sales, and J.H., Senior Director of Marketing, at Upsher-Smith. In February 2015, M.A., National Account Director at Mylan, communicated by text message with

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

D.Z., National Accounts Senior Director at Upsher-Smith. On March 17, Upsher-Smith announced identical list prices to Sandoz and Mylan.

### 107.   Clemastine Fumarate

1328.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Clemastine Fumarate tablets beginning at least as early as August 2013.

1329.   Clemastine Fumarate, also known by the brand name Tavist, is a medication used to treat hay fever and allergy symptoms.

1330.   During the relevant time frame, Defendants Teva and Sandoz were the primary manufacturers of Clemastine Fumarate tablets.

1331.   Teva and Sandoz coordinated a price increase on Clemastine Fumarate tablets for Teva's August 9, 2013 round of price increases. Patel of Teva spoke with an Associate Director of Pricing at Sandoz several times in August regarding Clemastine Fumarate, including calls on August 1, 2, and 8, 2013.

1332.   On August 28, 2014, Teva raised list (WAC) prices on Clemastine Fumarate tablets. Patel again spoke to her contact at Sandoz several times in August 2014 before that increase.

### 108.   Oxycodone/Acetaminophen

1333.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Oxycodone Acetaminophen 10-325 mg, 7.5-325 mg and 5-325 mg tablets beginning at least as early as August 2013.

1334.   Oxycodone/Acetaminophen, also known by the brand name Percocet, is a medication used to treat moderate to severe pain.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1335.   During the relevant timeframe, Defendants Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt and Par were the primary manufacturers of generic Percocet.

1336.   The market for Oxycodone/Acetaminophen was mature and at all relevant times had multiple manufacturers.

1337.   For years, the prices of Oxycodone/Acetaminophen were relatively low and stable. In the summer of 2013, however, market prices shifted radically higher. In the space of less than two months, Mallinckrodt, Alvogen, Amneal and Actavis ███████████████████ Around the same time, Aurobindo and Par/Qualitest re-entered the market. Rather than offer lower prices to win market share, they each entered ███████████████████ ███████████████████

1338.   Notwithstanding the enormous shifts in pricing, each manufacturer's share of the market remained relatively stable, as contemplated by the Fair Share agreement.

1339.   The NSP price chart below shows the large and parallel price increases by Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt and Par/Qualitest. [CHART REDACTED]

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1340.   Throughout this period, Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt and Par/Qualitest met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on generic Percocet and of their Fair Share agreement.

1341.   For example, between September and December 2013—when Oxycodone prices were skyrocketing—Actavis's Falkin communicated by phone with Alvogen (multiple calls in October and November with B.H., Alvogen Executive Vice President of Sales), with Amneal (voice and text in October with S.R., Amneal Vice President of Sales) and with Aurobindo (communications in November and December with R.C., Aurobindo CEO).

1342.   While Falkin was communicating with all of the rest of the manufacturers, A.S., Actavis Vice President of Sales, and A.B., Senior Vice President of Sales and Marketing at Actavis, were in touch with Kaczmarek, Vice President and General Manager at Mallinckrodt,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

between September and December 2013. Actavis's A.B. also had multiple phone communications during this period with S.R., Senior Director of Sales Finance at Amneal. Actavis's A.S. also had multiple conversation with C.P., Par/Qualitest Vice President of National Accounts between October and December 2013.

1343.   Alvogen's B.H. also was in touch with Aurobindo's J.K., Director of National Accounts, in December 2013 and January 2014.

### **109.**   **Griseofulvin**

1344.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Griseofulvin microsize tablets beginning at least as early as September 2013 and Griseofulvin suspension beginning at least as early as September 2014.

#### **Griseofulvin Microsize Tablets**

1345.   Griseofulvin microsize tablets, also known by the brand name Grifulvin V, is a medication used to treat fungal infections of the skin, hair, or nails that do not respond to creams or lotions.

1346.   During the relevant time frame, Defendants Sandoz and Rising were the primary manufacturers of Griseofulvin.

1347.   In August 2013, Sandoz received FDA approval to market Griseofulvin. At the time, Rising controlled the vast majority of the Griseofulvin microsize tablet market.

1348.   As Sandoz's launch date approached, C.B., Sandoz Director of National Accounts, communicated by phone with P.K., Rising Senior Vice President of Sales. Prior to working at Rising, P.K. worked with C.B. at Sandoz. In September, the two former colleagues communicated multiple times to coordinate pricing and target customers in the market for Griseofulvin microsize tablets.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1349.   In October 2013, C.B. (Sandoz) and P.K. (Rising) continued to communicate. Sandoz began pursuing customers and focused on those that it had agreed to target. Rising, for its part, declined to submit competitive bids to customers that it had agreed to cede to Sandoz. C.B. kept contemporaneous notes of his discussions with Rising during this period.

1350.   In November 2013, the coordination between Sandoz and Rising continued. As Sandoz pursued its Fair Share of the Griseofulvin microsize tablet market, C.B. (Sandoz) and P.K. (Rising) communicated by phone to work out the details. As Sandoz approached its Fair Share, P.K. kept his colleagues at Rising informed as to when it would no longer need to cede customers to Sandoz.

1351.   Sandoz and Rising obtained their Fair Shares of the market, as agreed, and profits on Griseofulvin microsize tablets remained high as a result of the coordination between the companies. But Rising wanted to extract even more profits, and planned to increase prices on Griseofulvin microsize tablets in October 2014. Before doing so, P.K. (Rising) coordinated with L.J., Sandoz Director of Marketing. The ostensible competitors also met in person to hammer out the details of the price increases over drinks.

1352.   In November 2014, after the Rising price increase, P.K. (Rising) continued to communicate with L.J. (Sandoz) and C.B. (Sandoz). Based on these communications, Rising was confident that it would not lose any customers; Sandoz would stick to their agreement.

1353.   Eventually, Sandoz increased its own prices on Griseofulvin microsize tablets. As it analyzed the price increase during the summer of 2015, Sandoz too was confident that no customers would be loss in the wake of price increase. Just to be certain, however, C.B. (Sandoz) resumed communications with Rising in late July 2015. This time, he contacted another former Sandoz colleague who had moved to Rising, S.G., Vice President of Sales.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1354.   In August 2015, Sandoz announced price increases for Griseofulvin microsize tablets that tracked those of Rising.

**Griseofulvin Suspension**

1355.   Griseofulvin suspension, also known by the brand name Grifulvin V, is an anti-fungal medication used to treat certain infections that do not respond to other medications.

1356.   During the relevant time frame, Defendants Teva and Actavis were the primary manufacturers of Griseofulvin suspension.

1357.   On September 9, 2014, Actavis notified its customers of a price increase on Griseofulvin microsize oral suspension. From September, through the day of the price increase, Patel and Rekenthaler communicated with Falkin and Rogerson of Actavis to coordinate the increase over the course of at least ten telephone calls.

1358.   Teva added Griseofulvin to its own price increase list, with the notation "Follow Competitor – Actavis" as the reason for the price increase, and followed the Actavis increase for Griseofulvin during its next price increase event on January 28, 2015.

1359.   As with the Actavis price increase in September, in the days leading up to the January 2015 price increase, Rekenthaler of Teva and Falkin of Actavis coordinated frequently. Teva's price increase for Griseofulvin matched Actavis's list (WAC) pricing exactly.

**110.   Cephalexin**

1360.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Cephalexin oral suspension beginning at least as early as October 2013.

1361.   Cephalexin, also known by the brand name Keflex, is a medication used to treat certain infections.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1362.   During the relevant time frame, Defendants Lupin and Teva were the primary manufacturers of Cephalexin oral suspension.

1363.   The market for Cephalexin was mature and at all relevant times had multiple manufacturers.

1364.   For years, the prices for Cephalexin oral suspension were relatively low and stable. In the fall of 2013, however, Lupin and Teva conspired to impose significant price increases. List (WAC) prices for Lupin and Teva Cephalexin more than doubled. ███████████████

███

1365.   The list (WAC) price chart and NSP price chart below show the abrupt and large price increases imposed by Lupin and Teva. Note: the pricing patterns for 125 mg and 250 mg suspension are very similar. Charts for only the 125 mg dosage are included here. [NSP CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1366.   Throughout this period, Lupin and Teva and met at trade conferences and communicated directly with each other in furtherance of their price fixing agreement on Cephalexin oral suspension and of the Fair Share agreement.

1367.   For example, as Lupin planned to increase prices in early November 2013, Berthold of Lupin communicated with Teva's Rekenthaler by phone on October 14, 2013, and with T.S., a National Account Manager at Teva, on October 31, 2013. Shortly after her call with Berthold, T.S. notified her Teva colleagues: "I have heard [] Lupin is implementing a price increase today on Cephalexin Oral Suspension (4-6x's current price)."

1368.   Because Teva did not announce its own Cephalaxin price increase until April 2014, customers approached Teva seeking better prices after Lupin raised prices. In line with their Fair Share and price fixing agreement, Teva opted not to compete for these customers. For example, Teva's Patel called Berthold of Lupin on November 22, 2013, after Teva decided it would not respond to a request from a large customer to bid on Cephalexin.

1369.   As Teva prepared to announce its price increase on Cephalaxin, Patel coordinated with Lupin's Berthold via phone communications throughout the period.

1370.   On April 4, 2014, Teva raised its list (WAC) prices on Cephalexin oral suspension to the identical level of Lupin's prices.

### 111.   Estradiol and Norethindrone Acetate (Mimvey)

1371.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Estradiol and Norethindrone Acetate (Mimvey) tablets beginning at least as early as October 2013.

1372.   Estradiol and Norethindrone Acetate (Mimvey) is an oral contraceptive.

1373.   During the relevant time frame, Defendants Teva and Breckenridge were the primary manufacturers of Mimvey.

1374.   On November 14, 2013, Breckenridge increased its pricing on Mimvey. Leading up to that increase, Rekenthaler of Teva had several phone calls with the Director of Sales at Breckenridge to coordinate the price increases, including two calls on October 14, 2013 and one on October 24, 2013. After those calls, they did not speak again until mid-January 2014, when Teva began preparing to implement its increase.

1375.   On April 4, 2014, Teva increased pricing on a number of drugs, including Mimvey. Teva's new list (WAC) price exactly matched Breckenridge's list price. As Patel of Teva planned for Teva's April 4, 2014 price increases, both she and Rekenthaler continued to communicate with their counterparts at Breckenridge. Rekenthaler spoke again to the Director of Sales at Breckenridge on January 15, 2014 and Patel spoke with a Director of National Accounts at Breckenridge two times on February 7, 2014.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### **112.**   **Hydroxyzine Pamoate**

1376.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Hydroxyzine Pamoate capsules beginning at least as early as October 2013.

1377.   Hydroxyzine Pamoate, also known by the brand name Vistaril, is an antihistamine with anticholinergic (drying) and sedative properties used as a sedative to treat anxiety and tension.

1378.   During the relevant time frame, Defendants Teva, Sandoz, Actavis, and Rising were the primary manufacturers of Hydroxyzine Pamoate.

1379.   In 2013, Rising was preparing to enter the market for Hydroxyzine Pamoate. During several calls in early October 2013, Rising's Senior Vice President of Sales coordinated with Green and Rekenthaler of Teva to acquire a large customer and facilitate Rising's entry into the Hydroxyzine Pamoate market.

1380.    In March and early April 2014, Patel and Rekenthaler both were communicating frequently with Teva's competitors to coordinate price increases. For example, Teva's Rekenthaler spoke to Falkin (Actavis) on March 11, 12 (twice), 14, 15, and 17, 2014, as well as on April 1, 2, 3, and 4, 2014.  Teva's Patel spoke to Rogerson (Actavis) numerous times on both March 14 and 17, 2014, as well as on April 1, 3, and 4, 2014. Patel spoke to M.V., Associate Director of Pricing at Sandoz, on March 31, 2014 for fifteen (15) minutes and on April 4, 2014 for twenty-five (25) minutes.  Rekenthaler spoke to P.K., SVP of Sales at Rising, on March 17 and 31, 2014.

1381.   After reaching a pricing and Fair Share agreement with the other Hydroxyzine Pamoate manufacturers, Teva increased its prices on April 4, 2014.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### **113.    Oxycodone HCL**

1382.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Oxycodone HCL tablets beginning at least as early as October 2013.

1383.   Oxycodone HCL, also known by the brand name Roxicodone, among others, is an opioid analgesic available in 5, 15 and 30 mg tablets.

1384.   The market for Oxycodone HCL was mature and at all relevant times had multiple manufacturers.

1385.   During the relevant time frame, Defendants Actavis, Mallinckrodt, Par/Qualitest, and Sun were the primary manufacturers of Oxycodone HCL tablets.

1386.   For years, the prices for Oxycodone HCL tablets were relatively low and stable. In the fall of 2013, however, Actavis, Mallinckrodt, Par/Qualitest and Sun imposed very large price increases in close succession.

1387.   The price charts below show the dramatic price increases imposed by Actavis, Mallinckrodt, Par/Qualitest, and Sun. Note: Prices for 5 and 15 mg tablets exhibited a similar pricing pattern. Charts for only the 30 mg dosage are included here. [NSP Chart Redacted]

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





OXYCODONE HCL ORAL TABLET 30 MG WAC PRICE

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1388.   Throughout this period, Actavis, Mallinckrodt, Par/Qualitest, and Sun met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Oxycodone HCL and their Fair Share agreement.

1389.   For example, shortly before coordinating large price increases for Oxycodone HCL tablets, representatives of Actavis, Mallinckrodt, Par/Qualitest, and Sun all attended the NACDS 2013 Total Store Expo in Las Vegas, Nevada from August 10-13, 2013.

1390.   The companies also communicated directly by phone during the period of their price increases on Oxycodone HCL. For example, on October 18, 2013, days before Actavis announced price increases on Oxycodone HCL, A.S., Actavis Vice President of Sales, and Kaczmarek, Mallinckrodt Vice President and General Manager, communicated multiple times by phone. They would communicate a number of additional times over the next month.

1391.   A.S. (Actavis) also was in contact with C.P., Vice President of National Accounts at Par/Qualitest. They two spoke for approximately 5 minutes on October 30, 2013 and again on November 13, 2013 for more than nine minutes. Also on November 13, A.S. (Actavis) communicated by phone with Kaczmarek (Mallinckrodt).

1392.   Actavis also communicated with Sun during this period. After Actavis, Mallinckrodt and Par/Qualitest had all implemented price increases in October 2013, Falkin, Actavis Vice President of Marketing, communicated by phone with G.S., Sun President, multiple times in November and December. After the calls, Sun began to raise customer prices before the end of 2013 and announced a list (WAC) price increase in February 2014.

### **114.   Tobramycin**

1393.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Tobramycin inhalation solution beginning at least as early as October 2013.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1394.   Tobramycin, also known by the brand name Cayston, is a medication used to treat growth of a certain bacteria that commonly infects the lungs of people with cystic fibrosis.

1395.   During the relevant time frame, Defendants Teva and Sandoz were the primary manufacturers of Tobramycin inhalation solution.

1396.   Beginning in October 2013, Sandoz began making plans to enter the Tobramycin market, where Teva was the sole supplier. To facilitate Sandoz's entry into the market and to allow it to gain a Fair Share, Teva and Sandoz began sharing information and coordinating to divide up the market for Tobramycin.

1397.   Patel of Teva exchanged seven calls with the Associate Director of Pricing at Sandoz on July 1, 2014, five calls on July 7, 2014, and one call on July 9, 2014.  During these calls, Sandoz and Teva discussed how to coordinate Fair Shares of the market for Tobramycin, including specific accounts that each would maintain or concede.

## <u>115.   Azithromycin</u>

1398.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Azithromycin oral suspension ( 100 mg and 200 mg/5 ml) beginning at least as early as November 2013.

1399.   Azithromycin, also known by the brand name Zithromax, is a medication used to treat certain bacterial infections.

1400.   During the relevant time frame, Defendants Teva and Greenstone/Pfizer were the primary manufacturers of Azithromycin.

1401.   In November 2013, Greenstone began planning to increase prices on several drugs that overlapped with Teva, including Azithromycin. Greenstone began to raise prices shortly thereafter and announced a list (WAC) price increase on January 1, 2014.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1402.   Over the next several months—during the period of time before Teva followed Greenstone's price increase—Teva declined to bid on Azithromycin at multiple customers, as contemplated by the Fair Share agreement between them.

1403.   Patel of Teva and a Director of National Accounts at Greenstone were in frequent communication, including calls on November 23, 2013, December 2, 2013, December 5, 2013, two calls on March 17, 2014, and two calls on April 4, 2014.

1404.   Teva followed Greenstone's price increases on April 4, 2014. Patel spoke to the Greenstone Director of National Accounts twice on that day.

### **116.**   **Balsalazide Disodium**

1405.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Balsalazide Disodium capsules beginning at least as early as November 2013.

1406.   Balsalazide Disodium, also known by the brand name Giazo, is an anti-inflammatory drug used in the treatment of inflammatory bowel disease.

1407.   During the relevant time frame, Defendants West-Ward[22] and Apotex were the primary manufacturers of Balsalazide Disodium.

1408.   The market for Balsalazide Disodium was mature and at all relevant times had multiple manufacturers.

1409.   For years, the prices for Balsalazide Disodium capsules were relatively low and stable. West-Ward/Roxane and Mylan were the dominant manufacturers in the market during the earlier years. Apotex joined the market in the spring of 2012, but remained a small player. Then,

---

[22] The relevant entity at this point in time was Roxane, which eventually was acquired by West-Ward during the relevant period (announced July 2015, completed March 2016).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

in the early summer of 2013, Mylan exited the market. West-Ward/Roxane managed to gain most of Mylan's market share.

1410.   In January 2014, Apotex experienced a brief supply disruption and exited the market for approximately one month. West-Ward/Roxane immediately increased prices. It raised list prices approximately 400% and NSP prices ▮▮▮▮▮▮▮▮

1411.   Apotex, which had only been out of the market for the blink of an eye, could have offered lower prices to win market share. Instead, it immediately followed West-Ward/Roxane's price increases. It announced an identical list price, and raised NSP prices ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮

1412.   Even with the higher prices, Apotex was able to build share. It quickly captured nearly twice the unit sales it had before the price increase, and owing to the much higher prices, its dollar sales increased more than five-fold. Meanwhile, although it had to cede some share to Apotex, West-Ward/Roxane's dollar sales more than doubled as a result of the higher market prices. The Fair Share agreement was working exactly as it was intended.

1413.   The NSP price chart and list price chart below show the abrupt and nearly simultaneous price increases by West-Ward/Roxane and Apotex. [NSP CHART REDACTED]





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1414.   Throughout this period, West-Ward/Roxane and Apotex met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Balsalazide Disodium and of their Fair Share agreement.

### 117.   Butorphanol Tartrate

1415.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Butorphanol Tartrate nasal spray beginning at least as early as December 2013.

1416.   Butorphanol Tartrate, also known by the brand name Stadol NS, is used to treat moderate to severe pain, including pain from surgery, muscle pain, and migraine headaches.

1417.   During the relevant time frame, Defendants Mylan, West-Ward[23] and Apotex were the primary manufacturers of Butorphanol Tartrate.

1418.   The market for Butorphanol Tartrate was mature and at all relevant times had multiple manufacturers.

1419.   For years, the prices for Butorphanol Tartrate nasal spray were relatively low and stable. West-Ward/Roxane, Mylan and Apotex were the dominant manufacturers in the market during the earlier years. West-Ward/Roxane and Mylan had roughly equal and larger shares of the market than did Apotex. In late 2013, Apotex exited the market, at which point West-Ward/Roxane and Mylan immediately raised prices. Rather than compete with Mylan to pick up what had been Apotex's share of the market, West-Ward/Roxane promptly announced a significant increase in its WAC price to make it identical to Mylan's. Both manufacturers ████████████

████████████████████████████████████

---

[23] The relevant entity at this point in time was Roxane, which eventually was acquired by West-Ward during the relevant period (announced July 2015, completed March 2016).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1420.   In the spring of 2015, Apotex re-joined the market. Rather than offer better prices to win market share, it announced list prices identical to West-Ward/Roxane, and roughly matched NSP prices as well. Even without better pricing, Apotex rapidly gained share, and the market shifted to roughly equal shares split between Mylan, West-Ward/Roxane and Apotex. Even with three manufacturers back in the market, prices did not decline, and have never returned to prior levels. Yet again, the Fair Share agreement was working exactly as intended.

1421.   The NSP price chart and list (WAC) price chart below show the abrupt and nearly simultaneous price increases by West-Ward/Roxane and Mylan, which were later matched by Apotex when it re-entered the market. [NSP CHART REDACTED]



1422.   Throughout this period, Mylan, West-Ward/Roxane and Apotex met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Butorphanol Tartrate and of their Fair Share agreement.

### 118.   **Cefuroxime Axetil**

1423.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Cefuroxime Axetil tablets beginning at least as early as December 2013.

1424.   Cefuroxime Axetil, also known by the brand name Ceftin, is used to treat a wide variety of bacterial infections.

1425.   During the relevant time frame, Defendants Lupin, Aurobindo and Citron were the primary manufacturers of Cefuroxime Axetil.

1426.   The market for Cefuroxime Axetil was mature and at all relevant times had multiple manufacturers.

1427.   For years, the prices for Cefuroxime Axetil tablets were relatively low and stable. In late 2013, however, Wockhardt exited the market, at which point Lupin and Aurobindo immediately imposed large price increases, notwithstanding the fact that each had enough supply to compete for more sales. Instead, they each only took a Fair Share at much higher prices.

1428.   Almost simultaneously, Lupin and Aurobindo announced identical, 500% list (WAC) price increases.

1429.   In line with the higher WAC prices, Lupin's and Aurobindo's NSP prices ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮

1430.   Not long after the large price increases imposed by Lupin and Aurobindo, Citron entered the market. Rather than offer lower prices to compete for share, in late March 2014, Citron announced list (WAC) prices identical to those of Lupin and Aurobindo.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1431.   Lupin, Aurobindo and Citron adhered to their Fair Share agreement to avoid competition and its attendant downward pressure on prices. For example, in the spring of 2014, a large customer requested that Aurobindo lower its prices significantly for Cefuroxime Axetil. Internally at Aurobindo, T.G., Director of National Accounts, shot down the idea: ████████

████████████████████████████████████████████████████

1432.   The NSP price chart and list (WAC) price chart below show the abrupt and nearly simultaneous price increases by Lupin and Aurobindo, which were later matched by Citron when it entered the market. Note: the prices of 250 mg and 500 mg tablets followed a very similar pattern. Only the 250 mg charts are included here. [NSP CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1433.   Throughout this period, Lupin, Aurobindo and Citron met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Cefuroxime Axetil and of their Fair Share agreement.

1434.   For example, Lupin's David Berthold, VP of Sales, communicated with K.S., Citron's EVP of Sales, on January 10, 2014.

1435.   Lupin's Berthold also communicated by phone multiple times in January and February 2014 with Aurobindo's P.M., Senior Director of Commercial Operations, including on the day before and the day immediately after both companies announced identical list (WAC) price increases.

### 119.   Clarithromycin

1436.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Clarithromycin Extended Release ("ER") tablets beginning at least as early as December 2013.

1437.   Clarithromycin, also known by the brand name Biaxin, among others, is a medication used to treat bacterial infections.

1438.   During the relevant time frame, Defendants Actavis, Zydus, and Teva were the primary manufacturers of Clarithromycin ER tablets.

1439.   On December 30, 2013, a large wholesaler approached Teva looking for a bid on Clarithromycin ER because Zydus was exiting the market. Rather than compete for this new customer, Teva opted to coordinate with Actavis to increase prices.

1440.   Teva's Patel spoke to Rogerson at Actavis for more than seventeen minutes on January 2, and then submitted a bid at an elevated price to the wholesaler. Patel called Rogerson again on January and 9, 2014, after the customer had accepted Teva's bid.

1441.   Teva and Actavis worked together over the next few months to implement market wide price increases. Patel spoke to Rogerson at Actavis on February 5, 6, and 7, 2014. The communications between Teva and Actavis intensified in March, when Patel spoke to Rogerson repeatedly on March 14 and 17, as well as once on March 15.  In addition, Teva's Rekenthaler spoke to Actavis's Falkin on March 11, 12, (twice), 14, 15, and 17, 2014.

1442.   In the spring of 2014, Teva and Actavis increased pricing on Clarithromycin ER tablets for all customers.

### 120.   Exemestane

1443.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Exemestane tablets beginning at least as early as December 2013.

1444.   Exemestane, also known by the brand name Aromasin, is used to treat breast cancer.

1445.   During the relevant time frame, Defendants Alvogen, Greenstone and West-Ward[24] were the primary manufacturers of Exemestane tablets.

1446.   The market for Exemestane was mature and at all relevant times had multiple manufacturers.

1447.   For years, the prices for Exemestane were relatively low and stable.  In late 2013, however, Greenstone and West-Ward/Roxane imposed very large and nearly simultaneous price increases. When Alvogen joined the market in the summer of 2014, rather than offer lower prices than Greenstone and West-Ward/Roxane, it offered the same or even higher prices. Nonetheless, as contemplated by their Fair Share agreement, Alvogen was able to win market share.

1448.   The price chart below shows the sustained and elevated prices imposed by Alvogen, Greenstone and West-Ward.  [CHART REDACTED]

---

[24] The relevant entity at this point in time was Roxane, which eventually was acquired by West-Ward during the relevant period (announced July 2015, completed March 2016).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1449.   Throughout this period, Alvogen, Greenstone and West-Ward/Roxane met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Exemestane and their Fair Share agreement.

1450.   For example, representatives from Alvogen, Greenstone and West-Ward/Roxane attended multiple trade events together in 2013 in the lead up to the steep price increases for Exemestane, including the HDMA Business Leadership Conference in June 2013 and the NACDS 2013 Total Store Expo in August 2013. In February 2014, all three companies sent representatives to the GPhA Annual Meeting in Orlando, FL. In the summer of 2014, as Alvogen was entering the market, all three companies again sent representatives to the NACDS Total Store Expo in August.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 121. Timolol Maleate

1451.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Timolol Maleate ophthalmic gel forming solution beginning at least as early as December 2013.

1452.   Timolol Maleate, also known by the brand names Betamol and Timoptic, is used to treat high pressure inside the eye due to glaucoma (open angle-type) or other eye diseases (*e.g.*, ocular hypertension).

1453.   During the relevant time frame, Defendants Bausch Health and Sandoz were the primary manufacturers of Timolol Maleate.

1454.   The market for Timolol Maleate was mature and at all relevant times had multiple manufacturers.

1455.   For years, the prices for Timolol Maleate ophthalmic gel forming solution were relatively low and stable.

1456.   A May 2013 Sandoz internal document posed the following question: ▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉ Not long after this analysis, Sandoz and Bausch Health almost simultaneously and out of the blue, imposed very large price increases. List (WAC) prices more than tripled, ▉▉▉▉ ▉▉ Even as prices skyrocketed, market share remained roughly split between the companies. ▉

1457.   The list (WAC) price chart and NSP price chart below show the large increases and parallel pricing by Bausch Health and Sandoz. (Note: the prices of the 0.5% formulation of Timolol Maleate followed a very similar pattern. Only the 0.25% charts are included here.) [NSP CHART REDACTED]





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1458.   Throughout this period, Bausch Health and Sandoz met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Timolol Maleate and of their Fair Share agreement.

1459.   For example, both companies sent representatives to the ECRM Retail Pharmacy Efficient Program Planning Session at the Omni Amelia Island Plantation Resort in Amelia Island, Florida on February 23-26, 2014. Sandoz had raised its list (WAC) prices shortly before the conference. Bausch announced its own list (WAC) price increases for Timolol Maleate shortly after the conference, on March 12, 2014.

### **122.   Capecitabine**

1460.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Capecitabine tablets beginning at least as early as January 2014.

1461.   Capecitabine, also known by the brand name Xeloda, is a chemotherapy medication used to treat multiple types of cancer, including breast and colon cancer.

1462.   During the relevant time frame, Teva and Mylan were the primary manufacturers of Capecitabine.

1463.   As early as January 2014, Teva and Mylan shared commercially sensitive information about their preparations to launch Capecitabine, which was just opening up to generic competition. For example, Teva and Mylan shared customer-specific sales information, which they provided to one another in order to allocate the Capecitabine market between them.

1464.   By late February, Mylan had informed Teva that its launch would be delayed.  Teva proceeded with its launch, and became the exclusive generic Capecitabine manufacturer in early March 2014.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1465.   Leading up to Mylan's launch in August 2014, Mylan and Teva communicated by phone on multiple occasions about the drug and Fair Share allocation of the market. For example, Teva's Rekenthaler and Mylan's Nesta discussed three large customers and a targeted market share of 35% for Mylan. Mylan ultimately sought business from each of the three customers that Rekenthaler and Nesta had spoken about, and Teva conceded each of them, pursuant to an agreement the two had reached around the time of Mylan's launch.

1466.   The agreement between Teva and Mylan as to these three customers was part of broader market allocation scheme for Capecitabine, as further demonstrated by Teva's concession other smaller customers to Mylan as well.

### **123.    Fluocinonide 0.1% Cream**

1467.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Fluocinonide 0.1% cream beginning at least as early as January 2014.[25]

1468.   Fluocinonide cream, also known by the brand name Vanos, is a corticosteroid used on the skin to reduce swelling, redness, itching, and allergic reactions.

1469.   During the relevant time frame, Defendants Bausch, Glenmark, Perrigo, Sandoz and Taro were the primary manufacturers of Fluocinonide 0.1% cream.

1470.   In January 2014, Perrigo and Bausch launched generic versions of Fluocinonide 0.1% cream. They were the first generics on the market. From day 1, Perrigo and Bausch abided by the Fair Share agreement.

---

[25] The EPP Fluocinonide complaint (Case No. 2:16-FL-27242-CMR, Doc. 142) does not include 0.1% cream. That complaint addresses Fluocinonide 0.05% ointment, gel, solution, cream and emulsified cream.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1471.   For example, although Perrigo had a slight head start on Bausch in getting to market, it was careful not to take more than a Fair Share; even though it was only getting started in the market for Fluocinonide, it ceded customers to Bausch.

1472.   By the summer of 2014, Taro and Glenmark were preparing to enter the market. Rather than devise a plan to win over customers with better prices, both companies opted to conspire with the incumbent manufacturers, Perrigo and Bausch, to get a Fair Share.

1473.   For example, on June 3, 2014, Michael Perfetto, Taro Chief Commercial Officer, exchanged multiple calls with Douglas Boothe, Perrigo Executive Vice President. Throughout the rest of June, the ostensible competitors continued to communicate. Perfetto (Taro) communicated by phone multiple additional times with Boothe (Perrigo) and also spoke a number of times with Jim Grauso, Glenmark Executive Vice President.

1474.   In July, Ara Aprahamian, Taro Vice President of Sales, and Grauso (Glenmark) spoke numerous times by phone, including on the day that each company launched its Fluocinonide 0.1% cream products. Grauso (Glenmark) also spoke to M.S., Bausch Senior Director of Generics Marketing, numerous times in July 2014.

1475.   Over the next couple of months, Bausch and Perrigo monitored the market as Glenmark and Taro launched their products. They each ceded customers to Taro and Glenmark so that everyone could obtain a Fair Share of the market.

1476.   The following year, Sandoz was preparing to enter the market. As was its custom, it reached out to the incumbent manufacturers to coordinate pricing and to figure out which customers to pursue. To that end, on September 24, 2015, C.B., Sandoz National Account Director, called Aprahamian (Taro). The same day, C.B. (Sandoz) also called T.P., Perrigo Director of National Accounts. On these calls, C.B. learned confidential and competitively sensitive pricing

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

information and details about specific customers, which Sandoz then used to pursue its Fair Share of the Fluocinonide 0.1% cream market.

### 124.    Norethindrone/Ethinyl Estradiol (Balziva)

1477.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Norethindrone/Ethinyl Estradiol tablets beginning at least as early as January 2014.

1478.    Norethindrone/Ethinyl Estradiol, also known by the brand name Ovcon35, is an oral contraceptive formulation. Teva markets its generic of this medication under the name Balziva.

1479.    During the relevant time frame, Teva and Lupin were the primary manufacturers of Norethindrone/Ethinyl Estradiol.

1480.    On January 23, 2014, a customer informed Teva that a new market entrant was seeking a share of its business on Norethindrone/Ethinyl Estradiol. Teva employees surmised that the entrant was Lupin, as it had recently obtained approval to begin marketing the generic drug.

1481.    Teva employees discussed internally how to respond to the entrant, with at least one expressing concern that conceding business would cause Teva to lose its position as the Norethindrone/Ethinyl Estradiol market leader.

1482.    On January 24, 2014, Teva's Patel spoke to Berthold at Lupin twice by phone. Several days after that call, on January 29, 2014, Patel internally recommended conceding "part of the business" with the customer at issue to Lupin, in order "to be responsible in the market." Patel and Berthold spoke again on February 4, 2014 to further coordinate Lupin's entry into the market.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1483.   As a result of the agreement and anticompetitive coordination between Teva and Lupin, prices for Norethindrone/Ethinyl Estradiol tablets were higher than they would have been in a competitive market.

### 125.   Penicillin V Potassium

1484.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Penicillin V Potassium tablets beginning at least as early as January 2014.

1485.   Penicillin V Potassium, or Penicillin VK, also known by the brand name Pen-Vee, is an antibiotic used to a fight a broad-spectrum of bacteria.

1486.   During the relevant time frame, Teva, Sandoz, Aurobindo, and Greenstone/Pfizer were the primary manufacturers of Penicillin VK tablets.

1487.   On August 28, 2014, Teva raised prices on a number of different drugs, including Penicillin VK tablets. Prior to the increase, Teva's Patel and Rekenthaler communicated with Aurobindo, Sandoz, and Greenstone. Rekenthaler spoke to R.C., CEO of Aurobindo, twice on July 29. Patel spoke to a Greenstone executive on August 25, and to the Associate Director of Pricing at Sandoz on August 26, 27 (two calls) and 28.

1488.   On October 10, 2014, Sandoz followed Teva's price increase. Teva's Patel again spoke to the Associate Director of Pricing at Sandoz that day, just as on the day of Teva's price increase. On October 15, Rekenthaler again spoke to R.C. at Aurobindo.

### 126.   Pilocarpine HCL

1489.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Pilocarpine HCL tablets (5 mg) beginning at least as early as January 2014.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1490.   Pilocarpine HCL tablets, also known by the brand name Salagen, is used to treat dryness of the mouth and throat caused by a decrease in the amount of saliva that may occur after radiation treatment for cancer.

1491.   During the relevant time frame, Defendants Lannett, Actavis and Impax were the primary manufacturers of Pilocarpine HCL tablets.

1492.   The market for Pilocarpine HCL tablets was mature and at all relevant times had multiple manufacturers.

1493.   For years, the prices for Pilocarpine HCL tablets were relatively low and stable. In late 2013 and early 2014, Impax experienced supply disruptions, at which point Actavis and Lannett immediately imposed very large price increases. Rather than compete for Impax's old customers on price, Actavis and Lannett relied on the Fair Share agreement to raise prices instead.

1494.   In the fall of 2015, when Impax was finally ready to re-enter the market, rather than compete for customers with better pricing, Impax offered higher prices than either Actavis or Lannett. Even with higher prices, Impax was quickly able to build market share. Meanwhile, prices for all three manufacturers remained higher than before the increases had been implemented.

1495.   The NSP price chart below shows the large increases and parallel pricing by Lannett, Actavis and Impax for Pilocarpine HCL 5 mg tablets. [NSP CHART REDACTED]

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1496.   Throughout this period, Actavis, Lannett and Impax met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Pilocarpine HCL and of their Fair Share agreement.

1497.   For example, in late 2013 and early 2014—the time of the Pilocarpine price increases—Actavis's Falkin and Lannett's K.S. communicated multiple times by phone. Falkin (Actavis) also communicated by phone on November 15, 2013 with M.G., Senior National Account Manager at Impax. Lannett's K.S. also communicated by phone with Impax during this same window of time; on January 15, 2014, he spoke to D.D., Impax National Accounts Manager.

### 127.   Calcipotriene Betamethasone Dipropionate

1498.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Calcipotriene Betamethasone Dipropionate  Ointment ("CBD Ointment" or "Cal Beta") beginning at least as early as February 2014.

1499.   CBD Ointment, also known by the brand name Taclonex Ointment, is topical medication used to treat psoriasis vulgaris in adults. It is available in 60 gm and 100 gm dosages.

1500.   During the relevant timeframe, Sandoz and Perrigo were the primary manufacturers of CBD Ointment.

1501.   In early 2014, Sandoz and Perrigo were preparing to launch generic versions of CBD Ointment. To ensure higher prices than a competitive market would allow, Sandoz and Perrigo coordinated their market entries.

1502.   Beginning in February 2014 and continuing through April 2014, T.P., a Perrigo Director of National Accounts, and C.B., a Sandoz Director of National Accounts, communicated frequently via telephone to coordinate pricing and to allocate customers. Each National Account Director also involved colleagues and supervisors in the effort to ensure that Perrigo and Sandoz each obtained a Fair Share of the CBD Ointment market. For example, T.P. (Perrigo) worked with John Wesolowski, Perrigo's Senior Vice President of Commercial Operations, to ensure that Perrigo achieved its Fair Share and abided by the agreement with Perrigo. At Sandoz, C.B. worked with numerous personnel, including Kellum (Sandoz Director of Pricing) and M.V. (Sandoz Associate Director of Pricing).

1503.   On March 13, 2014, C.B. (Sandoz) called T.P. (Perrigo) first thing in the morning, then again in the afternoon. The next day, Perrigo held a teleconference with its launch team to discuss CBD Ointment. The call was intended, in part, to ensure that all Perrigo sales personnel stuck to the terms of the Fair Share agreement that C.B. and T.P. had reached. Perrigo personnel were instructed to pursue only certain customers and no others.

1504.   Over the next couple of weeks, C.B. (Sandoz) and T.P. (Perrigo) continued to speak on the phone to relay confidential competitive information. For example, T.P. shared Perrigo's

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pricing plans and also detailed the pricing tiers that Perrigo used with different types of customers. C.B kept detailed notes of these discussions.

1505.   In addition to pricing, C.B. (Sandoz) and T.P. (Perrigo) agreed on which customers each company would pursue in order to achieve their Fair Share of the market. Initially, each company wanted some of the same customers. To avoid competition, however, Sandoz and Perrigo negotiated with each other to come up with an allocation of customers that was acceptable to both companies. C.B. (Sandoz) worked with his colleagues, Kellum and M.V., to devise a list of customers that would achieve an equal split of the market with Perrigo. C.B. then called T.P. to make the proposal, which Perrigo accepted.

1506.   Both companies adhered to their agreement thereafter and achieved a roughly equal split of the market. Because they had eliminated competition, each company was able to charge higher prices than would otherwise have been possible.

1507.   Both companies also monitored themselves to make sure that they did not stray from the agreement. For example, in late March 2014, when a potential customer solicited a bid on CBD Ointment from Perrigo, Wesolowski instructed his sales staff to decline the invitation.

### 128.   Dexmethylphenidate HCL

1508.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Dexmethylphenidate HCL ER capsules (5, 15, 20, 40 mg) beginning at least as early as February 2014.

1509.   Dexmethylphenidate HCL, or Dexmeth ER, also known by the brand name Focalin, is a muscle relaxant used to treat attention deficit hyperactivity disorder (ADHD).

1510.   During the relevant time frame, Teva, Sandoz, and Par were the primary manufacturers of Dexmethylphenidate HCL.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1511.   In February 2014, Sandoz was preparing to enter the market for Dexmeth ER. To coordinate, Teva's Patel spoke frequently with the Associate Director of Pricing at Sandoz about how to divide the market in order to permit Sandoz to obtain a Fair Share.

1512.   Following multiple conversations between Patel and her contact at Sandoz, Teva conceded two large customers to Sandoz. As Patel explained in a February 12 internal email reflecting the understanding reached between Teva and Sandoz, "**Sandoz is being responsible with their pricing. We should be responsible with our share.**"

1513.   Around the same time, on February 14, 2014, Teva also refused to lower its price for Dexmeth ER when approached by yet another large customer, thereby conceding the business to Sandoz.

1514.   On February 20, 2014, another large retail customer approached Teva seeking price protection terms. Patel spoke to the Associate Director of Pricing at Sandoz that same day, and the next day, internal emails indicated that Patel had inside information about Sandoz's plans for Dexmeth ER.

1515.   Par also abided by the Fair Share agreement when Sandoz entered, and when faced with a decision to cede share, "gave up the business to keep the market share even."

1516.   Again, to coordinate Fair Share, Rekenthaler of Teva was speaking to the Vice President of National Accounts at Par, right around the same time that Patel had been speaking to Sandoz Associate Director of Pricing, to confirm their agreement.

1517.   In May 2015, Teva again passed on an opportunity to sell more than its Fair Share of Dexmeth ER. It declined to bid for the Dexmeth ER business with a large customer, because "there is equal share in the market between competitors."

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1518.   Similarly, in June 2015, Sandoz declined to bid on Dexmeth ER business because it already had more than its Fair Share. When a Sandoz national account representative communicated the decision to the customer, he mispresented the reason, falsely explaining that the decision not to bid was based on limited supply. In fact, it was because of the Fair Share agreement between Teva, Sandoz and Par.

1519.   As a result of the agreement and anticompetitive coordination between Teva, Sandoz, and Par, prices for Dexmeth ER were higher than they would have been in a competitive market.

### 129.   Ketoconazole

1520.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Ketoconazole cream and tablets beginning at least as early as February 2014.

1521.   Ketoconazole, also known by the brand name Nizoral, among others, is a medication used to treat certain fungal and yeast infections, and is sold as a cream and in tablet form.

1522.   During the relevant time frame, Teva, Sandoz, Taro and G&W were the primary manufacturers of Ketoconazole cream, and Teva, Mylan, and Taro were the primary manufacturers of Ketoconazole tablets.

1523.   The markets for Ketoconazole cream and tablets were mature and at all relevant times had multiple manufacturers.

1524.   For years, the prices of Ketoconazole cream and tablets were relatively low and stable. That changed in February 2014, at which point Teva and Taro began to implement large and nearly simultaneous price increases on their tablet and cream products. By summer, Teva and Taro cream list prices had doubled, and NSP prices ███████████████████████████ Teva

and Taro tablet list prices quadrupled, and their NSP prices ███████████████

███████████████

1525.   In the tablet market, after a brief supply disruption, Mylan followed Teva and Taro in raising prices. Although its prices did not rise to the same level as Taro and Teva, the increase was significant. Mylan list prices nearly doubled, and NSP prices ██████████

1526.   In the cream market, Sandoz followed the Taro and Teva price increases in the fall of 2014. In October, it announced list (WAC) prices identical to those of Taro and Teva, and by the end of the year its NSP prices ████████████ Thus, by the start of 2015, all three Ketoconazole cream manufacturers had NSP prices ████████████

1527.   In August 2015, G&W entered the Ketoconazole cream market. It announced list (WAC) prices in June, even before it entered. Rather than offer lower prices to persuade customers to switch suppliers, G&W announced list prices more than four times higher than any other manufacturer. Taro almost immediately raised its own list prices to be identical to G&W, and its NSP prices ████████████ Even with high prices, G&W quickly gained share. Adding another supplier to the Ketoconazole cream market did not drive prices lower, but on the contrary, drove prices higher, just as Defendants' Fair Share agreement contemplated.

1528.   The NSP price charts below show the large and sustained price increases imposed by Taro, Teva, Mylan, Sandoz and G&W on their Ketoconazole products. [CHARTS REDACTED]

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





375

1529.   Throughout this period, Taro, Teva, Mylan, Sandoz and G&W met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Ketoconazole and of the Fair Share agreement.

1530.   For example, in February and March 2014, as Teva prepared for price increases across multiple drugs, including Ketoconazole cream and tablets, Teva coordinated with its competitors. On April 4, 2014—the day that Teva's list price increases were formally announced—Teva's Patel spoke separately with both Aprahamian of Taro and the Director of Pricing at Sandoz, to let them know that Teva was increasing its Ketoconazole prices. That same day, Teva's Rekenthaler spoke to Nesta of Mylan.

1531.   Taro and Sandoz were also communicating directly with each other, including on April 4, when Aprahamian of Taro spoke with C.B., a Director of National Accounts at Sandoz. After that call, the Director of National Accounts informed his colleagues at Sandoz of Taro's price increase plans.

1532.   The following Monday, April 7, Taro received a request from a customer seeking a competitive bid on Ketoconazole tablets due to the Teva price increase. Taro declined to bid, but decided to misrepresent the reason as "due to supply."

1533.   The following day, April 8, Aprahamian of Taro called Patel at Teva and the two spoke for more than 19 minutes. Shortly thereafter, Taro announced its own list price increases for Ketoconazole cream and tablets. Teva, for its part, declined a request from a large customer for a bid on Ketoconazole, explaining in an internal email: ███████████████████████ ████████████████████████████████████████████ ███████████████ Teva was committed to the agreement that each manufacturer would get a Fair Share.

1534.   Sandoz followed the Teva and Taro increases for Ketoconazole cream on October 10, 2014. That same day, Patel and the Sandoz Associate Director of Pricing spoke for more than three minutes.

1535.   After imposing price increases, Teva, Taro and Sandoz monitored the market and were careful not to disrupt Fair Shares. For example, Teva repeatedly turned down opportunities to grow its Ketoconazole sales at large customers; as Teva's Patel explained: "Unable to bid at this time. For internal purposes, it is for strategic reasons." Teva was careful to keep secret the real reason it turned down these business opportunities: Defendants' Fair Share agreement.

1536.   During the period when Taro prices spiked even higher than the other manufacturers, Taro was in touch with G&W, which eventually followed Taro's price spike. Taro's Michael Perfetto, Chief Commercial Officer, communicated by phone with Kurt Orlofski, G&W's President, in July, October, and multiple times in November, 2015. Also, Taro's Aprahamian had phone contact with Erika Vogel-Baker, G&W Vice President of Sales and Marketing, on September 24, 2015.

### **130.   Paricalcitol**

1537.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Paricalcitol capsules beginning at least as early as February 2014.

1538. Paricalcitol, also known by the brand name Zemplar, is a medication used to treat and prevent high levels of parathyroid hormone in patients with chronic kidney disease.

1539.   During the relevant time frame, Defendants Teva, Dr. Reddy's, and Zydus were the primary manufacturers of Paricalcitol.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1540.   Teva was the first generic manufacturer to enter the market for Paricalcitol and thus had 180 days of exclusivity. In March 2014, as the end of the exclusivity period was approaching, Teva began to plan for the ceding of Fair Shares to new market entrants.

1541.   Zydus was one of the new market entrants. Before Zydus launched its product, Patel and Rekenthaler of Teva spoke with Green of Zydus and discussed which Paricalcitol customers Teva would retain and which customers it would concede to Zydus. Rekenthaler and Green spoke on February 28 and March 3, and Green and Patel spoke at least five times over the course of two days (March 3 and March 4).

1542.   Throughout March and April, Teva's Patel, Rekenthaler, and Green continued to coordinate closely about divvying up the market. Representatives of the two companies spoke on March 14 (Patel called Green, and Rekenthaler called Patel), March 17 (three calls between Patel and Green), March 27 (Patel to Green), April 1-2 (voicemail and call between Patel and Green), and April 17 (Green and Patel spoke). In close proximity to these communications, Teva strategically conceded several Paricalcitol customers to Zydus.

1543.   By May 2014, Dr. Reddy's was preparing to enter the Paricalcitol market.

1544.   On May 1, 2014, a Senior Director of National Accounts at Dr. Reddy's spoke with Rekenthaler of Teva. On June 10, 2014, Patel spoke with the Vice President of Sales for North American Generics at Dr. Reddy's.

1545.   As Dr. Reddy's solicited business from Teva customers, Teva conceded them to Dr. Reddy's as agreed. For example, a large grocery chain informed Teva that it had received a competing offer for Paricalcitol from Dr. Reddy's. Internally, Patel recommended that Teva concede the business, and it did.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1546.   On July 10, 2014, another grocery chain informed Teva that it had received a Paricalcitol offer. That day, the Head of National Accounts at Dr. Reddy's called Patel. The next day, Teva conceded the customer to Dr. Reddy's.

1547.   In July, after Teva conceded yet another grocery customer to Dr. Reddy's, a large wholesaler informed Teva that it had received a competing bid for Paricalcitol.  On July 18, 2014, Patel called the Head of National Accounts at Dr. Reddy's and left a message. On July 21st, they spoke, and again on the following day. During these calls, Patel and the Head of National Accounts at Dr. Reddy's agreed that Dr. Reddy's would stop soliciting Teva customers if Teva conceded the large wholesaler to Dr. Reddy's. Dr. Reddy's confirmed to Teva that it "would be done after this." The next day, Teva conceded the wholesale customer to Dr. Reddy's.

### 131.   Atenolol Chlorthalidone

1548.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Atenolol Chlorthalidone tablets beginning at least as early as March 2014.

1549.   Atenolol Chlorthalidone, also known by the brand name Tenoretic, is a medication used to treat high blood pressure.

1550.   During the relevant time frame, Defendants Actavis and Mylan were the primary manufacturers of Atenolol Chlorthalidone tablets.

1551.   The market for Atenolol Chlorthalidone tablets was mature and at all relevant times had multiple manufacturers.

1552.   For years, the prices for Atenolol Chlorthalidone tablets were relatively low and stable. Beginning in the spring of 2014, Mylan and Actavis began to steadily and consistently raise the prices of Atenolol Chlorthalidone tablets. By the end of 2014, list (WAC) prices for both

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

manufacturers had more than doubled, and NSP prices for both manufacturers ███████

███

1553.   As Mylan and Actavis raised prices, they aimed to divide the market between themselves. Whenever market share diverged from a roughly equal split (as happened in a couple of instances when Mylan experienced supply disruptions), they eventually worked back toward a 50/50 division. All the while, Mylan and Actavis were careful not to erode pricing.

1554.   The NSP price chart and list (WAC) price chart below show the sustained increases and parallel pricing by Actavis and Mylan for Atenolol Chlorthalidone tablets. (Note: Atenolol Chlorthalidone tablets come in two dosages, 100-25 mg and 50-25 mg, and the pricing patterns for them are very similar. Only the 100-25 mg price charts are included here.) [NSP CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1555. Throughout this period, Actavis and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Atenolol Chlorthalidone and of their Fair Share agreement.

1556. For example, Nesta (Mylan) and Falkin (Actavis) communicated extensively throughout the time of the price increases.

### 132. Diphenoxylate Atropine

1557. Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Diphenoxylate Atropine tablets beginning at least as early as March 2014.

1558. Diphenoxylate Atropine, also known by the brand name Lomotil, is used to treat acute diarrhea.

1559. During the relevant time frame, Defendants Mylan and Greenstone were the primary manufacturers of Diphenoxylate Atropine tablets.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1560.   The market for Diphenoxylate Atropine tablets was mature and at all relevant times had multiple manufacturers.

1561.   For years, the prices for Diphenoxylate Atropine tablets were relatively low and stable. Then, in the space of about six weeks in the spring of 2014, Mylan and Greenstone imposed large and identical price increases on Diphenoxylate Atropine tablets. Mylan and Greenstone announced identical list (WAC) prices that were nearly double the old prices, and their NSP prices

████████████████████████████████████████████████████████

1562.   Both manufacturers saw an immediate jump in revenue from sales of Diphenoxylate Atropine. Prices have never returned to their former levels, and for years after the price increases, the dollar sales of Mylan and Greenstone remained remarkably stable.

1563.   The list (WAC) price chart and the NSP price chart below show the sudden and sustained price increases by Mylan and Greenstone for Diphenoxylate Atropine tablets. [NSP CHART REDACTED]





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1564.   Throughout this period, Mylan and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Diphenoxylate Atropine and of their Fair Share agreement.

1565.   For example, M.A., Mylan's National Account Director, communicated by phone with R.H., Greenstone's Director of National Accounts, on April 3, 4, 22, 28 and 29. Mylan announced its list (WAC) price increases on April 17, 2004.

1566.   When Greenstone followed the increase on June 2, 2004, R.H. (Greenstone) again spoke to M.A. (Mylan) on June 24.

### **133.**   **Estazolam**

1567.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Estazolam tablets beginning at least as early as March 2014.

1568.   Estazolam, also known by the brand name Prosom, is a benzodiazepine used to treat insomnia.

1569.   During the relevant time frame, Teva and Actavis were the primary manufacturers of Estazolam tablets.

1570.   On March 14, 2014, Rogerson at Actavis and Patel at Teva spoke at some length. Shortly after that call, Teva's Patel relayed to her Teva colleagues that Actavis would be increasing its Estazolam prices, notwithstanding the fact that the price increase would not be effective until April 15, 2014, approximately one month later.  Rogerson and Patel spoke for a second time on the same day.

1571.   On Monday, March 17, Patel called Rogerson again. Rekenthaler of Teva and Falkin of Actavis also exchanged four text messages that day and had one call. Meanwhile, Patel was sure to include Estazolam on Teva's internal price increase list.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1572.   Less than three weeks later, on April 4, 2014, Teva increased its Estazolam prices. Patel and Rogerson spoke twice by phone that day. Rekenthaler and Falkin also spoke by phone on April 4. Actavis, as promised, raised its Estazolam prices on April 15. █████████████

███████████████

1573.   After the price increases became effective, Teva took consistent steps not to disrupt the market or steal market share from Actavis, including declining to bid on Estazolam business at a large wholesaler that presented what would have been a great opportunity in a competitive market. But Estazolam was not a competitive market because of Defendants' Fair Share agreement.

### 134.   Niacin

1574.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Niacin ER tablets beginning at least as early as March 2014.

1575.   Niacin, also known by the brand name Niaspan ER, among others, is a medication used to high cholesterol.

1576.   During the relevant time frame, Defendants Teva, Lupin, and Zydus were the primary manufacturers of Niacin ER tablets.

1577.   Teva entered the market for Niacin ER on September 20, 2013 as the first-to-file generic manufacturer and was awarded 180 days of exclusivity.

1578.   Teva's exclusivity was set to expire on March 20, 2014. Teva learned that Lupin planned to enter that day, and that Zydus planned to enter on June 28, 2014.

1579.   In order to facilitate the entry of Lupin and Zydus, and to maintain dollar revenue while ceding share to those new entrants, Teva increased prices on Niacin ER on March 7, 2014,

before the new generics entered the market. Yet again, the entrance of additional suppliers had the perverse effect of increasing prices, which was a hallmark feature of the Fair Share agreement.

1580.   Prior to Teva's price increase, Teva, Lupin and Zydus exchanged calls during which they discussed the pricing of Niacin ER and ensuring that Fair Share principles would be followed. The calls were between Green of Zydus, Patel and Rekenthaler of Teva, and Berthold of Lupin.

1581.   Similarly, in the days leading up to the Lupin launch on March 20, 2014, all three competitors spoke again to discuss their plans for Niacin ER, with Teva agreeing to concede a Fair Share of the market to Lupin upon entry.

1582.   When Lupin entered the market for Niacin ER on March 20, 2014, it entered at the exact same list (WAC) prices as Teva. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ suggesting that it was not trying to lure away Teva's customers with better prices.

1583.   After Lupin's launch, Patel and Berthold continued to coordinate to make sure Lupin obtained the agreed-upon customers. They coordinated a number of concessions by Teva that allowed Lupin to acquire large customers and its Fair Share without resorting to unfettered price competition.

1584.   In May 2014, Zydus was preparing to enter the Niacin ER market. On May 6, Rekenthaler and Patel exchanged calls with Zydus's Green, after which Teva internally agreed to concede a large wholesaler customer, though it required a number of follow-up conversations with Zydus to hammer out the details.  On May 29, 2014, Rekenthaler again called Green, and they spoke twice that day. Patel also called Green that day, and there were additional phone calls between Green and Rekenthaler and Patel on June 2.  After these communications, Teva committed to conceding a large wholesale customer to Zydus.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1585.  On June 28, 2014, Zydus launched Niacin ER and announced list (WAC) prices that matched Teva and Lupin. ███████████

### 135.   **Phenytoin Sodium**

1586.  Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Phenytoin Sodium ER capsules beginning at least as early as March 2014.

1587.  Phenytoin Sodium, also known by the brand name Dilantin, is used to prevent and control seizures.

1588.  During the relevant time frame, Defendants Mylan, Taro, Sun and Amneal were the primary manufacturers of Phenytoin Sodium capsules.

1589.  The market for Phenytoin Sodium capsules was mature and at all relevant times had multiple manufacturers.

1590.  For years, the prices for Phenytoin Sodium capsules were relatively low and declining. Mylan, which had a dominant share of the market going back to at least January 2008, kept its NSP prices ████ but as a result of its higher prices, Mylan saw its market share erode. Sun, Taro and Amneal gained market share in the Phenytoin Sodium market. But once shares began to equalize into Fair Shares, the manufacturers were ready to coordinate a price increase.

1591.  In 2014, Mylan, Taro, Amneal and Sun decided to re-align prices at a much higher level. Within the space of a few months, Mylan, Taro and Amneal announced price increases that brought their list (WAC) prices to identical levels. The increases ranged from a little less than 200% to more than 300%, but all ended up at the same price.

1592.  Sun did not change its list (WAC) price, but it did dramatically increase the prices it charged its customers. Sun's Phenytoin Sodium NSP prices ███████████████

██████████████████████████████████████████████████

████████████████████████████

1593.   Thereafter, Defendants were careful to adhere to the Fair Share agreement. For example, in July 2014, a large retail customer approached Mylan seeking a bid. Mylan declined, because it already had sufficient share. Having been turned down by Mylan, the customer turned to Taro. But Taro, too, abided by the Fair Share agreement and refused to bid on the business, explaining: ██████████████████████████████

1594.   The list (WAC) price chart and the NSP price chart below show the sudden and sustained price increases by Mylan, Taro, Amneal and Sun for Phenytoin Sodium capsules. [NSP CHART REDACTED]





1595.   Throughout this period, Mylan, Taro, Sun and Amneal met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Phenytoin Sodium and of their Fair Share agreement.

1596.   For example, on April 21, 2014, W.F., Sun Senior Manager of National Accounts, informed a colleague: "No price increase yet on Phenytoin but I have heard one might be coming." Earlier that day, G.S., President of Sun, communicated by phone with Taro's Michael Perfetto, Chief Commercial Officer. The two communicated by phone again later that month, and in May, June, July, August and September 2014. During this period, Sun's Phenytoin Sodium pricing rose along with the other manufacturers, consistent with their price-fixing and Fair Share agreement.

1597.   Taro announced its list (WAC) price increase on June 3, 2014. Taro's Aprahamian then communicated by phone with M.A., Mylan National Account Director, on June 6, 9 and July 2 and 10. Mylan then raised its list (WAC) prices on July 16.

1598.   Mylan's Nesta communicated with S.R., Amneal Vice President of Sales, in the spring of 2014 and was in touch with A.L., Amneal's Director of Pricing, in June, August and September 2014. Amneal announced list price increases on September 1, 2014.

1599.   Defendants continued to abide by the Fair Share agreement well after the price increases became effective.  For example, in July 2015, Taro chose not to bid on Phenytoin Sodium capsules at a particular customer "due to Taro having enough market share." Again in August 2015, Taro declined an opportunity because "we have our share."

## 136.   Bumetanide

1600.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Bumetanide tablets beginning at least as early as April 2014.

1601.   Bumetanide, also known by the brand name Bumex, is a medication used to treat fluid retention (edema) and swelling that is caused by congestive heart failure, liver disease, kidney disease, or other medical conditions.

1602.   During the relevant time frame, Teva and Sandoz were the primary manufacturers of Bumetanide.

1603.   Bumetanide was among the drugs subject to Teva's April 4, 2014 price increases. As with other drugs on Teva's list, Teva actively planned and coordinated the price increase for Bumetanide. For example, a few days before the price increase, Teva's Patel and Sandoz's Associate Director of Pricing spoke at length. They spoke again on the day of the increase for twenty-five minutes.  Ultimately Teva increased prices dramatically on Bumetanide, and Sandoz eventually followed the increase.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 137.   Dicloxacillin Sodium

1604.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Dicloxacillin Sodium capsules beginning at least as early as April 2014.

1605.   Dicloxacillin Sodium, also known by the brand name Dycill, is a medication used to treat a broad variety of bacterial infections.

1606.   During the relevant time frame, Defendants Teva and Sandoz were the primary manufacturers of Dicloxacillin Sodium.

1607.   Teva increased prices on various drugs on April 4, 2014, including Dicloxacillin Sodium. As with Bumetanide, the increase on Dicloxacillin Sodium was coordinated via calls between Patel and the Associate Director of Pricing at Sandoz in March and April of 2014.

### 138.   Diflunisal

1608.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Diflunisal tablets beginning at least as early as April 2014.

1609.   Diflunisal, also known by the brand name Dolobid, is a nonsteroidal anti-inflammatory drug (NSAID) used to treat mild to moderate pain, and to relieve symptoms of arthritis, such as inflammation, swelling, stiffness, and joint pain.

1610.   During the relevant time frame, Defendants Teva and Rising were the primary manufacturers of Diflunisal.

1611.   In late 2013 and early 2014, Teva's Rekenthaler and the Senior Vice President of Sales and Marketing at Rising coordinated pricing and Fair Shares in the Diflunisal market. For example, the two spoke by phone on December 5, March 17 and March 31. During this period, Teva solidified plans to raise prices on Diflunisal tablets.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1612.   On April 4, 2014, Teva increased is list (WAC) prices on Diflunisal.

1613.   Rising exited the Diflunisal market for a short period of time starting in mid-July 2014. Rising's SVP of Sales called Rekenthaler to let him know about Rising's supply issues and temporary market exit in advance.

1614.   After Rising's supply problems were resolved four months later, Rising's SVP of Sales and Rekenthaler spoke by phone several more times to coordinate Rising's re-acquisition of a Fair Share of the market and to maintain pricing for Diflunisal.

1615.   When Rising re-entered the market for Diflunisal tablets, rather than win back customers by offering better pricing, it announced list (WAC) prices that matched Teva's.

### **139.   Eplerenone**

1616.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Eplerenone tablets beginning at least as early as April 2014.

1617.   Eplerenone, also known by the brand name Inspra, is an oral medication used to treat high blood pressure.

1618.   During the relevant time frame, Sandoz and Greenstone were the primary manufacturers of Eplerenone.

1619.   Between April and October 2014, Sandoz and Greenstone communicated by phone to coordinate price increases on multiple drugs, including Eplerenone. During this period, Greenstone's Robin Hatosy, Director of National Accounts, and Jill Nailor, Senior Director of Sales and National Accounts, communicated multiple times by phone with Armando Kellum, Sandoz Director of Contracts and Pricing.

1620.   For example, in late May, shortly before Greenstone increased its price on June 2 for Eplerenone (and Clindamycin, another drug made by both Greenstone and Sandoz), Nailor (Greenstone) reached out to Kellum (Sandoz) by phone.

1621.   Sandoz, as it had agreed with Greenstone, imposed its own price increases on Eplerenone in October 2014. The two companies continued to communicate by phone in furtherance of the Fair Share agreement both before and after Sandoz raised prices. Hatosy (Greenstone) and Kellum (Sandoz) spoke in August, and Kellum and Nailor (Greenstone) spoke in October 2014.

### 140.   Fluvastatin Sodium

1622.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Fluvastatin Sodium capsules beginning at least as early as April 2014.

1623.   Fluvastatin Sodium, also known by the brand name Lescol, among others, is a medication used to reduce the amount of cholesterol in the blood, and is among the class of drugs known as statins.

1624.   During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Fluvastatin Sodium.

1625.   Mylan increased its list (WAC) prices on a number of different drugs in April 2014. A number of these drugs also were manufactured by Teva, including Fluvastatin Sodium.

1626.   Almost immediately after Mylan announced price increases, Teva confirmed internally that it intended to follow the increases for Fluvastatin Sodium consistent with the established Fair Share and price fixing agreements between the two companies.

1627.   Teva's Rekenthaler spoke with Mylan's Nesta on April 24, May 20, and twice on May 27.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1628.   On August 28, 2014, Teva raised prices on a number of different drugs, including Fluvastatin Sodium. Leading up to the price increase, Rekenthaler spoke to Nesta on August 4, 7, 11, 18, and 21.

1629.   As a result of the agreement and anticompetitive coordination between Teva and Mylan, prices for Fluvastatin Sodium were higher than they would have been in a competitive market.

### 141.   Topiramate

1630.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Topiramate sprinkle capsules beginning at least as early as April 2014.

1631.   Topiramate, also known by the brand name Topamax, is a medication used to treat seizures in adults or children with epilepsy, and also to help control the type of pain caused by damaged nerves.

1632.   During the relevant time frame, Defendants Teva, Actavis, and Zydus were the primary manufacturers of Topiramate.

1633.   In April 2014, Zydus raised its price for Topiramate sprinkle capsules.  Teva's Patel was in frequent communication with Green of Zydus at the time of the Zydus price increase.

1634.   Zydus's Green coordinated with both Patel and Rekenthaler at Teva, including conversations on June 2, 11, and 13. In addition, on June 11, Rekenthaler spoke twice with Falkin of Actavis, the only other company in the market for Topiramate.

1635.   On June 13—the same day the Zydus price increase on Warfarin became effective—Patel added Topiramate sprinkle capsules to Teva's price increase list, with the notation, "Follow/Urgent - Zydus."

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1636.   Teva followed the Zydus price increase for Topiramate sprinkle capsules on August 28, 2014. Patel spoke with Zydus's Green and Actavis's Rogerson on August 27; Rekenthaler spoke with Green on August 19 and 20; and Rekenthaler spoke with Falkin on August 18, 24, 26, and 28. The day before the increase became effective, Patel spent most of the morning discussing price increases with her contacts at Actavis and Zydus, among other companies.

### 142.   Allopurinol

1637.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Allopurinol tablets beginning at least as early as May 2014.

1638.   Allopurinol, also known by the brand name Zyloprim, is a xanthine oxidase inhibitor used to treat gout and certain kinds of kidney stones.

1639.   During the relevant time frame, Defendants Actavis, Dr. Reddy's, Mylan and Par were the primary manufacturers of Allopurinol.

1640.   The market for Allopurinol was mature and at all relevant times had multiple manufacturers.

1641.   For years, the prices for Allopurinol were relatively low and stable. Par/Qualitest, Actavis, Dr. Reddy's and Mylan all offered prices for Allopurinol tablets for ▮▮▮▮▮▮▮▮▮▮ Dr. Reddy's exited the market in 2012, and prices remained low and stable. Then, in the spring of 2014, there were brief supply disruptions for Allopurinol. Par/Qualitest and Actavis used this as a reason to impose enormous price increases, which they did almost simultaneously. Actavis announced list prices approximately 5 times higher than its former prices, and Par/Qualitest announced list prices slightly higher even than Actavis. Their NSP prices ▮▮▮▮▮▮▮▮

1642.   Mylan did not immediately follow the Actavis and Par/Qualitest price increases, but eventually did so. Approximately six months after Actavis and Par announced their list prices,

Mylan joined them, announcing list prices identical to those of Actavis, and it also ▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇

1643.   High prices tend to attract competition, which in turn, tends to drive prices down as more manufacturers compete with each other by offering lower prices. When prices spiked in the Allopurinol market, Dr. Reddy's began to assess whether it should re-enter. But Dr. Reddy's— and Par/Qualitest, Actavis and Mylan—did not want added competition to drive down prices.

1644.   In August 2014, Dr. Reddy's assessed possible re-entry into the Allopurinol market. Since it would be the fourth manufacturer in the market, the Head of National Accounts at Dr. Reddy's recognized—in line with the Fair Share agreement—▇▇▇▇▇▇▇▇▇▇

▇▇▇▇

1645.   Dr. Reddy's did decide to re-enter the market. As it ramped up for re-entry, it conscientiously hewed to the Fair Share agreement between the Allopurinol manufacturers. In January 2015, rather than offer better prices to win market share, Dr. Reddy's announced identical list (WAC) prices as Actavis.

1646.   When Dr. Reddy's began pursuing a Fair Share of the market, it was careful not to disrupt pricing. For example, in January 2015, as Dr. Reddy's internally discussed an Allopurinol opportunity at a large customer, the Vice President and Head of Prescription Drugs reminded his team, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

1647.   Dr. Reddy's was similarly conscientious in abiding by its Fair Share agreement when opportunities to take Allopurinol business from Mylan arose: ▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1648.    The list (WAC) price chart and the NSP price chart below show the large price increases by Actavis, Par/Qualitest, Dr. Reddy's and Mylan on Allopurinol tablets. Note: Allopurinol tablets come in 100 mg and 300 mg dosages. The pricing patterns for each dosage were highly similar. Only the 100 mg charts are included here.  [NSP CHART REDACTED]





1649.   Throughout this period, Actavis, Dr. Reddy's, Mylan and Par/Qualitest met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Allopurinol and of their Fair Share agreement.

1650.   For example, Falkin (Actavis) was in touch with Nesta (Mylan) in September 2014. Falkin (Actavis) also communicated with C.S., Dr. Reddy's Senior Director of National Accounts, in September. Actavis announced its list (WAC) price increases on Allopurinol on September 19, 2014.

1651.   On September 26, 2014, a week after Actavis's price increase, A.S., Actavis VP of Sales, spoke to C.P., VP of National Accounts at Par/Qualitest, for nearly 15 minutes. A few days later, Par announced list (WAC) prices for Allopurinol that were even higher than those of Actavis.

1652.   Falkin (Actavis) again spoke to C.S. (Dr. Reddy's) multiple times in January and in early February. Dr. Reddy's announced its list (WAC) price increases on January 26, 2015.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1653.   Falkin (Actavis) also spoke to Nesta (Mylan) again in March 2015, shortly after Mylan announced its list (WAC) price increases on Allopurinol on March 4, 2015.

### 143.   Clotrimazole

1654.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Clotrimazole 1% solution beginning at least as early as May 2014.

1655.   Clotrimazole, also known by the brand name Gyne-Lotrimin, among others, is an antifungal medication used to treat yeast infections and certain types of ringworm, among other fungal infections.

1656.   During the relevant time frame, Teva and Taro were the primary manufacturers of Clotrimazole.

1657.   The market for Clotrimazole was mature and at all relevant times had multiple manufacturers.

1658.   For years, the prices of Clotrimazole lotion were relatively low and stable. In the spring of 2014, Taro and Teva began to coordinate extraordinary price increases. The first round of increases occurred in the summer of 2014, and a second round took place in the summer of 2015. The pricing of Taro and Teva was virtually lockstep, as they announced identical list prices in close succession. By July 2015, Taro and Teva prices were more than 400% higher than the previous summer.

1659.   The list (WAC) price chart and the NSP price chart below show the large and parallel price increases imposed by Teva and Taro in the summer of 2014 and again in the summer of 2015.  [NSP CHART REDACTED]





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1660.   Throughout this period, Taro and Teva met at trade conferences and communicated with each other directly in furtherance of their price-fixing agreement on Clotrimazole and of their Fair Share agreement.

1661.   For example, shortly before implementing price increases in early June 2014, Teva and Taro were in regular contact to coordinate the increases. On May 14, 2014, Teva's Patel and Taro's Aprahamian exchanged eight text messages and communicated by phone. Two weeks later, on May 28, 2014, pursuant to directions from Patel, a Teva employee circulated a list titled "2014 Future Price Increase Candidate Analysis" that included several drugs sold by Taro. Clotrimazole appeared along with the notation "Follow/Urgent" identified as the reason for the increase, even though Taro had not yet increased its price on those drugs or notified its customers that it would be doing so.

1662.   On June 3, 2014, the date that Taro announced its list price increase, Patel and Aprahamian exchanged five text messages. The two continued to communicate over the next few days.

1663.   After Taro announced its increase, but before Teva had followed, Teva declined an opportunity to take a large customer from Taro. Patel explained internally:

1664.   On August 28, 2014, Teva raised prices on a number of different drugs, including Clotrimazole. Leading up to the increase, Patel of Teva spoke with Aprahamian of Taro on August 18 and 27. In addition to those phone communications, representatives from Teva and Taro, along with representatives from numerous Defendants, met in Boston, MA, shortly before the increase from August 23-26, 2014 for the NACDS annual event.

1665.   As a result of the agreement and anticompetitive coordination between Teva and Taro, prices for Clotrimazole were higher than they would have been in a competitive market.

### **144.   Desogestrel and Ethinyl Estradiol**

1666.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Desogestrel and Ethinyl Estradiol tablets beginning at least as early as May 2014.

1667.   Desogestrel and Ethinyl Estradiol, also known by the brand names Kariva and Mircette, is an oral contraceptive.

1668.   During the relevant time frame, Teva, Actavis and Glenmark were the primary manufacturers of Desogestrel and Ethinyl Estradiol.

1669.   From at least May 2014 forward, Teva, Actavis and Glenmark monitored their Fair Share agreement on Desogestrel and Ethinyl Estradiol tablets to ensure that market shares remained relatively equal. They frequently communicated by phone to facilitate this process.

1670.   For example, during the morning of May 19, 2014, Patel learned that Glenmark had bid a low price for its own version of Kariva (known as Viorele) at a large retail pharmacy purchaser. This triggered a flurry of communications between Patel and at least three different Glenmark representatives, including Jim Brown (VP of Sales), Jim Grauso (Executive VP of Commercial Operations), and another sales and marketing executive.

1671.   Patel also spoke with Rogerson at Actavis that same day (May 19). In fact, Patel was regularly in contact with Rogerson throughout May. The two spoke on at least May 8, 9, 12, 19 and 22.

1672.   After communicating with Glenmark and Actavis, Patel decided that Teva would not compete on price. Instead, it would bid high, thereby ensuring that the large retail pharmacy business would be conceded to Glenmark.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 145.   **Fluoxetine HCL**

1673.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Fluoxetine HCL tablets beginning at least as early as June 2014.

1674.   Fluoxetine HCL, also known by the brand name Prozac, is a medication used to treat depression, obsessive-compulsive disorder (OCD), and panic disorder, among other conditions.

1675.   During the relevant time frame, Teva, Mylan, and Par were the primary manufacturers of Fluoxetine HCL tablets.

1676.   In late June 2014, Mylan imposed large price increases on Fluoxetine HCL. Around the time of the increases, Mylan, Teva and Par directly communicated via phone to coordinate.

1677.   For example, on June 18, 2014, less than a week before Mylan announced its Fluoxetine HCL price increases, a National Account Manager at Mylan spoke to the Vice President of National Accounts at Par.

1678.   On June 24, the day after Mylan announced its price increases, Mylan's Nesta spoke to Teva's Rekenthaler.

1679.   Two days later, on June 26, Teva's Patel exchanged a series of text messages with the Chief Commercial Officer at Par.

1680.   In January 2015, Teva followed Mylan's price increases for Fluoxetine HCL Tablets. Again, the manufacturers of Fluoxetine were in communication to coordinate.

1681.   On January 5, 14 and 20, Teva's Rekenthaler spoke with Mylan's Nesta.

1682.   On January 26, Rekenthaler spoke with a Vice President of National Accounts at Par for 14 minutes, and on January 28, he spoke with Par's Vice President of Sales.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1683.   Also, in the months leading up to Teva increasing the prices of Fluoxetine HCL tablets, Teva's Patel met in-person with many of Teva's competitors. *See, e.g.*, Exhibit A (Trade Association Contacts).

### 146.   Methadone HCL

1684.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Methadone HCL tablets beginning at least as early as June 2014.

1685.   Methadone HCL, also known by the brand name Methadose, is used to manage moderate to severe pain.  It is also used to treat addiction to opioids.

1686.   During the relevant time frame, Defendants West-Ward[26] and Mallinckrodt were the primary manufacturers of Methadone HCL tablets.

1687.   The market for Methadone HCL tablets was mature and at all relevant times had multiple manufacturers.

1688.   For years, the prices for Methadone HCL tablets were relatively low and stable. Before the summer of 2014, West-Ward/Roxane and Mallinckrodt sold Methadone HCL tablets for ▮▮▮▮▮▮▮▮▮▮▮▮  In the second half of 2014, however, West-Ward/Roxane and Mallinckrodt nearly simultaneously imposed large price increases, approximately tripling their list (WAC) prices ▮▮▮▮▮▮

1689.   The list (WAC) price chart and the NSP price chart below show the large and nearly simultaneous price increases by West-Ward/Roxane and Mallinckrodt on Methadone HCL tablets. (Note: Methadone HCL tablets come in 5 mg and 10 mg dosages. The pricing patterns for each

---

[26] The relevant entity at this point in time was Roxane, which eventually was acquired by West-Ward during the relevant period (announced July 2015, completed March 2016).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

dosage were highly similar. Only the 10 mg charts are included here.)   [NSP CHART REDACTED]





1690.    Throughout this period, West-Ward/Roxane and Mallinckrodt met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Methadone HCL tablets and of their Fair Share agreement.

1691.    Between April and August 2014, West-Ward/Roxane and Mallinckrodt attended multiple trade events together. Approximately one month after the NACDS meeting in August 2014, West-Ward/Roxane announced list (WAC) price increases for Methadone. A few weeks later, Mallinckrodt matched those list (WAC) prices.

### 147.    Methazolamide

1692.    Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Methazolamide tablets beginning at least as early as June 2014.

1693.    Methazolamide, also known by the brand name Neptazane, is used to treat ocular conditions, including several types of glaucoma. Methazolamide tablets are available in 25 mg and 50 mg dosages.

1694.    During the relevant time frame, Sandoz and Perrigo were the primary manufacturers of Methazolamide.

1695.    In the spring of 2014, Perrigo increased prices for Methazolamide. At the time, Sandoz was experiencing supply disruptions and was temporarily out of the market.

1696.    By June, Sandoz was returning to the market on some dosages of Methazolamide. Beginning that month, T.P (Perrigo) and C.B. began to coordinate pricing for Methazolamide.

1697.    Sandoz initially re-entered the market at its former, lower prices. This frustrated Perrigo, and internally Perrigo lamented that Sandoz ███████████████████ *i.e.*, coordinate with Perrigo, before re-launching. To that end, Perrigo ramped up communications with Sandoz to ensure that the two companies' pricing was coordinated.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1698.   In October 2014, T.P. (Perrigo) provided C.B. (Sandoz) with Perrigo's pricing for Methazolamide. C.B. kept notes of the information, with the intent for Sandoz to match those prices.

1699.   In November and December 2014, as Sandoz was analyzing and preparing for price increases on Methazolamide, C.B. (Sandoz) and T.P. (Perrigo) continued to communicate by phone. C.B. shared with his Sandoz supervisors and colleagues the confidential Perrigo information that he received from T.P.

1700.   In December 2014, Sandoz re-launched its Methazolmide products and, as agreed, matched Perrigo's pricing.

1701.   The price chart below shows the large and similar price increases imposed by Perrigo and Sandoz.  Note: The prices for 25 mg and 50 mg tablets exhibit similar patterns. Only the chart for 50 mg tablets is included here. [CHART REDACTED]



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1702.   Throughout this period, Perrigo and Sandoz met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Methazolamide and their Fair Share agreement.

### 148.   Omega-3-Acid Ethyl Esters

1703.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Omega-3-Acid Ethyl Esters capsules beginning at least as early as June 2014.

1704.   Omega-3-Acid Ethyl Esters, also known by the brand name Lovaza, is a medication used to lower high triglyceride levels in the blood.

1705.   During the relevant time frame, Teva, Par and Apotex were the primary manufacturers of Omega-3-Acid Ethyl Esters.

1706.   On April 8, 2014, Teva launched Omega-3 Acid Ethyl Esters.

1707.   On the morning of June 26, 2014, Patel emailed a colleague at Teva relaying that Par had recently received FDA approval for this drug. Patel said that she would "snoop around" to see if Par had begun shipping product. That morning, Patel sent a message to T.P., Chief Commercial Officer at Par through LinkedIn. Later that day, they exchanged a number of text messages.

1708.   The next morning, Par's Chief Commercial Officer called Patel and they spoke for nearly 30 minutes. That same morning, Patel told colleagues that she now had "some more color" on Par's launch of Omega-3-Acid Ethyl Esters. Internally, Teva documents evidence a clear understanding of Par's confidential bidding and pricing plans.

1709.   Par launched Omega-3-Acid Ethyl Esters capsules on June 30, 2014. Teva proceeded to concede business to Par to ensure Par's smooth entry into the market.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1710.   As new competitors entered the market, Teva coordinated with them to avoid competition and keep prices high, including phone calls between Rekenthaler and a Senior Vice President and General Manager of U.S. Sales at Apotex on September 25 and 27, 2014.

1711.   Due to supply limitations, Par was not able to pursue a full Fair Share of the market until late November 2014. On November 10, 2014, Patel and Par's Chief Commercial Officer exchanged 5 text messages.

1712.   By mid-February 2015, Teva had conceded several large customers to Par. During this time, Rekenthaler was speaking frequently with M.B., a senior national account executive at Par, to coordinate.

1713.   By April 2015, Apotex had officially entered the market, and consistent with the Fair Share understanding, Teva conceded customers to accommodate the new entrant. During this period, Rekenthaler spoke multiple times with J.H., Senior VP at Apotex.

### **149.   Warfarin Sodium**

1714.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Warfarin Sodium tablets beginning at least as early as June 2014.

1715.   Warfarin Sodium, also known by the brand name Coumadin, is an anticoagulant medication used to treat and prevent blood clots.

1716.   During the relevant time frame, Teva, Taro, Zydus and Amneal were the primary manufacturers of Warfarin Sodium.

1717.   The market for Warfarin Sodium tablets was mature and at all relevant times had multiple manufacturers.

1718.   For years, the prices for Warfarin Sodium tablets were relatively low and stable. Then, in the summer of 2014, Taro, Teva, Zydus and Amneal orchestrated a coordinated price increase.

1719.   Between June and August, ███████████████████████████████████████ ████████████████████████████████████████████████████

1720.   Taro, Teva, Zydus and Amneal also coordinated their list (WAC) pricing. Within a short window of time in June, Taro and Zydus announced large list (WAC) price increases. Teva, which already had higher list prices for Warfarin Sodium, announced a smaller list price increase in late August. Amneal, which had supply issues shortly after the price increase and briefly exited the market, did not raise list (WAC) prices until April 2015, when it rejoined the market. At that point, it matched Teva's list prices.

1721.   The NSP price chart and list (WAC) price chart below show the Warfarin Sodium price increases that were close in time and amount that Taro, Teva, Zydus and Amneal imposed in the summer of 2014.  Note: The pricing patterns for all dosages of Warfarin Sodium tablets (1, 2, 2.5, 3, 4, 5, 6, 7.5 and 10 mg) were highly similar. Charts for only the 5 mg dosage are included here. [NSP CHART REDACTED]

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1722.   Throughout this period, Teva, Taro, Zydus and Amneal met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Warfarin Sodium tablets and of the Fair Share agreement.

1723.   For example, when Taro implemented substantial price increases on Warfarin Sodium tablets on June 3, 2014, Teva's Patel already knew the price increases were coming from discussions with Taro's Aprahamian in the preceding weeks.

1724.   On the day of Taro's increase, Teva's Patel and Taro's Aprahamian exchanged 5 text messages, and, that evening, Patel called Aprahamian. The following morning, Patel and Aprahamian exchanged text messages and again spoke by phone.

1725.   On June 13, 2014, Zydus followed with a Warfarin Sodium price increase of its own. During the ten days between Taro's list price increase and Zydus's list price increase, Teva, Taro and Zydus coordinated through various phone communications between Patel, Aprahamian, Rekenthaler, and Green of Zydus.

1726.   On June 13, 2014—the date of the Zydus increase on Warfarin—Teva was presented with an offer from a customer for a one-time buy on that drug. On June 17, 2014, Patel had another conversation with Aprahamian, and, the following day, on June 18, 2014, Patel took preparatory steps internally for a price increase. Zydus's Green also spoke with A.L., the Director of Pricing at Amneal on June 17, and the two spoke a number of additional times later that month.

1727.   On August 28, 2014, Teva increased its list (WAC) prices on Warfarin Sodium. In the period before the price increase, Patel and Rekenthaler were communicating with the other Warfarin Sodium manufacturers. Patel spoke with Aprahamian of Taro on August 18.  On August 27 Patel spoke to Aprahamian and Green of Zydus. Rekenthaler also communicated with Green on August 19 and 20, and Rekenthaler spoke to S.R., the Vice President of Sales at Amneal, on

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

August 21. The same Amneal VP exchanged text messages and then spoke with K.R., a Vice President of Sales at Zydus on August 18.

1728.   Similarly, when Amneal was preparing to re-enter the market in the spring of 2015, it coordinated with the other Warfarin Sodium manufacturers.  For example, on March 3, 2015, Teva's Rekenthaler spoke to S.R., Amneal's Vice President of Sales, for 11 minutes. The next day, Amneal announced list (WAC) price increases on Warfarin Sodium. On March 6, Rekenthaler and the Amneal VP spoke again.

### 150.   Ciprofloxacin HCL

1729.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Ciprofloxacin HCL tablets beginning at least as early as August 2014.

1730.   Ciprofloxacin HCL, also known by the brand names Cetraxal, Otiprio, and Ciloxan, is a medication used to treat a variety of infections, including anthrax infection after inhalational exposure, urinary tract infections, and pneumonic and septicemic plague.

1731.   During the relevant time frame, Defendants Teva, Actavis, and Dr. Reddy's were the primary manufacturers of Ciprofloxacin HCL.

1732.   The market for Ciprofloxacin HCL tablets was mature and at all relevant times had multiple manufacturers.

1733.   After years of relatively low and stable pricing for Ciprofloxacin HCL tablets, Dr. Reddy's, Teva and Actavis orchestrated large price increases in the latter months of 2014. Within a matter of months, all four manufacturers announced large list (WAC) price increases and identical list prices.

1734.   The list (WAC) price chart below shows the large and parallel price increases for Ciprofloxacin HCL tablets.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



1735.   Throughout this period, Teva, Dr. Reddy's and Actavis met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Ciprofloxacin HCL tablets and of the Fair Share agreement.

1736.   For example, prior to announcing a five-fold increase to its list (WAC) prices on August 18, 2014, Dr. Reddy's communicated with the other manufacturers to coordinate. A senior sales executive at Dr. Reddy's spoke frequently with Teva's Patel about the planned price increase, and the two also exchanged four text messages on August 25, 2014.

1737.   Similarly, around the time that Actavis announced its price increases for Ciprofloxacin HCL (December 19, 2014), Rekenthaler of Teva spoke to Falkin of Actavis several times to coordinate, including twice on December 17 and once on December 18. This drug was also referenced in calls between Rekenthaler and Falkin in a call on January 13, 2014, and two calls on January 14, 2014, and also in a call on January 16, 2015.

1738.   Falkin (Actavis) also spoke with a Senior Director of National Accounts at Dr. Reddy's on January 5, 12, 15, 16 and 21.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1739. On January 28, 2015, Teva raised its Ciprofloxacin HCL prices, to match Dr. Reddy's and Actavis's list (WAC) prices exactly. The same day as the Teva price increase, Dr. Reddy's was able to obtain a full copy of Teva's price increase list.

### 151. Desmopressin Acetate

1740. Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Desmopressin Acetate tablets beginning at least as early as August 2014.

1741. Desmopressin Acetate, also known by the brand names Concentraid, DDAVP, and Stimate, is an antidiuretic agent used in the treatment of central diabetes insipidus.

1742. During the relevant time frame, Teva and Actavis were the primary manufacturers of Desmopressin Acetate.

1743. In August 2014, Teva increased prices on Desmopressin Acetate tablets, along with a number of other drugs. In the lead up and follow-up to the price increases, Teva was in frequent contact with other drug manufacturers to coordinate price increases and Fair Shares. Actavis, which was the only other manufacturer of Desmopressin Acetate, was no exception.

1744. On October 15, 2014, Teva received a request from a customer asking Teva to reduce prices for Desmopressin Acetate. Teva's Patel—who already knew that Actavis would be raising prices—responded to the customer by declining to lower the price with the explanation: "[w]e believe the market is still settling on this product."

1745. On December 19, 2014, Actavis followed Teva's price increase on Desmopressin Acetate, announcing identical list (WAC) prices.

1746. Leading up to Actavis's price increase, Rekenthaler of Teva and Falkin of Actavis spoke frequently, including calls on November 18, November 21, and November 25, 2014.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 152. **Entecavir**

1747.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Entecavir tablets beginning at least as early as August 2014.

1748.   Entecavir, also known by the brand name Baraclude, among others, is a medication used to treat chronic Hepatitis B.

1749.   During the relevant time frame, Defendants Teva and Par were the primary manufacturers of Entecavir.

1750.   In August 2014, Teva and Par were preparing to enter the market for Entecavir. Both companies were soliciting new customers before their launch. On August 28, 2014, Rekenthaler had three phone calls with M.B, a Vice President of National Accounts at Par. The next day, one of Teva's potential customers sought a lower price from Teva, suggesting it could lose the business to Par. Teva, reassured by its discussions with Par, refused to lower its price, and retained the customer's Entecavir business. In light of the successful coordination internally at Teva, Rekenthaler discussed the possibility of conceding a large customer to Par.

1751.   Teva and Par both launched their respective Entecavir products on September 4, 2014. Within a few weeks, however, Teva and Par had divided the market according to the Fair Share agreement.

1752.   Teva and Par continued to coordinate pricing and allocate customers, with Rekenthaler and the VP at Par speaking twice on October 2. For the entirety of the period in which Par and Teva were the only generic suppliers of Entecavir, market share and prices remained stable and higher than they would have been in a competitive market.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 153. **Flutamide**

1753.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Flutamide capsules beginning at least as early as August 2014.

1754.   Flutamide, also known by the brand names Flucinom, Flugerel, and Niftolide, among others, is a medication used to treat prostate cancer, along with other conditions.

1755.   During the relevant time frame, Defendants Teva, Par and Actavis were the primary manufacturers of Flutamide.

1756.   In late August 2014, Teva aimed to raise prices on a number of different drugs, including Flutamide. To coordinate prices and Fair Share, Teva (Patel and Rekenthaler), Actavis (Rogerson and Falkin) and Par (M.B., Vice President of National Accounts and J.H., Vice President of Sales), communicated directly with each other via telephone.

1757.   Rekenthaler (Teva) communicated by phone with Falkin (Actavis) on August 4, 5, 6, 7, 18, 24, 26 and 28.

1758.   Falkin (Actavis) communicated by phone with a Par Vice President of Sales on August 5 and 26.

1759.   Rekenthaler (Teva) had three phone calls with a Vice President of National Accounts at Par on August 28.

### 154. **Glimepiride**

1760.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Glimepiride tablets beginning at least as early as August 2014.

1761.   Glimepiride, also known by the brand name Amaryl, is a medication used to control high blood sugar in type 2 diabetics.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1762.   During the relevant time frame, Defendants Teva and Dr. Reddy's were the primary manufacturers of Glimepiride.

1763.   On August 28, 2014, Dr. Reddy's significantly increased its Glimepiride pricing. The increases were significant—with the Glimepiride WAC going up by approximately 300% across dosage strengths. Dr. Reddy's price increases for Glimepiride were preceded by frequent calls between a Vice President of Sales at Dr. Reddy's, and Teva's Patel. They also exchanged text messages on August 25, 2014, three days before the price increase. The Dr. Reddy's VP and Patel continued to communicate after the price increase as well.

1764.   Although Teva did not initially follow Dr. Reddy's price increases for Glimepiride, the Dr. Reddy's VP and Patel continued to communicate, and they exchanged four text messages on October 10, 2014.

1765.   Several months later, on January 25, 2015, Teva raised prices on a number of different drugs, including Glimepiride. Teva raised its list (WAC) prices to match Dr. Reddy's list prices exactly.

### **155.   Tacrolimus**

1766.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Tacrolimus ointment beginning at least as early as August 2014.

1767.   Tacrolimus, also known by the brand name Protopic, is a secondary treatment option for moderate to severe eczema. It is available in 30, 60 and 100 gm dosages.

1768.   During the relevant time frame, Sandoz and Perrigo were the primary manufacturers of Tacrolimus.

1769.   In the summer of 2014, Sandoz and Perrigo were both preparing to launch Tacrolimus as the first available generic versions of the drug.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1770.   In August 2014, as Sandoz assessed the market, it endeavored to learn whether any other companies would be launching, and if so on what time frame. To that end, C.B., Sandoz Director of National Accounts, communicated by phone with T.P., Perrigo Director of National Accounts. C.B. learned from T.P. that Perrigo would be launching Tacrolimus.

1771.   In September 2014, as both companies prepared for the launch of Tacrolimus, C.B. (Sandoz) and T.P. (Perrigo) communicated multiple times to keep each other apprised of developments and to coordinate pricing and which customers to target. T.P. shared Perrigo's pricing for the new product and the companies agreed to an equal split of the market. C.B. kept contemporaneous notes of what he learned from T.P.

1772.   As their November launch dates approached, C.B. (Sandoz) and T.P. (Perrigo) continued to communicate by phone. For example, on November 10, 2014, Perrigo heard rumors that Sandoz already had launched its Tacrolimus products. T.P. (Perrigo) went to the source for answers: he communicated multiple times with C.B. (Sandoz) and got confirmation directly from him that Sandoz had not yet launched. T.P. reported back to his Perrigo supervisor, Wesolowski: ██████████████████████████████████ T.P., likely recognizing that it would be unwise to memorialize in writing that he was illegally coordinating with C.B., a competitor, instead ascribed the source of the information as a ██████████

1773.   Sandoz and Perrigo both launched Tacrolimus in the second half of November 2014. Each company stuck to the plan and pursued only those customers that they had previously agreed to target. The coordination worked; each company achieved its Fair Share.

### 156.   Norethindrone Acetate

1774.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Norethindrone Acetate tablets beginning at least as early as September 2014.

419

1775.   Norethindrone Acetate, also known by the brand name Primolut-Nor, is a medicine used to treat menstrual cycle disorders, primary and secondary amenorrhea, pre-menstrual syndrome, menstrual cycle regulation and endometritis.

1776.   During the relevant time frame, Defendants Teva, Amneal, and Glenmark were the primary manufacturers of Norethindrone Acetate.

1777.   On September 9, 2014, as Teva was also communicating with competitors about other drugs, a customer approached Teva seeking lower pricing on Norethindrone Acetate. One of Teva's competitors for this drug was Amneal. Also on September 9, 2014, Teva's Patel received phone calls from two different Amneal employees—the Vice President of Sales, and the Senior Director of Sales and Finance. Also that same day, the Amneal Director of Sales and Finance spoke several times with Glenmark (Jim Brown), the only other competitor in the market for Norethindrone Acetate.

1778.   After speaking with the two Amneal executives, Teva offered only a nominal reduction to the customer, because it did not want to compete for the business since the market already was allocated according to Fair Shares.

1779.   Patel acknowledged internally that Teva had "bid high" based on its understanding that "it would be an increase candidate for Amneal." Thus, by bidding high and not taking business from Amneal, in anticipation of future price increases, Teva reinforced the Fair Share understanding among them.

### 157.   Raloxifene HCL

1780.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Raloxifene HCL tablets beginning at least as early as September 2014.

1781.   Raloxifene HCL, also known by the brand name Evista, is a medication used to combat the effects of osteoporosis in postmenopausal women.

1782.   During the relevant time frame, Defendants Teva and Camber were the primary manufacturers of Raloxifene HCL.

1783.   In March 2014, Teva began marketing Raloxifene. Actavis had received approval to begin marketing Raloxifene in 2014 as well, but, by September 2014, had not entered the market. Camber entered the market in September 2014.

1784.   With anticipated product launches approaching, the market entrants discussed an allocation scheme in September 2014: On September 9, 2014, Teva's Rekenthaler had a twenty-six (26) minute phone call with the Senior Vice President of U.S. Sales at Actavis, and, over the course of the following week, Rekenthaler spoke with multiple Actavis employees, including the SVP of U.S. Sales again, on September 16, 2014, for over half an hour.

1785.   On September 17, 2014, Camber sent an offer for Raloxifene to a large Teva customer. That day, Rekenthaler shared internally the information he had gathered from other manufacturers, including that Actavis would be "late" to the market, and that he would learn more about Camber's plan following an upcoming trip.

1786.   Rekenthaler and Kon Ostaficiuk, the President of Camber Pharmaceuticals, spent the next three days playing golf during the day and socializing at night at an industry outing in Kentucky. On September 21 and 22, 2014, Ostaficiuk had a series of five phone calls with Rekenthaler. After those calls, Camber sent a revised offer to a potential customer that same afternoon, containing modified prices for Raloxifene.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1787.   On September 24, Patel discussed a Raloxifene market strategy with her Teva colleagues in light of Camber's offer to the large Teva customer. Later that morning, Rekenthaler called Ostaficiuk and the two spoke for 2 minutes. They spoke two more times that day.

1788.   On September 25, after discussing with his colleagues which customers Teva should concede to give Camber its Fair Share of the Raloxifene market, and armed with the information Rekenthaler had gathered from Ostaficiuk, Teva decided to concede certain additional, smaller customers. Rekenthaler and Ostaficiuk spoke again twice that day.

1789.   On Friday, September 26, 2014, Camber announced that it was launching Raloxifene. Rekenthaler called Ostaficiuk that day to convey that Teva did not want Camber taking any more of its Raloxifene customers. Camber agreed, and on September 29, 2014, Ostaficiuk sent an email to colleagues at Camber warning them not to "offer anything to any Teva customers...Not even a 'bad price'! Please acknowledge....We do not want to upset them more!" The Director of Sales and Operations at Camber, replied, "We have not made any offers to any Teva Raloxifene accounts…. Both Sales and Contracts are aware, & requesting incumbent detail for all offers, if Teva, no offer."

1790.   About a week later, on October 7, 2014, a large Teva customer informed a Teva sales representative that Camber had made an unsolicited bid for its Raloxifene business. A Director of National Accounts at Teva sent an internal email at Teva, expressing surprise given the agreement that Teva had previously reached with Camber: "I thought they were done after securing [our large customer]?" Rekenthaler doubted that Camber made an offer to another Teva customer, stating, "You're positive they sent them an offer?" The Teva Director of National Accounts then "relayed 'the message'" to the customer that "the market should be stable at this point" and Teva doubted that Camber intended to make an offer on Raloxifene. After further

discussion with the customer, Teva learned that it was a misunderstanding. Camber never actually made the offer; it complied with the Fair Share agreement with Teva.

### 158. Amoxicillin/Clavulanate

1791. Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Amoxicillin/Clavulanate chewable tablets beginning at least as early as October 2014.

1792. Amoxicillin/Clavulanate, also known by the brand name Augmentin, is a medication used to treat various infections caused by bacteria, including sinusitis, pneumonia, ear infections, and bronchitis, among others.

1793. During the relevant time frame, Defendants Teva and Sandoz were the primary manufacturers of Amoxicillin/Clavulanate chewable tablets.

1794. In late summer and early fall of 2014, Teva and Sandoz orchestrated price increases on Amoxicillin/Clavulanate chewable tablets. Throughout this period, Teva and Sandoz were in regular contact. Teva's Patel spoke with the Associate Director of Pricing at Sandoz multiple times to fix the prices of Amoxicillin/Clavulanate and other drugs (including at least Diclofenac Potassium and Penicillin V Potassium).

1795. For example, on October 10, 2014, the day that Sandoz followed Teva's price increase for Amoxicillin/Potassium Clavulanate, Patel of Teva spoke to the Associate Director of Pricing at Sandoz.

### 159. Bethanechol Chloride

1796. Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Bethanechol Chloride beginning at least as early as October 2014.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1797.   Bethanechol Chloride, also known by the brand name Urecholine, is a medication used to treat certain disorders of the urinary tract or bladder.

1798.   During the relevant time frame, Defendants Amneal, Teva and Upsher-Smith were the primary manufacturers of Bethanechol Chloride tablets.

1799.   In the fall of 2014, Amneal, Teva and Upsher-Smith ███████████████████ Amneal also announced a list (WAC) price increase in early November, and Teva followed the list price increase in January.

1800.   During this period, Amneal, Teva and Upsher-Smith met at trade conferences and communicated directly in furtherance of their price-fixing agreement on Bethanechol Chloride and the Fair Share agreement.

1801.   On January 28, 2015, Teva announced a list (WAC) price increase on Bethanechol Chloride tablets. Teva's price increase spreadsheet identified the reason for the increase as "Follow Competitor – Amneal." Prior to Teva's increase, Patel had a fifty-one minute phone call with the Senior Director of Sales and Finance at Amneal.

### 160.   Gabapentin

1802.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Gabapentin tablets (600 and 800 mg) beginning at least as early as October 2014.

1803.   Gabapentin, also known by the brand name Neurotonin, is an anticonvulsant medication used to treat, among other things, pain that occurs after shingles.

1804.   During the relevant time frame, Defendants Teva, Glenmark and Aurobindo were the primary manufacturers of Gabapentin.

1805.   In October 2014, Teva, Glenmark and Aurobindo met and communicated for the purposes of fixing the prices of Gabapentin tablets.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1806.   For example, Jim Grauso at Glenmark communicated directly by phone with the CEO of Aurobindo (voice or text message) on October 3, 14, 26, 29 and 31. He also communicated with the Vice President of Commercial operations at Aurobindo on October 7, 27, and 28.

1807.   Grauso (Glenmark) also communicated directly by phone with Teva during this period. He had phone contact with a National Account Manager at Teva on October 3, 10, and 23.

1808.   For his part, in addition to communicating directly with Glenmark during this period, the CEO of Aurobindo was in direct contact with Teva as well. He communicated by phone with Teva's Rekenthaler on October 17, 22 and 24. He also communicated with a National Account Manager at Teva multiple times on October 23 (the same day that the Teva NAM communicated with Grauso of Glenmark).

1809.   Nisha Patel also coordinated the Gabapentin Fair Share agreement. For example, on October 13 and 14, 2014, a number of Defendants' employees attended the Annual Meeting of the Pharmaceutical Care Management Association, including Teva's Patel. On the morning of October 15, 2014, right after returning from the trade association meeting, Patel informed colleagues at Teva that Glenmark would be taking a price increase on Gabapentin. That same day, Patel and Jim Brown (Glenmark) exchanged text messages. The Glenmark increase had not yet been made public.

1810.   Because Teva had less share of the Gabapentin market than Glenmark, Teva discussed whether it should use the price increase as an opportunity to gain market share. In a competitive market, that would have been the clear choice. Instead, Teva moderated its desire for more share only to the extent that it could do so "in line with fair share principles." Teva did not "want to disrupt Glenmark's business too much."

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 161. Celecoxib

1811. Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Celecoxib capsules beginning at least as early as November 2014.

1812. Celecoxib, also known by the brand name Celebrex, among others, is a medication used to treat the pain and inflammation associated with arthritis.

1813. During the relevant time frame, Defendants Teva and Actavis were the primary manufacturers of Celecoxib.

1814. In November 2014, as Actavis and Teva were preparing to launch generic Celebrex, they communicated directly with each other to coordinate Fair Shares. For example, Actavis's Falkin communicated by phone with Teva's Rekenthaler on November 17, 18, 25, and with Maureen Cavanaugh (Senior Vice President of Sales) on November 11 and 14.

1815. The lines of communication remained open the following month as well. In the days leading up to and following Teva's December 10, 2014 launch of Celecoxib, Teva's Patel and the Senior Vice President of U.S. Sales at Actavis communicated by phone on December 5 and 8.

1816. In addition, Actavis's Falkin communicated by phone with Rekenthaler (December 3, 9, 10, 17, 18), including at least three times on the day of the launch.

### 162. Cabergoline

1817. Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Cabergoline tablets beginning at least as early as December 2014.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1818.   Cabergoline, also known by the brand name Dostinex, is a medication used in the treatment of Parkinson's disease and hyperprolactinemia, as well as certain menstrual and fertility problems, and tumors of the pituitary gland.

1819.   During the relevant time frame, Defendants Teva, Par and Greenstone were the primary manufacturers of Cabergoline.

1820.   As Greenstone was preparing to enter the Cabergoline market in December 2014, one of its senior executives approached the Senior Director of Sales at Teva. The Greenstone executive – F.H., who had responsibility for generic products at a large joint venture between a retail pharmacy and a wholesaler – did so in order to facilitate a customer allocation between the two competitors, and his December 9 email to T.C made clear: "Greenstone has promised to play nice in the sandbox."

1821.   That same day, on December 9, the Senior Director of Sales at Teva called the Senior Director of National Accounts at Par, the other primary manufacturer of Cabergoline. The two executives spoke for approximately four minutes.

1822.   The next day, after some internal discussions at Teva, the Senior Director of Sales agreed to the proposed allocation, stating:  "Tell Greenstone we are playing nice in the sandbox and we will let them have" the wholesaler customer at issue.

1823.   Greenstone was able to acquire the wholesaler as a customer for Cabergoline without any fear that Teva or Par would retaliate. In exchange, Greenstone agreed not to compete for other customers and drive prices down in the market.

### 163.   Naproxen Sodium

1824.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Naproxen Sodium tablets beginning at least as early as January 2015.

1825.   Naproxen Sodium, also known by the brand name Naprosyn, is a nonsteroidal anti-inflammatory drug (NSAID) used to treat pain, menstrual cramps, inflammatory diseases such as rheumatoid arthritis, and fever.

1826.   During the relevant timeframe, Defendants Glenmark and Amneal were the primary manufacturers of Naproxen Sodium tablets.

1827.   The market for Naproxen Sodium tablets was mature and at all relevant times had multiple manufacturers.

1828.   For years, the prices for Naproxen Sodium tablets were relatively low and stable. In 2015, Teva prepared to and eventually did exit the market, leaving Glenmark and Amneal as the dominant suppliers. Rather than compete against each other to pick up Teva's market share, Glenmark and Amneal imposed very large and nearly simultaneous price increases.

1829.   In close succession, Glenmark and Amneal increased list (WAC) prices more than ten-fold, and NSP prices ███████████ The NSP price chart and the list (WAC) price chart below show the large and parallel price increases by Glenmark and Amneal on Naproxen Sodium tablets. (Note: Naproxen Sodium tablets come in 275 mg and 550 mg dosages. The pricing patterns for each dosage are highly similar. Only the charts for the 550 mg dosage are included here.) [NSP CHART REDACTED]





1830.   Throughout this period, Glenmark and Amneal met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on generic Naproxen Sodium and of their Fair Share agreement.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1831.   For example, Jim Brown, VP of Sales at Glenmark, and S.R., Senior Director of Sales at Amneal, frequently communicated during the period when Glenmark and Amneal raised and maintained the prices of Naproxen Sodium. The two executives communicated by phone multiple times per month in every month of 2015.

### 164.   Trazodone HCL

1832.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Trazodone HCL tablets beginning at least as early as April 2015.

1833.   Trazodone HCL, also known by the brand name Desyrel, among others, is a medication used to treat depression.

1834.   During the relevant time frame, Defendants Apotex, Par, Sun, and Teva were the primary manufacturers of Trazodone HCL 50, 100 and 150 mg tablets.

1835.   The market for Trazodone HCL was mature and at all relevant times had multiple manufacturers.

1836.   For years, the prices for Trazodone HCL tablets were relatively low and stable. In early 2015, however, Apotex, Par, Sun, and Teva imposed large price increases in close succession.

1837.   The price charts below show the sustained price increases imposed by Apotex, Par, Sun, and Teva. Note: Prices for 50 mg and 150 mg Trazodone HCL tablets exhibited a similar pricing pattern. Charts for only the 100 mg tablets are included here. [NSP CHART REDACTED]





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1838.   Throughout this period, Apotex, Par, Sun and Teva met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Trazodone HCL and their Fair Share agreement.

1839.   For example, representatives from Apotex, Par, Sun, and Teva all attended the GPhA 2015 Annual Meeting in Miami, Florida from February 9-11, 2015 and the NACDS 2015 Annual Meeting in Palm Beach, Florida from April 25-28, 2015.

1840.   The companies also communicated directly during the summer of 2015, when they began to impose large price increases on Trazodone. For example, B.H., Apotex National Sales Director, communicated by phone with J.H., Par Vice President of Sales, on June 30 and July 1, 2015. B.H. (Apotex) also communicated by phone with Nisha Patel (Teva) on June 12, 2015. Meanwhile, J.M., Sun National Account Manager, communicated by phone with K.O., Par Vice President of National Accounts, on July 10, 2015.

### **165.   Metformin ER (F) [Fortamet]**

1841.   Plaintiffs allege that as part of Defendants' overarching conspiracy with respect to the Drugs at Issue, they conspired to fix, raise, maintain or stabilize the prices of Metformin ER (F) tablets beginning at least as early as June 2015.

1842.   Metformin ER (F), also known by the brand name Fortamet, is a medication used to improve blood sugar control in adults with type 2 diabetes mellitus.

1843.   During the relevant period, Actavis and Lupin were the primary manufacturers of Metformin ER (F).

1844.   The market for Metformin ER (F) was mature and at all relevant times had multiple manufacturers.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1845.   For years, the prices for generic Fortamet were relatively low, stable and declining. In the summer of 2015, Lupin and Actavis began to impose large price increases. Lupin increased prices more than 300% and Actavis prices shot up approximately 250%.

1846.   Note: Metformin ER (F) is available in 500 mg and 1000 mg dosages. The pricing patterns for the dosages are highly similar. The chart for only the 1000 mg dosage is included here.

[CHART REDACTED]



1847.   Throughout this period, Actavis and Lupin met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Metformin ER (F) and their Fair Share agreement.

1848.   For example, Lupin's David Berthold, VP of Sales, communicated by phone with Actavis's T.G., Director of National Accounts, throughout the period in which Lupin and Actavis raised and maintained high prices for Metformin ER (F). They communicated by phone in June, July and October 2015, and again in May, June and July of 2016.

## VIII.   INTERSTATE AND INTRASTATE TRADE AND COMMERCE

1849.   During the Class Period, Defendants sold and distributed generic drugs in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

1850.   Defendants' and their co-conspirators' conduct, including the marketing and sale of generic drugs, took place within the United States and has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

1851.   Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter alia*, retailers within each state and territory were foreclosed from offering less expensive generic drugs to Plaintiffs inside each respective state and territory. The foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

## IX.   BACKGROUND OF THE GENERIC DRUG INDUSTRY

### A.   Generic Drugs Are Commodity Products.

1852.   Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[27] In 2015, generic drug sales in the United States were estimated at $74.5 billion.[28]

---

[27] GPhA, *Generic Drug Savings in the U.S.* (2015) ("GPhA Report") at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

[28] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://portal.ct.gov/AG/Press-Releases/2016-Press-Releases.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1853.   According to the U.S. Food & Drug Administration ("FDA"), a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[29] Once the FDA approves a generic drug as "therapeutically equivalent" to a brand name drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[30]

1854.   In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name counterpart."[31] And that may be conservative. According to a Federal Trade Commission ("FTC") study, in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[32] Mature generic markets typically have several manufacturers that compete for sales, hence keeping prices in check.

1855.   Generic drug price competition provides enormous savings to Plaintiffs, as well as to consumers, pharmacies, other drug purchasers, and state Medicaid programs.

1856.   The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585). The Act streamlines the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs. Generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing

---

[29] FDA Website, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

[30] *Id.*

[31] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sep. 15, 2010), *available at* https://www.cbo.gov/publication/21800.

[32] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions* (Jan. 2010), *available at* http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

of an Abbreviated New Drug Application ("ANDA") that establishes that its product is bioequivalent to the branded counterpart.

1857.   Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

1858.   Because each generic is readily substitutable for another generic of the same brand name drug, pricing is the main differentiating feature. As recognized by the FTC, "generic drugs are commodity products" and, as a consequence of that, are marketed "primarily on the basis of price."[33] In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

1859.   It is well established that competition among generic manufacturers drives down prices. Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of sales. When lower-priced generics become available, the brand drug quickly loses market share as purchasers switch to the less expensive alternatives. Over time, the price of a generic drug approaches the manufacturers' marginal costs. As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:

---

[33] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



**Generic Competition and Drug Prices**

Source: FDA analysis of retail sales data from IMS Health, IMS National Sales
Perspective (TM), 1999-2004, extracted February 2005

1860.   When new entrants join a competitive generic market, they typically will price their product below the prevailing market price in order to gain market share. A recent government report confirmed this phenomenon in interviews with generic manufacturers: "manufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a price that is lower than the current market price in order to build its customer base. Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[34]

1861.   When there are multiple generic manufacturers in an established generic market, prices should remain low and stable, and should not increase absent a market disruption or, as is the case here, anticompetitive conduct.

---

[34] U.S. Government Accountability Office Report: Generic Drugs Under Medicare ("GAO Report") at 23, (August 2016), *available at* https://www.gao.gov/assets/680/679022.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### B. Pricing in the U.S. Prescription Drug Industry.

1862. In essence, the generic pharmaceutical supply chain flows as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (*e.g.*, a co-pay or co-insurance) if they are insured. The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies. These agreements and payments are sometimes arranged and intermediated by middlemen known as Pharmacy Benefit Managers ("PBMs").

1863. Because the prices paid by purchasers of generic drugs differ at different levels of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious. Market-wide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC"). NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription . . . drugs."[35] "NADAC is a simple average of the drug acquisition costs submitted by retail community pharmacies."[36] In effect, NADAC is "a single national average."[37] Thus, NADAC is one way to track general price trends in the marketplace.

1864. While NADAC provides the average price level across all manufacturers of a given drug, other prices are manufacturer specific. Drug manufacturers typically report benchmarks—

---

[35] CMS, Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

[36] *Id.* at 15.

[37] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

like WACs (Wholesale Acquisition Costs)—for their drugs, which are then published in compendia used by participants in the pharmaceutical industry. The benchmarks are not actual transaction prices; rather, they are the manufacturer's reported list price. Accordingly, WAC prices do not take into account discounts that may be provided, *e.g.*, for volume sales.[38]

1865.  The amount that an end-payer will pay a pharmacy for a generic drug typically is determined with reference to a benchmark or list price like a WAC. The end-payer pays the pharmacy an amount based on the manufacturer's list price for the drug, plus a small mark-up or dispensing fee. Over time, third-party payers and PBMs have learned that manufacturers' list prices for some generic drugs can be substantially higher than the actual costs incurred by certain pharmacies to acquire the drugs. As a consequence, end-payers were paying more than simply the acquisition cost plus a small amount.

1866.  To combat this, some third-party payers and PBMs have implemented their own proprietary benchmark prices—Maximum Allowable Costs ("MACs")—that set the amounts they will pay pharmacies for some generic drugs. A MAC caps the amount that an end-payer will pay a pharmacy for a given strength and dosage of a generic drug, regardless of the pharmacy's acquisition costs.

---

[38] Average Wholesale Price ("AWP") is another benchmark price that is used in the pharmaceutical industry. AWP is the average price wholesalers pay to purchase drugs from pharmaceutical manufacturers, inclusive of rebates and discounts. *See* Ctrs. for Medicare & Medicaid Servs., *Medicare Part B Average Sales Price*, *available at* https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Part-B-Drugs/McrPartBDrugAvgSalesPrice/. QuintilesIMS's National Sales Perspectives ("IMS NSP") is a measure of manufacturer specific pricing. IMS NSP data captures sales at actual transaction prices and includes sales by manufacturers into various outlets. IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* http://quintilesimsconsultinggroup.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1867.   Third-party payers and PBMs set the MAC of a drug based on several factors, one of which is believed to be the lowest acquisition cost in the market for that generic drug. So, for example, if there are three manufacturers offering the same generic drug at three different prices, a PBM or third-party payer might set the MAC price at or near the lowest of the three prices. A pharmacy could elect to buy from a manufacturer with a higher price, but upon resale to a customer of the PBM or third-party payer, the pharmacy would only be paid the MAC price.

1868.   Drug purchasers always have an incentive to buy the least expensive available drug. Because MAC prices further incentivize pharmacies to choose the lowest priced option, a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price. Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales. A manufacturer can only raise its price if it knows its competitors will raise their prices, too, *e.g.*, if they are conspiring.

## X.     FACTORS INCREASING THE SUSCEPTIBILITY TO COLLUSION OF THE DRUGS AT ISSUE

1869.   Publicly available data on the generic drug market in the United States demonstrate that it is susceptible to cartelization by Defendants. Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) inter-competitor contacts and communication.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 1.    Industry Concentration

1870.   A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators. Here, Defendants control the generic market. For each of the generic drugs described above, a small number of competitors—between two and six manufacturers in the United States—controlled a significant market share for that drug during the relevant time period. Defendants were the dominant players in each individual drug market. As explained above, industry consolidation and exits have led to this dominance.

### 2.    Barriers to Entry

1871.   Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

1872.   There are significant capital, regulatory, and intellectual property barriers to entry in the generic drug market that make such entry time-consuming and expensive. For example, as explained above, manufacturers must undergo an intense application process—that lasts nearly four years—in order to obtain ANDA approval to manufacture a generic drug. Historically, the price of ANDA filing is approximately $1 million. Numerous other barriers to entry exist in the generic drug market, including costs of manufacture and expenses related to regulatory oversight.

### 3.    Demand Inelasticity

1873.   Price elasticity of demand is defined as the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product. It is a measure of how demand for a product reacts to a change in price. The basic necessities of life—food, water, and shelter—are examples of goods that experience nearly perfectly inelastic demand at or near

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

the minimums necessary to sustain life. In other words, a person on the verge of dying of thirst will pay almost anything for water.

1874.   In order for a cartel to profit from raising prices above competitive levels, demand for the product must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made. Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

1875.   Demand for generic drugs is highly inelastic. Each generic drug described above is medically necessary to the health and well-being of the patient for whom it is prescribed. Despite the substantial price increases alleged in this Complaint, demand for each of the generic drugs remained largely the same following the price increase.

### 4.   Lack of Substitutes

1876.   For most generic drugs, there are significant barriers to changing treatments. A generic drug is considered a therapeutic equivalent of the brand-name version of a drug. However, generic drugs are not generally considered therapeutic equivalents of other drug products, even similar ones. A patient who is prescribed a specific generic drug cannot purchase a different drug using his or her prescription regardless of the respective prices of the drugs.

1877.   Branded versions of generic drugs do not generally serve as economic substitutes for generic versions, because branded products generally maintain substantial price premiums over even supracompetitively priced generic counterparts.

### 5.   Standardized Product with High Degree of Interchangeability

1878.   A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively.

1879.   Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price. When approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug. This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

1880.   Each generic drug described above is an interchangeable bioequivalent of the branded counterpart.

### 6.      Inter-Competitor Contacts and Communications

1881.   As discussed above, Defendants' representatives met at conferences convened by customers and trade associations of customers (such as the ECRM and NACDS), private industry dinners, and similar events. Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry meetings.

1882.   Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events such as industry dinners, girls nights out, lunches, parties, and frequent telephone calls, emails, and text messages. *See, e.g.*, Table 2 above (listing inter-Defendant contacts for each Defendant).

1883.   DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, have uncovered numerous inter-competitor communications. These types of communications are not unique or isolated, but are rampant. The sheer number of companies implicated in the investigations (including many of the Defendants here) highlights the prevalence in the generic drug industry of the types of contacts

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and communications that facilitate collusion. The following companies have drawn the scrutiny of law enforcement:

(a)    **Aceto**:  On April 23, 2018, Aceto disclosed: "In connection with the DOJ's ongoing investigation into marketing and pricing practices throughout the generic pharmaceutical industry, Aceto Corporation (the "Company") received a subpoena from the Antitrust Division of the U.S. Department of Justice (the "DOJ"). The Company is one of many operating companies in the generic pharmaceutical industry to receive a subpoena from the DOJ relating to its years-long investigation into the industry.[39]

(b)    **Actavis**:  In February 2016, Actavis's former parent, Allergan plc, disclosed that it received a DOJ subpoena "seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[40]

(c)    **Aurobindo**:  Aurobindo has disclosed receipt of a subpoena relating to DOJ's generic drug investigation.[41] The company stated that it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[42]

(d)    **Citron**: In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also

---

[39] Aceto, SEC 2018 Form 8-K (April 23, 2018), *available at* http://investor.aceto.com/static-files/6fed4dee-5d2f-419c-9c11-6b9828c079d1.

[40] Allergan, SEC 2015 Form 10-K (Feb. 26, 2016), at F-106, *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459016013478/agn-10k_20151231.htm.

[41] Zeba Siddiqui, *India's Aurobindo shares hit nine-month low on US price-fixing lawsuit,* Reuters (Dec 16, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV.

[42] Aurobindo Pharma, Ltd., BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ products." The Connecticut AG requested that Citron produce all documents produced to DOJ.[43]

(e)    **Dr. Reddy's**: In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[44]

(f)    **Heritage**: As a private company, Heritage is not required to make public disclosures. Nonetheless, in the wake of the criminal guilty pleas by two of its executives, Heritage confirmed that it is "fully cooperating" with DOJ.[45] The company has entered into a deferred prosecution agreement with DOJ.

(g)    **Impax**:  In July 2014, Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic digoxin.[46]  In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and documents about "any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications."[47] In February 2016, Impax

---

[43] Aceto Corp., SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm.

[44] Dr. Reddy's, SEC Form 6-K (Nov. 10, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17.

[45] Tom Schoenberg , David McLaughlin & Sophia Pearson, *U.S. Generic Drug Probe Seen Expanding After Guilty Pleas,* Bloomberg (Dec. 14, 2016), *available at* https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe.

[46] Impax SEC Form 8-K (July 15, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm.

[47] Impax SEC Form 8-K (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications. In particular…digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[48]

(h)     **Lannett**: In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price-fixing of digoxin.[49] On November 3, 2014, Lannett disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act." The subpoena also requested "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[50] On August 27, 2015, Lannett further explained that DOJ sought, among other things, "communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas."[51]

(i)     **Lupin**:   "In January 2017, [Lupin] and one of its employees (David Berthold) were issued subpoenas by Department of Justice (DOJ) requesting documents as part of DOJ's investigation into possible antitrust violations within the generic drug industry. [Lupin] has

---

[48] Impax, SEC 2015 Form 10-K (Feb. 22, 2016), at F-53, *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm.

[49] Lannett press release (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General.

[50] Lannett, SEC Form 10-Q (Nov. 6, 2014) at 16, *available at* https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm.

[51] Lannett, SEC Form 10-K (Aug. 27, 2015) at 18, *available at* http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

been cooperating in the ongoing investigation. Further in April 2018, [Lupin] and one of its employees received a non-party subpoena from the state of Connecticut Attorney General related to a civil antitrust case they filed in 2016, requesting documents and other information."[52]

(j)     **Mallinckrodt**:   "In March 2018, the Company received a grand jury subpoena issued by the U.S. District Court for the Eastern District of Pennsylvania pursuant to which the Antitrust Division of the DOJ is seeking documents regarding generic products and pricing, communications with generic competitors and other related matters."[53]

(k)     **Mayne**: On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena…seeking information relating to marketing, pricing and sales of select generic products" and that it had received a subpoena from the Connecticut AG seeking similar information.[54]  On November 4, 2016, Mayne Pharma Group Limited issued a press release stating: "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products. The investigation relating to Mayne Pharma is focused on Doxycycline Hyclate delayed-release tablets (generic) and potassium chloride powders."[55]

---

[52] Lupin Annual Report 2018-19 at 157, *available at* https://www.lupin.com/pdf/annual-report/2019/lupin-annual-report-2018-19.pdf.

[53] Mallinckrodt 2018 Annual Report at 127, *available at* http://www.annualreports.com/HostedData/AnnualReports/PDF/NYSE_MNK_2018.pdf.

[54] Mayne Pharma, 2016 Annual Report (Aug. 25, 2016), at 75, *available at* https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf.

[55] Mayne Pharma, Update on Status of DOJ Investigation (Nov. 4, 2016), *available at* http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(l)  **Mylan**: In February 2016, Mylan disclosed that it received a DOJ subpoena "seeking information relating to . . . generic Doxycycline" and a similar subpoena from the Connecticut AG seeking "information relating to . . . certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[56] In September 2016, Mylan's Pennsylvania headquarters was raided by federal authorities in connection with the generic drugs investigation. And on November 9, 2016, Mylan disclosed that "certain employees and a member of senior management, received subpoenas from the DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-Metformin, Propranolol and Verapamil products" and that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[57]

(m)  **Par**: In March 2015, Par disclosed that it received subpoenas from the Connecticut AG and DOJ relating to Digoxin and Doxycycline.[58] In November 2015, Endo, the parent company of Par, elaborated: "In December 2014, our subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania. The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic Doxycycline products, and on communications with competitors and others regarding those products. Par is currently cooperating fully with the

---

[56] Mylan, SEC 2015 Form 10-K (Feb. 16, 2016), at 160, *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdoc.htm.

[57] Mylan SEC Form 10-Q, at 58 (Nov. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdoc.htm.

[58] Par Pharmaceutical Companies, Inc., SEC 2014 Form 10-K (Mar. 12, 2015) at 37, *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm.

448

investigation."[59] Endo also disclosed that in December 2015 it "received Interrogatories and Subpoena Duces Tecum from the State of Connecticut Office of Attorney General requesting information regarding pricing of certain of its generic products, including Doxycycline Hyclate, Amitriptyline Hydrochloride, Doxazosin Mesylate, Methotrexate Sodium and Oxybutynin Chloride."[60] Notably, the inquiry appears to focus on at least three products (doxycycline, doxazosin mesylate, and methotrexate sodium) that were manufactured by Par (via its acquisition of DAVA).

(n)     **Perrigo**:  "On May 2, 2017, we disclosed that search warrants were executed at a number of Perrigo facilities and other locations in connection with the Antitrust Division's ongoing investigation related to drug pricing in the pharmaceutical industry."[61]

(o)     **Pfizer:**  On August 10, 2017, Pfizer disclosed: "As of July 2017, the U.S. Department of Justice's Antitrust Division is investigating our Greenstone generics business. We believe this is related to an ongoing antitrust investigation of the generic pharmaceutical industry. The government has been obtaining information from Greenstone."[62]

(p)     **Rising:**  "On April 16, 2018 . . . Rising . . . received a Grand Jury subpoena (the "DOJ Subpoena") from the Antitrust Division of the DOJ.  Rising is one of many operating

---

[59] Endo International plc, SEC Form 10-Q (March 31, 2016) at 30, *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-3312016x10q.htm.

[60] *Id.* at 31.

[61] Perrigo, SEC Form 10-K (May 22, 2017) at 45, available at https://www.sec.gov/Archives/edgar/data/1585364/000158536417000071/cy16q410k.htm.

[62] Pfizer, SEC Form 10-Q (Aug. 10, 2017) at 37, *available at* https://investors.pfizer.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=12225193.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

companies in the generic pharmaceutical industry to receive a subpoena from the DOJ relating to its years-long investigation into the industry."[63]

(q)     **Sandoz**: In March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly-owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products . . . and related communications with competitors."[64]

(r)     **Sun**: On May 27, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of Sun) stated in a filing with the National Stock Exchange of India that one of its U.S. subsidiaries, namely Sun, "received a grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents . . . relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[65]

(s)     **Taro**:  In September 2016, Taro disclosed that the Company "as well as two senior officers" received DOJ subpoenas seeking documents relating to "generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[66]

(t)     **Teva**: In August 2016, Teva disclosed that it received subpoenas from DOJ and the Connecticut AG seeking documents and other information "relating to the marketing and

---

[63] Aceto, SEC Form 10-K (Sep. 28, 2018) at 29, *available at* https://www.sec.gov/Archives/edgar/data/2034/000114420418051414/tv501271_10k.htm.

[64] Novartis 2016 Financial Report at 217, *available at* https://www.novartis.com/sites/www.novartis.com/files/novartis-annual-report-2016-en.pdf.

[65] Sun Pharmaceuticals Indus., Ltd., BSE Disclosure (May 27, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/8E568708_8D00_472E_B052_666C76A4263D_081648.pdf.

[66] Taro, SEC Form 6-K (Sept. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/906338/000115752316006685/a51417528.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pricing of certain of Teva USA's generic products and communications with competitors about such products."[67]

(u)   **West-Ward (Hikma)**: In January 2017, Hikma Pharmaceuticals PLC, the parent company of West-Ward, disclosed in its 2016 annual report: "In January 2017 the Group received a subpoena from a state attorney general, requesting certain pricing and costing information."[68]

(v)   **Zydus**: Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[69]

## XI.   THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.   The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy.

1884.   Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' disclosures of the existence of the government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic drugs.

1885.   Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth against these Defendants, until (at the earliest) the filing of the States' May 10, 2019 Complaint.

---

[67] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), *available at* https://www.sec.gov/Archives/edgar/data/818686/000119312516671785/d187194d6k.htm.

[68] Hikma Pharmaceuticals PLC, 2016 Annual Report, *available at* https://www.hikma.com/media/1189/2016-annual-report.pdf.

[69] *See* Rupali Mukherjeel, *US Polls, Pricing Pressure May Hit Indian Pharma Cos*, The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian- pharma-cos/articleshow/55301060.cms.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1886.   No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the Defendants was involved in a criminal conspiracy to fix prices for generic drugs.

1887.   Plaintiffs are purchasers who indirectly purchased generic drugs manufactured by one or more Defendants. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered Defendants' conspiracy.

1888.   Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies, which prohibited the type of collusion alleged in this Complaint. For example:

   (a)   Allergan's (predecessor to Actavis) Code of Conduct states: "We support a free and open market, which is why we comply with competition laws everywhere we do business and strive to always compete fairly."[70]

   (b)   Apotex's Code of Conduct directs employees: "Do not communicate with competitors about competitive business matters such as prices, costs discounts, customer suppliers, marketing plans, production capacities or any terms of conditions of sale that could create the appearance of improper agreements or understandings. Do not make agreements or reach understandings with competitors regarding allocation of customers, territories or market share. Do not conspire with other bidders when competing for contracts."[71]

   (c)   Dr. Reddy's' Code of Conduct provides: "We believe in free and open competition and never engage in improper practices that may hamper fair competition. We never look to gain competitive advantages through unethical or unlawful business practices. . . . [W]e must never enter into agreements with competitors to engage in any anti-competitive behavior,

---

[70] Allergan Code of Conduct, *available at* http://www.allergan.com/investors/corporate-governance/code-of-conduct.

[71] Apotex Code of Conduct, *available at* http://www1.apotex.com/docs/librariesprovider3/business-ethics/code-of-conduct-en.pdf?sfvrsn=6.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

including colluding or cartelization, fixing prices, dividing up customers, suppliers or markets."[72]

(d)    Glenmark's Code of Conduct states: "We must engage in fair competition and must ensure that our business dealings comply with all applicable local antitrust and competition laws, such as monopoly, unfair trade, or price discrimination laws. We must not make agreements or engage in concerted actions with a competitor with the intent of improperly dividing markets by allocating territories, customers, goods, or services, or price-fixing or collusion."[73]

(e)    Hikma's (the parent of West-Ward) Code of Conduct provides: "Hikma will engage in free and fair competition and not seek competitive advantage through unlawful means. Hikma will not collude with competitors on prices, bids or market allocations, nor exchange information with third parties in a way that could improperly influence business outcomes."[74]

(f)    Mayne's Business Code of Conduct provides: "Do not agree, even informally, with competitors on price (or any elements of price including discounts or rebates), production, customers or markets without a lawful reason."[75]

(g)    Mylan's Code of Conduct and Business Ethics states: "Mylan is committed to complying with applicable antitrust and fair competition laws."[76]

(h)    Novartis' (Parent of Sandoz) Code of Conduct states: "We are committed to fair competition and will not breach competition laws and regulations."[77]

(i)    Par's Code of Conduct provides: "It is Company policy to comply with the antitrust and competition laws of each country in which the Company does business."[78]

---

[72] Dr. Reddy's Code of Conduct, *available at* http://www.drreddys.com/media/508807/cobe_booklet.pdf.

[73] Glenmark Code of Conduct, *available at* https://www.glenmarkpharma.com/sites/all/themes/glenmark/pdf/glenmark-code-english.pdf.

[74] Hikma Code of Conduct, *available at* https://www.hikma.com/media/1687/code-of-coduct-en.pdf.

[75] Mayne Pharma Group Business Code of Conduct, *available at* https://www.maynepharma.com/media/1786/business-code-of-conduct.pdf.

[76] Mylan Code of Business Conduct and Ethics, *available at* https://www.mylan.com/-/media/mylancom/files/code%20of%20business%20conduct%20and%20ethics.pdf.

[77] Novartis Code of Conduct, *available at* https://www.novartis.com/sites/www.novartis.com/files/code-of-conduct-english.pdf.

[78] Par Code of Ethics, *available at* http://corpdocs.msci.com/ethics/eth_19100.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(j)    Perrigo's Code of Conduct provides: "We will succeed based on the quality and value of our products and not by illegal or otherwise improper business practices. Competition laws, also known as "antitrust" laws, generally prohibit agreements with competitors, suppliers or customers that could unfairly limit free and open competition."[79]

(k)    Sun Pharmaceutical Industries, Ltd. (parent of Sun and Taro) has a Global Code of Conduct that provides: "We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices." It goes on to state: "Sun Pharma shall compete only in an ethical and legitimate manner and prohibits all actions that are anti-competitive or otherwise contrary to applicable competition or anti-trust laws."[80]

(l)    Taro's Code of Conduct provides: "we do not discuss any of the following topics with our competitors: prices or price-fixing, customer or market allocation, bids or bid-rigging, any topic that seems to be about restricting competition. If a competitor attempts to engage you in a discussion on any of these topics, make it clear that you do not wish to participate. Leave the conversation immediately, and report the matter to Corporate Compliance."[81]

(m)    Teva's Code of Conduct provides: "We believe that customers and society as a whole benefit from fair, free and open markets. Therefore, we compete on the merits of our products and services and conduct business with integrity. We recognize that the potential harm to Teva's reputation and the penalties for breaching competition laws are severe, and can subject Teva, members of the Board of Directors and employees to severe civil fines and criminal penalties."[82]

1889.  It was reasonable for members of the Class to believe that Defendants were complying with their own antitrust policies.

---

[79] Perrigo Code of Conduct, *available at* http://perrigo.investorroom.com/download/Code+of+Conduct.pdf.

[80] Sun Pharma Global Code of Conduct, *available at* http://www.sunpharma.com/Shareholder-Information/Policies/93092/Global-Code-of-Conduct.

[81] Taro Code of Conduct, *available at* https://secure.ethicspoint.com/domain/media/en/gui/20249/Code_of_Conduct.pdf.

[82] Teva Code of Conduct, *available at* http://www.tevapharm.com/files/about/corporate_governance/code_of_conduct/TEVA_CodeOf Conduct_FINAL_111715%5B2%5D.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1890.   For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

**B.   Fraudulent Concealment Tolled the Statutes of Limitations.**

1891.   In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs. Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until Defendants disclosed the existence of government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic drugs.

1892.   Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth against these Defendants, until (at the earliest) the filing of the States' May 2019 Complaint.

1893.   No information evidencing these antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the Defendants was involved in a criminal conspiracy to fix prices for generic drugs.

1894.   As described in more detail below, Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic drugs. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of generic drugs they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic drugs. Defendants' false statements and conduct concerning the prices of generic drugs were deceptive, as they had the tendency or

455

capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing generic drugs at prices established by a free and fair market.

### 1.  Active Concealment of the Conspiracy.

1895.  Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe. Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

1896.  Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than the consequences of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic drugs.

1897.  For example, Defendants took overt steps to conceal their illegal activity and destroy evidence of any wrongdoing going back to at least 2009.

1898.  Defendants avoided putting incriminating information in writing. Examples include:

- Nailor of Greenstone instructing subordinates to avoid putting sensitive market intelligence in writing;[83]

- Kellum of Sandoz routinely admonishing colleagues for putting incriminating information in e-mails and voicing concern that the conduct they were engaging in could lead to significant legal exposure;[84]

---

[83] 5/10/19 State AG Complaint ¶ 1125.
[84] 5/10/19 State AG Complaint ¶¶ 159, 1124.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

- Teva's Green and Patel sending text messages to competitors saying "call me";[85]

- Teva's K.G. instructing Patel to remove from an August 2013 e-mail information obtained from competitors about their price increase plans;[86]

- Taro's Aprahamian instructing colleagues in May 2014 to avoid discussing fair share by e-mail and to discuss by phone instead;[87]

- Citron instructing Heritage to communicate by phone and not through e-mail;[88] and

- Sandoz avoiding "fair share" language in an internal presentation in May 2017.[89]

1899.   When incriminating information was put in writing, Defendants took overt and calculated steps to destroy evidence of those communications.  Examples include:

- G.S. of Mayne deleting incriminating messages between her and A.S. from her cell phone before the data on that phone were produced to the Connecticut AG's office;[90]

- Patel deleting text communications with competitors after Rekenthaler warned her in 2015 about the government investigation;[91] and

- Apotex deleting an entire custodial file for one of its key employees after the States requested it through an investigatory subpoena in 2017.[92]

1900.   Defendants lied to customers about why they increased prices or declined to submit bids.  Examples include:

- In an April 2013 e-mail, Kellum of Sandoz told CW-4 that Sandoz could "blame supply" when declining to bid for Publix's business;[93]

---

[85] 5/10/19 State AG Complaint ¶ 1123.

[86] 5/10/19 State AG Complaint ¶ 1115.

[87] 5/10/19 State AG Complaint ¶ 158.

[88] 6/18/18 State AG Complaint ¶ 459.

[89] 5/10/19 State AG Complaint ¶ 158.

[90] 6/18/18 State AG Complaint ¶ 462.

[91] 5/10/19 State AG Complaint ¶¶ 1127-28.

[92] 5/10/19 State AG Complaint ¶ 1129.

[93] 5/10/19 State AG Complaint ¶ 1035.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

- In June of 2015, a Sandoz national account representative told a customer that Sandoz was declining to bid based on limited supply, when in fact the reason was the fair share agreement with competitors;[94]

- Taro blamed supply for its decision not to submit a bid to MMCAP in April 2014, when in fact the reason the fair share agreement;[95] and

- K.K. told a customer in July 2013 that Wockhardt was simply following a Mylan price increase, when in fact Wockhardt had coordinated with Mylan.[96]

1901.   Defendants also lied to the public. For example, in December 2013, Sandoz received an inquiry from a Bloomberg reporter who questioned the propriety of Sandoz's recent price increases.  Sandoz responded that it just "followed Mylan and Taro" and learned about their increases from "pricing services we subscribe to." In reality, Sandoz had coordinated the increases with Taro and Mylan in advance.[97]

1902.   Defendants have coordinated to obstruct the investigations into generic drug prices and to coordinate their responses.[98]  For example, when the federal government executed a search warrant against Patel on June 21, 2017, she immediately called Rekenthaler, who was then Vice President of Sales at Apotex.  Rekenthaler called Cavanaugh and C.B., another senior Teva executive. Later that day, Patel called Rekenthaler two more times to coordinate her response to the government.[99]  Employees of other Defendants took similar action in response to the States' investigation. For example, on July 17, 2018, the States sent a subpoena to Grauso (Aurobindo, Glenmark), through his counsel. That same day, Grauso spoke to Aprahamian (Taro). The States

---

[94] 5/10/19 State AG Complaint ¶ 255.

[95] 5/10/19 State AG Complaint ¶ 787.

[96] 5/10/19 State AG Complaint ¶ 661.

[97] 5/10/19 State AG Complaint ¶¶ 1048-49.

[98] 5/10/19 State AG Complaint ¶ 1130.

[99] 5/10/19 State AG Complaint ¶ 1132.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

then set up a conference call with Grauso's counsel for July 25, 2018.  On the day before that call and on the day after it, Aprahamian spoke to Grauso.[100]

1903.   These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic drugs to inflated, supracompetitive levels.

1904.   Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic drugs.

1905.   The evidence available to date confirms that Defendants chose to communicate in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The structure of the generic drug industry provided numerous opportunities for collusive communications at trade shows, customer events and smaller more intimate dinners and meetings. When communications were reduced to writing or text message, Defendants often took overt and calculated steps to destroy evidence of those communications.

### 2.        Plaintiffs Exercised Reasonable Diligence.

1906.   Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets to be competitive.

---

[100]  5/10/19 State AG Complaint ¶ 1133.

Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

1907.  Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

1908.  Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct. Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

1909.  For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

## XII.   CONTINUING VIOLATIONS

1910.  This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## XIII.   DEFENDANTS' ANTITRUST VIOLATIONS

1911.  During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix, raise, and/or stabilize prices for Drugs at Issue sold in the United States.

1912.  In formulating and effectuating the contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of Drugs at Issue sold in the United States. These activities included the following:

(a)     Defendants participated in meetings and/or conversations regarding the price of Drugs at Issue in the United States;

(b)     Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of Drugs at Issue sold in the United States;

(c)     Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of Drugs at Issue; and

(d)     Defendants issued price announcements and price quotations in accordance with their agreements.

1913.   Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

1914.   During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased Drugs at Issue at inflated and supracompetitive prices.

1915.   Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various End-Payer Damages Jurisdictions enumerated below.

1916.   As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for Drugs at Issue than they would have paid in a competitive market.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1917.   General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end-payers such as Plaintiffs. Wholesalers and retailers passed on the inflated prices to Plaintiffs and members of the Class. The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of the drugs.

1918.   The unlawful contract, combination and conspiracy has had the following effects, among others:

(a)   price competition in the market for Drugs at Issue has been artificially restrained;

(b)   prices for Drugs at Issue sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

(c)   end-payer purchasers of Drugs at Issue sold by Defendants have been deprived of the benefit of free and open competition in the market for Drugs at Issue.

## XIV.   CLASS ACTION ALLEGATIONS

1919.   Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States and its territories that indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Drugs at Issue, other than for resale, from May 1, 2009 through the present.

Drugs at Issue are defined herein to include all drugs identified in Table 1.

> This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal

462
PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

governmental entities; (c) state governmental entities for which that state's Attorney General is seeking damages arising from the same purchases of Drugs at Issue (except for cities, towns, municipalities, or counties with self-funded prescription drug plans, all of which are included in the class); (d) all persons or entities who purchased Defendants' Drugs at Issue for purposes of resale or directly from Defendants; (e) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); and (f) pharmacy benefit managers.

1920.   Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "End-Payer Damages Jurisdictions")[101] on behalf of the following class (the "Damages Class"):

> All persons and entities in the End-Payer Damages Jurisdictions that indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Drugs at Issue, other than for resale, from May 1, 2009 through the present.

Drugs at Issue are defined herein to include all drugs identified in Table 1.

> This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities; (c) state governmental entities for which that state's Attorney General is seeking damages arising from the same purchases of Drugs at Issue (except for cities, towns, municipalities, or counties with self-funded prescription drug plans, all of which are included in the class); (d) all persons or entities who purchased Defendants' Drugs at Issue for purposes of resale or directly from Defendants; (e) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); and (f) pharmacy benefit managers.

1921.   The Nationwide Class and the Damages Class are referred to herein as the "Classes."

---

[101] The "End-Payer Damages Jurisdictions" include all States (except Indiana and Ohio), as well as the District of Columbia and Puerto Rico.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1922.   While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are thousands of members in each Class.

1923.   Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)      Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of Drugs at Issue and/or engaged in market allocation for Drugs at Issue sold in the United States;

(b)      The identity of the participants of the conspiracy;

(c)      The duration of the conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)      Whether the conspiracy violated the Sherman Act, as alleged in the First Count;

(e)      Whether the conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(f)      Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(g)      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(h)    The effect of the conspiracy on the prices of Drugs at Issue sold in the United States during the Class Period;

(i)    Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for Drugs at Issue, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)    The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)    The appropriate class-wide measure of damages for the Damages Class.

1924.   Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Drugs at Issue purchased indirectly from Defendants and/or their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

1925.   Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

1926.   The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1927.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

1928.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## XV.   CAUSES OF ACTION

1929.   As to the overarching conspiracy in which all Defendants participated, and as to each drug-specific conspiracy in which certain Defendants participated as alleged above and as identified above in Table 1, Plaintiffs seek relief under the laws specified in Counts 1 through 4 below.

### FIRST COUNT

**Violation of Sections 1 and 3 of the Sherman Act
(on behalf of Plaintiffs and the Nationwide Class)[102]**

1930.   Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

---

[102] As to Akorn, this Count is brought only with respect to those drugs and formulations included in the EPP complaint filed on December 19, 2019. For the avoidance of doubt, the following drugs and formulations are not considered Drugs at Issue with respect to Akorn: Adapalene cream; Ammonium Lactate cream and lotion; Atropine Sulfate opthalmic solution;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1931.   This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of Drugs at Issue.

1932.   This count also is brought against each Defendant-participant in each of the drug-specific price-fixing conspiracies alleged above and identified in Table 1.

1933.   Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

1934.   During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for Drugs at Issue, thereby creating anticompetitive effects.

1935.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for Drugs at Issue.

1936.   As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated End-Payers in the Nationwide Class who purchased Drugs at Issue have been harmed by being forced to pay inflated, supracompetitive prices for Drugs at Issue.

---

Betamethasone Valerate lotion; Calcipotriene solution; Calcipotriene Betamethasone Dipropionate ointment; Carisoprodol tablets; Cefpodoxime Proxetil oral suspension and tablets; Ciclopirox cream and shampoo; Desoximetasone ointment; Eplerenone tablets; Erythromycin solution; Ethambutol HCL tablets; Exemestane tablets; Fluocinonide cream (0.1%); Fluticasone Propionate nasal spray and lotion; Griseofulvin microsize tablets; Hydrocortisone Acetate suppositories; Imiquimod cream; Latanoprost opthalmic solution; Methazolamide tablets; Methylphenidate HCL ER tablets; Metronidazole gel (1%); Mometasone Furoate cream, ointment and solution; Nafcillin Sodium injectable vials; Neomycin Polymyxin Hydrocortisone otic solution; Nystatin Triamcinolone Acetonide cream and ointment; Oxacillin Sodium injectable vials; Oxycodone HCL tablets; Pioglitazone Metformin HCL tablets; Prochlorperazine Maleate suppositories; Promethazine HCL suppositories; Silver Sulfidiazine cream; Tacrolimus ointment; Terconazole vaginal cream; Tobramycin Dexamethasone opthalmic suspension; Trazodone HCL tablets; Triamcinolone Acetonide paste.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1937.   In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

1938.   Defendants' conspiracy had the following effects, among others:

(a)   Price competition in the market for Drugs at Issue has been restrained, suppressed, and/or eliminated in the United States;

(b)   Prices for Drugs at Issue provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)   Plaintiffs and members of the Nationwide Class who purchased Drugs at Issue indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

1939.   Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Drugs at Issue purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

1940.   Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

1941.   Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## SECOND COUNT

### Violation of State Antitrust Statutes[103]
### (on behalf of Plaintiffs and the Damages Class)[104]

1942.   Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

1943.   This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of Drugs at Issue.

1944.   This count also is brought against each Defendant-participant in each of the drug-specific price-fixing conspiracies alleged above and identified in Table 1.

1945.   During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Drugs at Issue in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

1946.   The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of Drugs at Issue and to allocate customers for Drugs at Issue in the United States.

1947.   In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States and elsewhere

---

[103] Statutory antitrust violations are alleged herein for the following jurisdictions: Arizona, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

[104] As to Akorn, this Count is brought only with respect to those drugs and formulations included in the EPP complaint filed on December 19, 2019. For the avoidance of doubt, excluded drugs and formulations with respect to Akorn are listed *supra* at n.102.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

during which they agreed to price Drugs at Issue at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize prices paid by Plaintiffs and members of the Damages Class with respect to Drugs at Issue provided in the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

1948.   Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for Drugs at Issue.

1949.   Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

**Arizona**

1950.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, *et seq*. Defendants' combination and conspiracy had the following effects: (1) price competition for Drugs at Issue was restrained, suppressed, and eliminated throughout Arizona; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq*. Accordingly,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq.*

**California**

1951.   Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 et seq. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code § 16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of Drugs at Issue at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of Drugs at Issue. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of Drugs at Issue. The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) price competition for Drugs at Issue has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for Drugs at Issue provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased Drugs at Issue indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Drugs at Issue

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code       § 16750(a).

**Connecticut**

1952.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-35, et seq.   Defendants' combinations and conspiracy had the following effects: (1) price competition for generic Drugs at Issue was restrained, suppressed, and eliminated throughout Connecticut; (2) generic Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Connecticut; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Drugs at Issue.   During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.   By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-35, et seq.   Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Connecticut law.

**District of Columbia**

1953.   Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, *et seq*. Defendants' combination and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Drugs at Issue in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Drugs at Issue in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for Drugs at Issue, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq*.

**Hawaii**

1954. Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages

Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-4, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated § 480-4, *et seq*.

**Illinois**

1955. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq*.). Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Iowa**

1956.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, *et seq*.

**Kansas**

1957.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, *et seq*. Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of Drugs at Issue, increasing the prices of Drugs at Issue, preventing competition in the sale of Drugs at Issue, or binding themselves not to sell Drugs at Issue, in a manner that established the price of Drugs at Issue and precluded free and unrestricted competition among themselves in the sale of Drugs at Issue, in violation of Kan. Stat. Ann. § 50-101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Kansas; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, *et seq.*

**Maine**

1958.  Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, *et seq.*) Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Maine; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, *et seq.* Accordingly, Plaintiffs

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, *et seq*.

**Maryland**

1959.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maryland Antitrust Act, Maryland Code, Com. Law § 11-204, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Maryland; (2) generic Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maryland; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Drugs at Issue.  During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the Maryland Antitrust Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maryland law.

**Michigan**

1960.  Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, *et seq*.

**Minnesota**

1961.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat.     § 325D.49, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Mississippi**

1962.  Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, *et seq*. Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1.  Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq*.

**Nebraska**

1963.  Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Drugs at Issue prices were raised, fixed, maintained and

stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, *et seq*.

**Nevada**

1964. Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**New Hampshire**

1965.  Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq*.

**New Mexico**

1966.  Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Issue. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, *et seq.*

**New York**

1967.  Defendants have entered into an unlawful agreement in restraint of trade in violation of New York's Donnelly Act, New York General Business Law § 340, *et seq.* Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New York; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the New York's Donnelly Act, New York General Business Law § 340, *et seq.* The conduct set forth above is a *per se* violation of the Act.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, *et seq.*

**North Carolina**

1968. Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, *et. seq.*

**North Dakota**

1969. Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, *et seq.* Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and

483

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, *et seq*.

**Oregon**

1970.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Rhode Island**

1971.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, *et seq*.

**South Dakota**

1972.   Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, *et seq.*

**Tennessee**

1973. Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, *et seq.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Utah**

1974.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Utah; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq*.

**Vermont**

1975.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, *et seq*.

**West Virginia**

1976.   Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq*. Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, *et seq*.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Wisconsin**

1977.  Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, *et seq*. Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Drugs at Issue prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue.  During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, *et seq*.

**As to All Jurisdictions Above**

1978.  Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for Drugs at Issue than they otherwise would have paid in the absence of Defendants' unlawful

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

1979.   In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

1980.   Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### THIRD COUNT

**Violation of State Consumer Protection Statutes[105]**
**(on behalf of Plaintiffs and the Damages Class)[106]**

1981.   Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

1982.   This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of Drugs at Issue.

1983.   This count also is brought against each Defendant-participant in each of the drug-specific price-fixing conspiracies alleged above and identified in Table 1.

---

[105] Statutory consumer protection violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Hawaii, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Virginia and Wisconsin.

[106] As to Akorn, this Count is brought only with respect to those drugs and formulations included in the EPP complaint filed on December 19, 2019. For the avoidance of doubt, excluded drugs and formulations with respect to Akorn are listed *supra* at n.102.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1984.   Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

**Alaska**

1985.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq*.   Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law.   Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Alaska; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Arkansas**

1986.   Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**California**

1987. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code

§ 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed Drugs at Issue in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq*., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, *et seq*. of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720, *et seq*. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of Drugs at Issue in the State of California within the meaning of § 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for Drugs at Issue. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

**Colorado**

1988. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq.* Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Colorado; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado; (3) Plaintiffs and members of the Damages Class were deprived

of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**Delaware**

1989. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code        § 2511, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Delaware; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### District of Columbia

1990.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Drugs at Issue were sold, distributed or obtained in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce and consumers. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

lacked any meaningful choice in purchasing Drugs at Issue because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of Drugs at Issue, including their illegal conspiracy to secretly fix the price of Drugs at Issue at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for Drugs at Issue. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Florida**

1991. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act,

Fla. Stat. § 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Florida; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Georgia**

1992.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq*. and the Georgia Fair Businesses Practices Act, Georgia Code Ann. § 10-1-390, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Georgia; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia law, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Hawaii**

1993.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated § 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at

Issue. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480-1 *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Massachusetts**

1994. Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch 93A, § 1, *et seq*. Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, §§ 2, 11. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch 93A, §§ 2, 11, that were knowing or willful, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute, including multiple damages.

**Michigan**

1995. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Minnesota**

1996.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*.   Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**Missouri**

1997.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq*. Plaintiffs and members of the Damages Class purchased and/or reimbursed for Drugs at Issue for personal or family purposes. Defendants engaged in the conduct described herein in connection with the sale of Drugs at Issue in trade or commerce in a market that includes Missouri. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class. Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of Drugs at Issue they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Drugs at Issue by making public statements that were not in accord with the facts. Defendants' statements and conduct concerning the price of Drugs at Issue were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

purchasing Drugs at Issue at prices established by a free and fair market. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. The foregoing acts and practices substantially affected Missouri commerce and consumers and constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…", as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq*., 15 CSR 60-8.010, *et seq*., and 15 CSR 60-9.010, *et seq*., and Mo. Rev. Stat. § 407.025.

**Montana**

1998.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, § 30-14-103, *et seq*., and § 30-14-201, *et seq*. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Montana; (2) Drugs at Issue prices were raised, fixed,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants marketed, sold, or distributed Drugs at Issue in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, § 30-14-103, *et seq*., and § 30-14-201, *et. seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nebraska**

1999.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*.  Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants marketed, sold, or distributed Drugs at Issue in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nevada**

2000. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Hampshire**

2001.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*  Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants marketed, sold, or distributed Drugs at Issue in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Jersey**

2002.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes §

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

56:8-1, et seq.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Drugs at Issue were sold, distributed, or obtained in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Drugs at Issue.  Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Drugs at Issue prices were competitive and fair.  Defendants' unlawful conduct had the following effects: (1) generic Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Drugs at Issue.  During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers.  As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendants' willful and deceptive conduct, as described herein.  Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Drugs at Issue at prices set by a free and fair market.  Defendants' misleading conduct and unconscionable activities constitute violations of N.J. Statutes § 56:8-1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Mexico**

2003.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Drugs at Issue were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of New Mexico Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for Drugs at Issue as set forth in New Mexico Stat. § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing Drugs at Issue because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of Drugs at Issue, including their illegal conspiracy to secretly fix the price of Drugs at Issue at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

consumers so that there was a gross disparity between the price paid and the value received for Drugs at Issue. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New York**

2004.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of Drugs at Issue that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for Drugs at Issue; and Defendants alone possessed material information that was

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased Drugs at Issue were misled to believe that they were paying a fair price for Drugs at Issue or the price increases for Drugs at Issue were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing Drugs at Issue would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing Drugs at Issue would have a broad impact, causing consumer class members who indirectly purchased Drugs at Issue to be injured by paying more for Drugs at Issue than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout New York; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants marketed, sold, or distributed Drugs at Issue in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Drugs at Issue in

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

**North Carolina**

2005.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of Drugs at Issue created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

suppressed, and eliminated throughout North Carolina; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants marketed, sold, or distributed Drugs at Issue in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Drugs at Issue in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**North Dakota**

2006.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants'

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Rhode Island**

2007.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq*. Members of the Damages Class purchased and/or reimbursed for Drugs at Issue for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

prices at which Drugs at Issue were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Drugs at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Gen. Laws. § 6-13.1-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**South Carolina**

2008.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq*. Defendants' combination or conspiracy had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

**South Dakota**

2009.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*.   Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Drugs at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Utah**

2010.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Ut. Stat. § 13-11-1, *et seq*.  Members of the Damages Class purchased and/or reimbursed for Drugs at Issue for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Utah, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Utah. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Utah; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. Defendants' illegal conduct substantially affected Utah commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Drugs at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ut. Stat. § 13-11-1 *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Vermont**

2011.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Statutes § 2451, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. Stat. § 2451, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Virginia**

2012.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Virginia Consumer Protection Act of 1977, Va. Code § 59.1-196, *et seq*.  Members of the Damages Class purchased and/or reimbursed for Drugs at Issue to be used for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Drugs at Issue. Defendants misrepresented to all

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Virginia; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. Defendants' illegal conduct substantially affected Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Drugs at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Wisconsin**

2013.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*.   Defendants agreed to, and did in fact, act in restraint of trade or commerce in a

market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Drugs at Issue were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' Drugs at Issue prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) Drugs at Issue price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Drugs at Issue prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Drugs at Issue. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of Drugs at Issue, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Drugs at Issue at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Drugs at Issue they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**FOURTH COUNT**

**Unjust Enrichment[107]**
**(on behalf of Plaintiffs and the Damages Class)[108]**

2014.   Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

2015.   This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of Drugs at Issue.

2016.   This count also is brought against each Defendant-participant in each of the drug-specific price-fixing conspiracies alleged above and identified in Table 1.

2017.   To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

2018.   Defendants have unlawfully benefited from their sales of Drugs at Issue because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue at prices that were more than they would have been but for Defendants' unlawful actions.

2019.   Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and the Damages Class.

2020.   Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

---

[107] Unjust enrichment claims are alleged herein under the laws of all States (except Ohio and Indiana) as well as the District of Columbia and Puerto Rico.

[108] As to Akorn, this Count is brought only with respect to those drugs and formulations included in the EPP complaint filed on December 19, 2019. For the avoidance of doubt, excluded drugs and formulations with respect to Akorn are listed *supra* at n.102.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

2021.   Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue while Plaintiffs and the Damages Class have been impoverished by the overcharges they paid for Drugs at Issue imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.

2022.   There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

2023.   Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

2024.   The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Drugs at Issue.

2025.   The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Drugs at Issue are ascertainable by review of sales records.

2026.   It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Drugs at Issue.

2027.   It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

purchased Drugs at Issue, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

2028.   The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Drugs at Issue is a direct and proximate result of Defendants' unlawful practices.

2029.   The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

2030.   It would be inequitable under unjust enrichment principles under the laws of all States (except Ohio and Indiana) and of the District of Columbia and Puerto Rico, for Defendants to be permitted to retain any of the overcharges for Drugs at Issue derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2031.   Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

2032.   Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of Drugs at Issue.

2033.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of Drugs at Issue by Plaintiffs and the Damages Class.

2034.   Plaintiffs and the Damages Class have no adequate remedy at law.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

2035.   By engaging in the foregoing unlawful or inequitable conduct depriving Plaintiffs and the Damages Class of the opportunity to purchase lower-priced generic versions of Drugs at Issue and forcing them to pay higher prices for Drugs at Issue, Defendants have been unjustly enriched in violation of the common law of various states, as outlined below:

**Alabama**

2036.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Alabama at prices that were more than they would have been but for Defendants' actions.   Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Drugs at Issue.  It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiffs and the Damages Class.

**Alaska**

2037.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Alaska at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Arizona**

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

2038.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Arizona at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue. Plaintiffs and the Damages Class have been impoverished by the overcharges for Drugs at Issue resulting from Defendants' unlawful conduct.   Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.   There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.   Plaintiffs and the Damages Class have no remedy at law.

**Arkansas**

2039.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Arkansas at prices that were more than they would have been but for Defendants' actions.   Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**California**

2040.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in California at prices that were more than they would have been but for Defendants' actions.   Defendants have received a benefit from Plaintiffs and the

Damages Class as a direct result of the unlawful overcharges.  Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

### Colorado

2041.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Colorado at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants have benefitted at the expense of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Connecticut

2042.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Connecticut at prices that were more than they would have been but for Defendants' actions.  Defendants were benefitted in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants have paid no consideration to any other person in exchange for this benefit. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

### Delaware

2043.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Delaware at prices that were more than they would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue. Plaintiffs and the Damages Class have been impoverished by the overcharges for Drugs at Issue resulting from Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs and the Damages Class have no remedy at law.

**District of Columbia**

2044. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in the District of Columbia at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

**Florida**

2045. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Florida at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants appreciated the benefits bestowed upon

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Georgia**

2046.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Georgia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Hawaii**

2047.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Hawaii at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Idaho**

2048.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Idaho at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit conferred upon

them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Illinois**

2049.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Illinois at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  It is against equity, justice, and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Iowa**

2050.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Iowa at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Kansas**

2051.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Kansas at prices that were more than they would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Kentucky**

2052.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Kentucky at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Louisiana**

2053.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Louisiana at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Drugs at Issue resulting from Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because

Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no other remedy at law.

**Maine**

2054.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Maine at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Maryland**

2055.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Maryland at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Massachusetts**

2056.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Massachusetts at prices that were more than they would have

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Michigan**

2057. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Michigan at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Minnesota**

2058. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Minnesota at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs and the Damages Class. Under the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Mississippi**

2059.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Mississippi at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges.  Defendants retain the benefit of overcharges received on the sales of Drugs at Issue, which in equity and good conscience belong to Plaintiffs and the Damages Class on account of Defendants' anticompetitive conduct.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Missouri**

2060.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Missouri at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.

**Montana**

2061.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Montana at prices that were more than they would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Nebraska**

2062. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Nebraska at prices that were more than they would have been but for Defendants' actions. Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money. In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to Plaintiffs and the Damages Class.

**Nevada**

2063. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Nevada at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for Drugs at Issue. Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class, for which they have paid no consideration to any other person. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**New Hampshire**

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

2064.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in New Hampshire at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.   Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

**New Jersey**

2065.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in New Jersey at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.   The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  Defendants have paid no consideration to any other person for any of the unlawful benefits they received from Plaintiffs and the Damages Class with respect to Defendants' sales of Drugs at Issue.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**New Mexico**

2066.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in New Mexico at prices that were more than they would have been but for Defendants' actions.  Defendants have knowingly benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Drugs at

Issue.  To allow Defendants to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

**New York**

2067.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in New York at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**North Carolina**

2068.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in North Carolina at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  The benefits conferred upon Defendants are measurable, in that

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records.  Defendants consciously accepted the benefits conferred upon them.

**North Dakota**

2069.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in North Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Drugs at Issue resulting from Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Oklahoma**

2070.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Oklahoma at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  Plaintiffs and the Damages Class have no remedy at law.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Oregon**

2071.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Oregon at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Pennsylvania**

2072.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Pennsylvania at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Puerto Rico**

2073.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Puerto Rico at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Drugs at Issue.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Drugs at Issue resulting from Defendants' unlawful conduct.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

**Rhode Island**

2074.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Rhode Island at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**South Carolina**

2075.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in South Carolina at prices that were more than they would have been but for Defendants' actions.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  Defendants realized value from the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**South Dakota**

2076.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in South Dakota at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiffs and the Damages Class.

**Tennessee**

2077.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Tennessee at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.  It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Drugs at Issue.  It would be futile for Plaintiffs and the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Damages Class to exhaust all remedies against the entities with which Plaintiffs and the Damages Class have privity of contract because Plaintiffs and the Damages Class did not purchase Drugs at Issue directly from any Defendant.

**Texas**

2078.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Texas at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  The circumstances under which Defendants have retained the benefits bestowed upon them by Plaintiffs and the Damages Class are inequitable in that they result from Defendants' unlawful overcharges for Drugs at Issue.  Plaintiffs and the Damages Class have no remedy at law.

**Utah**

2079.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Utah at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Vermont**

2080.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Vermont at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants accepted the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Virginia**

2081.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Virginia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of the benefit bestowed upon them.  Defendants should reasonably have expected to repay Plaintiffs and the Damages Class. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Drugs at Issue.  Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiffs and the Damages Class.

**Washington**

2082.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Washington at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### West Virginia

2083.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in West Virginia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Wisconsin

2084.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Wisconsin at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Wyoming**

2085.  Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Drugs at Issue in Wyoming at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants accepted, used and enjoyed the benefits bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

## XVI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment for the following relief:

1.      The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

2.      That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act; (b) a *per se* violation of Sections 1 and 3 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

3.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of

546

the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

4.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

5.      Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a *pro rata* basis;

6.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

7.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

8.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## XVII.   JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.


Date:  September 4, 2020                    Respectfully submitted,


                                           */s/ Roberta D. Liebenberg*
                                           Roberta D. Liebenberg, Esquire
                                           Fine, Kaplan and Black, R.P.C.
                                           One South Broad Street, 23rd Floor
                                           Philadelphia, PA  19107
                                           (215) 567-6565
                                           rliebenberg@finekaplan.com

                                           **Lead Counsel for the End-Payer Plaintiffs**

Gregory S. Asciolla, Esquire              Michael M. Buchman, Esquire
Labaton Sucharow LLP                      Motley Rice LLC
140 Broadway                              777 Third Avenue, 27th Floor
New York, NY  10005                       New York, NY  10017
(212) 907-0700                            (212) 577-0040
gasciolla@labaton.com                     mbuchman@motleyrice.com

Elizabeth J. Cabraser, Esquire            James R. Dugan, II, Esquire
Lieff Cabraser Heimann & Bernstein LLP    The Dugan Law Firm, APLC
275 Battery Street, 29th Floor            365 Canal Street, Suite 1000
San Francisco, CA  94111-3339             New Orleans, LA 70130
(415) 956-1000                            (504) 648-0180
ecabraser@lchb.com                        jdugan@dugan-lawfirm.com

Jayne A. Goldstein, Esquire               Mindee J. Reuben, Esquire
Shepherd Finkelman Miller & Shah, LLP     Lite DePalma Greenberg, LLC
1625 N. Commerce Parkway, Suite 320       1835 Market Street, 27th Floor
Fort Lauderdale, FL 33326                 Philadelphia, PA  19103
(886) 849-7545                            (267) 314-7980
jgoldstein@sfmslaw.com                    mreuben@litedepalma.com

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Joseph R. Saveri, Esquire
Joseph Saveri Law Firm, Inc.
601 California Street, Suite 1000
San Francisco, CA  94108
(415) 500-6800
jsaveri@saverilawfirm.com

Dena C. Sharp, Esquire
Girard Sharp LLP
601 California Street, Suite 1400
San Francisco, CA 94108
(415) 981-4800
chc@girardsharp.com

Heidi M. Silton, Esquire
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401
(612) 339-6900
hmsilton@locklaw.com

Bonny E. Sweeney, Esquire
Hausfeld LLP
600 Montgomery Street, Suite 3200
San Francisco, CA  94111
(415) 633-1908
bsweeney@hausfeld.com

Adam J. Zapala, Esquire
Cotchett, Pitre & McCarthy, LLP
840 Malcolm Road, Suite 200
Burlingame, CA  94010
(650) 697-6000
azapala@cpmlegal.com

**End-Payer Plaintiffs' Steering Committee**

Audrey A. Browne, Esquire
American Federation of State, County and
   Municipal Employees District Council 37
   Health & Security Plan
125 Barclay Street, Room 313
New York, NY 10007
(212) 815-1304
abrowne@dc37.net

Dan Drachler, Esquire
Zwerling Schachter & Zwerling, LLP
41 Madison Avenue
New York, NY 10010
(212) 223-3900
ddrachler@zsz.com

Peter Safirstein, Esquire
Elizabeth Metcalf, Esquire
Safirstein Metcalf LLP
14 Penn Plaza, 9th Floor
New York, NY 10122
(212) 201-2845
PSafirstein@SafirsteinMetcalf.com
EMetcalf@SafirsteinMetcalf.com

Bryan F. Aylstock, Esquire
Justin G. Witkin, Esquire
Aylstock, Witkin, Kreis & Overholtz, PLLC
17 East Main Street
Suite 200
Pensacola, Florida 32502
(850) 202-1010
BAylstock@awkolaw.com
JWitkin@awkolaw.com

**Additional End-Payer Plaintiffs' Counsel**

549

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER